## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| STEPHEN SULLIVAN, on behalf of himself and all others similarly situated, | |
| Plaintiff, | No. 13 cv 1159 |
| - against - | |
| BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., UBS AG, THE ROYAL BANK OF SCOTLAND PLC, AND JOHN DOE NOS. 1-50, | **CLASS ACTION COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

1.    Plaintiff Stephen Sullivan ("Plaintiff"), by his undersigned attorneys, brings this action against the Defendants identified below (collectively, "Defendants") pursuant to the Sherman Act, 15 U.S.C. §§ 1, *et seq*., and common law on behalf of himself and all other U.S. investors who purchased or sold, during the period of at least June 1, 2005 through at least June 30, 2010 (the "Class Period"), a NYSE Euronext LIFFE ("NYSE LIFFE") Euro Interbank Offered Rate futures contract ("Euribor futures").

2.    Plaintiff's claims are made on information and belief, except as to allegations specifically pertaining to Plaintiff, which are made on personal knowledge based on the investigation conducted by and under the supervision of Plaintiff's counsel which included, among other things, a review and analysis of news reports, the public documents of Defendants, the public settlements and factual admissions of Defendants, regulatory materials, scholarly research and other expert analysis, and other publicly available information.

3.      Except as alleged herein, neither Plaintiff, absent class members nor the public have access to underlying facts relating to Defendants' unlawful activities.  Rather, information lies exclusively within the possession, custody and/or control of Defendants, other insiders, and currently unnamed co-conspirators (e.g., the John Doe Defendants).  This limits Plaintiff from further detailing the Defendants' alleged unlawful conduct.

4.      Defendants' unlawful conduct has led to numerous government investigations in the U.S. and abroad, including by the U.S. Department of Justice ("DOJ"), the U.S. Commodity Futures Trading Commission ("CFTC"), the European Union (the "EU"), the U.K. Financial Services Authority ("FSA"), the Swiss Financial Market Supervisory Authority, German bank regulator Bafin, the Dutch Central Bank, various state attorneys general in the U.S., as well as related private court proceedings.  There have also been applications for conditional leniency or conditional immunity to antitrust authorities in various jurisdictions, including in the United States and Europe.

5.      To date, Defendants Barclays PLC, UBS AG and The Royal Bank of Scotland plc have collectively paid over **$2.5 billion** in fines and penalties to the DOJ, CFTC, and FSA (among other agreed to relief) relating to their unlawful combination, agreement and conspiracy to fix and restrain trade in and manipulation of Euribor.  These Defendants have each entered into deferred prosecution agreements with the DOJ, Criminal Division, requiring that each admit, accept and acknowledge responsibility for the conduct described in the agreements, agree not to make any public statements contradicting the conduct described in the agreements, and (among other relief) provide timely and future cooperation in connection with the DOJ's investigation of Euribor.

6.      The foregoing agreements, investigations and proceedings are expected to yield information from Defendants' internal records (*i.e.*, instant messages, e-mails, telephone recordings, Euribor futures trading data, etc.) that further supports Plaintiff's claims. Plaintiff believes that further evidentiary support for the allegations will be unearthed after a reasonable opportunity for discovery.

## SUMMARY OF ALLEGATIONS

7.      This action arises from Defendants' unlawful combination, agreement and conspiracy to fix and restrain trade in, and manipulate the European Banking Federation's ("EBF") Euro Interbank Offered Rate ("Euribor") and Euribor futures benchmarked and price settled to Euribor during the Class Period.

8.      Euribor is intended to reflect the rate of interest charged on short-term loans of unsecured funds denominated in the Euro currency between prime banks in the wholesale money (or interbank) market.

9.      In addition to the use of Euribor in pricing interbank loans, Euribor is used to benchmark and price settle over $200 trillion of financial products transacted in the U.S. and abroad, including Euribor futures contracts. The Three-month Euribor futures contract transacted in by Plaintiff and absent Class members is one of the most actively traded interest rate contracts in the world, and is benchmarked and price settled specifically to Three-Month Euribor. Trillions in notional value of Euribor futures contracts were traded by U.S. investors and others during the Class Period.

10.     The EBF publishes Euribor based on quotes received from EBF contributor banks as of 11:00 a.m. Central European Time ("CET") each business day. Thomson Reuters, on behalf of the EBF, computes that day's published Euribor by eliminating the highest and lowest

fifteen percent of submissions collected, and averaging the remaining submissions.  That average rate becomes the official daily EBF Euribor (the "Euribor fixing").

11.    Defendants Barclays, UBS, and RBS, as well as additional, currently unidentified Euribor contributor banks (e.g., John Doe Defendants), were directly responsible for fixing Euribor during the Class Period.

12.    Defendants' unlawful conduct has resulted in agreements with government regulators resulting in the payment – to date -- of over **$2.5 billion** in fines and penalties to the DOJ, CFTC, and FSA (among other relief) to resolve criminal and civil charges relating to Defendants' unlawful combination, agreement and conspiracy to fix and restrain trade in, and manipulate Euribor and Euribor futures (among other financial instruments).

13.    In particular, on June 27, 2012, the DOJ, CFTC and FSA jointly announced agreements with Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc. (collectively, "Barclays") that obligate Barclays to pay more than **$450 million** in fines in connection with Barclays' unlawful conduct in the fixing of Euribor and other rates (the "Barclays Settlement").

14.    Barclays Chairman Marcus Agius, and its Chief Executive Officer, Robert E. Diamond, Jr., resigned within days of the announcement of the Barclays Settlement.  In connection with his resignation, Mr. Diamond revealed that at least 14 traders at Barclays were involved in rate setting wrongdoing at the bank.  On November 28, 2012, *The Wall Street Journal* reported that Defendant Barclays had disciplined 13 employees for their involvement in the rate-fixing scandal.

15.    The factual findings that accompanied the Barclays Settlement include the DOJ's "Statement of Facts" (which Barclays expressly admitted) incorporated by reference into a deferred prosecution agreement with the DOJ, Criminal Division, and the FSA Final Notice

which detail Barclays' and other Euribor banks' false reporting and trade manipulation.
Findings in the Barclays Settlement include, *inter alia*, that:

a. From at least mid-2005 through 2009, Barclays wrongfully based its Euribor submissions on the requests of Barclays' interest rate derivatives traders for the purpose of manipulating Euribor in an artificial direction that financially benefitted Barclays' Euribor interest rate derivatives positions. This was an open, common and pervasive practice at Barclays. Interest rate derivatives traders would often shout across the trading desks to fellow traders to confirm there were no conflicting requests before they sent their requests to those responsible at Barclays for calculating and submitting Euribor rates to the EBF ("Euribor submitters"), and the interest rate derivatives traders discussed their requests with trading desk managers. A Barclays' interest rate derivatives trader even went so far as to set reminders in his electronic calendar of what particular Euribor submissions to request of Barclays' Euribor submitters the next trading day.

b. The interest rate derivatives traders' requests included either a specific artificial rate to be submitted or the direction, artificially higher or lower, that they wanted the Barclays' Euribor submission to move. Sometimes, the traders directed Barclays' Euribor submitters to submit rates that were at the very top or very bottom of Euribor rates submitted such that, as intended, Barclays' submissions would be excluded ("kicked out" or "knocked out") from the middle quartile of rates in order to render the final fixing of Euribor artificially higher or lower. Sometimes, the requests covered several days or even weeks of submissions at a time. The purpose and effect of Barclays' Euribor traders and submitters (and its co-conspirators) was singular: to manipulate Euribor in a direction that financially benefitted its Euribor interest rate derivatives positions.

c.      From at least mid-2005 through at least mid-2008, Barclays' interest rate derivative traders coordinated the submissions of artificial Euribor submissions with interest rate derivatives traders and submitters at other Euribor contributor banks, including John Doe Defendants, to manipulate Euribor in an artificial direction that financially benefitted their respective Euribor futures and derivatives positions.  For example, a Barclays' interest rate derivatives trader wrote in a 2007 instant message to a trader at another (unidentified) Euribor contributor bank, "If you know how to keep a secret I'll bring you in on it…if you breathe a word of this, I'm not telling you anything else."

d.      Further, Barclays' interest rate derivatives traders entered into illegitimate and sham market Euribor transactions, including wash trades, with interest rate derivatives traders at other Euribor contributor banks, with the assistance of currently unidentified interbank dealers (e.g., John Doe Defendants).  These illegitimate and sham market transactions, as intended, accomplished a dual purpose: (1) to disseminate false signals and information to other Euribor contributor banks and (2) provide the interdealer brokers with bribes in the form of illegitimate and unearned commissions for their material involvement in the Defendants' conspiracy to restrain trade, fix, and manipulate Euribor.

16.     On December 19, 2012, the DOJ, CFTC and FSA jointly announced agreements with UBS AG ("UBS") requiring UBS to pay more than **$1.5 billion** in fines and penalties to settle charges of restraint of trade and manipulation of Euribor and other key rates by UBS (the "UBS Settlement").

17.     The factual findings that accompanied the UBS Settlement include the DOJ's "Statement of Facts" (which UBS expressly admitted) incorporated by reference into a deferred prosecution agreement with the DOJ, Criminal Division, and the FSA Final Notice which detail

UBS's  other Euribor contributor bank's false reporting and trade manipulation.  These findings include, *inter alia*, that:

a.     During the Class Period, UBS engaged in systemic misconduct that undermined the integrity of certain global benchmark rates that are critical to financial markets, including Euribor.

b.     UBS engaged in two overarching courses of misconduct.  *First*, from at least September 2005 through June 2010, UBS made knowingly false submissions to rate-fixing panels for Euribor to benefit its Euribor derivatives positions (or the derivative positions of other Euribor contributor banks).  *Second*, during the period from approximately August 2007 to mid-2009 (the financial crisis period), UBS submitted false benchmark rates (including Euribor) in order to protect UBS against negative media and market perception concerning its financial stability during the financial crisis period.

c.     From at least January 2005 through the end of September 2009, UBS used a flawed interest rate submission process that relied on inherently conflicted employees to make UBS's Euribor submissions.  Specifically, UBS made its interest rate derivatives traders – who were responsible for trading UBS's interest rate derivative positions for profit – the persons charged with making UBS's interest rate submissions for Euribor.  As a result, when determining rates to submit for fixing Euribor, UBS's derivatives traders routinely submitted rates which were not reflective of honest and reliable assessments of the costs of borrowing unsecured funds in the Euribor interbank market.  Instead, the derivatives traders wrongfully submitted artificial (and impermissible) Euribor rates that financially benefitted UBS's Euribor derivatives positions. UBS's dual role of traders as submitters created a conflict of interest that compromised the integrity of UBS's Euribor submission process.

d.      This profit driven conduct relating to the manipulation of Euribor spanned from least September 2005 through June 2010, and at times, occurred on almost a daily basis.  It involved more than three dozen traders and submitters located in London  and elsewhere.  The misconduct also involved several UBS managers, who made requests to benefit UBS's derivatives positions, facilitated the requests of their staff for submissions that financially benefitted UBS's positions, or knew that this was a routine practice of the traders and did nothing to stop it.

e.      On June 25, 2009, more than eight months after the CFTC had launched its investigation of UBS and demanded information and documents from UBS in October 2008, a UBS senior manager warned UBS's Euro derivatives traders and submitters not to make requests for beneficial Euribor submissions on a "public chat" and instructed "JUST BE CAREFUL DUDE."   Tellingly, UBS senior managers in this chat never instructed UBS's Euribor traders and submitters to stop the practice of taking into account UBS's Euribor derivatives positions when determining UBS's Euribor submissions.  Instead, the conduct continued unabated.  In fact, a written direction involving a senior UBS manager for a specific Euribor submission benefitting UBS's Euribor derivatives positions occurred as late as June 30, 2010.

18.      On February 6, 2013, The Royal Bank of Scotland plc ("RBS") agreed to pay **$612 million** (USD) in fines and penalties to the DOJ, the CFTC and the FSA to settle charges of false reporting and manipulation of leading global interest rates (the "RBS Settlement").  RBS also entered into a deferred prosecution agreement with the DOJ, Criminal Division.  According to the RBS Settlement, from at least September 2007 through at least mid-2008, a RBS interest rate derivatives trader colluded with other interest rate derivatives traders, including those at Defendant Barclays and other unidentified Euribor contributor banks, to submit false Euribor

rates to the EBF to manipulate Euribor in an artificial direction that financially benefitted RBS's, Barclay's and the other Euribor contributor banks' Euribor derivatives positions.

## JURISDICTION AND VENUE

19.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and common law, respectively.

20.     This Court has jurisdiction over this action pursuant to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337, respectively.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

21.     Venue is proper in this District, pursuant to, among other statutes, Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, and a part of the events or omissions giving rise to the claims occurred in this District.

22.     Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

23.     Euribor is a commodity that trades in U.S. interstate commerce.   Defendants' restraint of trade, intentional misreporting and manipulation of Euribor and Euribor futures had direct, substantial and reasonably foreseeable effects in the U.S., and on Plaintiff and members of

the Class.  Billions, if not trillions, in notional value of Euribor futures contracts are traded by

U.S. investors on electronic boards of trade (*e.g.*, NYSE LIFFE) accessed and used in the U.S.

Defendants, as Euribor contributing panel members and sophisticated market participants, knew,

or had good reason to know, that Euribor rates published and compiled by Thomson Reuters on

behalf of the EBF are disseminated in the U.S., and are used to price and settle Euribor futures

contracts traded by U.S. investors.   For these reasons, Defendants knew, or had good reason to

know, that misreporting of Euribor to the EBF would, and did, have direct effects in the United

States, including on the prices of Euribor futures contracts transacted in by U.S. investors.

Lastly, in October 2011, the Chicago Mercantile Exchange ("CME"), located in Chicago,

Illinois, launched its own Euribor futures contract which – identical to the NYSE LIFFE Euribor

futures contract transacted by Plaintiff and members of the Class –  is benchmarked and price

settled to EBF Euribor.

## PARTIES

24.     Plaintiff Stephen Sullivan, a U.S. citizen residing in Chicago, Illinois, purchased

and sold hundreds of millions of dollars in notional value in Euribor futures contracts during the

Class Period and suffered net losses on such contracts due to the presence of artificial Euribor

futures prices proximately caused by Defendants' unlawful manipulation and restraint of trade as

alleged herein.   Plaintiff Stephen Sullivan's losses due to the presence of artificial Euribor

futures prices proximately caused by Defendants represents one measure of actual damages to

Plaintiff Stephen Sullivan that he is entitled to recover.  Plaintiff Stephen Sullivan was also

deprived of transacting in a lawful, non-manipulated Euribor market, and otherwise suffered

legal injury as a direct result of Defendants' unlawful conduct.

25.     Defendant Barclays PLC is a British banking and financial services company headquartered in the United Kingdom.  It has operations in over 50 countries and territories including the United States.  During the Class Period, Barclays PLC served as a Euribor contributor bank.

26.     Defendant Barclays Bank PLC is a global banking and financial services company based in the United Kingdom that is engaged in retail and commercial banking, credit cards, investment banking, wealth management and investment management services.  It is wholly owned by Barclays PLC.

27.     Defendant Barclays Capital Inc. is a wholly owned subsidiary of Barclays PLC and engages in investment banking, wealth management and investment management services. It has been registered with the CFTC as a Futures Commission Merchant since 1990, an approved Exempt Foreign agent since 1992, and a Commodity Pool Operator and Commodity Trading Advisor since 2009.

28.     Defendants Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc. are referred to collectively herein as "Barclays."  Barclays maintains an office in this District.

29.     Defendant UBS AG ("UBS") is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland that provides investment banking, asset management and wealth management services for private, corporate and institutional clients worldwide.  It has operations in over 50 countries, including the United States with its United States headquarters in New York, New York and Stamford, Connecticut.  UBS also maintains offices in this District.  During the Class Period, UBS, through its investment banking division, served as a Euribor contributor bank.

30.     Defendant The Royal Bank of Scotland Group plc ("RBS") is a British banking and financial services company headquartered in the United Kingdom.  It has operations in approximately forty countries and territories, including the United States.  On December 12, 2012, RBS was provisionally registered as a swap dealer with the CFTC.  RBS became a Euribor contributor bank in October 2007 by virtue of its acquisition of ABN AMRO Bank.

31.     Defendants Barclays, UBS, and RBS with other EBF Euribor contributor banks whose identities are currently unknown to Plaintiff (John Doe Defendants) are collectively referred to herein as the "Euribor Contributor Defendants."

32.      John Doe Defendants Nos. 1-50 are other entities or persons, including EBF Euribor contributor banks, interdealer brokers, and other co-conspirators referred to in the agreements memorializing the Barclays, UBS, and RBS settlements, whose identities are currently unknown to Plaintiff.  The John Doe Defendants, along with Defendants Barclays, UBS and RBS, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euribor and Euribor futures contracts.

33.     Defendants Barclays, UBS, RBS, and John Does Nos. 1-50 are collectively referred to herein as "Defendants."

## AGENTS AND UNNAMED CO-CONSPIRATORS

34.     Various other entities and individuals, including, but not limited to, securities-dealers subsidiaries and/or affiliates of Defendants, participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein.  The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or

combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euribor and Euribor futures contracts.

## SUBSTANTIVE ALLEGATIONS

I.      **Background**

      A.      **The Euro Interbank Offered Rate**

35.     Euribor is the predominant money market reference interest rate for the Euro currency and is used internationally as the pricing benchmark and basis for settlement of interest rate derivatives contracts traded on major futures and options exchanges and in over-the-counter markets, including on the NYSE LIFFE.  Billions (if not trillions) of dollars in notional value of Euribor futures contracts are purchased and sold by U.S. investors.

36.     Euribor is set by banks, known as Euribor contributor banks, through the EBF. During the Class Period, Defendants Barclays, UBS and RBS each served as a Euribor contributor bank.  The EBF is an unregulated non-profit association of the European banking sector based in Brussels, Belgium that oversees the publication of Euribor.

37.     Euribor is defined as the rate "at which Euro interbank term deposits are offered by one prime bank to another prime bank" within the Economic and Monetary Union of the European Union ("EMU") at 11:00am Central European Time ("CET") daily.   Euribor is determined using the submissions from Euribor contributor banks considered by the EBF to be the most active in the Euro zone with the highest volume of business in the EMU.

38.     According to EBF instructions, Euribor contributor banks "must quote the required euro rates to the best of their knowledge."  Thus, Euribor contributor banks are to observe the market and base their submissions on where the Euro is trading in the market.  By its

definition, Euribor requires the contributor banks to determine the rates at which funds may be obtained in the Euro interbank money market. The definition of Euribor does not permit consideration of factors unrelated to the costs of borrowing unsecured funds, such as a contributor banks' Euribor derivative positions.

39.     Euribor is fixed every business day for fifteen tenors, ranging from one week to twelve months, including three-months. Euribor contributor banks submit their rates electronically to Thomson Reuters, which manages the official Euribor process on behalf of the EBF by collecting the submitted rates from the contributor banks, calculating the rate, and then releasing it for publication just before noon CET. Thomson Reuters serves as the EBF's agent for the collection, calculation, publication and dissemination of the daily Euribor.

40.     According to the EBF, each contributor bank is allocated a private page on which to contribute its data. Each private page can only be viewed by the submitting Euribor contributor bank and by Thomson Reuters' staff involved in the fixing process. Therefore, absent collusion to restrain trade, fix the price of and manipulate Euribor among Euribor contributor banks, it is impossible for a contributor bank to know another contributor bank's Euribor submission prior to its daily dissemination by Thomson Reuters.

41.     Thomson Reuters computes that day's published Euribor by eliminating the highest and lowest fifteen percent of submissions collected, and averaging the remaining submissions. That average rate becomes the official daily EBF Euribor (the "Euribor fixing").

42.     On behalf of EBF, Thomson Reuters then issues the daily Euribor fixing and the submissions of each contributor bank to its subscribers and other data vendors. Through these licensing agreements with third parties, such as Thomson Reuters, the EBF disseminates Euribor fixings and rate information globally, including in the United States.

**B.**   **NYSE LIFFE**

43.   NYSE LIFFE is a global derivatives exchange and wholly-owned subsidiary of NYSE Euronext group.

44.   NYSE LIFFE allows U.S. investors to trade a number of globally-traded futures and derivative contracts, including Euribor futures contracts.

45.   NYSE LIFFE's U.S. based customers are connected through NYSE LIFFE CONNECT, an electronic trading platform that supports electronic transactions of all NYSE LIFFE products, including Euribor futures contracts.

46.   NYSE LIFFE became a fully electronic exchange in 2000, with the migration of its commodity futures products onto NYSE LIFFE CONNECT.

47.   U.S investors – by accessing NYSE LIFFE CONNECT terminals in the U.S. – have been able to directly trade Euribor futures contracts on NYSE LIFFE since 1999.  Euribor futures contracts are open for trading 20 hours a day on NYSE LIFFE.  NYSE LIFFE touts on its website that "Whether in Europe, the U.S. or Asia, you can trade the Euribor futures contract during your Trading Day."

48.   U.S. investor's direct access to NYSE LIFFE has been permitted pursuant to publicly filed requests by NYSE LIFFE to the U.S. Commodity Futures Trading Commission.  NYSE LIFFE's customers include U.S. banks, pension and hedge funds, algorithmic and proprietary traders, as well as institutional and individual investors.  On a daily basis, NYSE LIFFE estimates approximately $40 million a second in financial instruments, including Euribor futures contracts, are traded through NYSE LIFFE CONNECT.

C.      **Euribor Futures Contracts**

49.     Euribor serves as the commodity underlying Euribor futures contracts, the fourth largest interest rate futures contract by trading volume in the world.

50.     Euribor futures contracts are traded in units of €1,000,000.

51.     The contract months for Euribor futures contracts are March, June, September, and December, and four serial months, such that 28 delivery months are available for trading, with the nearest six delivery months being consecutive calendar months.

52.     Pursuant to its contract specifications and terms, the settlement price of a Euribor futures contract is the EBF's Euribor Offered Rate for three month ("Three-Month) Euro deposits at 11:00 am Brussels time (10:00 am London time) on the "Last Trading Day" defined as 10:00 am on two business days prior to the third Wednesday of the delivery month.

53.     Euribor futures contracts have no final settlement price on their own without reference to the published Euribor.  Euribor is included in the Euribor future contract's definition and represents the final settlement price of the futures contract.  Any fluctuation or manipulation of Euribor is a manipulation of the commodity underlying the Euribor futures contract and has a direct and immediate impact on the price of Euribor futures contracts.  This is because Euribor acts as the commodity for the purposes of final settlement and price discovery of Euribor futures contracts.

54.     The final settlement price of a Euribor futures contract is calculated as 100.00 minus Three-Month Euribor on the Last Trading Day rounded to three decimal places.  Given this price index construction, if Euribor rises, the price of the Euribor futures contract would fall, and vice-versa.  Therefore, to profit from a decrease in Euribor rates, a trader would need to buy

a Euribor futures contract (*e.g.*, go long); whereas to profit from an increase in Euribor rates, a trader would need to sell a Euribor futures contract (*e.g.*, go short).

55.      A purchaser of a short [or long] Euribor futures contract can cancel or offset his future obligation to the contract market/exchange by selling an offsetting long [or short] Euribor futures contract.  The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

56.      Traders who exit their positions before final settlement are still affected by the conspiracy to restrain trade and manipulate Euribor because Euribor futures contracts trade based on what Euribor is expected to be in the future.  To the extent that Euribor is price fixed in the present, expectations of what Euribor prices will be in the future (*i.e.,* then-present Euribor futures contract prices) will also be artificial and skewed.

II.      **Defendants' Restrained Trade and Intentionally Manipulated Euribor Futures Prices by Falsely Reporting Euribor Rates to the EBF**

57.      Defendants methodically and purposefully manipulated the prices of Euribor futures and other Euribor derivative contracts through their deliberate and systematic submission of false Euribor rates to the EBF throughout the Class Period.  The Defendants did so in order to unlawfully profit financially from the trading of Euribor futures and other Euribor derivative contracts held by them and/or other Euribor contributor banks.

58.      Euribor Contributor Defendants' Euribor submitters regularly and improperly conspired with and agreed to change their bank's Euribor submissions at the request of Euribor interest rate derivatives traders employed by that Euribor Contributor Defendant.  This was an open, common and pervasive practice on Euribor Contributor Defendants' trading desks, often involving traders shouting across the trading desk to fellow traders, and discussing their requests with trading desk managers, to confirm there were no conflicting requests before they sent their

requests to their Euribor submitters.   As a direct, intended and proximate consequence of the Euribor Contributor Defendants' unlawful conduct, the prices of and the market in Euribor futures contracts was manipulated to artificial levels by Euribor Contributor Defendants throughout the Class Period.

59.     Euribor Contributor Defendants' interest rate derivatives traders also regularly and improperly conspired with each other and with traders at other Euribor Contributor Defendants, the false Euribor rate that each trader would request of their own respective Euribor submitters, so as to maximize the manipulative and anticompetitive effect on the Euribor fixings and the profits derived and benefits flowing from such artificiality on Euribor Contributor Defendants' Euribor derivatives trading positions.

60.     Euribor Contributor Defendants knew that the false rates they submitted were used by the EBF in calculating and publishing Euribor.  Euribor Contributor Defendants knew, as sophisticated market participants and EBF Euribor contributor banks, that the (mis)information they reported directly impacted the prices of Euribor futures and other Euribor derivative contracts traded in the U.S. and abroad.

### III.    The Euribor Contributor Defendants' Restrained Trade and Manipulated Euribor Futures Prices By Their Illegitimate, Non-Bona Fide Trading of Euribor Futures Contracts

61.     Euribor Contributor  Defendants' trading of Euribor futures and other Euribor derivatives at times they knew the prices of such contracts were being distorted by Defendants' systematic false reporting of Euribor destroyed the legitimizing price discovery function of the Euribor futures market, created or contributed to prices which were not reflective of legitimate forces of supply and demand, and furthered Defendants' conspiracy to manipulate and unlawfully restrain trade in and fix prices of Euribor futures to artificial levels during the Class

Period to the detriment of Plaintiff and the Class.  Because Euribor Contributor Defendants'

positions were illegitimate and manipulative parts of the supply-demand equation for Euribor

futures prices, Defendants' impact on Euribor futures prices was necessarily an artificial one that

restrained trade and caused artificial prices.

**IV.    Defendants' Unlawful Conduct Has Led to Deferred Criminal Prosecution Agreements and Settlements Resulting in Payments of Fines and Penalties In Excess of $2.5 Billion to  Governmental Authorities in the U.S.  and Abroad**

62.     Defendants' unlawful conduct has led to deferred criminal prosecution

agreements and settlements with the DOJ, the CFTC, the FSA and the Swiss Financial Market

Supervisory Authority obligating Defendants Barclays, UBS and RBS to pay collective fines and

penalties to these regulators exceeding $2.5 billion.

**A.        The Barclays Settlement**

63.      On June 27, 2012, the DOJ, the FSA, and the CFTC announced agreements that

collectively obligate Barclays to pay more than $450 million due to, among other unlawful

conduct, making false Euribor submissions to the EBF.

64.     The documents that accompanied the Barclays Settlement include a: (a) CFTC

Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange

Act, as Amended, Making Findings and Imposing Remedial Sanctions (the "CFTC Order"); (b)

Department of Justice "Statement of Facts" (which Barclays expressly admitted) (the "DOJ

SOF"); and (c) FSA Final Notice to Barclays Bank plc (the "FSA Final Notice").

**1.       The CFTC Order**

65.     The CFTC Order provides that, *inter alia*:

a.       Barclays pay a civil monetary penalty of $200 million to the CFTC and agreed to comply with the conditions and undertakings set forth in the CFTC Order to ensure the integrity and reliability of its benchmark interest rate submissions.

i.       **Barclays Lacked Internal Controls or Procedures**

b.       Over a period of several years, commencing in at least mid-2005 and continuing through at least mid-2009 (the "relevant period"), Barclays did not have specific internal controls or procedures, written or otherwise, regarding how Euribor submissions should be determined or monitored.  Barclays also did not require documentation of the submitters' Euribor determinations.

ii.       **Barclays' Interest Rate Traders Requested Artificial Euribor Submissions to Financially Benefit Euribor Derivative Trading Positions**

c.       During the relevant period, Euro interest rate swaps traders located in Barclays' London office made requests to Barclays' Euribor submitters for higher or lower Euribor submissions with the purpose of affecting the official Euribor fixing.  Certain of these traders, in particular one former senior Euro swaps trader, also regularly contacted or were contacted by traders at certain other EBF Euribor contributor banks to coordinate the rates each trader would request of their own respective submitters.  The traders did so to manipulate the official Euribor fixing in an artificial direction order that financially benefitted Euribor derivatives trading positions, including swaps and futures positions, held by them.  The traders' Euribor derivatives positions were most affected by the Euribor fixing in the one-month, three-month, and six-month tenors.  Those were the tenors in which the traders most frequently requested a high or low submission by the Euribor submitters.

      iii.      **Improper Communication Between Barclays' Traders and Barclays'**
**Submitters Artificial Euribor Submissions to Financially Benefit**
**Euribor Derivative Trading Positions**

d.      Barclays' Euro interest rate swaps traders' requests to Barclays' Euribor

submitters to change their submissions to financially benefit Barclays' Euribor derivatives

positions were an open, common and pervasive practice.  Multiple traders engaged in this

conduct, and no attempt was made by any of the traders to conceal the requests from supervisors

at Barclays during the more than four-year relevant period in which the activity occurred.   An

appropriate daily supervision of the desk by the supervisors as well as periodic review of the

communications should have discovered the conduct.

e.      In fact, traders would often shout across the trading desk to fellow traders to

confirm there were no conflicting requests before they sent their requests to the Euribor

submitters, and, at times, the traders discussed their requests with trading desk managers.

f.      After determining how moves in EBF Euribor would affect the desk's

profitability, Barclays' Euro swaps traders contacted the Euribor submitters, including via email

and through electronic "chats" over an instant messaging system, to request that the submissions

be moved either higher or lower in a particular tenor.  On occasion, one swaps trader made

entries in electronic calendars to remind himself what requests to make of Barclays' Euribor

submitters the next day.

g.      Barclays' Euribor submitters accommodated the requests, frequently expressly

responding in the affirmative to the traders' requests.  The Euro swaps traders expected that the

Euribor submitters would take their account when determining their Euribor submissions.

h.      Additionally, one former Barclays' senior Euro swaps trader on occasion sent

requests to alter Barclays' Euribor submissions to his former fellow traders after he had left

Barclays and was employed by other financial institutions.  He made the requests to benefit his Euribor derivatives positions.  These requests were made at a minimum by email or instant message.

       i.     The following are just some of the numerous examples of the communications between the traders and submitters:

   1)  June 1, 2006:

      o  Senior Euro Interest rate derivatives Trader: "Hi [Euribor Submitter], is it too late to ask for a low 3m?"[1]

      o  Euribor Submitter: 'Just about to put them in.....so no."

   2)  September 7, 2006:

      o  Senior Euro Interest rate derivatives Trader: "i have a huge lm fixing today and it would really help to have a low lm tx a lot."

      o  Euribor Submitter: "I'll do my best."

      o  Senior Euro Interest rate derivatives Trader: "because I am aware some other bank need a very high one...if you could push it very low it would help. I have 50bn fixing."

   3)  October 13, 2006:

      o  Senior Euro Interest rate derivatives Trader: "I have a huge fixing on Monday... something like 30bn lm fixing... and I would like it to be very very very high..... Can you do something to help?  I know a big clearer will be against us ... and don't want to lose money on that one."

      o  Euribor Submitter forwarded the request to another Euribor submitter, advising: "We always try and do our best to help out....."

      o  Senior Euribor Submitter to Senior Euro Interest rate Derivatives Trader: "By the way [Euribor Submitter] tells me that it would be good to see a high lmth fix on Monday, we will pay for some cash that morning so hopefully that will help."

   4)  January 12, 2007:

---

[1] "3m" refers to three-month Euribor, the basis for final settlement and price discovery for the three-month Euribor futures contract traded on the NYSE LIFFE.

- o Senior Euro Interest rate derivatives Trader: "hi [Euribor Submitter]. we need a low 1m in the coming days if u can...."

- o Senior Euribor Submitter: "hi [Senior Euro Interest rate derivatives Trader], we will keep the lmth low for a few days."

5) April 2, 2007:

- o Euro Interest rate derivatives Trader: "hello [Senior Euribor Submitter], could you please put in a high 6 month euribor today?

- o Senior Euribor Submitter: "will do."

6) July 29, 2008:

- o Euro Interest rate derivatives Trader to Senior Euro Interest rate derivatives Trader: "I was discussing the strategy [to get a high fixing] with [Senior Euribor Submitter] earlier this morning - today he will stay bid in the mkt and put a high fixing but without lifting any offer, and then he will be really paying up for cash tomorrow and Thursday which is when the big positive resets are."

### iv.   Barclays' Coordination and Communication With Other Euribor Banks to Manipulate Euribor

j.       During the period from at least mid-2005 through mid-2008, certain Barclays' Euro swaps traders, led by the same former Barclays' Euro swaps trader,  coordinated with traders at certain other Euribor contributor banks to have their respective Euribor submitters make certain Euribor submissions in order to affect the official EBF Euribor fixing.  These requests to and among the traders were to benefit the traders' respective Euribor derivatives trading positions and either maximize profits or minimize their losses.

k.       The former Barclays senior Euro swaps trader, while still employed by Barclays, spoke daily with traders at certain other Euribor contributor banks concerning their respective Euribor derivatives positions in order to determine how to change the official EBF Euribor fixing in a manner that financially benefitted their derivatives positions.  In these conversations, the traders agreed to contact their respective Euribor submitters to request the agreed-upon Euribor submission.  The Barclays senior Euro swap trader also received at times requests for certain

Euribor submissions from traders at certain other Euribor contributor banks, which he then made of the Barclays Euribor submitters as if the requests were his own, at times blind carbon copying the external trader on his emails to Barclays' Euribor submitters.    By such conduct, the Barclays Euro swaps traders were specifically intending to manipulate Euribor and aid and abet the manipulation of Euribor by other Euribor contributor banks.

l.        The following are examples of the communications among the Barclays senior Euro swaps trader, Barclays' Euribor submitters, and traders at other Euribor contributor banks (identified as Banks A, B, C, and D below):

1) August 14, 2006:

   o  Trader at Bank A asked Barclays' Senior Euro Interest Rate Derivatives Trader to request a low one month and high three month and six month Euribor.

   o  Barclays' Senior Euro Interest Rate Derivatives Trader agreed to do so and promised to contact the trader at Bank B to make the same request.

   o  Barclays' Senior Euro Interest Rate Derivatives Trader emailed the Barclays Senior Euribor Submitter: "We have some big fixings today.  Is it possible to have a very low 1m and high 3m and 6m?  Thx a lot for your help."

   o  Barclays' Senior Euribor Submitter responded: "Sure, will do."

2) November 10, 2006:

   o  Trader at Bank A asked Barclays' Senior Euro Interest Rate Derivatives Trader to request a low one month Euribor setting at Barclays and at Bank B.

   o  Barclays' Senior Euro Interest Rate Derivatives Trader made the request of the trader at Bank B.

   o  Barclays' Senior Euro Interest Rate Derivatives Trader emailed the request to the Barclays Senior Euribor Submitter:  "hi [Senior Euribor Submitter]. I know you can help.  On Monday we have a huge fixing on the 1m and we would like it to be low if possible.  Tx for your kind help."

   o  Barclays' Senior Euribor Submitter replied: "of course we will put in a low fixing."

3) November 13, 2006:

- o Barclays' Senior Euro Interest Rate Derivatives Trader discussed the need for low one month Euribor with traders at Bank A and Bank B, and contacted a trader at Bank C.

- o Barclays' Senior Euro Interest Rate Derivatives Trader then reminded Barclays' Senior Euribor Submitter of his request from Friday: "hi [Senior Euribor Submitter]. Sorry to be a pain but just to remind you the importance of a low fixing for us today."

- o Barclays' Senior Euribor Submitter replied: "no problem, I had not forgotton [sic]. The [voice] brokers are going for 3.372, we will put in 36 for our contribution;"

- o Barclays' Senior Euro Interest Rate Derivatives Trader Trader's responded: "I love you."

4) December 5, 2006:

- o Barclays' Senior Euro Interest Rate Derivatives trader requested that traders at Banks A, B and C have their Euribor submitters make a high six month Euribor submission.

- o When the trader at Bank C stated that he needed the same submission, Barclays' Senior Euro Interest Rate Derivatives Trader agreed to make the request of the Barclays Euribor submitters.

- o Barclays' Senior Euro Interest Rate Derivatives Trader emailed the Barclays Senior Euribor Submitter: "hi [Senior Euribor Submitter] is it possible to have a high 6m ficxing [sic]? Where do you think it will fix?"

- o Barclays' Senior Euribor Submitter responded: "Hi [Senior Euro Interest Rate Derivatives Trader]. we have posted 3.73, hope that helps..can put in higher if you like?"

- o Barclays' Senior Euro Interest Rate Derivatives Trader replied: "that's fine tx a lot for your help."

5) February 12, 2007:

- o Barclays' Senior Euro Interest Rate Derivatives Trader agreed with traders at Banks A and B to have their respective one month Euribor submissions lowered.

- o Barclays' Senior Euro Interest Rate Derivatives Trader submitted that request to the Barclays Senior Euribor Submitter, stating: "hi [Senior Euribor Submitter]. Is it possible to have a low 1m fix today?"

     o  Barclays' Senior Euribor Submitter replied: "will do."

m.    In another instance of coordination over a four-month period, the Barclays senior Euro swaps trader orchestrated an effort to align trading strategies among traders at multiple Euribor banks with the goal of manipulating the official EBF three-month Euribor fixing on the International Monetary Market ("IMM") date of March 19, 2007.  IMM dates are standard quarterly settlement dates in March, June, September and December.  Many derivatives contracts are settled or reset on these dates, including various Euribor futures contracts. The express purpose of the manipulation was to financially benefit from such artificiality Barclays' and the unidentified co-conspirators' Euribor futures trading positions.

n.    The following are examples of the communications involved in this scheme:

1)  December 27, 2006:

     o  Barclays' Senior Euro Interest rate Derivatives Trader: "Hi [Barclays Euro Interest rate Derivatives Trader]. A few things.  Ask for a low 3m today and ask [trader at Bank B] and [trader at Bank A] to put it low as well."

     o  Two days later, Barclays' Euro Interest rate Derivatives Trader emailed the Euribor requests as instructed to the Barclays Euribor Submitters and the traders at the other banks.

2)  February 12, 2007:

     o  Barclays' Senior Euro Interest rate Derivatives Trader bragged to a trader at Bank D that he was going to "push the cash to the basement" on the next IMM March date in order to make money on trades, claiming that he will have 80,000 lots in the Euribor futures contract on it.  He swore the trader at Bank D to secrecy, claiming that if they did not keep the plan secret it would not work. Barclays' Senior Euro Interest rate Derivatives Trader also claimed that his "treasury [or Euribor Submitter] has the power to move 3m cash to the basement."

3)  March 19, 2007:

     o  Barclays' Senior Euro Interest rate Derivatives Trader emailed the Barclays Euribor submitter: "As discussed could ...put the 3m as low as possible...."

     o  The Barclays Euribor Submitter replied: "Will do my best."

4) March 20, 2007:

- o  Barclays' Senior Euro Interest rate Derivatives Trader stated to trader at Bank A that they needed to have the three month Euribor fixing go up slowly to avoid drawing any attention.

- o  Barclays' Senior Euro Interest rate Derivatives Trader told the trader at Bank A that he believed he was able to influence five other panel member banks the day before to lower their Euribor submissions as they both desired.

### v.     By Such Conduct, Barclays Made Knowingly False Reports

o.       Barclays' Euribor submitters knew it was improper to consider swaps traders' derivatives trading positions in determining the bank's Euribor submissions.  A bank's derivatives trading positions or profitability are not legitimate or permissible factors on which to base a bank's daily Euribor submissions.  By basing its Euribor submissions upon Barclays' derivatives traders' requests, and thereby on Barclays' derivatives trading positions, Barclays' Euribor submissions were not consistent with EBF's definitions and criteria for Euribor submissions.  Instead, Barclays conveyed false, misleading or knowingly inaccurate reports that its submitted rates for Euribor were based on and solely reflected the costs of borrowing unsecured funds in the Euro money market.  Accordingly, Barclays regularly specifically intended to manipulate and knowingly delivered false, misleading, or knowingly inaccurate reports concerning Euribor, a commodity in U.S. interstate commerce.

### vi.     Legal Findings

p.       On a  daily basis, Barclays, through the transmission of an electronic spreadsheet to Thomson Reuters, knowingly delivered or caused to be delivered its Euribor submissions through the mails or interstate commerce.  Barclays' submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and

publication globally, including in the U.S., of the Euribor contributor banks' submissions by

Thomson Reuters on behalf of the EBF, and other third party vendors.  The contributor banks'

submissions are, and were during the relevant period, used to determine the official published

rates for Euribor, which are calculated based on a trimmed average of the submissions.

Barclays' daily Euribor submissions contained market information concerning the costs of

borrowing unsecured funds in the Euro currency and in particular tenors, the liquidity conditions

and stress in the Euro money market, and Barclays' ability to borrow funds in the Euro money

market.  Such market information affects or tends to affect the prices of commodities in interstate

commerce, including the daily rates at which EBF Euribor is fixed.

      q.     Throughout the relevant period, Barclays' Euribor submissions were false,

misleading or knowingly inaccurate because they were routinely based on impressible factors

such as the derivatives positions of swaps traders, and not the costs of borrowing unsecured

funds in the Euro money market, as required by the EBF.  By using impermissible factors in

making its Euribor submissions and without disclosing that it based its submissions on

impermissible factors, Barclays conveyed false, misleading or knowingly inaccurate information

that the rates its submitted were based on and related to the costs of borrowing unsecured funds

in the Euro money market and were truthful and reliable.  Moreover, Barclays' submitters knew

that Barclays' Euribor submissions contained false and misleading rates.  By its conduct,

Barclays violated Section 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. § 13(a)(2)(2006).

      r.     As evidenced by the extensive communications among the traders and submitters,

Barclays' traders and submitters each specifically intended to affect the price at which the daily

EBF Euribor (for particular tenors), all commodities that trade in interstate commerce, would be

fixed.  Moreover, the evidence reflects the traders' motives were to affect EBF Euribor fixings in

order to benefit their derivatives trader positions or to benefit the trading positions of traders at other Euribor banks, with whom they actively coordinated.  The evidence also shows that the submitters understood the traders' motives and acted with manipulative intent by submitting false, misleading or knowingly inaccurate market information that purported to reflect the costs of borrowing unsecured funds in the Euro money market, but in reality, reflected the profit motive of the swaps traders.  The Barclays' traders' requests for certain rates to be submitted which would benefit their derivatives trading positions or the derivatives trading positions of traders at other Euribor banks, and the submitters making the Euribor submissions reflecting the traders' requests, constitute overt acts in furtherance of their intent to affect EBF Euribor fixings in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,  and 13(a)(2)(2006).

s. Through daily communications, certain Barclays swaps traders and traders at other Euribor contributor banks discussed Euribor rates that would benefit their banks' respective derivatives trading positions.  The traders at the other Euribor banks asked the Barclays swap traders to have the Barclays Euribor submitters submit a certain rate, or submit a rate in a direction higher or lower, that would benefit the derivatives positions of the traders at the other Euribor contributor banks.  The Barclays swaps traders agreed and made the requests of the Barclays Euribor submitters.  The Barclays Euribor submitters made their Euribor submissions based on the Barclays swaps traders' requests.  Accordingly, by seeking to affect the rate at which Euribor was fixed, traders at other Euribor banks specifically intended to manipulate Euribor in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,  and 13(a)(2)(2006).  Barclays' traders had knowledge of and intentionally assisted the acts of the traders at other banks to manipulate the rate at which Euribor was fixed.  By such

acts, Barclays aided and abetted the acts of traders at other banks to manipulate Euribor in

violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,

and 13(a)(2)(2006).

       t.      Barclays Bank and Barclays Capital are liable for the acts, omissions, and failures

of the traders, managers, and submitters who acted as their employees and/or agents in the

conduct described.  Barclays plc, which wholly owns Barclays Bank and Barclays Capital, is

liable for the acts, omissions, and failures of Barclays Bank and Barclays Capital with respect to

the  conduct described.   Accordingly, Barclays PLC, Barclays Bank and Barclays Capital

violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,

and 13(a)(2)(2006).

## 2.      The DOJ Statement of Facts

      66.      Among other facts, Barclays admitted that the following information set forth in

the DOJ SOF is true and accurate:

      a.       From at least 2005 through June 26, 2012, Barclays was a member of the

Contributor Panel for Euribor.  Each Euribor contributor bank submits its contributed rate to

Thomson Reuters through electronic means, and then the contributed rates are ranked.  The

highest and lowest 15% of all the quotes are excluded from the calculation, and the remaining

rates (i.e., the middle 70%) are averaged to formulate the resulting Euribor fix for each tenor.

The published rates, and each Contributor Panel bank's submitted rates, are made available

worldwide through electronic means and through a variety of information sources.

      b.      Barclays employs derivatives traders in New York and London who trade

financial instruments tied to Euribor and Libor, including interest rate swaps and futures

contracts.

c.      Barclays' employees on its money market desk in London have been responsible for contributing Barclays' Euribor submissions (collective referred to therein as "submitters").

d.      From at least as early as May 2005 through approximately September 2007 and continuing until at least May 2009, certain Barclays swaps traders requested that certain Barclays Euribor submitters report Euribor contributions that would financially benefit the traders' trading positions, rather than rates that complied with the definitions of Euribor.  Those swaps traders either proposed a particular Euribor contribution for a particular tenor or proposed that the Euribor submitter contribute a rate higher, lower, or unchanged for a particular tenor.  The swaps traders made the requests via electronic messages, telephone conversations, and in-person conversations.  The Euribor submitters agreed to accommodate, and accommodated, the swaps traders' requests for favorable Euribor submissions on numerous occasions.

e.      As an example, on July 28, 2006, at approximately 8:26 a.m., a Barclays Euro interest rates derivative trader ("Trader-4") sent an e-mail to a Barclays Euribor submitter ("Submitter-3") with the subject line, "6m fixing," stating, "Plz [Please] go for LOW 6M fixing today."  (emphasis in original).  Submitter-3 replied in part, "No probs...low it is today." (ellipses in original). Barclays's 6-month Euribor submission on July 28, 2006 was 3.21%, which was 12 basis points lower than its submission the previous day, and was lower than the lowest rate used in the calculation of the Euribor fix.

f.      As a further example, on Friday, October 13, 2006, a Barclays Euro interest rates derivatives trader ("Trader-5") sent an electronic communication to Submitter-3 stating in part, "I have a huge fixing on monday...something like 30bn 1m fixing...and i would like it to be very very very high....can you do something to help?  i know a big clearer will be ag[a]inst us...and dont [sic] want to loose money [sic] on that one."  (ellipses in original).  Submitter-3 replied that

s/he had been moved within Barclays, but had forwarded the request to another Euribor submitter ("Submitter-4") who was covering for Submitter-3.  Submitter-3 forwarded the request to Submitter-4 and added, "We always try and do our best to help out..." (ellipses in original). Barclays's 1-month Euribor submission on Monday, October 16, 2006, was 3.36%, which was 1 basis point higher than its submission the previous day and was equal to the second-highest rate submitted by Euribor contributor banks.  Within the Euribor contributor banks, Barclays moved from being tied for the 6th highest rank on the previous trading day to being tied for the 2nd highest rank.

g.     The purpose of this activity was to falsely report Barclays' Euribor contributions whether by increasing, decreasing, or maintaining the submitted rates, for the purpose of making artificial the resulting Euribor fixes in a direction that financially benefited Barclays' Euribor derivatives positions.

h.     Because certain interest rate derivatives traders' compensation was based in part on the profit and loss calculation of the trading books, a purpose of the requests by the swap traders was to benefit their compensation as well.

i.     Because of the high value of the notional amounts underlying derivatives transactions tied to Euribor, even very small movements in the rate could have a significant impact on the profitability of a trader's trading portfolio.

j.     From at least approximately August 2005 through at least May 2008, certain Barclays swaps traders communicated with swap traders at other Euribor contributor banks and other financial institutions about requesting Euribor contributions that would be favorable to the trading positions of the Barclays swap traders and/or their counterparts at other financial institutions.

k.      Certain Barclays swap traders made requests of traders at other Euribor contributor banks for favorable Euribor submissions from those banks.  In addition, certain Barclays swaps traders received requests from traders at other banks for favorable Euribor submissions from Barclays rate submitters.  When Barclays swaps traders did not have trading positions conflicting with their counterparts' requests, those Barclays swaps traders sometimes would agree to request a Euribor submission from the Barclays Euribor submitters that would benefit their counterparts' positions.  Those interbank communications included ones in which certain Barclays swaps traders communicated with former Barclays swaps traders who had left Barclays and joined other financial institutions.  The likelihood that the Euribor fix would be affected increased when other Contributor banks also manipulated their submissions as part of a coordinated effort.

l.      From at least approximately August 2005 through at least approximately May 2008, Barclays Euro swaps traders communicated with swaps traders at other financial institutions that were members of the Euribor panel about requesting favorable Euribor submissions from the Euribor submitters at their respective banks.  At Barclays, this conduct was primarily undertaken by a Barclays Euro swaps trader, "Trader-5," who left Barclays and joined another financial institution in approximately May 2007.  While Trader-5 worked at Barclays, Trader-5 conspired with traders at several other Euribor contributor banks about obtaining financially favorable Euribor submissions, and requested financially favorable Euribor submissions from the Barclays Euribor submitter.  After Trader-5 joined another financial institution, Trader-5 continued communicating with interest rate derivatives traders at Barclays about requesting financially favorable Euribor settings.

m.      As an example, during February and March 2007, in addition to communicating with the Barclays Euribor submitter, Trader-5 conspired with interest rate derivatives traders at four other Euribor contributor banks and requested that their respective Euribor submitters submit low 3-month Euribor contributions on March 19, 2007, which was the Monday before the March IMM date.

n.      That trading date was particularly significant for Trader-5, who stated that s/he had accumulated financial positions that would benefit from a low 3-month Euribor.  In one example of Trader-5's contacts with other banks, on February 6, 2007, in an electronic message, a trader at another Contributor bank asked Trader-5: "[I]n march do you still want a very low 3m cash fixing for imm?"  Trader-5 replied, "yeah."  The other trader continued, "I'm going to put pressure on the treasury so that he sets it very low."  Trader-5 replied, "750k eur/bp [Euros per basis point]."  Then, on March 19, 2007, before the Euribor submission was due, Trader-5 sent a message to Submitter-3 stating in part: "I am hearing u are bidding the cash....we really need a low 3m," and "as discussed could u put the 3m as low as possible."  (ellipses in original). Submitter-3 replied, "[W]ill do my best."

o.      Later on March 19, 2007, Trader-5 wrote to a trader at one of these other Contributor banks, stating in part, "this is the way you pull off deals like this," and "the trick is you must not do this alone."  Trader-5 also stated that after his "2months of preparation" [sic] he had made money in the end.  Trader-5 added, "[D]on't talk about it too much" and "don't make any noise about it please."  On that same date, Trader-5 wrote to a third trader whom he had previously contacted at another of the Contributor banks and said: "Please [trader name] don't make any noise about the 3m fixing. [T]his can backfire against us."

p.      When Barclays swaps traders made requests of Barclays rate submitters in order to influence Barclays' Euribor submissions, and when the submitters accommodated those requests, the manipulation of the submissions affected the fixed rates of Euribor on some occasions.

q.      Barclays entered into interest rate derivatives transactions tied to Euribor -- such as swaps, forward rate agreements, and futures- with counterparties to those transactions. Many of those counterparties were located in the United States. Those United States counterparties included, among others, asset management corporations, retirement funds, mortgage and loan corporations, and insurance companies. Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States.

r.      In the instances when the published rates were manipulated in Barclays's favor due to Barclays's manipulation of its submissions, that manipulation benefitted Barclays swaps traders, or minimized their losses, to the detriment of counterparties, at least with respect to the particular transactions comprising the trading positions that the traders took into account in making their request to the rate submitters.

s.      Certain Barclays swaps traders and rate submitters who engaged in efforts to manipulate Euribor submissions were well aware of the basic features of the derivatives products tied to these benchmark interest rates; accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions.

t.      When the requests of swap traders for favorable Euribor submissions were taken into account by the rate submitters, Barclays's rate submissions were false and misleading. In

making and in accommodating the requests, the swaps traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.   As part of that effort: (1) swaps traders and submitters submitted and caused the submission of materially false and misleading Euribor contributions; and (2) swaps traders, after initiating and continuing their effort to manipulate Euribor, negotiated and entered into derivative transactions with counterparties that did not know that Barclays employees were intending to manipulate Euribor.

u.      Barclays acknowledged that the wrongful acts described in the DOJ SOF taken by the participating employees in furtherance of this misconduct were within the scope of their employment at Barclays.  Barclays also acknowledged that the participating employees intended, at least in part, to benefit Barclays through the actions described in the DOJ SOF.

v.      Barclays agreed to pay a $160 million penalty to the DOJ and (among other relief) agreed to continue to cooperate with the DOJ's investigation of Euribor rigging.

**3.      The FSA Final Notice**

67.      The FSA Final Notice accompanying the Barclays Settlement provides that, *inter alia*:

a.       On June 27, 2012, the FSA imposed a penalty of £59.5 million on Barclays Bank PLC ("Barclays"), in accordance with section 206 of the Financial Services and Markets Act 2000 (the "Act").

b.      Barclays agreed to settle at an early stage of the FSA's investigation. Barclays therefore qualified for a 30% (stage 1) discount under the FSA's executive settlement procedures. Were it not for this discount, the FSA would have imposed a financial penalty of £85 million on Barclays.

c.      Barclays breached Principles 2, 3 and 5 of the FSA's Principles for Businesses through misconduct relating to its submission of rates which formed part of the Euribor setting process.   There was a risk that Barclays' misconduct would threaten the integrity of Euribor

d.      Barclays breached Principle 5 on numerous occasions between January 2005 and July 2008 by making Euribor submissions which took into account requests made by its derivatives traders.  This included requests made on behalf of derivatives traders at other banks. The derivatives traders were motivated by profit and sought to benefit Barclays' trading positions. The requests were made openly and in some cases Barclays' trading desk managers received or participated in unlawful and manipulative communications.

e.      Barclays breached Principle 5 on numerous occasions between January 2005 and July 2008 by making Euribor submissions which took into account requests made by its derivatives traders. This included requests made on behalf of derivatives traders at other banks. The derivatives traders were motivated by profit and sought to benefit Barclays' trading positions. The requests were made openly and in some cases Barclays' trading desk managers received or participated in unlawful and manipulative communications.

f.      It was inappropriate for Barclays to make Euribor submissions which took its derivatives traders' positions (or the positions of traders at other banks) into account. Barclays did not therefore observe proper standards of market conduct when making Euribor submissions.

g.      Barclays' derivatives traders knew on any particular day what their books' exposure to a one basis point (0.01%) movement on Euribor was.  Where Barclays made submissions which took into account the positions of its own derivatives traders there was a risk that the published Euribor rates would be manipulated.  Barclays could have benefitted from this misconduct to the detriment of other market participants. Where Barclays acted in concert with

other banks, the method of calculation of Euribor meant that the risk of manipulation increased materially.

      h.      Barclays breached Principle 3 from at least January 2005 until at least June 2010 by failing to have adequate risk management systems or effective controls in place in relation to its Euribor submissions processes. The extent of Barclays' misconduct throughout this period was exacerbated by these inadequate systems and controls.

      i.      The FSA determined that between September 2005 and May 2009, Barclays' derivatives traders made at least 58 requests for Euribor submissions to Barclays' submitters, including 20 requests based on communications from traders at other banks.

      j.      The Barclays' submitters' were influenced by the derivatives traders' requests. For example, on June 29, 2006, a submitter responded to a trader's request for Euribor submissions "with the offer side at 2.90 and 3.05 I will input mine at 2.89 and 3.04 with you guys wanting lower fixings (normally I would be a tick above the offer side)."

      k.      In addition, the FSA compared the requests against the submissions made by Barclays.  The FSA determined whether Barclays' submissions were consistent with the derivatives traders' requests by reviewing Barclays' submissions on the date of the requests and the day preceding the requests.  The FSA also reviewed Barclays' position in the panel of contributing banks (*i.e.*, whether Barclays' submissions were higher or lower than the other contributors' submissions) on the date of the requests and the day preceding the requests.

      l.      The FSA analyzed 42 requests made by Barclays' derivatives traders in the period from February 23, 2006 to June 3, 2008 relating to Barclays Euribor submissions.  The FSA determined that **86%** of the time Barclays' submissions were consistent with the requests.

m.      On February 19, 2007, a Barclays' trader (identified as Trader E in the FSA Notice) made three requests, asking Barclays' submitter for low one month, high three month and low six month Euribor submissions.  The FSA determined that Barclays one month, three month and six month submissions were consistent with the trader's requests for low one month, high three month and low six month submissions.  For instance, Barclays' three month Euribor submission **increased** by two basis points from the previous day.  Barclays' position relative to other banks also moved up on February 19, 2007 (26 banks contributed a higher three month Euribor submission than Barclays on February 16 and only one bank contributed a higher submission on February 19).

n.      The example given above relate to internal requests that were made by Barclays' derivatives traders to benefit their own trading positions.  However, Barclays' derivatives traders also made requests to Barclays' Euribor submitters based on the trading positions of traders at other banks who had asked them to pass the requests onto Barclays' Euribor submitters.

o.      At least 20 of the Euribor requests made by the Derivatives Traders were made on behalf of traders at other banks that contributed Euribor rates.  Barclays' Derivatives Traders passed on the requests of these other traders to Barclays' Submitters, even blind copying the external traders to their emails in order to demonstrate they had done so.

p.      For example, on September 6, 2006, an external trader at another bank (Panel Bank 1) contributing Euribor submissions sent an instant message to Trader E at Barclays requesting a low one month submission: "I seriously need your help tomorrow on the 1mth fix." The next day, Trader E passed on the request to Barclays' Submitters, blind copying the external trader.

q.     Similarly, on February 1, 2007, the same external trader sent several messages to Trader E requesting a low one month Euribor submission.  Trader E in turn made a request for a low one month submission to a Submitter, who sent a positive response.

r.     Barclays' Derivatives Traders attempted to influence the Euribor submissions of other banks as well by making requests to external traders.  One of the Derivatives Traders coordinated strategies to align Barclays' positions with traders at other banks and to influence the Euribor.

s.     Between February 2006 and October 2007, Barclays' Derivatives Traders made at least **56 requests** to external traders with the aim that those traders would pass on the requests for Euribor submissions to their banks' submitters. Five Derivatives Traders made the requests to external traders.  For example, on July 7, 2006, Trader E made an internal request to a Submitter for a low one month Euribor submission.  Trader E also made the same request to external traders at Panel Bank 1 and Panel Bank 2.

t.     On occasion, more concerted efforts were made to influence both Barclays' and other banks' Euribor submissions, consisting of a series of communications over the course of time.  In several key examples, one of Barclays' Derivatives Traders coordinated with external traders to influence Euribor submissions at Barclays and at other banks during the Relevant Period (and that trader instructed more junior Derivatives Traders at Barclays to do the same). Barclays' Derivatives Traders coordinated with external traders using the following methods: (i) making internal requests to Barclays' Submitters; (ii) making external requests to traders at other contributing banks in advance of and on particular days on which the Derivatives Traders stood to benefit; and (iii) on occasion by encouraging cash traders to make bids or enter into transactions in the money markets at rates which might influence indirectly the Euribor

submissions of any contributing bank observing market rates as a factor in determining its submissions.

u.      For example, beginning in early October 2006, Barclays' Derivatives Traders communicated with others (both inside and outside Barclays) in order to coordinate high one month Euribor submissions on October 16, 2006.  These communications included the following: (i) Trader E made internal requests for high one month Euribor submissions to Barclays' Submitters;  (ii) Trader E discussed his requests with an external trader at Panel Bank 1 and made requests to external traders at Panel Banks 2 and 3; (iii) the external trader at Panel Bank 1 informed Trader E he would also make a request to a trader at Panel Bank 4; and (iv) a cash trader at Barclays indicated that Barclays would be paying for cash that morning, "so hopefully that will help" (the logic being that if Barclays entered into cash transactions this might influence indirectly the Euribor submissions of other contributing banks).

v.      The following month in early November 2006, Trader E (having agreed to assist an external trader at Panel Bank 1) communicated his preference for a Euribor of "36" or a low one month Euribor submission on November 13, 2006.  These communications included the following: (i) Trader E made an internal request for a low one month Euribor submission to a Barclays Submitter on Friday, November 10, 2006 and sent a reminder on Monday, November 13, 2006; (ii) the Submitter responded positively on November 10, 2006, "of course we will put in a low fixing" and on November 13 indicated they would make a submission lower than the Brokers thought Euribor would set that day, "no problem.  I had not forgotten.  The brokers are going for 3.372, we will put in 36 for our contribution";  (iii) Trader E made a request to an external trader at Panel Bank 2; (iv) Trader E informed the trader at Panel Bank 2 that he and another trader had large positions (of 15 billion euro and 85 billion euro respectively) that would

benefit from a low one month Euribor rate on November 13, 2006; and (v) Trader E also made a request to an external trader at Panel Bank 3 and attempted to make a request to a trader at Panel Bank 5 following consultation with a trader at Panel Bank 1.

w.      Beginning as early as December 2006 there were coordinated efforts and communications to manipulate the Euribor futures contracts expiring in March 2007.  March 19, 2007 was the Monday prior to the third Wednesday in March and therefore relevant to the settlement price of exchange traded interest rate futures contracts expiring in March 2007 (as discussed above).

x.      The communications reveal that Trader E intended to "go long the march future", in other words to build up a trading position in interest rate futures contracts that would benefit from a low three month Euribor rate.  Trader E also stated in an internal email that he understood a trader at Panel Bank 1 and an individual at a hedge fund were also building up long positions. If a trader had a long position in futures contracts referenced to three month Euribor expiring in March 2007, he would benefit from a low three month Euribor rate on March 19, 2007 (the Monday prior to the third Wednesday in March, an IMM date).  Trader E also indicated that he would benefit from a particular spread between three month Euribor and EONIA on that date (EONIA is a reference rate based on transacted rates).

y.      Trader E communicated with traders at Panel Banks 1, 2 and 6 in advance of the IMM date.  For example on February 12, 2007, Trader E stated in an instant message with a trader at Panel Bank 6: "if you know how to keep a secret I'll bring you in on it […]  we're going to push the cash downwards on the imm day […]  if you breathe a word of this I'm not telling you anything else […] I know my treasury's firepower…which will push the cash downwards […] please keep it to yourself otherwise it won't work".

z.       Trader E's communications continued in the build up to March 19, 2007 and on Friday, March 16, 2007 (the last working day prior to  March 19, 2007), Trader E made requests for a low three month Euribor submission to traders at Panel Banks 2 and 3 (which he discussed with a trader at Panel Bank 1).

aa.      Trader E made further requests on Monday, March 19, 2007, including asking a trader at Panel Bank 6 to "tell your cash to put the 3m fixing in the basement".

bb.      Trader E also made an internal request for a low three month submission to a Submitter at Barclays on March 19, 2007; and Trader E also attempted to influence Barclays' cash trading strategy in order to affect contributing banks' Euribor submissions indirectly.  An external trader noted that he understood Barclays was making bids in the market for three month cash on March 19, 2007.  This appears to have been communicated to Trader E at Barclays, who then contacted the cash trader bidding in the market.  Barclays stopped bidding for three month cash thereafter.

cc.      Various instant messages exchanged after the final benchmark rates were published on March 19, 2007 indicated that the traders involved considered that their strategy had been successful.  Trader E commented to the external trader at Panel Bank 6 "this is the way you pull off deals like this chicken, don't talk about it too much, 2 months of preparation […] the trick is you must not do this  alone […] this is between you and me but really don't tell ANYBODY."

dd.      Other individuals with no apparent vested interest in the strategy commented on the Euribor rates on March 19, 2007. Trader D stated in an instant message to an external trader "look at the games in Euribor today […] I am sure a few names made a killing".  A trader at a hedge fund communicated with Trader E, also on March 19, 2007, stating "it's becoming

dangerous to trade in 3m imms […], especially when Barclays sets the 3m very low […] it does draw attention to you guys.  It doesn't look very professional".

**B.**   **The UBS Settlement**

68.    On December 19, 2012, the DOJ, the FSA, and the CFTC announced agreements that collectively obligate UBS to pay more than $1.5 billion in fines and penalties due to, among other unlawful conduct, making false Euribor submissions to the EBF (the "UBS Settlement").

69.    The documents that accompanied the UBS Settlement include a: (a) CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions (the "CFTC Order"); (b) Department of Justice "Statement of Facts" (which UBS expressly admitted) (the "DOJ SOF"); and (c) FSA Final Notice to UBS AG (the "FSA Final Notice").

**1.**   **The CFTC Order**

70.    The CFTC Order provides that, *inter alia*:

**i.**   **Summary**

a.    UBS paid a civil monetary penalty of $700 million to the CFTC and agreed to comply with conditions and undertakings in the CFTC Order to ensure the integrity and reliability of its benchmark interest rate submissions.

b.    UBS engaged in two overarching courses of misconduct.  *First*, from at least September 2005 through June 2010, UBS made knowingly false submissions to rate-fixing panels for Euribor (among other rates) to benefit its Euribor derivatives positions (or the derivative positions of other Euribor contributor banks).  *Second*, during the period from approximately August 2007 to mid-2009 (the financial crisis period), UBS submitted false

benchmark rates (including Euribor) in order to protect UBS against negative media and market perception concerning its financial stability during the financial crisis period.

c.      From at least January 2005 through the end of September 2009, UBS used a flawed interest rate submission process that relied on inherently conflicted employees to make UBS's Euribor submissions.  Specifically, UBS made its interest rate derivatives traders – who were responsible for trading UBS's interest rate derivative positions for profit – the persons charged with making UBS's interest rate submissions for Euribor.  As a result, when determining rates to submit for fixing Euribor, UBS's derivatives traders routinely submitted rates which were not reflective of honest and reliable assessments of the costs of borrowing unsecured funds in the Euribor interbank market.  Instead, the derivatives traders wrongfully submitted artificial (and impermissible) Euribor rates that financially benefitted UBS's Euribor derivatives positions.  UBS's dual role of traders as submitters created a conflict of interest that compromised the integrity of UBS's Euribor submission process.

d.      UBS submitters also accommodated requests of other UBS derivatives traders for submissions that would be beneficial to their Euribor trading positions, by either maximizing their profits or minimizing their losses.

e.      This profit driven conduct relating to the manipulation of Euribor spanned from least September 2005 through June 2010, and at times, occurred on almost a daily basis.  It involved more than three dozen traders and submitters located in London  and elsewhere.  The misconduct also involved several UBS managers, who made requests to benefit UBS's derivatives positions, facilitated the requests of their staff for submissions that financially benefitted UBS's positions, or knew that this was a routine practice of the traders and did nothing to stop it.

f.      UBS traders inappropriately viewed their benchmark interest rate submissions as mere tools to help the traders increase the profits or minimize losses on their Euribor trading positions.  To be sure, UBS's Euribor submissions frequently were not a reflection of UBS's assessment of the costs of borrowing funds in Euro interbank market, as the EBF's Euribor definition required.

g.      During the financial crisis period, certain UBS managers issued directions for making UBS benchmark interest rate submissions in order to protect against what UBS perceived as unfair and inaccurate media perceptions about UBS.  UBS first directed that UBS's submissions should "err on the low side" of the panel banks' submissions, a direction its submitters generally followed.  UBS subsequently directed that UBS's submissions be "in the middle of the pack" of the panel banks' submissions and the submitters followed the direction again.  These directions at times improperly influenced the submissions for Euribor, and did not reflect UBS's assessment of the borrowing costs of unsecured funds in the Euribor interbank market, as required by the EBF.  At times, these directions resulted in UBS knowingly making false, misleading or knowingly inaccurate Euribor submissions during the financial crisis period.

h.      By basing its Euribor submissions, in whole or in part, on UBS's trading positions and reputational concerns, UBS knowingly conveyed false, misleading or knowingly inaccurate reports that its submitted Euribor was based on and solely reflected UBS's costs of borrowing unsecured funds in the Euribor interbank market and were truthful and accurate.  Thus, UBS's false submissions contained market information that affected or tended to affect Euribor, a commodity in interstate commerce.

i.      UBS continued to engage in manipulative conduct relating to Euribor long after it was on notice that the CFTC was investigating UBS in connection with its U.S. Dollar LIBOR

practices.  UBS received a demand for documents and information from the CFTC's Division of

Enforcement in October 2008; yet the conduct of the traders and submitters, including collusive

conduct, occurred well into 2010.  The rampant misconduct involving Euribor at UBS only came

to light as a result of the CFTC's subsequent request in April 2010 that UBS conduct an internal

investigation relating to its U.S. Dollar LIBOR practices.

> ii.   **UBS Made False Reports to Manipulate Euribor to Benefit UBS's Derivatives Positions**

j.      From at least September 2005 through at least June 2010, UBS, through the acts

of its derivatives traders, benchmark interest rate submitters and managers, made false Euribor

submissions to manipulate the official Euribor fixing.  The goal was simple: to profit.  UBS held

significant derivatives positions whose value depended on benchmark interest rates fixed by rate-

setting panels.  The panels fixed and issued the respective benchmarks based on rates submitted

by banks on the respective panels, such as UBS, that were supposed to reflect an assessment of

the costs of borrowing unsecured funds in the relevant interbank money markets.  UBS,

however, made false submissions intended to manipulate these benchmarks to make its

derivatives positions more profitable or to minimize losses.

k.      Interest rate swaps traders ("Derivatives Traders") located in London (and

elsewhere) routinely asked their UBS colleagues who determined UBS's Euribor submissions to

make certain submissions to affect the daily fixings for certain tenors of Euribor.  The

Derivatives Traders' purpose was to benefit their respective derivatives trading positions.  The

UBS submitters often based their submissions on the traders' requests.  Making matters even

worse, for most of the period, until approximately the end of September 2009, UBS's submitters

wore two "hats"—they were also derivatives traders themselves ("Trader-Submitters")—and

they also based UBS's submissions on their own desk's trading positions.

l.      Accordingly, throughout a six-year period, UBS, through its Trader-Submitters and others, made Euribor submissions that reflected rates that benefitted UBS's derivatives trading positions, rather than their assessment of the costs of borrowing unsecured funds in the Euribor interbank market.  This conduct occurred on almost a daily basis.  The conduct of the dozens of Derivatives Traders and Trader-Submitters occurred openly and was pervasive at UBS on trading desks, even involving the participation or knowledge of desk managers and senior managers.

### iii.    UBS Used Derivatives Traders to Make UBS's Euribor Submissions

m.      UBS made Trader-Submitters who worked in UBS's Investment Banking Division responsible for making UBS's Euribor submissions.

n.      From at least January 2005 through October 2009, Derivatives Traders, who sat on Short Term Interest Rate ("STIR") trading desks in Zurich and traded short-term derivatives products, made all of UBS's Euribor submissions.  UBS's Derivatives Traders traded Euribor-based swaps, FRAs, and futures contracts.  Many of their derivatives contracts settled or reset on International Monetary Market ("IMM") dates, making the benchmark interest rates on these particular dates especially important.

o.      The STIR desk was a profit center for UBS and generated significant income for UBS based on trading derivatives products, such as interest rate swaps whose value depended on Euribor.  STIR also managed UBS's short-term cash position and engaged in cash trading in the money markets for each currency, primarily through traders located in Connecticut, Zurich and Singapore.  STIR was also responsible for hedging UBS's interest rate risk.

p.      Beginning October 2009, UBS transferred responsibility for determining its Euribor submissions to UBS's Asset and Liability Management ("ALM") group.  Even after

ALM assumed the role, however, UBS's interest rate derivatives traders still made requests for

Euribor submissions that would financially benefit the Euribor-based derivatives positions held

by these traders.

> ### iv.   Conflicts of Interest and Lack of Internal Controls Allowed the Misconduct to Flourish for Years

q.     UBS's dual role of traders acting as submitters created a conflict of interest that

compromised the integrity of UBS's submission process, thus establishing an environment ripe

for the Derivatives Traders and Trader-Submitters to abuse.  UBS's Trader-Submitters had an

inherent interest in making Euribor submissions that benefited their Euribor derivatives trading

positions.  This interest conflicted with UBS's responsibility to make honest and reliable

assessments of the costs of borrowing unsecured funds in the Euribor interbank  market, and

ensure its Euribor submissions were made in accordance with the EBF's definitions and criteria.

Until August 2008 at the earliest, UBS had no specific internal controls or procedures governing

its Euribor submissions to manage the conflicts of interest and ensure that its submissions did not

take into account impermissible factors, such as UBS's derivatives trading positions.  UBS

provided no training concerning the benchmark interest rate submission process or how to

manage the inherent conflict between making such submissions and the fact that the Trader-

Submitters were supposed to make money for UBS.

r.     Even after conducting a limited review and developing some procedures for its

submission process in the wake of an April 2008 *Wall Street Journal* ("WSJ") article critical of

the accuracy of banks' U.S. Dollar LIBOR submissions, UBS did not remove the inherent

conflict of interest described above or provide meaningful guidance or any training to the Trader-

Submitters.  Rather than strengthening its internal controls and removing the conflict of interest

embedded in the submission process, UBS instead delegated oversight responsibility for the

benchmark interest rate submissions to managers who not only knew that Derivatives Traders and Trader-Submitters were engaged in efforts to manipulate the official Euribor fixing, but who also made their own requests for submissions to benefit their individual derivatives trading positions.  At least certain Derivatives Traders, Trader-Submitters and managers disregarded the few procedures UBS eventually implemented in August 2008. UBS's lack of specific internal controls or procedures and overall lax supervision concerning its submission process for Euribor allowed this misconduct to occur.

<b>v.      UBS's Manipulative Acts Involving Euribor</b>

s.      From at least September 2005 through at least October 2009, UBS's Euribor submissions were based, in whole or in part, on UBS's Euro-based derivatives positions.

t.      UBS Euro Trader-Submitters considered UBS's net Euro positions on its "Rates" desk that were valued or priced off of Euribor or Euro LIBOR.  To determine the rates to submit that would be beneficial to UBS's trading positions, the Trader-Submitters reviewed UBS's derivatives transactions and consulted with and obtained information from other UBS Euro Derivatives Traders.  Based on that information, UBS's Euro Trader-Submitters adjusted UBS's Euribor submissions to benefit UBS's derivatives trading positions.   This occurred on a regular, if not daily, basis.

u.       Moreover, senior managers made their own requests for specific Euribor submissions that would benefit their trading positions and, at times, communicated with each other about their requested Euribor submissions.  For example,

August 7, 2007:

Senior Rates Manager B:  "hi [Senior STIR Manager B], what you putting in for 3mth and 6mth euribor fixing today?"

Senior STIR Manager B:  "goo[d] question ... need a low fix personally in 3s"

Senior Rates Manager B:  ".. .i have a 2bn fixing today and i'm [sic] also looking to sell1 bn of the 6mth at about 4.42  fun times with the fixings at the moment"

Senior STIR Manager B:  "i'll shoot for low then and hope some other do too and we dont fall out .."

Senior Rates Manager B:  "if i don't sell the 6mth before the fix, i need a high fixing  3mth i'm [sic] now flat  over the next few weeks we've got a lot of 6mtth fixing coming off"

Senior STIR Manager B:  "ill stick 4.42 in for 6s then"

Senior Rates Manager B:  "we are receiving the fixing"

Senior STIR Manager B:  "gotscha"

v.      Multiple UBS Euro Derivatives Traders also made requests to the Euro Trader-Submitters for submissions that would benefit their derivatives trading positions.  The Euro Trader-Submitters agreed to the requests and solicited the Derivatives Traders for their preferences for submissions.  The Trader-Submitters took the specific requests into account when determining UBS's Euribor submissions.

w.      On June 25, 2009, more than eight months after the CFTC had launched its investigation of UBS and demanded information and documents from UBS in October 2008, a senior UBS manager warned UBS's Euro Derivatives Traders and the Trader-Submitters not to make requests to manipulate UBS's Euribor submissions on a "public chat."

June 25, 2009 (Emphasis added.):

Euro Trader-Submitter 1:  "u need low 3s and/or 6s?  we need low 6s ... boys, we send the fixings in about 1hr, so let us know pls"

Euro Trader 1:  "low 6s high 12s please"

Euro Trader-Submitter 1:  "noted"

Rates Manager A:  **"JUST BE CAREFUL DUDE"**

Euro Trader-Submitter 1: "yeah [Sterling Trader-Submitter 1] gave me ur call update **i agree we shouldnt ve been talking about putting fixings for our positions on public chat** just wanted to get some transparency though otherwise we end up with the same talks afterwards why we fixed it low or high, from u boys in ldn"

x.      From at least September 2005 through at least October 2009, UBS's senior managers never instructed or demanded that UBS's Derivatives Traders and Trader-Submitters to stop the practice of taking into account UBS's Euribor derivatives positions in making its Euribor submissions.  In fact, this common and pervasive practice continued until at least June 20, 2010 (almost two years after the CFTC launched its investigation), when a senior UBS short-term interest rate manager made a written request for a specific Euribor submission.

### vi.      By Such Conduct, UBS Made Knowingly False Reports

y.      UBS, through its Derivatives Traders, Trader-Submitters and/or senior managers, knew it was improper to consider derivatives trading positions in determining the bank's Euribor submissions.  A bank's financial derivatives trading positions are not legitimate or permissible factors on which to base a bank's daily Euribor submissions.  By basing its Euribor submissions on rates that benefited UBS's derivatives positions, UBS's submissions were not made in accordance with the EBF's definitions and criteria for Euribor.  Instead, UBS knowingly conveyed false, misleading or knowingly inaccurate reports that its submitted rates for Euribor were based on and solely reflected its assessment of the costs of borrowing unsecured funds in the Euribor interbank market.  Accordingly, UBS regularly attempted to manipulate the official fixings of and knowingly delivered false, misleading or knowingly inaccurate reports concerning Euribor, a commodity in interstate commerce.

**vii.    Legal Findings**

z.       On a  daily basis, UBS, through the transmission of an electronic spreadsheet to

Thomson Reuters, knowingly delivered or caused to be delivered its Euribor submissions

through the mails or interstate commerce.  UBS's submissions were also caused to be delivered

through the mails or interstate commerce through the daily dissemination and publication

globally, including in the U.S., of the Euribor contributor banks' submissions by Thomson

Reuters on behalf of the EBF, and other third party vendors.  The Euribor contributor banks'

submissions are, and were during the relevant period, used to determine the official published

rates for Euribor, which are calculated based on a trimmed average of the submissions.  UBS's

daily Euribor submissions contained market information concerning the costs of borrowing

unsecured funds in the Euro currency and in particular tenors, the liquidity conditions and stress

in the Euro interbank market, and UBS's ability to borrow funds in the Euro interbank market.

Such market information affects or tends to affect the prices of commodities in interstate

commerce, including the daily rates at which EBF Euribor is fixed.

aa.      Throughout the period relevant to the conduct described, UBS's Euribor

submissions were false, misleading or knowingly inaccurate because they were routinely based

on impressible and illegitimate factors, specifically: (1) the derivatives trading positions of

traders, which occurred routinely if not daily, and (2) at times during the financial crisis

commencing in early August 2007, UBS's Group Treasury and ALM managers' directions that

UBS's submissions be either on the low side or in the middle of the pack of the panel

submissions to manage market and media perceptions of UBS and protect its reputation.  By

using these impermissible and illegitimate factors in making its Euribor submissions, UBS

conveyed false, misleading or knowingly inaccurate information that the rates its submitted were

based on and related to the costs of borrowing unsecured funds in the Euro interbank market and were truthful and reliable.  Certain of UBS's managers, traders, and submitters knew that certain of UBS's Euribor submissions contained false, misleading or knowingly inaccurate information. By such conduct, UBS violated Section 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. § 13(a)(2)(2006).

bb.     As evidenced by the extensive communications, several UBS Derivatives Traders and Trader-Submitters each specifically intended to affect the price at which the daily EBF Euribor would be fixed to benefit UBS's derivatives trading positions or to benefit the derivatives trading positions of colluding traders at other banks.  The UBS Derivatives Traders' requests for certain rates to be submitted that would benefit their derivatives trading positions or the derivatives trading positions of traders at other banks, and the Trade-Submitters making submission for Euribor reflecting rates beneficial to UBS's derivative trading positions, rather than reflecting, as required, UBS's assessments of the costs of borrowing unsecured funds in the Euribor interbank market, constitute overt acts in furtherance of their intent to affect EBF Euribor fixings in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,  and 13(a)(2)(2006).

cc.     UBS AG is liable for the acts, omissions, and failures of the traders, managers, and submitters who acted as their employees and/or agents in the conduct described. Accordingly, UBS AG violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,  and 13(a)(2)(2006).

dd.     On a daily basis, UBS, through the transmission of an electronic spreadsheet to Thomson Reuters, knowingly delivered or caused to be delivered its (mis)reported Euribor submissions through the mails or interstate commerce.  UBS' submissions were also caused to be

delivered through the mails or interstate commerce through the daily dissemination and publication globally, including in the United States, of the panel banks' submissions by Thomson Reuters on behalf of the EBF, and other third party vendors.  UBS' daily Euribor submissions contained market information concerning the costs of borrowing unsecured funds in the euro market, the liquidity conditions and stress in the money markets, and UBS' ability to borrow funds in particular markets.  Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which the EBF Euribor are fixed.

### 2. The DOJ Statement of Facts

71.     Among other facts, UBS admitted that the following information set forth in the DOJ SOF is true and accurate:

a.     From at least 2005 through December 18, 2012, UBS was a member of the Contributor Panel for Euribor.  Each Euribor contributor bank submits its contributed rate to Thomson Reuters through electronic means, and then the contributed rates are ranked.  The highest and lowest 15% of all the quotes are excluded from the calculation, and the remaining rates (i.e., the middle 70%) are averaged to formulate the resulting Euribor fix for each tenor.  The published rates, and each Contributor Panel bank's submitted rates, are made available worldwide through electronic means and through a variety of information sources.

b.     Because of the widespread use of Euribor in financial markets, these rates play a fundamentally important role in financial systems around the world.

c.     UBS AG, a financial services corporation, has banking divisions and subsidiaries around the world, including in the United States, with its United States headquarters located in New York, New York and Stamford Connecticut.   UBS employs derivatives traders throughout

the world, including Stamford, Connecticut, London, Zurich and Tokyo, who trade financial instruments tied to Euribor.

       d.     UBS AG's Group Treasury Section is the part of UBS AG that monitors and oversees the financial resources of the entire bank, including the bank's liquidity and funding. At all relevant times, Asset and Liability Management ("ALM" ) is the part of the Investment Bank Division which managed the bank's liquidity buffer and issuance of new commercial paper and certificates of deposit.  Group Treasury provided guidance to ALM on funding issues.  The head of ALM worked for the Investment Bank Division.

       e.     At various times from at least 2001 through June 2010, UBS derivatives traders— whose compensation from UBS was directly connected to their success in trading financial products tied to Euribor requested, and sometimes directed, that certain UBS Euribor submitters submit benchmark interest rate contributions that would benefit the traders' trading positions, rather than rates that complied with the definitions of Euribor.

       f.     Up until the end of September 2009, UBS's Euribor submissions were made by UBS derivative traders.  In October 2009, ALM took over the Euribor submission process from the derivatives traders.  This change was the result of a decision of UBS's Compliance Department ("Compliance"), based on the conclusion that there was an inherent conflict of interest in having derivatives traders determine UBS's daily Euribor submissions.  Nevertheless, under this new policy, derivatives traders continued to provide input to ALM, which ALM submitters at times considered in determining UBS's Euribor submissions.  Each day, approximately 15 minutes before ALM made its Euribor submissions, derivatives traders in a given currency would input their assessment of Euribor into a shared spreadsheet.  The ALM submitters then considered that input along with the previous day's submission.

g.      From as early as 2001 through at least June 2010, certain UBS derivatives traders requested and obtained benchmark interest rate submissions which benefitted their trading positions.  These derivatives traders requested, and sometimes directed, that certain Euribor submitters submit Euribor contributions to the EBF that would benefit the traders' trading positions, rather than rates that complied with the definition of Euribor.  Those derivatives traders either requested or directed a particular Euribor contribution for a particular tenor or requested that the rate submitter submit a rate higher, lower, or unchanged for a particular tenor. The derivatives traders made these requests in electronic messages, telephone conversations, and in-person conversations.  Euribor submitters regularly agreed to accommodate the derivatives traders' requests and directions for favorable Euribor submissions.

h.      From as early as September 2005 through approximately June 2010, certain UBS Euro derivatives traders requested that Euribor submitters contribute submissions to benefit the derivatives traders' positions.  UBS submitters often accommodated such requests.

i.      For example, in an October 2, 2006 electronic chat between a UBS Euro derivatives trader and the UBS Euribor submitter, the submitter solicited the trader's preference for that day's submission, asking, "any special wishes for the fixing?"  The trader responded, "I lose 120k of a received fix today . . . so low would be good."  The trader then indicated that his/her request for low Euribor applied to both the 3-month and 6-month tenors, to which the submitter responded, "ok we go 42 and 57."

j.      As a further example, in a June 25, 2009 internal UBS chat with 58 viewers, including UBS's representative on the BBA FX Money Market Committee ("UBS's BBA Representative"), the Euribor submitter solicited UBS derivatives traders for their submission preferences, asking, "boys, we send the fixings in about 1hr, so let us know pls."  A derivatives

trader immediately responded with, "low 6s high 12s . . .please."  The submitter responded, "noted".

k.      The UBS Euribor submitter and UBS's BBA Representative knew this practice of submitting a Euribor contribution for the benefit of derivatives traders' positions was inappropriate.  Indeed, as noted above, UBS's BBA Representative was tasked with monitoring such conduct to preserve the integrity of the submission process.  Moreover, five minutes after the June 25, 2009 chat described in the previous paragraph, in a separate electronic chat between the Euribor submitter and UBS's BBA Representative, UBS's BBA Representative admonished: "JUST BE CAREFUL DUDE."  The submitter responded, "I agree we shouldn't ve been talking about putting fixings for our positions on public chat."

l.      UBS's Fall 2009 transfer of responsibility for Euribor submissions to ALM did not prevent its derivatives traders from attempting to manipulate these benchmarks.  For example, in a June 29, 2010 electronic chat between the former Euribor submitter – who was still an active UBS Euro derivatives trader – and another UBS Euro derivatives trader, stated:

> Former submitter: u got 6mth fix position today?
>
> Trader:  6mth fixing today? . . . nothing.
>
> Former submitter: ok, gonna set fixing 1bp higher on the 6s for the turn then.
>
> Trader: didn't think you set it!
>
> Former submitter: i don't but i give my opinion to the ALM desk . . . regarding change, higher/lower.

m.      When UBS derivatives traders made requests of UBS rate submitters in order to influence UBS's Euribor, and when the submitters accommodated those requests, the manipulation of the submissions affected the fixed Euribor on various occasions.

n.      Likewise, when UBS derivatives traders influenced the submissions of other

Euribor contributor banks – either by (1) seeking and receiving accommodations from their

counterparts at such banks, or (2) influencing the submissions from other banks with assistance

from cash brokers who disseminated misinformation into the marketplace – the manipulation of

those submissions affected the fixed Euribor on various occasions.

o.      Indeed, the purpose of this activity was to manipulate Euribor (and benchmark)

submissions from UBS and other banks to influence the resulting fixes and thus to have a

favorable effect on the derivatives traders' trading positions.  Because traders' compensation was

based in part on the profit and loss calculation of the trading books, derivatives traders' requests

were intended to benefit their compensation as well.

p.      Because of the high notional value underlying derivatives transactions tied to

Euribor, even very small movements in those rates could have had a significant positive impact

on the profitability of a trader's trading portfolio, and a correspondingly negative impact on their

counterparties' trading positions.

q.      UBS entered into interest rate derivatives transactions tied to Euribor – such as

derivatives, forward rate agreements, and futures – with counterparties to those transactions.

Many of those counterparties were located in the United States.  Those United States

counterparties included, among others, asset management corporations, mortgage and loan

corporations, and insurance companies.  Those counterparties also included banks and other

financial institutions in the United States or located abroad with branches in the United States.

r.      In the instances when the published benchmark interest rates were manipulated in

UBS's favor due to UBS's manipulation of its own or any other Contributor Panel bank's

submissions, that manipulation benefitted UBS derivatives traders, or minimized their losses, to

the detriment of counterparties, at least with respect to the particular transactions comprising the trading positions that the traders took into account in making their requests to the rate submitters. Certain UBS derivatives traders and rate submitters who tried to manipulate Euribor submissions understood the features of the derivatives products tied to these benchmark interest rates; accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions.

s.      When the requests of derivatives traders for favorable Euribor submissions were taken into account by the UBS rate submitters, UBS's rate submissions were false and misleading.  Those false and misleading Euribor contributions affected or tended to affect the price of commodities, including futures contracts.  Moreover, in making and in accommodating these requests, the derivatives traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.  As part of that effort: (1) derivatives traders and submitters submitted and caused the submission of materially false and misleading Euribor contributions; and (2) derivatives traders, after initiating and continuing their effort to manipulate Euribor contributions, negotiated and entered into derivative transactions with counterparties that did not know that UBS employees were often attempting to manipulate the relevant rate.

t.      UBS acknowledged that the wrongful acts taken by the participating employees in furtherance of the misconduct set forth above were within the scope of their employment at UBS. UBS also acknowledged that the participating employees intended, at least in part, to benefit UBS through the actions described above.  UBS further acknowledged that due to this misconduct, UBS, including the UBS branches or agencies in the United States, have been

exposed to substantial financial risk, and partly as a result of the penalties imposed by this non-prosecution agreement and under agreements reached with other government authorities, has suffered actual financial loss.

w.      UBS agreed to pay a $500 million penalty to the DOJ and (among other relief) agreed to continue to cooperate with the DOJ's investigation of Euribor rigging.

### 3.     The FSA Final Notice

72.      The FSA Final Notice accompanying the UBS Settlement provides that, *inter alia*:

a.      On December 19, 2012, the FSA imposed a penalty of £160 million on UBS AG in accordance with section 206 of the Financial Services and Markets Act 2000 (the "Act").

b.      UBS agreed to settle at an early stage of the FSA's investigation. UBS therefore qualified for a 20% (stage 2) discount under the FSA's executive settlement procedures. Were it not for this discount, the FSA would have imposed a financial penalty of £200 million on UBS.

c.      Between January 1, 2005 and December 31, 2010 (the "Relevant Period") UBS breached Principles 3 and 5 of the FSA's Principles for Businesses through misconduct relating to its submission of rates which formed part of the Euribor setting process.   There was a risk that Barclays' misconduct would threaten the integrity of Euribor.

d.      UBS breached Principle 5 during the Relevant Period by making Euribor submissions which took into account requests made by its derivatives traders.  The derivatives traders were motivated by profit and sought to benefit UBS's trading positions.  The requests were made openly and in some cases Barclays' trading desk managers received or participated in inappropriate communications.

e.      Furthermore, UBS' practice to (mis)report its Euribor submissions to benefit trading positions was so pervasive that it was often conducted between certain individuals in open chat forums and in group emails, which included at least a further 70 individuals at UBS.

f.      It was inappropriate for UBS to make Euribor submissions which took its derivatives traders' positions into account. UBS did not therefore observe proper standards of market conduct when making Euribor submissions.

g.      During the period from January 1, 2005 to October 2009, UBS combined the roles of determining its Euribor submissions and proprietary trading in derivative products referenced to Euribor. This combination of roles was a fundamental flaw in organizational structure given the inherent conflict of interest between these two roles and the absence of any effective means of managing that conflict.  There was a clear conflict between the obligation to make submissions in accordance with the published criteria and the responsibility for the profitability of trading positions. Despite this inherent conflict, UBS took no steps to manage the conflict until October 2009.

h.      Even when the trading and submitting roles were split in October 2009, UBS's systems and controls did not prevent Traders from persisting with their Internal Requests and attempting to influence submissions by camouflaging them as "market colour".

i.      At least 13 documented Internal Requests to manipulate Euribor were made, directly involving at least eight individuals at UBS, five of whom were Managers.  In fact, a number of UBS managers knew about and in some cases were actively involved in UBS's attempts to manipulate its Euribor submissions. In total, improper requests directly involved approximately 40 individuals at UBS, 11 of whom were Managers. At least two further

Managers and five Senior Managers were also aware of the practice of the manipulation of submissions to benefit trading positions.

j.       In addition, Traders and Trader-Submitters routinely discussed their trading positions and made Internal Requests orally.

k.       Internal Requests were routine and expected to be taken into account by Trader Submitters. Trader-Submitters also solicited Internal Requests from the Traders and sometimes indicated if the requests suited their own positions. Aside from receiving specific Internal Requests, Trader-Submitters were informed about the overall trading exposure and took this into account when determining submissions.

l.       As discussed above, UBS managers were directly involved in UBS's Euribor manipulation. For example, during a discussion in a public chat group with 58 participants on June 25, 2009 Trader-Submitter C openly solicited several colleagues for Internal Requests in respect of Euribor submissions. Later on the same day, in a private chat Manager D said to Trader-Submitter C: "JUST BE CAREFUL DUDE". Trader-Submitter C replied: "i agree we shouldnt ve been talking about putting fixings for our positions on public chat".

m.       Banks on the Euribor panel are required to follow the Euribor Code of Conduct. On November 12, 2007, the EBF wrote to Euribor Panel Banks and reminded them of their obligations to comply with the Code. The EBF said that: "to avoid unwanted negative consequences, the panel banks are invited to ensure and maintain systematic and close control in their daily quotations to effectively provide accurate information for the daily calculations of the Euribor reference rate [. . .] it is incumbent upon all involved institutions to remain vigilant in their efforts to fully understand and comply with their obligations and best operational practices when providing and/or calculating data."

n.      UBS's sole significant action in connection with its Euribor submissions process was removing the responsibility for determining Euribor submissions from the Short-Term Interest Rates Desk and moving it to ALM in October 2009.  However, it conducted no reviews and had no systems, controls or policies over its Euribor submissions throughout the Relevant Period.

o.      As a result, every Euribor submission in tenors in which UBS traded was at risk of being manipulated.

###    C.    The RBS Settlement

73.      On February 6, 2013, The Royal Bank of Scotland plc ("RBS") agreed to pay **$612 million** (USD) in fines to the DOJ, the CFTC and the FSA to settle charges of false reporting and manipulation of leading global interest rates (the "RBS Settlement").  Among other facts, RBS admitted that the from at least September 2007 through at least mid-2008, on occasion, a RBS interest rate derivatives trader attempted to coordinate with derivatives traders at other banks about submissions relating to Euribor.   For example, in a series of instant messages on October 4, 2007, a RBS interest rates derivatives trader who traded products tied to Euribor, communicated with two derivatives traders employed by Defendant Barclays Bank, plc. The Barclays traders agreed to the RBS  trader's request and shared their intended submissions in other tenors, to which the RBS trader signaled approval.

###    D.    The EBF'S Re-Evaluation of Rate Setting Process

74.      The rate-setting manipulation has prompted the EBF to re-evaluate the Euribor rate-setting process.

75.      During the Class Period, the EBF expressed concerns internally that Euribor was manipulated by its Contributor banks.  The EBF shared those concerns internally and only with

the Euribor panel banks.  Documents recently released such as a November 12, 2007 email to the

Euribor panel banks, from Guido Ravoet, Secretary General of the EBF and Chairman of the

Euribor Steering Committee wrote, "the Euribor Steering Committee wishes to remind the panel

banks of the need for market participants to see the true reflection of the current market situation

in the index rates even in difficult or crisis situations…Participants whose numbers do not

accurately reflect the market and the respective bank's market activities could potentially expose

themselves and EURIBOR to reputational risks.  To avoid unwanted negative consequences, the

panel banks are invited to ensure and maintain a systematic and close control in their daily

quotations to effectively provide accurate information for the daily calculations of the EURIBOR

reference rate."

76.     In July 2012, the EBF requested that all Euribor panel banks to return a signed

Euribor management certification form, in which each bank certifies that (1) all internal

procedures are set up to ensure a robust process for the submission of contributions, excluding

any internal and external influences, (2) that all submitted contributions are the bank's

appreciation of the evolution of the interbank market in the Eurozone according to the Euribor

definition and (3) that the Euribor Code of Conduct is fully respected when contributing to the

Euribor fixing.

77.     In mid-November 2012, the European Central Bank asked for major changes to

Euribor, including an increased reliance on transaction-based figures in the calculation of

Euribor as well as having it directly regulated by European authorities and making it more

independent from the EBF.

78.     On November 28, 2012 Euribor-EBF responded to the European Commission

Consultation Document on the Regulation of Indices.  In its response, the EBF stated that "to

further enhance the credibility and accuracy of Euribor, Euribor-EBF is currently working on new agreed contribution criteria, to define which bank should be considered as a prime bank on one side, and which criteria should be taken into account by the panel bank when sending its contribution to the index." EBF also acknowledged that Euribor should be run by an independent non-profit driven structure, with the introduction of public supervision.

79.     On January 11, 2013, the *Wall Street Journal* reported that two European regulators, the European Banking Authority (the "EBA") and the European Securities and Markets Authority (the "ESMA"), urged a "root-and-branch reform of [Euribor's] governance within six months." The EBA and ESMA identified the weaknesses in the current Euribor structure and rate-setting process as: (i) The Steering Committee, responsible for the governance of the rate-setting process, is not sufficiently independent as a majority of its members come from the panel banks; (ii) EBF, as manager and administrator, does not assume sufficient direct responsibility for, and exercise direct control on, the rate-setting process, including the calculation agent (currently Thomson Reuters); (iii) No formal requirements exist for Euribor panel banks to have adequate internal governance, a code of conduct and conflicts of interest management in relation to the submission process; (iv) The definition of Euribor is not sufficiently clear as it is based on terms which create ambiguity; and (v) The rates being quoted are not assessed sufficiently against evidence from real transactions.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of himself and all others similarly situated. The "Class" is defined as:

> All U.S. persons or entities that purchased or sold, during the period of at least June 1, 2005 through at least June 30, 2010 (the "Class Period"), a NYSE LIFFE Euribor futures contract.

Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.[2]

81.      The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least hundreds, if not thousands, of geographically dispersed Class members transacted in Euribor futures contracts during the Class Period.

82.      Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

83.      Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including commodity futures manipulation and antitrust class action litigation.

84.      Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  These common questions of law and facts include, without limitation:

a.      Whether Defendants conspired to make artificial Euribor and Euribor futures contracts in violation of the Sherman Act;

b.      Whether Defendants' conduct had an anticompetitive and manipulative effect on Euribor and Euribor futures contracts during the Class Period;

---

[2] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

c.    Whether Defendants combined, agreed, or conspired to suppress, fix, maintain, or stabilize Euribor and Euribor futures contract prices in violation of the antitrust laws;

d.    Whether Defendants' unlawful conduct and restraint of trade caused injury to the business or property of Plaintiff and the Class;

e.    The fact and degree of impact on Euribor and the prices of Euribor futures contracts resulting from Defendants' course of unlawful conduct;

f.    Whether Defendants were unjustly enriched at the expense of Plaintiff and members of the Class;

g.    The operative time period and extent of Defendants' foregoing violations; and

h.    Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

85.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

86.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

87.     By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing.  Defendants engaged in secret and surreptitious activities in order to manipulate Euribor and Euribor futures contracts to artificial levels.

88.     Defendants fraudulently concealed their manipulative acts by, among other things, willfully concealing from the market their intentional and systematic submission of false rate information to the EBF in order to manipulate Euribor to artificial levels for the purpose of obtaining ill-gotten trading profits on their Euribor futures and other Euribor derivative contracts whose prices were affected by their (mis)reported Euribor rates.  Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' manipulation any earlier than public disclosures thereof.

89.     As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by the exercise of due diligence on or before October 19, 2011, when the European Commission confirmed that it was investigating companies and financial institutions in the sector of financial derivative products linked to the Euribor.

90.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff.

91.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (For Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*)

92.     Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

93.     Defendants entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

94.     During the Class Period, the Euribor Bank Defendants controlled what Euribor rates would be and therefore controlled the prices of Euribor futures contracts.  Defendants competed in this market.

95.     The combination and conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial Euribor rates and the prices of Euribor futures contracts.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

96.     Defendants' conspiracy, and resulting impact on Euribor and the prices of Euribor futures contracts occurred in or had direct, substantial and reasonably foreseeable effects on interstate and international commerce.

97.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property. Without limiting the generality of the foregoing, Plaintiff and members of the Class paid artificial and non-competitive prices for Euribor futures contracts as a proximate result of Defendants' anticompetitive conduct.  Plaintiff

and the other members of the Class were also deprived of the benefits of free and open competition in transacting Euribor futures contracts.

98.     Plaintiff and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## SECOND CLAIM FOR RELIEF

### (For Unjust Enrichment)

99.     Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

100.     Defendants financially benefited from their unlawful acts.  As alleged herein, Defendants misreported, caused to be misreported, and created false Euribor based rates for the purpose of manipulating Euribor in an artificial direction that, as intended, financially benefitted Euribor futures contracts and other Euribor derivatives held by them.  In this regard, Euribor submitters at Euribor Contributor Defendants regularly and improperly coordinated and changed their Euribor submissions with one another at the request of Euribor Contributor Defendants' interest rate derivatives traders.

101.     Further, certain Euribor Contributor Defendants' interest rate derivatives traders entered into illegitimate and sham market Euribor transactions, including wash trades, with interest rate derivatives traders at other Euribor contributor banks, with the assistance of currently unidentified interbank dealers (e.g., John Doe Defendants).  These illegitimate and sham market transactions, as intended, accomplished a dual purpose: (1) to disseminate false signals and information to other Euribor contributor banks and (2) provide the interdealer

brokers with bribes in the form of illegitimate and unearned commissions for their material involvement in the Defendants' conspiracy to restrain trade, fix, and manipulate Euribor.

102.    These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact in Euribor futures contracts at artificial and manipulated prices.

103.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

104.    Each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

## **PRAYER FOR RELIEF**

Accordingly, Plaintiff demands relief as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and his counsel be appointed as Class counsel;

B.    For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act,

C.    For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

E.       For a judgment awarding Plaintiff and the Class restitution of any and all sums of Defendants' unjust enrichment;

F.       For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

G.       For such other and further relief as the Court may deem just and proper./

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.

Dated:  Chicago, Illinois
          February 12, 2013

By:     /s/   Douglas M. Chalmers
          Doug M. Chalmers, Esq.
          77 West Wacker Drive
          Suite 4800
          Chicago, IL  60601
          Tel.: 312-606-8700
          Fax: 312-444-1028
          ARDC: 6200986

          LOWEY DANNENBERG COHEN
          & HART, P.C
          Vincent Briganti, Esq.
          Geoffrey M. Horn, Esq.
          One North Broadway
          White Plains, New York 10601
          Tel.: 914-997-0500
          Fax: 914-997-0035

          *Counsel for Plaintiff and the Proposed Class*