| | |
|---|---|
| STEPHEN SULLIVAN AND WHITE OAK FUND LP, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>       - against -<br><br>BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., CITIGROUP, INC., CITIBANK, N.A., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., CRÉDIT AGRICOLE S.A., CRÉDIT AGRICOLE CIB, DEUTSCHE BANK AG, HSBC HOLDINGS PLC, HSBC BANK PLC, J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, NATIONAL ASSOCIATION, THE ROYAL BANK OF SCOTLAND PLC, SOCIÉTÉ GÉNÉRALE SA, UBS AG AND JOHN DOE NOS. 1-50,<br><br>          Defendants. | Docket No. 13-cv-02811 (PKC)<br><br>ECF Case<br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Stephen Sullivan and White Oak Fund LP (collectively, "Plaintiffs") complain, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, against Defendants (defined at ¶¶ 44-62), as follows:

## INTRODUCTION

1.      So far, Defendants have paid in excess of $ 4,500,000,000 to settle government charges and consented to findings that they manipulated, among other things, the European Banking Federation's ("EBF") Euro Interbank Offered Rate ("Euribor") and the prices of Euribor-based derivatives.  This action is brought by Plaintiffs on behalf of themselves and the

class of persons who transacted at the manipulated and artificial prices of Euribor-based derivatives that Defendants unlawfully caused.

2.     **<u>Nature of the Action</u>**.  This action arises from Defendants' unlawful combination, agreement and conspiracy to fix and restrain trade in, and the intentional manipulation of Euribor and the prices of Euribor-based derivatives, during the period of at least June 1, 2005 through at least March 2011 and later (the "Class Period"), in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* (the "CEA"), the Sherman Act, 15 U.S.C. § 1, *et seq.*, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and the common law.

3.     **<u>Background</u>**.  Euribor is intended to reflect the rate of interest charged on short-term loans of unsecured funds denominated in the Euro currency between prime banks in the wholesale money (or interbank) market.  Euribor is used to price, settle and benchmark over $200 trillion of Euribor-based derivatives traded in the U.S. and abroad.  One such derivative, the NYSE LIFFE three-month Euribor futures contract, for example, is the fourth most actively traded interest rate futures contract in the world, and is benchmarked and price settled specifically to three-month Euribor.  Trillions of dollars in notional value of Euribor-based derivatives were traded by U.S. investors and others during the Class Period.

4.     The EBF publishes Euribor based on quotes received from EBF contributor banks as of 11:00 a.m. Central European Time ("CET") each business day.  Thomson Reuters, on behalf of the EBF, computes that day's published Euribor by eliminating the highest and lowest fifteen percent of submissions collected, and averages the remaining submissions.  That average becomes the official daily EBF Euribor (the "Euribor fixing").  By its definition, Euribor requires the EBF contributor banks to determine the rates at which funds may be obtained in the

Euro interbank market.  Under no circumstances are EBF Euribor contributor banks allowed to report rates that are reflective of factors unrelated to the prevailing costs of borrowing unsecured funds denominated in the Euro currency, such as rates influenced by a bank's motive to maximize profits or minimize losses in derivative transactions tied to Euribor.

5.      The Contributor Bank Defendants (defined at ¶ 59) served as EBF Euribor contributor banks during the Class Period (defined at ¶ 394).  In that capacity, the Contributor Bank Defendants were directly responsible for the setting of Euribor during the Class Period, and thereby controlled pricing for Euribor and Euribor-based derivatives.

6.      **ACPERA**.  Pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act (Pub. L. No. 108-237, tit. II, 118 Stat. 661, 665, extended by Pub. L. No. 111-190, 124 Stat. 1275) ("ACPERA"), the U.S. Department of Justice ("DOJ") Antitrust Division granted Defendant Barclays Bank PLC conditional leniency for its anticompetitive conduct relating to its Euribor-related collusion during the Class Period.  Defendant Barclays Bank PLC, pursuant to its obligations under ACPERA, has agreed to provide Plaintiffs cooperation in connection with prosecution of the claims alleged herein, but has to date been restrained from doing so by the DOJ because the DOJ's criminal investigation of the conduct alleged herein continues.

7.      **Deferred Prosecution Agreement**.  Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") agreed to waive indictment to a one-count criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section and Antitrust Division of the DOJ charging Rabobank with wire fraud, in violation of 18 U.S.C. § 1343, in connection with, *inter alia*, Rabobank's false reporting of Euribor.  Rabobank agreed to cooperate with the DOJ's continuing investigation of Euribor manipulation (among other unlawful conduct) and agreed to pay a fine of $325 million.  Rabobank also agreed that a 41-

page Statement of Facts detailing the nature of its misconduct was true and accurate. The DOJ agreed to defer prosecution of Rabobank for a two-year period.

8.     **Government Settlements and Admissions of Unlawful Anticompetitive and Manipulative Conduct**.  Defendants' unlawful conduct has resulted in agreements with government regulators and collective payments of over **$4.5 billion** in fines and penalties (among other relief) by Defendants Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc. (collectively, "Barclays"), the Royal Bank of Scotland plc ("RBS"), UBS AG ("UBS"), Rabobank, Deutsche Bank and Société Générale.

9.     The settlements resolve DOJ, U.S. Commodity Futures Trading Commission ("CFTC"), the U.K. Financial Services Authority ("FSA")[1] and European Commission criminal and/or civil charges relating to restraints of trade and manipulation of Euribor and Euribor-based derivatives.

10.     The Barclays, RBS, UBS and Rabobank settlements each include a DOJ "Statement of Facts" that are attached to, and incorporated by reference in, various non-prosecution or deferred prosecution agreements entered with the DOJ's Criminal Division, Fraud Section.  Barclays, RBS, UBS and Rabobank admitted that their respective Statement of Facts was true and accurate, which makes these facts conclusive, not just plausible, for purposes of this pleading and in subsequent stages of this litigation, including trial.  Among other facts, Barclays, RBS, UBS and Rabobank admitted:

11.     **Barclays**.  From approximately 2005 through 2009, Barclays made knowingly false submissions of Euribor to deliberately move Euribor in an artificial direction that financially benefitted Barclays' Euribor-based derivatives positions (and, on certain occasions,

---

[1] On April 1, 2013, the Financial Services Authority changed its name to the Financial Conduct Authority ("FCA").

the Euribor-based derivatives trading positions of other Contributor Bank Defendants). For example, beginning in at least February and March 2007, Barclays colluded with traders at four other Euribor contributor banks to manipulate the three-month Euribor artificially lower on March 19, 2007, in order to financially benefit their Euribor-based derivatives positions. Recognizing the apparent success of their "2months of preparation" [sic] in collusively moving Euribor and the prices of Euribor-based derivatives, a Barclays' trader wrote to one of his conspirators at another Euribor contributor bank, stating in part, "this is the way you pull off deals like this," and "the trick is *you must not do this alone*." (emphasis added).

12. **RBS**. Commencing in at least September 2007 and continuing through at least mid-2008, an RBS interest rate derivatives trader colluded with other interest rate derivatives traders, including those at Defendant Barclays and other presently unidentified Euribor contributor banks, to submit false Euribor rates to the EBF. The purpose of the collusion was to manipulate Euribor in an artificial direction to benefit RBS's, Barclays' and the other yet-to-be-identified Euribor contributor banks' Euribor-based derivatives positions.

13. **UBS**. From at least September 2005 through June 2010, UBS Euro derivatives traders requested that UBS's Euribor submitters contribute submissions to financially benefit the UBS's Euribor-based derivatives positions. For example, in an October 2, 2006 electronic chat between a UBS Euro derivatives trader and a UBS Euribor submitter, the submitter solicited the trader's preference for that day's Euribor submission, asking, "any special wishes for the fixing?" The trader responded, "I lose 120k of a received fix today . . . so low would be good." The trader then indicated that his/her request for low Euribor to financially benefit UBS's Euribor-based derivatives positions applied to both the 3-month and 6-month tenors, to which the submitter responded, "ok we go 42 and 57."

14.     **Rabobank**.  From approximately July 2007 through September 2008, multiple Rabobank Euribor swaps traders in London and Utrecht made frequent requests for favorable Euribor contributions to the Rabobank Euribor submitters on the Utrecht money markets desk to financially benefit Euribor-based derivatives positions held by Rabobank and/or their co-conspriators.  Rabobank's Euribor submitters accommodated these requests.  For example, on April 22, 2008, Rabobank's Euribor submitter, Submitter-9, messaged a Euribor swaps trader ("Trader-10"): "Hello let's cheat on the fixes ??" Trader-10 wrote back: "only biggie is really low 3s. much appreciated, as usual:)."  Also, from at least as early as January 2006, and at various times until at least December 2007, Submitter-9 received requests from two swaps traders located in London at a non-Contributor Panel bank (anonymously identified as "Bank-C") to move Rabobank's Euribor submission in a direction that would benefit their Euribor derivatives positions.

15.     The Barclays, RBS, UBS and Rabobank Settlements are also memorialized in "CFTC Orders" and "FSA Final Notices" which include additional factual allegations consistent with the admissions contained in the DOJ "Statement of Facts" regarding anticompetitive and manipulative conduct by Defendants Barclays, RBS, UBS and Rabobank (among other yet-to-be identified co-conspirators).

16.     On December 4, 2013, the European Commission fined Defendants Barclays, Deutsche Bank, Société Générale and RBS more than €1 billion for participating in a "Euro Interest Rate Derivatives cartel."  The European Commission determined that the Euro Interest Rate Derivatives cartel operated between September 2005 and May 2008.  The cartel's aim was to distort the normal course of pricing components for Euribor-based derivatives.  Traders of different banks discussed their bank's submissions for the calculation of Euribor as well as their

derivatives trading and pricing strategies. The European Commission's investigation into the Euro Interest Rate Derivatives cartel continues against Defendants Crédit Agricole, HSBC and JPMorgan.

17. **Primary Commodity Exchange Act Violations**. Defendants utilized diverse and pervasive means to manipulate Euribor and Euribor-based futures contract prices to artificial levels during the Class Period in violation of the CEA, including making false reports prohibited in Section 4b(a) of the CEA, 7 U.S.C. § 6b, and criminalized in Section 9(a) of the CEA, 7 U.S.C. § 13(a). Plaintiffs have a private right of action under Section 22(a) of the CEA, 7 U.S.C. § 25(a), for each and every of the foregoing manipulative acts by Defendants.

18. **Direct Evidence of Anticompetitive and Manipulative Conduct**. Defendants intentionally and systematically manipulated Euribor to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) in ill-gotten trading profits on Euribor-based derivatives held by them or their co-conspirators, the prices of which (and thus profits or losses) were determined in whole or in part by Euribor. As an intended and direct consequence of Defendants' unlawful conduct, the prices of Euribor-based derivatives contracts were manipulated to artificial levels by Defendants throughout the Class Period.

19. Although only a small fraction of Defendants' communications have thus far been made public in connection with the Barclays, RBS, UBS and Rabobank settlements, those communications already include what courts have characterized as "rare," "smoking gun," and "direct" evidence of illicit conspiratorial conduct and blatant market manipulation. Defendants' employees, including Barclays, RBS, UBS, Rabobank, other Contributor Bank Defendants' traders and submitters, and other co-conspirators, are captured in communications speaking

freely, unapologetically and eagerly of their desire to manipulate Euribor in an artificial direction so as to financially benefit their Euribor-based derivatives positions.

20.     For example, in one instance of continued and successive manipulation over a four-month period from at least December 2006 through March 2007, Barclays orchestrated a collusive scheme to align the trading strategies among traders at multiple Contributor Bank Defendants for the express purpose of rendering artificial the three-month Euribor on the March 2007 International Monetary Market ("IMM") date, in order to derive illicit profits from their long Euribor futures contract trading positions. The foregoing conduct is evidenced in numerous communications, including, for example, the following instant messages between a Barclays trader (referred to as Barclays' Senior Euro Swaps Trader) and traders at numerous other Contributor Bank Defendants (referred to as Banks A, B and D):

1) December 27, 2006:

   o   Barclays' Senior Euro Swaps Trader: "Hi [Barclays Euro Swaps Trader]. A few things. Ask for a low 3m today and ask [trader at Bank B] and [trader at Bank A] to put it low as well."

   o   Two days later, Barclays' Euro Swaps Trader emailed the Euribor requests as instructed to the Barclays Euribor Submitters and the traders at the other banks.

2) February 12, 2007:

   o   Barclays' Senior Euro Swaps Trader bragged to a trader at Bank D that he was going to "push the cash to the basement" on the next IMM March date in order to make money on trades, claiming that he will have 80,000 lots in the Euribor futures contract on it. He swore the trader at Bank D to secrecy, claiming that if they did not keep the plan secret it would not work. Barclays' Senior Euro Swaps Trader also claimed that his "treasury [or Euribor Submitter] has the power to move 3m cash to the basement."

3) March 19, 2007:

   o   Barclays' Senior Euro Swaps Trader emailed the Barclays Euribor submitter: "As discussed could ... put the 3m as low as possible ...."

   o   The Barclays Euribor Submitter replied: "Will do my best."

4) March 20, 2007:

- Barclays' Senior Euro Swaps Trader stated to trader at Bank A that they needed to have the three month Euribor fixing go up slowly to avoid drawing any attention.

- Barclays' Senior Euro Swaps Trader told the trader at Bank A that he believed he was able to influence five other panel member banks the day before to lower their Euribor submissions as they both desired.

21. **Other Indicia of Unlawful Conduct:  Motive To Manipulate Euribor**.

Plaintiffs disclaim any need to plead motive for their claims.  Insofar, however, as motive allegations are legally relevant, Defendants' (i) admitted desire to manipulate Euribor to financially benefit their or their co-conspirators' Euribor-based derivatives positions; (ii) unlawful conduct in the setting of Euribor; and (iii) consistent success in manipulating Euribor and Euribor-based derivatives prices to artificial levels, all indicate Defendants' manipulative intent.  Another indication of the Defendants' intent is the large financial motive they had to manipulate.  The high-stakes nature and tremendous amounts of money that was waged on the manipulation and then realized on its success, *i.e.*, hundreds of millions (if not billions) in ill-gotten trading profits from Euribor-based derivatives positions held by the Contributor Bank Defendants (translating into hundreds of millions in illegitimate bonus and other compensation paid to the banks' traders and submitters), fueled an obsessive need to manipulate Euribor.

22. Instant messages and other documents thus far made public show that Defendants' traders and co-conspirators knew how much money was on the line with even the slightest movement (*e.g.*, one basis point) in Euribor.  For example, a trader at an unidentified Euribor Contributor bank stated "I'm going to put pressure on the treasury so that he sets it very low," to which Barclays' Trader-5 replied a move lower would benefit Barclays, "750k eur/bp [€750,000 per basis point move]."  Traders also routinely thanked rate submitters for carrying

out their instructions to submit false Euribor rates that benefitted their Euribor-based derivatives positions, remarking "thanks" and "I love you."

23.     **Other Indicia of Unlawful Conduct: Reckless Disregard for the Consequences of their False Euribor Submissions**.  Defendants' own words are unencumbered by any concern of market oversight, internal supervision, or legal recourse. They fully intended the far reaching, negative and material impact that their anticompetitive and manipulative conduct had on the Euribor-based derivatives market and public investors.  As sophisticated market participants responsible for setting some of the world's most important benchmark interest rates, Defendants knowingly submitted false reports to the EBF that caused Euribor-based derivatives contracts to trade at artificial and manipulated levels throughout the Class Period.

24.     **Other Indicia of Unlawful Conduct: The Role of Managers, Knowledge of Unlawfulness and Conduct to Escape Detection**.  Defendants continued their Euribor manipulation long after authorities had launched investigations into false reporting and manipulation of the London Inter-Bank Offered Rate for the U.S. Dollar ("USD-LIBOR").  For example, on June 25, 2009, more than eight months after the CFTC had launched an investigation into UBS's USD-LIBOR submission practices, a UBS senior manager warned UBS's Euro derivatives traders and submitters not to make requests for beneficial Euribor submissions on a "public chat" and instructed UBS traders to "JUST BE CAREFUL DUDE." Tellingly, UBS senior managers in this chat never instructed UBS's Euribor traders and submitters to stop the practice of falsely reporting Euribor to benefit UBS's Euribor derivatives positions.  Instead, this conduct continued unabated.  In fact, a written direction involving a

senior UBS manager for a false Euribor submission benefitting UBS's Euribor derivatives positions occurred as late as June 30, 2010.

25.     **Written Evidence, Evidence of Oral Communications and Other Strong Circumstantial Evidence of Conspiracy Implicating the Other Contributor Bank Defendants**.  While the direct evidence implicates conclusively Defendants Barclays, RBS Rabobank, Deutsche Bank and Société Générale in the manipulation and antitrust conspiracy, the other Contributor Bank Defendants are under investigation by various global antitrust regulators. Moreover, the small sampling of instant messages and other collusive communications publicly released thus far demonstrate that a substantial number of the Contributor Bank Defendants (whose names are masked by designations such as "Bank A") are also involved in the manipulation and antitrust conspiracy.  For example, there are at least 56 publicly available instant messages showing collusion between Barclays, Rabobank, multiple Euribor Contributor Banks and others.

26.     The FSA found that that "Trader E" at Barclays along with five swaps traders at Barclays regularly conspired with traders at six other yet unidentified Euribor contributor banks (identified in the FSA Final Notice as Banks 1-6).

27.     Public reports have identified Trader-E as Philippe Moryoussef.  The *Financial Times* revealed that Philippe Moryoussef regularly contacted traders he knew at other banks, either through previous employment or professional networks.  These traders included: (i) Michael Zrihen at Defendant Crédit Agricole; (ii) Didier Sander at Defendant HSBC; (iii) Christian Bittar at Defendant Deutsche Bank; and (iv) other traders at Defendants Rabobank and Société Générale SA.

28.     In addition, individuals close to the investigation disclosed that Barclays' traders "were the ringleaders" of a circle that included traders at Contributor Bank Defendants who conspired together to align their trading strategies in order to profit from their Euribor-based derivatives positions.

29.     The full scope of Contributor Bank Defendants Deutsche, HSBC, Société Générale SA, Crédit Agricole CIB, and yet-to-identified co-conspirators' involvement in the conspiracy to fix the prices of Euribor-based derivatives has not yet been determined.

30.     **Disciplinary Proceedings, Terminations, Resignations and Withdrawal from the Euribor Rate Setting Panel**.  Defendants UBS, Rabobank and Citigroup have withdrawn from the Euribor panel.  In addition, Barclays' Chairman Marcus Agius, its Chief Executive Officer, Robert E. Diamond, Jr. and Chief Operating Officer Jerry Del Missier resigned within days of the announcement of the Barclays' Settlement.  In connection with his resignation, Mr. Diamond revealed that at least 14 traders at Barclays were involved in the unlawful conduct at the bank.

31.     Further, on October 29, 2013, Rabobank's CEO Piet Moerland resigned immediately following the announcement of Rabobank's $1.07 billion settlement with global regulators.  Rabobank also disciplined more than 20 employees and admitted that 30 employees participated in the unlawful manipulative and anticompetitive conduct in Euribor and Euribor-based derivatives (among other interbank rates).

32.     Former employees and traders at Defendants Deutsche, HSBC, Société Générale SA, Crédit Agricole CIB and Rabobank are directly implicated by public reports as integral to the manipulation and conspiracy to fix the prices of Euribor and Euribor-based derivatives.

33.  **Government Investigations**.  Numerous government investigations in the U.S. and abroad into alleged Euribor rigging are on-going, including by the DOJ, the CFTC, the European Union (the "EU"), the FSA, the Swiss Financial Market Supervisory Authority, German bank regulator Bafin, the Dutch Central Bank and Italian prosecutors.  The full scope of these investigations has not yet been publicly revealed.

34.  **Public Officials Acknowledge The Existence of Cartels and Wide-Spread Collusion in Euribor Rate-Setting**.  Commenting on the European Commission's €1 billion fine against Barclays, RBS, Deutsche Bank and Société Générale, Joaquin Alumnia, Vice-President of the European Commission, publicly stated: "What is shocking about the . . . Euribor scandal[] is not only the manipulation of the benchmarks, . . . but also the collusion between banks who are supposed to be competing with each other."

35.  **Further Evidentiary Support**.  The foregoing agreements, investigations and proceedings are expected to yield information from Defendants' internal records (*e.g.*, instant messages, e-mails, telephone recordings, Euribor-based derivatives trading data, etc.) that further supports Plaintiffs' claims.  Plaintiffs believe that further evidentiary support for the allegations will be unearthed after Plaintiffs receive ACPERA cooperation from Barclays and a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

36.  This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Section 1964 of RICO, 18 U.S.C. § 1964 and common law, respectively.

37.  This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the

Clayton Act, 15 U.S.C. §§ 15 and 26(a), Section 1964 of RICO, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337, respectively. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

38.     Venue is proper in the Southern District of New York, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. § 25(c), Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, Section 1965 of RICO (18 U.S.C. § 1965), and 28 U.S.C. §1391(b), (c) and (d). One or more of the Defendants resided, transacted business, were found, or had agents in the District, and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

39.     Defendants, directly and indirectly, unilaterally and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, specifically through use of electronic messaging and other electronic means of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint.

40.     The United States courts have jurisdiction over the claims asserted in this Complaint. Euribor and Euribor-based derivatives contracts are each a commodity that trades in U.S. interstate commerce. Euribor is a "commodity" and is the "commodity underlying" Euribor-based derivatives contracts, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively. More specifically, Euribor is an "excluded commodity" as that term is defined in Section 1a(19), 7 U.S.C. §§ 1a(19) (formerly 7

U.S.C. §1a(13)). In the CEA, the term "'excluded commodity' means (i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure . . . .". Excluded commodities are subject to all CFTC anti-manipulation rules, including Section 9(a)(2), which criminalizes the dissemination of false market information.

41.     Defendants' restraints of trade, intentional misreporting, manipulation and agreements to fix the price of Euribor and manipulation of the price of Euribor-based derivatives had direct, substantial and foreseeable effects in the U.S., and on the Euribor-based derivatives Plaintiffs and members of the Class transacted in during the Class Period. Hundreds of millions of Euribor-based derivatives were traded in the U.S. and by U.S. investors during the Class Period. Defendants, as Euribor contributor banks and sophisticated market participants, knew that Euribor rates published and compiled by and on behalf of the EBF are disseminated in the U.S., and are used to benchmark, price and settle Euribor-based derivatives contracts traded in the U.S. and by U.S. investors. For these reasons, Defendants knew that misreporting Euribor to the EBF as well as other manipulative and collusive conduct in the Euribor market, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including on the prices of Euribor-based derivatives contracts transacted in the U.S. and by U.S. investors.

## PARTIES

42.     Plaintiff Stephen Sullivan, a natural person residing in Chicago, Illinois, suffered losses due to the presence of artificial Euribor-based derivatives prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. For example, on March 19, 2007, Plaintiff Sullivan, liquidated a June 2007 NYSE LIFFE three-month Euribor futures position at a loss and initiated a June 2007 NYSE LIFFE three-month Euribor futures

position that was subsequently liquidated at a loss on March 23, 2007. These loses were caused as a result of transacting in a manipulated Euribor-based derivatives market that was restrained by anticompetitive acts alleged here. Sullivan also purchased long 40 December 2005 CME Euro currency futures contracts on October 7, 2005 and liquidated this position on October 10, 2005 for a net loss of $19,762 as a result of transacting in a manipulated Euribor-based derivatives market that was restrained by anticompetitive acts alleged here. Sullivan also sold short 2 CME June 2006 Euro currency futures contracts on April 12, 2006 and liquidated this position on April 17, 2006 for a net loss of $4,112 as a result of transacting in a manipulated Euribor-based derivatives market that was restrained by anticompetitive acts alleged here. In addition, Sullivan sold short 14 December 2006 CME Euro currency futures contracts on October 12 and 13, 2006 and liquidated this position on October 19 and 20 for a net loss of $5,162 as a result of transacting in a manipulated Euribor-based derivatives market that was restrained by anticompetitive acts alleged here. The financial losses on these transactions proximately caused by the Defendant's overcharges and/or the artificiality caused by Defendants' manipulation represent one category of damages Sullivan is entitled to recover. Additionally, Sullivan was deprived of his right and expectation of transacting in a lawful, non-manipulated and non-collusive Euribor-based derivatives market, and otherwise suffered injury to his business or property as a direct result of Defendants' unlawful conduct.

43. Plaintiff White Oak Fund LP ("White Oak") is an investment fund headquartered in Burr Ridge, Illinois. White Oak traded NYSE LIFFE Euribor futures contracts during the Class Period at artificially manipulated prices and was overcharged in those transactions due to the anticompetitive acts alleged herein. White Oak was further deprived of its right and

expectation of transacting in a lawful, non-manipulated Euribor market, and therefore otherwise suffered injury to its business or property as a direct result of Defendants' unlawful conduct.

44.     Defendant Barclays PLC is a British banking and financial services company headquartered in the United Kingdom.  It operates in over 50 countries around the world, including the United States.

45.     Defendant Barclays Bank PLC is a United Kingdom-based global banking and financial services company that is engaged in retail and commercial banking, credit cards, investment banking, wealth management and investment management services.  Barclays Bank PLC has banking subsidiaries around the world, including in the United States, and Barclays Bank PLC has a branch in New York.

46.     Defendant Barclays Capital Inc. is a wholly owned subsidiary of Barclays PLC and engages in investment banking, wealth management and investment management services. It has been registered with the CFTC as a Futures Commission Merchant since 1990, an approved Exempt Foreign agent since 1992, and a Commodity Pool Operator and Commodity Trading Advisor since 2009 (collectively, Barclays Bank PLC and Barclays Capital Inc. are referred to as "Barclays").  Barclays maintains an office in this District.

47.     Barclays employs derivatives traders in New York, New York and in London, England who trade Euribor-based derivatives.  Barclays' employees on its money markets desk in London have been responsible for contributing Barclays' Euribor submissions.

48.     Defendant Citigroup, Inc. is a Delaware corporation headquartered at 399 Park Avenue, New York, New York.  Defendant Citibank, N.A. is a federally chartered national banking association.  Defendant Citibank, N.A. is a wholly-owned subsidiary of defendant

Citigroup, Inc.  Defendants Citigroup Inc. and Citibank, N.A. are collectively referred to herein as "Citi."

49.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider with offices worldwide and its main headquarters in the Netherlands.   Rabobank maintains offices in this District.

50.     Defendant Crédit Agricole S.A. is a financial services company headquartered in France.  Defendant Crédit Agricole CIB is the Corporate & Investment Banking arm of the Crédit Agricole group, a retail bank based in Paris, France.  Crédit Agricole CIB is the current name (as of February 6, 2010) of Euribor Contributor Bank Calyon (together with Crédit Agricole S.A., "Crédit Agricole").  Crédit Agricole maintains offices in this District.

51.     Defendant Deutsche Bank AG ("Deutsche") is a German financial services company headquartered in Frankfurt, Germany. Deutsche maintains offices in this District.

52.     Defendants HSBC Holdings plc is a United Kingdom public limited company headquartered in London, England.  Defendant HSBC Bank plc is also a United Kingdom public limited company headquartered in London, England and a wholly-owned subsidiary of HSBC Holdings plc.  Defendants HSBC Holdings plc and HSBC Bank plc are referred to collectively herein as "HSBC."  HSBC maintains offices in this District.

53.     Defendant J.P. Morgan Chase & Co. ("JPMorgan Chase") is a Delaware financial holding company headquartered in New York, New York.  Defendant J.P. Morgan Chase Bank, National Association, is a federally chartered national banking association also headquartered in New York, New York and is a wholly owned subsidiary of Defendant JPMorgan Chase.

54.     Defendant The Royal Bank of Scotland plc ("RBS") is a British banking and financial services company headquartered in the United Kingdom.  It has operations in approximately forty countries and territories around the world, including the United States.

55.     Defendant Société Générale SA ("Société Générale") is a European financial services company headquartered in Paris, France.  Société Générale maintains offices in this District.

56.     Defendant UBS AG ("UBS") is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland.  UBS provides investment banking, asset management and wealth management services for private, corporate and institutional clients worldwide.  It has operations in over 50 countries, including the United States, with its United States headquarters in New York, New York and Stamford, Connecticut.

57.     UBS employs derivatives traders throughout the world, including Stamford, Connecticut, London, Zurich and Tokyo, who trade Euribor-based and other interbank rate derivatives from these locations.

58.     Defendants Barclays, Citi, Crédit Agricole, Deutsche, HSBC, JPMorgan, Rabobank, RBS, Société Générale and UBS either directly or indirectly through a wholly-owned subsidiary served as EBF Euribor Contributor Panel Banks during the Class Period.

59.     Defendants Barclays, Citi, UBS, RBS, Deutsche, HSBC, Crédit Agricole, Société Générale, Rabobank and JPMorgan with other EBF Euribor contributor banks whose identities are currently unknown to Plaintiffs (the "John Doe Defendants") are collectively referred to herein as the "Contributor Bank Defendants."

60.     The Contributor Bank Defendants, either directly or through their subsidiaries or affiliates engaged in for-profit trading of Euribor-based derivatives which were benchmarked, traded and/or price settled to Euribor during the Class Period.

61.     John Doe Defendants Nos. 1-50 are other entities or persons, including EBF Euribor contributor banks, interdealer brokers, cash brokers and other co-conspirators referenced in the agreements memorializing the Barclays, RBS, UBS and Rabobank settlements or discovered at a later date, whose identities are currently unknown to Plaintiffs. The John Doe Defendants, along with the Contributor Bank Defendants, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euribor and the prices of Euribor-based derivatives.

62.     Defendants Barclays, Citi, Crédit Agricole, Deutsche, HSBC, JPMorgan, Rabobank, RBS, Société Générale, UBS and John Does Nos. 1-50 are collectively referred to herein as "Defendants."

## AGENTS AND UNNAMED CO-CONSPIRATORS

63.     Various other entities and individuals, including, but not limited to, securities-dealers subsidiaries and/or affiliates of the Contributor Bank Defendants, participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein. The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euribor and Euribor-based derivatives.

## SUBSTANTIVE ALLEGATIONS

**I.      Background**

**A.  The Euro Interbank Offered Rate**

64.      Euribor is the predominant money market reference interest rate for the Euro currency.  It is intended to reflect the rate of interest charged on short-term loans of unsecured funds denominated in the Euro currency between prime banks in the wholesale money (or interbank) market.

65.      Specifically, Euribor is defined as the rate "at which Euro interbank term deposits are offered by one prime bank to another prime bank" within the Economic and Monetary Union of the European Union ("EMU") at 11:00am Central European Time ("CET") daily.

66.      Euribor is set through the EBF by its member banks.  The EBF, an unregulated non-profit association of the European banking sector based in Brussels, Belgium oversees the publication of Euribor.  Euribor is determined using the submissions from Euribor contributor banks considered by the EBF to be the most active in the Euro zone with the highest volume of business in the EMU.

67.      Under Article 1 of the Euribor Code of Conduct, titled "Criteria to Qualify For And Stay On The Euribor Panel," a bank may qualify for the panel "if they are active players in the euro money markets in the euro-zone or worldwide and if they are able to handle good volumes in euro-interest rate related instruments, especially in the money market, even in turbulent market conditions."  Additionally, the bank must be "of first class credit standing, high ethical standards and enjoying an excellent reputation."  Thus, the banks on the Euribor Panel are the most sophisticated and active banks in the Euro interbank and Euribor derivatives market.

68.     In addition, Euribor Contributor banks must subject themselves unconditionally to the Euribor Code of Conduct and its Annexes, in their present or future form.

69.     Under Article 4 of the Euribor Code of Conduct, titled "Obligations of Panel Banks," Euribor Contributor Banks must among other things, quote the required euro rates: (i) to the best of their knowledge, these rates being defined as the rates at which Euro interbank term deposits are being offered within the EMU zone by one prime bank to another at 11.00 a.m. Brussels time ("the best price between the best banks"). Thus, Euribor contributor banks are to observe the market and base their submissions on where the Euro is trading. Euribor contributor banks may not base their submissions on unrelated considerations such as the profitability of their Euribor-based derivatives positions.

70.     Significantly, Euribor Contributor banks must promote as much as possible Euribor (*e.g.*, use Euribor as reference rate as much as possible) and refrain from any activity that could negatively impact Euribor.

71.     Euribor is fixed each business day for fifteen tenors, ranging from one week to twelve months, including three-months. Euribor contributor banks submit their rates electronically to Thomson Reuters, which manages the official Euribor process on behalf of the EBF by collecting the submitted rates from the contributor banks, calculating the rate, and then releasing it for publication just before noon CET. Thomson Reuters, headquartered in this district, serves as the EBF's agent for the collection, calculation, publication and dissemination of the daily Euribor.

72.     Thomson Reuters computes that day's published Euribor by eliminating the highest and lowest fifteen percent of submissions collected, and averaging the remaining submissions. That average rate becomes the official daily EBF Euribor (the "Euribor fixing").

73.     On behalf of EBF, Thomson Reuters then issues the daily Euribor fixing and the submissions of each contributor bank to its subscribers and other data vendors.  Through these licensing agreements with third parties, such as Thomson Reuters, the EBF disseminates Euribor fixings and rate information globally, including in the United States.

74.     According to the EBF, each contributor bank is allocated a private page on which to contribute its data.  Each private page can only be viewed by the submitting Euribor contributor bank and by Thomson Reuters' staff involved in the fixing process.  Therefore, absent collusion to restrain trade, fix the price of, and manipulate Euribor and Euribor-based derivatives among Euribor contributor banks, it is impossible for a contributor bank to know another contributor bank's Euribor submission prior to its daily dissemination by Thomson Reuters.

### B.  Euribor-Based Derivatives

75.     Euribor is used to price, settle and benchmark over $200 trillion of Euribor-based derivatives traded on major futures and options exchanges and in over-the-counter markets in the U.S. and abroad.  For example, the NYSE LIFFE three-month Euribor futures contract is the fourth most actively traded interest rate futures contract in the world, and is benchmarked, priced and/or settled specifically to three-month Euribor.

76.     Euribor-based derivatives are financial instruments that are benchmarked, priced and/or settled to Euribor.  Euribor-based derivatives include but are not limited to NYSE LIFFE Euribor futures contracts, CME Euro currency futures contracts, interest rate swaps, forward rate agreements and other financial instruments.

### i.    NYSE LIFFE and Euribor Futures Contracts

77.    NYSE LIFFE is a global derivatives exchange and wholly-owned subsidiary of NYSE Euronext group.

78.    NYSE LIFFE allows U.S. investors to trade a number of globally-traded futures and derivative contracts, including Euribor futures contracts.

79.    NYSE LIFFE's U.S.-based customers are connected through NYSE LIFFE CONNECT, an electronic trading platform that supports electronic transactions of all NYSE LIFFE products, including Euribor futures contracts.

80.    NYSE LIFFE became a fully electronic exchange in 2000, with the migration of its commodity futures products onto NYSE LIFFE CONNECT.

81.    U.S investors – by accessing NYSE LIFFE CONNECT terminals in the U.S. – have been able to directly trade Euribor futures contracts on NYSE LIFFE since 1999.  Euribor futures contracts are open for trading 20 hours a day on NYSE LIFFE.  NYSE LIFFE touts on its website that "Whether in Europe, the U.S. or Asia, you can trade the Euribor futures contract during your Trading Day."

82.    U.S. investors' direct access to NYSE LIFFE has been permitted pursuant to publicly filed requests for no-action relief by NYSE LIFFE to the CFTC.

83.    For instance, on July 23, 1999, the CFTC issued a no-action letter in which it confirmed that it would not recommend that the CFTC institute enforcement action against LIFFE (Euronext acquired LIFFE in January 2002) or its members solely based upon LIFFE's failure to apply for contract market designation pursuant to Sections 5 and 5a of the Commodity Exchange Act  "if: (i) LIFFE members trade for their proprietary accounts through LIFFE CONNECT™, [LIFFE's electronic trading and order matching system,] in the U.S.; (ii) LIFFE

members who are registered with the Commission as futures commission merchants (FCMs)[2] or who are Rule 30.10 Firms submit orders from United States customers for transmission to LIFFE CONNECT™; and/or (iii) LIFFE members who are registered with the Commission as FCMs or who are Rule 30.10 Firms accept orders through automated order routing systems (AORS) from United States customers for submission to LIFFE CONNECT™." CFTC Staff Letter No. 99-31 (July 23, 1999), at p. 19.

84.     The CFTC, in granting no-action relief to LIFFE, relied upon LIFFE's representations that, *inter alia*, "LIFFE CONNECT™ is capable of identifying trades that have originated from an API system located in the United States and will report such trades as "United States trades." CFTC Staff Letter No. 99-31 (July 23, 1999), at n. 71.

85.     On August 21, 2006, LIFFE requested an amendment to the above no-action relief such that current and future LIFFE members that are registered with the Commission as commodity pool operators (CPO) or commodity trading advisors (CTA), or that that are exempt from such registration pursuant to Commission Rule 4.13 or 4.14, may enter orders directly into LIFFE CONNECT® through terminals "located in the U.S" on behalf of the pools which they operate or the customer accounts over which they exercise trading discretion, respectively. CFTC Staff Letter No. 06-25 (September 29, 2006), at p. 1.

86.     In so requesting the amendment, LIFFE represented, *inter alia*, that all such trading activity would be cleared through an FCM or Rule 30.10 Firm, that all positions entered

---

[2] The CFTC defines Future Commission Merchants (FCMs) as "individuals, associations, partnerships, corporations, and trusts that solicit or accept orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any exchange and that accept payment from or extend credit to those whose orders are accepted." *See* http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossary_f. The following Defendants, their affiliates and/or subsidiaries are registered with CFTC as FCMs:  (i) Barclays Capital Inc.; (ii) UBS Financial Services Inc.; (iii) UBS Securities LLC; (iv) Deutsche Bank Securities Inc.; (v) HSBC Securities USA Inc.; and (vi) RBS Securities Inc.

into on LIFFE by such CPOs and CTAs (and persons exempt from registration as such) on behalf of such pools and "U.S. customers" would be guaranteed by a clearing member of LIFFE without limitation, and that there was an urgent commercial need to provide CPOs and CTAs with the ability to enter orders directly into "LIFFE CONNECT® terminals located in the U.S." on behalf of the pools which they operate or the customer accounts over which they exercise trading discretion.  CFTC Staff Letter No. 06-25 (September 29, 2006), at p. 2, fn. 3.

87.     Based on LIFFE's representations, the CFTC confirmed that it would not recommend that the Commission institute enforcement action against LIFFE or its members solely based upon LIFFE's failure to seek designation as a contract market or registration as a derivatives transaction execution facility under Sections 5 and 5a of the CEA if LIFFE members who are registered with the CFTC as CPOs or CTAs, or who are exempt from such CPO or CTA registration pursuant to Commission Regulation 4.13 or 4.14, "enter orders directly into LIFFE CONNECT® through terminals located in the U.S on behalf of the pools which they operate or the customer accounts over which they exercise trading discretion, provided that all such trading activity is cleared through a registered FCM or a firm that is exempt from registration by the Commission pursuant to Rule 30.10."  CFTC Staff Letter No. 06-25 (September 29, 2006), at p. 2.

88.     In response to a Freedom of Information Act request Plaintiffs' counsel served on the CFTC, the CFTC reported that approximately 300 million "U.S. Based" NYSE LIFFE Euribor futures contracts traded during the period of 2005 through 2010.  Each of these contracts has a notional value of €1,000,000.

89.     The following Defendants, their affiliates and/or subsidiaries are members of LIFFE:  (i) Barclays Bank Plc; (ii) Barclays Capital Securities Limited; (iii) Deutsche Bank AG;

(iv) HSBC Bank Plc; (v) Rabobank International; (vi) Société Générale; (vii) The Royal Bank of Scotland Plc; (viii) UBS Limited; (ix) Crédit Agricole CIB; (x) JP Morgan Securities plc; and (xi) Citigroup Global Markets Limited.

90.     Euribor is the commodity underlying Euribor-based derivatives contracts.  NYSE LIFFE Euribor futures contracts are the fourth largest interest rate futures contract by trading volume in the world.

91.     The contract months for a three-month Euribor futures contract are March, June, September and December, and four serial months, such that 28 delivery months are available for trading, with the nearest six delivery months being consecutive calendar months.

92.     The settlement price of a Euribor futures contract is the EBF's Euribor Offered Rate for three month ("Three-Month") Euro deposits at 11:00 am Brussels time (10:00 am London time) on the "Last Trading Day."   The Last Trading Day is defined as 10:00 am on two business days prior to the third Wednesday of the named month of delivery (*e.g.*, March, June, September or December).

93.     Three-month Euribor futures contracts are quoted in terms of 100 minus the three-month Euribor rate.  For example, if the three-month Euribor rate is 5.50% then the Euribor futures price will be 94.50 (100-5.50).  Given this price index construction, if the three-month Euribor rate rises, the price of the Euribor futures contract would fall, and vice-versa.

94.     Moreover, the Euribor futures contract terms provide that the final settlement price is 100 minus Euribor.  Euribor thus represents the sole variable in the final settlement price of the Euribor futures contract.  Any fluctuation or manipulation of three-month Euribor will have a direct and immediate impact on the final settlement price of three-month Euribor futures contracts.

95.     For example, if Euribor was driven artificially lower, then at the time of expiration, the final settlement price for three-month Euribor futures contracts would be artificially high. This is because the underlying value of the three-month Euribor futures contract is inversely related to the interest rate. Thus, the lower/higher the three-month Euribor, the higher/lower the three-month Euribor futures contract final settlement price.

96.     Any manipulation of Euribor is a manipulation of the commodity underlying Euribor-based derivatives contracts, including the three-month Euribor futures contract. This is because three-month Euribor, more than a delivered commodity, is the sole variable determining the final settlement price.

97.     A purchaser of one Euribor futures contract in a given expiration can cancel their future obligation to the contract market/exchange by selling one Euribor futures contract of the same expiration. This offsets or balances their obligation to the contract market/exchange. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

**ii.     CME Euro Currency Futures Contracts**

98.     The CME has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. CME submits to the CFTC various rules and regulations for approval through which CME designs, creates the terms of, and conducts trading in Euribor-based futures contracts. CME is an organized, centralized market that provides a forum for Euribor-based futures contracts.

99.     The following Defendants, their affiliates and/or subsidiaries are clearing members of the CME: (i) Barclays Capital Inc.; (ii) Crédit Agricole CIB; (iii) Deutsche Bank Securities Inc.; (iv) HSBC Securities (USA) Inc.; (v) Rabo Securities USA Inc.; (vi) RBS

Securities Inc.; (vii) Société Générale; (viii) The Royal Bank of Scotland plc; (ix) UBS Securities LLC; and (x) J.P. Morgan Securities LLC.

100.   Clearing membership in CME is a privilege granted by the Clearing House Risk Committee of CME.  Clearing members assume full financial and performance responsibility for all transactions executed through them and cleared by the Clearing House. They are responsible and accountable for every position they carry, whether it is for the account of a member, non-member customer or their own account.  In every matched transaction executed through the Clearing House's facilities, the Clearing House is substituted as the buyer to the seller and the seller to the buyer, with a clearing member assuming the opposite side of each transaction.[3]

101.   Euro currency futures contracts are exchange-listed financial instruments traded within the United States on the floor of the CME and electronically on the CME's Globex platform.

102.   The size of a Euro futures contracts is €125,000.

103.   The contract months for Euro currency futures are March, June, September and December, extending out 5 years (for a total of 20 contract months that are actively trading at any point in time).   The third Wednesday of March, June, September and December, also known as International Monetary Market dates ("IMM dates"), are the four quarterly dates of each year that futures contracts use as their scheduled maturity or termination date.

104.   Euro currency futures contracts terminate trading at 9:16 a.m. Central Time (CT) on the second business day immediately preceding the third Wednesday of the contract's named month of delivery (*e.g.*, March, June, September and December).  For example, the December 2013 Euro futures contract terminates trading on Monday, December 16, 2013.

---

[3] *See Clearing Membership Handbook*, CME GROUP, available at
http://www.cmegroup.com/company/membership/files/cme-group-clearing-membership-handbook.pdf.

105.     A manipulation of Euribor causes a manipulation of the price of CME Euro currency futures contracts because Euribor is a price component of Euro currency futures contracts.

### iii.     Interest Rate Swaps

106.     An interest rate swap ("swap") is a financial derivatives instrument in which two parties agree to exchange interest rate cash flows.  If, for example, a party has a transaction in which it pays a fixed rate of interest but wishes to pay a floating rate of interest tied to a reference rate, it can enter into an interest rate swap to exchange its fixed rate obligation for a floating rate one.  Commonly, for example, Party A pays a fixed rate to Party B, while Party B pays a floating interest rate to Party A indexed to a reference rate like Euribor.  There is no exchange of principal amounts, which are commonly referred to as the "notional" amounts of the swaps transactions.

### iv.     Forward Rate Agreements

107.     A forward rate agreement ("FRA") is an interest rate forward contract.  The contract sets the rate of interest, Euribor in this case, to be paid or received on an obligation beginning at a future start date.  The contract will determine the interest rate to be used along with the termination date and notional value.  On this type of agreement, it is only the differential that is paid on the notional amount of the contract.  Swaps and FRAs benchmarked, priced and/or settled to Euribor were widely traded in the U.S. during the Class Period.  As a result of Defendants' manipulation of Euribor, prices of swaps and FRAs were also manipulated to artificial levels.

**II.    Defendants Restrained Trade and Intentionally Manipulated Euribor-Based Derivatives Contract Prices by Falsely Reporting Euribor Rates to the EBF**

108.    Defendants methodically and purposefully manipulated the prices of Euribor-based derivatives through their deliberate and systematic submission of false Euribor rates to the EBF throughout the Class Period.  Defendants did so in order to unlawfully profit financially from the trading of Euribor-based derivatives held by them or their co-conspirators.

109.    The Contributor Bank Defendants' Euribor submitters regularly and improperly conspired with and agreed to change their bank's Euribor submissions at the request of Euribor interest rate derivatives traders employed by that Contributor Bank Defendant.  As revealed by the settlements to date, this was an open, common and pervasive practice on Euribor Contributor Defendants' trading desks, often involving traders shouting across the trading desk to fellow traders, and discussing their requests with trading desk managers, to confirm there were no conflicting requests before they sent their requests to their Euribor submitters.   As a direct, intended and proximate consequence of the Contributor Bank Defendants' unlawful conduct, the prices of and the market in Euribor-based derivatives was manipulated to artificial levels by the Contributor Bank Defendants throughout the Class Period.

110.    The Contributor Bank Defendants' interest rate derivatives traders also regularly and improperly conspired with each other and with traders at other Contributor Bank Defendants (and others) to select the false Euribor rate that each trader would request of their own respective Euribor submitters.  Thereby Defendants maximized the manipulative and anticompetitive effect on the Euribor fixings and the profits derived and benefits flowing from such artificiality on the Contributor Bank Defendants' Euribor-based derivatives trading positions.

111.    Defendants knew that the false rates they submitted were used by Thompson Reuters, as an agent of the EBF, in calculating and publishing Euribor.  They also knew, as

sophisticated market participants, that the (mis)information they reported directly impacted the prices of Euribor-based derivatives traded in the U.S. and abroad.

III.  **Defendants Restrained Trade and Manipulated Euribor-Based Derivatives Prices By Their Illegitimate, Non-Bona Fide Trading of Euribor-Based Derivatives**

112.    Defendants traded Euribor-based derivatives at times they knew the prices of such contracts were being distorted by Defendants' systematic false reporting of Euribor (among other unlawful collusive and manipulative conduct).  This destroyed the legitimizing price discovery function of the Euribor-based derivatives market, created or contributed to prices which were not reflective of legitimate forces of supply and demand, and furthered Defendants' conspiracy to manipulate and unlawfully restrain trade in and fix prices of Euribor-based derivatives to artificial levels during the Class Period to the detriment of Plaintiffs and the Class. Because the Contributor Bank Defendants' positions were illegitimate and manipulative parts of the supply-demand equation for Euribor-based derivatives, Defendants' impact on Euribor-based derivatives was necessarily an artificial one that restrained trade and caused artificial prices.

113.    Defendants' derivatives traders, by knowing the contents of their trading books, knew the amount of their exposure to movements in Euribor.  For example, on any given day, the derivatives traders may have had exposures to Euribor in particular maturities if  payments were owed to or by them on OTC interest rate swap contracts or if the derivatives traders had traded interest rate futures positions settling on that day.  The amount owed to or by the traders could be affected by movements in Euribor.  A beneficial movement in Euribor could have made the derivatives traders profit or reduced a loss.  In the foregoing context, each Defendant's derivatives traders repeatedly communicated with the Euribor submitters at that Defendant in order to cause their firm to make false Euribor submissions that favored the traders' Euribor-based derivatives positions.

## IV. Plaintiffs' Statistical Analyses Confirms the Direct Pricing Relationship Between Euribor and the Prices of Euribor-Based Derivatives

114.    The published Euribor has a direct effect on both the price of NYSE LIFFE Euribor futures contracts and the CME Euro currency futures contract.  NYSE LIFEE Euribor futures prices are derived solely from the published Euribor.  The price is quoted in increments of 100.00 minus Euribor.  At the conclusion of trading in each expiring contract, there is no delivery on the futures contract.  Instead, there is a strictly financial settlement of the contract on the last day of trading based upon the strictly mathematical formula: 100.00 minus the Euribor rounded to three decimal places.[4]  Thus, the sole variable in the settlement of this futures contract is Euribor.   Therefore, by manipulating Euribor, Defendants' also manipulated the price of this futures contract.

115.    Because the price of the NYSE LIFFE three-month Euribor futures contract is quoted at 100.00 minus Euribor, the contract price moves opposite the direction of the published rate.  For example, if the published three-month Euribor is 3.00%, the price of the NYSE LIFFE Euribor futures contract would be 97.00 or 100.00 minus the 3.00% interest rate.

116.    In addition to the mathematical and logical certainty that manipulating Euribor manipulates the NYSE LIFFE futures contract, Plaintiffs also conducted a statistical analysis of the price of NYSE LIFFE three-month Euribor futures contracts for each of the four nearby (i.e. earliest to expire) contract months, March, June, September, and December, relative to movements in the published three-month Euribor for the entire Class Period.  Specifically, Plaintiffs looked for a linear correlation between the NYSE LIFFE three-month Euribor futures contract and the three-month Euribor to determine the directional impact, if any, changes in the

---

[4] *Three Month Euro (Euribor) Futures*, NYSE EURONEXT, https://globalderivatives.nyx.com/nyse-liffe/three-month-euribor-futures/contract-specification.

three-month Euribor had on the price of NYSE LIFFE three-month Euribor futures contract prices.

117.    The linear correlation between two variables, for example the price of the NYSE LIFFE three-month Euribor futures contract and the published three-month Euribor, is measured by a statistic known as the Pearson Product-Moment Correlation Coefficient ("PPMCC"). The PPMCC quantifies the relationship between the variables on a scale of +1 to -1.  A PPMCC equal to 0 indicates no correlation between the two variables.  Any other PPMCC value, positive or negative, indicates a correlation between variables.  A positive PPMCC represents a positive correlation; that is the values of the two variables tend to move together in the same direction.  A negative PPMCC represents a negative correlation, indicating that two variables tend to move in opposite directions, for example with one increasing as the other is decreasing.  The larger the PPMCC, the closer to either +1 or -1, the stronger the correlation.

## FIGURE 1

| Pearson Product-Moment Correlation Coefficient | | | | |
|---|---|---|---|---|
| | 3M Rate Fix | March Future | June Future | Sept Future | Dec. Future |
| **3M Rate Fix** | 1.000000 | -0.956747 | -0.956437 | -0.950439 | -0.966563 |
| **March Future** | -0.956747 | 1.000000 | 0.978419 | 0.974124 | 0.974453 |
| **June Future** | -0.956437 | 0.978419 | 1.000000 | 0.983283 | 0.966696 |
| **Sept. Future** | -0.950439 | 0.974124 | 0.983283 | 1.000000 | 0.975529 |
| **Dec. Future** | -0.966563 | 0.974453 | 0.966696 | 0.975529 | 1.000000 |

118.    Figure 1 contains the PPMCC values associated with the relationship between the four nearby NYSE LIFFE three-month Euribor futures contracts and the published three-month Euribor throughout the Class Period.  Comparing the price of the four nearby NYSE LIFFE three-month Euribor futures contracts to the published three-month Euribor results in a PPMCC

34

for each contract that is almost at the maximum value of the scale, -0.95 out of -1. This indicates a very strong negative correlation between the two variables. As a negative correlation indicates that the values of the two variables tend to move opposite one another, based on this data, one would expect the price of the NYSE LIFFE three-month Euribor futures contract to move opposite that of the three-month Euribor. In other words, as Euribor increases the price of the NYSE LIFFE three-month Euribor futures contract decreases.

119.    Figure 1 also demonstrates a very strong positive correlation between the values of the four nearby NYSE LIFFE three-month Euribor futures contracts. The PPMCC for the relationship between these contracts is also near the maximum value of the scale, 0.96 (or better) out of 1, for each contract. Based on that data, one would expect price movements for the nearby months of the NYSE LIFFE three-month Euribor futures contracts to move together in the same direction.

120.    The very strong positive correlation between each of the four nearby NYSE LIFFE three-month Euribor futures contracts, combined with the very strong negative correlation between those contracts and the published three-month Euribor, indicates that a change in the published three-month Euribor impacts the price of all four NYSE LIFFE Euribor futures contracts. For example, if the published three-month Euribor moves down, it is very likely the price of the four NYSE LIFFE three-month Euribor futures contracts will move up, each one following the other.

121.    Plaintiffs also conducted the same analysis on the relationship between the price of CME Euro currency futures contracts and the published three-month Euribor. This time, in addition to the four nearby CME Euro currency futures contracts, Plaintiffs included the Euro spot price, the daily exchange rate for Euros in U.S. Dollars, as part of the analysis. As

35

explained more *infra* the Euro spot price is a component in calculating the price of the CME

Euro currency contract.  As a result, one would expect the price of the CME Euro currency

futures contract to demonstrate a very strong correlation to the Euro spot price.  In this sense, the

Euro spot price serves almost as a control, providing a basis from which the relationship between

the price of the CME Euro currency futures contract and the published three-month Euribor can

be compared.

**FIGURE 2**

| Pearson Product-Moment Correlation Coefficient | | | | | | |
|---|---|---|---|---|---|---|
| | **3M Rate Fix** | **Euro Spot Price** | **March FX Future** | **June FX Future** | **Sept. FX Future** | **Dec. FX Future** |
| **3M Rate Fix** | 1.000000 | 0.232707 | 0.243973 | 0.246118 | 0.250555 | 0.245533 |
| **Spot Euro Price** | 0.232707 | 1.000000 | 0.994854 | 0.995007 | 0.995839 | 0.995371 |
| **March FX Future** | 0.243973 | 0.994854 | 1.000000 | 0.996124 | 0.995842 | 0.996993 |
| **June FX Future** | 0.246118 | 0.995007 | 0.996124 | 1.000000 | 0.996400 | 0.995575 |
| **Sept. FX Future** | 0.250555 | 0.995839 | 0.995842 | 0.996400 | 1.000000 | 0.997399 |
| **Dec. FX Future** | 0.245533 | 0.995371 | 0.996993 | 0.995575 | 0.997399 | 1.000000 |

122.    Figure 2 contains the PPMCC values for the relationship between the four nearby

CME Euro currency futures contracts, the Euro spot price, and the three month published

Euribor.  As expected there is a very strong positive correlation, 0.99 with a possible maximum

of 1, between the Euro spot price and the price of the four nearby CME Euro currency futures

contract.  Relative to the Euro spot price, the data shows a weak positive correlation, between the

price of the Euro, represented by the four CME Euro currency futures contracts and the Euro

spot price, and the published three-month Euribor.  This means that while the price of the four

nearby CME Euro currency-futures contracts and the underlying Euro currency tend to move in

the same direction as the published three-month Euribor, the association is not as strong as that

36

between the underlying currency, the Euro spot price, and the four CME Euro currency futures contracts.

123.     However, that manipulation manifests itself in an observable change in the price of the CME Euro currency futures contract only to the extent that the other variables to which this futures contract is tired do not fluctuate in way that offset or wash the manipulation.  In other words, Defendants' manipulations of Euribor definitely manipulated the CME Euro currency futures contract price to levels other than what it would have been absent the manipulation, but the actual futures contract price will move by that amount only if the other variables remain the same.

**FIGURE 3[5]**

$$\text{Futures Price} = \text{Spot Price} \times \left( \frac{1 + [\text{Rterm} \times (d / 360)]}{1 + [\text{Rbase} \times (d / 360)]} \right)$$

124.     Figure 3 contains the formula for calculating the price of CME Euro currency futures contracts.  According to the formula, the CME Euro currency futures price is derived from the spot price of the Euro adjusted to account for the interest rate paid on deposits for the two currencies, here Euros and U.S. Dollars, over the length of the futures contract. "Rbase" represents the rate of interest paid on deposit for the "base currency," which in a Euro futures contract is the Euro.  "Rterm" represents the rate of interest paid on deposits for the "term currency," which in this case is U.S. Dollars.  These two rates are then adjusted to reflect the

---

[5] *See* John W. Labuszewski, Sandra Roh, David Gibbs, *Currencies Understanding FX Futures* 8, CME GROUP (April 22, 2013).

amount of interest paid over the duration of the futures contract or "d" days divided by 360, which represents the entire year.

125.    This formula helps to explain the correlation between Euribor, which is included in the calculation as Rterm, and the price of the CME Euro currency contract.  As Euribor is only one factor in the calculation of the CME Euro currency futures price, it is not likely that the futures contract would track changes in the published three month Euribor as closely as the NYSE LIFE Euribor futures contract, which is priced solely based on the published three month Euribor.  However, as the Euribor is included in the price calculation, one would expect the three month Euribor to have a determinative effect on the price of the CME Euro currency futures contract, even if there is only a weak directional relationship between changes in the two variables.

126.    To assess the determinative impact the published three month Euribor has on the price of the CME Euro currency futures, Plaintiffs conducted a statistical analysis of the non-linear dependency between the price of CME Euro currency futures contracts, the Euro spot price, and the published three-month Euribor for the entire class period.  This statistic, known as the Kendall Tau Rank Correlation Coefficient ("Kendall Tau"), measures the strength of the relationship between two variables without taking into consideration their distribution, for example how closely the values cluster around a best fit line, as does the PPMCC.

127.    Figure 4 shows the Kendall Tau data for the relationship between the four nearby CME Euro currency futures contracts, the Euro spot price, and the published three-month Euribor.  This data demonstrates a strong positive correlation between the published three-month Euribor and the price of CME Euro currency futures contracts.  This shows that the published three-month Euribor has a strong determinative effect on the price of the CME Euro currency

futures contract even though there is a weak directional association, or tendency for the price of the CME Euro currency futures contract to follow the published three-month Euribor, as indicated by the PPMCC values in Figure 1.

**FIGURE 4**

| Kendall Tau Rank Correlation Coefficient | | | | | | |
|---|---|---|---|---|---|---|
| | **3M Rate Fix** | **Euro Spot Price** | **March FX Future** | **June FX Future** | **Sept. FX Future** | **Dec. FX Future** |
| **3M Rate Fix** | 1.000000 | 0.061368 | 0.071533 | 0.074289 | 0.078920 | 0.078659 |
| **Spot Euro Price** | 0.061368 | 1.000000 | 0.937096 | 0.936085 | 0.939582 | 0.938553 |
| **March FX Future** | 0.071533 | 0.937096 | 1.000000 | 0.953522 | 0.951274 | 0.961224 |
| **June FX Future** | 0.074289 | 0.936085 | 0.953522 | 1.000000 | 0.955513 | 0.946521 |
| **Sept. FX Future** | 0.078920 | 0.939582 | 0.951274 | 0.955513 | 1.000000 | 0.962539 |
| **Dec. FX Future** | 0.078659 | 0.938553 | 0.961224 | 0.946521 | 0.962539 | 1.000000 |

128.   Together these two analyses demonstrate that the three-month Euribor has a direct and expected price impact on both the CME Euro currency futures contract price and the NYSE LIFFE three-month Euribor futures contracts.  However, the data analyzed thus far only establishes a correlation, or statistical dependence, between the price of the CME Euro currency futures contract, NYSE LIFFE three-month Euribor futures contract, and the published three-month Euribor.  Correlation, by itself does not establish, causation, in other words, that changes in the published three-month Euribor tend to correspond with price movements in both the CME Euro currency futures contract and NYSE LIFFE three-month Euribor contract does not mean that changes in the three-month Euribor contract necessarily caused the price to change.

129.   To establish causation, Plaintiffs conducted a targeted analysis comparing the price of both NYSE LIFFE Euribor futures contracts and CME Euro currency futures contracts to the three-month Euribor and individual Defendant's rate submissions for sub-periods within

the overall Class Period. These twenty-four sub-periods encompass dates during which communications, released as a result of Defendants' settlements with various regulatory bodies, indicate an intent to manipulate the published three-month Euribor.

**FIGURE 5**

| Date | Statement | Source | Defendant |
|------|-----------|--------|-----------|
| November 19, 2007 | Euribor trader ("Trader-12") to Euribor Submitter-8: "I need high 3m euribor today!" | Rabobank DOJ SOF, p. 31, ¶65 | Rabobank |

130.    Figure 5 contains part of a conversation between two Rabobank employees that occurred within one of the twenty-four sub-periods that Plaintiffs analyzed. As Figure 5 demonstrates, on November 19, 2007, an unknown Euribor futures trader at Rabobank, known as "Trader-12," sent a message to an unknown Euribor rate submitter, "Submitter-8," requesting a "high" Euribor submission for that day.

131.    Based on Plaintiffs' statistical analysis, a higher three-month Euribor will affect the price of both the NYSE LIFFE Euribor futures contract and the CME Euro currency futures contract. Given the negative correlation between the three-month Euribor and NYSE LIFFE Euribor futures contracts shown in Figure 1, a higher interest rate should drive the price of the NYSE LIFFE Euribor futures contract down. Conversely, because of the positive correlation between the three-month Euribor and CME Euro currency futures contract shown in Figure 2, an increase in Euribor should simultaneously increase the price of the CME Euro currency futures contract.

# **FIGURE 6**



# FIGURE 7



Dec. 07 Euro FX Futures Price vs. Rabobank 3M Submissions vs. 3M Euribor Fix

132.     Figures 6 and 7 track the daily price movements of the NYSE LIFFE Euribor futures contract and the CME Euro currency futures contract from November 12, 2007, through November 26, 2007.  This time range is significant because it contains November 19, 2007, the day Trader-8 sent the message contained in Figure 5 asking for a high three-month Euribor submission.

133.     The price movement that results is exactly what Plaintiffs' statistical model predicted.  On November 19, 2007, the published three-month Euribor moves higher than the previous day.  As a result, the price of the three-month NYSE LIFFE Euribor futures contract decreases and the price of the CME Euro currency futures contract increases.

## FIGURE 8

| Date | Statement | Source | Defendant |
|------|-----------|--------|-----------|
| August 28, 2008 | <u>Senior Euribor Trader-Submitter:</u>     HI I AM GOING FOR HIGH 1S TODAY WHAT DO YOU NEED IN 3S AND 6S PLEASE ??<br><br><u>Euro Trader 1:</u> **low 3s high 6s pls! btw, whenever i say low 6s pls ignore me, we always need high 6s to keep the basis as wide as possible.** thanks! | Rabobank CFTC Order, p. 44 | Rabobank |

134.     Plaintiffs observed similar price movements in both the three-month NYSE LIFFE Euribor futures contract and the CME Euro currency futures contract on other days throughout the Class Period where Defendants' communications indicate their manipulative intent. Figure 8 contains another conversation between two Rabobank employees.  This time the Senior Euribor Trader-Submitter initiates the conversation, asking Euro Trader 1 what he needs for the three-month and 6 month Euribor to be so that Rabobank's submissions can be adjusted accordingly.  The trader indicates the need for "low 3s", referring to the three-month Euribor, and "high 6s" for the 6 month Euribor.

# **FIGURE 9**



Sept. 3M Euribor Contract vs. Rabobank 3M Submissions vs. 3M Euribor Fix

# FIGURE 10



Sept. 08 Euro FX Futures Price vs. Rabobank 3M Submissions vs. 3M Euribor Fix

135.     Figure 9 and Figure 10 demonstrate the relationship between Rabobank's three-month Euribor submission, the published three-month Euribor and the price of the NYSE LIFFE three-month Euribor Futures contract and the CME Euro currency futures contract.  Just as was requested by Euro Trader 1, Rabobank's three-month Euribor submissions takes a noticeable drop on August 28, 2008, the same day Euro Trader 1 made his request.  That day, the published threemonth Euribor, influenced by Rabobank's submission, moves down from the previous day.  Reacting to that downward movement the price of the NYSE LIFFE Euribor futures contract, as indicated in Figure 9 moves up, while the price of the CME Euro currency futures contract, following the three-month published Euribor, moves down in Figure 10.

**FIGURE 11**

| Date | Statements | Source | Defendant(s) |
|---|---|---|---|
| August 14, 2006 | o  Trader at Bank A asked Barclays' Senior Euro Swaps Trader to request a low one month and high three month and six month Euribor.<br>o  Barclays' Senior Euro Swaps Trader agreed to do so and promised to contact the trader at Bank B to make the same request.<br>o  Barclays' Senior Euro Swaps Trader emailed the Barclays Senior Euribor Submitter: "We have some big fixings today.  **Is it possible to have a very low 1m and high 3m and 6m**? Thx a lot for your help."<br><br>Barclays' Senior Euribor Submitter responded: "Sure, will do." | Barclays CFTC Order, p. 16 | Barclays, Bank A and Bank B |

136.     Figure 11 includes a series of statements made by Barclays traders regarding the bank's Euribor submissions.  On August 14, 2006, a senior Barclays Euro Swaps Trader requests "low 1m and high 3m and 6m" Euribor submissions.  "Sure, will do" responds the Barclays' Senior Euribor Submitter, agreeing to put in a high three-month Euribor submission.

# FIGURE 12



137.     Examining the price movement for the NYSE LIFFE three-month Euribor futures contract relative to the published three-month Euribor and Barclays' three-month Euribor submissions, Figure 12 demonstrates that on August 14, 2006, Barclays' Senior Euribor Submitter followed through on the request of Barclays' Euro Swaps trader, submitting a higher three-month Euribor quote.  That day, responding to an increase in the three-month Euribor, the price of the NYSE LIFFE three-month Euribor futures contract drops.

138.     Defendants, in addition to making one-off submission requests on specific days also conducted at least one long term effort to suppress Euribor to benefit their own Euribor derivatives positions.  Beginning in December 2006 Barclays along with traders and submitters from several other unidentified banks began establishing large long positions in March 2007 Euribor futures.  As the price of Euribor futures move opposite the direction of the published Euribor, these long Euribor futures positions would increase in value if the published Euribor decreased.

139.     Instant message communications released as part of Barclays' settlements with the Depart of Justice, CFTC, and British Financial Services Authority reveal that the plan was to drive the three-month Euribor as low as possible while simultaneously accumulating long Euribor futures positions.  The plan was to culminate on March 19, 2007, the last day of trading for the March 2007 Euribor futures contract, where by putting "the 3M fixing in the basement," the traders would cause a spike in the March 2007 Euribor futures price.

## **FIGURE 13**



140.     Figure 13 demonstrates how the price of the NYSE LIFFE three-month Euribor futures contract moved relative to the published three-month Euribor and Barclays' three-month Euribor submissions for the period of time between March 12, 2007 and March 26, 2007. During that time period the price of NYSE LIFFE three-month Euribor futures contracts spikes sharply on March 19, 2007, the exact day indicated in the government settlement documents that Defendants planned to put the three-month Euribor "in the basement" to drive the price of Euribor futures contracts through the roof.

141.     While this activity benefited the Defendants Euribor futures positions it had the effect of injuring other traders.  Plaintiff Sullivan, traded NYSE LIFFE three-month Euribor futures market within the time period that Defendants were carrying on their plan to manipulate the price of the March 2007 Euribor futures contract.  On March 19, 2007, Plaintiff Sullivan, liquidated a June 2007 NYSE LIFFE three-month Euribor futures position at a loss and initiated a June 2007 NYSE LIFFE three-month Euribor futures position that was subsequently liquidated at a loss on March 23, 2007.  Plaintiff Sullivan's injury was a direct result of the artificiality that existed in the market for Euribor futures contracts on and around March 19, 2007 as caused by Defendants manipulative activity.

**V.      Defendants' Unlawful Conduct Has Led to Deferred Criminal Prosecution Agreements and Settlements Resulting in Payments of Fines and Penalties In Excess of $4.5 Billion to Governmental Authorities in the U.S. and Abroad**

142.     Defendants' unlawful conduct has led to deferred and/or non-criminal prosecution agreements with the DOJ and settlements with the CFTC, the FSA, the European Commission and the Swiss Financial Market Supervisory Authority obligating Defendants

Barclays, RBS, UBS, Rabobank Deutsche Bank and Société Générale to pay collective fines and penalties to these regulators exceeding $4.5 billion (among other agreed to relief) .

### A.     The Barclays Settlement

143.     On June 27, 2012, the DOJ, the FSA, and the CFTC announced agreements that collectively obligate Barclays to pay more than $450 million due to, among other unlawful conduct, making false Euribor submissions to the EBF in order to benefit Barclays' Euribor-based derivatives positions.

144.     The factual findings that accompanied the Barclays Settlement include a "Statement of Facts" (of which Barclays admitted as true and accurate) that are attached to, and incorporated by reference in, a non-prosecution agreement entered with the Department of Justice's Criminal Division, Fraud Section.  The Barclays Settlement is also memorialized in a CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions (the "CFTC Order") and a FSA Final Notice to Barclays Bank plc (the "FSA Final Notice").[6]

### 1.     Barclays Settlement: DOJ Statement of Facts

145.     Among other facts, Barclays admitted that the following information set forth in the DOJ Statement of Facts is true and accurate:

### i.     Overview

146.     From at least 2005 to the present, Barclays served as a member of the Contributor EBF Euribor.

---

[6] The Barclays DOJ Statement of Facts is attached as Exhibit A-1.  The Barclays CFTC Order is attached as Exhibit A-2.  The Barclays FSA Final Notice is attached as Exhibit A-3.

147.     Each Contributor Panel bank's submitted Euribor rate to the EBF (including Barclays), is made available worldwide through electronic means and through a variety of information sources.

148.     Barclays Bank PLC is a financial services corporation with headquarters located in London, England. Barclays Bank PLC has banking subsidiaries around the world, including in the United States, and Barclays Bank PLC has a branch in New York. Barclays Capital Inc. is a wholly-owned subsidiary of Barclays Bank PLC that engages in investment banking, wealth management, and investment management services (collectively, Barclays Bank PLC and Barclays Capital Inc. are referred to as "Barclays"). Barclays employs derivatives traders in New York, New York and in London, England who trade financial instruments tied to Euribor, including interest rate swaps ("swaps traders"). Barclays' employees on its money markets desk in London have been responsible for contributing Barclays' Euribor submissions ("submitters").

### ii.     Manipulation within Barclays of Its Euribor Submissions

149.     From approximately 2005 through 2007, and occasionally thereafter through approximately 2009, certain Barclays swaps traders requested that certain Barclays Euribor submitters submit Euribor contributions that would benefit the traders' trading positions, rather than rates that complied with the definition of Euribor. Those traders either proposed a particular Euribor contribution for a particular tenor and currency, or proposed that the rate submitter contribute a rate higher, lower, or unchanged for a particular tenor and currency. The traders made these requests via electronic messages, telephone conversations, and in-person conversations. The Euribor submitters agreed to accommodate, and accommodated, the traders' requests for favorable Euribor submissions on numerous occasions.

150.    Specifically, from at least as early as May 2005 through approximately

September 2007, certain Barclays Euro swaps traders in London submitted requests for favorable

Euribor settings to Barclays Euribor submitters in London on an ongoing basis.  From

approximately September 2007 through at least approximately May 2009, such requests were

made occasionally.  Barclays' rate submitters for Euribor accommodated the requests by Euro

swaps traders on numerous occasions and submitted Barclays' Euribor contributions consistent

with the requests.

151.    As an example, on July 28, 2006, at approximately 8:26 a.m., a Barclays Euro

swaps trader ("Trader-4") sent an e-mail to a Barclays Euribor submitter ("Submitter-3") with

the subject line, "6m fixing," stating, "Plz [Please] go for LOW 6M fixing today." (emphasis in

original). Submitter-3 replied in part, "No probs...low it is today." (ellipses in original).

Barclays's 6-month Euribor submission on July 28, 2006 was 3.21%, which was 12 basis points

lower than its submission the previous day, and was lower than the lowest rate used in the

calculation of the Euribor fix.

152.    As a further example, on Friday, October 13, 2006, a Barclays Euro swaps trader

("Trader-5") sent an electronic communication to Submitter-3 stating in part, "I have a huge

fixing on monday...something like 30bn 1m fixing...and i would like it to be very very very

high....can you do something to help? i know a big clearer will be ag[a]inst us...and dont [sic]

want to loose money [sic] on that one." (ellipses in original).  Submitter-3 replied that s/he had

been moved within Barclays, but had forwarded the request to another Euribor submitter

("Submitter-4") who was covering for Submitter-3.  Submitter-3 forwarded the request to

Submitter-4 and added, "We always try and do our best to help out..." (ellipses in original).

Barclays's 1-month Euribor submission on Monday, October 16, 2006, was 3.36%, which was 1

basis point higher than its submission the previous day and was equal to the second-highest rate submitted by Euribor Contributor Panel banks. Within the Contributor Panel, Barclays moved from being tied for the 6th highest rank on the previous trading day to being tied for the 2nd highest rank.

153.     The purpose of this activity was to manipulate Barclays' Euribor contributions, whether by increasing, decreasing, or maintaining the submitted rates, to influence the resulting Euribor fix and thus to have a favorable effect on Barclays' Euribor trading positions. Because certain swaps traders' compensation was based in part on the profit and loss calculation of the trading books, a purpose of the requests by the swaps traders was to benefit their compensation as well. Because of the high value of the notional amounts underlying derivative transactions tied to Euribor, even very small movements in those rates could have a significant impact on the profitability of a trader's trading portfolio.

### iii.     Collusion with Other Euribor Contributor Banks to Manipulate Euribor

154.     From at least approximately August 2005 through at least approximately May 2008, certain Barclays' traders communicated with traders at other Contributor Panel banks and other financial institutions about requesting Euribor contributions that would be favorable to the trading positions of the Barclays' traders and/or their counterparts at other financial institutions.

155.     Certain Barclays' traders made requests of traders at other Contributor Panel banks for favorable Euribor submissions from those banks. In addition, certain Barclays' traders received requests from traders at other banks for favorable Euribor submissions from Barclays' rate submitters. When Barclays' traders did not have trading positions conflicting with their counterparts' requests, those Barclays' traders sometimes would agree to request a Euribor submission from the Barclays' Euribor submitters that would benefit their counterparts'

positions. Those interbank communications included ones in which certain Barclays' traders communicated with former Barclays' traders who had left Barclays and joined other financial institutions. The likelihood that the Euribor fix would be affected increased when other Contributor Panel banks also manipulated their submissions as part of a coordinated effort.

156. From at least approximately August 2005 to at least approximately May 2008, Barclays' traders communicated with traders at other financial institutions that were members of the Euribor Contributor Panel about requesting favorable Euribor submissions from the Euribor submitters at their respective banks. At Barclays, this conduct was primarily undertaken by a Barclays Euro swaps trader, Trader-5, who left Barclays and joined another financial institution in approximately May 2007. While Trader-5 worked at Barclays, Trader-5 communicated with traders at several other Contributor Panel banks about obtaining favorable Euribor submissions, and requested favorable Euribor submissions from the Barclays Euribor submitter. After Trader-5 joined another financial institution, Trader-5 continued communicating with traders at Barclays about requesting favorable Euribor settings.

157. As an example, during at least approximately February and March 2007, in addition to contacting the Barclays Euribor submitter, Trader-5 communicated with traders at four other Euribor Contributor Panel banks and requested that their respective Euribor submitters submit low 3-month Euribor contributions on March 19, 2007, which was the Monday before the March IMM date. That trading date was particularly significant for Trader-5, who stated that s/he had accumulated financial positions that would benefit from a low 3-month Euribor. In one example of Trader-5's contacts with other banks, on February 6, 2007, in an electronic message, a trader at another Contributor Panel bank asked Trader-5: "[I]n march do you still want a very low 3m cash fixing for imm?" Trader-5 replied, "yeah." The other trader continued, "I'm going

to put pressure on the treasury so that he sets it very low."  Trader-5 replied, "750k eur/bp [Euros per basis point]."

158.    Then, on March 19, 2007, before the Euribor submission was due, Trader-5 sent a message to Submitter-3 stating in part: "I am hearing u are bidding the cash....we really need a low 3m," and "as discussed could u put the 3m as low as possible." (ellipses in original). Submitter-3 replied, "[W]ill do my best."  Later on March 19, 2007, Trader-5 wrote to a trader at one of these other Contributor Panel banks, stating in part, "this is the way you pull off deals like this," and "the trick is you must not do this alone."  Trader-5 also stated that after his "2months of preparation" [sic] he had made money in the end. Trader-5 added, "[D]on't talk about it too much" and "don't make any noise about it please."  On that same date, Trader-5 wrote to a third trader whom he had previously contacted at another of the Contributor Panel banks and said: "Please [trader name] don't make any noise about the 3m fixing. [T]his can backfire against us."

### iv.    Implications of Barclays' Traders' Requests

159.    When Barclays' traders made requests of Barclays' rate submitters in order to influence Barclays' benchmark interest rate submissions, and when the submitters accommodated those requests, the manipulation of the submissions affected the fixed rates on some occasions.

160.    Barclays entered into interest rate derivatives transactions tied to Euribor – such as swaps, forward rate agreements, and futures – with counterparties to those transactions.  Many of those counterparties were located in the United States.  Those United States counterparties included, among others, asset management corporations, retirement funds, mortgage and loan corporations, and insurance companies.  Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States.

161.     In the instances when the published rates were manipulated in Barclays' favor due to Barclays' manipulation of its submissions, that manipulation benefitted Barclays' traders, or minimized their losses, to the detriment of counterparties, at least with respect to the particular transactions comprising the trading positions that the traders took into account in making their requests to the rate submitters.

162.     Certain Barclays' traders and rate submitters who engaged in efforts to manipulate Euribor submissions were well aware of the basic features of the derivatives products tied to these benchmark interest rates; accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions.

163.     When the requests of Barclays' traders for favorable Euribor submissions were taken into account by Barclays' rate submitters, Barclays' rate submissions were false and misleading.  In making and in accommodating the requests, the Barclays' traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.  As part of that effort: (1) traders and submitters submitted and caused the submission of materially false and misleading Euribor contributions; and (2) traders, after initiating and continuing their effort to manipulate Euribor contributions, negotiated and entered into derivative transactions with counterparties that did not know that Barclays' employees were often attempting to manipulate the relevant rate.

164.     Barclays acknowledged that the wrongful acts described in the DOJ Statement of Facts taken by the participating employees in furtherance of this misconduct were within the scope of their employment at Barclays.  Barclays also acknowledged that the participating

employees intended, at least in part, to benefit Barclays through the actions described in the DOJ Statement of Facts. Barclays agreed to pay a $160 million penalty to the DOJ and (among other relief) agreed to continue to cooperate with the DOJ's investigation of Euribor.

## 2.     Barclays Settlement: CFTC Order

165.     Barclays paid a civil monetary penalty of $200 million to the CFTC and agreed to comply with the conditions and undertakings set forth in the CFTC Order to ensure the integrity and reliability of its benchmark interest rate submissions.  The CFTC Order includes additional factual allegations complimentary to the admissions contained in the DOJ "Statement of Facts" regarding false reporting of Euribor and other unlawful acts by Defendant Barclays. These additional factual allegations include as follows:

### i.   Overview

166.     Over a period of several years, commencing in at least mid-2005 and continuing through at least mid-2009, Barclays did not have specific internal controls or procedures, written or otherwise, regarding how Euribor submissions should be determined or monitored.  Barclays also did not require documentation of the submitters' Euribor determinations.

167.     During the period from at least mid-2005 through mid-2009, Barclays' traders, primarily located in Barclays' New York and London offices, regularly requested that the Barclays' employee(s) responsible for determining and submitting Barclays' daily Euribors ("Submitters") submit a particular rate or adjust their submitted rates higher or lower in order to affect the daily, official published Euribor.  Barclays' traders were improperly attempting to benefit Barclays' derivatives trading positions and the profitability of their particular trading books and desks.  Barclays' traders also facilitated former Barclays traders' requests to alter Euribor submissions by passing along the former traders' requests to the Barclays Euribor

submitters as if they were their own. The Barclays submitters routinely based their Euribor submissions on the traders' requests in furtherance of the attempts to manipulate Euribor.

168. During the period from at least mid-2005 through mid-2008, certain Barclays' traders, led by a former Barclays senior Euro swaps trader, coordinated with and aided and abetted traders at certain other banks in attempts to manipulate Euribor. The Barclays traders coordinated with traders at other banks on the rates to be submitted by their respective Euribor submitters in order to benefit their Bank's derivatives trading positions. These Barclays traders agreed to ask, and did ask, the Barclays submitters for rates that benefited the trading positions of the traders at the other Banks. The Barclays traders made these requests as if they were their own requests and were to benefit Barclays' trading positions. The submitters routinely accommodated those requests. The Barclays traders also made similar requests to the traders at the other Banks in order to benefit Barclays' derivatives trading positions.

ii.    **Barclays Made False Reports to Manipulate Euribor to Financially Benefit Barclays' Euribor Derivatives Positions**

169. Barclays, through its traders and submitters, also attempted to manipulate Euribor through internal requests by traders, which were accommodated by Barclays' submitters. These traders at times coordinated their requests with traders at certain other banks. The requests were made in order to benefit Barclays' Euribor derivatives trading positions and the Euribor derivatives trading positions of the other individual institutions involved.

170. During the period from at least mid-2005 through mid-2009, traders located in Barclays' London office made requests to Barclays' Euribor submitters for higher or lower Euribor submissions with the purpose of affecting the official Euribor fixing. Certain of these traders, in particular one former senior Euro swaps trader, also regularly contacted or were contacted by traders at certain other EBF Euribor contributor banks to coordinate the rates each

trader would request of their own respective submitters. The traders did so to manipulate the official Euribor fixing in an artificial direction that financially benefitted Euribor derivatives trading positions, including swaps and futures positions, held by them. The traders' Euribor derivatives positions were most affected by the Euribor fixing in the one-month, three-month, and six-month tenors. Those were the tenors in which the traders most frequently requested a high or low submission by the Euribor submitters.

171. Barclays' traders' requests to Barclays' Euribor submitters to change Barclays' Euribor submissions to financially benefit Barclays' Euribor derivatives positions were an open, common and pervasive practice. Multiple traders engaged in this conduct, and no attempt was made by any of the traders to conceal the requests from supervisors at Barclays during the more than four-year relevant period in which the activity occurred. Appropriate daily supervision of the desk by the supervisors as well as periodic review of the communications should have discovered the conduct.

172. In fact, traders would often shout across the trading desk to fellow traders to confirm there were no conflicting requests before they sent their requests to the Euribor submitters, and, at times, the traders discussed their requests with trading desk managers.

173. After determining how moves in EBF Euribor would affect the desk's profitability, Barclays' traders contacted the Euribor submitters, including via email and through electronic "chats" over an instant messaging system, to request that the submissions be moved either higher or lower in a particular tenor. On occasion, one Barclays' swaps trader made entries in electronic calendars to remind himself what requests to make of Barclays' Euribor submitters the next day.

174.    Barclays' Euribor submitters accommodated the requests, frequently expressly responding in the affirmative to the traders' requests. Barclays' traders expected that the Euribor submitters would take their account when determining their Euribor submissions.

175.    Additionally, one former Barclays' senior Euro swaps trader on occasion sent requests to alter Barclays' Euribor submissions to his former fellow traders after he had left Barclays and was employed by other financial institutions. He made the requests to benefit his Euribor derivatives positions. These requests were made at a minimum by email or instant message.

176.    The following are a few of the numerous examples of Barclays' traders and submitters internal requests to manipulate Euribor:

1) June 1, 2006:

  o  Senior Euro Interest rate derivatives Trader: "Hi [Euribor Submitter], is it too late to ask for a low 3m?"[7]

  o  Euribor Submitter: 'Just about to put them in.....so no."

2) September 7, 2006:

  o  Senior Euro Interest rate derivatives Trader: "i have a huge lm fixing today and it would really help to have a low lm tx a lot."

  o  Euribor Submitter: "I'll do my best."

  o  Senior Euro Interest rate derivatives Trader: "because I am aware some other bank need a very high one...if you could push it very low it would help. I have 50bn fixing."

3) October 13, 2006:

  o  Senior Euro Interest rate derivatives Trader: "I have a huge fixing on Monday... something like 30bn lm fixing... and I would like it to be very very very high..... Can you do something to help? I know a big clearer will be against us ... and don't want to lose money on that one."

---

[7] "3m" refers to three-month Euribor.

- o Euribor Submitter forwarded the request to another Euribor submitter, advising: "We always try and do our best to help out....."

- o Senior Euribor Submitter to Senior Euro Interest rate Derivatives Trader: "By the way [Euribor Submitter] tells me that it would be good to see a high 1mth fix on Monday, we will pay for some cash that morning so hopefully that will help."

4) January 12, 2007:

- o Senior Euro Interest rate derivatives Trader: "hi [Euribor Submitter]. we need a low 1m in the coming days if u can...."

- o Senior Euribor Submitter: "hi [Senior Euro Interest rate derivatives Trader], we will keep the 1mth low for a few days."

5) April 2, 2007:

- o Euro Interest rate derivatives Trader: "hello [Senior Euribor Submitter], could you please put in a high 6 month euribor today?

- o Senior Euribor Submitter: "will do."

6) July 29, 2008:

- o Euro Interest rate derivatives Trader to Senior Euro Interest rate derivatives Trader: "I was discussing the strategy [to get a high fixing] with [Senior Euribor Submitter] earlier this morning - today he will stay bid in the mkt and put a high fixing but without lifting any offer, and then he will be really paying up for cash tomorrow and Thursday which is when the big positive resets are."

### iii. Barclays' Collusion With Other Euribor Banks to Manipulate Euribor

177.     During the period from at least mid-2005 through mid-2008, certain Barclays' traders, led by the same former Barclays' Euro swaps trader, coordinated with traders at certain other Euribor contributor banks to have their respective Euribor submitters make certain Euribor submissions in order to affect the official EBF Euribor fixing. These requests to and among the traders were to benefit the traders' respective Euribor derivatives trading positions and either maximize profits or minimize their losses.

178.    The former Barclays senior Euro swaps trader, while still employed by Barclays, spoke daily with traders at certain other Euribor contributor banks concerning their respective Euribor derivatives positions in order to determine how to change the official EBF Euribor fixing in a manner that financially benefitted their derivatives positions.  When he was out of the office, the Barclays senior Euro swaps trader directed other traders on the desk to contact the traders at the other banks on his behalf.

179.    In these conversations, the traders agreed to contact their respective Euribor submitters to request the agreed-upon Euribor submission.  The Barclays senior Euro swap trader also received at times requests for certain Euribor submissions from traders at certain other Euribor contributor banks, which he then made of the Barclays Euribor submitters as if the requests were his own, at times blind carbon copying the external trader on his emails to Barclays' Euribor submitters.  By such conduct, Barclays' traders were specifically intending to manipulate Euribor and aid and abet the manipulation of Euribor by other Euribor contributor banks.

180.    The following are examples of the communications among the Barclays senior Euro swaps trader, Barclays' Euribor submitters, and traders at other Euribor contributor banks (identified as Banks A, B, C, and D below):

1) August 14, 2006:

   o   Trader at Bank A asked Barclays' Senior Euro Interest Rate Derivatives Trader to request a low one month and high three month and six month Euribor.

   o   Barclays' Senior Euro Interest Rate Derivatives Trader agreed to do so and promised to contact the trader at Bank B to make the same request.

   o   Barclays' Senior Euro Interest Rate Derivatives Trader emailed the Barclays Senior Euribor Submitter: "We have some big fixings today.  Is it possible to have a very low 1m and high 3m and 6m?  Thx a lot for your help."

   o   Barclays' Senior Euribor Submitter responded: "Sure, will do."

2) November 10, 2006:

- o Trader at Bank A asked Barclays' Senior Euro Interest Rate Derivatives Trader to request a low one month Euribor setting at Barclays and at Bank B.

- o Barclays' Senior Euro Interest Rate Derivatives Trader made the request of the trader at Bank B.

- o Barclays' Senior Euro Interest Rate Derivatives Trader emailed the request to the Barclays Senior Euribor Submitter: "hi [Senior Euribor Submitter]. I know you can help. On Monday we have a huge fixing on the 1m and we would like it to be low if possible. Tx for your kind help."

- o Barclays' Senior Euribor Submitter replied: "of course we will put in a low fixing."

3) November 13, 2006:

- o Barclays' Senior Euro Interest Rate Derivatives Trader discussed the need for low one month Euribor with traders at Bank A and Bank B, and contacted a trader at Bank C.

- o Barclays' Senior Euro Interest Rate Derivatives Trader then reminded Barclays' Senior Euribor Submitter of his request from Friday: "hi [Senior Euribor Submitter]. Sorry to be a pain but just to remind you the importance of a low fixing for us today."

- o Barclays' Senior Euribor Submitter replied: "no problem, I had not forgotton [sic]. The [voice] brokers are going for 3.372, we will put in 36 for our contribution;"

- o Barclays' Senior Euro Interest Rate Derivatives Trader Trader's responded: "I love you."

4) December 5, 2006:

- o Barclays' Senior Euro Interest Rate Derivatives trader requested that traders at Banks A, B and C have their Euribor submitters make a high six month Euribor submission.

- o When the trader at Bank C stated that he needed the same submission, Barclays' Senior Euro Interest Rate Derivatives Trader agreed to make the request of the Barclays Euribor submitters.

- o Barclays' Senior Euro Interest Rate Derivatives Trader emailed the Barclays Senior Euribor Submitter: "hi [Senior Euribor Submitter] is it possible to have a high 6m ficxing [sic]? Where do you think it will fix?"

- o Barclays' Senior Euribor Submitter responded: "Hi [Senior Euro Interest Rate Derivatives Trader]. we have posted 3.73, hope that helps..can put in higher if you like?"

- o Barclays' Senior Euro Interest Rate Derivatives Trader replied: "that's fine tx a lot for your help."

5) February 12, 2007:

- o Barclays' Senior Euro Interest Rate Derivatives Trader agreed with traders at Banks A and B to have their respective one month Euribor submissions lowered.

- o Barclays' Senior Euro Interest Rate Derivatives Trader submitted that request to the Barclays Senior Euribor Submitter, stating: "hi [Senior Euribor Submitter]. Is it possible to have a low 1m fix today?"

- o Barclays' Senior Euribor Submitter replied: "will do."

### iv. Barclays' Collusive Scheme to Manipulate Three-Month Euribor on the March 2007 IMM to Financially Benefit Futures Trading Positions

181.    In another instance of coordination over a four-month period, the Barclays senior Euro swaps trader orchestrated an effort to align trading strategies among traders at multiple Euribor banks with the goal of manipulating the official EBF three-month Euribor fixing on the IMM date of March 19, 2007.  The express purpose of the manipulation was to financially benefit from such artificiality Barclays' and the unidentified co-conspirators' Euribor futures trading positions.

182.    The following are examples of the communications involved in this scheme:

1) December 27, 2006:

- o Barclays' Senior Euro Interest rate Derivatives Trader: "Hi [Barclays Euro Interest rate Derivatives Trader]. A few things.  Ask for a low 3m today and ask [trader at Bank B] and [trader at Bank A] to put it low as well."

- o Two days later, Barclays' Euro Interest rate Derivatives Trader emailed the Euribor requests as instructed to the Barclays Euribor Submitters and the traders at the other banks.

2) February 12, 2007:

- o Barclays' Senior Euro Interest rate Derivatives Trader bragged to a trader at Bank D that he was going to "push the cash to the basement" on the next IMM March date in order to make money on trades, claiming that he will have 80,000 lots in the Euribor futures contract on it. He swore the trader at Bank D to secrecy, claiming that if they did not keep the plan secret it would not work. Barclays' Senior Euro Interest rate Derivatives Trader also claimed that his "treasury [or Euribor Submitter] has the power to move 3m cash to the basement."

3) March 19, 2007:

- o Barclays' Senior Euro Interest rate Derivatives Trader emailed the Barclays Euribor submitter: "As discussed could ...put the 3m as low as possible...."

- o The Barclays Euribor Submitter replied: "Will do my best."

4) March 20, 2007:

- o Barclays' Senior Euro Interest rate Derivatives Trader stated to trader at Bank A that they needed to have the three month Euribor fixing go up slowly to avoid drawing any attention.

- o Barclays' Senior Euro Interest rate Derivatives Trader told the trader at Bank A that he believed he was able to influence five other panel member banks the day before to lower their Euribor submissions as they both desired.

### v. By Such Conduct, Barclays Made Knowingly False Reports

183.    Barclays' Euribor submitters knew it was improper to consider Barclays' traders' derivatives trading positions in determining the bank's Euribor submissions. A bank's derivatives trading positions or profitability are not legitimate or permissible factors on which to base a bank's daily Euribor submissions. By basing its Euribor submissions upon Barclays' derivatives traders' requests, and thereby on Barclays' derivatives trading positions, Barclays' Euribor submissions were not consistent with EBF's definitions and criteria for Euribor submissions. Instead, Barclays conveyed false, misleading or knowingly inaccurate reports that its submitted rates for Euribor were based on and solely reflected the costs of borrowing

66

unsecured funds in the Euro money market. Accordingly, Barclays regularly specifically intended to manipulate and knowingly delivered false, misleading, or knowingly inaccurate reports concerning Euribor, a commodity in U.S. interstate commerce.

### vi.  Legal Findings

184.    On a  daily basis, Barclays, through the transmission of an electronic spreadsheet to Thomson Reuters, knowingly delivered or caused to be delivered its Euribor submissions through the mails or interstate commerce.  Barclays' submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally, including in the U.S., of the Euribor contributor banks' submissions by Thomson Reuters on behalf of the EBF, and other third party vendors.  The contributor banks' submissions are, and were during the relevant period, used to determine the official published rates for Euribor, which are calculated based on a trimmed average of the submissions. Barclays' daily Euribor submissions contained market information concerning the costs of borrowing unsecured funds in the Euro currency and in particular tenors, the liquidity conditions and stress in the Euro money market, and Barclays' ability to borrow funds in the Euro money market.  Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which EBF Euribor is fixed.

185.    Throughout the relevant period, Barclays' Euribor submissions were false, misleading or knowingly inaccurate because they were routinely based on impressible factors such as the derivatives positions of swaps traders, and not the costs of borrowing unsecured funds in the Euro money market, as required by the EBF.  By using impermissible factors in making its Euribor submissions and without disclosing that it based its submissions on impermissible factors, Barclays conveyed false, misleading or knowingly inaccurate information

that the rates its submitted were based on and related to the costs of borrowing unsecured funds in the Euro money market and were truthful and reliable. Moreover, Barclays' submitters knew that Barclays' Euribor submissions contained false and misleading rates. By its conduct, Barclays violated Section 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. § 13(a)(2)(2006).

186. As evidenced by the extensive communications among the traders and submitters, Barclays' traders and submitters each specifically intended to affect the price at which the daily EBF Euribor (for particular tenors), all commodities that trade in interstate commerce, would be fixed. Moreover, the evidence reflects the traders' motives were to affect EBF Euribor fixings in order to benefit their derivatives trader positions or to benefit the trading positions of traders at other Euribor banks, with whom they actively coordinated. The evidence also shows that the submitters understood the traders' motives and acted with manipulative intent by submitting false, misleading or knowingly inaccurate market information that purported to reflect the costs of borrowing unsecured funds in the Euro money market, but in reality, reflected the profit motive of the Barclays' traders. The Barclays' traders' requests for certain rates to be submitted which would benefit their derivatives trading positions or the derivatives trading positions of traders at other Euribor banks, and the submitters making the Euribor submissions reflecting the traders' requests, constitute overt acts in furtherance of their intent to affect EBF Euribor fixings in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2)(2006).

187. Through daily communications, certain Barclays' traders and traders at other Euribor contributor banks discussed Euribor rates that would benefit their banks' respective derivatives trading positions. The traders at the other Euribor banks asked the Barclays traders to have the Barclays Euribor submitters submit a certain rate, or submit a rate in a direction higher

or lower, that would benefit the derivatives positions of the traders at the other Euribor contributor banks.  The Barclays traders agreed and made the requests of the Barclays Euribor submitters.  The Barclays Euribor submitters made their Euribor submissions based on the Barclays' traders' requests.  Accordingly, by seeking to affect the rate at which Euribor was fixed, traders at other Euribor banks specifically intended to manipulate Euribor in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2)(2006).  Barclays' traders had knowledge of and intentionally assisted the acts of the traders at other banks to manipulate the rate at which Euribor was fixed.  By such acts, Barclays aided and abetted the acts of traders at other banks to manipulate Euribor in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,  and 13(a)(2)(2006).

188.    Barclays Bank and Barclays Capital are liable for the acts, omissions, and failures of the traders, managers, and submitters who acted as their employees and/or agents in the conduct described.  Barclays plc, which wholly owns Barclays Bank and Barclays Capital, is liable for the acts, omissions, and failures of Barclays Bank and Barclays Capital with respect to the conduct described.  Accordingly, Barclays PLC, Barclays Bank and Barclays Capital violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,  and 13(a)(2)(2006).

### 3.    Barclays Settlement: FSA Final Notice

#### i.    Overview

189.    On June 27, 2012, the FSA imposed a penalty of £59.5 million on Barclays Bank PLC ("Barclays"), in accordance with section 206 of the Financial Services and Markets Act 2000.  Barclays agreed to settle at an early stage of the FSA's investigation and qualified for a 30% (stage 1) discount under the FSA's executive settlement procedures.  Were it not for this

discount, the FSA would have imposed a financial penalty of £85 million on Barclays.  In connection with the Barclays Settlement, the FSA issued a "Financial Notice" which includes additional factual allegations that are consistent with Barclays' admissions contained in the DOJ Statement of Facts.  The FSA Final Notice provides, *inter alia*, as follows:

190.    Barclays' derivatives traders knew on any particular day what their books' exposure was to Euribor.  For example, on any given day, the Derivatives Traders may have had exposures to Euribor in particular maturities if reset payments were owed to or by Barclays on OTC interest rate swap contracts or if the Derivatives Traders had traded interest rate futures positions settling on that day. The amount owed to or by Barclays could be affected by movements in Euribor.  A beneficial movement in the relevant benchmark rates could have made the Derivatives Traders profit or reduced a loss.  In relation to traded interest rate futures contracts, this would be more likely on the four quarterly IMM dates each year.  For the majority of interest rate futures contracts tied to Euribor, the settlement price is calculated by reference to the final benchmark rates published by Thomson Reuters two days prior to the settlement date.  Therefore the Euribor rates published on the third Monday of any month (and in particular of March, June, September and December) are of particular relevance to traders with interest rate futures positions.

### ii.  Barclays' Traders Internal Requests to Manipulate Euribor

191.    On numerous occasions between January 2005 and June 2009, Barclays' Derivatives Traders made requests to its Submitters for submissions based on their trading positions.  These included requests made on behalf of derivatives traders at other banks.  The Derivatives Traders were motivated by profit and sought to benefit Barclays' trading positions.

The aim of these requests was to influence the final benchmark Euribor rates published by the EBF.

192.    The misconduct involving internal requests to the Submitters at Barclays was widespread, cutting across several currencies and occurring over a number of years. The Derivatives Traders discussed the requests openly at their desks. At least one Derivatives Trader at Barclays would shout across the euro Swaps Desk to confirm that other traders had no conflicting preference prior to making a request to the Submitters.

193.    Requests to Barclays' Submitters were made verbally and a large amount of email and instant message evidence consisting of Derivatives Traders' requests also exists. At times, requests made by email alone were sent by the Derivatives Traders nearly every day.

194.    The FSA determined that between September 2005 and May 2009, Barclays' derivatives traders made at least 58 requests for Euribor submissions to Barclays' submitters, including 20 requests based on communications from traders at other banks.

195.    Barclays' Trader D set calendar entries on at least 4 occasions in 2006 to remind him to make requests for Euribor submissions: "*Ask for Low Reset Rate*" and "*Ask for High 6M Fix*". The routine nature of the requests demonstrates that the Derivatives Traders considered Barclays took their requests into account when determining its submissions.

196.    Barclays' Submitters stated to the Derivatives Traders contemporaneously on numerous occasions that they would take their requests into account. Submitters sent positive responses to Barclays' Derivative Traders on a regular basis. Certain examples record expressly that the Submitters' judgment in determining Barclays' submissions was influenced by the Derivatives Traders' requests. For example, on June 29, 2006, a submitter responded to Trader

E's request for Euribor submissions "with the offer side at 2.90 and 3.05 I will input mine at 2.89 and 3.04 with you guys wanting lower fixings (normally I would be a tick above the offer side)."

197.     In addition, the FSA compared the requests against the submissions made by Barclays.  The FSA determined whether Barclays' submissions were consistent with the derivatives traders' requests by reviewing Barclays' submissions on the date of the requests and the day preceding the requests.  The FSA also reviewed Barclays' position in the panel of contributing banks (*i.e.*, whether Barclays' submissions were higher or lower than the other contributors' submissions) on the date of the requests and the day preceding the requests.

198.     The FSA analyzed 42 requests made by Barclays' derivatives traders in the period from February 23, 2006 to June 3, 2008 relating to Barclays Euribor submissions.  The FSA determined that **86%** of the time Barclays' submissions were consistent with the requests.

199.     For example, on February 19, 2007, a Barclays' trader (identified as Trader E in the FSA Notice) made three requests, asking Barclays' submitter for low one month, high three month and low six month Euribor submissions.  The FSA determined that Barclays one month, three month and six month submissions were consistent with the trader's requests for low one month, high three month and low six month submissions.  For instance, Barclays' three month Euribor submission increased by two basis points from the previous day.  Barclays' position relative to other banks also moved up on February 19, 2007 (26 banks contributed a higher three month Euribor submission than Barclays on February 16 and only one bank contributed a higher submission on February 19).

### iii. Collusion with Other Euribor Contributor Banks

200.    Barclays' derivatives traders also made requests to Barclays' Euribor submitters based on the trading positions of traders at other banks who had asked them to pass the requests onto Barclays' Euribor submitters.

201.    At least 20 of the Euribor requests made by the Derivatives Traders were made on behalf of traders at other banks that contributed Euribor rates.  Barclays' Derivatives Traders passed on the requests of these other traders to Barclays' Submitters, even blind copying the external traders to their emails in order to demonstrate they had done so.

202.    For example, on September 6, 2006, an external trader at another bank (Panel Bank 1) contributing Euribor submissions sent an instant message to Trader E at Barclays requesting a low one month submission: "I seriously need your help tomorrow on the 1mth fix." The next day, Trader E passed the request to Barclays' Submitters, blind copying the external trader.

203.    Similarly, on February 1, 2007, the same external trader sent several messages to Trader E requesting a low one month Euribor submission.  Trader E in turn made a request for a low one month submission to a Submitter, who sent a positive response.

204.    Barclays' Derivatives Traders attempted to influence the Euribor submissions of other banks as well by making requests to external traders.  One of the Derivatives Traders coordinated strategies to align Barclays' positions with traders at other banks and to influence the Euribor.

205.    Between February 2006 and October 2007, Barclays' Derivatives Traders made at least 56 requests to external traders with the aim that those traders would pass on the requests for Euribor submissions to their banks' submitters.  Five Derivatives Traders made the requests to

external traders.  For example, on July 7, 2006, Trader E made an internal request to a Submitter for a low one month Euribor submission.  Trader E also made the same request to external traders at Panel Bank 1 and Panel Bank 2.

206.    On occasion, more concerted efforts were made to influence both Barclays' and other banks' Euribor submissions, consisting of a series of communications over the course of time.  In several key examples, one of Barclays' Derivatives Traders coordinated with external traders to influence Euribor submissions at Barclays and at other banks during the Relevant Period (and that trader instructed more junior Derivatives Traders at Barclays to do the same).  Barclays' Derivatives Traders coordinated with external traders using the following methods: (i) making internal requests to Barclays' Submitters; (ii) making external requests to traders at other contributing banks in advance of and on particular days on which the Derivatives Traders stood to benefit; and (iii) on occasion by encouraging cash traders to make bids or enter into transactions in the money markets at rates which might influence indirectly the Euribor submissions of any contributing bank observing market rates as a factor in determining its submissions.

207.    For example, beginning in early October 2006, Barclays' Derivatives Traders communicated with others (both inside and outside Barclays) in order to coordinate high one month Euribor submissions on October 16, 2006.  These communications included the following: (i) Trader E made internal requests for high one month Euribor submissions to Barclays' Submitters;  (ii) Trader E discussed his requests with an external trader at Panel Bank 1 and made requests to external traders at Panel Banks 2 and 3; (iii) the external trader at Panel Bank 1 informed Trader E he would also make a request to a trader at Panel Bank 4; and (iv) a cash trader at Barclays indicated that Barclays would be paying for cash that morning, "so

hopefully that will help" (the logic being that if Barclays entered into cash transactions this might influence the Euribor submissions of other contributing banks).

208. The following month in early November 2006, Trader E (having agreed to assist an external trader at Panel Bank 1) communicated his preference for a Euribor of "36" or a low one month Euribor submission on November 13, 2006. These communications included the following: (i) Trader E made an internal request for a low one month Euribor submission to a Barclays Submitter on Friday, November 10, 2006 and sent a reminder on Monday, November 13, 2006; (ii) the Submitter responded positively on November 10, 2006, "of course we will put in a low fixing" and on November 13 indicated they would make a submission lower than the Brokers thought Euribor would set that day, "no problem. I had not forgotten. The brokers are going for 3.372, we will put in 36 for our contribution"; (iii) Trader E made a request to an external trader at Panel Bank 2; (iv) Trader E informed the trader at Panel Bank 2 that he and another trader had large positions (of 15 billion euro and 85 billion euro respectively) that would benefit from a low one month Euribor rate on November 13, 2006; and (v) Trader E also made a request to an external trader at Panel Bank 3 and attempted to make a request to a trader at Panel Bank 5 following consultation with a trader at Panel Bank 1.

209. Beginning as early as December 2006 there were coordinated efforts and communications to manipulate the Euribor futures contracts expiring in March 2007. March 19, 2007 was the Monday prior to the third Wednesday in March and therefore relevant to the settlement price of exchange traded interest rate futures contracts expiring in March 2007.

210. The communications reveal that Trader E intended to "go long the march future," and build up a trading position in interest rate futures contracts that would benefit from a low three month Euribor rate. Trader E also stated in an internal email that he understood a trader at

Panel Bank 1 and an individual at a hedge fund were also building up long positions. If a trader had a long position in futures contracts referenced to three month Euribor expiring in March 2007, he would benefit from a low three month Euribor rate on March 19, 2007 (the Monday prior to the third Wednesday in March, an IMM date).

211.     Trader E communicated with traders at Panel Banks 1, 2 and 6 in advance of the IMM date. For example on February 12, 2007, Trader E stated in an instant message with a trader at Panel Bank 6: "if you know how to keep a secret I'll bring you in on it […] we're going to push the cash downwards on the imm day […] if you breathe a word of this I'm not telling you anything else […] I know my treasury's firepower…which will push the cash downwards […] please keep it to yourself otherwise it won't work".

212.     Trader E's communications continued in the build up to March 19, 2007 and on Friday, March 16, 2007 (the last working day prior to March 19, 2007), Trader E made requests for a low three month Euribor submission to traders at Panel Banks 2 and 3 (which he discussed with a trader at Panel Bank 1).

213.     Trader E made further requests on Monday, March 19, 2007, including asking a trader at Panel Bank 6 to "tell your cash to put the 3m fixing in the basement".

214.     Trader E also made an internal request for a low three month submission to a Submitter at Barclays on March 19, 2007; and Trader E also attempted to influence Barclays' cash trading strategy in order to affect contributing banks' Euribor submissions indirectly. An external trader noted that he understood Barclays was making bids in the market for three month cash on March 19, 2007. This appears to have been communicated to Trader E at Barclays, who then contacted the cash trader bidding in the market. Barclays stopped bidding for three month cash thereafter.

215.     Various instant messages exchanged after the final benchmark rates were published on March 19, 2007 indicated that the traders involved considered that their strategy had been successful.  Trader E commented to the external trader at Panel Bank 6 "this is the way you pull off deals like this chicken, don't talk about it too much, 2 months of preparation […] the trick is you must not do this alone […] this is between you and me but really don't tell ANYBODY."

**B.     The UBS Settlement**

216.      On December 19, 2012, the DOJ, the FSA, and the CFTC announced agreements that collectively obligate UBS to pay more than $1.5 billion in fines and penalties due to, among other unlawful conduct, making false Euribor submissions to the EBF in order to benefit UBS's Euribor-based derivatives positions (the "UBS Settlement").

217.     The factual findings that accompanied the UBS Settlement include a "Statement of Facts" (of which UBS admitted as true and accurate) that are attached to, and incorporated by reference in, a non-prosecution agreement entered with the Department of Justice's Criminal Division, Fraud Section.  The UBS Settlement is also memorialized in a CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions (the "CFTC Order") and a FSA Final Notice to UBS AG (the "FSA Final Notice").[8]

**1.     UBS Settlement: DOJ Statement of Facts**

218.      Among other facts, UBS admitted that the following information set forth in the DOJ Statement of Facts is true and accurate:

---

[8] The UBS DOJ Statement of Facts is attached as Exhibit B-1.  The UBS CFTC Order is attached as Exhibit B-2.  The UBS FSA Final Notice is attached as Exhibit B-3.

### i. Overview

219. From at least 2005 through December 18, 2012, UBS was a member of the Contributor Panel for Euribor. Each Contributor Panel bank's submitted rates to the EBF (including UBS), were made available worldwide through electronic means and through a variety of information sources.

220. UBS AG, a financial services corporation, has banking divisions and subsidiaries around the world, including in the United States, with its United States headquarters located in New York, New York and Stamford, Connecticut. UBS employs derivatives traders throughout the world, including Stamford, Connecticut, London, Zurich and Tokyo, who trade financial instruments tied to Euribor and other rates.

221. At various times from at least 2001 through June 2010, UBS derivatives traders—whose compensation from UBS was directly connected to their success in trading financial products tied to Euribor requested, and sometimes directed, that certain UBS Euribor submitters submit benchmark interest rate contributions that would benefit the traders' trading positions, rather than rates that complied with the definitions of Euribor.

222. UBS AG's Group Treasury section is the part of UBS AG that monitors and oversees the financial resources of the entire bank, including the bank's liquidity and funding. At all relevant times herein, Asset and Liability Management ("ALM") is the part of the Investment Bank Division which managed the bank's liquidity buffer and issuance of new commercial paper and certificates of deposit. Group Treasury provided guidance to ALM on funding issues. The head of ALM worked for the Investment Bank Division.

223.     Until the end of September 2009, UBS's Euribor submissions were made by UBS derivative traders.  In October 2009, ALM took over the Euribor submission process from the derivatives traders.  This change was the result of a decision of UBS's Compliance Department ("Compliance"), based on the conclusion that there was an inherent conflict of interest in having derivatives traders determine UBS's daily Euribor submissions.  Nevertheless, under this new policy, derivatives traders continued to provide input to ALM, which ALM submitters at times considered in determining UBS's Euribor submissions.  Each day, approximately 15 minutes before ALM made its Euribor submissions, derivatives traders in a given currency would input their assessment of Euribor into a shared spreadsheet.  The ALM submitters then considered that input along with the previous day's submission.

224.     From as early as 2001 through at least June 2010, certain UBS derivatives traders requested and obtained benchmark interest rate submissions which benefitted their trading positions.  These derivatives traders requested, and sometimes directed, that certain Euribor submitters submit Euribor contributions to the EBF that would benefit the traders' trading positions, rather than rates that complied with the definition of Euribor.  Those derivatives traders either requested or directed a particular Euribor contribution for a particular tenor or requested that the rate submitter submit a rate higher, lower, or unchanged for a particular tenor.  The derivatives traders made these requests in electronic messages, telephone conversations, and in-person conversations.  Euribor submitters regularly agreed to accommodate the derivatives traders' requests and directions for favorable Euribor submissions.

## ii. Manipulation Within UBS of its Euribor Submissions

225.    From as early as September 2005 through approximately June 2010, certain UBS Euro derivatives traders requested that Euribor submitters contribute submissions to benefit the derivatives traders' positions.  UBS submitters often accommodated such requests.

226.    For example, in an October 2, 2006 electronic chat between a UBS Euro derivatives trader and the UBS Euribor submitter, the submitter solicited the trader's preference for that day's submission, asking, "any special wishes for the fixing?"  The trader responded, "I lose 120k of a received fix today . . . so low would be good."  The trader then indicated that his/her request for low Euribor applied to both the 3-month and 6-month tenors, to which the submitter responded, "ok we go 42 and 57."

227.    As a further example, in a June 25, 2009 internal UBS chat with 58 viewers, including UBS's representative on the BBA FX Money Market Committee ("UBS's BBA Representative"), the Euribor submitter solicited UBS derivatives traders for their submission preferences, asking, "boys, we send the fixings in about 1hr, so let us know pls."  A derivatives trader immediately responded with, "low 6s high 12s . . .please."  The submitter responded, "noted."

228.    The UBS Euribor submitter and UBS's BBA Representative knew this practice of submitting a Euribor contribution for the benefit of derivatives traders' positions was inappropriate.  Indeed, as noted above, UBS's BBA Representative was tasked with monitoring such conduct to preserve the integrity of the submission process.  Moreover, five minutes after the June 25, 2009 chat described in the previous paragraph, in a separate electronic chat between the Euribor submitter and UBS's BBA Representative, UBS's BBA Representative admonished:

"JUST BE CAREFUL DUDE." The submitter responded, "I agree we shouldn't ve been talking about putting fixings for our positions on public chat."

229.    UBS's Fall 2009 transfer of responsibility for Euribor submissions to ALM did not prevent its derivatives traders from attempting to manipulate these benchmarks. For example, in a June 29, 2010 electronic chat between the former Euribor submitter – who was still an active UBS Euro derivatives trader – and another UBS Euro derivatives trader, stated:

> Former submitter: u got 6mth fix position today?
>
> Trader:  6mth fixing today? . . . nothing.
>
> Former submitter: ok, gonna set fixing 1bp higher on the 6s for the turn then.
>
> Trader: didn't think you set it!
>
> Former submitter: i don't but i give my opinion to the ALM desk . . . regarding change, higher/lower.

### iii.    Implications of UBS's Derivatives Traders Requests

230.    When UBS derivatives traders made requests of UBS rate submitters in order to influence UBS's Euribor, and when the submitters accommodated those requests, the manipulation of the submissions affected the fixed Euribor on various occasions.

231.    Indeed, the purpose of this activity was to manipulate Euribor submissions from UBS and other banks to influence the resulting fixes and thus to have a favorable effect on the derivatives traders' trading positions. Because traders' compensation was based in part on the profit and loss calculation of the trading books, derivatives traders' requests were intended to benefit their compensation as well.

232.    Because of the high notional value underlying derivatives transactions tied to Euribor, even very small movements in those rates could have had a significant positive impact

on the profitability of a trader's trading portfolio, and a correspondingly negative impact on their counterparties' trading positions.

233. UBS entered into interest rate derivatives transactions tied to Euribor – such as derivatives, forward rate agreements, and futures – with counterparties to those transactions. Many of those counterparties were located in the United States. Those United States counterparties included, among others, asset management corporations, mortgage and loan corporations, and insurance companies. Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States.

234. In the instances when the published benchmark interest rates were manipulated in UBS's favor due to UBS's manipulation of its own or any other Contributor Panel bank's submissions, that manipulation benefitted UBS derivatives traders, or minimized their losses, to the detriment of counterparties, at least with respect to the particular transactions comprising the trading positions that the traders took into account in making their requests to the rate submitters. Certain UBS derivatives traders and rate submitters who tried to manipulate Euribor submissions understood the features of the derivatives products tied to these benchmark interest rates; accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions.

235. When the requests of derivatives traders for favorable Euribor submissions were taken into account by the UBS rate submitters, UBS's rate submissions were false and misleading. Moreover, in making and in accommodating these requests, the derivatives traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties. As part of that effort: (1) derivatives traders and submitters submitted

and caused the submission of materially false and misleading Euribor contributions; and (2) derivatives traders, after initiating and continuing their effort to manipulate Euribor contributions, negotiated and entered into derivative transactions with counterparties that did not know that UBS employees were often attempting to manipulate the relevant rate.

236.    UBS acknowledged that the wrongful acts described in the DOJ Statement of Facts taken by the participating employees in furtherance of the misconduct set forth above were within the scope of their employment at UBS.  UBS also acknowledged that the participating employees intended, at least in part, to benefit UBS through the actions described in the DOJ Statement of Facts.

237.    UBS agreed to pay a $500 million penalty to the DOJ and (among other relief) agreed to continue to cooperate with the DOJ's investigation of Euribor rigging.

### 2.    UBS Settlement: CFTC Order

238.    UBS paid a civil monetary penalty of $700 million to the CFTC and agreed to comply with conditions and undertakings in the CFTC Order to ensure the integrity and reliability of its benchmark interest rate submissions.  The CFTC Order includes additional factual allegations complimentary to the admissions contained in the DOJ Statement of Facts regarding false reporting of Euribor.  These additional factual allegations include as follows:

### i.    Conflicts of Interest and Lack of Internal Controls Allowed the Misconduct at UBS to Flourish for Years

239.    From at least January 2005 through the end of September 2009, UBS used a flawed interest rate submission process that relied on inherently conflicted employees to make UBS's Euribor submissions.  UBS made its interest rate derivatives traders – who were responsible for trading UBS's interest rate derivative positions for profit – the persons charged with making UBS's interest rate submissions for Euribor.  As a result, when determining rates to

submit for fixing Euribor, UBS's derivatives traders routinely submitted rates which were not reflective of honest and reliable assessments of the costs of borrowing unsecured funds in the Euribor interbank market. Instead, the derivatives traders wrongfully submitted artificial (and impermissible) Euribor rates that financially benefitted UBS's Euribor derivatives positions. UBS's dual role of traders as submitters created a conflict of interest that compromised the integrity of UBS's Euribor submission process.

240. UBS's dual role of traders acting as submitters created a conflict of interest that compromised the integrity of UBS's submission process, thus establishing an environment ripe for the Derivatives Traders and Trader-Submitters to abuse. UBS's Trader-Submitters had an inherent interest in making Euribor submissions that benefited their Euribor derivatives trading positions. This interest conflicted with UBS's responsibility to make honest and reliable assessments of the costs of borrowing unsecured funds in the Euribor interbank market, and ensure its Euribor submissions were made in accordance with the EBF's definitions and criteria.

241. Until August 2008 at the earliest, UBS had no specific internal controls or procedures governing its Euribor submissions to manage the conflicts of interest and ensure that its submissions did not take into account impermissible factors, such as UBS's derivatives trading positions. UBS provided no training concerning the benchmark interest rate submission process or how to manage the inherent conflict between making such submissions and the fact that the Trader-Submitters were supposed to make money for UBS.

242. Even after conducting a limited review and developing some procedures for its U.S. Dollar LIBOR submissions process, UBS did not remove the inherent conflict of interest described above or provide meaningful guidance or any training to the Trader-Submitters. Rather than strengthening its internal controls and removing the conflict of interest embedded in

the submission process, UBS instead delegated oversight responsibility for the benchmark interest rate submissions to managers who not only knew that Derivatives Traders and Trader-Submitters were engaged in efforts to manipulate the official Euribor fixing, but who also made their own requests for submissions to benefit their individual derivatives trading positions. At least certain Derivatives Traders, Trader-Submitters and managers disregarded the few procedures UBS eventually implemented in August 2008. UBS's lack of specific internal controls or procedures and overall lax supervision concerning its submission process for Euribor allowed this misconduct to occur.

### ii. UBS Made False Reports to Manipulate Euribor to Benefit UBS's Derivatives Positions

243.　From at least September 2005 through at least October 2009, UBS's Euribor submissions were based, in whole or in part, on UBS's Euro-based derivatives positions.

244.　UBS Euro Trader-Submitters considered UBS's net Euro positions on its "Rates" desk that were valued or priced off of Euribor. To determine the rates to submit that would be beneficial to UBS's trading positions, the Trader-Submitters reviewed UBS's derivatives transactions and consulted with and obtained information from other UBS Euro Derivatives Traders. Based on that information, UBS's Euro Trader-Submitters adjusted UBS's Euribor submissions to benefit UBS's derivatives trading positions. This occurred on a regular, if not daily, basis.

245.　Moreover, senior managers made their own requests for specific Euribor submissions that would benefit their trading positions and, at times, communicated with each other about their requested Euribor submissions. For example,

August 7, 2007:

Senior Rates Manager B: "hi [Senior STIR Manager B], what you putting in for

85

3mth and 6mth euribor fixing today?"

Senior STIR Manager B:  "goo[d] question ... need a low fix personally in 3s"

Senior Rates Manager B:  ".. .i have a 2bn fixing today and i'm [sic] also looking to sell1 bn of the 6mth at about 4.42  fun times with the fixings at the moment"

Senior STIR Manager B:  "i'll shoot for low then and hope some other do too and we dont fall out .."

Senior Rates Manager B:  "if i don't sell the 6mth before the fix, i need a high fixing  3mth i'm [sic] now flat  over the next few weeks we've got a lot of 6mtth fixing coming off"

Senior STIR Manager B:  "ill stick 4.42 in for 6s then"

Senior Rates Manager B:  "we are receiving the fixing"

Senior STIR Manager B:  "gotscha"

246.     Multiple UBS Euro Derivatives Traders also made requests to the Euro Trader-Submitters for submissions that would benefit their derivatives trading positions.  The Euro Trader-Submitters agreed to the requests and solicited the Derivatives Traders for their preferences for submissions.  The Trader-Submitters took the specific requests into account when determining UBS's Euribor submissions.

247.     On June 25, 2009, more than eight months after the CFTC had launched its investigation of UBS and demanded information and documents from UBS in October 2008, a senior UBS manager warned UBS's Euro Derivatives Traders and the Trader-Submitters not to make requests to manipulate UBS's Euribor submissions on a "public chat."

June 25, 2009 (Emphasis added.):

Euro Trader-Submitter 1:  "u need low 3s and/or 6s?  we need low 6s ... boys, we send the fixings in about 1hr, so let us know pls"

Euro Trader 1:  "low 6s high 12s please"

Euro Trader-Submitter 1:  "noted"

Rates Manager A:  **"JUST BE CAREFUL DUDE"**

Euro Trader-Submitter 1:  "yeah [Sterling Trader-Submitter 1]  gave me ur call update  **i agree we shouldnt ve been talking about putting fixings for our positions on public chat** just wanted to get some transparency though  otherwise we end up with the same talks afterwards why we fixed it low or high, from u boys in ldn"

248.    From at least September 2005 through at least October 2009, UBS's senior managers never instructed or demanded that UBS's Derivatives Traders and Trader-Submitters to stop the practice of taking into account UBS's Euribor derivatives positions in making its Euribor submissions.  In fact, this common and pervasive practice continued until at least June 20, 2010 (almost two years after the CFTC launched its investigation into UBS' USD-LIBOR practices), when a senior UBS short-term interest rate manager made a written request for a specific Euribor submission.

### iii.    By Such Conduct, UBS Made Knowingly False Reports

249.    UBS, through its Derivatives Traders, Trader-Submitters and/or senior managers, knew it was improper to consider derivatives trading positions in determining the bank's Euribor submissions.  A bank's financial derivatives trading positions are not legitimate or permissible factors on which to base a bank's daily Euribor submissions.  By basing its Euribor submissions on rates that benefited UBS's derivatives positions, UBS's submissions were not made in accordance with the EBF's definitions and criteria for Euribor.  Instead, UBS knowingly conveyed false, misleading or knowingly inaccurate reports that its submitted rates for Euribor were based on and solely reflected its assessment of the costs of borrowing unsecured funds in the Euro interbank market.  Accordingly, UBS regularly attempted to manipulate the official fixings of and knowingly delivered false, misleading or knowingly inaccurate reports concerning Euribor, a commodity in interstate commerce.

#### iv. **Legal Findings**

250.    On a  daily basis, UBS, through the transmission of an electronic spreadsheet to Thomson Reuters, knowingly delivered or caused to be delivered its Euribor submissions through the mails or interstate commerce.  UBS's submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally, including in the U.S., of the Euribor contributor banks' submissions by Thomson Reuters on behalf of the EBF, and other third party vendors.  The Euribor contributor banks' submissions are, and were during the relevant period, used to determine the official published rates for Euribor, which are calculated based on a trimmed average of the submissions.  UBS's daily Euribor submissions contained market information concerning the costs of borrowing unsecured funds in the Euro currency and in particular tenors, the liquidity conditions and stress in the Euro interbank market, and UBS's ability to borrow funds in the Euro interbank market.  Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which EBF Euribor is fixed.

251.    On a daily basis, UBS, through the transmission of an electronic spreadsheet to Thomson Reuters, knowingly delivered or caused to be delivered its (mis)reported Euribor submissions through the mails or interstate commerce.  UBS's submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally, including in the United States, of the panel banks' submissions by Thomson Reuters on behalf of the EBF, and other third party vendors.  UBS's daily Euribor submissions contained market information concerning the costs of borrowing unsecured funds in the euro market, the liquidity conditions and stress in the money markets, and UBS's ability to borrow funds in particular markets.  Such market information affects or tends to affect the prices of

commodities in interstate commerce, including the daily rates at which the EBF Euribor are fixed.

252.     Throughout the period relevant to the conduct described in the UBS CFTC Order, UBS's Euribor submissions were false, misleading or knowingly inaccurate because they were routinely based on illegitimate factors, including, the derivatives trading positions of traders, which occurred routinely if not daily.  By using these impermissible and illegitimate factors in making its Euribor submissions, UBS conveyed false, misleading or knowingly inaccurate information that the rates it submitted were based on and related to the costs of borrowing unsecured funds in the Euro interbank market and were truthful and reliable.  Certain of UBS's managers, traders, and submitters knew that certain of UBS's Euribor submissions contained false, misleading or knowingly inaccurate information.  By such conduct, UBS violated Section 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. § 13(a)(2)(2006).

253.     As evidenced by the extensive communications, several UBS Derivatives Traders and Trader-Submitters each specifically intended to affect the price at which the daily EBF Euribor would be fixed to benefit UBS's derivatives trading positions or to benefit the derivatives trading positions of colluding traders at other banks.  The UBS Derivatives Traders' requests for certain rates to be submitted that would benefit their derivatives trading positions or the derivatives trading positions of traders at other banks, and the Trader-Submitters making submission for Euribor reflecting rates beneficial to UBS's derivative trading positions, rather than reflecting, as required, UBS's assessments of the costs of borrowing unsecured funds in the Euro interbank market, constitute overt acts in furtherance of their intent to affect EBF Euribor fixings in violation of Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,  and 13(a)(2)(2006).

254.     UBS AG is liable for the acts, omissions, and failures of the traders, managers, and submitters who acted as their employees and/or agents in the conduct described. Accordingly, UBS AG violated Sections 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13b,  and 13(a)(2)(2006).

### 3.     The UBS Settlement: FSA Final Notice

255.     On December 19, 2012, the FSA imposed a penalty of £160 million on UBS AG in accordance with section 206 of the Financial Services and Markets Act 2000 (the "Act"). UBS agreed to settle at an early stage of the FSA's investigation.  UBS therefore qualified for a 20% (stage 2) discount under the FSA's executive settlement procedures.  Were it not for this discount, the FSA would have imposed a financial penalty of £200 million on UBS.  In connection with the UBS Settlement, the FSA issued a "Final Notice" which includes additional factual allegations that are consistent with UBS's admissions contained in the DOJ Statement of Facts.  The FSA Final Notice accompanying the UBS Settlement provides that, *inter alia*:

256.     Between January 1, 2005 and December 31, 2010, the FSA documented at least 13 internal requests to manipulate EURIBOR directly involving at least eight individual UBS employees, five of whom were UBS managers.

257.     UBS sought to manipulate Euribor in order to improve the profitability of its Euribor-based derivatives trading positions.

258.     It was inappropriate for UBS to make Euribor submissions which took its derivatives traders' positions into account. UBS did not therefore observe proper standards of market conduct when making Euribor submissions.

259.     From January 1, 2005 to October 2009, UBS's Euribor submissions were determined by Trader-Submitters on the EUR STIR Desk.  The STIR Desk generated significant

profits for UBS through their derivatives trading in products linked to Euribor. During the period from January 1, 2005 to October 2009, UBS combined the roles of determining its Euribor submissions and proprietary trading in derivative products referenced to Euribor. This combination of roles was a fundamental flaw in organizational structure given the inherent conflict of interest between these two roles and the absence of any effective means of managing that conflict. There was a clear conflict between the obligation to make submissions in accordance with the published criteria and the responsibility for the profitability of trading positions. Despite this inherent conflict, UBS took no steps to manage the conflict until October 2009.

260.    Even when the trading and submitting roles were split in October 2009, UBS's systems and controls did not prevent Traders from persisting with their Internal Requests and attempting to influence submissions by camouflaging them as "market colour".

261.    At least 13 documented Internal Requests to manipulate Euribor were made, directly involving at least eight individuals at UBS, five of whom were Managers. In fact, a number of UBS managers knew about and in some cases were actively involved in UBS's attempts to manipulate its Euribor submissions. In total, improper requests directly involved approximately 40 individuals at UBS, 11 of whom were Managers. At least two further Managers and five Senior Managers were also aware of the practice of the manipulation of submissions to benefit trading positions.

262.    In addition, Traders and Trader-Submitters routinely discussed their trading positions and made Internal Requests orally.

263.    Internal Requests were routine and expected to be taken into account by Trader Submitters. Trader-Submitters also solicited Internal Requests from the Traders and sometimes

indicated if the requests suited their own positions. Aside from receiving specific Internal Requests, Trader-Submitters were informed about the overall trading exposure and took this into account when determining submissions.

264.    As discussed above, UBS managers were directly involved in UBS's Euribor manipulation.  For example, during a discussion in a public chat group with 58 participants on June 25, 2009 Trader-Submitter C openly solicited several colleagues for Internal Requests in respect of Euribor submissions. Later on the same day, in a private chat Manager D said to Trader-Submitter C: "JUST BE CAREFUL DUDE". Trader-Submitter C replied:  "i agree we shouldnt ve been talking about putting fixings for our positions on public chat".

265.    Banks on the Euribor panel are required to follow the Euribor Code of Conduct. On November 12, 2007, the EBF wrote to Euribor Panel Banks and reminded them of their obligations to comply with the Code.  The EBF said that: "to avoid unwanted negative consequences, the panel banks are invited to ensure and maintain systematic and close control in their daily quotations to effectively provide accurate information for the daily calculations of the Euribor reference rate [. . .] it is incumbent upon all involved institutions to remain vigilant in their efforts to fully understand and comply with their obligations and best operational practices when providing and/or calculating data."

266.    UBS's sole significant action in connection with its Euribor submissions process was removing the responsibility for determining Euribor submissions from the Short-Term Interest Rates Desk and moving it to ALM in October 2009.  However, it conducted no reviews and had no systems, controls or policies over its Euribor submissions throughout the Relevant Period.

267. As a result, every Euribor submission in tenors in which UBS traded was at risk of being manipulated.

### C. The RBS Settlement

268. On February 6, 2013, the DOJ, the CFTC and the FSA announced agreements that collectively obligate RBS to pay $612 million (USD) in fines and civil penalties due to, among other unlawful conduct, false reporting and manipulation of leading global interest rates, including Euribor.

269. The factual findings that accompanied the RBS Settlement include a "Statement of Facts" (of which RBS admitted as true and accurate) that are attached to, and incorporated by reference in, a Deferred Prosecution Agreement entered with the United States Department of Justice, Criminal Division, Fraud Section, Antitrust Division. The RBS Settlement is also memorialized in a CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions (the "CFTC Order") and a FSA Final Notice to the Royal Bank of Scotland plc (the "FSA Final Notice").[9]

### 1. RBS Settlement: DOJ Statement of Facts

270. Among other facts, RBS admitted that the following information set forth in the DOJ Statement of Facts is true and accurate:

271. A RBS derivatives trader, on a few occasions from September 2007 to mid-2008, attempted to coordinate with derivatives traders at other banks about submissions related to Euribor.

---

[9] The RBS Deferred Prosecution Agreement and DOJ Statement of Facts is attached as Exhibit C-1. The RBS CFTC Order is attached as Exhibit C-2. The RBS FSA Final Notice is attached as Exhibit C-3.

272. For example, in a series of instant messages on October 4, 2007, the RBS derivatives trader who traded products tied to Euribor, communicated with two derivatives traders employed by Barclays Bank, plc regarding favorable Euribor settings for their trading positions. The Barclays Bank traders agreed to the RBS trader's request and shared their intended submissions in other tenors, to which the RBS trader signaled approval.

273. RBS acknowledged that the wrongful act taken by participating employees in furtherance of the misconduct set forth in the DOJ Statement of Facts were within the scope of their employment at RBS. RBS acknowledged that the participating employees intended, at least in part, to benefit RBS through the actions described in the DOJ Statement of Facts.

### 2. RBS Settlement: CFTC Order

274. The RBS CFTC Order includes additional factual allegations complimentary to the admissions contained in the DOJ Statement of Facts. For example, the CFTC found that RBS, through a Euro derivatives trader, also colluded with traders at other banks on at least a handful of occasions relating Euribor, by asking for beneficial Euribor submissions to be made by the other banks from at least September 2007 through at least mid-2008.

### D. The Rabobank Settlement

275. On October 29, 2013, the DOJ, the CFTC and the FCA (formerly FSA) announced agreements that collectively obligate Rabobank to pay more than $1 billion in fines and civil penalties, due to, among other unlawful conduct, making false Euribor submissions to EBF in order to benefit Rabobank's derivative positions.

276. The factual findings that accompanied the Rabobank settlement include a "Statement of Facts" (of which Rabobank admitted as true and accurate) that are attached to, and incorporated by reference in a a Deferred Prosecution Agreement entered with the United States

Department of Justice, Criminal Division, Fraud Section, Antitrust Division. The Rabobank Settlement is also memorialized in a CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions (the "CFTC Order") and a FCA Final Notice to Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (the "FCA Final Notice").[10]

### 1.    The Rabobank Settlement: DOJ Statement of Facts

277.    Among other facts, Rabobank admitted that the following information set forth in the DOJ Statement of Facts is true and accurate:

### i.    Overview

278.    Until January 2013, Rabobank served as a member of the Contributor Panel for EBF Euribor.

279.    Rabobank is a financial services corporation with headquarters located in Utrecht, the Netherlands. Rabobank is structured as a cooperative. Rabobank "Member Banks" are independent cooperatives that are members of a centralized entity called Rabobank Nederland (in the Netherlands) and Rabobank International (outside of the Netherlands) (collectively, "Rabobank"). In addition to supporting the Rabobank Member Banks, Rabobank operates its own banking business and conducts other activities such as supervising the Rabobank Member Banks on behalf of financial regulators. Rabobank has banking divisions and branches around the world, including in the United States, with its United States branch headquartered in New York. Rabobank employs derivatives traders throughout the world - including in New York, London, Utrecht, Tokyo, Hong Kong, and Singapore - who trade financial instruments tied to Euribor, including interest rate swaps ("swaps traders"). Employees on Rabobank's money

---

[10] The Rabobank DOJ Statement of Facts is attached as Exhibit D-1. The Rabobank CFTC Order is attached as Exhibit D-2. The Rabobank FCA Final Notice is attached as Exhibit D-3.

markets desks in London and Utrecht have been responsible for contributing Rabobank's Euribor submissions ("submitters"). Rabobank's Euribor submissions have always been made by submitters in Utrecht.

### ii. Internal Manipulation of Rabobank's Euribor Submissions

280. From in or around July 2007 through September 2008, multiple Rabobank Euribor traders in London and Utrecht made frequent and regular requests for favorable Euribor contributions to the Rabobank Euribor submitters on the Utrecht money markets desk. Rabobank's Euribor submitters accommodated these requests on numerous occasions.

281. For example, on April 22, 2008, Rabobank's Euribor submitter, Submitter-9, messaged a Euribor swaps trader ("Trader-10"): "Hello let's cheat on the fixes ??" Trader-10 wrote back: "only biggie is really low 3s. much appreciated, as usual:)." That day, Rabobank's 3-month Euribor submission was 4.81, an increase of one basis point. Due to upward movement by other banks on the Contributor Panel, however, Rabobank's submission went from being tied as the twenty-first highest submission on the Contributor Panel on the previous day to being tied as the twenty-eighth highest submission on the Contributor Panel.

282. On September 5, 2008, Submitter-9 messaged Trader-10: "Hi still high 3s and 6s ??" Trader-10 wrote back: "yes, everything high pls." That day, Rabobank's 3-month Euribor submission was 4.97, an increase of one basis point. Rabobank's submission went from being tied as the thirteenth highest submission on the Contributor Panel on the previous day to being tied as the seventh highest submission on the Contributor Panel. Likewise, Rabobank's 6-month Euribor submission was 5.19, an increase of one basis point. Rabobank's submission went from being tied as the eleventh highest submission on the Contributor Panel on the previous day to being tied as the fourth highest submission on the Contributor Panel.

283.    The trader requests on the Euribor desk were made both to advance the traders'
trading positions and to maintain the appearance of consistency in Rabobank's submissions.  On
June 3, 2008, Submitter-9 messaged Trader-10: "salut fixes please ??"  Trader-10 replied: "ok,
hold on tight; high 3s and 6s pls!!"  Submitter-9 replied: "high >?? U sure ??"  Trader-10 wrote
back: "yes indeed only 3 s not soo big and prob tomorrow low again so maybe dont spoil the
pattern too much? thanks either way:)."  On September 24, 2008, Submitter-9 wrote: "hi high 3
and 6s," to which Trader-10 replied: "today low 1s and 3s, high 6s pls:-) merci!"  Submitter-9
wrote back: "u got me confused here [Trader-10]."  Trader-10 replied: "always high 6s, and our
fixings 1s and 3s are large enoug today to want lower fixings there, 1s and 3s do change daily, if
e.g. 3m is small then we go for high 3s to support your high 6s. bon?"  Submitter-9 replied: "a
lesson in fixings !!!!"

284.    In addition to accommodating other Rabobank traders' requests, a Rabobank
Euribor submitter also took her own trading positions into account.  On September 29, 2008,
Submitter-9 messaged Trader-10: "Hi low 3s and high 6s ??" Trader-10 wrote back: "yes pls
[Submitter-9], low Is and 3s actually, both are quite big., many thanks!"  Submitter-9 replied: "I
have 7 bio 1s." Trader-10 replied: "meaning you need it high?"  Submitter-9 wrote: "I hear
between 4.95 and 5.05 is 1s what shall I put ???"

285.    Certain other Rabobank traders and submitters also sent and received requests.
For instance, on July 12, 2007, another Euribor trader ("Trader-11") wrote to the backup Euribor
submitter ("Submitter-10") with the subject line: "fixings."  In the message, Trader-11 wrote:
"Only when it doesn't affect you in a negative way: today we'd like to see the 6M fixing as high
as possible and the 3M fixing as low as possible...many thanks!"

286.     On November 19, 2007, another Euribor trader ("Trader-12") messaged Submitter-9: "I need high 3m euribor today!" That day, Rabobank's 3-month Euribor submission was 4.62, an increase of six basis points. Rabobank's submission went from being tied as the thirty-eighth highest submission on the Contributor Panel on the previous day to being tied as the eighteenth highest submission on the Contributor Panel.

287.     According to multiple Rabobank employees, Trader-11 and at least one other Euribor swaps trader made regular and frequent verbal requests to the submitters for submissions that would benefit their positions.

### iii.     Collusion to Manipulate Euribor

288.     From at least as early as January 2006, and at various times until at least December 2007, Submitter-9 received requests from two swaps traders located in London at a non-Contributor Panel bank ("Bank-C") to move Rabobank's Euribor submission in a direction that would benefit their trading positions.  Bank C's traders requested that Rabobank's Euribor submitter contribute a particular Euribor submission, or move the submission in a particular direction (*i.e.*, up or down) to benefit their trading positions.  These requests were accommodated on numerous occasions.

289.     In order to accommodate Bank C's requests, Submitter-9 adjusted her Euribor submissions from what she ordinarily would have submitted to a rate that benefitted Bank-C's trading positions.  For example, on September 21, 2006, she informed one of Bank C's traders ("Trader- D") that she saw the 1-month fix at 3.205.  When informed by Trader-D that he wanted a lower submission, she lowered the Rabobank rate to 3.19.

290.     On at least one occasion, Submitter-9 was asked to submit 3-month Euribor "at the ceiling" because, as another Bank-C swaps trader ("Trader-E") explained: "I am long in

fixings against Dec futures it cost me a fortune yesterday." Submitter-9 informed him that she could not because the Rabobank "long swaps need it low."

291.    Submitter-9 was aware that her Euribor submissions would impact the trading positions of the Bank-C traders. On multiple occasions, she contacted them to specifically ask if they had trading positions dependent on Euribor before submitting Rabobank's rate. For example, on June 14, 2006, Submitter-9 asked Trader-D: "do you have fixings??" to which Trader-D responded: "yes." Submitter-9 then asked: "what do you want?" Trader-D stated: "low the 1m and high the 3 and the 6 please." Submitter-9 agreed, responding: "2.86 2.97 and 3.12 i'm going to get myself [kicked out of the fix] but okay." Rabobank's Euribor contribution that day was exactly as Submitter-9 promised.

### iv.    Implications of Rabobank's Requests

292.    When Rabobank derivatives traders made requests of Rabobank rate submitters in order to influence Rabobank's benchmark interest rate submissions, and when the submitters accommodated those requests, the manipulation of the submissions affected the fixed rates on various occasions.

293.    Likewise, when Rabobank derivatives traders influenced the submissions of other Contributor Panel banks by seeking and receiving accommodations from their counterparts at such banks, and when Rabobank derivatives traders accommodated the requests of traders at other Contributor Panel banks and non-panel banks, the manipulation of those submissions affected the fixed benchmark rates on various occasions.

294.    Indeed, the purpose of this activity was to manipulate benchmark submissions from Rabobank and other banks to influence the resulting fixes and thus to have a favorable effect on the derivatives traders' trading positions. Because traders' compensation was based in

part on the profit and loss calculation of their trading books, derivatives traders' requests were intended to benefit their compensation as well.

295.     Because of the high value of the notional amounts underlying derivatives transactions tied to Euribor, even very small movements in those rates could have had a significant positive impact on the profitability of a trader's trading portfolio, and a correspondingly negative impact on their counterparties' trading positions.

296.     Rabobank entered into interest rate derivatives transactions tied to Euribor—such as derivatives, forward rate agreements, and futures—with counterparties to those transactions. Many of those counterparties were located in the United States.  Those United States counterparties included, among others, asset management corporations, mortgage and loan corporations, and insurance companies.  Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States.

297.     In the instances when the published benchmark interest rates were manipulated in Rabobank's favor due to Rabobank's manipulation of its own or any other Contributor Panel bank's submissions, that manipulation benefitted Rabobank derivatives traders to the detriment of counterparties, at least with respect to the particular transactions comprising the trading positions that the traders took into account in making their requests to the rate submitters.

298.     Certain Rabobank derivatives traders and rate submitters who tried to manipulate Euribor submissions understood the features of the derivatives products tied to these benchmark interest rates; accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions.

299.    When the requests of derivatives traders for favorable Euribor submissions were taken into account by the Rabobank rate submitters, Rabobank's rate submissions were false and misleading. Those false and misleading Euribor contributions affected or tended to affect the price of commodities, including futures contracts. Moreover, in making and in accommodating these requests, the derivatives traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties. As part of that effort: (1) derivatives traders and submitters submitted and caused the submission of materially false and misleading Euribor contributions; and (2) derivatives traders, both before and after initiating and continuing their effort to manipulate Euribor contributions, negotiated and entered into derivative transactions with counterparties that did not know that Rabobank employees were often attempting to manipulate the relevant rate.

300.    Rabobank acknowledged that the wrongful acts described in the DOJ Statement of Facts taken by the participating employees in furtherance of the misconduct were within the scope of their employment at Rabobank. Rabobank also acknowledged that the participating employees intended, at least in part, to benefit Rabobank through the actions described in the DOJ Statement of Facts.

301.    Rabobank agreed to pay a $325 million penalty to the DOJ and (among other relief) agreed to continue to cooperate with the DOJ's investigation of Euribor.

### 2.    Rabobank Settlement: CFTC Order

302.    Rabobank paid a civil monetary penalty of $475 million to the CFTC and agreed to comply with the conditions and undertakings in the CFTC to ensure the integrity and reliability of its benchmark interest rate submissions. The CFTC Order includes additional factual allegations complimentary to the admissions contained in the DOJ "Statement of Facts"

regarding false reporting of Euribor and other unlawful acts by Defendant Rabobank. These additional factual allegations include:

### i. Overview

303. From at least mid-2005 through early 2011, Rabobank engaged in hundreds of manipulative acts that undermined the integrity of Euribor.

304. Rabobank derivatives and cash traders frequently asked Rabobank's Euribor submitters to submit preferential rates in attempts to manipulate Euribor to benefit Rabobank traders' cash and derivatives trading positions that were tied to Euribor. Rabobank's submitters often accommodated those requests and made false submissions reflecting the requested rates as Rabobank's contributions to the fixings of Euribor. At times, Rabobank also aided and abetted other banks' attempts to manipulate Euribor.

305. Rabobank ignored the obvious inherent conflicts of interest created by assigning traders with cash and/or derivatives trading positions tied to Euribor to serve as Rabobank's Euribor submitters. This fostered an environment which facilitated the traders' attempts to manipulate Euribor. Rabobank thus created a conflict between the submitters' responsibility to make an honest assessment of the costs of borrowing for purposes of determining Rabobank's daily Euribor submissions and the submitters' desire to maximize the profitability of their trading positions. Rabobank's Euribor submitters often resolved this conflict in favor of their trading positions and those of their colleagues to the detriment of the integrity of Euribor. The conflicts of interest were heightened because Rabobank also grouped the submitters on the same desks with other derivatives traders, which further facilitated the ease of coordinating on the submissions. In fact, one dominant derivatives trader simply shouted his requests across the desk to the submitters. This profit-driven and manipulative submission process involved traders,

managers and at least one senior manager located in Rabobank offices in London, New York, Utrecht (Rabobank's headquarters), Tokyo, Singapore, and Hong Kong.

306.    The manipulative conduct of Rabobank's traders and submitters occurred because Rabobank lacked internal controls, procedures and policies specifically relating to its Euribor submission processes during the period of 2005 through early 2011, and failed to adequately supervise its trading desks and traders.

> ## ii.    Conflicts of Interest and Lack of Internal Controls Allowed the Misconduct at Rabobank to Flourish for Years

307.    Rabobank assigned responsibility for making its Euribor submissions to traders who traded both cash and derivatives trading products.  These traders regularly transacted in interbank cash deposits and loans to meet the bank's funding needs each day in all currencies, and in derivatives products, including interest rate swaps, forward rate agreements, foreign exchange forwards, cross-currency swaps, overnight index swaps and tenor basis swaps.  The traders engaged in derivatives transactions not only to hedge risk but also to generate profits in a proprietary fashion.  The positions held by the traders were often priced off of Euribor (among other rates), and settled or reset on IMM dates.  Euribor submissions, by definition, are to relate solely to the costs of borrowing in the relevant markets, and not upon derivatives trading positions.  By assigning derivative traders whose profits depended upon the fixings of Euribor, Rabobank created an inherent conflict of interest.

308.    This conflict of interest was heightened by the fact that Rabobank had its Euribor submitters sitting next to and working with the other derivatives traders on trading desks. Rabobank managers and at least one senior manager expected the traders and submitters to communicate about relevant market conditions and individual trading positions.  A senior manager in London ("Senior Manager 1"), who was Rabobank's representative to the BBA,

oversaw cash and derivatives traders, which included the traders responsible for Rabobank's Euribor submissions.  Traders, submitters and Senior Manager 1 openly discussed individual trading positions across the trading desks, and also utilized Bloomberg chat terminals and email to provide each other with instant and continuous written communication about such positions. This free flow of information increased the risk that submitters would make Euribor submissions which were beneficial to Rabobank traders' derivatives trading positions.

309.    Due to the Rabobank submitters' dual role as submitters and traders, and the open communication policy promoted by certain senior managers which encouraged the sharing of information about trading positions, several submitters routinely and improperly considered their own and other traders' trading positions when determining their Euribor submissions.  As a result, the submitters often skewed their Euribor submissions to benefit those trading positions by attempting to manipulate the fixings of Euribor.  Rabobank's Euribor submitter also accommodated requests from traders at a non-panel bank for preferential Euribor submissions to benefit those traders' derivatives trading positions.

310.    By failing to separate responsibilities for making Euribor submissions from its trading functions, Rabobank created an embedded conflict of interest that incentivized submitters to prioritize profit over their responsibility to make an honest assessment of the costs of borrowing unsecured funds when submitting rates to the EBF.  As such, Rabobank allowed an environment to exist that yielded unfettered opportunities to manipulate Euribor submissions for the benefit of trading positions held by Rabobank's traders, and the traders took advantage of those opportunities.  Rabobank's manipulative conduct involved over two dozen traders, some of whom were desk managers, and the knowing involvement of at least one senior manager, Senior Manager 1.

311.     From mid-2005 through early 2011, Rabobank failed to recognize and address the conflicts of interest, and failed to adequately supervise its derivatives traders and submitters. Further, Rabobank did not have any policies, internal controls or procedures for determining, monitoring or supervising its Euribor submissions to ensure that Rabobank's submissions reflected an honest assessment of the costs of borrowing unsecured funds in the interbank markets.

312.     In April 2010, Rabobank received the CFTC's request that it conduct an internal investigation of its U.S. Dollar LIBOR practices.  During this investigation, on November 30, 2010, a Rabobank senior manager ("Senior Manager 2") informed submitters that it was inappropriate for derivatives traders to provide the rates to submit for Euribor.  Despite this admonishment, Rabobank failed to adequately improve its internal controls to monitor its traders.

313.     Rabobank's failure to provide internal training or standards addressing benchmark interest rate submissions, allowance of inappropriate communications amongst traders and submitters, and related conflicts of interest amplified the potential for misconduct and permitted it to continue for a number of years.

### iii.     Rabobank Made False Reports to Manipulate Euribor to Benefit Rabobank's Trading Positions

314.     For at least three years, spanning from January 2006 through 2008, Rabobank, through its submitters and traders, attempted to manipulate Euribor and frequently made submissions in furtherance of those attempts.  Rabobank, a Euribor panel bank member since January 1998, assigned its Euribor submission process to a cash and derivatives trader in its Utrecht office ("Senior Euribor Trader-Submitter").  Based on instructions received from a senior manager, the Senior Euribor Trader-Submitter generally contributed Euribor submissions at levels intended to be close to the expected Euribor fixings.  To accomplish this, the Senior

Euribor Trader-Submitter reviewed data published each day by a broker that contained indications on where Euribor was expected to fix each day, and used this information to make submissions that ensured Rabobank would be in the middle of the pack of the submitting panel banks.

315. Rabobank's Senior Euribor Trader-Submitter was on a trading desk with other Euro cash and derivatives traders. The trading desk had consolidated profit and loss targets ("P&L"), and the environment encouraged open communication between the Senior Euribor Trader-Submitter and derivatives traders that transacted in products tied to Euribor. As a result, traders orally and in writing communicated requests for preferential Euribor submissions that could benefit their trading positions.

316. The Senior Euribor Trader-Submitter regularly considered traders' requests and her own trading positions when determining Rabobank's Euribor submissions. Thus, the Senior Euribor Trader-Submitter's Euribor submissions reflected her and other traders' financial interests, rather than the costs of borrowing Euro in the relevant interbank market. Additionally, at times, the Senior Euribor Trader-Submitter aided two former Rabobank employees at a non-panel bank in their attempts to manipulate Euribor by accommodating their requests to skew Rabobank's Euribor submissions in favor of their trading positions.

#### iv. Rabobank's Internal Requests to Manipulate Euribor

317. Rabobank traders regularly communicated orally with the Senior Euribor Trader-Submitter concerning market activity and the direction of key interest rates, allowing the Senior Euribor Trader-Submitter to develop a general understanding of the trading positions taken by the Euro derivatives trading desk and, thus, their exposure to Euribor fixings for particular tenors. For example, the senior manager of the submitter who sat next to her in 2007, Senior

Manager 2, merely had to mention how his trading positions were exposed to Euribor, and the Senior Euribor Trader-Submitter knew what submission to make to benefit his position.

318.    In mid-2007, many Rabobank Euro derivatives traders started having difficulty hedging their positions because market liquidity was decreasing with the beginning of the financial crisis.  The Senior Euribor Trader-Submitter began receiving requests from the Euro derivatives traders for specific Euribor submissions which were beneficial to their trading positions, particularly when the desk had large Euribor-based positions that it could not hedge.  The traders and submitter discussed the requests openly across the desk, as well as in emails and Bloomberg chats.  The Senior Euribor Trader-Submitter also developed a practice of asking members of the Euro Desk if the desk had any requests related to Euribor before she made her day's submissions.  From approximately mid-2007 through late 2008, the traders made requests with a frequency of two to three times per week.

319.    The Senior Euribor Trader-Submitter took the traders' requests into account in determining Rabobank's Euribor submissions.  At one point, the Senior Euribor Trader-Submitter commented to Rabobank's U.S. Dollar Trader-Submitter 1 in a November 15, 2007 Bloomberg instant message exchange: 'I DO THE FIXING I ASK SWAP DESK WHAT THEY HAVE."

320.    By mid-2008, the Senior Euribor Trader-Submitter started trading Euribor-based derivatives and began factoring in her own positions into her determination of Rabobank's Euribor submissions.  At times during this period, the Senior Euribor Trader-Submitter had to balance requests made by other derivatives traders with her own trading positions, and, in doing so, skewed Rabobank's Euribor submissions in order to best benefit the Euro trading desk's consolidated P&L.  She altered the applicable Euribor rates to the extent that it would not cause

Rabobank's submissions to be outside the middle range of the panel banks' submissions, as she was instructed to do.

321.     The following examples demonstrate the regular communications sent by Rabobank traders requesting preferential Euribor submissions and the Senior Euribor Trader-Submitter's willingness to accommodate the requests:

**July 12, 2007:**

Euro Desk Manager email to Euro Trader-Submitter 1:
Subject:  fixings

Hi [Euro Trader-Submitter 1],

> Only when it doesn't affect you in a negative way: today we'd like to see the 6M fixing as high as possible and the 3M fixing as low as possible ... many thanks!

Euro Trader-Submitter 1 reply to Euro Desk Manager:
Subject:          RE: fixings

Consider it done.

Cheers

**March 27, 2008:** (emphasis added)

| | |
|---|---|
| Senior Euribor Trader-Submitter: | WHUPPY SMURF GOOD MORNING **SAME FIXINGS?** |
| Euro Trader 1: | **yes pls, certainly low 3m and if possible high lm, but i believe [Senior Manager 2] wouldn't agree with that:)** ty! |
| Senior Euribor Trader-Submitter: | **AIE AIE WE HAVE CONFLICT OF INTEREST HERE BETWEEN THE OVERKANT EN DEZE KANT[11] INCIDENT DIPLOMATIQUE!!!!** |
| Euro Trader 1: | i propose an entente amicale[12] |

---

[11] As translated from Dutch this phrase means: "other side and this side."

[12] As translated from French this phrase means: "friendly agreement."

| | |
|---|---|
| Senior Euribor Trader-Submitter: | OK I SEND THE AMBASSADOR BACK ..... 1S WILL BE 38 ANYWAY BUT I PUT THE 3S TO 4.72 |

**April 3, 2008:**

| | |
|---|---|
| Senior Euribor Trader-Submitter: | SALUT FIXES ?? |
| Euro Trader 1: | fairly small, just low 3s pls .. merci! |
| Senior Euribor Trader-Submitter: | OK AM OFF TILL 14TH [Euro Trader-Submitter 1] WILL TAKE CARE OF THIS ... |

**April 15, 2008:** (emphasis added)

| | |
|---|---|
| Senior Euribor Trader-Submitter: | **SALUT FIXES?? LOW 3S AND HIGH 6S ??** |
| Euro Trader 1: | bonjour mademoiselle, just low 3s pls, others very small. ty! |
| Senior Euribor Trader-Submitter: | BON |

**April 22, 2008**: (emphasis added)

| | |
|---|---|
| Senior Euribor Trader-Submitter: | **HELLO LET'S CHEAT ON THE FIXES ??** |
| Euro Trader 1: | morning! **only biggie is really low 3s**. much appreciated, as usual:) |

**May 7, 2008:**

| | |
|---|---|
| Senior Euribor Trader-Submitter: | HIY A FIXES ?? |
| Euro Trader 1: | just low 3s pls, the rest very small. merci! |
| Senior Euribor Trader-Submitter: | BON |

**May 8, 2008**: (emphasis added)

| | |
|---|---|
| Senior Euribor Trader-Submitter: | **LET ME GUESS LOW 3S REST IS SMALL ??** |
| Euro Trader 1: | **yes indeed, merci beaucoup!** |
| Senior Euribor Trader-Submitter: | HAHHA EXPECTED BIT LOWER I'D SAY |

**May 28, 2008**: (partially translated from Dutch)

| | |
|---|---|
| Senior Euribor Trader-Submitter: | FIXINGS ?? |
| Euro Trader 1: | voila, a nice one again:) low 3s and high 1 and 6s pls! [friendly thanks] .. |
| Senior Euribor Trader-Submitter: | [TOMORROW'S] 1S FIXING WILL BE VERY HIGH |

**June 3, 2008**:

| | |
|---|---|
| Senior Euribor Trader-Submitter: | SALUT FIXES PLEASE ?? |
| Euro Trader 1: | ok, hold on tight; high 3s and 6s pls!! |
| Senior Euribor Trader-Submitter: | HIGH >?? U SURE ?? |
| Euro Trader 1: | yes indeed only 3s not soo big and prob tomorrow low again so maybe dont spoil the pattern too much? thanks either way:) |
| Senior Euribor Trader-Submitter: | OK [Euro Trader 1] |

**July 15, 2008**:

| | |
|---|---|
| Senior Euribor Trader-Submitter: | ... FIXINGS ?? |
| Euro Trader 1: | hello! high 3s and 6s pls .. thanks for asking me again:) |

**August 28, 2008**: (emphasis added)

| | |
|---|---|
| Senior Euribor Trader-Submitter: | HI I AM GOING FOR HIGH 1S TODAY WHAT DO YOU NEED IN 3S AND 6S PLEASE?? |
| Euro Trader 1: | **low 3s high 6s pls! btw, whenever i say low 6s pls ignore me, we always need high 6s to keep the basis as wide as possible. thanks!** |

**September 24, 2008**: (emphasis added)

| | |
|---|---|
| Senior Euribor Trader-Submitter: | hi high 3 and 6s |
| Euro Trader 1: | today low 1s and 3s, high 6s pls:-) merci! |
| Senior Euribor Trader-Submitter: | u got me confused here [Euro Trader 1] |
| Euro Trader 1: | **always high 6s, and our fixings 1s and 3s are large enoug today to want lower fixings there, 1s and 3s do change daily, if** |

|  | **e.g. 3m is small then we go for high 3s to support your high 6s. bon?** |
|---|---|
| Senior Euribor Trader-Submitter: | **allons bon ...... a lesson in fixings ! ! ! !** |

**September 26, 2008**: (emphasis added)

| Senior Euribor Trader-Submitter:<br>Euro Trader 1: | bon! HIGH 6S AND ?<br>morning! low 3s pls, pretty big. lm very small.muchos! |
|---|---|
| Senior Euribor Trader-Submitter:<br>Euro Trader 1: | **HM I NEED HIGH 3S MYSELF**<br>ok, we'll have to leave tha up to you.<br>**monday we need low** 3s for very big, about 250k fixing delta! Thanks in advance |
| Senior Euribor Trader-Submitter: | **OK I PUT IT AT 5.13 THAT IS 3 BP LOWER THAN EXPECTED BUT STILL HIGHER THAN YESTERDAY AND MONDAY WE ALL GO FOR 6 PVC 3S FIXING** |

322.     Rabobank's Euribor submitters knew it was improper to consider traders' cash and derivatives trading positions in determining the bank's Euribor submissions.  A panel bank's financial derivatives trading positions are not legitimate or permissible factors on which to base a bank's daily Euribor submissions.  By basing its Euribor submissions upon Rabobank's derivatives traders' requests or their own positions, and thereby on Rabobank's derivatives trading positions, Rabobank's Euribor submissions were not consistent with the EBF's definitions and criteria for Euribor submissions.  Instead, Rabobank conveyed false, misleading or knowingly inaccurate reports that its submitted rates for Euribor were based on and solely reflected the costs of borrowing unsecured funds in the Euro money market.  Accordingly, Rabobank knowingly delivered false, misleading or knowingly inaccurate reports concerning Euribor, a commodity in interstate commerce.

### v.    Collusion with Other Banks to Manipulate Euribor

323.    Starting at least as early as January 2006 and continuing through at least 2007, the Senior Euribor Trader-Submitter received requests to skew Rabobank's Euribor submissions from two former Rabobank senior Euro derivatives traders working at another bank not on the Euribor panel. These traders, External Euro Trader 1 and External Euro Trader 2, previously worked in Rabobank's Utrecht office, where they developed relationships with the Senior Euribor Trader-Submitter.

324.    On several occasions, External Euro Trader 1 and External Euro Trader 2 transmitted to the Senior Euribor Trader-Submitter requests to submit Euribor higher or lower with the purpose of affecting the official Euribor fixing.  They communicated these requests orally and through electronic communications.  They often targeted key tenors, such as the three and six month tenors, when making their requests.  At times, they explicitly advised the Senior Euribor Trader-Submitter which of their positions would gain or suffer depending on the fixings.

325.    The Senior Euribor Trader-Submitter understood that both of her former colleagues worked together at the other non-panel bank, and that requests from either were attempts to manipulate certain EBF Euribor fixings to suit both of their trading positions. Upon receiving their requests, the Senior Euribor Trader-Submitter often accommodated them and, at times, adjusted her Euribor submissions by one basis point in a direction compatible with the requests.  On certain days when fixings trended higher but External Euro Trader 1 or External Euro Trader 2 requested a low submission, the Senior Euribor Trader-Submitter accommodated the request by simply submitting the same rate as the day before.

326.    The following communications are examples of requests from External Euro

Trader 1 and External Euro Trader 2 and indications of accommodation by the Senior Euribor

Trader-Submitter:

**January 13, 2006:** (translated from French)

| | |
|---|---|
| External Euro Trader 1: | where do you see the 3m fixing?? |
| Senior Euribor Trader-Submitter: | wherever you want me to put it :-D |
| External Euro Trader 1: | lower then 2.50 that would be super! |
| Senior Euribor Trader-Submitter: | it will be a little bit lower between 50 and 51 I believe but rather 51 but I put it at 50 lower my quote gets me kicked out |
| External Euro Trader 1: | nice thank you very much ; -) |

**June 14, 2006:** (translated from French)

| | |
|---|---|
| External Euro Trader 1: | for today I would like a really low one month fix and the 3 and the 6 really high ..... |
| [….] | |
| Senior Euribor Trader-Submitter: | do you have fixings?? |
| External Euro Trader 1: | yes |
| Senior Euribor Trader-Submitter: | what do you want |
| External Euro Trader 1: | low the 1m and high the 3 and the 6 please |
| Senior Euribor Trader-Submitter: | 2.86 2.97 and 3.12 I'm going to get myself kicked out but okay |

**July 27, 2006:** (translated from French)

| | |
|---|---|
| External Euro Trader 1: | can the lm fixing not be expensive madame cadburry? |
| Senior Euribor Trader-Submitter: | hahah sure |
| External Euro Trader 1: | thank you |

**August 1, 2006:** (translated from French)

| | |
|---|---|
| Senior Euribor Trader-Submitter: | do you have some fixings |
| External Euro Trader 2: | little fixing for 3m receiving |
| Senior Euribor Trader-Submitter: | you want high fixing is that right?? |
| External Euro Trader 2: | yes if you can thank you |

113

|                                  |                          |
|----------------------------------|--------------------------|
| Senior Euribor Trader-Submitter: | [Okay]                   |

**September 4, 2006:** (translated from French)

|                                  |                                          |
|----------------------------------|------------------------------------------|
| External Euro Trader 1:          | I need another 3m fixing at the ceiling! |
| Senior Euribor Trader-Submitter: | hahahaha OK [External Euro Trader 1]     |

**October 4, 2006:** (translated from French)

|                                  |                                          |
|----------------------------------|------------------------------------------|
| External Euro Trader 1:          | can the 1m fix be expensive madame cadburry? |
| Senior Euribor Trader-Submitter: | absolutely sir. ..                       |

**January 25, 2007:** (translated from French)

|                                  |                                          |
|----------------------------------|------------------------------------------|
| External Euro Trader 1:          | little request for the morning can you put the lm fix expensive? |
| Senior Euribor Trader-Submitter: | ;-) euro or gbp??                        |
| External Euro Trader 1:          | euro ;-)                                 |
| Senior Euribor Trader-Submitter: | good no prob                             |

### vi.     Legal Findings

327.     On a daily basis, Rabobank, through the transmission of an electronic spreadsheet to the service provider of the EBF, who calculates their official fixings *(i.e.*, Thomson Reuters), knowingly delivered or caused to be delivered its Euribor submissions through the mails or interstate commerce.  Rabobank's submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally, including into the United States, of the panel banks' submissions as well as the daily official benchmark interest rates by at least Thomson Reuters on behalf of the EBF, and other third party vendors. The panel banks' submissions are used to determine the official published rates for Euribor which are calculated based on a trimmed average of the submissions. Rabobank's daily Euribor submissions contained market information concerning the costs of

borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets, and Rabobank's ability to borrow funds in the particular markets. Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which Euribor are fixed.

328. At times, during the periods relevant to the conduct described in the Rabobank CFTC Order, Rabobank's submissions for Euribor were false, misleading or knowingly inaccurate because they were based in whole or in part on impermissible and illegitimate factors, specifically Rabobank traders' cash and derivatives trading positions. By using these impermissible and illegitimate factors in making its Euribor submissions, Rabobank conveyed false, misleading or knowingly inaccurate information that the rates it submitted were based on and related solely to the costs of borrowing unsecured funds in the relevant markets and were truthful and reliable. Moreover, Rabobank traders, submitters and managers, including at least one senior manager, knew that certain Rabobank Euribor submissions contained false, misleading and knowingly inaccurate information concerning the submitted rates. By such conduct, Rabobank violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2006).

329. Several Rabobank derivatives traders and submitters specifically intended to affect the rate at which the daily Euribor would be fixed to benefit Rabobank traders' derivatives trading and, at times, money market positions or to benefit the derivatives trading positions of colluding traders at other banks. The Rabobank derivatives traders' requests for beneficial Euribor submissions, and the Rabobank submitters making submissions based on those requests constitute overt acts in furtherance of their intent to affect the fixings of Euribor.

330. As evidenced by the communications set forth in the CFTC Order, certain Rabobank Euribor submitters and submitters and derivatives traders at other panel banks

coordinated about Euribor submissions that would benefit their banks' respective cash and derivatives trading positions. At times, the traders at the other panel banks or brokers on behalf of traders at other banks asked Rabobank traders to submit a certain rate, or submit a rate in a direction higher or lower, that would benefit the cash and derivatives trading positions of the traders at the other panel banks. The Rabobank Euribor submitters agreed and submitted the requested preferential rates on various occasions. Certain Rabobank Euribor submitters had knowledge of and intentionally assisted the attempts of the traders at the other banks to manipulate the rates at which Euribor was fixed.

331.    Rabobank is liable for the acts, omissions and failures of the traders, managers and submitters who acted as its employees and/or agents in the conduct described in the CFTC Order and accordingly, violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2).

## VI.    The European Commission Fines Defendants Barclays, Deutsche Bank, RBS and Société Générale Over €1 Billion for Their Participation in The Cartel in Euro Interest Rate Derivatives

332.    On December 4, 2013, the European Commission fined Defendants Barclays, Deutsche Bank, Société Générale and RBS more than €1 billion for participating in a "Euro Interest Rate Derivatives cartel."

333.    The European Commission determined that the Euro Interest Rate Derivatives cartel operated between September 2005 and May 2008. The cartel aimed at distorting the normal course of pricing components for these derivatives. Traders of different banks discussed their bank's submissions for the calculation of Euribor as well as their trading and pricing strategies.

334. The European Commission's investigation into the Euro Interest Rate Derivatives cartel continues against Defendants Crédit Agricole, HSBC and JPMorgan.

335. The fines imposed by the European Commission for the cartel in Euro Interest Rate Derivatives is as follows:

| Participants | Duration of Participation | Reduction Under the Leniency Notice (%) | Fine (€) |
|---|---|---|---|
| Barclays | 32 months | 100% | 0 |
| Deutsche Bank | 32 months | 30% | 465,861,000 |
| Société Générale | 26 months | 5% | 445,884,000 |
| RBS | 8 months | 50% | 131,004,000 |

336. Barclays received full immunity for revealing the existence of the cartel and thereby avoided a fine of €690 million for its participation in the infringement.

## VII. Defendants Engaged in a Conspiracy in Restraint of Trade By Collusively Fixing the Price of Euribor-Based Derivatives

### A. Direct Evidence and Factual Admissions Confirm That Defendants Conspired To Fix the Price of Euribor-Based Derivatives

337. The limited instant messages and other communications that have thus far been publicly disclosed by the DOJ Antitrust Division, the CFTC and the FSA provide direct evidence of pervasive collusion by Barclays, RBS, Rabobank, other Contributor Banks and others to fix the price of Euribor-based derivatives for the express purpose of obtaining hundreds of millions (if not billions) in ill-gotten trading profits on Euribor-based derivatives contracts held by them or others, the prices of which (and thus profits or losses) were determined in whole or in part to Euribor.

338. **The Admitted Agreement to Fix the Price of Euribor-Based Derivatives By Jointly Submitting False March 2007 IMM Euribor Submissions**. As an example, during at

least approximately February and March 2007, in addition to contacting the Barclays Euribor submitter, Barclays' Trader-5 communicated with traders at four other Euribor Contributor Panel banks and requested that their respective Euribor submitters submit low 3-month Euribor contributions on March 19, 2007, which was the Monday before the March IMM date. That trading date was particularly significant for Trader-5, who stated that s/he had accumulated Euribor-based derivative financial positions the price of which would benefit from a low 3-month Euribor.

339.     In one example of Trader-5's contacts with other banks, on February 6, 2007, in an electronic message, a trader at another Contributor Panel bank asked Trader-5: "[I]n march do you still want a very low 3m cash fixing for imm?" Trader-5 replied, "yeah." The other trader continued, "I'm going to put pressure on the treasury so that he sets it very low." Trader-5 replied, "750k eur/bp [Euros per basis point]." Then, on March 19, 2007, before the Euribor submission was due, Trader-5 sent a message to Submitter-3 stating in part: "I am hearing u are bidding the cash....we really need a low 3m," and "as discussed could u put the 3m as low as possible." (ellipses in original). Submitter-3 replied, "[W]ill do my best." Later on March 19, 2007, Trader-5 wrote to a trader at one of these other Contributor Panel banks, stating in part, "this is the way you pull off deals like this," and "the trick is you must not do this alone." Trader-5 also stated that after his "2months of preparation" [sic] he had made money in the end. Trader-5 added, "[D]on't talk about it too much" and "don't make any noise about it please." On that same date, Trader-5 wrote to a third trader whom he had previously contacted at another of the Contributor Panel banks and said: "Please [trader name] don't make any noise about the 3m fixing. [T]his can backfire against us."

340.     The CFTC determined that the agreement to fix the prices of Euribor-based derivatives by jointly manipulating the March 2007 IMM lasted over a four-month period, beginning in at least December 2006 and continuing through March 2007.  The CFTC also determined that the Barclays senior Euro swaps trader orchestrated this effort to align Euribor-based derivative trading strategies among traders at multiple banks for the express purpose of manipulating the official EBF three-month Euribor fixing on the IMM date of March 19, 2007, in order to profit from their Euribor futures trading positions.   This scheme involved multiple and successive requests over this period of time by the Barclays senior Euro swaps trader to Barclays' Euribor submitters and traders at other banks (identified in the Barclays' CFTC Order as Banks A, B and D) to lower the three-month Euribor submission on dates leading up to and including the March 2007 IMM date.  The following are additional examples of the communications involved in this scheme:

1) December 27, 2006:

- Barclays' Senior Euro Swaps Trader: "Hi [Barclays Euro Swaps Trader]. A few things. Ask for a low 3m today and ask [trader at Bank B] and [trader at Bank A] to put it low as well."

- Two days later, Barclays' Euro Swaps Trader emailed the Euribor requests as instructed to the Barclays Euribor Submitters and the traders at the other banks.

2) February 12, 2007:

- Barclays' Senior Euro Swaps Trader bragged to a trader at Bank D that he was going to "push the cash to the basement" on the next IMM March date in order to make money on trades, claiming that he will have 80,000 lots in the Euribor futures contract on it. He swore the trader at Bank D to secrecy, claiming that if they did not keep the plan secret it would not work. Barclays' Senior Euro Swaps Trader also claimed that his "treasury [or Euribor Submitter] has the power to move 3m cash to the basement."

3) March 19, 2007:

- Barclays' Senior Euro Swaps Trader emailed the Barclays Euribor submitter: "As discussed could ... put the 3m as low as possible ...."

119

- The Barclays Euribor Submitter replied: "Will do my best."

4) March 20, 2007:

- Barclays' Senior Euro Swaps Trader stated to trader at Bank A that they needed to have the three month Euribor fixing go up slowly to avoid drawing any attention.

- Barclays' Senior Euro Swaps Trader told the trader at Bank A that he believed he was able to influence five other panel member banks the day before to lower their Euribor submissions as they both desired.

341.    As the above messages reveal, the collusion involved both joint efforts to submit artificial and coordinated Euribor rates and exchange and coordination of price information concerning Euribor-based derivatives positions.

342.    The FSA also identified additional examples of collusive communications in furtherance of the Contributor Panel Banks' agreement to fix the prices of Euribor-based derivatives tied to the March 2007 IMM fix.  For example, Barclays' Trader E communicated with traders at three unidentified Panel Banks 1, 2 and 6 in advance of the March 2007 IMM date.   On February 12, 2007, Barclays' Trader E stated in an instant message with a trader at Panel Bank 6:

> "*if you know how to keep a secret I'll bring you in on it […]*
> *we're going to push the cash downwards on the imm day […]*
> *if you breathe a word of this I'm not telling you anything else […]*
> *I know my treasury's firepower…which will push the cash downwards […]*
> *please keep it to yourself otherwise it won't work*".

343.    After Euribor was fixed on March 19, 2007, the FSA determined that Barclays and the unidentified co-conspirators at the other Euribor Contributor Panel Banks considered that their strategy had been successful.  For example, Barclays' Trader E commented to the external trader at Panel Bank 6 "*this is the way you pull off deals like this chicken, don't talk about it too*

*much, 2 months of preparation […] the trick is you must not do this alone […] this is between you and me but really don't tell ANYBODY*".

344. **The Admitted RBS and Barclays Conspiracy**. Like Barclays, RBS admitted to conspiring to fix the price of Euribor-based derivatives. In particular, RBS admitted that a RBS derivatives trader from September 2007 to mid-2008 attempted to coordinate with derivatives traders at other banks about submissions related to Euribor to fix the prices of Euribor-based derivatives. For example, in a series of instant messages on October 4, 2007, the RBS derivatives trader who traded products tied to Euribor, communicated with two derivatives traders employed by Defendant Barclays regarding favorable Euribor settings for their trading positions. The Barclays traders agreed to the RBS trader's request and shared their intended submissions in other tenors, to which the RBS trader signaled approval.

345. **The Conspiracy to Fix Prices of Euribor-Based Derivatives Using the One-Month Euribor in October 2006.** The FSA determined that from early October 2006, Barclays' Derivatives Traders communicated with others in order to co-ordinate high one month EURIBOR submissions on October 16, 2006. These communications included the following: (i) Trader E made internal requests for high one month EURIBOR submissions to Barclays' Submitters; (ii) ii. Trader E discussed his requests with an external trader at Panel Bank 1 and made requests to external traders at Panel Banks 2 and 3; (iii) the external trader at Panel Bank 1 informed Trader E he would also make a request to a trader at Panel Bank 4; and (iv) a cash trader at Barclays indicated that Barclays would be paying for cash that morning, "*so hopefully that will help*" (the logic being that if Barclays entered into cash transactions this might influence indirectly the EURIBOR submissions of other contributing banks).

346.    **The Conspiracy to Fix Prices of Euribor-Based Derivatives Using the One-**
**Month Euribor in November 2006**.  The FSA determined that from early November 2006,
Barclays' Trader E (having agreed to assist an external trader at unidentified Panel Bank 1)
communicated his preference for a Euribor of "*36*" or a low one month Euribor submission on
November 13, 2006.  These communications included the following: (i) Barclays' Trader E
made an internal request for a low one month Euribor submission to a Submitter at Barclays on
Friday, November 10, 2006 and sent a reminder on Monday, November 13, 2006; (ii) the
Barclays' Submitter responded positively on November 10, 2006, "*of course we will put in a low*
*fixing*" and on November 13, 2006 indicated they would make a submission lower than the
Brokers thought Euribor would set that day, "*no problem. I had not forgotten. The brokers are*
*going for 3.372, we will put in 36 for our contribution*"; (iii) Trader E made a request to an
external trader at unidentified Panel Bank 2; (iv) Barclays Trader E informed the trader at
unidentified Panel Bank 2 that he and another trader had large positions (of 15 billion euro and
85 billion euro, respectively) that would benefit from a low one month Euribor rate on November
13, 2006; and (v) Trader E also made a request to an external trader at unidentified Panel Bank 3
and attempted to make a request to a trader at unidentified Panel Bank 5 following consultation
with a trader at unidentified Panel Bank 1.

347.    The FSA also alleged that "Trader E" at Barclays, along with five other swaps
traders at Barclays regularly conspired with other traders at six other competitor banks
(identified in the FSA Final Notice as Banks 1-6).

348.    Public reports have identified Trader-E as Philippe Moryoussef.  The *Financial*
*Times* revealed that Philippe Moryoussef regularly contacted a number of traders he knew at
other banks, either through previous employment or professional networks.  These traders

included: (i) Michael Zrihen at Defendant Crédit Agricole, (ii) Didier Sander at Defendant HSBC and (iii) Christian Bittar at Defendant Deutsche Bank as well as traders at Defendants Rabobank and Société Générale SA.

349. In addition, individuals close to the investigation disclosed that Barclays' traders "were the ringleaders" of a circle that included, *inter alia*, Defendants Deutsche, HSBC, Société Générale SA and Crédit Agricole.

### B. "Plus Factors" Support the Plausible Inference That the Yet-Non-Settling Contributor Bank Defendants Participated in the Conspiracy

350. This Section of the Complaint sets forth allegations concerning what courts have identified as "plus factors" that further support the reasonable inference that Contributor Bank Defendants, including those that have not yet settled with government regulators, participated in the widespread antitrust conspiracy uncovered in the government investigations.

### C. The Pricing Structure of the Euribor-Based Derivatives Market Lends Itself—As the Evidence Amassed Thus Far By The Regulators Reveals—To Successful Collusion

351. The overwhelming evidence of collusion gathered by the various regulators and discussed in the Complaint demonstrates that the pricing structure of the Euribor-based derivatives market lends itself to successful collusion. The Contributor Bank Defendants concluded that it was in their interest to collude to profit from their proprietary Euribor-based derivative positions and that these efforts could successfully influence the pricing of such instruments through collusive Euribor submissions and other sharing of spot transaction information, including pricing Euribor rate-setting. As such, the nature of the Euribor-based derivatives market, as shown by the evidence revealed thus far, permits an environment that is susceptible to collusion. Additionally, because only certain banks can successfully move the

prices of Euribor-based derivatives, the structure of the price-setting mechanism for these financial products was oligopolistic, making collusion a rational business strategy to fix prices.

352. The EBF rules governing who may submit rates for purposes of determining Euribor form a barrier to entry that is not present in highly competitive marketplaces. These restrictions permit those banks with access to the rate submission process a competitive advantage in an environment closed to competitive incursion by new entrants. Because the EBF rules exclude potential competitor banks from joining the panels and submitting rates, the Euribor-based derivatives price-setting process is highly susceptible to a successful antitrust conspiracy. The Contributor Bank Defendants successfully colluded with one another free from concern that other competitors in the Euribor-based derivatives market would be able to thwart their price-fixing efforts.

353. Further, the EBF's Rules prohibit collaboration and information sharing in the Euribor-based derivatives price-setting process. According to the EBF, each contributor bank is allocated a private page on which to contribute its data. Each private page can only be viewed by the submitting Euribor contributor bank and by Thomson Reuters' staff involved in the fixing process. Therefore, absent collusion to restrain trade, and fix the price of, the prices of Euribor-based derivatives among the Contributor Panel Banks, contributor banks would not know their competitors' confidential pricing information on these instruments.

**1. Defendants' Employees Are Under Investigation and/or Have Resigned, Been Suspended or Fired, Suggesting Complicity In the Price-Fixing**

354. **Disciplinary Proceedings, Terminations, Resignations and Withdrawal from the Euribor Price Setting Panel**. Citi, UBS and Rabobank have withdrawn from the Euribor panel. In addition, Barclays Chairman Marcus Agius, its Chief Executive Officer, Robert E. Diamond, Jr. and Chief Operating Officer Jerry Del Missier resigned within days of the

announcement of the Barclays Settlement. In connection with his resignation, Mr. Diamond revealed that at least 14 traders at Barclays were involved in Euribor-based derivatives price fixing wrongdoing at the bank.

355.    Further, on October 29, 2013, Rabobank's CEO Piet Moerland resigned immediately following the announcement of Rabobank's $1.07 billion settlement with global regulators for participating in the Euribor-based derivative instrument cartel (among other interbank rates). Rabobank also disciplined more than 20 employees and admitted that 30 employees participated in the collusion.

356.    Former employees and traders at Defendants Deutsche, HSBC, Société Générale SA, Crédit Agricole CIB and Rabobank are directly implicated by public reports as integral to the conspiracy to fix the prices of Euribor-based derivatives.

357.    According to public reports, defendants' employees are under investigation, have been fired or suspended for their alleged involvement in price fixing efforts in a variety of interest-rate derivatives markets, including derivatives priced relative to Euribor. These disciplinary actions lend further credence to the plausibility of Plaintiffs' allegations that Contributor Bank Defendants participated in the Euribor-based derivative instrument price fixing cartel. Such firings, suspension and/or investigations of individuals employed or affiliated with the Defendants include, but are not limited to the following:

358.    **Barclays**. Public reports identified former Barclays' swaps Euro swaps trader Philippe Moryoussef as the "ringleader" of the Euribor-based derivative instrument price fixing cartel. He allegedly communicated with traders at banks including Deutsche, Société Générale, Crédit Agricole and HSBC. Since Moryoussef left Barclays in 2007, he worked as a trader at the Royal Bank of Scotland, Morgan Stanley and Nomura. He has since left Nomura. On

November 28, 2012, *The Wall Street Journal* reported that Defendant Barclays had disciplined 13 members of its staff for their involvement in interest rate derivatives price fixing, including those pegged to Euribor. Also, following the announcement of the Barclays Settlement, Chairman Marcus Agius, Chief Executive Officer Robert Diamond, and Chief Operating Officer Jerry Del Missier resigned.

359. **Deutsche**. According to public reports, Christian Bittar former managing director and head of money market derivatives at Deutsche Bank was one of the Euribor-based derivative instrument price fixing co-conspirators identified in the Barclays settlement documents. Deutsche Bank fired Bittar in December 2011 because Bittar attempted to rig interest rate derivatives. Deutsche Bank also clawed back approximately $53 million in bonuses from Bittar after Deutsche Bank fired him. In September 2013, *Bloomberg* reported Deutsche Bank fired at least seven employees over suspected misconduct in connection with benchmark rate-rigging. On April 8, 2014, *Bloomberg* reported that a German court ordered Deutsche to reinstate four employees fired as a result of the rate-rigging investigations. The four employees include two managing directors, a vice president and a director. They are Ardalan Gharagozlou, the former Head of Foreign Exchange of Germany and Head of Global Finance Continental Europe, Kai-Uwe Kappauf, Markus Kiekenbeck, and Jorg Vogt.

360. The *Financial Times* reported that in August 2013 the Federal Financial Supervisory Authority ("BaFin") recommended that Deutsche fire or discipline senior management over the Libor / Euribor scandal. As an example of Deutsche's lack of disciplinary consequences for staff, the report pointed to the promotion of Alan Cloete to the General Executive Committee in 2012. As Head of Global Finance and Foreign Exchange, Cloete oversaw traders alleged to have sought to rig interest rate derivatives prices and therefore had to

be aware of the irregularities in the Libor / Euribor derivatives price fixing efforts.  The report also named two other senior staff – Richard Walker, General Counsel, and Andrew Procter, Head of Compliance.  In March 2014, Procter announced that he would be leaving Deutsche.

361.     In January 2014, a retired risk executive, William Broeksmit, took his own life after admitting to his psychologist that he was afraid of the formal investigation by regulators into Libor/ Euribor derivatives price fixing efforts at Deutsche.  It was reported that he had been involved in investigations by U.S. authorities probing the bank and that many at the bank perceived him to be the right hand of Chief Executive Officer Anishu Jain.  Former colleagues say they considered a conversation with Broeksmit to be virtually equivalent to one with Jain.  At the end of his career, Broeksmit worked in the investment bank sector of Deutsche and held the title "Head of Risk and Capital Optimization," tasked with the evaluation of risks attached to complex transactions.

362.     **HSBC**. According to public reports, Didier Sander, was an HSBC trader identified as one of the Euribor co-conspirators in the Barclays settlement documents.

363.     **Rabobank**.  Rabobank quit the Euribor panel in 2013.  Investigations revealed that a number of Rabobank employees sought to fix Euribor-based derivative prices and inappropriately communicated with employees at other banks and brokers about certain Libor and Euribor derivatives prices between 2005 and early 2011.  As a remediative measure, Rabobank disciplined more than 20 employees and admitted that 30 employees participated in the wrongdoing.  According to Rabobank, those employees who were involved in serious misconduct have been terminated.  Other disciplinary action included, in different combinations, formal warnings, financial sanctions, the removal of managerial responsibilities, and bonuses have been partly or entirely reclaimed for the period 2009-2012, in the total amount of $5.7

million.  Further, on October 29, 2013, Rabobank's CEO Piet Moerland resigned immediately following the announcement of Rabobank's $1.07 billion settlement with global regulators.

364.    **Crédit Agricole**. According to public reports, Michael Zrihen, was a Crédit Agricole trader identified as a participant in the Euribor-based derivative instrument cartel in the Barclays settlement documents.

365.    **Société Générale**. A probe in December 2013 revealed that one of Société Générale's employees participated in the alleged price fixing and/or manipulation of Euribor-based derivatives from March 2006 to May 2008, leading it to pay a settlement of $610.5 million.  The bank said its employee acted "without the knowledge of his supervisors or the bank's management."  The unidentified employee left the bank in September 2009.

## 2.    Settlements With Other Contributor Panel Banks Are Pending

366.    As reported by Bloomberg News on April 9, 2013, the European Commission is reportedly in talks Contributor Bank Defendant Deutsche Bank to settle charges of price fixing interest rate derivatives prices.  *See* Aoife White, *EU Said to Push to Fine Banks Over Yen Libor, Euribor Rates*, Bloomberg, Apr. 9, 2013.  The article states that several additional banks involved in that investigation have indicated a desire to resolve the antitrust probe as early as October 2013.  Rabobank met the deadline and settled on October 29, 2013.  Deutsche and Société Générale also met that deadline settling with the European Commission in December 2013.

## 3.    Disclosures Confirm the Existence of Investigations, Reveal Additional Investigations and Efforts to Reach Potential Settlements with Regulators

367.    In its Form 6-K filed with the SEC on July 30, 2012 announcing its second-quarter results, HSBC revealed for the first time that: "Various regulators and competition and enforcement authorities around the world including in the UK, the US, Canada, the EU,

Switzerland and Asia, are conducting investigations related to certain past submissions made by panel banks in connection with the setting of . . . European interbank offered rates ('EURIBOR') and other interest rates. . . .  Based on the facts currently known, it is not practicable at this time for HSBC to predict the resolution of these regulatory investigations or private lawsuits, including the timing and potential impact on HSBC."  Commenting on HSBC's second-quarter earnings, HSBC CEO Stuart Gulliver admitted that HSBC "lost its way" and that HSBC may face legal fines in excess of $700 million to settle rate-rigging allegations.

368.    In its Form 6-K filed on October 30, 2012, Deutsche Bank acknowledged that it had "received subpoenas and requests for information from various regulators and governmental agencies in Europe, North America and Asia Pacific in connection with the setting of…Euro Interbank Offered Rate (EURIBOR) and other interbank offered rates. Deutsche Bank is cooperating with these investigations."

369.    In its 2013 Registration Document, filed on March 11, 2013, Defendant Société Générale disclosed that, "Societe Generale, along with other financial institutions, has received formal requests for information from several authorities in Europe, the United States and Asia, in connection with investigations regarding submissions to the…European Banking Federation for setting the Euro Interbank Offered Rate ("EURIBOR"), as well as trading in derivatives indexed to various benchmark rates.  Societe Generale is cooperating fully with the investigating authorities."

370.    In its Annual Report for 2012 filed on March 15, 2013, Crédit Agricole S.A. revealed that, "[a]s concerns the Euribor…, Crédit Agricole S.A. and its subsidiary Crédit Agricole CIB, in their capacity as contributors to a number of interbank rates, have received requests for information from a number of authorities as part of investigations into…the Euribor

(Euro Interbank Offered Rate) rate…and ii) transactions connected with [Euribor]. These requests cover a number of periods running from 2005 to the present date. As part of its cooperation with these authorities, Crédit Agricole S.A. and its subsidiary Crédit Agricole CIB, carried out investigations in order to gather the information requested by these various authorities. This work will continue in the second half 2013. It is not possible to predict the outcome of said work, nor the date at which it will end."

### 4. Government Investigations Are Continuing

371. Numerous government investigations in the U.S. and abroad, including by the DOJ, the CFTC, the European Union (the "EU"), the FSA, the Swiss Financial Market Supervisory Authority, German bank regulator Bafin, the Dutch Central Bank and Italian prosecutors, into alleged Euribor rigging are on-going. The full scope of these investigations have not yet been publicly revealed.

372. For example, in a letter dated December 14, 2011 that was made public in December 2012 from EU Competition Commissioner Joaquín Almunia to Guido Ravoet Chief Executive of Euribor, Competition Commission Almunia wrote:

> …I confirm indeed that, in October 2011, the Commission has conducted inspections in the sector of financial derivative products linked to Euribor.
>
> The Commission is investigating a possible violation of EU antitrust rules by certain companies active in this sector. More specifically, the Commission has concerns that the companies that are being investigated may have violated EU rules that prohibit cartels and restrictive business practices between undertakings.
>
> I understand your concerns and the need to guarantee a good governance of the Euribor benchmark. However, this investigation is on-going and the rules governing our investigations prevent the Commission from identifying the companies involved or provide further details at this stage…

373.     In particular, the European Commission's investigation into the cartel in Euro interest rate derivatives continues against Defendants Crédit Agricole, HSBC and JPMorgan.

**5.     The Conspiracy to Fix Prices of Euribor-Based Derivatives Constituted an Agreement in Restraint of Trade or Commerce**

374.     The abundant evidence of collusive price fixing of Euribor-based derivatives uncovered by the regulators and cited herein restrained trade in the market for Euribor-based derivatives.  Just like a traditional "brick and mortar" price fixing conspiracy, where manufacturers collude to set a pricing formula for their goods, the Contributor Panel Banks colluded to fix the prices of their Euribor-based derivatives through various means, including sharing price and volume information with competitors for the purpose of coordinating prices and agreeing to set Euribor prices either lower or higher, depending upon their mutual financial interests. This price-fixing resulted in no less of a restraint of trade than a traditional agreement to fix the wholesale prices of, for example, washing machines.  The market for Euribor-based derivatives was unlawfully restrained by price fixing because collusion, rather than the forces of supply and demand, set artificially supracompetitive and, at times, infracompetitive prices for these derivatives.

**6.     The Conspirators Were Horizontal Competitors In the Euribor-Based Derivatives Market**

375.     Each of the Contributor Bank Defendants were competitors with one another for attracting transactions in the Euribor-based derivatives market.  Indeed, it was by virtue of their position as competitor banks in this market that these Defendants secured their position as a panel member with the EBF.  These banks competed for financial positions in this derivatives market in the position of horizontal competitors not only insofar as they occupied the same level of distribution in the marketplace, but because they competed with one another to attract

customers for Euribor derivatives transactions and/or to purchase and sell Euribor-based derivatives contracts and/or to profit or lose on their activities in the foregoing.

### 7. The Collusive Conduct Fixed Prices and Restrained or Changed Output

376. The collusion alleged herein fixed the prices of Euribor-based derivatives prices when the cartel members agreed to share pricing information and coordinate prices for their derivatives. Moreover, the collusion had the effect of restraining or changing output in the derivatives market because market participants naturally responded to the changed prices. The volume of derivatives transactions was therefore restrained and output changed.

377. The alleged rate-setting collusion harmed competition among sellers and buyers of Euribor-based derivatives. The Euribor submission is supposed to be a proxy for the competitive borrowing rate of each bank. The counterparties to financial instruments that use Euribor do so for the reason that they know that these rates reflect competitive supply and demand influences on the Euro interbank lending market. It is because these rates reflect such competitive prices that they are so commonly used in Euribor-based derivative contracts to set pricing. When, as here, banks and others colluded and altered Euribor from competitively set prices to collusively fixed prices, competition in the Euribor-based derivatives *a fortiori* was affected at the very instant and in the very same manner that the rate itself was collusively set. The price of Euribor-based derivative contracts—set by collusion—became inherently anticompetitive in the same manner as Euribor itself became anticompetitive.

### 8. The Government Settlements to Date Reveal a High Number of Inter-Firm Communications.

378. The Barclays and Rabobank Settlement documents reveal a high number of inter-firm communications between Barclays' traders and unidentified Euribor Contributor Banks. The Barclays Settlement documents also make clear that Barclays Euribor submitters continued

to fix prices of Euribor-based derivatives by coordinating submissions with former Barclays' traders after the traders left Barclays and joined other unidentified financial institutions. Similarly, the Rabobank Settlement documents make clear that Rabobank's Euribor Submitter coordinated Rabobank's Euribor submissions with two former senior Rabobank Euro derivatives traders.

379.     In all, there are at least 56 instant messages that evidence explicit and implicit agreement among traders and submitters at Barclays, RBS, Rabobank, other Contributor Banks and co-conspirators to fix Euribor-based derivatives prices.  Examples of these messages directly evidencing collusion among Barclays, RBS, Rabobank, other Contributor Banks and co-conspirators, who agreed to further the conspiracy, were sent and received on the following days: January 13, 2006; June 14, 2006; July 7, 2006 (3 separate messages); July 27, 2006; August 1, 2006; August 14, 2006 (3 separate messages); September 4, 2006; September 6, 2006 (2 separate messages); September 21, 2006; October 2006 (5 separate messages); October 4, 2006; early November 2006 (at least 4 separate messages); November 10, 2006 (3 separate messages); November 13, 2006 (4 separate messages); December 5, 2006 (4 separate messages); December 27, 2006 (3 separate messages); January 25, 2007; February 1, 2007 (2 separate messages); February 6, 2007; February 12, 2007 (4 separate messages); March 16, 2007 (3 separate messages); March 19, 2007 (4 separate messages); March 20, 2007 (2 separate messages); and October 4, 2007.

## VIII.   Former Deutsche Euribor Traders File a Wrongful Termination Lawsuit Against Deutsche

380.     More information about Defendants' anticompetitive and manipulative behavior was recently revealed in a German wrongful termination lawsuit.

381.     Defendant Deutsche fired five former traders, including two former Deutsche Managing Directors, two Directors and a Vice President for attempting to manipulate global interbank offered rates.  At least three of the former Deutsche traders were responsible for making Deutsche's Euribor submissions, including Ardalan Gharagozlou, Kai-Uwe Kappauf and Jörg Voigt.  The traders were fired by Deutsche for manipulating Euribor to benefit their Euribor-based derivatives positions.

382.     After being fired, four of the fired traders brought a legal action in Frankfurt Labor Court against Deutsche seeking to have their jobs returned and to receive back pay.  The traders alleged that Deutsche created an environment that facilitated price manipulation of Euribor-based derivatives (among other interest rate derivatives) because Deutsche: (i) failed to provide any systems, controls or guidelines on Deutsche's interest rate submissions process; (ii) encouraged its traders to take Deutsche's derivatives positions into account when making submissions; (iii) failed to create a Chinese Wall and formed the "Dirt/Bird" initiative which consolidated the desks of Deutsche's money market, derivative and swap teams with the submission team; and (iv) created a conflict of interest by having traders also make Deutsche's interbank submissions.

383.     According to the former Deutsche traders, in the thirty minutes prior to the official publication of the interbank rate (*e.g.*, Euribor), emails were circulated to approximately 30 Deutsche traders identifying the specific interbank rate to be submitted.  The traders also alleged that Deutsche mandated a "fixed appointment" every Monday over international video teleconferencing that coordinated the trading activities with Deutsche's London-based traders, discussed Deutsche's trading positions in detail and upon information and belief, discussed Deutsche's interbank submissions for the week.

384.     As part of the termination proceeding, Deutsche Bank admitted that "certain employees…had engaged in conduct that fell short of the Bank's standards" and that the employees were suspended or fired.

385.     Presiding Judge Annika Gey ordered Deutsche to give the former traders back their jobs finding that Deutsche "didn't have adequate internal rules and controls in place and didn't see to it that rate submitting and derivative trading was adequately separated."

## IX.     The EBF's Re-Evaluation of the Euribor-Based Derivative Instrument Pricing

386.     The price manipulation in Euribor-based derivatives has prompted the EBF to re-evaluate the Euribor rate-setting process.

387.     During the Class Period, the EBF expressed concerns internally that the prices of Euribor-based derivatives was manipulated by its Contributor banks.  The EBF shared those concerns internally and only with the Euribor panel banks.  For instance, documents made public in December 2012 include a November 12, 2007 Memorandum to the Euribor panel banks, from Guido Ravoet, Secretary General of the EBF and Chairman of the Euribor Steering Committee, entitled "Reminder of Euribor panel banks obligations under the Code of Conduct."   The November 12, 2007 Memorandum stated that,

> In the context of the recent market turmoil[,] questions have been raised in the public domain as to the reliability of the published financial markets benchmarks (such as LIBOR, Euribor, etc.), the Euribor Steering Committee wishes to remind the panel banks of the need for market participants to see the true reflection of the current market situation in the index rates even in difficult or crisis situations.

> Thus, I draw your attention to the importance of compliance with the panel banks' respective obligations in accordance with the Euribor Code of Conduct, which aims to facilitate and maintain a consistent and accurate flow of Euribor reference rate data.

> Participants whose numbers do not accurately reflect the market and the respective bank's market activities could potentially expose

themselves and EURIBOR to reputational risks.  To avoid unwanted negative consequences, the panel banks are invited to ensure and maintain a systematic and close control in their daily quotations to effectively provide accurate information for the daily calculations of the EURIBOR reference rate.

In such case where panel banks provide information to the chosen data vendor (*i.e., Reuters*), it is incumbent upon all involved institutions to remain vigilant in their efforts to fully understand and comply with their obligations and best operational practices when providing and/or calculating data.

388.    Another document also released in December 2012 is a September 29, 2009

Memorandum from EBF Secretary General Ravoet to the Euribor Panel Banks entitled

"Credibility of Euribor."  The September 29, 2009 Memorandum stated that:

The Euribor-Steering Committee has recently been informed that contributions to Euribor regularly and significantly differed from EuroLibor for the same contributors, at times, well in excess of 1 basis point.

Therefore, as Chairman of the Euribor Steering Committee, I hereby remind you of the panel banks' respective obligations in accordance with Euribor Code of Conduct and highlight the importance of preserving the credibility of the indexes, particularly since they have been subject to occasional challenges over the last two years.  More significantly, a loss of credibility of the Euribor rates could have an impact on each bank member of the panel.

I also remind you that, by joining Euribor panel, contributing banks have subjected themselves unconditionally to this Code and its Annexes, in their present or future form, and agreed to promote Euribor as much as possible and refrain from any activity damageable to Euribor. Consequently, I would be grateful if you could ensure that the contributions to the Euribor rates are accurate and truly reflect the market.

389.    In July 2012, the EBF requested that all Euribor panel banks return a signed

Euribor management certification form, in which each bank certifies that (1) all internal

procedures are set up to ensure a robust process for the submission of contributions, excluding

any internal and external influences, (2) that all submitted contributions are the bank's

appreciation of the evolution of the interbank market in the Eurozone according to the Euribor definition, and (3) that the Euribor Code of Conduct is fully respected when contributing to the Euribor fixing.

390.    In mid-November 2012, the European Central Bank asked for major changes to Euribor, including an increased reliance on transaction-based figures in the calculation of Euribor as well as having it directly regulated by European authorities and making it more independent from the EBF.

391.    The demand for use of actual transaction prices reflects that Euribor submissions were supposed to be the proxy for competitively set rates.  The violations of the Euribor Code of Conduct so as to submit collusive and non-competitive submissions interdicted the pro-competitive purpose of Euribor.  This further caused antitrust injury to those who transacted at Euribor derivative prices based upon the collusive submissions of non-competitive rates by Defendants.

392.     On November 28, 2012, the EBF responded to the European Commission Consultation Document on the Regulation of Indices.  In its response, the EBF stated that "to further enhance the credibility and accuracy of Euribor, the EBF is currently working on new agreed contribution criteria, to define which bank should be considered as a prime bank on one side, and which criteria should be taken into account by the panel bank when sending its contribution to the index."  The EBF also acknowledged that Euribor should be run by an independent non-profit driven structure, with the introduction of public supervision.

393.    On January 11, 2013, the *Wall Street Journal* reported that two European regulators, the European Banking Authority (the "EBA") and the European Securities and

Markets Authority (the "ESMA"), urged a "root-and-branch reform of [Euribor's] governance within six months."

**CLASS ACTION ALLEGATIONS**

394.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the following Class:

> All persons or entities that engaged in a U.S. based transaction of Euribor-based derivatives during the period of at least June 1, 2005 through at least March 2011 (the "Class Period").  A U.S. based transaction in Euribor-based derivatives includes: (a) a purchase or sale of a NYSE LIFFE Euribor futures contract by a U.S. person or entity from a location within the U.S.; (b) a purchase or sale of a Euro currency futures contract on the CME; and/or (c) a purchase or sale of an interest rate swap, forward rate agreement or other financial instrument benchmarked, priced and/or settled to Euribor entered into by a U.S. person or entity from a location within the U.S.  Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.[13]

395.    The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically dispersed Class members transacted in Euribor-based derivatives during the Class Period.

396.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

397.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are adequate representatives of the Class and have no interests which are

---

[13] Plaintiffs defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including commodity futures manipulation and antitrust class action litigation.

398.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

a.    Whether Defendants manipulated the price of a commodity futures contract and/or the price of the commodity underlying such futures contract in violation of the CEA;

b.    Whether such manipulation caused the price of a commodity futures contract and/or the price of the commodity underlying such futures contract to be artificial;

c.    Whether such manipulation caused cognizable legal injury under the CEA;

d.    Whether Defendants unlawful acts violate Section 1 of the Sherman Act;

e.    Whether Defendants combined, agreed, or conspired to fix or manipulate Euribor and/or Euribor-based derivatives prices in violation of the antitrust laws;

f.    Whether Defendants unlawful acts violate RICO;

g.    Whether Defendants' conduct had an anticompetitive and manipulative effect on Euribor and Euribor-based derivatives during the Class Period;

h.    Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiffs and the Class;

i.    The fact and degree of impact on Euribor and the prices of Euribor-based derivatives resulting from Defendants' course of unlawful conduct;

j.    Whether Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class;

k.    The operative time period and extent of Defendants' foregoing violations; and

l.      Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

399.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

400.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

401.    The statute of limitations relating to the claims for relief alleged herein (*see* ¶¶ 406-59) were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.  Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by the exercise of due diligence prior to the time of the public disclosures of manipulation and price fixing of Euribor-based derivatives.  Applicable statute of limitations affecting the rights of the claims for relief asserted by Plaintiffs has therefore been tolled.

Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

402.    Active acts of concealment by Defendants to conceal their violations of law from Plaintiffs and the Class include, *inter alia*: (i) knowingly submitting (or causing to be submitted) Euribor submissions that were false, misleading or knowingly inaccurate because they were based in whole or in part on impermissible and illegitimate factors, for instance, artificial rates that would benefit Defendants' Euribor-based derivatives trading positions or the Euribor-based derivatives trading positions of other colluders despite representing such submissions as truthful and reliable assessments of Euribor (*see, e.g.*, ¶¶ 143-331); (ii) avoiding discussing the rigging of Euribor and otherwise concealing same in their statements in public forums (*see, e.g.*, ¶¶ 211, 228, 342); and (iii) knowingly instructing traders and submitters to curb written communications about false Euribor reports (*see, e.g.*, ¶¶ 228, 264).

403.    Many (if not all) off these affirmative acts of concealment were also inherently self-concealing.  *See, e.g.*, *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004) ("[a]mong the principal allegations against Defendants are assertions that they reported false trade data to entities that collect that information for public dissemination, and that they engaged in fraudulent wash trades…Such activities are inherently self-concealing."); *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, 00 CIV. 7804 (LMM), 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004) (recognizing that bid-rigging and price-fixing conspiracies are inherently self-concealing) (citing *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir. 1988)).  Not only did Defendants conceal their scheme, Defendants repeatedly agreed to conceal same.  *See, e.g.*, ¶ 211 ("if you breathe a word of this, I'm not telling you anything else.").

404.     Alternatively and additionally evidencing the self-concealing nature of the manipulation alleged herein, is the assertion by Defendant UBS that "its" discovery of its rampant misconduct in the pricing of Euribor-based derivatives, among other non-U.S. Dollar derivatives, supposedly occurred only as a result of a CFTC request in April 2010 that UBS conduct an internal investigation relating to its U.S. Dollar LIBOR practices.

405.     As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by the exercise of due diligence on or before June 27, 2012, when Barclays announced its $450 million settlement with global regulators for conspiring to fix prices of Euribor-based derivatives.  On this date, Barclays also announced that it was granted conditional leniency under ACPERA from the DOJ for alleged anticompetitive conduct relating to price fixing of Euribor-based derivatives during the Class Period.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(For Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)**

**Against All Defendants**

406.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

407.     **Ability to Influence Prices**.  The Contributor Bank Defendants served as EBF Euribor panel members during the Class Period, and Euribor was determined by the submissions of Defendants and other banks.  For many years, the Contributor Bank Defendants knowingly delivered or caused to be delivered false EBF Euribor submissions precisely because Defendants had the ability to influence Euribor but also the ability to influence (and create profits for themselves in respect of) the prices of Euribor derivatives at issue herein.  They did so through

142

the instrumentalities of interstate commerce, including but not limited to, wire and U.S. mails. The submissions were also caused to be delivered through the instrumentalities of interstate commerce, including but not limited to, wire and U.S. mails and through the daily dissemination and publication globally, including into the United States, of the Contributor Bank Defendants' submissions and daily official benchmark interest rates by at least Thomson Reuters on behalf of the EBF, and other third party vendors. The Contributor Bank Defendants' submissions were used during the Class Period to determine the official published rates for Euribor which is calculated based on a trimmed average of the submissions. By virtue of this methodology, the Contributor Bank Defendants had the ability to influence and affect the rate that would become the official Euribor for any tenor. Further, the Contributor Bank Defendants' Euribor submissions to the EBF contained market information concerning the costs of borrowing unsecured funds in particular tenors in the Euro interbank market. Such market information affected the price of commodity futures contracts and/or the price of a commodity underlying such contracts in violation of the CEA.

408. **Causation and Artificial Price.** When a factor that affects a futures contract price is artificial or illegitimate, then the resulting futures contract price is necessarily artificial. Here, Euribor was not just a factor that affected Euribor futures contract prices. Euribor was the predominant factor that affected such prices. Euribor is a commodity that trades in U.S. interstate commerce and is the commodity underlying Euribor futures contracts. Any manipulation of Euribor is a manipulation of the commodity underlying Euribor futures contracts in violation of the CEA. When multiple Defendants collude to submit false reports, this plausibly affects, (among other derivatives) Euribor futures contract prices. Defendants' affected Euribor futures contract prices in an illegitimate and artificial manner, and caused such prices to

be artificial. During the Class Period, the daily rates at which Euribor was fixed and the prices of futures contracts which were benchmarked, traded, priced and settled to such rates were affected by illegitimate factors consisting of Defendants' knowingly false, misleading and/or inaccurate submissions. Defendants thereby, for years, caused artificial Euribor rates and Euribor futures contract prices in order to benefit the Contributor Bank Defendants' derivatives trading positions. As a direct result, the prices of commodity futures contracts and/or the price of the commodity underlying such futures contracts were caused to be artificial by Defendants. Other unlawful conduct engaged in by Defendants during the Class Period, *e.g.*, abusive, non-bona fide Euribor derivatives trading, further injected illegitimate supply and demand factors into the Euribor derivatives market and Defendants' thereby further caused artificial Euribor futures contract prices.

409. **Intent**. Plaintiffs disclaim any need to plead or prove any manipulative intent other than that each Defendant knew that its Euribor reports were false. Alternatively and additionally, Plaintiffs disclaim any need to plead or prove any manipulative intent other than (a) that extensive communications produced in connection with the Barclays, RBS, UBS and Rabobank Settlements, and the other facts and circumstances, show that Defendants purposely and systematically intended to and did manipulate Euribor to artificial levels, and (b) Euribor is the commodity underlying Euribor futures contracts or is at least the price of the commodity underlying the futures contracts here. Additionally, Defendants' specific intent and motive in the manipulation of Euribor was to manipulate Euribor-based derivative prices and obtain ill-gotten trading profits on Euribor-based derivative contracts held by them or other co-conspirators. The prices of these contracts (and thus Defendants' profits or losses) were benchmarked, traded, priced and settled to Euribor. As specifically intended and a direct consequence of Defendants'

knowingly unlawful conduct, the prices of Euribor commodity futures contracts and/or the price of the commodity underlying such contracts were manipulated to artificial levels by the Contributor Bank Defendants and their aiders and abettors throughout the Class Period.

410. The CME has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. CME submits to the CFTC various rules and regulations for approval through which CME designs, creates the terms of, and conducts trading in Euribor-based futures contracts. CME is an organized, centralized market that provides a forum for futures contracts priced, settled and/or benchmarked to Euribor.

411. Each Defendant, individually, in concert, and/or as one another's control persons or agents, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices of futures contracts in violation of the CEA, 7 U.S.C. § 1, *et seq.*

412. The Defendants' undisclosed conduct and trading activity alleged herein constituted a manipulation of Euribor and the prices of Euribor futures contracts in violation of Section 4b(a), 4c(a), 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 6b(a), 6c(a), 13(a)(2), and 25(a). As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial Euribor and Euribor futures contract prices to which they would not have been subject but for the unlawful conduct of the Defendants as alleged herein. Plaintiffs and members of the Class were further legally injured and suffered injury in fact that they transacted Euribor futures contracts in an artificial and manipulated market operating under the artificial prices caused by the Defendants. Plaintiffs and members of the Class who purchased or sold Euribor futures contracts during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

**(For Principal-Agent Liability In Violation of The Commodity Exchange Act, 7 U.S.C. § 1,**

***et seq.*)**

### Against All Defendants

413. Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

414. Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

415. Plaintiffs and members of the Class are each entitled to actual damages sustained in Euribor futures contracts for the violations of the CEA alleged herein.

## THIRD CLAIM FOR RELIEF

**(For Aiding and Abetting Manipulation In Violation of The Commodity Exchange Act, 7**

**U.S.C. § 1, *et seq.*)**

### Against All Defendants

416. Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

417. The Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by other Defendants as alleged herein. Each Defendant did so knowing of other Defendants' manipulation of Euribor and Euribor futures contracts, and substantially and willfully intended to assist these manipulations to cause the prices of Euribor

futures contracts to be artificial during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

418. Under Section 13c(a) of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

419. Other persons willfully intended to assist these manipulations to cause Euribor and the price of Euribor futures contracts to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1). They are the agents and unnamed co-conspirators as alleged herein.

420. Plaintiff and members of the Class are each entitled to actual damages sustained for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

**(For Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*)**

**Against All Defendants**

421. Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

422. Defendants competed among themselves and others in the market for Euribor-based derivatives. However, during the Class Period, the Contributor Bank Defendants controlled what Euribor rates would be and therefore controlled Euribor-based derivatives prices.

423. During the Class Period, Defendants and their unnamed co-conspirators entered into one or more agreements and one or more unlawful combinations and agreements in an unreasonable and unlawful restraint of trade to fix Euribor-based derivatives prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

424. Such contracts, combination and conspiracy included a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in

furtherance of which Defendants fixed, maintained or made artificial the prices of Euribor-based derivatives. Defendants' price-fixing conspiracies are a *per se* violation of the federal antitrust laws and are, in any event, unreasonable and unlawful restraints of trade.

425.    Defendants' conspiracies, and resulting impact on the prices of Euribor-based derivatives occurred in or had direct, substantial and reasonably foreseeable effects on U.S. interstate commerce.

426.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered antitrust injury to their business or property. Without limiting the generality of the foregoing, Plaintiffs and members of the Class paid artificial and non-competitive prices for Euribor-based derivatives as a proximate result of Defendants' anticompetitive conduct. Plaintiffs and the other members of the Class were also deprived of the benefits of free and open competition in transacting in Euribor-based derivatives.

427.    Plaintiffs and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## FIFTH CLAIM FOR RELIEF

**(For Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO))**

**18 U.S.C. §§ 1961 *et seq.***

**Against All Defendants**

428.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

## Defendants Engaged In Conduct Actionable Under RICO

429.    18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

430. 18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

431. Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

432. 18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

433. 18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

434. 18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

435.    At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including by transmitting false Euribor submissions or directing other employees to do so) were "person[s]" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and a hierarchy of corporate direction and control.

436.    At all relevant times, Plaintiffs were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

### Defendants Formed A RICO Enterprise

437.    Defendants' collective association, including through their participation together as members of the EBF's Euribor panel, constitutes the RICO enterprise in this case. Every member of the enterprise participated in the process of transmitting or causing to be transmitted false and artificial Euribor submissions throughout the Class Period. On a daily basis, Defendants transmitted or caused to be transmitted an electronic spreadsheet to Thomson Reuters. Through this daily transmission of an electronic spreadsheet, Defendants knowingly transmitted or caused to be transmitted false Euribor submissions. These transmissions completed Defendants' criminal acts of wire fraud in the United States or while crossing U.S. borders and/or were sent through electronic servers located in the United States.

438.    The common purpose of the enterprise was simple: profiteering. By transmitting or causing false and artificial Euribor submissions to be transmitted to Thomson Reuters and the EBF and by exchanging Euribor-based derivative positions and prices, Defendants affected the prices of Euribor-based derivatives, rendering them artificial. This directly resulted in Defendants reaping hundreds of millions, if not billions, in illicit trading profits on their Euribor-based derivative positions.

**The Enterprise Has Perpetrated A Continuing Practice Of Racketeering**

439.    Defendants committed far more than two predicate acts of wire fraud. Defendants, in concert, made false statements and transmitted false Euribor submissions, for the purpose and with the effect of manipulating Euribor and the price of Euribor-based derivatives to artificial levels.  Defendants did so for the purpose and with the effect of increasing their trading profits on Euribor-based derivatives.  Defendants earned hundreds of millions, if not billions, of dollars in illicit profits as a result, which they shared with the employees who perpetrated the scheme.  The conduct of every party involved in the scheme is hardly an isolated occurrence that resulted in one fraudulent charge.

440.    In perpetrating the fraudulent scheme, each Defendant directly or indirectly through its corporate structure has designed and implemented a uniform scheme to manipulate Euribor and Euribor-based derivatives prices.  Defendants' daily submission and electronic communication of their false and artificial Euribor submissions to Thomson Reuters and the EBF comprise one common, uniform nearly identical system of procedures used in virtually an identical way every day.

441.    Defendants have knowingly, intentionally, or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing much more than two predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343, by knowingly and intentionally implementing the scheme to submit false and artificial Euribor quotes to manipulate Euribor and Euribor-based derivatives prices, which allowed Defendants to reap unlawful profits.

442.    By devising the scheme or artifice to defraud investors in Euribor-based derivatives as alleged herein, and for obtaining money from participants in the market for

Euribor-based derivatives through "false or fraudulent pretenses, representations, or promises" about Euribor and Euribor-based derivatives, Defendants completed all elements of wire fraud within the United States or while crossing United States borders. Defendants did so by: (i) transmitting or causing to be transmitted false and artificial Euribor quotes in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (ii) transmitting or causing to be transmitted false and artificial Euribor quotes that were used by Thomson Reuters as agent for the EBF in collecting, calculating, publishing and disseminating the daily Euribor submissions of each Defendant and the daily Euribor fix that was transmitted, published and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; or (iii) coordinating their daily Euribor submissions and their Euribor-based derivatives trading positions in electronic chats routed through electronic servers located in the United States. For example, Defendants committed the predicate acts of wire fraud on at least the following dates: January 13, 2006; June 1, 2006; June 14, 2006; June 29, 2006; July 27, 2006; July 28, 2006; August 1, 2006; August 14, 2006; September 4, 2006; September 6, 2006; September 7, 2006; September 21, 2006; October 2, 2006; October 4, 2006; October 13, 2006; October 16, 2006; November 10, 2006; November 13, 2006; December 5, 2006; December 27, 2006; January 12, 2007; January 25, 2007; February 1, 2007; February 6, 2007; February 12, 2007; March 19, 2007; March 20, 2007; April 2, 2007; July 12, 2007; August 7, 2007; August 9, 2007; November 19, 2007; March 27, 2008; April 3, 2008; April 15, 2008; April 22, 2008; May 7, 2008; May 8, 2008; May 28, 2008; June 3, 2008; July 15, 2008; August 28, 2008; September 5, 2008; September 24, 2008; September 26, 2008; September 29, 2008; June 25, 2009; and June 29, 2010.

443.    As part of its global settlement with regulators for its manipulation of financial benchmarks, Defendant Rabobank agreed to waive indictment to a one-count criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section and Antitrust Division of the DOJ charging Rabobank with wire fraud, in violation of 18 U.S.C. § 1343, in connection with, *inter alia*, Rabobank's false reporting of Yen-LIBOR, a financial benchmark also collected, calculated and disseminated by Thompson Reuters.  The one-count criminal information provides that "[b]etween approximately 2005 and at least 2010, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., the defendant, through its employees, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant, through its employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about April 17, 2008, the defendant transmitted or caused the transmission of electronic communications - specifically, (1) an electronic chat between a derivatives trader and a money market trader, (2) a subsequent Yen LIBOR submission from the defendant to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate through international and interstate wires."  This was a violation of 18 U.S.C. § 1343 (relating to wire fraud).  The Rabobank Criminal Information is attached as Exhibit D-4.

444.     The Plaintiffs do not base their RICO claims on any conduct that is actionable as fraud in the purchase or sale of securities.

## The Racketeering Scheme Affected Interstate Commerce

445.     Through the racketeering scheme described above, Defendants used the enterprise to improperly increase their profits to the detriment of investors of Euribor-based derivatives, who resided throughout or transacted Euribor-based derivatives from within the United States.

446.     Plaintiffs' allegations satisfy RICO's "interstate commerce" element because the racketeering claims alleged herein arise out of, and are based on, Defendants' use of the internet or the wires across state lines as well as agreements between entities in different states to manipulate Euribor and the price of Euribor-based derivatives.  Using those interstate channels to coordinate the scheme and transmit fraudulent statements to Plaintiffs across state lines satisfies RICO's requirement of an effect on interstate commerce.

## Defendants Conspired To Violate RICO

447.     Apart from construction and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C § 1962(d).

448.     The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

449.     Defendants organized and implemented the scheme, and ensured it continued uninterrupted by concealing their manipulation of Euribor and the prices of Euribor-based derivatives from investors, including Plaintiffs.

450.     Defendants knew the scheme would defraud investors of Euribor-based derivatives yet each Defendant remained a participant despite the fraudulent nature of the

enterprise. At any point while the scheme has been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence. Rather than stopping the scheme, however, the members of the enterprise deliberately chose to continue it, to the direct detriment of Euribor-based derivatives investors such as Plaintiffs and members of the Class.

**Plaintiffs Suffered Injury Resulting From The Pattern of Racketeering Activity**

451. As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiffs and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, those effects were precisely why the scheme was concocted.

452. Plaintiffs and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

453. As direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SIXTH CLAIM FOR RELIEF

### (For Unjust Enrichment)

### Against All Defendants

454. Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

455. The Contributor Bank Defendants individually, and/or through their subsidiaries or affiliates (as alleged in ¶¶ 89, 99), are Euribor swaps dealers and traders and also are futures commission merchants, clearing firms and/or trading members of futures exchanges involved in

155

profit-based trading, clearing and/or brokering of Euribor-based derivatives traded by Plaintiffs and members of the Class.

456.    The Contributor Bank Defendants, and/or one or more of their subsidiaries and/or affiliates, financially benefitted from the unlawful manipulation and restraint of trade.  As alleged herein, the Contributor Bank Defendants intentionally and systematically manipulated Euribor to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) in ill-gotten trading profits on Euribor-based derivatives, including Euribor futures contracts, interest rate swaps and forward rate agreements.  These instruments were held by Defendants, and thus the prices of such instruments (and thus Defendants' ill-gotten gains) were benefitted by, determined, benchmarked, traded or settled based on Defendants' manipulation of Euribor.  In this regard, for example, Euribor submitters at the Contributor Bank Defendants regularly and improperly coordinated and changed their Euribor submissions with one another at the request of Contributor Bank Defendants' interest rate derivatives traders employed by them or their securities subsidiaries or affiliates.

457.    These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money and transact in Euribor-based derivatives, including Euribor swaps, Euribor futures contracts, interest rate swaps and forward rate agreements at artificial, manipulated and rigged prices.

458.    As a result of the foregoing, it is unjust and inequitable for the Contributor Bank Defendants (and/or their subsidiaries or affiliates) to have enriched themselves in this manner at the expense of Plaintiffs and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

459. Each Defendant should pay restitution or its own unjust enrichment to Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs demand relief as follows:

A. For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives, and appointing Lowey Dannenberg Cohen & Hart, P.C. and Lovell Stewart Halebian Jacobson LLP as Class counsel;

B. For a judgment awarding Plaintiffs and members of the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C. For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

D. For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful enterprise in violation of RICO;

E. For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

F. For a judgment awarding Plaintiffs and members of the Class damages against Defendants for their violations of the federal antitrust laws and RICO, in an amount to be trebled in accordance with such laws;

G. For a judgment awarding Plaintiffs and members of the Class restitution of any and all sums received by the Defendants' unjust enrichment;

157

H.     For an award to Plaintiffs and members of the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

I.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated:  White Plains, New York
      May 2, 2014

LOWEY DANNENBERG COHEN
& HART, P.C.

By: /s/ Vincent Briganti
Vincent Briganti
Geoffrey M. Horn
Peter D. St. Phillip
Raymond Girnys
Christian Levis
One North Broadway
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914-997-0035
vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com
rgirnys@lowey.com

LOVELL STEWART HALEBIAN
JACOBSON LLP

By: /s/ Christopher Lovell
Christopher Lovell
Gary S. Jacobson
Ian T. Stoll
61 Broadway, Suite 501
New York, NY 10006
Tel.: 212-608-1900
Fax: 212-719-4677
clovell@lshllp.com
gsjacobson@lshllp.com
istoll@lshllp.com

*Proposed Interim Co-Lead Class Counsel*

Brian P. Murray
Lee Albert (*pro hac vice* to be filed)
GLANCY BINKOW & GOLDBERG LLP
122 East 42nd Street, Suite 2920
New York, NY 10168
Tel.: 212-682-5340
Fax: 212-884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

David E. Kovel
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022
Tel.: 212-371-6600
Fax: 212-751-2540
dkovel@kmllp.com

*Additional Counsel for Plaintiffs*