**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHEN SULLIVAN, WHITE OAK FUND LP, CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, SONTERRA CAPITAL MASTER FUND, LTD., FRONTPOINT PARTNERS TRADING FUND, L.P., AND FRONTPOINT AUSTRALIAN OPPORTUNITIES TRUST on behalf of themselves and all others similarly situated, | Docket No. 13-cv-02811 (PKC) ECF Case |
| Plaintiffs, | |
| - against - | **FOURTH AMENDED CLASS ACTION COMPLAINT** |
| BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BNP PARIBAS S.A., CITIGROUP, INC., CITIBANK, N.A., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., CRÉDIT AGRICOLE S.A., CRÉDIT AGRICOLE CIB, DEUTSCHE BANK AG, DB GROUP SERVICES UK LIMITED, HSBC HOLDINGS PLC, HSBC BANK PLC, ICAP PLC, ICAP EUROPE LIMITED, J.P. MORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, SOCIÉTÉ GÉNÉRALE SA, UBS AG AND JOHN DOE NOS. 1-50, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

SUMMARY OF ALLEGATIONS ................................................................................. 1

JURISDICTION AND VENUE ............................................................................. 12

PERSONAL JURISDICTION ................................................................................ 14

PARTIES ............................................................................................................... 23

    A.    The Barclays Defendants. ...................................................... 25

    B.    The BNP Paribas Defendant. ................................................. 27

    C.    The Citi Defendants. .............................................................. 28

    D.    The Rabobank Defendant. ...................................................... 28

    E.    The Crédit Agricole Defendants. ............................................ 29

    F.    The Deutsche Bank Defendants. ............................................. 31

    G.    The HSBC Defendants. .......................................................... 32

    H.    The JPMorgan Defendants. .................................................... 33

    I.    The RBS Defendant. .............................................................. 34

    J.    The Société Générale Defendant. ........................................... 36

    K.    The UBS Defendant. .............................................................. 37

    L.    The ICAP Defendants. ........................................................... 38

AGENTS AND UNNAMED CO-CONSPIRATORS ................................................ 39

SUBSTANTIVE ALLEGATIONS ......................................................................... 40

I.    Background ......................................................................................... 40

    A.    Euribor: The Euro Interbank Offered Rate .......................... 40

    B.    Euribor-Based Derivatives ..................................................... 42

        1.    NYSE LIFFE Three-Month Euribor Futures Contract ................ 42

        2.    CME Euro Currency Futures Contracts ....................................... 44

        3.    Foreign Exchange Forwards ........................................................ 46

        4.    Interest Rate Swaps ...................................................................... 47

        5.    Forward Rate Agreements ............................................................ 48

II.    Euribor Manipulation Conspiracy: Defendants Agreed to and Did Manipulate Euribor to Artificial Levels for Their Financial Gain, to the Detriment of Plaintiffs and Other Market Participants. ........................................................................................ 49

    A.    Requests for False Euribor Submissions ............................... 50

1.       Defendants Coordinated Their Euribor Submissions to Maximize their Impact on the Euribor Fix...................................................... 51

    i.      Deutsche & Barclays        ....................................... 53

    ii.     Société Générale: ██████████████████........................... 55

    iii.    HSBC: ████████████ ................................................. 56

    iv.    Citi: ████████████ ...................................................... 57

    v.      BNP Paribas: From Deutsche Through Citi................................. 59

    vi.    JPMorgan: ██████████████████ ....................... 60

    vii.   Crédit Agricole: ███████████████████ ............. 61

    viii.  RBS: Hires Moryoussef, Who Continues the Agreement ........... 64

    ix.    Rabobank: ██████████████ .............................. 65

    x.      UBS: █████████████████.................... 66

2.       Daily Requests for False Submissions .......................................... 67

3.       Defendants' Management Encouraged and Actively Participated in Their Traders' and Submitters' Manipulation of Euribor and the Prices of Euribor-Based Derivatives................................................ 73

B.     Defendants Manipulated and Fixed Euribor and the Prices of Euribor-based Derivatives by Pushing Cash in the Market......................................... 77

C.     Coordination Through Inter-Dealer Brokers: "Spoofing" The Market to Manipulate Other Banks' Euribor Submissions. ....................................... 83

D.     Defendants Executed at Least Three Known Long-Term Campaigns to Rig Euribor ............................................................................................ 85

    1.       Long-Term Campaign No. 1: September 2006 through November 2006...................................................................................... 86

        i.      Raising Euribor in October 2006 .................................... 88

        ii.     Lowering Euribor in November 2006 ............................. 94

    2.       Campaign No. 2: December 2006 through March 2007 .............. 99

    3.       Campaign No. 3: January 2007 through March 2007 ................ 107

E.     Defendants Made Structural Changes to Support the Manipulation of Both Euribor and Euribor-Based Derivatives. ............................................... 111

    1.       Defendants Permitted Manipulative Conduct By Failing to Monitor Their Euribor Submission Processes. ......................................... 111

2.    Defendants Implemented Lax Compliance Standards That Ignored Manipulative Conduct................................................................. 114

3.    Defendants Actively Concealed Their Wrongdoing from Government Regulators ............................................................. 120

III.   OTC Derivatives Price Fixing Conspiracy: Defendants Conspired to Fix the Prices of Euribor-Based Derivatives by Coordinating their Activity Instead of Competing for Business in the Over-The-Counter Market ...................................................... 124

A.    Defendants Agreed On Where to Quote Prices For Euribor-Based Derivatives 124

B.    Defendants Engaged in Bid Rigging..................................................... 127

C.    Defendants Agreed On What to Quote In Pricing Run Throughs ..................... 128

D.    Defendants Refused to Deal with Certain Customers........................................ 130

E.    Defendants Shared Proprietary Pricing Information: .......................................... 131

F.    Defendants Transacted With Co-Conspirators at Favorable Prices.................... 133

IV.   Defendants' Manipulative Conduct Directly Impacted Plaintiffs' and Class Members Euribor-Based Derivatives Positions. .................................................................. 136

A.    Plaintiff Sullivan ................................................................................. 136

B.    Plaintiff White Oak ............................................................................ 138

C.    Plaintiff CalSTRS .............................................................................. 140

D.    Plaintiff Sonterra ............................................................................... 148

E.    Plaintiff FrontPoint Australian........................................................... 149

F.    Plaintiff FrontPoint Trading................................................................ 150

V.    The European Commission Fines Defendants Barclays, Deutsche Bank, RBS and Société Générale Over €1 Billion for Their Participation in The Cartel in Euro Interest Rate Derivatives ...................................................................................................... 150

VI.   The Pricing Structure of the Euribor-Based Derivatives Market Lends Itself—As the Evidence Amassed Thus Far By The Regulators Reveals—To Successful Collusion... 152

A.    Defendants' Employees Are Under Investigation and/or Have Resigned, Been Suspended or Fired, Suggesting Complicity In the Price-Fixing ....................... 153

B.    Disclosures Confirm the Existence of Investigations, Reveal Additional Investigations and Efforts to Reach Potential Settlements with Regulators....... 157

C.    Government Investigations Are Continuing ...................................... 158

D.    The Conspiracy to Fix Prices of Euribor-Based Derivatives Constituted an Agreement in Restraint of Trade or Commerce................................................. 159

E.    The Conspirators Were Horizontal Competitors In the Euribor-Based Derivatives Market ................................................................................... 159

F. The Collusive Conduct Fixed Prices and Restrained or Changed Output .......... 160

G. The Government Settlements to Date Reveal a High Number of Inter-Firm Communications. ................................................................................ 161

VII. The EBF's Re-Evaluation of the Euribor-Based Derivative Instrument Pricing ............ 161

CLASS ACTION ALLEGATIONS ................................................................ 165

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ...................................... 167

A. Dates of Initial Public Disclosure .................................................. 168

B. Plaintiffs' Due Diligence Efforts ................................................... 170

CLAIMS FOR RELIEF ............................................................................ 176

FIRST CLAIM FOR RELIEF ...................................................................... 176

SECOND CLAIM FOR RELIEF .................................................................... 177

THIRD CLAIM FOR RELIEF ...................................................................... 179

FOURTH CLAIM FOR RELIEF .................................................................... 181

FIFTH CLAIM FOR RELIEF ....................................................................... 183

SIXTH CLAIM FOR RELIEF ...................................................................... 186

SEVENTH CLAIM FOR RELIEF ................................................................... 187

EIGHTH CLAIM FOR RELIEF ..................................................................... 188

1. Defendants Engaged In Conduct Actionable Under RICO ........ 188

2. Defendants Conducted the Affairs of a RICO Enterprise Through a Pattern of Racketeering Activity ................................................ 189

3. The Enterprise Has Perpetrated a Continuing Practice of Racketeering ..................................................................... 190

4. The Pattern of Racketeering Activity Was Directed to, and Did Affect Interstate Commerce ...................................................... 197

5. Plaintiffs Suffered Injury Caused By The Pattern of Racketeering Activity .......................................................................... 197

NINTH CLAIM FOR RELIEF ...................................................................... 198

1. Defendants Conspired To Violate RICO ................................... 198

TENTH CLAIM FOR RELIEF ...................................................................... 199

ELEVENTH CLAIM FOR RELIEF .................................................................. 201

PRAYER FOR RELIEF ............................................................................ 202

DEMAND FOR JURY TRIAL ................................................................................... 203

## TABLE OF EXHIBITS

| Exhibit ("Ex.") Reference | Description |
|---|---|
| Ex. A-1 | United States Department of Justice, Criminal Division, Fraud Section Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG (Dec. 18, 2012) |
| Ex. A-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., CFTC Docket No. 13-09 (Dec. 19, 2012) |
| Ex. A-3 | Financial Services Authority Final Notice against UBS AG, FSA Ref. No. 186958 (Dec. 19, 2012) |
| Ex. B-1 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement and Attachment A Statement of Facts with The Royal Bank of Scotland plc, (Feb. 6, 2013) |
| Ex. B-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against The Royal Bank of Scotland plc and RBS Securities Japan Limited, CFTC Docket No. 13-14 (February 6, 2013) |
| Ex. B-3 | Financial Services Authority Final Notice against The Royal Bank of Scotland plc, FSA Ref. No. 121882 (Feb. 6, 2013) |
| Ex. C-1 | United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Deferred Prosecution Agreement and Attachment A Statement of Facts with Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Oct. 29, 2013) |
| Ex. C-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against Coöperatieve Centrale Raiffeisen- |

| | |
|---|---|
| | Boerenleenbank B.A., CFTC Docket No. 14-02 (Oct. 29, 2013) |
| Ex. C-3 | Financial Conduct Authority Final Notice against Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., FCA Ref. No. 171596 (Oct. 29, 2013) |
| Ex. C-4 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Criminal Information against Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Oct. 29, 2013) |
| Ex. D-1 | The European Commission Press Release, "Antitrust: Commission fines banks €1.71 billion for participating in cartels in the interest rate derivatives industry," IP/13/120 & Memo/13/1090 (Dec. 4, 2013) |
| Ex. E-1 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Non-Prosecution Agreement and Appendix A Statement of Facts with Barclays Bank PLC (June 26, 2012) |
| Ex. E-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, As Amended, Making Findings and Imposing Remedial Sanctions against Barclays PLC, Barclays Bank PLC and Barclays Capital, Inc. CFTC Docket No. 12-25 (June 27, 2012) |
| Ex. E-3 | Financial Services Authority Final Notice against Barclays Bank PLC, FSA Ref. No. 122702 (June 27, 2012) |
| Ex. F-1 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement and Appendix A Statement of Facts with Deutsche Bank AG (Apr. 23, 2015) |
| Ex. F-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, As Amended, Making Findings and Imposing Remedial Sanctions against Deutsche Bank AG (Apr. 23, 2015) |
| Ex. F-3 | Financial Conduct Authority Final Notice against Deutsche Bank AG (Apr. 23, 2015) |
| Ex. F-4 | United States Department of Justice, Criminal |

| | Division, Fraud Section, and Antitrust Division Plea Agreement and Appendix A Statement of Facts with DB Group Services UK Limited (Apr. 23, 2015) |
|---|---|
| Ex. F-5 | New York State Department of Financial Services Consent Order Under New York Banking Law §§ 44 and 44-a against Deutsche Bank AG and Deutsche Bank AG, New York Branch (Apr. 23, 2015) |
| Ex. F-6 | The Federal Financial Supervisory Authority, BaFin, Audit report for the IBOR special audit by Ernst & Young against Deutsche Bank AG (May 11, 2015) |
| Ex. F-7 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Criminal Information against Deutsche Bank A.G. (Apr. 23, 2015) |

Plaintiffs Stephen Sullivan, White Oak Fund LP, California State Teachers' Retirement System, Sonterra Capital Master Fund, Ltd., FrontPoint Partners Trading Fund, L.P., and FrontPoint Australian Opportunities Trust (collectively, "Plaintiffs") complain, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, against Defendants (defined at ¶¶ 63-106) as follows:

## SUMMARY OF ALLEGATIONS

1.     **Violations Alleged**. Beginning before June 1, 2005 and ending after March 31, 2011 ("Class Period"), Defendants agreed, combined and conspired to rig the European Interbank Offer Rate ("Euribor") and fix the prices of Euribor-based derivatives in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*., the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, the Commodity Exchange Act, 7 U.S.C. § 1, *et seq*. ("CEA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 – 1968 ("RICO"), and common law.

2.     Throughout the Class Period, Defendants operated in the United States as horizontal competitors, *i.e.*, businesses that compete with one another at the same level of production or distribution, to buy, sell and transact in trillions of dollars of Euribor-based derivatives.  Defendants used their offices in the United States, the U.S. wires, and numerous other U.S. contacts to manipulate and fix the prices of Euribor-based derivatives, injuring Plaintiffs and Class members in the United States.

3.     The United States Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC"), the New York State Department of Financial Services ("NYSDFS"), the United Kingdom Financial Conduct Authority ("FCA"), and the European Commission ("EC") have each charged or found the unlawful manipulation of Euribor and prices

of Euribor-based derivatives by numerous Defendants.[1]  Communications revealed in Defendants' settlements with these government regulators and documents produced to Plaintiffs by Barclays further identify manipulative conduct by additional co-conspirators.[2]

4.    The Barclays Defendants have sought antitrust immunity from the United States Department of Justice for Barclays' manipulation of Euribor and the prices of Euribor-based derivatives in the United States.  Barclays has thus far provided Plaintiffs with █████████ documents pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act (Pub. L. No. 108-237, tit. II, 118 Stat. 661, 665, extended by Pub. L. No. 111-190, 124 Stat. 1275) ("ACPERA"), Plaintiffs expect eventually to receive more than 1 million pages of documents from Barclays' cooperation.

5.    Based on the limited materials received from Barclays to date, as well as the limited "exemplars" of the manipulative conduct that Defendants negotiated to be included in the public portions of their government orders, Plaintiffs have so far alleged hundreds of manipulative conversations.  *See* App. A (containing communications revealed to public in Defendants' government settlements); App. B (identifying additional manipulative conversation from Barclays' documents).  Plaintiffs have so far uncovered and alleged ten different means that Defendants used to manipulate Euribor, involving the rigging of Euribor and fixing of Euribor-based derivatives prices in the over-the-counter market, which together demonstrate that Defendants caused artificial prices.  *See infra* ¶ 18. However, Plaintiffs have good grounds to believe and do allege that the very limited pre-discovery materials Plaintiffs reviewed to date are

---

[1] See Exhibit Ex. A-1-3 (UBS), Ex. B-1-3 (RBS), Ex. C-1-3 (Rabobank), Ex E-1-3 (Barclays), Ex. F-1-7 (Deutsche Bank); Ex. D-1 (Société Générale); EC Statement of Objections (JPMorgan, Crédit Agricole, HSBC) http://europa.eu/rapid/press-release_IP-14-572_en htm.

[2] *See infra* Part II.A.1.iv (Citibank); Part II.A.1.v (BNP Paribas); Part II.C (ICAP).

only the "tip of the iceberg" of the manipulative conversations and extensive means of manipulation Defendants employed.

6.   **Causation of Artificial Prices.**  Defendants continuously conspired to rig Euribor and fixed the prices of Euribor-based derivatives in the over-the-counter market to financially benefit their own Euribor-based derivatives positions.  For example, Barclays, per a Senior Euro Swaps Trader, and Deutsche Bank, per a person who made Deutsche Bank's Euribor submissions to Reuters and the EBF, celebrated what they called an "excellent concerted action" on March 19, 2007:

>  **Barclays Trader 5:** [after] "2months of preparation"  [he had made money on his Euribor-based derivatives position][3]

>  **Deutsche Bank Submitter 4**: HAVE U SEEN THE 3MK FIXING TODAY? THAT WAS AN EXCELLENT CONCERTED ACTION FFT/LDN. CHEERS.[4]

7.   Similarly, on March 19, 2007, an unknown person from one conspirator Defendant and a Euribor trader from Defendant Deutsche Bank congratulated one another as follows:

>  **March 19, 2007**:

>  Trader K-1: nice fixing!!!

>  Deutsche Bank Trader-3: indeed

>  Trader K-1: why so low?

>  Trader-3: why not ![5]

>  Trader K-1: who gets f*cked on that?
>  　　　　　I assume its all you short end guys ripping off an end user.

---

[3] Ex. E-1 at 13.

[4] Ex. F-1 at 42.

[5] *Id.* at 42-43.

8.      Plaintiffs and Class members were the "end users" of Euribor-based derivatives who transacted in an artificial market and were otherwise disadvantaged by Defendants' concerted conduct and manipulation.  *See infra* Part IV.

9.      **Euribor and Euribor-Based Derivatives.**  The European Banking Federation ("EBF"), a trade association made up of Defendants and other banks, created Euribor to provide a daily proxy for the average competitive interest rate at which leading banks could borrow Euros from other leading banks.  The Euro is the official currency of most of the Eurozone.

10.      Under the EBF Code of Conduct, each bank in the so-called Euribor panel was required to make an **independent submission** on a daily basis to Reuters.  This independent submission was supposed to reflect the true competitive interest rate at which it was believed that a prime bank could borrow Euros from other banks for various durations: 1 month, 3 months, 6 months and longer durations.

11.      These daily Euribor rates were transmitted by U.S. wires throughout the United States where Defendants, operating from their offices in the United States and otherwise, were selling and transacting in Euribor-based derivatives.

12.      A derivative is simply a contract among two or more parties in which the price or payment term is derived from another source.  For Euribor-based derivatives, the prices and/or payments were derived from and determined or directly affected by Euribor.

13.      For example, Euribor was used as the express benchmark interest rate, price, or payment term, and directly affected the price or payment term in contracts for the following derivatives: Euribor interest rate swaps, Euribor forward rate agreements, Euro foreign exchange forwards, Euro currency futures traded on the Chicago Mercantile Exchange ("CME"), NYSE LIFFE Euribor futures contract, and multiple other types of contracts and over-the-counter

transactions.   In Part I.B. below, Plaintiffs allege descriptions of each type of Euribor-based derivative sold and transacted in the United States by Defendants and Class members.

14.     The EFB's arrangement among horizontal competitors to have daily pricing information sent to Reuters for calculation and publication of an average rate was fraught with potential antitrust concerns.  But these concerns were somewhat alleviated because, under the EBF's own rules, Defendants were required to make independent submissions of the competitive rates **without** coordination or discussion among the banks.  Because Euribor was intended to be a competitive rate published daily, it could save parties in the United States and elsewhere the time to negotiate a competitive daily rate. It could do so by supplying the competitive average rate for use in what became Euribor-based swaps, forward rate agreements and other types of Euribor-based derivatives.

15.     Accordingly, using Euribor to set the prices and payments for the Euribor-based derivatives sold in the United States would have provided the benefits of competition—that is, competitive prices—to Plaintiffs, Class members, and the economy IF each Defendant had submitted the true competitive and non-manipulated borrowing rates in line with EBF guidelines. However, instead of acting independently as horizontal competitors, Defendants systematically manipulated the prices of Euribor-based derivatives.  Thus, Joaquín Almunia, the European Commission Vice President in charge of competition policy remarked: "What is shocking about the LIBOR and Euribor scandals is not only the manipulation of benchmarks, which is being tackled by financial regulators worldwide, but also the collusion between banks who are supposed to be competing with each other."[6]

---

[6] "Antitrust: Commission fines banks €1.71 billion for participating in cartels in the interest rate derivatives industry," European Commission Press Release, http://europa.eu/rapid/press-release_IP-13-1208_en.htm, Dec. 4, 2013

16.     Another strong indication of the price artificially that certain Defendants caused in their portion of the unlawful conduct is the large amounts of fines that have been assessed against the Defendants who have actually settled the government charges against them.  More than €1.7 billion have been assessed against Defendants Barclays, Deutsche Bank, Société Générale, and RBS solely for their manipulations of Euribor[7] while an additional $5.3 billion in fines also have been assessed against various Defendants for their manipulations of Euribor and indices of other interbank offer rates.  Because some of these Defendants cooperated with the prosecuting authority,  payment of some of these fines was excused or reduced.

17.     Despite the substantial harm caused to Plaintiffs and the Class by these artificial prices, none of the billions of dollars of fines and penalties that have so far been assessed against Defendants, will be paid to the victims of Defendants' systematic unlawful conduct.  Rather, Plaintiffs and Class Members must obtain any recompense and relief for their injuries from this action.

18.     **Multiple Means of Collusion and Manipulation.**  In order to effectuate their hundreds of manipulations of Euribor and the prices of Euribor-based derivatives during the Class Period, Defendants employed multiple different means, including:

- **Coordinating false Euribor submissions**: Defendants organized and influenced brokers and banks to cause Euribor panel members and affiliates to submit interest rate quotes to Thomson Reuters that did not reflect the cost of borrowing Euros in the inter-bank money market.  *See infra* Part II.A;

- "**Pushing Cash**": Defendants intentionally borrowed or loaned Euros at above or below prevailing market rates to manipulate the cost of borrowing funds in the inter-bank money market, above or below competitive levels in order to manipulate the Euribor submissions.  *See infra* Part II.B;

- "**Spoofing**": Defendants transmitted false bids and offers for money market instruments through, *e.g.*, inter-dealer brokers, in order to change the perception

---

[7] Ex. D-1 (EC Euro Interest Rate Derivatives Cartel).

of the cost of borrowing Euros in the inter-bank money, and directly manipulate Euribor. *See infra* Part II.C;

- **Using Derivatives Traders As Submitters**: Contrary to government directions, certain Defendants caused their derivative traders, who had a profit interest in obtaining lower or higher Euribor submissions, to act as the bank's Euribor submitter and thereby, to maximize the correspondence between the actual Euribor submission and the financial profit interest of the bank. *See infra* Part II.A.2-3, Part E.

- **Agreeing on Where to Price Euribor-based Derivatives**: Defendants consulted with one another to determine a mutually beneficial price level before issuing quotes to other market participants and directly manipulate Euribor-based derivatives prices. *See infra* Part III.A;

- **Rigging Bids for Euribor-based Derivatives**: Defendants intentionally submitted price quotes worse than their supposed competitors to guarantee a trade with another Defendant at a higher price and cause non-competitive prices of Euribor-based derivatives. *See infra* Part III.B;

- **Coordinating Pricing "Runs" Sent to Clients**: Defendants made sure to match prices for multiple Euribor-based derivatives with those other Defendants sent and thereby cause non-competitive prices for Euribor based derivatives. *See infra* Part III.C;

- **Refusing to Deal with Certain Market Participants**: Various Defendants agreed to show "no interest" or not issue price quotes below a certain level and thereby manipulate the price of Euribor-based derivatives. *See infra* Part III.D;

- **Sharing Non-Public, Proprietary Information**: Various Defendants included the names of their clients, the pricing curves used by their bank to value their Euribor-based derivatives, their trading positions, and overall contents of their portfolio. *See infra* Part III.E; and

- **Trading with Co-Conspirators at Below Market Rates**: Defendants reserved special "members only" pricing for the other Defendants and their affiliates that was unavailable to other market participants. *See infra* Part III.F.

19. Plaintiffs have only begun to learn the extensive means of communications between and among Defendants. For example, the DOJ, CFTC, and FSA settled charges with UBS for its participation in, among others, the Euribor-based collusion and manipulation for aggregate fines of $903,000,000 (the DOJ and CFTC) and £160,000,000 (the FSA). The FSA

found that UBS' "misconduct gave rise to a risk that the published LIBOR and Euribor rates would be manipulated and undermined the integrity of those rates. In addition to its routine internal manipulation of its own LIBOR and Euribor submissions, UBS' collusion with Panel Banks and Brokers significantly increased the risk if manipulation...."[8] Plaintiffs have not yet learned virtually any of the levels of communication involved in this "collusion."

      20.    But Plaintiffs have learned that the agreements to manipulate Euribor and prices of Euribor-based derivatives were carried out at multiple levels and by multiple employees from the respective Defendants. One frequent means of implementing and coordinating the agreement and conspiracy to rig Euribor and fix the prices of Euribor-based derivatives involved communications among three interest rate derivatives traders:



      21.    These traders were a close-knit group who connected early in their professional careers and organized in person and online through instant messages and emails sent over the Bloomberg network.[9] They worked with and involved other persons within their respective banks and at other Defendants who joined in their agreement to manipulate Euribor and fix the prices of Euribor-based derivatives. This included, but is not limited to, the following Defendants and individuals, who are identified in news articles, settlement documents, and the limited number of inter-Defendant communications available to date:



- **UBS**

---

[8] Ex. A-3 at 5.

[9] Upon information and belief, these communications were transmitted using U.S. wires, through servers located within the United States. *See infra* ¶ 51.

███████████████████████      • **Rabobank**

• ████████████████████        • **ICAP**
      ██████████

• **BNP Paribas**

22.    The foregoing derivatives traders were paid based on the profits their Bank received from their portfolio.  These individuals repeatedly carried out the Defendants' conspiracy and maximized the returns of the respective Defendants for whom they worked. This generated increased profits for their respective Defendants and also increased performance bonuses for the individuals.

23.    For another example of the substantial extent to which Defendants manipulated Euribor and Euribor-based derivatives prices, the conspiracy's manipulations were so successful for Deutsche Bank that its employee, Christian Bittar ("Bittar") received a £90 million individual performance bonus (roughly $136 million) in 2008. Due to the conspiracy, Deutsche Bank's money market derivatives desk ("MMD") quadrupled its revenue from €399 million in 2007 to €1.92 billion in 2008.[10]

24.    Deutsche Bank has been found to have destroyed documents, lied to regulators, and otherwise taken unlawful action to further the Euribor conspiracy.[11]  Consistent with what has been found to be a culture of manipulation and conspiracy at Deutsche Bank, that bank actually promoted conspirator Bittar to the Head of the London MMD in 2009.[12]

25.    **Fraudulent Concealment and Equitable Tolling.** Deutsche Bank and the other Defendants knew that what they were doing was unlawful and took steps to actively conceal

_____

[10] Ex. F-1 at 67.

[11] *Id.* at 11.

[12] *Id.* at 22.

their wrongdoing from the public, evading detection. They communicated in secret electronic chat rooms. They used unrecorded mobile phones. They met in person. And they took other steps to avoid detection and conspire secretly, including instructing each other to "keep quiet" and to not make "noise" about their plans to avoid being found out. At one point, having disclosed the details of one of the conspiracies' most important schemes, ████████████

████████████████████████████████████████████

26.     Again, Deutsche Bank repeatedly lied to the FCA. Deutsche Bank misrepresented the extent of its compliance measures and refused to turn over documents demonstrating its misconduct. It falsely stated to the FCA that BaFin, the German financial regulator, prohibited it from providing that data.[13] These statements were knowingly false. They were made by Deutsche's senior managers and compliance officers to mislead government regulators and hide the extent of their wrongdoing. Deutsche Bank also recently announced (conveniently *after* settling with global regulators) that a "software glitch" in its internal messaging system "DB Chat" resulted in the loss of additional potentially incriminating communications from as far back as 2005.[14]

27.     Defendants' many hundreds of manipulations of Euribor are part of a broader pattern of collusion and manipulation in similar products to Euribor, including US Dollar LIBOR, Japanese Yen LIBOR, Swiss Franc LIBOR, and British Pound Sterling LIBOR. Just the snippets negotiated to be revealed in the government orders and the limited allegations herein demonstrate the persistent, pervasive, and secret nature of the Defendants' manipulations. The government orders have also revealed Defendants' success in covering up such manipulations.

---

[13] Ex. F-3 at 12.

[14] *See* Michael J. Moore and Greg Farrell, *Deutsche Bank Error Loses Chat Logs Sought in Libor Probe*, BLOOMBERG BUSINESS (July 30, 2015), available at http://www.bloomberg.com/news/articles/2015-07-30/deutsche-bank-error-said-to-lose-chat-logs-sought-in-libor-probe.

28. **Injury To Plaintiffs And The Hundreds Of Additional Acts To Continue The Manipulation That Are Likely To Be Revealed In Discovery**. Again, Plaintiffs have good grounds to believe and do allege that discovery will uncover hundreds of manipulations additional to those alleged herein and summarized in Appendix A and B to this Complaint. Defendants' extensive manipulation caused continuous or extremely frequent artificiality in Euribor and the prices of Euribor-based derivatives. This directly injured Plaintiffs and Class members by causing them to transact in an artificial market and suffer the other injuries alleged herein.

29. **Personal Jurisdiction.** Defendants are subject to the jurisdiction of this Court because Defendants, *inter alia*: (i) purposefully availed themselves to the privilege of trading Euribor-based derivatives within the United States; (ii) employed Euribor-based derivatives traders within this District; (iii) purposefully directed their unlawful activity at U.S. counterparties; (iv) conspired with U.S.-based persons and entities, including Citibank and JPMorgan; (v) consented to jurisdiction by registering to do business in New York and Connecticut; (vi) consented to jurisdiction by negotiating ISDA Master Agreements agreeing to jurisdiction in this Court; (vii) consented to jurisdiction by declaring New York and other states as their "home state" to the Board of Governors of the Federal Reserve System; (viii) used U.S. wires to manipulate Euribor and Euribor-based derivatives; and (ix) used U.S.-based LIFFE to trade three-month Euribor futures contracts. *See infra* ¶¶ 36-56.

11

## JURISDICTION AND VENUE

30.    This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Section 1964 of RICO, 18 U.S.C. § 1964 and common law, respectively.

31.    This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), Section 1964 of RICO, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337, respectively.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

32.    Venue is proper in the Southern District of New York, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. § 25(c), Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, Section 1965 of RICO (18 U.S.C. § 1965), and 28 U.S.C. §1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

33.    Defendants, directly and indirectly, unilaterally and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, specifically through use of electronic messaging and other electronic means of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint.

34.     The United States courts have jurisdiction over the claims asserted in this Complaint.  Euribor and Euribor-based derivatives contracts are each a commodity that trades in U.S. interstate commerce.  Euribor is a "commodity" and is the "commodity underlying" Euribor-based derivatives contracts, including NYSE LIFFE three-month Euribor futures contracts, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.  More specifically, Euribor is an "excluded commodity" as that term is defined in Section 1a(19), 7 U.S.C. §§ 1a(19) (formerly 7 U.S.C. §1a(13)).  In the CEA, the term "'excluded commodity' means (i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure . . . ."  Excluded commodities are subject to all CFTC anti-manipulation rules, including Section 9(a)(2), which criminalizes the dissemination of false market information.

35.     Defendants' restraints of trade, intentional misreporting, manipulation and agreements to fix the price of Euribor and manipulation of the price of Euribor-based derivatives had direct, substantial and foreseeable effects in the U.S., and on the Euribor-based derivatives Plaintiffs and members of the Class transacted in during the Class Period.  Hundreds of millions of Euribor-based derivatives were traded in the U.S. and by U.S. investors during the Class Period. Defendants, as Euribor contributor banks and sophisticated market participants, knew that Euribor rates published and compiled by and on behalf of the EBF are disseminated in the U.S., and are used to price, benchmark, and/or settle Euribor-based derivatives contracts traded in the U.S. and by U.S. investors.  For these reasons, Defendants knew that misreporting Euribor to the EBF as well as other manipulative and collusive conduct in the market for Euro-denominated deposits and Euribor-based derivatives, would, and did, have direct, substantial and

reasonably foreseeable effects in the United States, including on the prices of Euribor-based derivatives transacted in the U.S. and by U.S. investors.

## PERSONAL JURISDICTION

36.     Each Defendant is subject to personal jurisdiction because it purposefully availed itself of the privilege of trading Euribor-based derivatives in the United States and could foresee being haled into Court in this District.

37.     Barclays admitted as true in its DOJ settlement that "Barclays employs derivatives traders in New York, New York and in London, England who trade financial instruments tied to LIBOR and EURIBOR, including interest rate swaps . . . ."[15]  UBS admitted that it "employs derivatives traders throughout the world – including in Stamford, Connecticut . . . who trade financial instruments tied to LIBOR, [and] Euribor . . . including interest rate swaps . . . ."[16]  Rabobank admitted as true that "Rabobank employs derivatives traders throughout the world – including in New York . . . who trade financial instruments tied to LIBOR and Euribor, including interest rate swaps . . . ."[17]  Deutsche Bank admitted in its NYSDFS Consent Order that "Deutsche Bank AG and the New York Branch manipulated or attempted to manipulate submissions for . . . the Euro Interbank Offered Rate ("EURIBOR") . . . which are benchmark interest rates used in financial markets around the world, by, at times, submitting rates that would benefit Deutsche Bank's trading positions, rather than rates that complied with the definitions of the rates[.]"[18]

---

[15] Ex. E-1 at 5.

[16] Ex. A-1 at 6.

[17] Ex. C-1 at 5.

[18] Ex. F-5 at 1.

38.     Defendants  Barclays,  BNP Paribas,  Citibank,  Deutsche  Bank,  HSBC, JPMorgan,

RBS, Société Générale,  and UBS  purposefully  availed  themselves  of  the  privilege  of  trading

foreign  exchange  and  interest  rate  derivatives,  including  Euribor-based  derivatives,  from within

the United States  throughout  the Class Period.[19]  Every  three years,  the  Federal  Reserve  Bank of

New York conducts  a survey  of the over-the-counter  interest  rate derivatives  and foreign

exchange market.  This survey  measures  the "turnover,"  or volume  of transactions,  in foreign

exchange  and  interest  rate  derivatives  within  the  United  States.  The  Federal  Reserve  Bank  of

New York survey  only includes  data from dealers  located  within  the United  States and

transactions  that are located  within  the United  States.  Dealers  located  outside  of the United

States report their figures  to the central  bank where  they are located.  Defendants  Barclays,  BNP

Paribas,  Citibank,  Deutsche  Bank,  HSBC, JPMorgan,  RBS, Société  Générale,  and UBS  each

participated  in the  Federal  Reserve  Bank  of New York's survey  of foreign  exchange  and interest

rate derivatives  dealers  throughout  the Class Period,  indicating  that they entered  into foreign

exchange  and interest  rate  derivatives  transactions,  including  transactions  priced,  benchmarked,

and/or settled  to Euribor,  from within  the United  States.

39.     By employing  derivatives  traders  in their  New York and Connecticut  branches

that traded  Euribor-based  derivatives  from within  the United  States,  manipulating  and fixing

their Euribor  submissions  to increase  the value  of these  Euribor-based  derivatives,  and earning

profits  from these  instruments  from within  the United  States at Plaintiffs'  and the Class'  expense,

Defendants  purposefully  availed  themselves  of this District  and could  foresee  being  haled  into

Court here.

---

[19] See The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, THE FEDERAL
RESERVE BANK OF NEW YORK (Apr. 2007);  The Foreign Exchange and Interest Rate Derivatives Markets: Turnover
in the United States, THE FEDERAL RESERVE BANK OF NEW YORK (Apr. 2010).

40.     Defendants purposefully directed their activity at the United States, taking intentional and tortious actions expressly aimed at the forum, transacting business throughout the United States, including in this District, including trading Euribor-based derivatives, priced, benchmarked and/or settled based on Euribor with U.S. counterparties.  Defendants Barclays, Rabobank, Deutsche, and UBS admitted the following as "true and accurate" in their Statement of Facts incorporated into their various agreements with the DOJ:

> Barclays [Rabobank, Deutsche, and UBS] entered into interest rate derivatives transactions tied to LIBOR and EURIBOR – such as swaps, forward rate agreements, and futures – with counterparties to those transactions.   Many of those counterparties were located in the United States.   Those United States counterparties included, among others, asset management corporations, retirement funds, mortgage and loan corporations, and insurance companies.   Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States.[20]

41.     Defendants knowingly and purposefully directed their price fixing and other manipulative acts at U.S. counterparties to generate illicit profits to the detriment of U.S. market participants.  Defendants Barclays, UBS, Citibank, HSBC, RBS, and Société Générale traded Euribor-based derivatives products with U.S. counterparties, including Plaintiff CalSTRS.  Defendant UBS traded Euribor-based derivatives products with Plaintiff FrontPoint Australian.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████  Defendants expressly aimed their unlawful fixing and manipulation at increasing the value of their Euribor-based derivatives in order to gain an anticompetitive financial advantage over U.S. counterparties, including Plaintiffs and the Class, and have therefore subjected themselves to jurisdiction in this District.

---

[20] Ex. E-1 at 13-14;  Ex. C-1 at 40;  Ex. F-1 at 70;  Ex. A-1 at 36.

[21] ██████████  "EONIA" is the Euro OverNight Index Average, an interest rate used to price overnight Euro-denominated deposits.

42.    Defendants are subject to personal jurisdiction by virtue of participating in a conspiracy with U.S.-based persons and entities to manipulate Euribor and the prices of Euribor-based derivatives from within the United States. For example, Eric Bommensath, the Global Head of Fixed Income, Currencies, and Commodities at Defendant Barclays Capital, was based in Barclays Capital's New York office from 2006 through September 2010.[22] From this New York office, Bommensath was one of twenty-four individuals at Barclays that were implicated in the global government regulators' investigation into the interest rate fixing scandal.[23]



---

[22] Ahuja, Vivek, *Meet The Men Everybody's Talking About at Barclays*, THE WALL STREET JOURNAL (Apr. 18, 2013), available at http://blogs.wsj.com/moneybeat/2013/04/18/meet-the-new-guard-at-barclays/.

[23] *UK Court Forces Barclays to Reveal Staff on Libor List*, HITC BUSINESS, available at http://www.hitc.com/en-gb/2013/01/24/update-1-uk-court-forces-barclays-to-reveal-staff-on-libor-list/page/1/.

[24] ███████████ (emphasis added).

43.



Because of their agreement to fix and manipulate Euribor and the prices of Euribor-based derivatives products, Defendants are deemed to be each other's agents. Barclays Capital's contacts with the forum while acting in furtherance of the conspiracy may therefore be attributed to the other co-conspirators.

45.    Defendants Deutsche Bank AG, Société Générale SA, Barclays Bank plc, BNP Paribas, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., Crédit Agricole S.A., and The Royal Bank of Scotland plc consented to the personal jurisdiction of the United States Courts by registering their New York City branch or representative offices with the NYSDFS under New York Banking Law §§ 200 and 200-b.[26] Defendants RBS and UBS consented to personal jurisdiction in the United States by registering with the Connecticut Department of Banking

---

[2] ▮▮▮▮▮▮▮▮▮▮▮

[26] See *Aldo Vera v. Republic of Cuba*, No. 12 Civ. 1596, 2015 U.S. Dist. LEXIS 32846 (S.D.N.Y. Mar. 17, 2015).

("DOB") under Section 36a-428g of the Connecticut General Statutes.  In order to benefit from the advantages of transacting business in this forum, these Defendants registered as foreign branches with the NYSDFS and DOB, which confers privileges and benefits and binds these entities to the same judicial constraints as domestic corporations.[27]  These Defendants promoted the legitimacy of their businesses by registering to do business in New York and Connecticut, and have therefore consented to jurisdiction within this District.

46.     Defendants RBS and Barclays further consented to the jurisdiction of this Court by individually negotiating ISDA Master Agreements with Plaintiff CalSTRS, whereby RBS and Barclays each agreed to the jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City.  RBS and Barclays signed their respective ISDA Master Agreements, irrevocably submitting that jurisdiction in New York is proper with respect to any suit, action, or proceedings relating to those ISDA Master Agreements.  In RBS' ISDA Master Agreement with CalSTRS, executed on December 6, 2004, it appointed its New York office, at 101 Park Avenue, New York, NY 10178-1199, as its process agent.  In Barclays' ISDA Master Agreement with CalSTRS, executed on November 3, 2005, it designated its New York office, at 200 Park Avenue, New York, NY 10166, as the party to receive all notice pertaining to the agreement.  Because this action is a proceeding that arises under these agreements, RBS and Barclays have consented to the jurisdiction of this Court.

47.     Defendants Deutsche Bank AG, Société Générale SA, Barclays Bank plc, BNP Paribas, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., Crédit Agricole CIB, The Royal Bank of Scotland plc, and UBS are further subject to personal jurisdiction in the United States' courts by virtue of their establishment of foreign bank offices in the United States

---

[27] *Id.* at *24-5.

pursuant to the authority vested in the Board of Governors of the Federal Reserve System ("FRB") under 12 U.S.C. § 3105(d) and 12 C.F.R. § 211.24.

48. To operate as a foreign bank branch, agency or representative office in the United States, a foreign bank must declare a "home state" or are assigned one by the FRB pursuant to 12 U.S.C. § 3103(c), and 12 C.F.R. §§ 28.11(n), 211.22. The home state is the main office, or principal place of business for the foreign bank in the United States. Information provided by the FRB indicates that New York is the home state for Deutsche Bank AG, Société Générale SA, Barclays Bank plc, BNP Paribas, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., and Crédit Agricole CIB, California is the home state for BNP Paribas, and Connecticut is the home state for UBS. Upon information and belief, The Royal Bank of Scotland plc's home state is New York or Connecticut.

49. By virtue of its registration with the FRB and designation of a home state, the foreign bank may conduct its operations with the same rights and privileges and subject to the same duties, restrictions, penalties, liabilities, conditions and limitations that would apply to a national bank operating at the same location.[28] As a national bank would be subject to general personal jurisdiction in its principal place of business, similarly Deutsche Bank AG, Société Générale SA, Barclays Bank plc, BNP Paribas, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., Crédit Agricole CIB, The Royal Bank of Scotland plc, and UBS are subject to general personal jurisdiction in their home state.

50. Defendants are subject to the jurisdiction of this Court because they used U.S. domestic and interstate wires to accomplish their fixing and manipulation of Euribor and the prices of Euribor-based derivatives. Defendants admitted that "[o]n a daily basis, [Defendants],

---

[28] 12 C.F.R. § 28.13(a)

through the transmission of an electronic spreadsheet to Thomson Reuters, knowingly delivered or caused to be delivered its . . . Euribor submissions through the mails or interstate commerce. [Defendants'] submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally."[29]   Defendants knowingly aimed their false Euribor submissions to Thomson Reuters, which is located in the United States, and published the Euribor fixing along with these false submissions to investors in the United States, using U.S. wires, through Bloomberg and other financial services platforms.

51.    Defendants are further subject to the jurisdiction of this Court for sending electronic chats across U.S. domestic wires in furtherance of their conspiracy to manipulate Euribor and fix the prices of Euribor-based derivatives.  Given the structure of Bloomberg's network, upon information and belief, these electronic communications are located within the United States and were transmitted into the United States, crossing U.S. wires, through servers located in the United States.  Bloomberg transport specifications require that all users connect to internet protocol ("IP") addresses located within the United States in order to access Bloomberg's U.S.-based servers, which are used to send messages in addition to accessing financial information.  These servers also host the Instant Bloomberg chat rooms Defendants' utilized in their scheme.[30]

52.    A Deutsche Bank AG manager, David Nicolls, held telephone calls each week, where Deutsche Bank's traders, including those located on its New York-based derivatives trading desk, discussed their trading strategy and trading positions, including its Euribor

---

[29] Ex. E-2 at 26; Ex. C-2 at 45; A-2 at 52-3; Ex. F-2 at 36.

[30] *See Transport and Security Specifications*, BLOOMBERG L.P. (Nov. 13, 2014) at 7, 12 (listing Bloomberg IP addresses and diagraming network structure with endpoints in New York and New Jersey).

submissions and Euribor-based derivatives positions.[31]  These "Monday Risk Calls," which continued throughout the Class Period, used interstate wires to communicate the means by which Deutsche would fix and manipulate Euribor.  Therefore, by using U.S. wires to communicate its unlawful strategies to fix and manipulate Euribor and the prices of Euribor-based derivatives, Deutsche Bank is subjected to the jurisdiction of this Court.

53.     Defendants are subject to the jurisdiction of this Court by virtue of their use of U.S. wires as members of the London International Financial Futures and Options Exchange ("LIFFE"), the platform upon which three-month Euribor futures contracts trade.  The following Defendants, their affiliates and/or subsidiaries are members of the LIFFE: (i) Barclays Bank PLC; (ii) Barclays Capital Securities Limited; (iii) Deutsche Bank AG; (iv) HSBC Bank Plc; (v) Rabobank International; (vi) Société Générale; (vii) The Royal Bank of Scotland Plc; (viii) UBS Limited; (ix) Crédit Agricole CIB; (x) JP Morgan Securities plc; and (xi) Citigroup Global Markets Limited.

54.     The CFTC granted LIFFE, and its electronic trading and order matching system, LIFFE CONNECT®, no-action relief from registering for a designation as a contract market because LIFFE certified that "(i) LIFFE members trade for their proprietary accounts through LIFFE CONNECT™, in the U.S.; (ii) LIFFE members who are registered with the Commission as futures commission merchants (FCMs)[32] or who are Rule 30.10 Firms submit orders from United States customers for transmission to LIFFE CONNECT™; and/or (iii) LIFFE members

---

[31] Ex. F-6 at 9.

[32] The CFTC defines Future Commission Merchants ("FCMs") as "individuals, associations, partnerships, corporations, and trusts that solicit or accept orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any exchange and that accept payment from or extend credit to those whose orders are accepted."  *See* http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossary_f.  The following Defendants, their affiliates and/or subsidiaries are registered with CFTC as FCMs: (i) Barclays Capital Inc.; (ii) UBS Financial Services Inc.; (iii) UBS Securities LLC; (iv) Deutsche Bank Securities Inc.; (v) HSBC Securities USA Inc.; and (vi) RBS Securities Inc.

who are registered with the Commission as FCMs or who are Rule 30.10 Firms accept orders through automated order routing systems (AORS) from United States customers for submission to LIFFE CONNECT™." LIFFE further amended its CFTC no-action relief, stating that its members may enter orders directly into LIFFE CONNECT® through terminals "located in the U.S." on behalf of the pools which they operate or the customer accounts over which they exercise trading discretion, respectively.[33]

55.     Defendants, in their roles as members of LIFFE, used interstate wires on LIFFE CONNECT® terminals located in the United States to trade NYSE LIFFE Euribor futures contracts with, among others, U.S. counterparties, subjecting them to the jurisdiction of the U.S. Courts.

56.     Defendants additionally are subject to the jurisdiction of this Court because the aim of their conduct was intended to affect the prices of commodities listed in New York and Chicago, such as the NYSE LIFFE Euribor futures contract and the CME Euro currency futures contract.

## PARTIES

57.     Plaintiff Stephen Sullivan ("Sullivan"), a natural person residing in Chicago, Illinois engaged in U.S.-based transactions of Euribor-based derivatives, including NYSE LIFFE three-month Euribor futures contracts and CME Euro currency futures, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was damaged and suffered legal injury. *See infra* Part IV.A

---

[33] CFTC Staff Letter No. 06-25 (September 29, 2006), at p. 1.

58.     Plaintiff White Oak Fund LP ("White Oak") is an investment fund headquartered in Burr Ridge, Illinois. White Oak engaged in U.S.-based transactions of Euribor-based derivatives, including NYSE LIFFE three-month Euribor futures contracts and CME Euro currency futures, during the class period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was damaged and suffered legal injury. *See infra* Part IV.B.

59.     Plaintiff California State Teachers' Retirement System ("CalSTRS"), established in 1913, provides pension benefits for its members and/or their beneficiaries. CalSTRS is the largest U.S. teachers' retirement fund, with approximately $188.3 billion in assets and close to one million members. CalSTRS engaged in U.S.-based transactions of Euribor-based derivatives, including Euribor-based interest rate swaps with Barclays and RBS, and Euro foreign exchange forwards with Barclays, UBS, Citibank, Deutsche Bank, HSBC, JPMorgan, RBS, and Société Générale, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was damaged and suffered injury. *See infra* Part IV.C.

60.     Plaintiff Sonterra Capital Master Fund, LTD., ("Sonterra") is an investment fund headquartered in New York, New York. Sonterra engaged in U.S.-based transactions of Euribor-based derivatives, including Euro foreign exchange forwards, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a consequence of Defendants' manipulative conduct, Sonterra was damaged and suffered legal injury. *See infra* Part IV.D.

61.     Plaintiff FrontPoint Australian Opportunities Trust ("FrontPoint Australian"), is an investment fund headquartered Greenwich, Connecticut. FrontPoint Australian engaged in

24

U.S. based-transactions of Euribor-based derivatives, including foreign exchange forwards with UBS, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a consequence of Defendants' manipulative conduct, FrontPoint Australian was damaged and suffered legal injury. *See infra* Part IV.E

62. Plaintiff FrontPoint Partners Trading Fund, L.P., ("FrontPoint Trading"), is an investment fund headquartered Greenwich, Connecticut. FrontPoint Trading engaged in U.S. based-transactions of Euribor-based derivatives, including CME Euro currency futures contracts, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a consequence of Defendants' manipulative conduct, FrontPoint Trading was damaged and suffered legal injury. *See infra* Part IV.F.

### A. The Barclays Defendants.

63. Defendant Barclays PLC is a global financial services provider headquartered and incorporated in England. Two of Barclays PLC U.S. "material entities" include Barclays Bank PLC New York Branch and Barclays Capital, Inc.[34] Barclays PLC owns all of the issued ordinary share capital of Defendant Barclays Bank PLC.[35]

64. Defendant Barclays Bank PLC, a wholly-owned subsidiary of Defendant Barclays PLC, is headquartered and incorporated in England. Barclays Bank PLC maintains an office in this District at 745 Seventh Avenue New York, NY 10019 ("Barclays Bank PLC, New York Branch"). Since 1963, Barclays Bank PLC, New York Branch has been licensed, supervised, and regulated by the NYSDFS. Barclays Bank PLC, New York Branch employs over 500

---

[34] Resolution Plan, Section 1: US Public Section, BARCLAYS, at 2 (July 2012).

[35] Form 20-F, Barclays PLC, Barclays Bank PLC (2005).

employees and has over $36 billion in total assets. Barclays Bank PLC is also regulated by the Board of Governors of the Federal Reserve System and the Florida Office of Financial Regulation. Barclays Bank PLC is a provisionally registered swap dealer with the CFTC. Pursuant to FRB regulations, New York is Barclays Bank PLC's designated home state. Barclays Bank PLC's shares are listed on the New York Stock Exchange ("NYSE").

65.     Defendant Barclays Capital Inc. ("BCI"), a wholly-owned indirect subsidiary of Barclays PLC, is a financial services firm incorporated in Connecticut that offers advisory, brokerage, and banking services. BCI maintains its headquarters in this District at 745 Seventh Avenue New York, NY 10019. BCI is a clearing firm on the Chicago Mercantile Exchange ("CME"), the Chicago Board of Trade ("CBOT"), the New York Mercantile Exchange ("NYMEX"), and the Commodity Exchange, Inc. ("COMEX").

66.     Collectively, Barclays PLC, Barclays Bank, and BCI are referred to as "Barclays." Barclays employs derivatives traders in New York who trade Euribor-based derivatives.[36] During the Class Period, Barclays was a member of the EBF Euribor panel.

67.     Barclays joined Defendants' agreement to rig Euribor and fix the prices of Euribor-based derivatives through Philippe Joseph Moryoussef ("Moryoussef"), a Euribor-based derivatives trader employed by the bank from May 2005 through August 2007.  Starting in August 2007, Moryoussef traded Euribor-based derivatives at Defendant RBS where he

---

[36] Ex. E-1 at 4.

continued to participate in the agreement to rig Euribor and fix the prices of Euribor-based derivatives by conspiring with his former junior traders who were still at Barclays.

**B. The BNP Paribas Defendant.**

68.     Defendant BNP Paribas, S.A. ("BNP Paribas") is a commercial, investment, and corporate banking company incorporated in France with its headquarters in Paris. BNP Paribas, S.A. "directly engages in US banking activities through its US branches, agencies, and representative offices."[37]   BNP Paribas, S.A.'s main U.S. operations are headquartered in New York, at BNP Paribas New York Branch, which is a legal and operational extension of BNP Paribas, S.A, and not a separate legal entity.[38]   BNP Paribas, S.A. New York Branch is located in this District at 787 Seventh Avenue, New York, NY 10019. BNP Paribas is licensed, supervised, and regulated by the NYSDFS. BNP Paribas, S.A. is a provisionally registered swap dealer with the CFTC, a Depository Trust and Clearing Corporation, and is regulated by the Board of Governors of the Federal Reserve System. Pursuant to FRB regulations, California is BNP Paribas' designated home state.

69.



[37] BNP Paribas 165(d) Resolution Plan Public Section, at 3, 8 (July 1, 2013).

[38] *Id.* at 3.

[39] Ex. F-5 at 8 ¶ 31.

### C. The Citi Defendants.

70.     Defendant Citigroup, Inc. is a Delaware financial services company with its principle place of business in this District at 399 Park Avenue New York, NY 10022.

71.     Defendant Citibank, N.A., a wholly-owned subsidiary of Defendant Citigroup, Inc. is a commercial and consumer banking company. Citibank, N.A. is regulated by the Office of the Comptroller of the Currency, the Federal Reserve Bank of New York, and the Federal Deposit Insurance Corporation ("FDIC"). Collectively, Defendants Citigroup Inc. and Citibank, N.A. are referred to herein as "Citi." During the Class Period, Citi was a member of the EBF Euribor panel.

72.     Citi joined and participated in Defendants' agreement to rig Euribor and fix the prices of Euribor-based derivatives through, *inter alia*, ███████████████

████████████████████████████████████████

████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

████████████████████

### D. The Rabobank Defendant.

73.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a banking and asset management company headquartered and incorporated in the Netherlands. During the Class Period, Rabobank was a member of the EBF Euribor panel.

74. Rabobank identifies its New York Branch, located in this District at 245 Park Avenue New York, NY 10167, as its sole "material entity" within the United States.[40] Rabobank's New York Branch is licensed, supervised, and regulated by the NYSDFS. The New York Branch "operates in the United States as a legal extension" of Rabobank and is regulated by the Federal Reserve Bank of New York.[41] Pursuant to FRB regulations, New York is Rabobank's designated home state. Rabobank employs derivatives traders throughout the world, including in New York, who trade financial instruments tied to Euribor.[42]

75. Rabobank joined Defendants' agreement to rig Euribor and fix the prices of Euribor-based derivatives by, among other things, conspiring with Barclays' senior trader Philippe Moryoussef.[43] Rabobank also accommodated requests for false submissions from at least two former traders who left to trade Euribor-based derivatives at an unidentified bank,[44] and received requests for false submissions from Broker Defendant ICAP during the Class Period.

**E. The Crédit Agricole Defendants.**

76. Defendant Crédit Agricole S.A. is a financial services company headquartered and incorporated in France. Crédit Agricole S.A. owns a 97.8% interest in Defendant Crédit Agricole CIB, which Crédit Agricole S.A. considers its only business line that has a significant presence in the United States.[45] Crédit Agricole S.A. lists Crédit Agricole CIB New York

---

[40] U.S. Resolution Plan Public Section, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., at 3 (Dec. 23, 2014).

[41] *Id*. at 2.

[42] Ex. C-1 at 5.

[43] *See* Caroline Binham, *Ex-Barclays Trader in Rabobank Link Probe*, FINANCIAL TIMES (August 5, 2012),

[44] Ex. C-1 at 5.

[45] Crédit Agricole S.A. U.S. Resolution Plan Public Section, at 1-2 (Dec. 27, 2013).

Branch as a "material entity" in the United States.[46]  Crédit Agricole  CIB New York Branch is a branch of Crédit Agricole  CIB and "not a separate legal entity."[47]   Crédit Agricole  S.A.'s "core business lines" that it conducts from within the United States include  Crédit Agricole  CIB New York Branch's  Global Markets Division,  which sells and trades certain debt instruments  and derivatives,  including  interest  rates and foreign exchange.[48]  Crédit Agricole  CIB New York Branch is located in this District at 1301 Avenue of the Americas  New York, NY 10019.  Crédit Agricole  CIB New York Branch is licensed, supervised,  and regulated by the NYSDFS.  Crédit Agricole  CIB is a provisionally  registered  swap dealer with the CFTC.  Crédit Agricole  CIB is also regulated  by the Board of Governors  of the Federal Reserve System.  Pursuant  to FRB regulations,  New York is Crédit Agricole  CIB's home state.  Prior to February 6, 2010, Crédit Agricole  CIB was named Calyon.  Crédit Agricole  S.A., Crédit Agricole  CIB, and Calyon are collectively  referred to as "Crédit Agricole."   During  the Class Period, Crédit Agricole  was a member  of the EBF Euribor  panel.

77. ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

---

[46] *Id.* at 4.

[47] *Id.*

[48] *Id.*

**F.  The Deutsche Bank Defendants.**

78.     Defendant Deutsche Bank AG ("Deutsche") is a German financial services company headquartered in Frankfurt, Germany.  During the Class Period, Deutsche was a member of the EBF Euribor panel.

79.     Deutsche Bank's U.S. headquarters are in New York.  Its New York branch ("Deutsche Bank AG, New York Branch") is located in this District at 60 Wall Street, New York, NY 10005.  Deutsche considers Deutsche Bank AG, New York Branch to be a "material entity" within the United States.  Deutsche Bank AG, New York Branch is licensed, supervised, and regulated by the NYSDFS to do business in this state.  Deutsche is also registered with the Board of Governors of the Federal Reserve System.  Pursuant to FRB regulations, New York is Deutsche's home state.  Deutsche Bank AG, New York Branch has more than 1,700 employees and total assets exceeding $152 billion.  Deutsche is a registered swap dealer with the CFTC.  From its New York Branch, Deutsche engages in derivatives trading activities, including interest rate-related derivatives.  From 2006 through 2011, Deutsche operated its Global Finance and Foreign Exchange ("GFFX") desk—which includes its Global Finance FX Forwards ("GFF") and foreign exchange ("FX") units—from several offices around the world, including in New York.  Its GFF unit engaged in pool trading and MMD throughout the Class Period.

80.     Deutsche joined Defendants' agreement to rig Euribor and fix the prices of Euribor-based derivatives through Christian Bittar ("Bittar").  Bittar was a proprietary, or "prop," trader employed by the bank from 2001 through 2011, who specialized in short-term derivatives contracts.  In 2009, Bittar was promoted to the Head of the London MMD desk.  Before working at Deutsche, Bittar worked at Defendant Société Générale along with several of the other traders and submitters, ███████████████████████ Bittar is known to have colluded with

multiple traders including his friend, Moryoussef from Barclays, as well as ███████

███████ nd traders at Crédit Agricole, Société Générale, HSBC, and RBS.[49]

81.    Defendant DB Group Services (UK) Limited ("DB Group Services") is a wholly-
owned subsidiary of Defendant Deutsche Bank. DB Group Services is incorporated and operates
its principal place of business in the United Kingdom. DB Group Services settled with the DOJ,
admitting that it employed some of Deutsche's London-based pool and MMD traders that were
responsible for manipulating "IBOR" rates, including Euribor. DB Group Services also pled
guilty to felony wire fraud in the District of Connecticut for its involvement in Deutsche Bank's
LIBOR manipulation scheme.

## G. The HSBC Defendants.

82.    Defendant HSBC Holdings plc is a United Kingdom public limited company
headquartered in London. HSBC Holdings plc is the ultimate parent company of one of the
world's largest banking and financial services groups, including Defendant HSBC Bank plc.
HSBC Holdings and its subsidiaries provide services in 75 countries and territories, with
approximately 16,000 employees in the United States.[50] HSBC Holdings plc "is the primary
source of equity capital for its subsidiaries and provides non-equity capital to them when
necessary."[51] HSBC Holdings disclosed approximately $22.6 billion in profit before tax for the
year ended December 31, 2013, with $8.8 billion in revenue and $1.221 billion in profit before
tax in North America. HSBC Holdings plc and its subsidiaries "core business lines" within the
United States include its Global Markets–Rates Division, which provides services in interest rate

---

[49] Ex. F-1 at 30-31; *see also* Libor: The Spider Network, THE WALL STREET JOURNAL, available at
http://graphics.wsj.com/libor-network/#item=Bittar.

[50] HSBC Holdings plc HSBC Bank USA, National Association US Resolution Plan Section I – Public Section, at 14
(July 1, 2014).

[51] *Id.* at 5.

swaps and other related derivatives.[52]   HSBC Holdings plc is listed as an ADR on the New York Stock Exchange.

83.   Defendant HSBC Bank plc is a wholly-owned subsidiary of HSBC Holdings plc that is headquartered and incorporated in England.  HSBC Bank plc is a provisionally registered swap dealer with the CFTC. Collectively, HSBC Holdings plc and HSBC Bank plc are referred to as "HSBC."  During the Class Period, HSBC was a member of the EBF Euribor panel.

84.   HSBC joined Defendants' agreement to rig Euribor and fix the prices of Euribor-based derivatives through ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

**H. The JPMorgan Defendants.**

85.   Defendant J.P. Morgan Chase & Co. is a Delaware financial holding company with its headquarters in this District at 270 Park Avenue, New York, New York. J.P. Morgan Chase & Co. provides businesses, institutions, and individuals with investment banking, treasury and securities, asset management, private banking, and commercial banking services.  Its U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency

---

[52] *Id.* at 6.

swaps.[53] J.P. Morgan Chase & Co. is registered with the Board of Governors of the Federal Reserve System.

86.     Defendant JPMorgan Chase Bank, N.A. is a federally chartered national banking association headquartered in New York and a wholly owned subsidiary of Defendant J.P. Morgan Chase & Co. Collectively, J.P. Morgan Chase & Co. and JPMorgan Chase Bank, N.A. are referred to as ("JPMorgan").   During the Class Period, JPMorgan was a member of the EBF Euribor panel.

87.     JPMorgan joined Defendants' agreement to rig Euribor and fix the prices of Euribor-based derivatives through ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

## I.   The RBS Defendant.

88.     Defendant The Royal Bank of Scotland plc ("RBS") is a British banking and financial services company headquartered in the United Kingdom.   RBS has an office located at 340 Madison Avenue, New York, NY 10173. RBS' New York branch is licensed, supervised, and regulated by the NYSDFS to do business in this state. RBS also has a branch located at 600 Washington Boulevard, Stamford, CT 06901. The Connecticut branch is a registered foreign bank with the Connecticut Department of Banking ("DOB"). RBS is also licensed and supervised by the Board of Governors of the Federal Reserve System. Upon information and

---

[53] See Federal Reserve Bank of New York 2007 Survey, at 12, 16-17 (JPMorgan participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction.").

belief, pursuant to FRB regulations, New York or Connecticut is RBS' home state. RBS is a Clearing Firm on several of the CME Group's Exchanges, including the CME, NYMEX, CBOT, and COMEX, as well as a registered swap dealer with the CFTC. As of June 30, 2010, RBS was ranked among the fourteen largest broker/dealers of interest-rate derivatives. During the Class Period, RBS was a member of the EBF Euribor panel.

89.     RBS' U.S.-based dealers trade in the over-the-counter foreign exchange and interest rate derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[54] RBS transacted in Euribor-based derivatives with U.S.-based counterparties during the Class Period. As part of its Deferred Prosecution agreement with the DOJ, RBS admitted that "RBS entered into interest rate derivatives transaction tied to . . . Euribor . . . with various counterparties, some of which were located in the United States. U.S. counterparties included banks and other financial institutions in the United States or located abroad with branches in the United States. Those counterparties also included, among others, asset management corporations, business corporations, insurance companies, universities, and non-profit organizations."[55] According to RBS' 2013 U.S. Resolution Plan, RBS made 20% of its income for the 2012 year in the United States.

90.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[54] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (RBS participated in the survey by submitting data on its U.S.-based transactions in Euribor-based derivatives).

[55] Ex. B-1 at 38 ¶ 79.

██████████████████████████████████████████████

███████████████████████████████

**J.   The Société Générale Defendant.**

91.    Defendant Société Générale SA ("Société Générale") is a financial services company headquartered in Paris.  During the Class Period, Société Générale was a member of the EBF Euribor panel.

92.    Société Générale engages in "significant U.S. activities" in several core business areas—including corporate and investment banking, which includes financial and commodities futures brokerage services.   Société Générale maintains offices in this District, including at 1221 Avenue of the Americas, New York, New York 10020 and 245 Park Avenue, New York, NY 10167.

93.    Société Générale is licensed, supervised, and regulated as a foreign branch with the NYSDFS.  Société Générale is also regulated by the Board of Governors of the Federal Reserve System.  Pursuant to FRB regulations, New York is Société Générale's home state. Société Générale is also a registered swap dealer with the CFTC, a swap firm and guaranteed introducing broker with the National Futures Association ("NFA"), and an OTC clearing firm with the CME Group.  In Société Générale's 2014 U.S. Resolution Plan, it stated that its core business line within the United States is Global Banking and Investor Solutions, as well as declaring its New York Branch as a "material entity."[56]  In 1938, Société Générale opened its first U.S. offices and now employs 1,800 corporate professionals in seven U.S. cities.

94.    ███████████████████████████████████████████

███████████████████████████████████████

---

[56] 2014 U.S. Resolution Plan Société Générale (Dec. 22, 2014).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

**K. The UBS Defendant.**

95.      Defendant UBS AG ("UBS") is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland.  During the Class Period, UBS was a member of the EBF Euribor panel.

96.      UBS provides investment banking, asset management, and wealth management services for private, corporate, and institutional clients worldwide.  UBS maintains branches in several U.S. states, including Connecticut, Illinois, Florida, and New York, with its U.S. headquarters in New York and Stamford, Connecticut.  UBS is registered with the Office of the Comptroller of the Currency ("OCC"), the DOB, and the CFTC as a swap dealer.  UBS is also licensed and supervised by the Board of Governors of the Federal Reserve System.  Pursuant to FRB regulations, Connecticut is UBS' home state.  Its U.S.-based dealers trade in the over-the-counter foreign exchange market.

97.      Defendant UBS filed a Resolution Plan with the Federal Reserve in 2014 in which it acknowledged that it is a global institution with the majority of its operations located in Switzerland, the United Kingdom and the United States.  In its Resolution Plan, UBS designated its New York and Stamford, Connecticut branches as material entities.  The Stamford branch is the center of operations for UBS' Treasury function and payment operations in the United States and the primary booking center for the UBS Investment Bank's foreign exchange business with U.S. clients and U.S. corporate lending businesses.  UBS' New York branch houses its U.S. retail activities of its Wealth Management Americas ("WMA") division and provides investment

37

management and custody service to WMA clients.  UBS' shares are registered as Global Registered Shares on the NYSE.

98.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

99.  Defendants Barclays, BNP Paribas, Citi, UBS, RBS, Deutsche, HSBC, Crédit Agricole, Société Générale, Rabobank, and JPMorgan with other EBF Euribor contributor banks whose identities are currently unknown to Plaintiffs (the "John Doe Defendants") are collectively referred to herein as the "Contributor Bank Defendants."

100.  The Contributor Bank Defendants, either directly or through their subsidiaries or affiliates engaged in for-profit trading of Euribor-based derivatives which were priced, benchmarked, and/or settled based on Euribor during the Class Period.

**L.  The ICAP Defendants.**

101.  Defendant ICAP plc is the world's largest voice and electronic interdealer broker, headquartered and incorporated in the United Kingdom.  Defendant ICAP Europe Limited is a wholly owned subsidiary of ICAP Group Holdings plc ("ICAP Group"), which is a wholly owned subsidiary of Defendant ICAP plc, and is headquartered in London.  Collectively, Defendants ICAP plc and ICAP Europe Limited are referred to herein as "ICAP."

102.  ICAP provides independent broking services to commercial banks, investment banks, and other liquidity providers and is active in the wholesale markets for OTC derivatives, fixed income securities, money market products, foreign exchange, and equity derivatives.  ICAP maintains dedicated derivatives teams within the United States, in New York and Chicago. ICAP brokers Euro currency trades within the United States through its electronic broking

system that uses centers located in New York. ICAP's voice brokerage business, which handles interest rate derivatives and foreign exchange, generated approximately $792 million in revenue from the Americas during the 2012 fiscal year. During the Class Period, ICAP was a clearing member on the CME and CBOT.

103. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

104.   John Doe Defendants Nos. 1-50 are other entities or persons, including EBF Euribor contributor banks, interdealer brokers, cash brokers and other co-conspirators referenced in the agreements memorializing the Barclays, RBS, UBS, Deutsche and Rabobank settlements or discovered at a later date, whose identities are currently unknown to Plaintiffs. The John Doe Defendants, along with the Contributor Bank Defendants, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euribor and the prices of Euribor-based derivatives.

105.   Defendants Barclays, BNP Paribas, Citi, Crédit Agricole, Deutsche, DB Group Services, HSBC, JPMorgan, Rabobank, RBS, Société Générale, UBS, ICAP and John Does Nos. 1-50 are collectively referred to herein as "Defendants."

**AGENTS AND UNNAMED CO-CONSPIRATORS**

106.   Various other entities and individuals including, but not limited to, securities-dealers subsidiaries and/or affiliates of the Contributor Bank Defendants, participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein. The unnamed co-

conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euribor and Euribor-based derivatives.

## SUBSTANTIVE ALLEGATIONS

### I.   Background

### A. Euribor: The Euro Interbank Offered Rate

107.   Euribor is the predominant money market interest rate for the Euro currency and intended to reflect the cost of borrowing Euros in the inter-bank money market based on the amount of interest that banks offer to pay each other in exchange for making short term Euro-denominated deposits.[57]

108.   Euribor is set through the EBF, an unregulated non-profit association based in Brussels, Belgium, using interest rate quotes submitted by a select group of Euribor contributor banks. According to the EBF Code of Conduct, each trading day the contributor banks are to observe the market and make their Euribor submissions based on where Euro inter-bank term deposits are being offered within the European Monetary Union ("EMU") by one prime bank to another as of 11.00 a.m. Brussels time.[58]

109.   Thomson Reuters, a financial services company headquartered in this District, manages the Euribor submission process. The Euribor contributor banks submit their interest

---

[57] Deposit rates represent the cost of borrowing funds in the inter-bank market because one way banks borrow money is by issuing certificates of deposit ("CDs"). A CD functions as a short term loan to the bank. Money is deposited for a certain period of time and is returned to the depositor with interest at maturity. *See* Timothy Q. Cook and Robert K. Laroche, *Instruments of the Money Market*, FEDERAL RESERVE BANK OF RICHMOND, 2 (available at https://www.richmondfed.org/publications/research/special_reports/instruments_of_the_money_market/).

[58] Article 4 of the Euribor Code of Conduct, "Obligations of Panel Banks," *available at* https://www.emmi-benchmarks.eu/assets/files/D0490C-2011-Euribor%20Code%20of%20Conduct_July2012.pdf.

rate quotes to Thomson Reuters electronically using a private webpage that can only be viewed by the individuals at that bank and Thomson Reuters' staff involved in the Euribor process.

110.   These quotes reflect the rate interest charged on deposits for fifteen different "tenors," or maturities, ranging from one week to twelve-months. The different tenors exhibit a predictable relationship to each other, following what is known as a "yield curve," where deposits with a longer duration (*e.g.*, twelve months) pay more interest than those maturing in the near term (*e.g.*, one-month).

111.   After receiving the banks' submissions, Thomson Reuters compiles and organizes the quotes before calculating the official Euribor which is published just before noon CET. Thomson Reuters ranks the contributor banks' submissions for each tenor in numerical order and then averages the middle 70%, discarding the highest and lowest 15% of submissions. This average rate becomes the official daily EBF Euribor "fix" for each tenor and is distributed electronically, along with each bank's submissions, by Thomson Reuters through Bloomberg and other financial services into the United States using U.S. wires.

112.   To ensure that Euribor reflects the rate of interest paid on inter-bank deposits, the EBF requires, as a condition to membership on the Euribor panel, that all Euribor contributor banks subject themselves unconditionally to the Euribor Code of Conduct and its Annexes. The Code of Conduct requires that all Euribor contributor banks refrain from any activity that could negatively impact Euribor, *e.g.*, contributing false Euribor quotes, and dictates that each bank's submissions should reflect only "the best price between the best banks" for Euro-denominated deposits and not, *e.g.*, the value of their Euribor-based derivatives positions. However, as alleged below, throughout the Class Period the Contributor Bank Defendants ignored the EBF code of conduct and routinely made false Euribor submissions that did not reflect the cost

41

borrowing Euros in the inter-bank money market, in order to fix the prices of Euribor-based derivatives at artificial levels that financially benefited their trading books.

### B. Euribor-Based Derivatives

113.    The Euribor-based derivatives market is one of the largest derivatives markets in the world and includes over-the-counter instruments, such as interest rate swaps, forward rate agreements, foreign exchange forwards, cross-currency swaps, overnight index swaps, and tenor basis swaps, as well as exchange-traded futures and options, such as the NYSE LIFFE three-month Euribor futures contract, which is the fourth most actively traded interest rate futures contract in the world, and Euro currency futures contracts traded on the CME.

### 1. NYSE LIFFE Three-Month Euribor Futures Contract

114.    One of the most common exchange-traded Euribor-based derivatives is the NYSE LIFFE three-month Euribor futures contract, which has a notional value of €1,000,000 and is directly priced, benchmarked, and settled based on three-month Euribor, the "commodity underlying" this futures contract as defined in the CEA.[59]

115.    Like all futures contracts, the NYSE LIFFE three-month Euribor futures contract is "standardized" and trades in accordance with the rules specified by the NYSE LIFFE. It is also "bilateral" and represents an agreement between two parties, a buyer and a seller of the underlying commodity, who are referred to as a "long" and a "short," respectively.

116.    NYSE LIFFE three-month Euribor futures contracts are available for delivery in 28 months, those following the "March quarterly cycle," *i.e.*, March, June, September and December, and four serial months such that the nearest six contracts are for delivery are available

---

[59] *See* 7 U.S.C. §§ 1a(9) and 25(a)(1)(D).

in consecutive calendar months. Each of the 28 available futures contract trades until the Monday before the third Wednesday of the delivery month when it "expires."

117.    At expiration, those in the long and short positions must settle their obligations under the contract. Because Euribor is not a tangible commodity, *e.g.*, wheat, that can be physically delivered, on the settlement date the parties "financially" or "cash settle" their positions by purchasing or selling an offsetting futures contract. For example, an investor with a long position of one NYSE LIFFE three-month Euribor futures contract can financially settle that obligation by selling one NYSE LIFFE three-month Euribor futures contract, creating and offsetting obligation. In financial settlement, the difference between the initial contract price and the price at which the offsetting futures contract is purchased or sold represents the profit or loss on that transaction.

118.    U.S. investors buy and sell NYSE LIFFE three-month Euribor futures contracts by accessing the NYSE LIFFE exchange directly from within the United States through NYSE LIFFE CONNECT.[60] This direct connection to the United States has resulted in a substantial amount of U.S.-based trading in NYSE LIFFE three-month Euribor futures contracts. In response to a Freedom of Information Act request served on the CFTC by Plaintiffs' counsel, the CFTC reported that approximately 300 million U.S.-based NYSE LIFFE Euribor futures contracts traded during the period of 2005 through 2010. Given the €1,000,000 notional size of these futures contracts, during the Class Period, the notional amount of NYSE LIFFE three-month Euribor futures contracts outstanding in the United States exceeded $470 billion.

119.    Euribor has a direct impact on the price of NYSE LIFFE three-month Euribor futures contracts. Prices for active NYSE LIFEE three-month Euribor futures contracts are

---

[60] *See supra* Part I.B.1 (describing LIFFE CONNECT and access within U.S.).

derived from Euribor and quoted in terms of 100 minus three-month Euribor.[61]   On the last day of trading, all expiring Euribor futures contracts are financially settled at a final settlement price equal to 100.00 minus three-month Euribor rounded to three decimal places.[62]   As Euribor is the sole variable in the formula used to price and settle NYSE LIFFE three-month Euribor futures contracts, any fluctuation or manipulation of three-month Euribor will have a direct and immediate impact on the final settlement price of three-month Euribor futures contracts.

120.    To evaluate this direct relationship, Plaintiffs conducted a regression analysis[63] comparing the daily change closing prices of the four most active NYSE LIFFE three-month Euribor futures contracts, *i.e.*, the March, June, September, and December contracts, to the daily change in, one-month, three-month, and six-month Euribor.  This analysis produced statistically significant results, demonstrating that a change in the prices of NYSE LIFFE Euribor futures contracts for the "front month," *i.e.*, closest to expiration, and "next month," *i.e.*, second closest to expiration, are related to a change in any, or any combination of, one-month, three-month, and six-month Euribor.  This confirms the direct pricing relationship described above and that the prices of NYSE LIFFE three-month Euribor futures contracts are substantially impacted by changes in Euribor.

### 2.  CME Euro Currency Futures Contracts

121.    Another common Euribor-based derivative is the CME Euro currency futures contract.  Like the NYSE LIFFE three-month Euribor futures contract, CME Euro currency futures contracts are standardized, bilateral agreements that trade in accordance with the rules

---

[61] *Three Month Euro (Euribor Interest Rate) Futures*, NYSE EURONEXT, https://globalderivatives.nyx.com/sites/globalderivatives.nyx.com/files/euribor-futures-options.pdf

[62] *Id.*

[63] *See* David H. Kaye & David A. Freedman, FEDERAL JUDICIAL CENTER, *Reference Guide on Statistics*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 264 (3d ed. 2011).

and regulations specified by the CME, a Designated Contract Market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.

122.    Each CME Euro currency futures contracts is an agreement to buy ("go long") or sell ("short") €125,000 in terms of U.S. Dollars, on some future date, *i.e.*, one of the next 20 available delivery months in the March quarterly cycle. The cost of buying or selling Euros in the future, and thus the price of a CME Euro currency futures contract, is determined using an industry standard formula that incorporates Euribor.[64]

$$\textbf{Future Price} = \textbf{Spot Price} \times \left( \frac{\textbf{1 + [Rterm x (d / 360)]}}{\textbf{1 + [Rbase x (d / 360)]}} \right)$$

**FIGURE 1**

123.    This formula, displayed in Figure 1, takes the "spot price," *i.e.*, the price of Euro for immediate delivery, and adjusts for the "cost of carry," *i.e.*, the amount of interest paid or received on Euro-denominated deposits, for the duration of the agreement.[65]  Euribor, the rate of interest for Euro-denominated deposits, is incorporated into the formula as either "Rbase" or "Rterm" depending on whether Euros are being purchased or sold in the transaction.[66]  Thus Euribor is used to calculate the cost of carrying Euros over the "duration" of a CME Euro

---

[64] *See e.g.*, John W. Labuszewski, Sandra Ro & David Gibbs, *Understanding FX Futures*, CME Group, at 3, 8, http://www.cmegroup.com/education/files/understanding-fx-futures.pdf (hereinafter "Understanding FX Futures") (applying pricing formula to both currency futures contracts and forwards).

[65] *Id.*

[66] Both foreign exchange forwards and currency futures transactions involve a currency pair, *e.g.*, EUR/USD.  In each pair, the first currency listed is referred to as the "Base Currency" while the other, is referred to as the "Term Currency."  As prices are typically quoted "in terms of" units of the Term Currency, *e.g.*, for EUR/USD the number of dollars per one Euro, the currency listed first will depend on which currency is being purchased/sold by the buyer/seller.  The variables Rterm and Rbase in Figure 1 refer to the rate of interest paid on deposits of the Term Currency and Base Currency, respectively, and will change depending on the order of the currency pair.  *See id.* at 3 n.2-3 (explaining Base and Term Currency use in pricing formula).

currency futures contract, indicated by the variable "d." Applying the formula in Figure 1, the price of a CME Euro currency futures contract, which is an agreement to buy Euros in terms of U.S. Dollars, will exhibit an inverse relationship to the changes in Euribor. As Euribor increases, the value of the fraction on the right side of the equation will decrease, lowering the future price of Euros and decreasing the value of the contract. As Euribor decreases, the value of the fraction will increase, raising the future price of Euros and increasing the value of the contract.

124.    Using the formula in Figure 1 as a guide, Plaintiffs conducted a regression analysis comparing the change in the daily closing price of the nearby most active CME Euro currency futures contract to the daily change in the spot price of Euro, three-month Euribor ("Rbase"), and U.S. Dollar LIBOR ("Rterm"). All three terms produced statistically significant results, indicating that a change in Euribor is a significant factor in causing a change in the price of CME Euro currency futures contracts.

### 3.  Foreign Exchange Forwards

125.    A foreign exchange forward, also known as a currency forward agreement, is an over-the-counter Euribor-based derivative that is identical to a CME Euro currency futures contract, except that the instead of trading in accordance with the rules and regulations specified by the CME, certain terms, such as the currencies involved in the transaction, notional amount exchanged, and settlement date, can be customized by the parties. For example, if a party needed to purchase €1,000,000 in the future they could enter into 1 foreign exchange forward for that amount, instead of buying 8 CME Euro currency futures contracts €125,000. Typically, the foreign exchange forward will specify the price at which currency is purchased and sold under the agreement, along with the settlement date when payment is due. On the settlement date, the parties exchange currency at the contracted price, with the buyer paying the seller and the seller delivering the specified amount of currency to the buyer.

126.     Because foreign exchange forwards represent an agreement to buy or sell Euros in the future, they are impacted by the same cost of carry considerations present in CME Euro currency futures contracts and are priced based on the same formula displayed in Figure 1. The relationship between interest rates and currency prices is well established. The "forex" market, where foreign currency is exchanged, expects and relies upon short term interest rates like Euribor to price and settle transactions every day. As the global head of forex cash trading at Defendant HSBC explained, "[i]nterest rates are a key driver of the forex forwards market. The market needs an interest rate yield curve to be able to value currencies over time."[67]   In fact, the CFTC found that prices of foreign exchange forwards are impacted by IBOR rates for the relevant currencies.[68]   As a result, a change in Euribor will impact the buyer or seller of Euros under a Euro foreign exchange forward in the same way as a CME Euro currency futures investor.

### 4.  Interest Rate Swaps

127.     An interest rate swap ("swap") is an over-the-counter Euribor-based derivative that allows two counterparties to exchange interest rate payment obligations on an agreed upon "notional," *i.e.*, principal, amount. There are several types of interest rate swaps. The simplest interest rate swap is a "plain vanilla" interest rate swap, which involves the exchange of a fixed stream of interest rate payments, *e.g.* 2% per year, for one based on a "floating" rate, *e.g.*, Euribor, which may change every day.

128.     The parties to a plain vanilla interest rate swap are typically referred to by their relationship to the stream of fixed interest rate payments. The party exchanging its floating rate

---

[67] *See* Michael Watt, *Rates Volatility Buoys Hopes for Currency Forwards Desk*, RISK.NET, http://www.risk.net/risk-magazine/feature/2284442/rates-volatility-buoys-hopes-for-currency-forwards-desks (July 30, 2013).

[68] *See e.g.*, Ex. B-2 at 6 (finding Yen and Swiss franc foreign exchange forwards are priced based on Yen and Swiss franc LIBOR); Ex. C-2 at 6 (finding Yen foreign exchange forwards are priced off of Yen-LIBOR).

obligation for a stream of fixed interest rate payments is known as the "receiver," while the party making fixed interest rate payments in exchange for a stream of payments tied to a floating reference rate is known as the "payer."

129.    Payment under an interest rate swap is due at regular intervals, *e.g.*, every six-months, for the life of the agreement. Each time a payment is due, the amounts owed by the payer and receiver are netted against each other. Only the party with the larger obligation, fixed or floating, makes a payment reflecting the difference between the two interest rates as applied to the agreed upon notional amount.

130.    The value of an interest rate swap is represented by the difference between the total interest to be paid and received under the swap agreement. For example, if the total present value of interest owed to a party is greater than the total present value of the interest that the party must pay out over the life of the interest rate swap, then the swap has a positive value. As a result, Euribor directly impacts the value of Euribor-based interest rate swaps by determining the value of the floating rate payments due under that swap contract.

131.    Interest rate swaps based on Euribor were widely traded in the U.S. during the Class Period. According to the Bank of International Settlements, the notional amount of Euribor-based interest rate swaps outstanding in the United States exceeded 41 trillion dollars during the Class Period.

### 5.    Forward Rate Agreements

132.    A forward rate agreement ("FRA") is an interest rate forward contract in which, much like an interest rate swap, cash flow obligations at an agreed upon settlement date are calculated for some notional amount based on the difference between a predetermined "forward rate" and a "market rate," *e.g.*, Euribor. Typically, one party to the FRA is long and benefits if Euribor increases and the other is short and benefits if Euribor decreases during the term of the

agreement.  According to the Bank of International Settlements, the notional amount of Euribor-based forward rate agreements outstanding in the United States exceeded 5 trillion dollars during the Class Period.

133.    Given the direct pricing relationships demonstrated above and high notional value of Euribor-based derivatives traded during the Class Period, small changes in Euribor had a significant positive impact on the Defendants' Euribor-based derivatives positions and a corresponding negative impact on those held by Plaintiffs and the Class.

## II.  Euribor Manipulation Conspiracy: Defendants Agreed to and Did Manipulate Euribor to Artificial Levels for Their Financial Gain, to the Detriment of Plaintiffs and Other Market Participants.

134.    Defendants' unlawful conduct in manipulating Euribor and other IBOR rates has led to deferred and/or non-criminal prosecution agreements with the DOJ and settlements with the CFTC, FSA, NYSDFS, EC, and Swiss Financial Market Supervisory Authority, obligating Defendants Barclays, RBS, UBS, Rabobank, Deutsche, DB Group Services, and Société Générale to pay collective fines and penalties to these regulators exceeding $7 billion.

135.    Each of these settlement agreements provide examples of how Defendants conspired to rig Euribor during the Class Period, pairing conduct directly intended to manipulate the Euribor fix, including: (1) making false Euribor submissions; (2) "pushing cash" in the market to drive the prices of Euro-denominated deposits up or down; (3) and coordinating with inter-dealer brokers to "spoof" the market by transmitting false information regarding the prices of Euro-denominated deposits; with supportive conduct intended to enhance the impact of their manipulative efforts, such as reorganizing their trading desks to facilitate collusion and intentionally implementing lax compliance standards that would fail to detect any wrongdoing.

136.    The information released in the Defendants' government settlement agreements has since been supplemented by the ▓▓▓▓▓▓▓ produced to Plaintiffs as part of Barclays'

ACPERA cooperation.  Defendants operated their conspiracy to rig Euribor and fix the prices of Euribor-based derivatives for their financial benefit on daily basis.  Countess additional documents evincing the scope and nature of this anticompetitive conduct have yet to be discovered.  However, based on the information revealed to date, Plaintiffs know as follows:

### A.  Requests for False Euribor Submissions

137.    The Contributor Bank Defendants made false Euribor submissions in response to requests from their own Euribor-based derivatives traders, as well as those made by co-conspirator banks and inter-dealer brokers. The goal was always the same: to manipulate the Euribor fixing for one or more tenors, thereby manipulating and fixing the prices of Euribor-based derivatives at artificial levels that financially benefited the Defendants Euribor-based derivatives positions.  The allegations below reference select examples of this misconduct.  A more comprehensive list of publicly available manipulative communications is attached to this Complaint as Appendix A, along with a chart containing additional known requests for false Euribor submissions revealed as part of Barclays' ACPERA cooperation, in Appendix B.

138.    Defendants' communications reveal that their requests for false Euribor submissions were at times focused on "fixings," days where one or more of the Defendants had Euribor-based derivatives positions that were going to be priced, benchmarked, and/or settled based on Euribor.  By manipulating Euribor on these fixing days, Defendants specifically intended to manipulate the value of these Euribor-based derivatives for their financial benefit.

139.    However, in addition to targeting specific days, Defendants also requested false Euribor submissions to inject a certain "bias" into the Euribor fixing, permanently manipulating specific tenors higher or lower by making false submissions over long periods of time.  These requests were at times issued by senior management in the form of standing orders to make false submissions in a particular direction, or a company policy regarding how the bank should

determine its Euribor submissions to guarantee that the daily fixing was skewed in a direction that benefited the bank's Euribor-based derivative positions and those of co-conspirators.

### 1. Defendants Coordinated Their Euribor Submissions to Maximize their Impact on the Euribor Fix.

140.    Defendants coordinated making false Euribor submissions with multiple Euribor contributor banks to maximize the impact on the published rate. As a result, traders and submitters at each bank frequently reached out to multiple co-conspirators to solicit their help in manipulating Euribor. ███████████████████████████████

███████████████████████████████████████████ █ ████

███████████████████████████████

141.    Many of these requests for false submissions occurred over Bloomberg chat or on phone calls between Euribor-based derivatives traders and Euribor submitters. These recorded communications are direct evidence of Defendants' anticompetitive agreement. However, even this underestimates the scale of Defendants' conspiracy. Defendants used multiple forms of unrecorded communications, including their personal cell phones[71] and in-person meetings to coordinate the rigging of Euribor with other traders and submitters. █████████████

█████████████████████████████████████

███████████████████████████████████████

███ ██████████████████████████████████

███████████████████████████████████████

███ ████████████

███ ████████████

---

[71] This was a common feature of all "IBOR" manipulations. Testimony in the related criminal trial of Tom Hayes, mastermind of UBS' Yen-LIBOR manipulation scheme, demonstrates that traders coordinated manipulative conduct using, *inter alia*, unmonitored personal cell phones to escape detection. *See e.g.,* David Enrich, *Former Trader Tom Hayes Told Libor Investigators of 'Collusive' Price Fixing*, The Wall Street Journal, available at http://www.wsj.com/articles/hayes-told-investigators-of-collusive-price-fixing-1433160629.



i. **Deutsche & Barclays**

142.    The opportunity for unmonitored, illicit strategy sessions among co-conspirators was even more prevalent because many of the Defendants' traders and submitters were friends who socialized outside of work, where none of their communications could be detected. █

███████████████████████████████████████████

███████████████████████████████████

██████████████████████

████████████████

███████████████

██

████████████████

██████████████

██ ████████████████████████████

████████████████

████████████████

███████████████████████

█████████████████

████████████████

███████████████████████

███████

████████████

███████████





          ii.        **Société Générale: A**

146.

### iii.　　HSBC: ███████████████

147.　Defendants' combination included traders at many banks who joined in the agreement to rig Euribor and fix the prices of Euribor-based derivatives through its members' connections. ████████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████

███████████████████████████████

██████████████████████

████████████████

█████████████

██████████████

███████████████████

████████████████████

██████████████████

███████████████████

██████████████

████████████

█████████████

████████



**iv.   Citi:** ███████████████

149.   █████████████████████████████████

████████████████████████████ Citi joined the Defendants'

agreement through Deutsche's Bittar, who frequently reached out to ███████ a Euribor-

based derivatives trader identified as "Trader CD" in Deutsche's settlement with the DOJ. ███

████████████████████████████████████████████████ The CFTC found that ███

was one of Bittar's go-to guys for false Euribor submissions.[82]   In fact, the two spoke so

frequently, that ████ referred to Bittar as his "amigo" in their chats.[83]   Below is one example of

the two amigos coordinating their false three-month Euribor submissions:

> **September 29, 2005**:
>
> Citibank ████   where DB 3s fixing today will u guys finally deliver?
>
> Deutsche Bank [Bittar]: where u puttin the fix?
>
> Citibank ████   13? Guess still 12
>
> Deutsche Bank [Bittar]: we'll put in 12 today amigo[84]

150.   Citibank continued to associate with the Defendants after ████ oved to

████████████████████   While the identity of those involved is currently unknown, Citibank

remained a faithful co-conspirator, at times outshining ████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

████████████████████████

███████████████████████

███

████████████████████████████████

---

[82] Ex. F-2 at 20.

[83] *Id*.

[84] Ex. F-1 at 31.



### v.        BNP Paribas: From Deutsche Through Citi

151.        █████████ brought BNP Paribas into the conspiracy by reaching out to them to coordinate false Euribor submissions while still at Citi. While the identity of ██████ contact at BNP Paribas is currently unknown, the conversation below between ██████ and Bittar demonstrates that he contracted someone at BNP Paribas and another unidentified bank, "DRSF," as part of a plan to rig Euribor with at least Deutsche:

**June 10, 2005:**

Citibank ████████ M GETTING 12 FIX HERE

Deutsche Bank [Bittar]: luks like we will be same in fft as well, did you speak to bnp [BNP Paribas]?

Citibank ████████ YES N DRSF NOT SURE THEY WILL GET MUCH JOY BUT TRYING HARD AMIGO[86]

---

85 ████████████████████████

86 Ex. F-5 at 8 ¶ 31.

vi.        **JPMorgan:** 

152.



153. ███████████████████████████

████████████████████████████████

███████████████████████████████

█████████████████████████████████

████████████████████

        vii.    **Crédit Agricole:** █████████████████

154. █████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

█████████████████████████████

████████████

    ███████████████████

    █████████    ███████████

    ████████    ██████

    █████████    █████████████████████

    █████████    ███████████████

    █████████    ██████

████████████████████

█ █████████████

█ ████████████

█████████████   ████

█████████████   ████

155.    Defendants also colluded with another Euribor trader employed at Crédit

Agricole, █████████   ███████████████████████

████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

██████████

█████████████   ████████████████████

█████████████   ███████████

██   ██████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

█████████████████████████

██████████

█████████████   ████████████████████

█████████████   █████████

██

█████████████   ███████████████

_____

██████████████████

██████████

██████████████████████████████████████





viii.        **RBS: Hires Moryoussef, Who Continues the Agreement**

ix.      **Rabobank:** ██████████████████████

159.    ████████████████████████████████████████████

████████        Though the identity of the Rabobank traders involved in the scheme is currently unknown, the Financial Times reported that Barclays' Moryoussef, "a trader at the center of rate-manipulation allegations leveled at Barclays communicated with counterparts at Rabobank, the Dutch Bank, about trading positions related to Euribor."[95]

160.    In addition to disusing its Euribor-based trading positons with Barclays, beginning in at least 2006, a Rabobank Senior Euribor Trader-Submitter made false Euribor submissions to benefit Euribor-based derivatives positions of former Rabobank traders located at other unidentified banks.[96] The Rabobank submitter knew that these requests were being made to benefit the external traders Euribor-based derivatives positions and frequently accommodated these requests. For example:

<u>**January 13, 2006**</u>: (translated from French)

External Euro Trader 1: where do you see the 3m fixing??

Senior Euribor Trader-Submitter: wherever you want me to put it :-D[97]

\*\*\*

<u>**August 1, 2006**</u>: (translated from French)

Senior Euribor Trader-Submitter: do you have some fixings?

External Euro Trader 2: little fixing for 3m receiving

Senior Euribor Trader-Submitter: you want high fixing is that right??

External Euro Trader 2: yes if you can thank you

---

[9] ████████████████████████

[95] *See* Caroline Binham, *Ex-Barclays Trader in Rabobank Link Probe*, FINANCIAL TIMES (Aug. 5, 2012).

[96] Ex. C-2 at 39.

[97] Ex. C-2 at 40.

<u>Senior Euribor Trader Submitter</u>:  [Okay][98]



162. 

### 2. Daily Requests for False Submissions

164.   In line with the communications above, requests for false Euribor submissions were made to each bank's Euribor submitter on a daily basis during Class Period.[102]   UBS routinely took its trading positions into account when making a Euribor submission.   For

_____



[102] *See e.g.*, Ex. A-2 at 2, 39 (UBS made false Euribor submissions for their benefit on a daily basis).

example, on August 7, 2007, UBS' Euribor-based derivatives trader requested a false one-month Euribor submission from UBS' Euribor submitter to manipulate and fix the prices of Euribor-based derivatives at artificial levels for their financial benefit.

**August 7, 2007:**

| | |
|---|---|
| <u>Senior Rates Manager B</u>: | hi [Senior STIR Manager B], what you putting in for 3mth and 6mth Euribor fixing today? |
| <u>Senior STIR Manager B</u>: | goo[d] question ... need a low fix personally in 3s |
| <u>Senior Rates Manager B</u>: | ...i have a 2bn fixing today and i'm also looking to sell 1 bn of the 6mth at about 4.42 fun times with the fixings at the moment |
| <u>Senior STIR Manager B</u>: | i'll shoot for low then and hope some other do too and we dont fall out.. |
| <u>Senior Rates Manager B</u>: | if i don't sell the 6mth before the fix, i need a high fixing 3mth i'm now flat over the next few weeks we've got a lot of 6mtth fixing coming off |
| <u>Senior STIR Manager B</u>: | ill stick 4.42 in for 6s then |
| <u>Senior Rates Manager B</u>: | we are receiving the fixing |
| <u>Senior STIR Manager B</u>: | gotscha[103] |

165.    This conversation is a typical example of how Defendants manipulated Euribor during the Class Period. The UBS Rates Manager and UBS STIR Manager coordinated their Euribor manipulation because UBS had a "large fixing," *i.e.*, a counterparty would pay UBS based on where six-month Euribor ended up that day.[104] The higher UBS could manipulate six-month Euribor on August 7, 2007, the more money the UBS Trader would collect from his counterparty, financially befitting his Euribor-based derivatives trading book.[105]

---

[103] Ex. A-2 at 40.

[104] *Id.* at 40.

[105] *Id.*

166.     In another example,  in an October 2, 2006 electronic  chat between a UBS Euro derivatives  trader and the UBS Euribor  submitter,  the submitter  solicited  the trader's preference  for that day's submission,  asking, "any special wishes for the fixing?"  The trader responded, "I lose 120k of a received fix  today . . . so low would be good." The trader then indicated  that his/her  request for low Euribor  applied  to both the 3-month and 6-month  tenors,  to which the submitter  responded, "ok we go 42 and 57."[106]

167.     This callous, manipulative  conduct occurred at other Contributor  Bank Defendants  during the Class Period.  Barclays' Euribor-based derivatives  traders also routinely made requests  for false Euribor  submissions  during  the Class Period.[107]  On July 28, 2006, at approximately  8:26 a.m., a Barclays  Euro swaps trader ("Trader-4")  sent an e-mail to a Barclays Euribor submitter  ("Submitter-3")  with the subject line, "6m fixing,"  stating,  "Plz [Please] go for LOW 6M fixing  today."  Submitter-3  replied  in part, "No probs...low it is today." As instructed, Barclays'  6-month Euribor  submission  on July 28, 2006 was 3.21%, 12 basis points  lower than its submission  the previous  day, and was lower than the lowest rate used in the calculation  of the Euribor  fix.

168.     As a further  example,  on Friday,  October 13, 2006, a Barclays  Euro swaps trader ("Trader-5")  sent an electronic  communication  to Submitter-3  stating  in part, "I have a huge fixing  on monday...something  like 30bn 1m fixing...and  i would  like  it to be very very very high....can  you do something  to help? i know a big clearer  will  be ag[a]inst  us...and dont [sic] want to loose money  [sic] on that one." Submitter-3  replied  that she had been moved  within Barclays,  but had forwarded  the request to another Euribor  submitter  ("Submitter-4")  who was covering  for Submitter-3.  Submitter-3  forwarded  the request to Submitter-4  and added, "We

---

[106] Ex.  A-1 at 33.

[107] Ex.  E-2 at 3.

always try and do our best to help out..."[108]   Barclays' 1-month Euribor submission on Monday, October 16, 2006, was 3.36%, which was 1 basis point higher than its submission the previous day and was equal to the second-highest rate submitted by Euribor Contributor Panel banks.

169.   Also on board with the scheme to manipulate Euribor, Rabobank's traders on the Euribor desk made requests for false submissions to financially benefit their trading positions. For example:

**June 3, 2008**:

| | |
|---|---|
| Senior Euribor Trader-Submitter: | SALUT FIXES PLEASE ?? |
| Euro Trader 1: | ok, hold on tight; high 3s and 6s pls!! |
| Senior Euribor Trader-Submitter: | HIGH >?? U SURE ?? |
| Euro Trader 1: | yes indeed only 3s not soo big and prob tomorrow low again so maybe dont spoil the pattern too much? thanks either way:) |
| Senior Euribor Trader-Submitter: | OK [Euro Trader 1][109] |

170.   Rabobank's traders knew the value of maintaining a certain relationship or spread between the different Euribor tenors, manipulating the rate in a pattern that suited their Euribor-based trading positions.   For example, on September 24, 2008, Submitter-9 wrote:

**September 24, 2008**:

| | |
|---|---|
| Senior Euribor Trader-Submitter: | hi high 3 and 6s |
| Euro Trader 1: | today low 1s and 3s, high 6s pls:-) merci! |
| Senior Euribor Trader-Submitter: | u got me confused here [Euro Trader 1] |
| Euro Trader 1: | always high 6s, and our fixings 1s and 3s are large enoug today to want lower fixings there, 1s and 3s do change daily, if e.g. 3m is small then we go for high 3s to support your high 6s. bon? |

---

[108] Ex. E-1 at 8-9 ¶ 19; Ex. E-2 at 14-15.

[109] Ex. C-2 at 43.

<u>Senior Euribor Trader-Submitter</u>:        allons bon ...... a lesson in fixings  ! ! ! ![110]

171.    Deutsche's traders and submitters also colluded to manipulate and fix Euribor and the prices of Euribor-based derivatives.  Upon management's instruction, Deutsche's traders and submitters constantly communicated to ensure that their Euribor submissions and Euribor-based derivatives positions were aligned to generate the highest possible profits for the bank.  Christian Bittar, the "guaranteed money maker," substantially influenced Deutsche's submitters in making false Euribor submissions.  As Bittar's successful trading book became well-known throughout Deutsche, he gained more pull among Deutsche's submitters, who honored his requests for false Euribor submissions over other Deutsche traders' requests.

172.    Deutsche's Euribor submitters often checked with Bittar before making their Euribor submissions to ensure that they submitted a rate that would benefit his Euribor-based derivatives positions.  In March of 2008, Bittar wanted to drive 6m Euribor higher to benefit his trading book at the March IMM date.  On February 29, 2008, Submitter-5 messaged Bittar about where to make his 6m Euribor submission, asking "[Bittar], you still need the high 6m fxg for the trade you wrote last time?"  Bittar responded: "yes please [Submitter-5] every day if possible and especially in march where we have a lot of 6mth fixings[.]"  Submitter-5 agreed to make high 6m Euribor submissions throughout March.[111]

173.    Bittar followed up days later to ensure that Submitter-5 was still on the same page and working to benefit Bittar's March Euribor-based derivatives positions.

**March 5, 2008:**

<u>Deutsche Bank [Bittar]</u>:        [Submitter-5] we need very high 6mth please all month

<u>Deutsche Bank Submitter-5</u>:  its due to the position described last time?

---

[110] *Id.* at 44; Ex. C-1 at 30 at ¶ 63.

[111] Ex. F-1 at 24.

<u>Deutsche Bank [Bittar]</u>:        yes please[112]

174.    Two days later, Bittar made sure that Deutsche's March 2008 6m Euribor submissions would continue to increase, enlisting Manager-5's help to ensure he would get the 6m Euribor rate as high as possible.

**<u>March 7, 2008</u>:**

<u>Deutsche Bank [Bittar]</u>:        so basically we need high 6 month

<u>Deutsche Bank Manager-5</u>:    sure, you will get high 6 month

<u>Deutsche Bank [Bittar]</u>:        especially on the IMM date.

<u>Deutsche Bank Manager-5</u>:    which rate do you like?

<u>Deutsche Bank [Bittar]</u>:        4.80?[113]

175.    The same communication between traders and submitters was encouraged at Deutsche's subsidiary, DB Group Services. DB Group Services employed a junior MMD trader, "Trader-10," who primarily traded Euribor-based derivatives and worked under Bittar since 2003.[114] Deutsche's Frankfurt-based pool traders regularly solicited and honored Trader-10's requests for false Euribor submissions.[115] At other times, Trader-10 took it upon himself to contact Deutsche's pool traders to manipulate Euribor to benefit his Euribor-based trading positions. For example, in the following electronic communication, Trader-10 obtained a lower 1m Euribor submission.

**<u>January 23, 2007</u>:**

<u>Trader-10</u>:        [Manager-5] pls

---

[112] *Id.* at 25.

[113] *Id.* at 25.

[114] Ex. F-4 at 24.

[115] *Id.* at 25.

Submitter-4:    Hihi he is on holiday, may I help

Trader-10:     Hi [Submitter-4], [Trader-10] here . . could we pls ask you to put low 1m fixing today please

Submitter-4:    hahahahh sure, I have just written [Bittar] a bbg asking whether u have any preferences for the fixings. We have only small xposure there so sure we can put in a 60 fix in the 1m

Trader-10:     thx vmuch [Submitter-4] we need evry penny we can get atm the ee it's a bit tough to make money[116]

### 3. Defendants' Management Encouraged and Actively Participated in Their Traders' and Submitters' Manipulation of Euribor and the Prices of Euribor-Based Derivatives.

176.     Given Defendants' open and pervasive efforts to rig Euribor, and their knowledge of how manipulating Euribor would increase profits and reduce losses for their Euribor-based derivatives, management was often times aware of this illicit conduct. For example, at Deutsche, management was not only aware of its employees' Euribor manipulation, it actively encouraged and participated in manipulating Euribor to benefit the bank's Euribor-based derivatives positions. Because Deutsche's Frankfurt GFFX desk made most of Deutsche's Euribor submissions, the Global Senior Manager encouraged the Frankfurt Euribor submitters to contact the derivatives traders in London *every day* about what false Euribor submissions they needed to increase their Euribor-based trading profits.[117]

177.     Deutsche's senior management, including David Nicholls (Head of Core GFFX), Alan Cloete (Global Head of GFFX), and Anshu Jain (Global Head of Global Markets), was aware of their star trader's, Christian Bittar's, manipulative conduct. However, instead of disciplining Bittar for breaking the law, they encouraged him, telling him "[k]eep going you

---

[116] Ex. F-1 at 25-26.

[117] Ex. F-2 at 8.

doing great."[118]   For example,  Mr. Nicholls,  Mr. Cloete,  and Mr. Jain, Deutsche's  soon-to-be co-CEO,  knew that Bittar disregarded  Deutsche's  internal  risk policies  by exceeding  trading limits, but did not take action against  him because of the extraordinary  success of Bittar's  trading book and consequentially,  the GFFX desk as a whole.  As the heads of GFFX, these three Deutsche managers  were directly  responsible  for the bank's  LIBOR and Euribor  submissions  and the traders that worked at that desk.  Instead of insuring  the GFFX desk's integrity  in its Euribor submissions  and Euribor-based  derivatives  trading, Mr. Nicholls,  Mr. Cloete, and Mr. Jain, along with other Deutsche  managers,  valued  the desk's profitability  and encouraged  the employees  to continue  to manipulate  Euribor.

178.    The manager  of pool trading at Deutsche's  Frankfurt  desk through  2006, "Senior Manager-6,"  was actively  involved  in Bittar's  Euribor  manipulation.   For example, on March 9, 2005, Bittar messaged  Senior Manager-6  in an electronic  chat to ask for a lower 3m Euribor submission,  stating: "HIHI  GOOD MORNING  DO YOU THIK  YOU CAN PUSH 3MTH DOWN A LITTLE  TO GET AN 87 OR HIGHER  FIX ON MARCH?  DOES IT SUIT YOU AS WELL?[]"

179.    Senior  Manager-6  made his own requests  to Deutsche's  Euribor  submitters  to move Euribor in the direction  that would best benefit  his trading book. In one example,  after Senior Manager-6  made a request to a Deutsche Euribor  submitter,  "Submitter-4,"  for a high 1m Euribor submission,  Submitter-4  denied another trader's request for a low 1m submission,  stating how he did not want to jeopardize  his bonus by going against  management's  wishes.

<u>**October 12, 2005:**</u>

<u>Trader-10</u>:     Good morning  [Submitter-4],  [Trader-10] here.. could we please
                 ask you to put in low 1m fixing  pls

---

[118] Ex.  F-6 at 9.

<u>Submitter-4</u>:   Difficlt,  think [Senior Manager-6] wnarts it [] on the high side

<u>Trader-10</u>:   Oh no!! But ladies  first  no ;))?

<u>Submitter-4</u>:   First come first serve.

<u>Trader-10</u>:   Exctly..  And we have been begging  you for last two month!!

<u>Submitter-4</u>:   But u dont sign my bonus right?

<u>Trader-10</u>:   Hahah hmmm..  Unfortunatly  not…[119]

180.    After 2006, Manager-4 and then Manager-5 managed Deutsche's Frankfurt pool trading desk, and just like Senior Manager-6, each of these managers took active roles in manipulating Euribor to Deutsche's financial benefit.  For example, on April 3, 2007, Submitter-4 emailed Manager-5 to tell him that he was increasing Deutsche's 3m Euribor submissions to benefit the London traders' trading books:

> Hi buddy, can you take a look at the 3m fixing.  We already fixed 3.93 last week and now we are back at 3.92. The guys in London must think  we are not going to manage to drive the fixing [rate] up. It shouldn't  make any difference  whether we have a passive fixing  or not. If we want to drive it up we must permanently  fix high and offer on the cash market.[120]

181.    Rabobank's senior management  similarly  encouraged  its Euribor  submitter, Senior Euribor Trader-Submitter, to manipulate her Euribor submissions.[121]   For example, Senior Manager 2, who sat directly next to Senior Euribor Trader-Submitter, only had to lean over and mention his Euribor-based derivatives'  exposure and Senior Euribor Trader-Submitter automatically  made the most favorable  submission to benefit Senior Manager 2's trading book.[122]

---

[119] Ex.  F-1 at 29.

[120] *Id*. at 27.

[121] Ex.  C-2 at 38.

[122] *Id*. at 41.

182.    Even the head of Rabobank's Euro desk manipulated the bank's Euribor submissions.  In the following email communication, the Euro Desk Manager requested high 6m and low 3m Euribor submissions, which his employee, Euro Trader-Submitter 1, quickly agreed to submit.

**July 12, 2007:**

Euro Desk Manager email to Euro Trader-Submitter 1:
Subject:        fixings

Hi [Euro Trader-Submitter 1],

Only when it doesn't affect you in a negative way: today we'd like to see the 6M fixing as high as possible and the 3M fixing as low as possible…many thanks!

Euro Trader-Submitter 1 reply to Euro Desk Manager:
Subject:        RE: fixings

Consider it done.
Cheers[123]

183.    The same was true at UBS, where the Euribor-based derivatives traders and Euribor submitters openly discussed requests for false submissions in front of UBS' management, who in turn, failed to take action against the employees.  For example, in a June 25, 2009 chat with fifty-eight UBS employees, including UBS' Head of Funding for the Rates Division, Panagiotis Koutsogiannis, known as "Pete the Greek," UBS' Euribor submitter solicited requests for favorable three and six month Euribor submissions from several UBS derivatives traders, who in turn requested low six-month and high twelve-month Euribor submissions.  Pete the Greek did not tell the traders and submitters not to make the false submission, but instead only warned them to be careful in putting their requests in writing.

---

[123] *Id.* at 42.

**June 25, 2009**: (Emphasis added)

| | |
|---|---|
| Euro Trader-Submitter 1: | u need low 3s and/or 6s? we need low 6s ... boys, we send the fixings in about 1hr, so let us know pls |
| Euro Trader 1: | low 6s high 12s please |
| Euro Trader-Submitter 1: | noted[124] |
| Panagiotis Koutsogiannis [Pete the Greek]: | JUST BE CAREFUL DUDE |
| Euro Trader-Submitter 1: | yeah [Sterling Trader-Submitter 1] gave me ur call update i agree we shouldn't ve been talking about putting fixings for our positions on public chat just wanted to get some transparency though otherwise we end up with the same talks afterwards why we fixed it low or high, from u boys in ldn[125] |

184.    As this conversation shows, Defendants were fully aware that accepting requests for false submissions was wrong. However, neither the UBS senior managers in the chat above nor any other UBS managers instructed UBS' Derivatives Traders and Trader-Submitters to stop manipulating Euribor and make submissions in line with EBF guidelines. Instead, the conduct continued unabated, as written requests for favorable Euribor submissions by UBS Senior STIR Management occurred as late as June 30, 2010.[126]

**B. Defendants Manipulated and Fixed Euribor and the Prices of Euribor-based Derivatives by Pushing Cash in the Market.**

185.    To further guarantee the success of their efforts to rig Euribor and fix the prices of Euribor-based derivatives, Defendants engaged in a manipulative trading strategy in Euro-denominated money market, referred to as "pushing cash." The strategy was rather simple. Because Euribor is supposed to reflect the rate of interest being paid on Euro-denominated

---

[124] Ex. A-2 at 40; Ex. A-1 at 34 ¶ 86.

[125] Ex. A-2 at 40; Ex. A-1 at 34 ¶ 86.

[126] Ex. A-2 at 40-41.

deposits, Defendants would borrow and lend at above or below market rates to "push" the rate of interest being paid on Euro-denominated deposits in the desired direction.

For example, when Defendants wanted to manipulate Euribor higher they would "bid up" the cash, *i.e.*, pay above-market rates for Euros-denominated deposits to raise prices in the cash market and influence the Euribor fix.

**April 13, 2007:**

> Frankfurt Euro Desk Manager: HI MATE, JUST FOR UR GUIDE. WE TRY TO BID UP IN THE 3M TO PUSH THE FIX A BIT.[127]

186.    Similarly, when Defendants wanted to manipulate Euribor lower they would "offer" cash and lending at below market rates to drive the prices of Euro-denominated deposits lower and influence the Euribor fix:

**June 21, 2007:** (to [Bittar])

> Frankfurt Euro Desk Manager: WE CONTINUE TO OFFER 1M CASH IN THE MARKTE TO KEEP lME FIX ON THE LOW SIDE.[128]

187.    Because "honest" Euribor panel banks (if any) were supposed to look to the cash market when determining their Euribor submissions, "pushing cash" was most effective when multiple Defendants with large "treasuries," *i.e.*, money market desks, were involved because they could move cash prices more easily, enhancing the manipulative impact on Euribor.  In conversation below, Barclays' Moryoussef ████████████████ discuss how the strategy worked on March 19, 2007, during one of the Defendants' planned long-term Euribor manipulations. ████████████████████████████████████

████████████████████████████████████████

---

[127] Ex. F-2 at 19.

[128] *Id*. at 19.





189.    To further maximize the impact of this strategy, Defendants timed their efforts to push cash when they knew the market was "thin," or illiquid, and it was easier to manipulate prices. As one Deutsche Euribor submitter explained below:

**September 7, 2006:**

Ok here we goi – we all know that we have limited ability to impact the cash market exept of sometimes. Naturally we can not give cash in size due to bs limits but we can take in cash without restrictions. Since DB has a good name in the market we suhd be able to rise some size. **This impact becomes even bigger when we do this in times when the cash market is even thinner than normal (i.e. Year end).** . . . Target tenors would be 1m

---

[131] Futures contracts trade on "margin," which means that an investor does not need to put down the full notional value underlying a contract to trade that product. Thus, while an NYSE LIFFE three-month Euribor futures contract is based on notional value of €1,000,000, it takes significantly less than that amount to buy one contract. This is in contrast to the Euro-denominated deposits involved in the pushing cash strategy, which may require a Defendant to pay 100% of the offered amount, to satisfy the loan. Given the difference in capital required, a €1,000,000 purchase of three-month Euribor futures contracts would allow a Defendant to own a large of number of futures contract and control millions of dollars in notional value making a change of 1 "basis point," *i.e.*, one one-hundredth of one percent, far more valuable in the futures market than on a cash market position.

and 3m. I am wondering wether its possible to build up fra-eonia spread throughout the year at decent levels and blow up the spread in Dec.[134]

190.    Deutsche's management knew and approved of this manipulative trading strategy. Following the conversation above, Submitter-4 messaged Senior Manager-6 and Manager-5 with the details of his strategy, telling them that the "total profit possible EUR 2m."[135]  Each manager failed to take any action, permitting Deutsche's traders and submitters to continue to manipulate Euribor by pushing the cash market.

191.    Deutsche also enlisted the help of its co-conspirators, who agreed to push cash and drive the Euribor fix higher or lower. ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

████████████████

███████████            ██████████████████

███████████            ███

███████████            ██████████████████

███████████            ██████████████████

███████████            ██████████████████

███████████            ██████████████████

---

[134] Ex. F-1 at 28 (emphasis added).

[135] *Id.*



192.

193.   Because Euribor is supposed to represent the rate at which interbank term deposits are offered on Euro deposits, by pushing cash and manipulating the prices of Euro money market instruments through, *inter alia*, placing bids and offers for Euro-denominated deposits at above



[139] *Id.*

and below market rates, Defendants manipulated the prices of Euribor-based derivatives to artificial levels during the Class Period for their financial benefit.

**C.  Coordination Through Inter-Dealer Brokers: "Spoofing" The Market to Manipulate Other Banks' Euribor Submissions.**

194.    Another means by which the Defendants manipulated and fixed Euribor and the prices of Euribor-based derivatives was by colluding with "inter-dealer brokers," *i.e.*, intermediaries that facilitate transactions between dealer banks in markets where there are no centralized exchanges, such as the over-the-counter market for Euro-denominated deposits and Euribor-based derivatives. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.

195.    Deutsche's and Barclays' government settlements detail how the banks enlisted the help of inter-dealer brokers to transmit false cash market prices to their customers, creating the perception that market prices (and Euribor) were moving in a direction that was beneficial to their trading positons. For example, in the following electronic communication, ████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████

██████████████████

██████████████        ████████████████████████

████████████████████████████ [140]

196.    On May 28, 2008, Bittar once again reached out to his friend, Moryoussef, after

Moryoussef moved from Barclays to Defendant RBS, telling him how he talks to his cash

brokers each day, who reach out to inter-dealer brokers, to tell them to raise the 6m Euribor rate.

In this phone call to Moryoussef, Bittar stated: "Every day, every day I speak to my cash desk, to

the cash brokers. I say 'You have to raise the six month, you have to raise the six month!'" [141]

197.    In another example, in a January 28, 2009 telephone call with an unidentified

Euro derivatives trader, Bittar informed the trader that ". . . we are still working on the, on the

brokers . . . so that they, they re-steepen the curve,"[142] *i.e.*, Bittar enlisted the inter-dealer brokers

to transmit false pricing information that would cause the spread between different Euribor

tenors to widen and the yield curve to increase a sharper, or "steeper" angle.

198.    To strengthen their relationships with the inter-dealer brokers and ensure that

everyone was on the same page, ███████████████████████████████████████████

███████████████████████████████  ██████████████████████████████

███████████████████████████████████████████████████████

█████████████████

        ████████████████

        ████████████████████     ███████████████████████

        █████████████     █████████████

        ████████████████████     ████████████████████████████████

        ████████████████     ████████████████████████████

---

[140] Ex. F-2 at 22.
[141] *Id.*
[142] *Id.*

██  ██████████

199.    While the government settlements and Plaintiffs' limited ACPERA discovery from Defendant Barclays revealed these communications between the Contributor Panel Banks and inter-dealer brokers, only discovery will reveal the full extent to which the brokers participated in manipulating and fixing Euribor and the prices of Euribor-based derivatives.

**D. Defendants Executed at Least Three Known Long-Term Campaigns to Rig Euribor**

200.    Applying the manipulative tactics described above, Defendants executed three known long-term campaigns to rig Euribor and fix the prices of Euribor-based derivatives. Based on the information revealed to date, these campaigns covered:

- **September 2006 – November 2006**: Defendants planned to manipulate Euribor higher on October 16, 2006 and lower on November 13, 2006 to benefit their Euribor-based derivatives positions that were being fixed on those dates;

- **December 2006 – March 2007**: having amassed a large, long position in NYSE LIFFE three-month Euribor futures contracts, Defendants planned to manipulate three-month Euribor lower on March 19, 2007 to increase the value of their futures position;

- **January 2007 – May 2007**: while planning to manipulate three-month Euribor lower on March 19, 2007, Defendants also planned to lower one-month Euribor during the same time period to benefit a large "basis spread" position that would increase in value as the different between one-month Euribor and "EONIA," the interest rate used for overnight deposits, narrowed.

201.    In each long-term campaign, Defendants aligned their Euribor-based derivative positions to create a common motive and maximize the financial benefit to the group. By coordinating the Euribor submissions and cash market activity of some of the largest banks in the world, Defendants had what Barclays Moryoussef called the "firepower" to bend Euribor to their will, fixing Euribor-based derivatives prices at levels that financially benefited their collective positions at the expense of Plaintiffs and the Class.

### 1. Long-Term Campaign No. 1: September 2006 through November 2006

202.    The first known long-term campaign to fix Euribor-based derivatives prices began with a September 7, 2006 conversation between Barclays' Moryoussef and Deutsche's Bittar.  In this conversation, which was partially released in Deutsche's settlement with the DOJ, Bittar explained to Moryoussef that he has two large Euribor-based derivatives positons fixing on the October and November "IMM" date.[144]



---

[144] While official IMM dates only fall in March, June, September, and December, here Bittar was using the term IMM to refer to generally to the time of the month, *i.e.*, the third Wednesday, of October and November.  As trading typically stops two business days before the third Wednesday on an IMM date, these Euribor-based derivatives positions would be fixed on October 16, 2006 and November 13, 2006.

[145] *See supra* Part I.A.4 and I.A.5 (discussing interest rate swaps and FRAs).

[146] ███████████████████████████████████████
███████████████████



203.    After learning of Bittar's position, Barclays' Moryoussef disclosed that he too has a large Euribor-based derivative position worth ▮▮▮▮ resetting in October and another in November.  Given their mutual interest in both fixings, the two agreed to work together in manipulating Euribor to fix the prices of Euribor-based derivatives for their benefit in both October and November 2006:



---

▮ ▮▮▮▮▮▮



204.    After reaching an agreement, the two traders discussed how best to manipulate Euribor up to and including on these two dates. ███████████████████████

███████████████████████████████████████████████████████ ████

█████████████████████████████████████████████████████

████████████████████████████

██████████████            ███████████████████

                        █████████████████████

███████████████            █████████████████

███████████████            █████████████

██████████████            ██████████████████████████

### i.    Raising Euribor in October 2006

205.    Throughout September, Moryoussef and Bittar continued to discuss their planned upward manipulation of Euribor, confirming their plans to raise rates during October:

<u>September 11, 2006</u>:

Deutsche [Bittar]:              in October, well set the fixings at the sky,
                              or that's not good for you?

Barclays [Moryoussef]:        no, no, at the sky is good better for me[150]

---



[150] Ex. F-2 at 21.

206. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████

**September 27, 2006**:

Deutsche [Bittar]:          amigo, which way are you in 3mth oct fras? if u receiving libor I hope u gonna put high fixings

████████          surprised how low it came out but I am neutral 3m fixings like low 1s fixing n high 6 fixing[151]

**September 28, 2006**:

Deutsche [Bittar]:          amigo mio…hope u gonna put a high fix if it suits?

████████          Amigo will check with cash here think they go 42 to b honest v neutral to this one where do u guys see it?

Deutsche [Bittar]:          am hoping for 425 or 43…that's where it shud be really[152]

207.    Other banks also reached out to Bittar to join the conspiracy. In the conversation below, Trader E-1 at co-conspirator Bank E messaged Bittar to check on his position for the upcoming October IMM date. After disclosing their positions and realizing they are in the same direction, Bank E joined with Deutsche in agreeing to manipulate Euribor higher in October and lower in November:

**September 28, 2006**:

Trader E-1:                      mate how u positionned on 3mth fras at the moment? u have interest in a high or low libors?

[Deutsche] Trader-3
[Christian Bittar]:            wud still love high rates mate, but i have to say that i bought loads of them some six months ago and sold back

---

[151] Ex. F-1 at 35.

[152] *Id.* at 35-36.

|   | at high levels to our mutual clients let s say on emonth ago ... so, nothing huge in my book for now ... i reckon u' re in the same position right? |
|---|---|
| Trader E-1: | I need high libors in octobers and lower in November WOULD LOVE IT…do u speak to ur guys in frankfurter for the fixings? |
| [Deutsche] Trader-3 [Christian Bittar]: | yes and to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as well – my fft will put a high fix all allong October.. can u speak to your cash guys if it suits u ? |
| Trader E-1: | will try, certainly[153] |



208. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

209. Defendants understood the importance of following the agreed-upon plan and that making Euribor submission in a different direction would financially harm their co-conspirators.

---

[153] *Id.* at 36-37.

▮ ▮▮▮▮▮▮▮



210.     Also, on October 4, an unidentified external trader (identified as "External Euro Trader 1" below and in Rabobank's CFTC Settlement) requested a high one-month Euribor from Defendant Rabobank's Senior Euribor Trader-Submitter:

External Euro Trader 1:         can the 1m fix be expensive madame cadburry?

[Rabobank] Senior Euribor
Trader-Submitter:                absolutely sir…[156]



211.

212.

---

[156] Ex. C-2 at 41.



213.



217.    As a result of Defendants coordinated effort to manipulate Euribor higher by October 16, 2006, one-month Euribor increased from 3.291% on October 2, 2006 to 3.348% on October 16. 2006. Three and six-month Euribor also increased over the same time period, from 3.435% to 3.502% and 3.582% to 3.643% respectively.  These higher Euribor fixings benefited Defendants trading positions, which were aligned to benefit from an increase in Euribor, while directly and proximately causing injury to Plaintiffs and the Class.

**ii.       Lowering Euribor in November 2006**

218.    Following the successful upward manipulation of Euribor on October 16, 2006, Moryoussef and Bittar immediately switched their focus to driving Euribor lower heading into November 13, 2006.



219.



221.





████████████████████████████████████████████████████████████

████████████████████████████████████████   These false

Euribor submissions resulted in an artificially lower Euribor fixing which financially benefited

Defendants' Euribor-based derivative positions while causing injury to Plaintiffs and the Class.

**2.      Campaign No. 2: December 2006 through March 2007**

228.    Having successfully manipulated Euribor in October and November 2006,

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

██████    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

      ██████████████████████████
      ███████████████

      █████████████████████████████████████████████████████
      █████████████████████████████████

██████    ███████████████████████████████████████████

███████████████████████████████████████████████████████

      ─────────────────────────

██  ████████████████



231.



232.



233.    On March 19, 2007, multiple banks helped Moryoussef push cash in the market and lower three-month Euribor. Bittar and Deutsche began "offering aggressively," pushing so much cash into the market that they caused a chain reaction, getting other market participants, including unidentified Broker Firm 1, to lower their quotes on the "screen" where prices are displayed to the rest of the market. As Deutsche Submitter C explained, by giving away cash at 1 basis point below market rates, Deutsche caused a "1/10" drop in the "3M FIX," which was worth it given the size of their Euribor-based derivatives positions:

**March 19, 2007**:

| Deutsche Submitter C: | FYG [Broker Firm 1] DOWN TO 3.89 IN THE 3M AS WELL WE ARE OFFERING AGRESSIVLY |
|---|---|
| Deutsche [Bittar]: | thanks [Submitter C] |
| Deutsche Submitter C: | HAVE JUST GIVEN…AT 87.5 |
| Deutsche [Bittar]: | oh my god! we don't want this to cost u money, do it only if it makes sense as well for you – don't wanna be annoying |
| Deutsche Submitter C: | NO WORRIES, I WLD OFFER AT 88.5 ANYWAY SO ITS 1bp GIVE AWAY THAT'S EUR 6K. SO NOTHING TO WORRY ABOUT. AND WE GOT HIS SCREEN DOWN WHICH IS QUITE IMPORTANT. 1/10 IN THE 3M FIX IS WORTH IT[175] |

---

[175] Ex. F-1 at 41-42.

234.    Knowing that "pushing cash" market prices has a direct impact on the direction in which Euribor is fixed on a particular day, Barclays' Moryoussef in a March 19, 2007 email pressed Barclays' cash desk and Barclays' Euribor submitter ██████████ to stop "bidding" in the Euro cash market, *i.e.*, paying for cash, as this had the potential to raise prices and thus increase Euribor that day:

**March 19, 2007**:

Barclays [Moryoussef]:        i am hearing you are bidding the cash…
                             we really need a low 3m…as discussed could u put the 3m
                             as low as possible

Barclays Submitter ██████     will do my best.[176]

235.    ████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████ █████████████████████
████████████████████████████████████████████████
██████ █████████████████████████████████████████
█████████████████████████████████████

        ████████████████
████████████████     █████████████████████████████
████████████████     ████████████████
████████████████     ████████████████

[176] Ex E-1 at 13.

██ ████████████████████████████████████████
██ ██████████████
██ ██████████████

236.





238.    Deutsche's employees also celebrated the successful team work among the Defendants and their co-conspirators.   When the three-month Euribor fixing came out as expected, Deutsche Submitter 4 sent the following message to unidentified Manager 1:

**March 19, 2007**:

HAVE U SEEN THE 3MK FIXING TODAY? THAT WAS AN EXCELLENT CONCERTED ACTION FFT/LDN. CHEERS.[182]

239.    Galvanized by the success of the March 19, 2007 manipulation, Bittar praised Deutsche' Euribor submitter for his help in executing the plan and looked to carrying out future, identical manipulations:

**March 19, 2007**:

Deutsche [Bittar]:      Great job on this [Submitter-4], we can do more of this stuff

Deutsche Submitter-4: WE CAN MY FRIEND. WE CAN[183]

240.    ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

241.    The praise for the success of the March 2007 IMM manipulation continued a week later.  █████████████████████████████████████

---

██ ████████████████████████████████

[182] Ex. F-1 at 42.

[183] *Id.* at 41.



242.    While Defendants made a substantial profit from this concerted manipulation of Euribor, it caused direct injury to Plaintiffs and the Class. As explained by Trader K-1, an unidentified co-conspirator at Bank K, this manipulative effort amounted to nothing more than Defendants "ripping off an end user," *i.e.*, Class members, for their own personal gain:

---

184

**March 19, 2007**:

| Trader K-1: | nice fixing!!! |
|---|---|
| Deutsche [Bittar]: | indeed |
| Trader K-1: | why so low? |
| Deutsche [Bittar]: | why not! |
| Trader K-1: | who gets fucked on that? I assume its all you short end guys ripping off an end user[185] |

### 3. Campaign No. 3: January 2007 through March 2007

243.    The third campaign overlapped with Defendants' plan to drive three-month Euribor artificially lower around the March 2007 IMM date. Beginning in at least January 2007, Deutsche trader Christian Bittar also planned to manipulate one-month Euribor artificially lower to benefit a large basis spread position he had accumulated involving one-month Euribor and the EONIA, the Euro OverNight Index Average, the interest rate used to price overnight deposits. Bittar needed the spread or distance between these rates to "tighten" or decrease, which he could accomplish by orchestrating a downward manipulation of one-month Euribor. In the conversation below, Bittar orders his Euribor submitter to keep Deutsche's one-month submission lower through March, forcing a tightening in the spread:

**January 29, 2007**:

Deutsche Bank Submitter:   HI, DO YOU STILL NEED A LOW 1M EURIBOR?
                           HOW LONG DO YOU NEED THESE LOW 1M FIXINGS?

Deutsche Bank [Bittar]: hi – yes please; all through march,
                        I need the libor/eonia spread to tighten[186]

---

[185] Ex F-1 at 42-43.

[186] Ex. F-5 at 7.

244.    When March arrived, Bittar reissued the same request, directing this time instructing Deutsche's Euro Desk Manager to continue making low one-month and high six-month Euribor submissions in line with his previous order:

**March 23, 2007**:

Frankfurt Euro Desk Manager:  FIXINGS AS USUAL MONSIEUR?
                                                            LOW 1M HIGH 6M (SAME HERE)

Deutsche Bank [Bittar]:  yes please – thank you very much [Euro Desk Manager]

Frankfurt Euro Desk Manager:  DE RIEN [you're welcome][187]

245.    ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████

246.    ███████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████

---

[187] Ex. F-2 at 17.

247.  ████████████████████████  the manipulation of the spread between Euribor tenors, is consistent with the information reveled in Defendants' government settlements regarding their Euribor-based trading positions.  For example, during the Class Period traders on Deutsche Bank's GFFX desk implemented a "basis spread" strategy, which traded the spread between two or more Euribor tenors.[188]  Developed at least in part by Bittar, Deutsche recognized that spread positions had the potential to generate significant profits and held weekly calls to educate their traders about how to take advantage of this strategy, even training their Euribor submitters to build a spread "bias" into their daily submissions.[189]  By manipulating the spread between Euribor tenors, Deutsche Bank increased the profitability of its Pool Trading and Money Market Derivatives Desk by more than 400% from €399 million in 2007 (1.29% of Deutsche's total yearly revenue) to €1.942 billion in 2008 (14.27% of Deutsche's total yearly revenue).

248.  These illicit profits directly trickled down to Bittar, who received a $136 million performance bonus during 2008 alone.  ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

249.  Other Defendants also implemented a similar basis spread trading strategy during the Class Period.  For example, the FSA found that Barclays' traders initiated positions in Euribor-based derivatives that would benefit from change in the spread between various tenors

---

[188] *Id.* at 9.

[189] *Id.*

[190] BCI 1368144.

of Euribor and Euribor relative to other interest rates, *e.g.*, EONIA.[191]   Rabobank's CFTC

settlement also indicates that the bank had Euribor-based derivatives positions that benefited

from a change in the spread, as traders discussed manipulating one, three, and six-month Euribor

to financial benefit from a change in one tenor relative to the others.[192]   These common, large,

basis spread positions further aligned Defendants' motives manipulate Euribor.

### E. Defendants Made Structural Changes to Support the Manipulation of Both Euribor and Euribor-Based Derivatives.

250.    Defendants supported the anticompetitive conduct described above by (1) making

structural changes to their money markets and interest rate derivatives trading desks to create an

environment where benchmark manipulation, including the coordination of requests for false

submissions between traders and submitters, was encouraged; (2) implementing lax compliance

standards that failed to detect any misconduct; and (3) hiding evidence of wrongdoing from

government regulators to thwart their investigations.

### 1. Defendants Permitted Manipulative Conduct By Failing to Monitor Their Euribor Submission Processes.

251.    For example, throughout the Class Period, Deutsche did not have any LIBOR or

Euribor-specific systems and controls in place governing its submissions—it did not keep

records of which employees made its Euribor submissions, the rationale behind those

submissions, or even train its employees regarding how to make submissions.[193]   Instead,

Deutsche promoted a company culture of increasing profits without concern for the overall

---

[191] Ex. E-3 at 9.

[192] Ex. C-2 at 44; Ex. C-1 at 30 at ¶ 63.

[193] Ex. F-5 at 14.

integrity of the market, including awarding bonuses and promoting employees based on the profits and losses of their trading books.[194]

252.    For example, one of Deutsche's most successful Euribor traders, Christian Bittar, the "guaranteed money maker," generated extraordinary profits for Deutsche and was highly regarded by senior management.  Anshu Jain, the then Global Head of Global Markets and soon-to-be co-CEO, deemed Bittar and another Deutsche trader as "the best people on the street" and "the best guys [Deutsche's] got," rewarding them with large bonuses and promotions.[195]

253.    Deutsche further encouraged a culture of manipulation by seating its Euribor submitters next to its derivatives traders so that its Euribor submissions would better serve its trading book. Starting in 2006, to increase Deutsche' profits, Anshu Jain (the Global Head of Global Markets) and Alan Cloete (who became the Global Head of Global Financial and Foreign Exchange Forwards) merged the bank's pool trading and money market derivatives ("MMD") desks, creating the Global Financial and Foreign Exchange Forwards ("GFFX") desk. Deutsche's GFFX desks operated in various offices around the world, including New York.[196] The GFFX desk was comprised of Deutsche's Pool Trading Group, which was responsible for cash trading, overseeing internal funding and liquidity, and trading financial instruments, including Euribor-based derivatives products, and its MMD traders, who traded, among other things, Euribor-based derivatives products. These Pool Trading and MMD desks were organized by currency and managed by regional managers in Deutsche's Frankfurt and New York offices.[197]

---

[194] Ex. F-5 at 14.

[195] Ex. F-1 at 22, 67.

[196] Ex. F-1 at 8; Ex. F-7 at 13, 17, 22.

[197] Ex. F-2 at 8.

254.    The sole purpose of creating this seating structure was to make it easier for Deutsche's traders and submitters to communicate regularly so that its Euribor submitters would be aware of the false rates they needed to submit to financially benefit each of the bank's trading positions.[198] This seating strategy, while inherently creating a conflict of interest, proved incredibly profitable for Deutsche, with its MMD desk alone generating €1.9 billion in 2008 and €2.9 billion in 2009.[199]

255.    Upon creating the GFFX desk, Deutsche implemented a new trading strategy that focused on the "spread" or difference between certain LIBOR and Euribor tenors. Deutsche's traders capitalized on the relationship between tenors by entering into "massive derivatives basis trading positions" which increased in value as the spread between tenors widened. To benefit these positions, Deutsche's basis spread strategy focused on keeping the spread between tenors wider.

256.    Deutsche educated its traders and submitters to ensure that this basis spread strategy was well known and utilized across currency desks. David Nicholls, the Head of Global Finance Europe and other senior traders from Deutsche's London, New York, Tokyo, and Frankfurt GFFX desks held weekly meetings, termed "Monday Risk Calls," where they openly discussed the use of this trading strategy so that everyone involved understood the plan. As a result, the CFTC found that Deutsche's IBOR submitters, including those who made Deutsche's Euribor submissions, routinely built a spread "bias" into Deutsche's IBOR submissions, pushing the spread between different tenors of IBOR wider, even in the absence of written communications from traders requesting a specific false rate.

---

[198] Ex. F-6 at 5.

[199] Ex. F-6 at 6.

257.    UBS made similar seating arrangements.  From at least January 2005 through September 2009, derivatives traders on UBS' STIR desk traded short-term interest rate derivatives and made UBS' Euribor submissions.[200]

258.    The STIR desk managed both UBS' interest rate risk and short term cash positions, engaging in transactions for interest rate derivatives and cash trading in the money markets for each currency, including Euribor.[201]

259.    On UBS' STIR desk, Euribor-based interest rate derivatives traders were not just seated next to Euribor submitters, they actually made the submissions themselves.  By placing Euribor derivatives traders (whose compensation was directly based on the performance of their trading books) in charge of determining UBS' Euribor submissions, UBS created a direct conflict of interest between the profit motive of these traders and their responsibility to submit Euribor quotes that reflected UBS' true cost of borrowing.

### 2. Defendants Implemented Lax Compliance Standards That Ignored Manipulative Conduct

260.    Defendants not only intentionally rearranged their trading operations to facilitate manipulative conduct, they also used their compliance departments to support the ongoing rate fixing manipulations by imposing meaningless standards that were guaranteed not to detect wrongdoing, at times going so far as to interfere with government investigations.

261.    To conceal its rate fixing misconduct, members of Deutsche's compliance department repeatedly refused to conduct internal audits of its rate fixing submission process. For example, on October 25, 2010, a Deutsche Compliance Supervisor asked Compliance Officer A, who upon information and belief is Andrew Sowter, to look into the bank's rate fixing

---

[200] Ex. A-2 at 8.

[201] *Id.*

systems and control to formally review the banks' practices in multiple currencies.[202] Compliance Officer A ignored this request and did not conduct the review because it would negatively impact Deutsche's highly profitable rate fixing derivatives business, explaining to another Deutsche employee that he thought the Compliance Supervisor's idea of reviewing the IBOR submission process was "crazy" and that "the business is going to go completely mental" if any kind of audit ever takes place.[203]

262.    Later that same year, Compliance Officer A struck again, this time in response to a December 2010 rate fixing investigation.  Rather than simply conduct an internal review of Deutsche's IBOR-related systems and controls, Compliance Officer A signed and submitted a confirmation to the British Bankers Association on January 12, 2011, stating that Deutsche's IBOR submission process had already been audited.  This was a lie—Deutsche's compliance did not audit the systems and controls in place for LIBOR or Euribor.  Compliance Officer A further dismissed the BBA's request and his fraudulent statement in an email, stating that the signed confirmation form was nothing more than "an arse-covering exercise [by the BBA]."

263.    On February 4, 2011, the FCA requested that Deutsche attest to the systems and controls in place to ensure the integrity of Deutsche's IBOR submission process.  Once again, the task of completing this review fell on Compliance Officer A, who conducted only a minimal investigation into Deutsche's IBOR submission process.  Compliance Officer A found that there were **no IBOR-specific systems and controls** in place to ensure the integrity of these rates.  He also found that Deutsche's communication monitoring system would not detect any IBOR-related "buzz words" indicative of manipulative conduct and/or inter-bank coordination.[204]

---

[202] Ex. F-3 at 23.

[203] *Id.*

[204] *Id.* at 30.

264.    Despite these findings, on March 18, 2011, Compliance Officer A provided an attestation to Senior Manager I, who signed and returned the following statement to the FCA:

> DB monitors all email and instant messaging communications of all front office staff. The focus of this surveillance is DB's market conduct, such that key words and phrases within the monitoring tool are designed to flag potential market conduct issues. Any potential issues can be escalated and investigated as necessary. In light of the above, I consider, together with the senior management [names of Senior Manager B and Senior Manager C provided] . . . that DB currently has adequate systems and controls in place for the determination and submission of DB's LIBOR fixings.[205]

265.    This statement was blatantly false in three respects, as Compliance Officer A knew that Deutsche: (1) did not have any specific procedure in place governing IBOR submissions; (2) did not conduct spot checks; and (3) did not monitor communications for IBOR-specific terms. The FCA found that Deutsche's senior management failed to oversee Compliance Officer A or verify any information contained within the attestation.[206]

266.    Rabobank also filed a false attestation with the FCA to cover up its failure to implement internal IBOR-related systems and controls. On February 2, 2011, the FCA asked Rabobank to "provide an attestation as to the adequacy of the systems and controls arrangements currently in place for the determination and agreement of [ . . . ] LIBOR submissions."[207]   At that time, Rabobank had drafted an IBOR policy, but did not implement it.

267.    Despite not having any IBOR-related systems and controls in place, Rabobank signed and returned an attestation to the FCA on March 18, 2011, stating: "As per your letter of 2nd February 2011, we can confirm that the arrangements in place for Rabobank International's LIBOR submissions are adequate and fit for purpose." This statement was false in three aspects,

---

[205] *Id.* at 30-31.

[206] *Id.* at 31.

[207] Ex. C-3 at 16.

as Rabobank: (i) did not implement, disseminate, or even train its employees on any IBOR-related systems and controls; (ii) continued to allow submitters to trade derivatives that were based on the very rate they were responsible for submitting; and (iii) failed to implement a system to maintain records of who was making IBOR submissions and what those submissions were based on.[208]

268.    After lying to the FCA, Rabobank put its flawed IBOR policy in place on March 30, 2011, but given the policy's shortfalls, Rabobank's traders and submitters continued to manipulate IBOR. It was not until over a year later, in August 2012, that Rabobank finally addressed the problem by putting systems and controls in place that prohibited IBOR submitters from trading IBOR-based derivatives products.[209]

269.    UBS also did not have any systems or controls in place to monitor its rate-fixing submission process, which permitted its traders and submitters to manipulate Euribor.[210] When UBS' Compliance department launched an internal review of its rate submission processes and procedures (the "2008 Review"),[211] it chose to limit its 2008 Review solely to U.S. Dollar LIBOR, ignoring the likely possibility that its traders and submitters, who management placed next to each other on the STIRs desk, were involved in manipulating the rate-fixing process for multiple currencies—a reality confirmed by UBS' guilty plea to wire fraud in connection with its rate-fixing misconduct.[212]

270.    To ensure the 2008 Review did not uncover any rate-fixing misconduct, UBS' Compliance department placed one of the Bank's LIBOR submitters in charge. This created a

---

[208] *Id.*

[209] *Id.*

[210] Ex. A-3 at 34.

[211] *Id.* at 27.

[212] Ex. A-4 at 1.

direct conflict of interest, giving the submitter an opportunity to conceal any misconduct that might get him or his friends in trouble. For example, the LIBOR submitter selected to lead the 2008 Review had himself received at least one request for a false LIBOR submission during the relevant period.[213] Proof that the 2008 Review was a sham, the LIBOR submitter found nothing wrong with UBS' USD LIBOR submission process even though he had direct knowledge that UBS' traders were manipulating LIBOR.[214] UBS' Compliance department naïvely terminated its limited inquiry into the IBOR submitting process at the bank, permitting UBS' IBOR manipulation to continue without consequence.

271.    To give the appearance that UBS was making a serious effort to end IBOR-related misconduct, Compliance decided in August 2008 that it was finally time to draft formal procedures and guidelines (the "2008 Guidelines") for UBS' rate-fixing submission process. The 2008 guidelines, like the 2008 Review, were also a sham and never actually circulated to UBS' employees. UBS' Compliance department only drafted them as a protective measure, in the event they were ever questioned about what procedures they had in place.[215] The 2008 Guidelines were illusory, and neglected to address key failures within the bank's IBOR submission process: the inherent conflicts of interest (*e.g.* assigning trading and submitting responsibilities to the same individual at the STIR desk) and lack of training for IBOR submitters on how to properly calculate UBS' daily IBOR submission.

272.    The 2008 Guidelines also created an "exception reporting regime" intended to give the appearance that UBS actively monitored its IBOR submissions for false reporting. Under this new system, compliance was to make weekly comparisons of UBS' IBOR

---

[213] Ex. A-3 at 28.

[214] *See*, *e.g.*, *id.* at 28.

[215] *Id.* at 29-30.

submissions to UBS' actual cost of borrowing and/or the various published IBOR rates for the day. Large differences would be considered "exceptions" and flagged for further review. While this sounded good on paper, compliance configured the exception reporting regime to only be triggered by extremely large differences between UBS' IBOR submission and actual cost of borrowing, effectively neutering the system. As a result, despite UBS' admitted false reporting in multiple IBOR currencies throughout the Class Period, the exception reporting regime did not detect a single false LIBOR submission while it was in place.[216]

273.    As a result of UBS' ongoing manipulative and unlawful conduct, on May 20, 2015, the DOJ determined that UBS breached its December 18, 2012 Non-Prosecution Agreement ("NPA")[217] for manipulating its benchmark interest rate submissions, including Euribor.[218]   After signing the NPA and agreeing to implement systems and controls to govern its benchmark submission processes, UBS represented to the DOJ that it made "important and positive changes in its compliance, training, and overall approach to ensuring its adherence to the law."[219] This was untrue, as UBS continued its company culture of promoting profit over the overall integrity of the U.S. financial markets.

274.    In UBS' fourth DOJ matter in only six years, the DOJ found that UBS engaged in fraudulent and deceptive practices in the foreign exchange market and colluded with other banks to manipulate foreign exchange, yet unsurprisingly, UBS' deficient compliance department

---

[216] *Id.* at 29.

[217] Ex. A-1.

[218] *United States v. UBS AG*, No. 15-cr-00076, ECF No. 6 (D. Conn.).

[219] *Id.*, Exhibit 1 at.

failed to detect it.[220]  Because the DOJ revoked UBS' NPA, UBS pled guilty to a one-count

criminal information for violation of the wire fraud statute, 18 U.S.C. §§ 1343 and 1342.[221]

### 3. Defendants Actively Concealed Their Wrongdoing from Government Regulators

275.  To further conceal their wrongdoing, at least one Defendant, Deutsche, repeatedly

lied to the FCA during its probe into Deutsche's IBOR rate fixing misconduct, including Euribor.

276.  The FCA's Final Notice against Deutsche details how the bank attempted to hide

the Federal Financial Supervisory Authority for Germany's ("BaFin") findings from their IBOR

probe. In 2012, BaFin reviewed Deutsche's rate-fixing misconduct, producing a report ("The

Report") to the bank in August of 2013.[222] Deutsche was unhappy with The Report, which

heavily criticized the bank.[223]

277.  In the course of its investigation, the FCA requested that Deutsche provide it a

copy of The Report.[224] Deutsche's Senior Management, concerned about disclosing both The

Report and BaFin's findings, sought the advice of counsel.[225]  Deutsche's lawyers informed

them that a failure to disclose The Report would constitute a breach of FCA Principal 11, which

broadly covers providing false, misleading or inaccurate information to the FCA, including

during an investigation.[226]

278.  Disregarding this advice, Deutsche went on a campaign to suppress the BaFin

report. In September 2013, Deutsche's Senior Manager F met with BaFin and expressed concern

---

[220] *Id.* at 2.

[221] *United States v. UBS AG*, No. 15-cr-00076,  ECF No. 6 (D. Conn.).

[222] Ex. F-3 at 26.

[223] *Id* at 27.

[224] *Id.*

[225] *Id.* at 26.

[226] *Id.* at 27.

regarding disclosure of The Report. The BaFin took no position, meaning Deutsche was free to provide the report to FCA.

279.    After the BaFin meeting, on September 6, 2013, Senior Manager F talked to Senior Manager G via telephone. Together, Senior Managers F and G scripted a fabricated response, which they agreed to follow if the FCA asked Deutsche to produce the BaFin report in the future. The script read as follows:

> . . . the BaFin has explicitly stated to DB that it would not approve of DB sharing either copies or details of the contents of the aforementioned documents [including the report] with foreign regulators at this stage.[227]

280.    To provide further cover for Deutsche's actions and support the scripted response above, Senior Manager F met with Legal Manager A later that same day to draft an "attendance note" about the BaFin meeting. The note was intentionally ambiguous and written so that it could be interpreted to state that the BaFin expressly prohibited Deutsche from disclosing The Report to the FCA. Conveniently, this ambiguous document was the only record of the September BaFin meeting.

281.    All the while, Deutsche's management knew that disclosing the report was not prohibited by BaFin. For example, in a September 10 email, a Deutsche Legal Team member wrote that "subject to the [Management] Board agreeing, we would likely inform the other regulators about receipt of the [Report and the other materials] but only be prepared to share the [Report]."[228] This statement was also reflected in papers sent to the management board during a meeting which stated that disclosure of The Report "may be acceptable for the BaFin."

---

[227] *Id.* (alteration in original).

[228] *Id.* at 28 (alterations in original).

282.    Despite being told by its legal department to disclose The Report to the FCA, Deutsche's management deliberately chose to conceal the BaFin's criticisms against the bank. On September 13, 2013, Deutsche conveyed the previously-scripted statement to the FCA's Enforcement and Financial Crime Division.   On September 16, Senior Manager E told the FCA's Supervision Department the same message during a phone call.   Deutsche also followed-up via email on September 16, stating to the FCA:

> DB received several documents from the BaFin in August 2013 including [the Report]… **The BaFin has indicated to DB that it would not approve of DB sharing either copies or details of the contents of the documents referred to above with foreign regulators at this stage.** In these circumstances, the Bank feels that it has no option but to defer to the BaFin's wishes. As discussed, if you would like further information, we would therefore ask that you speak directly with your contacts at the BaFin.[229]

283.    Collectively, the information Deutsche told the FCA was inaccurate, misleading, and intentionally crafted to keep the FCA from discovering the criticisms of the bank, including The Report, that senior management considered unflattering.

284.    On January 30, 2014, the FCA began to investigate Deutsche for its failure to disclose The Report. Deutsche continued to make misrepresentations to the FCA to cover-up its investigation-related misconduct. Deutsche Senior Manager H represented to the FCA that the attendance note of the September meeting with BaFin substantiated the bank's position that their non-disclosure was reliable and appropriate. Senior Manager H later determined that the attendance note was misleading, but did not contact the FCA to correct his misleading statement.

---

[229] *Id.* (emphasis added).

The FCA determined that the attendance note was drafted by Legal Manager A two days after the September meeting, at which he was not present.[230]

285.    To further conceal its wrongdoing from the FCA and other regulators, Deutsche destroyed possibly-relevant evidence after receiving a formal FCA request to preserve it. In May 2011, the FCA ordered that Deutsche retain all IBOR-related data and information, including telephone recordings, dated back through 2006. Hermann-Josef Lamberti, a member of Deutsche's management board and Chief Operating Officer responsible for overseeing IT, did not properly warn his subordinates of the FCA order. As a result, in July 2012, Deutsche destroyed at least 482 audio tapes of telephone calls relevant to the IBOR investigation dating from 2008 to 2009.

286.    Not only did Deutsche destroy evidence, the bank failed to archive and produce other possibly-relevant communications altogether. A month after Deutsche settled with global regulators, it realized that other potentially-incriminating communications were never produced from its internal messaging system, "DB Chat."[231] Some of Deutsche's internal communications dating back to 2005 could be permanently lost. Regulators, including the NYSDFS, are currently investigating the matter and could reopen the Deutsche settlement, exposing the bank to additional IBOR-related liability in the future.[232]

---

[230] *Id.* at 29.

[231] *See* Moore, Michael J. and Farrell, Greg, *Deutsche Bank Error Loses Chat Logs Sought in Libor Probe*, BLOOMBERG BUSINESS (July 30, 2015), available at http://www.bloomberg.com/news/articles/2015-07-30/deutsche-bank-error-said-to-lose-chat-logs-sought-in-libor-probe.

[232] *Id.*

**III.    OTC Derivatives Price Fixing Conspiracy: Defendants Conspired to Fix the Prices of Euribor-Based Derivatives by Coordinating their Activity Instead of Competing for Business in the Over-The-Counter Market**

287.    In addition to rigging Euribor by making false Euribor submissions, "pushing cash" and displaying "spoof" bids and offers, Defendants also fixed the prices of Euribor-based derivatives by acting directly in the Euribor-based derivatives market. Transcripts of Bloomberg chats and telephone conversations show Defendants, a supposed group of horizontal competitors, engaged in multiple types of anticompetitive conduct, including: (1) agreeing upon Euribor-based derivatives prices before issuing quotes to market participants; (2) rigging bids to guarantee trades at a desired price; (3) coordinating pricing "runs" sent to their clients with other Defendants; (4) sharing proprietary market-sensitive information including the names of their clients, the interest rate curve used by their bank to price Euribor-based derivatives, and the contents of their trading book; (5) refusing to deal with certain market participants; (6) assisting co-conspirators by trading with them at below market rates.

**A.  Defendants Agreed On Where to Quote Prices For Euribor-Based Derivatives**

288.    Defendants fixed the prices of Euribor-based derivatives by consulting each other and agreeing on prices before issuing price quotes to other market participants. By agreeing on prices instead of competing, Defendants fixed Euribor-based derivatives prices at levels that were beneficial to their trading book and activity as "market makers," *i.e.*, dealers that offer to buy and sell Euribor-based derivatives hoping to make a profit on the "spread," or difference between the "bid price," where they offer to buy a financial instrument, and "ask price," where they offer to sell a financial instrument.

289.    By agreeing on prices before issuing quotes, Defendants capitalized on the opaque nature of trading in the over-the-counter Euribor-based derivatives market. Trading over-the-counter is different from trading on a public exchange because the prices of each Euribor-based

derivative are not publicly visible. For example, while exchange-traded instruments, like an NYSE LIFFE three-month Euribor futures contract, can be bought and sold a publicly listed price, in the over-the-counter market, prices are set by the individual market makers. To find out the price of a certain Euribor-based derivative, market participants need to contact a market maker and request a price quote. The conversation below is an example of a request for a price quote and subsequent transaction between a market maker and a client. Here, the client enters the Bloomberg chat and requests a quote for a Euribor-based forward rate agreement.[233] The market maker responds with a price, quoted as a spread; the first number is the bid price and the second is the ask price. After seeing the spread, the client indicates that it is a buyer at the quoted price[234] and the two counterparties agree to the trade:

> Client: 4/5 end
>
> Bank: 65.25-66.25
>
> Client: I BUY
>
> Bank: yours at 66.25
>
> Client: agreed, thanks

290.   To fix the prices of Euribor-based derivatives, Defendants shared these incoming requests for price quotes with each other, discussing and agreeing upon a price for the specific Euribor-based derivative, before returning a quote to the client. ████████████████████

████████████████████████████████████████████████████

---

[233] FRAs are identified by the following general format [# of Months Until Start]/[# of Months Until End] [Start Date]. The difference between the first two numbers separate by a forward slash indicates the duration of the agreement. The number or letters after this initial start month/end month indicator, represents the day of the month when the FRA will begin and end. For example, "4/5 end" means the FRA starts and ends at the end of the month, while "4/5 15" would indicate a FRA starting and ending on the 15th of the month.

[234] Market participants typically will not reveal their interest until after a price is quoted. This protects them from receiving a skewed price quote, as a bank that knows it has buyer on the line will charge more, raising the ask price, while a bank that knows it has a seller will pay less and lower its bid.



291.

██████████████

█████████████████████████████████████

███████████████████████████

████████████████████████████

███████████████████████

██████████████████████████████

██████████████████████

████████████████████

███████████████████

**B. Defendants Engaged in Bid Rigging.**

292.   After agreeing upon where to fix the price of a certain Euribor-based derivative, Defendants worked together to make sure that artificial price prevailed in the market. Because market participants could, in theory, ask a different market maker for a price quote if they did not like a Defendant's offer, the Defendants agreed to rig their bids and quote worse prices to the same market participants in order to guarantee a trade at the desired level. ██████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████

---

██ ███████████████



**C. Defendants Agreed On What to Quote In Pricing Run Throughs**

293.    In addition to agreeing on what prices to quote in response to direct client requests, Defendants also agreed on what prices to include in "run throughs," *i.e.*, lists containing price quotes for multiple Euribor-based derivatives.



294.    Defendants  also  sent pricing  runs  to each other  as a way  to  verify  that they were

quoting  Euribor-based  derivatives  prices  at the same level.

███████████

█████████████████████

███████████████████████████

█████████████████████

█████████████████████

███

██████████████

██████████████████████

█████████████████████████████████████████

**D.  Defendants Refused to Deal with Certain Customers**

295.   Defendants also fixed Euribor-based derivatives prices by refusing to deal with counterparties at below a certain rate. ███████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████

████████████

████████████████████████

█████████████████████

█████████████████

██████████████████████

███████████████████████████

██████████████████████

---

██ ██████████

██ █████████

███████████████████

████████████████████████████

███████████████████████████████████

**E. Defendants Shared Proprietary Pricing Information:**

296.    Defendants also shared otherwise proprietary pricing information used by their banks to determine the prices of Euribor-based derivatives.   This included the details behind the interest rate curve they used to price Euribor-based derivatives.  ████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████

███████████████████████████████

███████████████

████████████████████

███████████████████████

███████████████

███████████████

███████████████

███████████████

███████████████

███████████████

───────────────────────────

██ ██████████████



297.    By coordinating their pricing curves, Defendants ensured that they would quote Euribor-based derivatives at the same levels in the future.

298.    Defendants recognized the value behind this coordination and offered to compensate each other for sharing their pricing curve.



299.    In addition to coordinating prices for Euribor-based derivatives across range of maturities, Defendants also routinely checked prices with each other to make sure they were not quoting too high or too low. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

██████████████

████████████████████████████████

████████████████

██████████████████

██████████████

████████████████

██████████████████████████

██████████████████████████████

**F. Defendants Transacted With Co-Conspirators at Favorable Prices**

300.    Just as Defendants altered their price quotes depending on which clients were requesting Euribor-based derivatives prices, they offered special prices to their co-conspirators.



Bloomberg chats among the Defendants contain dozens of examples of one Defendant requesting a price quote "for me," *i.e.*, at the preferred level, different from what would be quoted to a customer. ████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

███████████

████████████████

████████████████

████████████████████████

██████████████

███████████████

██████████████████████

████████████████

██████████████

███████████████████

██████████████

████████████████████

██   ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

███████████████████████████

████████████████████████

██ ████████████

302.    Defendants knew the prices they were quoting to their counterparties were fixed at artificial levels and different from the preferential pricing they showed to each other. Communications between Defendants demonstrate that they operated off two sets of prices, "fake" prices that would be quoted to most market participants and "real" prices that were only discussed among co-conspirators.

**IV.    Defendants' Manipulative Conduct Directly Impacted Plaintiffs' and Class Members Euribor-Based Derivatives Positions.**

**A.  Plaintiff Sullivan**

303.    While Defendants' manipulative conduct financially benefited their Euribor-based derivatives positions, it negatively impacted those of Plaintiffs and Class Members.  Plaintiff Sullivan engaged in U.S.-based transaction of Euribor-based derivatives during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was damaged and suffered legal injury.  For example, on March 19, 2007, Plaintiff Sullivan initiated a short position of 103 June 2007 NYSE LIFFE three-month Euribor futures contracts at an artificially inflated price as a direct result of Defendants' plan to artificially increase the price of NYSE LIFFE three-month Euribor futures contracts between December 2006 and March 19, 2007.[249]  Plaintiff Sullivan subsequently liquidated his short position on March 23, 2007, for a loss of $2,575.00.

304.    Plaintiff Sullivan's injury was a direct and proximate result of Defendants' manipulative conduct and the artificiality that existed in the market for NYSE LIFFE three-month Euribor futures contracts on and around March 19 and March 23, 2007.

305.    Plaintiff Sullivan also engaged in transactions involving CME Euro currency futures contracts and suffered losses as a direct and proximate result of Defendants' manipulative conduct.  For example, on October 2, 2006, Sullivan initiated a long position of 408 December 2006 CME Euro currency futures contracts.  Sullivan subsequently added to that long position,

---

[249] *See supra* Part II.D.2.

purchasing an additional 436 December 2006 Euro currency futures contracts on October 3, 2006, and 1 December 2006 CME Euro currency futures contract on October 4, 2006.

306.    Sullivan liquidated this long position in December 2006 CME Euro currency futures contracts by selling 225 December 2006 CME Euro currency futures contracts on October 3, 2006, 601 December 2006 CME Euro currency futures contracts on October 4, 2006, and 19 December 2006 CME Euro currency futures contracts on October 6, 2006. Sullivan lost a total of $584,112.50 on these transactions.

307.    Communications released as part of UBS' DOJ settlement and Rabobank's CFTC settlement reveal that Defendants were engaged in a downward manipulation of three-month and six-month Euribor on October 2, 2006, when Sullivan initiated his long position in December 2006 CME Euro currency futures contract, and an upward manipulation of one-month Euribor on October 4, 2006, when he liquidated part of that position by selling 601 offsetting Euro currency futures contracts.

**October 2, 2006**

In an electronic chat between a UBS Euro derivatives trader and the UBS Euribor submitter, the submitter solicited the trader's preference for that day's submission, asking, "any special wishes for the fixing?" The trader responded, "I lose 120k of a received fix today . . . so low would be good." The trader then indicated that his/her request for low Euribor applied to both the 3-month and 6-month tenors, to which the submitter responded, "ok we go 42 and 57."[250]

**October 4, 2006**

External Euro Trader 1:              can the 1m fix be expensive madame cadburry?

Senior Euribor Trader-Submitter:    absolutely sir…[251]

308.    Plaintiffs demonstrate that the prices of CME Euro currency futures contracts are directly and substantial impacted by changes in Euribor, increasing in price as Euribor decreases

---

[250] Ex. A-1 at 33 ¶ 84.

[251] Ex. C-2 at 41.

and vice versa.[252] As a result, Defendants' downward manipulation of three-month and six-month Euribor on October 2, 2006, artificially increased the price of CME Euro currency futures contracts. This manipulative conduct proximately caused Sullivan's loss by artificially increasing the cost to initiate his long position of 408 December 2006 CME Euro currency futures contracts on October 2, 2006.

309. Following the same inverse relationship, Defendants' upward manipulation of Euribor on October 4, 2006, artificially decreased the price of CME Euro currency futures contracts. This manipulative conduct proximately caused Sullivan's losses on October 4, 2006, when he sold 601 offsetting CME Euro currency futures contracts at an artificially lower price.

310. Sullivan also sold short 2 June 2006 CME Euro currency futures contracts on April 12, 2006 and liquidated this position on April 17, 2006 for a net loss of $4,112.00. Communications revealed in Rabobank and Barclays CFTC settlements demonstrate that Defendants were actively engaged in manipulating Euribor between January 13, 2006, and June 1, 2006.[253] As a result, Sullivan's injury was a direct and proximate result of Defendants' manipulative conduct and the artificiality that existed in the CME Euro currency on or around April 17, 2006, when he liquidated his short CME Euro currency futures positon.

**B. Plaintiff White Oak**

311. Plaintiff White Oak engaged in U.S.-based transactions of Euribor-based derivatives during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was damaged and suffered legal injury.

---

[252] *See supra* Part I.B.2.

[253] *See* Ex. C-2 at 40; Ex. E-2 at 14.

312.    For example, on June 8, 2010, White Oak initiated a short position of 2 September 2010 CME Euro currency futures contracts. White Oak subsequently liquidated that position by purchasing 2 offsetting September 2010 CME Euro currency futures contracts on July 6, 2010, for a loss of $17,112.50.

313.    Communications released as part of the statement of facts incorporated UBS' DOJ non-prosecution agreement demonstrate that Defendants were engaged in manipulating Euribor during the time period that Plaintiff White Oak held this short position in in September 2010 CME Euro currency futures contracts:

**June 29, 2010**

| | |
|---|---|
| Former submitter: | u got 6mth fix position today? |
| Trader: | 6mth fixing today?...nothing. |
| Former submitter: | ok, gonna set fixing 1bp higher on the 6s for the turn then. [254] |
| Trader: | didn't' think you set it! |
| Former submitter: | i don't but i give my opinion to the ALM desk… regarding change, higher/lower.[255] |

314.    Prices of CME Euro currency futures contracts are directly impacted by changes in Euribor.[256]  Thus, Plaintiff White Oak's injury was a direct and proximate result of Defendants' manipulative conduct and the artificiality that existed in the market for CME Euro currency futures contracts between June 8, 2010 and July 6, 2010.

315.    Plaintiff White Oak also transacted in NYSE LIFFE three-month Euribor futures contracts and suffered losses as a direct and proximate result of Defendants manipulative

---

[254] The word turn refers to "turn of the month" or "turn of the year."  For example, UBS traders initiated "The Turn Campaign" to manipulate the price of derivatives tied to six-month Yen-LIBOR which were due to reset or mature on June 29, 2009.  *See* Ex A-2 at 29.

[255] *See* Ex. A-1 at 34.

[256] *See supra* Part I.B.2.

conduct.  For example, on May 12, 2010, Plaintiff White Oak initiated a long position of 2 September 2010 NYSE LIFFE three-month Euribor futures contracts.  White Oak added to that position to on May 13, 2010, by purchasing an additional 2 September 2010 NYSE LIFFE three-month Euribor futures contracts.  Plaintiff White Oak subsequently liquidated its position in September 2010 NYSE LIFFE three-month Euribor futures contracts by selling two offsetting three-month Euribor futures contracts on July 6, 2010, for a loss of $1,375.00.

316.    Communications released as part of UBS' non-prosecution agreement, show that Defendants were engaged in manipulating six-month Euribor higher during the time period that White Oak held a long position in NYSE LIFFE three-month Euribor futures contracts.  The prices of NYSE LIFFE three-month Euribor futures contracts are directly impacted by changes in six-month Euribor.[257]  By manipulating Euribor higher, Defendants negatively impacted Plaintiff White Oak's long position in September 2010 NYSE LIFFE three-month Euribor futures contracts, which deceased in value as Defendants manipulated Euribor artificially higher.

317.    Plaintiff White Oak suffered legal injury as a direct and proximate result of Defendants' manipulative conduct, occurring between May 12 and July 6, 2010, when it liquidated its long positon of 4 September 2010 NYSE LIFFE three-month Euribor futures contracts on July 6, 2010, selling offsetting three-month Euribor futures contracts at an artificially lower price.

## C. Plaintiff CalSTRS

318.    Plaintiff CalSTRS engaged in U.S.-based transactions of Euribor-based derivatives during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was

---

[257] *See supra* Part I.B.1.

damaged and suffered legal injury. Plaintiff CalSTRS executed thousands of Euribor-based derivatives transactions during the Class Period including Euribor-based interest rate swaps and Euro foreign exchange forwards.

319. Throughout the Class Period, CalSTRS transacted directly with Contributor Bank Defendants including hundreds of foreign exchange forwards with Defendant Barclays between June 14, 2005, and March 21, 2011; hundreds of foreign exchange forwards with Defendant UBS between June 7, 2005 and March 31, 2011; hundreds of foreign exchange forwards with Defendant Citibank between June 1, 2005 and March 25, 2011; hundreds of foreign exchange forwards with Defendant Deutsche between June 8, 2005 and March 31, 2011; hundreds of foreign exchange forwards with Defendant HSBC between June 20, 2005 and March 31, 2011; hundreds of foreign exchange forwards with Defendant JPMorgan between June 1, 2005 and March 28, 2011; hundreds of foreign exchange forwards with Defendant RBS between November 4, 2005 and March 10, 2011; dozens of foreign exchange forwards with Defendant Société Générale between March 7, 2006 and March 25, 2011.

320. The CFTC has found that foreign exchange forward agreements are priced based on short-term interest rates for the relevant currency.[258] Thus, as demonstrated in Figure 1 and alleged in Part I.B.3., a manipulation of Euribor renders the amount to be paid or received under a Euro foreign exchange forward artificial by altering a component in the formula used to calculate the future price of Euro. As a direct and proximate result of Defendants' manipulation of Euribor, CalSTRS paid more for and/or received less Euro from foreign exchange forwards it entered into during the Class Period, including those transacted directly with Contributor Bank Defendants.

---

[258] See e.g., Ex B-2 at 6 (finding that Yen and Swiss franc foreign exchange forwards are priced based on Yen-LIBOR and Swiss Franc LIBOR, respectively); Ex C-2 at 6 (finding Yen foreign exchange forward are priced off of Yen-LIBOR).

321.    For example, On June 24, 2010, CalSTRS entered into a Euro foreign exchange forward with Defendant UBS agreeing to sell €5,087,339.83 to UBS for $6,256,766.64 on September 14, 2010.

322.    Communications released as part of UBS' DOJ settlement demonstrate that Defendants were engaged in an upward manipulation of Euribor headed into the "turn," *i.e.*, the end of the month, during June 2010. *See supra* ¶ 313.

323.    Consistent with this communication, which indicates that Defendants intended to manipulate Euribor artificially higher heading into the turn of the month, between June 14 and June 30, 2010, the one-month, three-month, and six-month tenors of Euribor each increased relative to the prior day.

324.    Defendants' manipulative conduct during June 2010 artificially increased the amount of Euro required for CalSTRS to fulfill its obligations to Defendant UBS under the Euro foreign exchange forward. As a result, CalSTRS was injured by Defendants' manipulation of Euribor during June 2010, when it entered into the Euro foreign exchange forward with UBS on June 24, 2010, agreeing to sell Euro to UBS at an artificially lower price.

325.    On June 30, 2006, CalSTRS entered into two foreign exchange forwards with Defendant Citibank, agreeing to purchase €70,000,000.00 from Citibank for $89,580,750.00 on October 5, 2006.

326.    Communications released as part of Barclays settlement with the FSA demonstrate that on and around June 29, 2006, Defendants' were engaged in an downward manipulation of one-month and three-month Euribor:

**June 29, 2006**:

A Submitter responded to Trader E's request for EURIBOR submissions "*with the offer side at 2.90 and 3.05 I will input mine at 2.89 and 3.04 with you guys wanting lower fixings (normally I would be a tick above the offer side)*".[259]

327.     On June 30, 2006, as a direct and proximate result of Defendants' manipulative conduct, both the one-month and three-month tenors of Euribor decreased to 2.897% and 3.056% respectively.

328.     Defendants' suppression of Euribor artificially increased the cost for Plaintiff CalSTRS to purchase Euro from Defendant Citibank on October 5, 2006, in fulfillment of its foreign exchange forwards. As a result, CalSTRS was injured when it entered into these two foreign exchange forwards with Citibank on June 30, 2006, agreeing to purchase Euro at an artificially inflated price.

329.     On June 4, 2008, CalSTRS entered into a Euro foreign exchange forward with Defendant Deutsche agreeing to sell €385,088.54 to Deutsche for $592,443.32 on August 14, 2008.

330.     Communications released as part of Rabobank's settlements with the CFTC and DOJ demonstrate that Defendants were engaged in an upward manipulation of three-month and six-month Euribor on June 3 and June 4, 2008:

**June 3, 2008**

| | |
|---|---|
| Senior Euribor Trader-Submitter: | SALUT FIXES PLEASE ?? |
| Euro Trader 1: | ok, hold on tight; high 3s and 6s pls!! |
| Senior Euribor Trader-Submitter: | HIGH>?? U SURE ?? |
| Euro Trader 1: | yes indeed only 3s not soo big and prob tomorrow low again so maybe dont spoil the pattern too much? thanks either way:) |

---

[259] Ex. E-3 at ¶ 66.

<u>Senior Euribor Trader-Submitter:</u>     OK [Euro Trader 1][260]

331.   On both June 3 and June 4, 2008, three-month Euribor was fixed at 4.864%. Consistent with Defendants' plan to "hold on tight" to artificially higher three-month Euribor 29 Contributor Panel Banks, including Rabobank, submitted the exact same three-month Euribor quote on June 3 and June 4, 2008, while 9 Contributor Panel Banks raised their three-month Euribor submissions from June 3 to June 4, 2008.

332.   Defendants' manipulative conduct on June 3 and June 4, 2008, artificially increased the amount of Euro required for CalSTRS to fulfill its obligations to Defendant Deutsche under the Euro foreign exchange forward. As a result, CalSTRS was injured by Defendants' manipulation of Euribor on June 3 and June 4, 2008, when it entered into the Euro foreign exchange forward with Deutsche on June 4, 2008, agreeing to sell Euros to Deutsche at an artificially lower price.

333.   On November 20, 2007, CalSTRS entered into a Euro foreign exchange forward with Defendant JPMorgan, agreeing to sell €5,962,000.00 to JPMorgan for $8,814,876.62 on November 27, 2007.

334.   Communications released as part of Rabobank's settlement with the DOJ demonstrate that on at least November 19, 2007, Defendants' were engaged in an upward manipulation of three-month Euribor:

**November 19, 2007**

Another U.S. Dollar and Euribor trader ("Trader-12") messaged Submitter-8: "I need high 3m euribor today!"[261]

---

[260] Ex. C-2 at 44; Ex. C-1 at ¶ 63.

[261] Ex. C-1 at ¶ 65.

335.    Consistent with this communication, on November 19, 2007, three-month Euribor increased from 4.584% to 4.619%, or 35 basis points from the previous day. However, three-month Euribor continued to climb on November 20, 2007, increasing an additional 17 basis points from the day before to 4.636%.

336.    Defendants' manipulative conduct on November 19 and November 20, 2007, artificially increased the amount of Euro required for CalSTRS to fulfill its obligations to Defendant JPMorgan under the Euro foreign exchange forward. As a result, CalSTRS was injured by Defendants' manipulation of Euribor on November 19 and November 20, 2007, when it entered into the Euro foreign exchange forward with JPMorgan on November 20, 2007, agreeing to sell Euro to JPMorgan at an artificially lower price.

337.    Plaintiff CalSTRS also engaged in foreign exchange forward transactions with non-Contributor Panel Banks during the time period when communications, released as part of Defendant Barclays' settlements with the CFTC, FSA, and DOJ, show that Defendants engaged in a three-month long campaign to systematically lower three-month Euribor between December 2006 and March 19, 2007.[262]

338.    For example, CalSTRS entered into 2 foreign exchange forwards on March 16, 2007, agreeing to buy €20,000,000.00 on June 15, 2007, in exchange for $26,629,800.00.

339.    As a result of Defendants' downward manipulation of Euribor during March 2007, Plaintiff CalSTRS was directly injured when it entered into these two foreign exchange forwards as CalSTRS agreed to buy Euro at an artificially inflated price.

340.    Plaintiff CalSTRS also transacted in Euribor-based interest rate swaps with Barclays and RBS between April 9, 2008 and November 12, 2008, and suffered legal injury as a

---

[262] *See supra* Part II.D.2.

direct and proximate result of Defendants' manipulative conduct.  For example, on April 9, 2008, Plaintiff CalSTRS entered into an interest rate swap with RBS agreeing to receive a fixed 4.285% interest rate on €37,391,493.00 in exchange for making interest rate payments equal to six-month Euribor.  As a further example, on April 10, 2008, Plaintiff CalSTRS entered into an interest rate swap with Barclays agreeing to receive a fixed 4.254% interest rate on €28,420,214.98 in exchange for making interest rate payments equal to six-month Euribor.

341.    Communications released as part of Defendant Rabobank's settlements with the CFTC and DOJ, and Defendant Barclays' settlement with the CFTC, indicate that Defendants were engaged in an upward manipulation of six-month Euribor throughout the duration of this interest rate swap agreement.   For example:

**May 28, 2008:**

| Senior Euribor Trader-Submitter: | FIXINGS?? |
|---|---|
| Euro Trader 1: | voila, a nice one again:) low 3s and high 1 and 6s pls! [friendly thanks].. |
| Senior Euribor Trader-Submitter: | [TOMORROW'S] 1S FIXING WILL BE VERY HIGH[263] |

**June 3, 2008:**

| Senior Euribor Trader-Submitter: | SALUT FIXES PLEASE ?? |
|---|---|
| Euro Trader 1: | ok, hold on tight; high 3s and 6s pls!! |
| Senior Euribor Trader-Submitter: | HIGH>?? U SURE ?? |
| Euro Trader 1: | yes indeed only 3s not soo big and prob tomorrow low again so maybe dont spoil the pattern too much? thanks either way:) |
| Senior Euribor Trader-Submitter: | OK [Euro Trader 1][264] |

---

[263] Ex. C-2 at 44.

[264] *Id*. at 44; Ex. C-1 at 30.

**July 15, 2008**:

Senior Euribor Trader-Submitter:　　　　… FIXINGS ??

Euro Trader 1:　　　　　　　　　　　hello! High 3s and 6s pls.. thanks for asking me again:)[265]

**July 29, 2008**:

Euro Swaps Trader:　　　　　　　　"I was discussing the strategy [to get a high fixing] with [Senior Euribor Submitter] earlier this morning- today he will stay bid in the mkt and put a high fixing but without lifting any offer, and then he will be really paying up for cash tomorrow and Thursday which is when the big positive resets are."[266]

**August 28, 2008**:

Senior Euribor Trader-Submitter:　　HI I AM GOING FOR HIGH 1S TODAY WHAT DO YOU NEED IN 3S AND 6S PLEASE ??

Euro Trader 1:　　　　　　　　　**low 3s high 6s pls! btw, whenever i say low 6s pls ignore me, we always need high 6s to keep the basis as wide as possible.** thanks![267]

**September 5, 2008**:

Submitter-9 messaged Trader-10: "Hi still high 3s and 6s ??"

Trader-10 wrote back: "yes, everything high pls."[268]

**September 24, 2008**:

Senior Euribor Trader-Submitter:　　hi high 3 and 6s

Euro Trader 1:　　　　　　　　　today low 1s and 3s, high 6s pls:-) merci!

Senior Euribor Trader-Submitter:　　u got me confused here [Euro Trader 1]

Euro Trader 1:　　　　　　　　　**always high 6s, and our fixings 1s and 3s are large enoug [sic] today to want lower fixings**

---

[265] Ex. C-2 at 44.

[266] Ex. E-2, at 15.

[267] Ex. C-2, at 44.

[268] Ex. C-1, at 30.

**there, 1s and 3s do change daily, if e.g. 3m is small then we go for high 3s to support your high 6s. bon?**

<u>Senior Euribor Trader-Submitter:</u>     **allons bon…... a lesson in fixings!!!![269]**

342.    By manipulating six-month Euribor artificially higher Defendants artificially increased the amount of interest that Plaintiff CalSTRS was required to pay in fulfillment of its obligation under the interest rate swap agreement.  As a direct and foreseeable result, Plaintiff CalSTRS was injured when it entered into an interest rate swap agreement at an artificially inflated price on April 9, 2008, as well as every time thereafter when it made an interest payment tied to six-month Euribor.

**D.  Plaintiff Sonterra**

343.    Plaintiff Sonterra engaged in U.S.-based transactions of Euribor-based derivatives during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was damaged and suffered legal injury.

344.    Plaintiff Sonterra entered into hundreds of foreign exchange forwards during the Class Period. As demonstrated in Figure 1 and alleged in Part I.B.3, manipulation of Euribor renders the price of Euros to be paid or received under a Euro foreign exchange forward artificial.  As a direct and proximate result of Defendants' manipulation of Euribor during the Class Period, Plaintiff Sonterra paid more for or received less Euro from foreign exchange forwards.  For example, on June 25, 2010, Plaintiff Sonterra entered into a Euro foreign exchange forward, agreeing to purchase $13,009,395.00 for €10,500,000.00 on July 30, 2010.

345.    Communications released as part of the statement of facts incorporated into UBS' non-prosecution agreement with the DOJ demonstrate that Defendants were engaged in an

---

[269] Ex. C-2, at 44; Ex. C-1, at 30.

upward manipulation of Euribor during the week that Sonterra entered into this Euro foreign exchange forward. *See supra* ¶ 313.

346.    Defendants' upward manipulation of Euribor during June 2010, artificially increased the amount of Euro required for Plaintiff Sonterra to fulfill its Euro foreign exchange forward on July 30, 2010. As a result, Plaintiff Sonterra was injured by Defendants' manipulation of Euribor when it entered into the Euro foreign exchange forward on June 25, 2010 at an artificially inflated price.

**E. Plaintiff FrontPoint Australian**

347.    Plaintiff FrontPoint Australian entered into two Euro foreign exchange forward directly with Defendant UBS; one on February 10, 2011, agreeing to purchase €7,445,461.99 for 10,120,616.48 Australian Dollars on February 14, 2011, and another on February 11, 2011, agreeing to sell €7,445,461.99 to UBS for 10,111,681.93 Australian Dollars on February 14, 2011, for a net loss of 8,934.55 Australian Dollars.

348.    The CFTC found that at least Defendant Rabobank continued to manipulate Euribor throughout early 2011.[270] As a direct and proximate result of Defendants' manipulation of Euribor during the Class Period, Plaintiff FrontPoint Australian, paid more for and/or received less Euros under the foreign exchange forwards it entered into with UBS on February 10 and February 11, 2011. Thus, Plaintiff FrontPoint was injured by Defendants' manipulation of Euribor during February 2011 when it entered into foreign exchange forwards at artificial prices with Defendant UBS.

---

[270] Ex. C-2 at 3.

### F. Plaintiff FrontPoint Trading

349.    Plaintiff FrontPoint Trading engaged in U.S.-based transactions in CME Euro currency futures contracts between September 29, 2009, and November 10, 2010. For example, on October 21, 2010, FrontPoint trading initiated a short position of two December 2010 CME Euro currency futures contracts. FrontPoint trading subsequently liquidated that position on October 25, 2010, by purchasing two offsetting December 2010 CME Euro currency futures contracts for a loss of $1950.00.

350.    Communications released as part of UBS' DOJ settlement demonstrate that Defendants were engaged a downward manipulation of Euribor during the time that FrontPoint Trading transacted in CME Euro currency futures contracts.[271] The prices of CME Euro currency futures contracts are directly impacted by a change in Euribor.[272] As a result, FrontPoint Trading's losses are a direct and proximate result of Defendants' manipulative conduct and the artificiality that existed in the market for CME Euro currency on or around October 25, 2010, when it liquidated the short position in CME Euro currency futures by purchasing two offsetting futures contracts at an artificially higher price.

### V. The European Commission Fines Defendants Barclays, Deutsche Bank, RBS and Société Générale Over €1 Billion for Their Participation in The Cartel in Euro Interest Rate Derivatives

351.    On December 4, 2013, the European Commission fined Defendants Barclays, Deutsche Bank, Société Générale and RBS more than $1.26 billion for participating in a "Euro Interest Rate Derivatives cartel" between September 2005 and May 2008. The cartel was aimed at distorting the normal course of pricing components for these derivatives. Traders of different

---

[271] *See* Ex. A-1 at 34.

[272] *See supra* Part I.B.2.

banks discussed their bank's submissions for the calculation of Euribor as well as their trading and pricing strategies.

352.    The fines imposed by the European Commission for the cartel in Euro Interest Rate Derivatives is as follows:

| Participants | Duration of Participation | Reduction Under the Leniency Notice (%) | Fine (€) |
|---|---|---|---|
| Barclays | 32 months | 100% | 0 |
| Deutsche | 32 months | 30% | 465,861,000 |
| Société Générale | 26 months | 5% | 445,884,000 |
| RBS | 8 months | 50% | 131,004,000 |

353.    Barclays received full immunity for revealing the existence of the cartel and thereby avoided a fine of approximately $874 million for its participation in the infringement.

354.    On May 20, 2014, the European Commission sent Defendants Crédit Agricole, HSBC, and JPMorgan a statement of objections regarding its investigation of the Euribor manipulation.  In a public statement, the European Commission stated they "have now reached the preliminary conclusion that these three banks may have participated in this cartel too." Defendants Crédit Agricole, HSBC, and JPMorgan now have the opportunity to defend themselves before the European Commission makes its final decision.  ▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

## VI.  The Pricing Structure of the Euribor-Based Derivatives Market Lends Itself—As the Evidence Amassed Thus Far By The Regulators Reveals—To Successful Collusion

355.    The overwhelming evidence of collusion gathered by the various regulators and discussed in the Complaint demonstrates that the pricing structure of the Euribor-based derivatives market lends itself to successful collusion.  The Contributor Bank Defendants concluded that it was in their interest to collude to profit from their proprietary Euribor-based derivative positions and that these efforts could successfully influence the pricing of such instruments through collusive Euribor submissions and other sharing of spot transaction information, including pricing Euribor rate-setting.  As such, the nature of the Euribor-based derivatives market, as shown by the evidence revealed thus far, permits an environment that is susceptible to collusion.  Additionally, because only certain banks can successfully move the prices of Euribor-based derivatives, the structure of the price-setting mechanism for these financial products was oligopolistic, making collusion a rational business strategy to fix prices.

356.    The EBF rules governing who may submit rates for purposes of determining Euribor form a barrier to entry that is not present in highly competitive marketplaces.  These restrictions permit those banks with access to the rate submission process a competitive advantage in an environment closed to competitive incursion by new entrants.  Because the EBF rules exclude potential competitor banks from joining the panels and submitting rates, the Euribor-based derivatives price-setting process is highly susceptible to a successful antitrust conspiracy.  The Contributor Bank Defendants successfully colluded with one another free from concern that other competitors in the Euribor-based derivatives market would be able to thwart their price-fixing efforts.

357.    Further, the EBF's Rules prohibit collaboration and information sharing in the Euribor-based derivatives price-setting process.  According to the EBF, each contributor bank is

allocated a private page on which to contribute its data. Each private page can only be viewed by the submitting Euribor contributor bank and by Thomson Reuters' staff involved in the fixing process. Therefore, absent collusion to restrain trade, and fix the price of, the prices of Euribor-based derivatives among the Contributor Panel Banks, contributor banks would not know their competitors' confidential pricing information on these instruments.

### A. Defendants' Employees Are Under Investigation and/or Have Resigned, Been Suspended or Fired, Suggesting Complicity In the Price-Fixing

358.     **Disciplinary Proceedings, Terminations, Resignations and Withdrawal from the Euribor Price Setting Panel**. According to public reports, defendants' employees are under investigation, have been fired or suspended for their alleged involvement in price fixing efforts in a variety of interest-rate derivatives markets, including derivatives priced relative to Euribor. These disciplinary actions lend further credence to the plausibility of Plaintiffs' allegations that Contributor Bank Defendants participated in the Euribor-based derivative instrument price fixing cartel.

359.     Former employees and traders at Defendants Deutsche, HSBC, Société Générale SA, Crédit Agricole CIB and Rabobank are directly implicated by public reports as integral to the conspiracy to fix the prices of Euribor-based derivatives.

360.     Further, Citi, UBS and Rabobank have withdrawn from the Euribor panel. In addition, Barclays Chairman Marcus Agius, its Chief Executive Officer, Robert E. Diamond, Jr. and Chief Operating Officer Jerry Del Missier resigned within days of the announcement of the Barclays Settlement. In connection with his resignation, Mr. Diamond revealed that at least 14 traders at Barclays were involved in Euribor-based derivatives price fixing wrongdoing at the bank. Such firings, suspension and/or investigations of individuals employed or affiliated with the Defendants include, but are not limited to the following:

153

361.   **Barclays**.  Public reports identified former Barclays' swaps Euro swaps trader Philippe Moryoussef as the "ringleader" of the Euribor-based derivative instrument price fixing cartel.  He allegedly communicated with traders at banks including Deutsche, Société Générale, Crédit Agricole and HSBC.  Since Moryoussef left Barclays in 2007, he worked as a trader at the Royal Bank of Scotland, Morgan Stanley and Nomura.  He has since left Nomura.  On November 28, 2012, *The Wall Street Journal* reported that Defendant Barclays had disciplined 13 members of its staff for their involvement in interest rate derivatives price fixing, including those pegged to Euribor.  Also, following the announcement of the Barclays Settlement, Chairman Marcus Agius, Chief Executive Officer Robert Diamond, and Chief Operating Officer Jerry Del Missier resigned.

362.   **Deutsche**.  According to public reports, Christian Bittar former managing director and head of money market derivatives at Deutsche is a co-conspirator identified in the Barclays settlement documents.  Deutsche fired Bittar in December 2011 because Bittar attempted to rig interest rate derivatives.  After firing Bittar, Deutsche clawed back approximately $53 million from Bittar's bonuses.  In June 2014, the FCA sent Bittar a warning notice for a fine of about 10 million pounds ($17 million) for trying to rig various interest rates, its largest ever penalty against an individual.  In September 2013, *Bloomberg* reported Deutsche fired at least seven employees over suspected misconduct in connection with IBOR rate-rigging.  On April 8, 2014, *Bloomberg* reported that a German court ordered Deutsche to reinstate four employees fired as a result of the rate-rigging investigations.  The four employees include two managing directors, a vice president and a director.  They are Ardalan Gharagozlou, the former Head of Foreign Exchange of Germany and Head of Global Finance Continental Europe, Kai-Uwe Kappauf, Markus Kiekenbeck, and Jorg Vogt.

363.    The *Financial Times* reported that in August 2013 the German Federal Financial Supervisory Authority ("BaFin") recommended that Defendant Deutsche fire or discipline senior management over the IBOR scandal.  As an example of Deutsche's lack of disciplinary consequences for staff, the report pointed to the promotion of Alan Cloete to the General Executive Committee in 2012.  As the Global Head of GFFX, Cloete oversaw traders alleged to have sought to rig interest rate derivatives prices and therefore had to be aware of the irregularities in the IBOR derivatives price fixing efforts.  The report also named two other senior staff – Richard Walker, General Counsel, and Andrew Procter, Head of Compliance.  In March 2014, Procter announced that he would be leaving Deutsche.

364.    In January 2014, a retired risk executive, William Broeksmit, took his own life after admitting to his psychologist that he was afraid of the formal investigation by regulators into Libor / Euribor derivatives price fixing efforts at Deutsche.  It was reported that he had been involved in investigations by U.S. authorities probing the bank and that many at the bank perceived him to be the right hand of Chief Executive Officer Anshu Jain.  Former colleagues say they considered a conversation with Broeksmit to be virtually equivalent to one with Jain.  At the end of his career, Broeksmit worked in the investment bank sector of Deutsche and held the title "Head of Risk and Capital Optimization," tasked with the evaluation of risks attached to complex transactions.

365.    **HSBC**.  According to public reports, Didier Sander, was an HSBC trader identified as one of the Euribor co-conspirators in the Barclays settlement documents.  ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

366.    **Rabobank**.  Rabobank quit the Euribor panel in 2013.  Investigations revealed that a number of Rabobank employees sought to fix Euribor-based derivative prices and

inappropriately communicated with employees at other banks and brokers about certain Libor and Euribor derivatives prices between 2005 and early 2011. As a remedial measure, Rabobank disciplined more than 20 employees and admitted that 30 employees participated in the wrongdoing. According to Rabobank, those employees who were involved in serious misconduct have been terminated. Other disciplinary action included, in different combinations, formal warnings, financial sanctions, the removal of managerial responsibilities, and bonuses have been partly or entirely reclaimed for the period 2009-2012, in the total amount of $5.7 million. Further, on October 29, 2013, Rabobank's Chief Executive Officer Piet Moerland resigned immediately following the announcement of Rabobank's $1.07 billion settlement with global regulators for participating in the Euribor-based derivative instrument cartel (among other rates).

367. **Crédit Agricole**. According to public reports, Michael Zrihen, was a Crédit Agricole trader identified as a participant in the Euribor-based derivative instrument cartel in the Barclays settlement documents. ████████████████████████████████████████
████████

368. **Société Générale**. A probe in December 2013 revealed that one of Société Générale's employees participated in the alleged price fixing and/or manipulation of Euribor-based derivatives from March 2006 to May 2008, leading it to pay a settlement of $610.5 million. The bank said its employee acted "without the knowledge of his supervisors or the bank's management." The unidentified employee left the bank in September 2009. ████████
████████████████████████████████

**B. Disclosures Confirm the Existence of Investigations, Reveal Additional Investigations and Efforts to Reach Potential Settlements with Regulators**

369.     In its Form 6-K filed with the SEC on July 30, 2012 announcing its second-quarter results, HSBC revealed for the first time that: "Various regulators and competition and enforcement authorities around the world including in the UK, the US, Canada, the EU, Switzerland and Asia, are conducting investigations related to certain past submissions made by panel banks in connection with the setting of . . . European interbank offered rates ('EURIBOR') and other interest rates. . . . Based on the facts currently known, it is not practicable at this time for HSBC to predict the resolution of these regulatory investigations or private lawsuits, including the timing and potential impact on HSBC." Commenting on HSBC's second-quarter earnings, HSBC CEO Stuart Gulliver admitted that HSBC "lost its way" and that HSBC may face legal fines in excess of $700 million to settle rate-rigging allegations.

370.     In its 2013 Registration Document, filed on March 11, 2013, Defendant Société Générale disclosed that, "Societe Generale, along with other financial institutions, has received formal requests for information from several authorities in Europe, the United States and Asia, in connection with investigations regarding submissions to the…European Banking Federation for setting the Euro Interbank Offered Rate ("EURIBOR"), as well as trading in derivatives indexed to various benchmark rates. Societe Generale is cooperating fully with the investigating authorities."

371.     In its Annual Report for 2012 filed on March 15, 2013, Crédit Agricole S.A. revealed that, "[a]s concerns the Euribor…, Crédit Agricole S.A. and its subsidiary Crédit Agricole CIB, in their capacity as contributors to a number of interbank rates, have received requests for information from a number of authorities as part of investigations into…the Euribor (Euro Interbank Offered Rate) rate…and ii) transactions connected with [Euribor]. These

requests cover a number of periods running from 2005 to the present date. As part of its

cooperation with these authorities, Crédit Agricole S.A. and its subsidiary Crédit Agricole CIB,

carried out investigations in order to gather the information requested by these various

authorities. This work will continue in the second half 2013. It is not possible to predict the

outcome of said work, nor the date at which it will end."

### C. Government Investigations Are Continuing

372.    Numerous government investigations in the U.S. and abroad, including by the

DOJ, the CFTC, the European Union (the "EU"), the FSA, the Swiss Financial Market

Supervisory Authority, German bank regulator BaFin, the Dutch Central Bank and Italian

prosecutors, into alleged Euribor rigging are on-going. The full scope of these investigations

have not yet been publicly revealed.

373.    For example, in a letter dated December 14, 2011 that was made public in

December 2012 from EU Competition Commissioner Joaquín Almunia to Guido Ravoet Chief

Executive of Euribor, EU Competition Commission, Almunia wrote:

> …I confirm indeed that, in October 2011, the Commission has
> conducted inspections in the sector of financial derivative products
> linked to Euribor.
>
> The Commission is investigating a possible violation of EU
> antitrust rules by certain companies active in this sector.  More
> specifically, the Commission has concerns that the companies that
> are being investigated may have violated EU rules that prohibit
> cartels and restrictive business practices between undertakings.
>
> I understand your concerns and the need to guarantee a good
> governance of the Euribor benchmark.  However, this investigation
> is on-going and the rules governing our investigations prevent the
> Commission from identifying the companies involved or provide
> further details at this stage…

374.    In particular, the European Commission's investigation into the cartel in Euro

interest rate derivatives continues against Defendants Crédit Agricole, HSBC and JPMorgan.

### D. The Conspiracy to Fix Prices of Euribor-Based Derivatives Constituted an Agreement in Restraint of Trade or Commerce

375.      The abundant evidence of collusive price fixing of Euribor-based derivatives uncovered by the regulators and cited herein restrained trade in the market for Euribor-based derivatives. Just like a traditional "brick and mortar" price fixing conspiracy, where manufacturers collude to set a pricing formula for their goods, the Contributor Panel Banks colluded to fix the prices of their Euribor-based derivatives through various means, including sharing price and volume information with competitors for the purpose of coordinating prices and agreeing to set Euribor prices either lower or higher, depending upon their mutual financial interests. This price-fixing resulted in no less of a restraint of trade than a traditional agreement to fix the wholesale prices of, for example, washing machines. The market for Euribor-based derivatives was unlawfully restrained by price fixing because collusion, rather than the forces of supply and demand, set artificially supracompetitive and, at times, infracompetitive prices for these derivatives.

### E. The Conspirators Were Horizontal Competitors In the Euribor-Based Derivatives Market

376.      Each of the Contributor Bank Defendants were competitors with one another for attracting transactions in the Euribor-based derivatives market. Indeed, it was by virtue of their position as competitor banks in this market that these Defendants secured their position as a panel member with the EBF. These banks competed for financial positions in this derivatives market in the position of horizontal competitors not only insofar as they occupied the same level of distribution in the marketplace, but because they competed with one another to attract customers for Euribor derivatives transactions and/or to purchase and sell Euribor-based derivatives contracts and/or to profit or lose on their activities in the foregoing.

159

**F.  The Collusive Conduct Fixed Prices and Restrained or Changed Output**

377.    The collusion alleged herein fixed the prices of Euribor-based derivatives prices when the cartel members agreed to share pricing information and coordinate prices for their derivatives.  Moreover, the collusion had the effect of restraining or changing output in the derivatives market because market participants naturally responded to the changed prices.  The volume of derivatives transactions was therefore restrained and output changed.

378.    The alleged rate-setting collusion harmed competition among sellers and buyers of Euribor-based derivatives.  The Euribor submission is supposed to be a proxy for the competitive borrowing rate of each bank.  The counterparties to financial instruments that use Euribor do so because that they know that these rates reflect competitive supply and demand influences on the Euro interbank lending market.  It is because these rates reflect such competitive prices that they are so commonly used in Euribor-based derivative contracts to set pricing.  When, as here, banks and others colluded and altered Euribor from competitively set prices to collusively fixed prices, competition in the Euribor-based derivatives *a fortiori* was affected at the very instant and in the very same manner that the rate itself was collusively set. The price of Euribor-based derivative contracts—set by collusion—became inherently anticompetitive in the same manner as Euribor itself became anticompetitive.  This anticompetitive rate setting conduct worked in conjunction with Defendants' anticompetitive conduct to fix prices in the over-the-counter derivatives market.  Together, this multipronged approach to fixing prices generated increased profits for Defendants at Plaintiffs' and the Class' expense.

**G. The Government Settlements to Date Reveal a High Number of Inter-Firm Communications.**

379.    The Barclays, Deutsche, and Rabobank Settlement documents reveal a high number of inter-firm communications between Barclays' traders and unidentified Euribor Contributor Banks. These communications are supported by the communications produced as a result of Barclays' ACPERA production. The Barclays Settlement documents also make clear that Barclays Euribor submitters continued to fix prices of Euribor-based derivatives by coordinating submissions with former Barclays' traders after the traders left Barclays and joined other unidentified financial institutions. Similarly, the Rabobank Settlement documents make clear that Rabobank's Euribor Submitter coordinated Rabobank's Euribor submissions with two former senior Rabobank Euro derivatives traders.

380.    In all, there are at least 114 conversations included in Appendix A to this Complaint and ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

**VII.    The EBF's Re-Evaluation of the Euribor-Based Derivative Instrument Pricing**

381.    The price manipulation in Euribor-based derivatives has prompted the EBF to re-evaluate the Euribor rate-setting process.

382.    During the Class Period, the EBF expressed concerns internally that the prices of Euribor-based derivatives were manipulated by its Contributor Panel Banks. The EBF shared those concerns internally and only with the Euribor Contributor Panel Banks. For instance, documents made public in December 2012 include a November 12, 2007 Memorandum to the

Euribor panel banks from Guido Ravoet, Secretary General of the EBF and Chairman of the

Euribor Steering Committee, entitled "Reminder of Euribor panel banks obligations under the

Code of Conduct." The November 12, 2007 Memorandum stated:

> In the context of the recent market turmoil[,] questions have been raised in the public domain as to the reliability of the published financial markets benchmarks (such as LIBOR, Euribor, etc.), the Euribor Steering Committee wishes to remind the panel banks of the need for market participants to see the true reflection of the current market situation in the index rates even in difficult or crisis situations.

> Thus, I draw your attention to the importance of compliance with the panel banks' respective obligations in accordance with the Euribor Code of Conduct, which aims to facilitate and maintain a consistent and accurate flow of Euribor reference rate data.

> Participants whose numbers do not accurately reflect the market and the respective bank's market activities could potentially expose themselves and EURIBOR to reputational risks. To avoid unwanted negative consequences, the panel banks are invited to ensure and maintain a systematic and close control in their daily quotations to effectively provide accurate information for the daily calculations of the EURIBOR reference rate.

> In such case where panel banks provide information to the chosen data vendor (*i.e., Reuters*), it is incumbent upon all involved institutions to remain vigilant in their efforts to fully understand and comply with their obligations and best operational practices when providing and/or calculating data.

383. Another document also released in December 2012 is a September 29, 2009

Memorandum from EBF Secretary General Ravoet to the Euribor Panel Banks entitled

"Credibility of Euribor." The September 29, 2009 Memorandum stated:

> The Euribor-Steering Committee has recently been informed that contributions to Euribor regularly and significantly differed from EuroLibor for the same contributors, at times, well in excess of 1 basis point.

> Therefore, as Chairman of the Euribor Steering Committee, I hereby remind you of the panel banks' respective obligations in accordance with Euribor Code of Conduct and highlight the importance of

> preserving the credibility of the indexes, particularly since they have been
> subject to occasional challenges over the last two years. More
> significantly, a loss of credibility of the Euribor rates could have an impact
> on each bank member of the panel.
>
> I also remind you that, by joining Euribor panel, contributing
> banks have subjected themselves unconditionally to this Code and its
> Annexes, in their present or future form, and agreed to promote Euribor as
> much as possible and refrain from any activity damageable to Euribor.
> Consequently, I would be grateful if you could ensure that the
> contributions to the Euribor rates are accurate and truly reflect the market.

384.    In July 2012, the EBF requested that all Euribor panel banks return a signed

Euribor management certification form, in which each bank certifies that (1) all internal

procedures are set up to ensure a robust process for the submission of contributions, excluding

any internal and external influences, (2) that all submitted contributions are the bank's

appreciation of the evolution of the interbank market in the Eurozone according to the Euribor

definition, and (3) that the Euribor Code of Conduct is fully respected when contributing to the

Euribor fixing.

385.    In mid-November 2012, the European Central Bank asked for major changes to

Euribor, including an increased reliance on transaction-based figures in the calculation of

Euribor as well as having it directly regulated by European authorities and making it more

independent from the EBF.

386.    The demand for use of actual transaction prices reflects that Euribor submissions

were supposed to be the proxy for competitively set rates. The violations of the Euribor Code of

Conduct so as to submit collusive and non-competitive submissions interdicted the pro-

competitive purpose of Euribor. This further caused antitrust injury to those who transacted at

Euribor derivative prices based upon the collusive submissions of non-competitive rates by

Defendants.

387.     On November 28, 2012, the EBF responded to the European Commission Consultation Document on the Regulation of Indices stating that "to further enhance the credibility and accuracy of Euribor, the EBF is currently working on new agreed contribution criteria, to define which bank should be considered as a prime bank on one side, and which criteria should be taken into account by the panel bank when sending its contribution to the index." The EBF also acknowledged that Euribor should be run by an independent non-profit driven structure, with the introduction of public supervision.

388.     On January 11, 2013, the *Wall Street Journal* reported that two European regulators, the European Banking Authority (the "EBA") and the European Securities and Markets Authority (the "ESMA"), urged a "root-and-branch reform of [Euribor's] governance within six months."

389.     The EBF subsequently updated the Euribor Code of Conduct ("Code") on October 1, 2013, marking "the cornerstone of the Euribor Reform" according to EBF Secretary General Ravoet.

390.     The updated Code was designed "to offer panel banks further guidance with respect to the governance, methodologies, control environment and independent review related to their Euribor submissions." Article B.3 of the Code expanded sanctions, creating a bifurcated sanctioning system whereby whistleblowers or other complainants can advise the Euribor-EBF of suspected violations of law and regulation, as well as the previously existing Euribor Steering Committee sanction process. Additionally, the Code created a conflicts of interest policy applicable to members, panel banks, calculating agents, and related parties, an accountability procedure, a record-keeping policy for participants in the determination of Euribor, and a section regarding the responsibilities of the calculation agent.

391.    On January 28, 2014, the Euribor-EBF announced that Global Rate Set Systems Ltd. would replace Reuters as of May 11, 2014 (delayed by subsequent press release to July 1, 2014) as the calculating agent to collect, process, and distribute financial benchmarks. EBF Secretary General Ravoet stated the appointment "reflects our continued efforts to improve the transparency, monitoring and accuracy of the benchmarks in line with regulatory requirements."

## CLASS ACTION ALLEGATIONS

392.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the following Class:

> All persons or entities that engaged in a U.S. based transaction of Euribor-based derivatives during the period of at least June 1, 2005 through at least March 2011 (the "Class Period"). A U.S. based transaction in Euribor-based derivatives includes: (a) a purchase or sale of a NYSE LIFFE Euribor futures contract by a U.S. person or entity from a location within the U.S.; (b) a purchase or sale of a Euro currency futures contract on the CME; and/or (c) a purchase or sale of a Euribor based interest rate swap; and/or (d) a purchase or sale of a Euro foreign exchange forward entered into by a U.S. person or entity from a location within the U.S.; and/or (e) a purchase or sale of a Euribor based forward rate agreement entered into by a U.S. person or entity from a location with the U.S. Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant or any co-conspirator whether or not named in the Complaint, and the United States Government.[273]

393.    The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically dispersed Class members transacted in Euribor-based derivatives during the Class Period.

394.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each

---

[273] Plaintiffs defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

395.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are adequate representatives of the Class and have no interests which are adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including commodity futures manipulation and antitrust class action litigation.

396.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

a.    Whether Defendants manipulated the price of a commodity futures contract and/or the price of the commodity underlying such futures contract in violation of the CEA;

b.    Whether such manipulation caused the price of a commodity futures contract and/or the price of the commodity underlying such futures contract to be artificial;

c.    Whether such manipulation caused cognizable legal injury under the CEA;

d.    Whether Defendants unlawful acts violate Section 1 of the Sherman Act;

e.    Whether Defendants combined, agreed, or conspired to fix or manipulate Euribor and/or Euribor-based derivatives prices in violation of the antitrust laws;

f.    Whether Defendants unlawful acts violate RICO;

g.    Whether Defendants' conduct had an anticompetitive and manipulative effect on Euribor and Euribor-based derivatives during the Class Period;

h.    Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiffs and the Class;

i.    The fact and degree of impact on Euribor and the prices of Euribor-based derivatives resulting from Defendants' course of unlawful conduct;

166

j.    Whether Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class;

k.    The operative time period and extent of Defendants' foregoing violations; and

l.    Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

397.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

398.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

399.    The statutes of limitations relating to the claims for relief alleged herein (*see* ¶¶ 422-521) were tolled because of fraudulent concealment, including: (1) Defendants' active acts of concealment that were independent of the acts that constituted the underlying conduct giving rise to their liability; and (2) the inherently self-concealing nature of Defendants' misconduct. Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing

manipulative acts and could not have discovered the same by the exercise of due diligence prior to the public disclosure of their misconduct. The earliest a Defendant's conduct became known was on June 27, 2012, when regulators and Defendant Barclays disclosed Barclays' involvement in manipulating Euribor and the resulting regulatory fines and punishment.

400. As to other Defendants, their unlawful and self-concealing manipulative acts could not have been discovered by the exercise of due diligence until much later. Defendant UBS' manipulation of Euribor was not known and could not have been known prior to December 19, 2012. Defendant RBS's manipulative conduct was not known and could not have been known prior to February 6, 2013; Rabobank on October 29, 2013; Deutsche Bank, Société Générale, JPMorgan, HSBC and Crédit Agricole on December 4, 2013; Citibank and BNP Paribas on April 23, 2015.

401. Plaintiffs and the Class' investigation of their claims required time and resources to identify additional culpable parties through, among other things, the public disclosures and "reverse engineering" to identify unnamed co-conspirator banks. With each succeeding indictment and government investigation disclosure, more and more information was revealed, and identities of Defendants and the scope of their misconduct became clearer.

## A. Dates of Initial Public Disclosure

402. The June 27, 2012 disclosure of Barclays' involvement in Euribor manipulation is the earliest Plaintiffs could have suspected any identifiable party's role in manipulating Euribor and the prices of Euribor-based derivatives. Plaintiffs could not have known of other Defendants' involvement in Euribor manipulation until later dates when additional information was disclosed. Plaintiffs thus invoke the tolling of the applicable statute of limitations affecting the rights of the claims for relief asserted. Defendants are also equitably estopped from asserting that any applicable statute of limitations period has run.

403.    On June 27, 2012, U.S. and U.K. regulators issued press releases and publicly disclosed settlement agreements announcing their findings that Barclays had manipulated Euribor and the prices of Euribor-based derivatives. On the same day, Barclays published a statement in its Form 6-K, disclosing that it had agreed to pay regulatory penalties to U.S. and U.K. authorities, entered into settlement agreements and/or non-prosecution agreements with regulators, and had been granted conditional leniency from the DOJ Antitrust Division in connection with "potential US antitrust law violations with respect to financial instruments that reference EURIBOR." As part of its conditional leniency, Barclays agreed to cooperate in the ongoing investigations into benchmark rate manipulation involving Euribor, among other rates.

404.    Prior to June 27, 2012, no other institution had been named and publicly charged with manipulating Euribor. Additional Euribor-related regulatory action followed the disclosure of Barclays' involvement. On December 19, 2012, U.S. and U.K. regulators announced charges against and settlements with UBS for manipulating Euribor, among other benchmarks.

405.    On January 10, 2013, BBC News reported that RBS was "in the last delicate phase of negotiations" with U.S. and U.K. regulators to settle charges related to LIBOR manipulation, but the article made no mention of Euribor manipulation. It was not until regulators announced and published settlements on February 6, 2013 that RBS' manipulation of Euribor and admitted conspiracy with at least Barclays to manipulate Euribor became known.

406.    Additional public disclosures of other Defendants' involvement in Euribor manipulation followed later in 2013. Rabobank's involvement was not publicly disclosed until October 29, 2013, when U.S. and U.K. regulators announced criminal charges and settlements with the bank. The disclosures described anticompetitive agreements to manipulate Euribor between Rabobank's Euribor submitter and traders at unidentified banks.

407.     In covering the Rabobank settlement, at least one news outlet reported that Deutsche Bank was waiting to settle with regulators for rate manipulation. However, neither the article, Deutsche Bank's disclosures in its 6-K, or any other public disclosure prior to December 4, 2013 indicated whether Deutsche Bank had been involved in Euribor manipulation.

408.     On December 4, 2013, regulators for the first time publicly announced charges and settlements against banks participating in what the European Commission called the "Euro Interest Rate Derivatives" ("EIRD") cartel. Barclays, Deutsche Bank, Société Générale, and RBS settled charges of Euribor and Euribor-based derivatives manipulation. Regulators also disclosed the ongoing prosecution of JPMorgan, HSBC, and Crédit Agricole as non-settling members of the EIRD cartel.

409.     Citi's involvement with Euribor manipulation has only been recently been publicly disclosed. The NYSDFS issued a Consent Order on April 23, 2015 wherein Deutsche Bank stipulated to manipulating Euribor. In the stipulated facts of the Consent Order, Deutsche Bank's communications revealed coordination with Citi to manipulate Euribor.

410.     In the same NYSDFS Consent Order, BNP Paribas' involvement in the EIRD cartel was publicly disclosed. Communications between Deutsche Bank and Citi indicated that Citi contacted with BNP Paribas about BNP Paribas' manipulated Euribor submission.

**B. Plaintiffs' Due Diligence Efforts**

411.     Plaintiffs actively monitor their investments to ensure that there is no evidence of fraud or irregularities in their trading positions and did so in connection with their Euribor-based derivatives during the Class Period. This monitoring included using an investment professional to analyze (1) market trends and economic data associated with their investments and (2) public information concerning the markets in which they were invested. Prior to the dates when Defendants' roles in Euribor manipulation were publicly disclosed, Plaintiffs, much like Class

members, had no reasonable basis to suspect (and no reason to know) that Defendants engaged in a widespread collusion and manipulation of Euribor. Despite Plaintiffs' due diligence, they were unable to discover the conspiracy alleged herein until public disclosures raised their suspicions as to Barclays, and they investigated the culpability of others, primarily through their counsel's investigatory work.

412.    Further, the structure of the Euribor submission process gave Plaintiffs no reason to suspect Defendants engaged in misconduct.

413.    In order to ensure that Euribor constituted the average competitive interest rate, the EBF instructed contributing banks to submit "the rate at which euro interbank term deposits within the euro zone are offered by one prime bank to another."[274]   The EBF held Euribor panel banks to a strict Code of Conduct, which among other things provided that "[p]anel banks must quote the required euro rates [] to the best of their knowledge, these rates being defined as the rates at which euro interbank term deposits are being offered within the EMU zone by one prime bank to another at 11:00 a.m. Brussels time."[275]   The EBF required panel banks to make Euribor submissions that "accurately reflect the market and the respective bank's market activities."[276] The EBF boasted that it "closely monitors the current marketplace in terms of Euribor. This comes in the wake of heightened press coverage arising from some non-standard movements in some financial market rates commonly used as benchmarks." [277] The EBF also claimed that it

---

[274] *See* Press Statement, European Banking Federation, "Euribor is an entirely satisfactory and reliable benchmark": Euribor-FBE Statement on current Euribor Rate Developments (June 13, 2008), *available at* http://www.emmi-benchmarks.eu/assets/files/D0994C-Euribor%20Statement%20press.pdf (last viewed July 31, 2015).

[275] European Banking Federation, Euribor Code of Conduct (as approved December 15, 1997), *available at* https://web.archive.org/web/20010809120033/http://www.euribor.org/pages/eurib_cc htm.

[276] Letter from Guido Ravoet, Secretary General of the European Banking Federation and Chairman of the Euribor Steering Committee to Euribor panel banks (November 12, 2007) (concerning "[r]eminder of Euribor panel bank obligations under the Code of Conduct"), *available at* http://online.wsj.com/public/resources/documents/Euriborredacted112007.pdf.

[277] Press Statement, European Banking Federation, available at http://www.emmi-

had an "independent Steering Committee [that] closely monitors all market development and ensures, by reviewing panel banks' contributions on a regular basis, strict compliance with the Code of Conduct."[278]

414.    By continuing to make their Euribor submissions, each Defendant implicitly represented that it was submitting its competitive market borrowing rate and was not submitting a non-competitive rate that served its interest in manipulating the market. Defendants made such representations continuously during the Class Period.

415.    Despite the EBF's supervision and Defendants' obligations under the Euribor Code of Conduct, Defendants' representations were false and fraudulent. For example, Barclays made false Euribor submissions from 2005 through at least 2009, and UBS and Deutsche from at least 2005 through at least 2010. Defendants intentionally and carefully limited their communications that facilitated their manipulative and collusive conduct to secret channels such as private chatrooms, emails and through traders' personal cellphones. Defendants intentionally, affirmatively, and fraudulently concealed the facts that, on a daily basis, they were conspiring among themselves to submit manipulated, non-competitive Euribor rates that benefited their Euribor-based derivatives positions.

416.    Defendants' manipulative and collusive conduct was inherently self-concealing. *See, e.g., In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004) ("[a]mong the principal allegations against Defendants are assertions that they reported false trade data to entries that collect that information for public dissemination, and that they engaged in fraudulent wash trades . . . . Such activities are inherently self-concealing."); *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, 00 CIV. 7804 (LMM), 2004 WL 487222, at *4

---

benchmarks.eu/assets/files/D0994C-Euribor%20Statement%20press.pdf.

[278] *Id.*

(S.D.N.Y. Mar. 12, 2004) (recognizing that bid-rigging and price-fixing conspiracies are inherently self-concealing) (citing *State of N.Y. v. Hendrickson Bros., Inc.* 840 F.2d 1065, 1084 (2d Cir. 1988)). Further, as certain Defendants' traders recognized, the manipulation of Euribor required that it remain concealed from the EBF, regulators and the public in order to insure its success over an extended period of time. *See, e.g.,* ¶ 232.

417.   Even after the European Commission raided certain Euribor panel banks on or around October 19, 2011, a manager at Euribor-EBF, Cedric Quemener, publicly stated that it would be "almost impossible" to manipulate Euribor. He went on to explain, "You would need to have an agreement between so many different banks from so many different countries that there's no way someone could do that. We have high monitoring and very clear transparency in the way we are defining Euribor." In another interview, Quemener asserted, "We are fully confident in the governance of Euribor. With so many banks [44 contributors] involved in setting the rate, fixing a rate artificially would be impossible."

418.   For Defendants' conspiracy and manipulation to succeed, their actions had to be concealed. The fact that Defendants were able to avoid detection by the EBF reaffirms the self-concealing nature of their manipulative and collusive conduct.

419.   As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence on or before June 27, 2012 when regulators and Barclays announced their $460 million settlement for Barclays' part in the conspiracy to fix Euribor and prices of Euribor-based derivatives. On this date, Barclays also announced that it was granted conditional leniency by the DOJ for its alleged anticompetitive conduct relating to price fixing of Euribor-based derivatives during the Class Period, requiring it to cooperate in the ongoing investigations.

420.     In addition to and separate from the inherently self-concealing manipulative and collusive acts alleged herein with respect to Euribor, Defendants engaged in extraordinary measures to hide their wrongdoing from government investigators and their victims, including Plaintiffs. These acts included:

a. Agreeing to methodically align trading strategies over four month period from at least December 2006 through March 2007 to artificially lower three-month Euribor until the March 2007 IMM date, thus avoiding detection, with one participant remaking ███████████████████████████████████ ████████████████████████████████████████ (¶ 235);

b. Enforcing a code of secrecy to guarantee the manipulation's success, telling participants ████████████████████████████████████ ████████████████████████████████ (¶ 231);

c. Slowly increasing the three-month Euribor fixing "to avoid drawing any attention" to the manipulation;[281]

d. "[A]gree[ing that] we shouldn't ve been talking about putting fixing for your positions on a public chat . . ."[282] and thus avoiding discussion of manipulative conduct in public chatrooms (¶ 183);

e. Relying heavily on instant messages to facilitate collusion between Defendants (¶¶ 134-184, App. A) and limiting communications to private chatrooms, emails, in-person exchanges and through traders' personal cellphones to avoid detection;

f. Reorganizing trading desks to facilitate verbal communication, and eliminate written communication, between their Euribor traders and submitters (¶¶ 253-254);

g. Lacking or not utilizing specific internal controls and procedures to facilitate monitoring of Euribor submissions (¶¶ 251-259);

h. Maintaining no Euribor-specific systems and controls that could detect Euribor-related "buzz words" indicative of manipulation (¶¶ 260-274);

---

[279] Ex. E-3 ¶ 97.

[280] *Id.* ¶ 96.

[281] Ex. E-2 at 18.

[282] Ex. A-1 ¶ 86.

     i.    Implementing lax compliance standards they knew would not detect wrongdoing (¶¶ 260-274);

     j.    Blind-copying email requests for particular Euribor submissions by submitters to external co-conspirators at other banks (¶¶ 157, 212, 224);

     k.    Making bids and enter into money market transactions at particular rates to influence Euribor submissions of other Euribor panel banks (¶¶ 185-193);

     l.    Spoliating evidence of their wrongdoing by destroying Euribor-related phone recordings and other documents after being put on notice of government investigations (¶¶ 285-286);

     m.    Certifying, in response to the EBF's July 2012 request, that (1) its internal procedures ensured a robust process for monitoring Euribor submissions and excluded the impact of internal or external influences on the submission, (2) its Euribor submissions reflected the bank's own assessment of the interbank market in accordance with the Euribor definition, and (3) the bank was in full compliance with the Euribor Code of Conduct (¶¶ 264-267);

     n.    Engaging in sham audits of submission processes, and referring to such reviews as "arse-covering exercise[s]" (¶ 262);[283]

     o.    Misleading internal compliance personnel, regulators and the public as to the extent and involvement in Euribor and LIBOR manipulation and concealing negative findings from other regulators investigating the bank by, among other means, falsely informing regulatory officials that they were prohibited from producing documents;[284] and

     p.    In one case, committing suicide (¶ 364).

     421.    The applicable statute of limitations affecting the rights of the claims for relief asserted by Plaintiffs have therefore been tolled. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

---

[283] Ex. F-3 ¶ 4.98.

[284] *See, e.g.,* Ex. E-3 ¶¶ 125-127, 131, 133, 137-38; Ex. F-3 ¶¶ 4.63, 4.81-4.96.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Agreement, Combination, or Conspiracy to Restrain Trade in
Violation of § 1 of the Sherman Act**

**Euribor-Rigging Conspiracy**

**15 U.S.C. § 1, *et seq.***

**Against all Defendants**

422.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

423.     Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

424.     During the Class Period, Defendants entered into a series of agreements designed to create profit, or limit liabilities amongst themselves, by fixing the prices and/or settlement values of Euribor and Euribor-based derivatives. Defendants simultaneously employed multiple manipulative tactics to this end, including (a) coordinating the submissions of false Euribor quotes to Thomson Reuters and the EBF; (b) pushing cash to manipulate the prices of the Euro-denominated deposits that Euribor was intended to reflect; and (c) using brokers to transmit spoof bids and offers that did not reflect actual cash market prices, to artificially suppress, inflate, maintain, or otherwise alter Euribor.

425.     This conspiracy to rig Euribor restrained trade by fixing the prices and/or settlement value of Euribor and Euribor-based derivatives at levels that reflected the Defendants' false Euribor submissions and illegitimate cash market activity instead of the prices that would have been set by competitive market forces.

176

426.    Defendants' conduct caused injury to Plaintiffs and members of the Class because they paid more for or received less than they should have in transactions based on Euribor, including those for the purchase or sale of Euribor-based derivatives, than they otherwise would have in a competitive market.

427.    The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the over-the-counter and exchange traded Euribor-based derivatives market. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pretextual or could have been achieved by less restrictive means.

428.    As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

429.    Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act under § 4 of the Clayton Act.

430.    Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### For Price Fixing In Violation of § 1 of the Sherman Act

### OTC Euribor-Based Derivatives and Cash Market Conspiracy

### Against All Defendants

431.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

432.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

433.    During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of Euribor and the prices of Euribor-based derivatives, by conspiring to, *inter alia*: (a) agreeing where to fix the price of Euribor-based derivatives; (b) coordinating their Euribor-based derivatives pricing "runs" sent to other Euribor-based derivative market participants; (c) making false bids and offers for Euro money market instruments; (d) sharing non-public, proprietary Euribor-based derivative market pricing information; (e) trading with co-conspirators at below market prices, unavailable to non-co-conspirators; (f) coordinating their trading of Euribor-based derivatives, *e.g.*, aligning their Euribor futures positons on the March 2007 IMM date,[285] to further the anticompetitive effects of their manipulation; and (g) refusing to deal with Euribor-based derivatives market participants.

434.    Defendants affirmatively engaged in conspiratorial conduct, including, *inter alia*, using secret communications to reach an agreement on pricing, paying bribes to each other by executing trades at below market rates, and deceiving government regulators, that served no legitimate competitive purpose and demonstrate Defendants' intent to harm and/or restrain trade, thereby effectuating their combination and conspiracy.

435.    This conspiracy restrained trade by fixing the prices Euribor-based derivatives at levels agreed upon and dictated by the Defendants instead of the prices that would have been set by competitive market forces. Defendants' conduct caused injury to Plaintiffs and members of

---

[285] *See supra* Part II.D.2.

the Class because they paid more for or received less in transactions for Euribor-based derivatives, than they otherwise would have in a competitive market.

436.     The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the over-the-counter and exchange traded Euribor-based derivatives market. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

437.     As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

438.     Plaintiffs and members of the Class seek treble damages for Defendants' violations of §1 of the Sherman Act under § 4 of the Clayton Act.

439.     Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## THIRD CLAIM FOR RELIEF

### For Bid Rigging In Violation of Section 1 of the Sherman Act

### 15 U.S.C. §1, *et seq.*

### Against All Defendants

440.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

441.    Defendants and their unnamed co-conspirators engaged in numerous unlawful acts of bid rigging by pre-arranging which co-conspirator would win a customers' business and at what price. This is a *per se* violation of Section 1 of the Sherman Act.

442.    As alleged Part III.B, when asked for price quotes by other market participants, Defendants and their co-conspirators colluded to determine which co-conspirator would win the business in a particular traction and then agreed to quote pre-arranged prices to their potential customers to effectuate the agreed upon outcome. On many occasions, Defendants agreed amongst themselves to quote worse price to the same market participants in order to guarantee a trade at the desired price level. By their concerted action, Defendants rigged the Euribor-based derivatives market with the purpose and effect of fixing the price of Euribor-based derivatives at the co-conspirators pre-arranged and agreed upon price.

443.    Defendants intended to and actually did restrain trade by refusing to compete for business in the Euribor-based derivatives market, instead pre-selecting the winner on their trades. Defendants actively contacted each other via phone or electronic communication upon receiving requests for quotes, discussed which Defendants should win the business, and what other Defendants would quote to ensure the pre-determined outcome. Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, pegging, maintaining, stabilizing, and otherwise manipulating the price of Euribor-based derivatives.

444.    As a direct, material, and proximate results of Defendants' violations of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

445.    Plaintiffs and member of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act under § 4 of the Clayton Act.

446.    Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

447.    Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## FOURTH CLAIM FOR RELIEF

### For Concerted Refusal to Deal In Violation of Section 1 of the Sherman Act

### 15 U.S.C. § 1, *et seq.*

### Against All Defendants

448.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

449.    Defendants and their unnamed co-conspirators engaged in numerous group boycotts or concerted refusals to deal by quoting exorbitant prices of Euribor-based derivative to counterparties. This is a *per se* violation of Section 1 of the Sherman Act.

450.    As alleged in Part III.D, in conjunction with and in furtherance of their price fixing and bid rigging schemes, Defendants and their co-conspirators colluded to determine whether they would purchase or sell Euribor-based derivatives to other market participants. Defendants agreed amongst themselves to quote prices to the same market participants designed to cause the market participant to reject the offer, or acquiesce to a non-competitive price. By their concerted action, Defendants further manipulated the supply and demand for Euribor-based

derivatives and ensured that the Euribor-based derivatives market would continue to reflect prices consistent their price fixing scheme.

451.    Defendants intended to and actually did restrain trade by refusing to compete for business in the Euribor-based derivatives market and manipulating supply and demand in the market. Defendants actively contacted each other via phone or electronic communication upon receiving requests for quotes, discussed whether counterparties should be allowed to transact in Euribor-based derivatives, and quoted prices to ensure the counterparties could not complete a transaction. Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, pegging, maintaining, stabilizing, and otherwise manipulating the price of Euribor-based derivatives.

452.    The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the over-the-counter and exchange traded Euribor-based derivatives market. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

453.    As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

454.    Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act under § 4 of the Clayton Act.

455.    Plaintiffs and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

456.    Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

### FIFTH CLAIM FOR RELIEF

**For Manipulation In Violation of The Commodity Exchange Act**

**7 U.S.C. §§ 1,** *et seq.*

**Against All Defendants**

457.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

458.    **Ability to Influence Prices**. The Contributor Bank Defendants served as EBF Euribor panel members during the Class Period, and Euribor was determined by the submissions of Defendants and other banks. For many years, the Contributor Bank Defendants knowingly delivered or caused to be delivered false EBF Euribor submissions precisely because Defendants had the ability to influence Euribor but also the ability to influence (and create profits for themselves in respect of) the prices of Euribor derivatives at issue herein. They did so through the instrumentalities of interstate commerce, including but not limited to, wire and U.S. mails. The submissions were also caused to be delivered through the instrumentalities of interstate commerce, including but not limited to, wire and U.S. mails and through the daily dissemination and publication globally, including into the United States, of the Contributor Bank Defendants' submissions and daily official benchmark interest rates by at least Thomson Reuters on behalf of the EBF, and other third party vendors. The Contributor Bank Defendants' submissions were used during the Class Period to determine the official published rates for Euribor which is calculated based on a trimmed average of the submissions. By virtue of this methodology, the

Contributor Bank Defendants had the ability to influence and affect the rate that would become the official Euribor for any tenor. Further, the Contributor Bank Defendants' Euribor submissions to the EBF contained market information concerning the costs of borrowing unsecured funds in particular tenors in the Euro interbank market. Such market information affected the price of commodity futures contracts and/or the price of a commodity underlying such contracts in violation of the CEA.

459. **Causation and Artificial Price.** When a factor that affects a futures contract price is artificial or illegitimate, then the resulting futures contract price is necessarily artificial. Here, Euribor was not just a factor that affected Euribor futures contract prices. Euribor was the predominant factor that affected such prices. Euribor is a commodity that trades in U.S. interstate commerce and is the commodity underlying Euribor futures contracts. Any manipulation of Euribor is a manipulation of the commodity underlying Euribor futures contracts in violation of the CEA. When multiple Defendants collude to submit false reports, this plausibly affects, (among other derivatives) Euribor futures contract prices. Defendants' affected Euribor futures contract prices in an illegitimate and artificial manner, and caused such prices to be artificial. During the Class Period, the daily rates at which Euribor was fixed and the prices of futures contracts which were benchmarked, traded, priced and settled to such rates were affected by illegitimate factors consisting of Defendants' knowingly false, misleading and/or inaccurate submissions. Defendants thereby, for years, caused artificial Euribor rates and Euribor futures contract prices in order to benefit the Contributor Bank Defendants' derivatives trading positions. As a direct result, the prices of commodity futures contracts and/or the price of the commodity underlying such futures contracts were caused to be artificial by Defendants. Other unlawful conduct engaged in by Defendants during the Class Period, *e.g.*, abusive, non-

bona fide Euribor derivatives trading, further injected illegitimate supply and demand factors into the Euribor derivatives market and Defendants' thereby further caused artificial Euribor-based futures contract prices.

460.   **Intent**. Plaintiffs disclaim any need to plead or prove any manipulative intent other than that each Defendant knew that its Euribor reports were false. Alternatively and additionally, Plaintiffs disclaim any need to plead or prove any manipulative intent other than (a) that extensive communications produced in connection with the Barclays, RBS, UBS and Rabobank Settlements, and the other facts and circumstances, show that Defendants purposely and systematically intended to and did manipulate Euribor to artificial levels, and (b) Euribor is the commodity underlying Euribor futures contracts or is at least the price of the commodity underlying the futures contracts here. Additionally, Defendants' specific intent and motive in the manipulation of Euribor was to manipulate Euribor-based derivative prices and obtain ill-gotten trading profits on Euribor-based derivative contracts held by them or other co-conspirators. The prices of these contracts (and thus Defendants' profits or losses) were benchmarked, traded, priced and settled to Euribor. As a specifically intended and direct consequence of Defendants' knowingly unlawful conduct, the prices of Euribor commodity futures contracts and/or the price of the commodity underlying such contracts were manipulated to artificial levels by the Contributor Bank Defendants and their aiders and abettors throughout the Class Period.

461.   The CME has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. CME submits to the CFTC various rules and regulations for approval through which CME designs, creates the terms of, and conducts trading in Euribor-based futures contracts. CME is an organized, centralized market that provides a forum for futures contracts priced, settled and/or benchmarked to Euribor.

462.   Each Defendant, individually, in concert, and/or as one another's control persons or agents, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices of futures contracts in violation of the CEA, 7 U.S.C. § 1, *et seq.*

463.   The Defendants' undisclosed conduct and trading activity alleged herein constituted a manipulation of Euribor and the prices of Euribor futures contracts in violation of Section 4b(a), 4c(a), 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 6b(a), 6c(a), 13(a)(2), and 25(a). As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial Euribor and Euribor futures contract prices to which they would not have been subject but for the unlawful conduct of the Defendants as alleged herein. Plaintiffs and members of the Class were further legally injured and suffered injury in fact that they transacted Euribor futures contracts in an artificial and manipulated market operating under the artificial prices caused by the Defendants. Plaintiffs and members of the Class who purchased or sold Euribor futures contracts during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## SIXTH CLAIM FOR RELIEF

**For Principal-Agent Liability In Violation of The Commodity Exchange Act**

**7 U.S.C. § 1, *et seq.***

### Against All Defendants

464.   Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

465.   Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

466.    Plaintiffs and members of the Class are each entitled to actual damages sustained in Euribor futures contracts for the violations of the CEA alleged herein.

## SEVENTH CLAIM FOR RELIEF

**For Aiding and Abetting Manipulation In Violation of The Commodity Exchange Act, 7 U.S.C. § 1, *et seq*.**

**Against All Defendants**

467.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

468.    The Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by other Defendants as alleged herein. Each Defendant did so knowing of other Defendants' manipulation of Euribor and Euribor futures contracts, and substantially and willfully intended to assist these manipulations to cause the prices of Euribor futures contracts to be artificial during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

469.    Under Section 13c(a) of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

470.    Other persons willfully intended to assist these manipulations to cause Euribor and the price of Euribor futures contracts to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1). They are the agents and unnamed co-conspirators as alleged herein.

471.    Plaintiffs and members of the Class are each entitled to actual damages sustained for the violations of the CEA alleged herein.

## EIGHTH CLAIM FOR RELIEF

**For Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)**

**18 U.S.C. §§ 1961, *et seq.***

**Against All Defendants**

472.     Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

### 1.   Defendants Engaged In Conduct Actionable Under RICO

473.     18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

474.     18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

475.     Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

476.     18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

477.     18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

478.    18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

479.    At all relevant times, an association in fact consisting of Defendants, Defendants' employees and agents who conducted Defendants' affairs through illegal acts (including by transmitting false Euribor submissions or directing other employees to do so), and the EBF were an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The enterprise engaged in interstate commerce, or in activities which affected interstate commerce, and functioned as a continuing unit with an existence beyond that necessary to commit the predicate acts.

480.    At all relevant times, Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

## 2.   Defendants Conducted the Affairs of a RICO Enterprise Through a Pattern of Racketeering Activity

481.    Defendants' association in fact through their frequent communications with each other, their association with the EBF and, their participation together as members of the EBF's Euribor panel, constitutes the RICO enterprise in this case. Every member of the enterprise participated in the process of transmitting or causing to be transmitted false and artificial Euribor submissions throughout the Class Period. On a daily basis, Defendants conducted the affairs of the enterprise through a pattern of racketeering activity by transmitting or causing to be transmitted an electronic spreadsheet to Thomson Reuters. Through this daily transmission of an

electronic spreadsheet, Defendants knowingly transmitted or caused to be transmitted false Euribor submissions. As alleged herein, Defendants engaged in the acts of wire fraud in furtherance of the conspiracy and in conducting the affairs of the association in fact through a pattern of racketeering activity.

482.    Defendants completed all elements of wire fraud within the United States or while crossing United States borders. Defendants did so by: (i) transmitting or causing to be transmitted false and artificial Euribor quotes in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (ii) transmitting or causing to be transmitted false and artificial Euribor quotes that were relied on by Thomson Reuters and the EBF in collecting, calculating, publishing and/or disseminating the daily Euribor submissions of each Defendant and the daily Euribor fix that was transmitted, published and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; (iii) coordinating their daily Euribor submissions and their Euribor-based derivatives trading positions in electronic chats routed through electronic servers located in the United States; and (iv) sending trade confirmations based on manipulated Euribor rates to counterparties in the United States. Plaintiffs identify hundreds of predicate acts of wire fraud.

483.    The common purpose of the enterprise was simple: profiteering. By transmitting or causing false and artificial Euribor submissions to be transmitted to Thomson Reuters and the EBF and by exchanging Euribor-based derivative positions and prices, Defendants affected the prices of Euribor-based derivatives, rendering them artificial. This directly resulted in Defendants reaping hundreds of millions, if not billions, in illicit trading profits on their Euribor-based derivative positions.

### 3.  The Enterprise Has Perpetrated a Continuing Practice of Racketeering

484.    Defendants conducted the affairs of the enterprise through far more than two predicate acts of wire fraud. As alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

(1) The transmission of false Euribor rates to Thomson Reuters for further dissemination;

(2) Causing the transmission and dissemination in the United States of a false Euribor fix by Thomson Reuters as agent for the EBF;

(3) Causing the transmission in the United States of false Euribor individual bank quotes by Thomson Reuters;

(4) Electronic communications and instant messages that emanated from within the United States or were routed through United States electronic servers with manipulative requests; and

(5) Sending trade confirmations based on manipulated, false, and artificial Euribor rates to counterparties in the United States.

485.    Defendants, in concert, made false statements and transmitted false Euribor submissions, for the purpose and with the effect of manipulating Euribor and the price of Euribor-based derivatives to artificial levels. Defendants did so for the purpose and with the effect of increasing their trading profits on Euribor-based derivatives. Defendants earned hundreds of millions, if not billions, of dollars in illicit profits as a result, which they shared with the employees who perpetrated the scheme. The conduct of every party involved in the scheme is hardly an isolated occurrence that resulted in one fraudulent charge.

486.    The pattern of racketeering activity alleged herein involved not isolated occurrences but constituted related acts which amounted to a threat of continued criminal activity throughout the Class Period. Each Defendant shared a common purpose in increasing its profits from trading in derivatives priced, benchmarked and/or settled based on Euribor, and also had a common method of conducting the affairs of the enterprise through a pattern of racketeering activity through use of the wires in transmitting false Euribor reports and placing trades in

conformity therewith. Defendants acted in a uniform way, directly or indirectly through their corporate structures, to conduct the affairs of the enterprise through daily submission and electronic communication of their collusive and artificial Euribor submissions to Thomson Reuters and the EBF comprising one common, uniform nearly identical system of procedures used in virtually an identical way every day. Statements made by Defendants, as alleged herein (*See e.g.*, Part II.A.1; App. A; App. B) evidence this uniform nature. As alleged herein, the predicate acts had a close-ended continuity involving a closed period of repeated conduct in colluding to set Euribor, reporting the collusive and artificial Euribor, and trading to benefit therefrom, throughout the Class Period.

487.    Defendants have knowingly, intentionally, or recklessly engaged in an ongoing pattern of racketeering activity under 18 U.S.C. § 1962(c) by committing many more than two predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343, by knowingly and intentionally implementing the scheme to submit collusive and artificial Euribor quotes to manipulate Euribor and Euribor-based derivatives prices, which allowed Defendants to reap unlawful profits. Defendants' numerous and repeated acts of racketeering activity, as described herein, all occurred after the effective date of RICO and within ten years of each other.

488.    By devising their fraudulent scheme in Euribor-based derivatives as alleged herein, and for obtaining money from participants in Euribor-based derivatives through "false or fraudulent pretenses, representations, or promises" about Euribor and Euribor-based derivatives, Defendants completed all elements of wire fraud within the United States or while crossing United States borders.

489.    Defendants did so by: (i) transmitting or causing to be transmitted collusive and artificial Euribor quotes in the U.S. or while crossing U.S. borders through electronic servers

located in the United States; (ii) transmitting or causing to be transmitted collusive and artificial Euribor quotes that were relied on by Thomson Reuters and the EBF in collecting, calculating, publishing and/or disseminating the daily Euribor submissions of each Defendant and the daily Euribor fix that was transmitted, published and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; (iii) coordinating their daily Euribor submissions and their Euribor-based derivatives trading positions in electronic chats routed through electronic servers located in the United States; and (iv) sending trade confirmations based on manipulated Euribor rates to counterparties in the United States. Plaintiffs identify hundreds of predicate acts of wire fraud. For example, upon information and belief, Defendants committed the predicate acts of wire fraud on at least the following dates: January 13, 2006; June 1, 2006; June 14, 2006; June 29, 2006; July 27, 2006; July 28, 2006; August 1, 2006; August 14, 2006; September 4, 2006; September 6, 2006; September 7, 2006; September 21, 2006; October 2, 2006; October 4, 2006; October 13, 2006; October 16, 2006; November 10, 2006; November 13, 2006; December 5, 2006; December 27, 2006; January 12, 2007; January 25, 2007; February 1, 2007; February 6, 2007; February 12, 2007; March 19, 2007; March 20, 2007; April 2, 2007; July 12, 2007; August 7, 2007; August 9, 2007; November 19, 2007; March 27, 2008; April 3, 2008; April 15, 2008; April 22, 2008; May 7, 2008; May 8, 2008; May 28, 2008; June 3, 2008; July 15, 2008; August 28, 2008; September 5, 2008; September 24, 2008; September 26, 2008; September 29, 2008; June 25, 2009; and June 29, 2010.

490.    As part of its global settlement with regulators for its manipulation of financial benchmarks, Defendant Rabobank agreed to waive indictment to a one-count criminal information filed in the District of Connecticut by the DOJ Criminal Division, Fraud Section and

Antitrust Division, charging Rabobank with wire fraud, in violation of 18 U.S.C. § 1343, in connection with, *inter alia*, Rabobank's false reporting of Yen-LIBOR, a financial benchmark similar to Euribor, also collected, calculated and disseminated by Thompson Reuters. The one-count criminal information provides that "[b]etween approximately 2005 and at least 2010, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., the defendant, through its employees, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant, through its employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about April 17, 2008, the defendant transmitted or caused the transmission of electronic communications - specifically, (1) an electronic chat between a derivatives trader and a money market trader, (2) a subsequent Yen LIBOR submission from the defendant to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate through international and interstate wires." This was a violation of 18 U.S.C. § 1343 (relating to wire fraud). The Rabobank Criminal Information is attached as Exhibit C-4.

491.    As part of its deferred prosecution agreement with the DOJ in connection with its collusive manipulation of financial benchmarks, Defendant Deutsche Bank agreed to waive indictment to one count of wire fraud in violation of 18 U.S.C. § 1343, and one count of price fixing in violation of the Sherman Act 15 U.S.C § 1, filed in the District of Connecticut by the

DOJ Criminal Division, Fraud Section and Antitrust Division. In doing so Deutsche Bank acknowledged that a number of Euribor-based "products are traded in the United States – such as Euro-based swaps contracts traded over-the-counter – in transactions involving U.S.-based counterparties." *See* Ex. F-1 at 21. The Deutsche Bank Criminal Information is attached as Exhibit F-1. The court ordered that " [b]etween approximately 2003 and at least 2010, the defendant, DEUTSCHE BANK AG, through its employees, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all affecting a financial institution, to wit, the defendant, through its employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about July 20, 2006, the defendant transmitted or caused the transmission of electronic communications specifically, (1) an electronic chat between a United States Dollar derivatives trader who was located in the United States at the time of the chat and a United States Dollar LIBOR submitter, (2) a subsequent United States Dollar LIBOR submission from the defendant to Thomson Reuters, and (3) a subsequent publication of a United States Dollar LIBOR rate through international and interstate wires." This was a violation of 18 U.S.C. § 1343 (relating to wire fraud). The Deutsche Bank Information is attached as Ex. F-7.

492.    As part of a May 20, 2015 Plea Agreement with the DOJ, UBS pleaded guilty to one count of a criminal information charging that on "June 29, 2009, in furtherance of a scheme

to defraud counterparties to interest rate derivatives transactions by secretly manipulating benchmark interest rates to which the profitability of those transactions was tied, UBS transmitted or caused the transmission of electronic communications in interstate and foreign commerce, in violation of Title 18, United States Code, Sections 1343 and 2."[286] Further, as part of a Dec. 19, 2012 Information, charging one count of wire fraud, the court held "[b]etween approximately 2006 and at least 2009, in the District of Connecticut and elsewhere, UBS SECURITIES JAPAN CO., LTD., the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant devised and engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about February 25, 2009, the defendant transmitted or caused the transmission of electronic communications - specifically, (1) an electronic chat between a derivatives trader employed by the defendant and a broker employed at an interdealer brokerage firm, (2) a subsequent Yen LIBOR submission from a bank to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate.

493.    Defendants made these transmissions through international and interstate wires, at least one of which passed through, among other locations and facilities, servers located in Stamford, Connecticut." This was a violation of 18 U.S.C. § 1343 (relating to wire fraud).[287]

---

[286] *United States v. UBS AG*, No. 15-cr-00076, ECF No. 6 (D. Conn.).

[287] *Id.*

494.     Plaintiffs do not base their RICO claims on any conduct that is actionable as fraud in the purchase or sale of securities.

### 4.  The Pattern of Racketeering Activity Was Directed to, and Did Affect Interstate Commerce

495.     Through the pattern of racketeering activity described above, Defendants conducted the affairs of the enterprise to improperly increase their profits to the detriment of investors of Euribor-based derivatives, who resided throughout or transacted Euribor-based derivatives from within the United States.

496.     Plaintiffs' allegations satisfy RICO's "interstate commerce" element because the racketeering claims alleged herein arise out of, and are based on, Defendants' use of the internet or the wires across state lines as well as agreements between entities in different states to manipulate Euribor and the price of Euribor-based derivatives. Using those interstate channels to coordinate the scheme and transmit fraudulent statements to Plaintiffs across state lines satisfies RICO's requirement of an effect on interstate commerce.

### 5.  Plaintiffs Suffered Injury Caused By The Pattern of Racketeering Activity

497.     As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiffs and the Class have been injured in their business and/or property as contemplated by 18 U.S.C. § 1962(c), because such violations caused Euribor and the prices of Euribor-based derivatives to be manipulated to artificial levels during the Class Period. The injuries sustained by Plaintiffs and Class members were the direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, those effects were precisely why the scheme was concocted.

498.     Plaintiffs and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

499.     As a direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## NINTH CLAIM FOR RELIEF

**For Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)**

**18 U.S.C. §§ 1961, *et seq.***

**Against All Defendants**

500.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

### 1.  Defendants Conspired To Violate RICO

501.     In addition to conducting the affairs of the enterprise through a pattern of racketeering activity, each of Defendants agreed with each other, or, in the alternative, with a subset of the Defendants, to enter into a conspiracy to, and did, in fact, conduct and participate in the affairs of the enterprise directly and indirectly, which included the repeated predicate acts alleged above, in violation of 18 U.S.C § 1962(d).

502.     Defendants organized and implemented the scheme, and ensured it continued uninterrupted, by concealing their manipulation of Euribor and the prices of Euribor-based derivatives from Plaintiffs and members of the Class.

503.     Defendants knew and intended that their racketeering acts would injure participants in the Euribor-based derivatives market yet each Defendant remained a participant despite the racketeering nature of their conduct. At any point while the scheme has been in

place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence. Rather than stopping the scheme, Defendants deliberately chose to continue it, to the direct detriment of Euribor-based derivatives investors such as Plaintiffs and members of the Class.

504.    As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiffs and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, those effects were precisely why the scheme was concocted.

505.    Plaintiffs and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

506.    As a direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## TENTH CLAIM FOR RELIEF

### For Unjust Enrichment

### Against All Defendants

507.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

508.    To the extent required, this claim is pled in the alternative to Plaintiffs' Eleventh Claim for Relief under FED. R. CIV. P. 8(d).

509.    The Contributor Bank Defendants individually, and/or through their subsidiaries or affiliates are Euribor swaps dealers and traders and also are futures commission merchants, clearing firms and/or trading members of futures exchanges involved in profit-based trading,

clearing and/or brokering of Euribor-based derivatives traded by Plaintiffs and members of the Class.

510.    The Contributor Bank Defendants, and/or one or more of their subsidiaries and/or affiliates, financially benefitted from the unlawful manipulation and restraint of trade. As alleged herein, the Contributor Bank Defendants intentionally and systematically manipulated Euribor to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) in ill-gotten trading profits on Euribor-based derivatives, including Euribor futures contracts, interest rate swaps and forward rate agreements. These instruments were held by Defendants, and thus the prices of such instruments (and thus Defendants' ill-gotten gains) were benefitted by, determined, benchmarked, traded or settled based on Defendants' manipulation of Euribor. In this regard, for example, Euribor submitters at the Contributor Bank Defendants regularly and improperly coordinated and changed their Euribor submissions with one another at the request of Contributor Bank Defendants' interest rate derivatives traders employed by them or their securities subsidiaries or affiliates.

511.    Plaintiff FrontPoint Australian transacted Euribor-based derivatives during the Class Period directly with Contributor Bank Defendants, including UBS. *See supra* ¶¶ 347-348.

512.    Plaintiff CalSTRS transacted Euribor-based derivatives during the Class Period directly with Contributor Bank Defendants, including UBS, Barclays, Citibank, Deutsche, HSBC, JPMorgan, RBS, and Société Générale. *See supra* ¶¶ 318-342.

513.    As a result of the foregoing, it is unjust and inequitable for the Contributor Bank Defendants (and/or their subsidiaries or affiliates) to have enriched themselves in this manner at the expense of Plaintiffs FrontPoint Australian, CalSTRS and members of the Class. The circumstances are such that equity and good conscience require Defendants to make restitution.

514.    Each Defendant should pay restitution for its own unjust enrichment to Plaintiffs and members of the Class.

## ELEVENTH CLAIM FOR RELIEF

**For Breach of The Implied Covenant of Good Faith and Fair Dealing**

**Against Defendant UBS, Barclays, Citibank, Deutsche, HSBC, JPMorgan,**

**RBS, and Société Générale**

515.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

516.    To the extent required, this claim is pled in the alternative to Plaintiffs' Tenth Claim for Relief under FED. R. CIV. P. 8(d).

517.    Plaintiff FrontPoint Australian entered into binding and enforceable contracts with Defendant UBS in connection with Euribor-based derivatives ("contracts"), for example, foreign exchange forwards.

518.    Plaintiff CalSTRS entered into binding and enforceable contracts with Defendants UBS, Barclays, Citibank, Deutsche, HSBC, JPMorgan, RBS, and Société Générale, including foreign exchange forwards.

519.    Each of the contracts includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

520.    Defendants UBS, Barclays, Citibank, Deutsche, HSBC, JPMorgan, RBS, and Société Générale breached this duty and, without reasonable basis and with improper motive, acted in bad faith by, among other things, (i) intentionally submitting false and artificial Euribor

submissions to the EBF for the express purpose of obtaining ill-gotten profits from their Euribor-based derivatives positions; and (ii) colluding directly with employees at other Contributor Panel Banks, either directly or through brokers, in order to manipulate Euribor and the prices of Euribor-based derivatives.

521.    As a direct and proximate cause of these breaches of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purposes of these contracts, Plaintiffs FrontPoint Australian, CalSTRS and similarly situated members of the Class, have been damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs demand relief as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives, and appointing Lowey Dannenberg Cohen & Hart, P.C. and Lovell Stewart Halebian Jacobson LLP as Class counsel;

B.    For a judgment awarding Plaintiffs and members of the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.    For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

D.    For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful enterprise in violation of RICO;

E.    For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons

acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

F.        For a judgment awarding Plaintiffs and members of the Class damages against Defendants for their violations of the federal antitrust laws and RICO, in an amount to be trebled in accordance with such laws;

G.        For a judgment awarding Plaintiffs and members of the Class restitution of any and all sums received by the Defendants' unjust enrichment;

H.        For an award to Plaintiffs and members of the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

I.        For such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: White Plains, New York
      August 13, 2015

LOWEY DANNENBERG COHEN & HART, P.C.

By: /s/ Vincent Briganti
    Vincent Briganti
    Geoffrey M. Horn
    Peter D. St. Phillip
    Raymond Girnys
    Christian Levis
    One North Broadway
    White Plains, New York 10601
    Tel.: 914-997-0500
    Fax: 914-997-0035
    vbriganti@lowey.com
    ghorn@lowey.com
    pstphillip@lowey.com
    rgirnys@lowey.com
    clevis@lowey.com

LOVELL  STEWART  HALEBIAN
JACOBSON  LLP

By: /s/ Christopher  Lovell
Christopher  Lovell
Gary S. Jacobson
Ian T. Stoll
61 Broadway, Suite  501
New York, NY 10006
Tel.: 212-608-1900
Fax: 212-719-4677
clovell@lshllp.com
gsjacobson@lshllp.com
istoll@lshllp.com

*Proposed Interim Co-Lead Class Counsel*

Nicole Lavallee
Todd A. Seaver
**BERMAN DEVALERIO**
One California  Street, Suite  900
San Francisco,  CA  94111
Telephone:  (415) 433-3200
Facsimile:  (415) 433-6282
nlavallee@bermandevalerio.com
tseaver@bermandevalerio.com

Patrick  T. Egan  (PE-6812)
**BERMAN DEVALERIO**
One Liberty  Square
Boston,  MA 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
pegan@bermandevalerio.com


Brian  P. Murray
Lee Albert  (*pro hac vice* to be filed)
GLANCY  BINKOW & GOLDBERG  LLP
122 East 42nd Street, Suite  2920
New York, NY 10168
Tel.: 212-682-5340
Fax: 212-884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com


David  E. Kovel

KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022
Tel.: 212-371-6600
Fax: 212-751-2540
dkovel@kmllp.com

*Additional Counsel for Plaintiffs*