## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STEPHEN SULLIVAN, WHITE OAK FUND LP,
CALIFORNIA STATE TEACHERS' RETIREMENT
SYSTEM, SONTERRA CAPITAL MASTER FUND,
LTD., FRONTPOINT PARTNERS TRADING
FUND, L.P., AND FRONTPOINT AUSTRALIAN
OPPORTUNITIES TRUST on behalf of themselves
and all others similarly situated,

                Plaintiffs,

          - against -

BARCLAYS PLC, BARCLAYS BANK PLC,
BARCLAYS CAPITAL INC., BNP PARIBAS S.A.,
CITIGROUP, INC., CITIBANK, N.A.,
COÖPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A., CRÉDIT AGRICOLE
S.A., CRÉDIT AGRICOLE CIB, DEUTSCHE BANK
AG, DB GROUP SERVICES UK LIMITED, HSBC
HOLDINGS PLC, HSBC BANK PLC, ICAP PLC,
ICAP EUROPE LIMITED, J.P. MORGAN CHASE &
CO., JPMORGAN CHASE BANK, N.A., THE ROYAL
BANK OF SCOTLAND PLC, SOCIÉTÉ GÉNÉRALE
SA, UBS AG AND JOHN DOE NOS. 1-50,

                Defendants.

Docket No. 13-cv-02811 (PKC)

ECF Case

## DECLARATION OF VINCENT BRIGANTI, ESQ

I, Vincent Briganti, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.      I am a shareholder of the law firm Lowey Dannenberg Cohen & Hart, P.C. ("Lowey Dannenberg"). I submit this Declaration in connection with the pending Motion for Preliminary Approval of the settlement reached with the Barclays Defendants in the above referenced action.

2.      On February 12, 2013, Plaintiff Stephen Sullivan filed the first class action complaint in the United States District Court for the Northern District of Illinois captioned *Sullivan v. Barclays PLC et al.*, 13-cv-1159 (N.D. Ill.), on behalf of himself and a proposed class comprised of all other U.S. investors who purchased or sold, during the period of at least June 1, 2005 through at least June 30, 2010, a NYSE Euronext LIFFE Euro Interbank Offered Rate futures contract ("Euribor futures contracts"). The complaint alleged violations of the Sherman Antitrust Act, 15 U.S.C. § 1, and common law arising from the alleged manipulation by Defendants of Euribor[1] and the prices of Euribor futures contracts.

3.      On April 25, 2013, the Honorable Milton I. Shadur ordered that the action be transferred to the U.S. District Court for the Southern District of New York ("S.D.N.Y."). On April 29, 2013, the action was transferred to the S.D.N.Y. and assigned to the Honorable P. Kevin Castel.

4.      On November 2, 2013, Plaintiffs filed their Amended Class Action Complaint. ECF No. 75. On May 5, 2014, Plaintiffs filed their Second Amended Class Action Complaint ("SAC"). ECF Nos. 109, 113.

---

[1] Unless otherwise stated, capitalized terms have the same meaning as set forth in the Settlement Agreement.

5.      On September 11, 2014, the Court granted the United States Department of Justice, Fraud Section of the Criminal Division and the Antitrust Division, motion to intervene in this action and its request for a stay of discovery until May 12, 2015. ECF No. 136.

6.      On October 3, 2014, Plaintiffs filed their Third Amended Class Action Complaint ("TAC"). ECF No. 139. The TAC added additional named Plaintiffs, including the California State Teachers' Retirement System.

7.      During 2015, Plaintiffs and Barclays began negotiating to settle Plaintiffs' claims against Barclays. Prior to and during the Settlement negotiation process, once the Department of Justice permitted Barclays to do so, Barclays made a number of attorney proffers under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, tit. II, 118 Stat. 661 (2004) ("ACPERA") to Plaintiffs of specific factual information. As a result of Barclays' ACPERA proffers, Plaintiffs had obtained by June 2015 more useful information over a few days than is often yielded by years of discovery. This information enabled Plaintiffs to make further detailed allegations of manipulative and conspiratorial conduct.

8.      On May 27, 2015, June 23, 2015, and June 25, 2015, nationally recognized mediator Kenneth R. Feinberg, Esq. held in-person mediation sessions between Plaintiffs and Barclays.

9.      Over the course of the mediation sessions, Proposed Class Counsel were well-informed regarding the strengths and weaknesses of Plaintiffs' claims. Among other sources of information, Plaintiffs had the benefit of: (a) Lowey Dannenberg's and Lovell Stewart's extensive factual and legal research regarding the best possible claims here, (b) proffers from Barclays' counsel pursuant to the ACPERA, (c) government orders revealing various facts, and (d) economic analyses by three economists about the degree of deviation, and the impact of such

deviation, on the prices of Euribor Products attributable to Barclays' (and other Defendants')

conduct.

10.     The mediation sessions ended in impasse. After the impasse on June 25th,

Kenneth Feinberg, Esq., continued to mediate in telephone calls between the parties. The

Mediator's telephone calls were ultimately successful.

11.     On August 11, 2015, counsel for Barclays and Plaintiffs signed a Memorandum of

Understanding ("MOU"). This MOU set forth the terms on which the parties agreed, subject to

the preparation of a full Settlement Agreement, to settle all claims based on Plaintiffs' claims

relating to Euribor or Euribor Products that Plaintiffs have or could have asserted against

Barclays in this action. At that time, Plaintiffs' Counsel were well-informed about the legal risks,

factual uncertainties, potential damages and other aspects of the strengths and weaknesses of the

claims asserted herein when the terms of the Settlement Agreement were agreed upon.  The

Settlement Agreement was the culmination of arms-length, settlement negotiations that had

extended over many months.

12.     At no time was there any collusion. On the contrary, there were extensive

negotiations and "hard beginning."

13.     On August 13, 2015, Plaintiffs filed their Fourth Amended Class Action

Complaint ("FAC").[2]   ECF No. 174. In the FAC, Plaintiffs made additional detailed allegations

---

[2] The FAC asserts ten claims against Barclays and ten other banks and an interdealer broker: (i) a
conspiracy to restrain competition in and to fix the prices of Euribor-based derivatives in
violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) bid rigging in violation of Section 1
of the Sherman Act, 15 U.S.C. § 1; (iii) concerted refusal to deal in violation of Section 1 of the
Sherman Act, 15 U.S.C. § 1; (iv) the manipulation of Euribor and the prices of Euribor-based
derivatives, in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*; (v)
vicarious liability for manipulation of Euribor and prices of Euribor-based derivatives, in
violation of Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1); (vi) aiding and abetting the
manipulation of Euribor and the prices of Euribor-based derivatives, in violation of Section

of conspiratorial manipulation of Euribor and Euribor Products. *See, e.g*., FAC, Appendix A and Appendix B. In particular, the FAC alleges that Defendants employed multiple different means to manipulate Euribor and the prices of Euribor-based derivatives during the Class Period, including:

- **Coordinating false Euribor submission:**  Defendants organized and influenced brokers and banks to cause Euribor panel members and affiliates to submit interest rate quotes to Thomson Reuters that did not reflect the cost of borrowing Euros in the inter-bank money market.  FAC, Part II.A;

- **"Pushing Cash":**  Defendants intentionally borrowed or loaned Euros at above or below prevailing market rates to manipulate the cost of borrowing funds in the inter-bank money market, above or below competitive levels in order to manipulate the Euribor submissions.  FAC, Part II.B;

- **"Spoofing":**  Defendants transmitted false bids and offers for money market instruments through, *e.g.,* inter-dealer brokers, in order to change the perception of the cost of borrowing Euros in the inter-bank money, and directly manipulate Euribor. FAC, Part II.C;

- **Using Derivatives Traders As Submitters:**  Contrary to government directions, certain Defendants caused their derivative traders, who had a profit interest in obtaining lower or higher Euribor submissions, to act as the bank's Euribor submitter and thereby, to maximize the correspondence between the actual Euribor submission and the financial profit interest of the bank.  FAC, Part II.A.2-3, Part E;

- **Agreeing on Where to Price Euribor-based Derivatives:**  Defendants consulted with one another to determine a mutually beneficial price level before issuing quotes to other market participants and directly manipulate Euribor-based derivatives prices. FAC, Part III.A;

- **Rigging Bids for Euribor-based Derivatives:**  Defendants intentionally submitted price quotes worse than their supposed competitors to guarantee a trade with another Defendant at a higher price and cause non-competitive prices of Euribor-based derivatives.  FAC, Part III.B;

---

22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1); (vii) racketeering by engaging in wire fraud to transmit false Euribor submissions, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*; (viii) conspiracy to violate RICO, in violation of 18 U.S.C. § 1962(d); (ix) unjust enrichment; and (x) breach of the implied covenant of good faith and fair dealing.

- **Coordinating Pricing "Runs" Sent to Clients:** Defendants made sure to match prices for multiple Euribor-based derivatives with those other Defendants sent and thereby cause non-competitive prices for Euribor-based derivatives. FAC, Part III.C;

- **Refusing to Deal with Certain Market Participants:** Various Defendants agreed to show "no interest" or not issue price quotes below a certain level and thereby manipulate the price of Euribor-based derivatives.  FAC, Part III.D;

- **Sharing Non-Public, Proprietary Information:** Various Defendants included the names of their clients, the pricing curves used by their bank to value their Euribor-based derivatives, their trading positions, and overall contents of their portfolio.  FAC, Part III.E; and

- **Trading with Co-Conspirators at Below Market Rates:** Defendants reserved special "members only" pricing for the other Defendants and their affiliates that was unavailable to other market partiicpants.  FAC, Part III.F.

14. On October 7, 2015, Plaintiffs and Barclays executed the Settlement Agreement annexed as Exhibit 1 to the Declaration of Christopher Lovell, Esq. ("Lovell Decl.").

15. On October 13, 2015, Plaintiffs and Barclays wrote to the Court notifying the Court and parties of the existence of the Settlement Agreement and intention to move for preliminary approval.

16. The Settlement Agreement involves a structure and terms that are common in class action settlements in this District.

17. The consideration that Barclays has agreed to pay in the initial, "ice-breaker" settlement is within the range of that which may be found to be fair, reasonable, and adequate at final approval.

18. Proposed Class Counsel, Lowey Dannenberg and Lovell Stewart Halebian Jacobson LLP, are experienced with antitrust and commodity futures claims. *See* Exhibit 1 (Lowey Dannenberg Resume); Exhibit 2 to the Lovell Decl. (Lovell Stewart Resume) (Proposed Class Counsel previously conducted multiple successful prosecutions that produced pre-trial

5

settlements, including what were at the time the first, second, third, and fourth largest class action recoveries under the Commodity Exchange Act).

19.     Proposed Class Counsel have strong reason to believe that there are at least hundreds of geographically dispersed persons and entities that fall within the Settlement Class definition. This belief is based on data from the Bank of International Settlements which shows that trillions of dollars of Euribor-based interest rate swaps and forward rate agreements were traded within the United States from 2005 through 2011. This belief is also based on the U.S. Commodity Futures Trading Commission's ("CFTC") response to Lowey Dannenberg's Freedom of Information Act ("FOIA") request. In March 2013, Lowey Dannenberg served a FOIA request on the CFTC requesting the CFTC provide the total volume in NYSE LIFFE Euribor futures contracts originating from LIFFE CONNECT Application Program Interfaces assigned to each of LIFFE's members in the United States from 2000 through 2012.  The CFTC granted full access to Lowey Dannenberg's FOIA request and reported that for the period of 2001 through 2012 more than 350 million NYSE LIFFE Euribor futures contracts were traded from within the United States.

20.     Proposed Class Counsel have diligently represented the interests of the Class in this litigation. They investigated and brought the case.  They preserved the statute of limitations. They negotiated with Barclays, the other Defendants, and the Department of Justice to obtain Barclays' proffers.  They performed all of the years' work leading up to and prepared the 205-page Fourth Amended Complaint.  They negotiated with Barclays and the Mediator to produce the Settlement. Class Counsel will continue to zealously represent the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 30, 2015
White Plains, New York

_____
VINCENT BRIGANTI

7