UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
STEPHEN SULLIVAN, WHITE OAK FUND
LP, CALIFORNIA STATE TEACHERS'
RETIREMENT SYSTEM, SONTERRA
CAPITAL MASTER FUND, LTD.,
FRONTPOINT PARTNERS TRADING FUND,
L.P. and FRONTPOINT AUSTRALIAN
OPPORTUNITIES TRUST, on behalf of
themselves and all others similarly situated,

                    Plaintiffs,                    13-cv-2811 (PKC)

        -against-                    MEMORANDUM
                                                  AND ORDER

BARCLAYS PLC, BARCLAYS BANK PLC,
BARCLAYS CAPITAL INC., BNP PARIBAS
S.A., CITIGROUP, INC., CITIBANK, N.A.,
COOPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A., CRÉDIT
AGRICOLE S.A., CRÉDIT AGRICOLE CIB,
DEUTSCHE BANK AG, DB GROUP
SERVICES UK LIMITED, HSBC HOLDINGS
PLC, HSBC BANK PLC, ICAP PLC, ICAP
EUROPE LIMITED, J.P. MORGAN CHASE &
CO., JPMORGAN CHASE BANK, N.A., THE
ROYAL BANK OF SCOTLAND PLC,
SOCIÉTÉ GÉNÉRALE SA, UBS AG and JOHN
DOE NOS. 1-50,

                    Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiffs bring this putative class action asserting claims directed to the

defendants' alleged manipulation of the Euro Interbank Offered Rate ("Euribor"). The Euribor is

a daily benchmark intended to reflect the average interest rate that major banks offer one another

to hold short-term Euro deposits. Its daily calculation is based on submissions from some of the

world largest banks, including defendants.

Some contracts – such as interest rate swaps, forward rate agreements and currency futures – include a price or payment term derived from the Euribor.  Changes in the Euribor alter the payment obligations, and hence the profits and losses, of the parties to these contracts.  The core misconduct alleged in the Complaint is relatively straightforward: plaintiffs claim that, for their own enrichment, traders and institutions secretly conspired to submit false data used to calculate the Euribor.  Plaintiffs allege that as a result of the Euribor's manipulation, they suffered losses in their own Euribor-based transactions, as did others similarly situated.

Although the Complaint often discusses "defendants" in the aggregate, the Euribor scheme described by plaintiffs apparently was orchestrated by two individuals: a Deutsche Bank trader named Christian Bittar and a trader named Philippe Moryoussef, who was employed by Barclays and later by RBS.  (See e.g., Compl't ¶¶ 142-244; Opp. Mem. at 1 (describing Barclays as the "ringleader" of Euribor manipulation.)  Accepting the Complaint's allegations, Bittar and Moryoussef drew traders and submitters at other banks into their scheme, seeking to manipulate the Euribor rate for the benefit of holdings that they had at Deutsche Bank, Barclays and/or RBS.

The Complaint does not allege the total market size for Euribor-based transactions, but it states that during the class period, the United States market for just two categories of derivative contracts exceeded $41 trillion.[1]  Transactions directly involving the defendant banks made up a modest portion of the overall market – as alleged in the Complaint, defendants' positions totaled hundreds of millions of dollars, or perhaps somewhere in the billions.  Only two plaintiffs – FrontPoint Australian Opportunities Trust and the California State Teachers' Retirement System – allege that they transacted directly with any defendant.

---

[1] As a point of reference, the total projected expenditures of the U.S. government for fiscal year 2016 is slightly less than $4 trillion.

Plaintiffs' Fourth Amended Class Action Complaint (the "Complaint") brings claims under the Sherman Antitrust Act, 15 U.S.C. § 1, et seq., the Commodity Exchange Act, 7 U.S.C. § 1 et seq. (the "CEA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"), and asserts common-law claims of unjust enrichment and the breach of the implied covenant of good faith and fair dealing.

Defendants have moved to dismiss the Complaint for lack of subject matter jurisdiction, failure to state a claim and lack of personal jurisdiction.  Rules 12(b)(1), 12(b)(2) and 12(b)(6), Fed. R. Civ. P.  For the reasons that will be explained, this Court concludes that plaintiffs have Article III standing.  But the Complaint suffers from several infirmities.  It does not plausibly allege that four of the six plaintiffs have an essential component of antitrust standing: that they can function as efficient enforcers of the antitrust laws.  Out of plaintiffs' four Sherman Act claims, only Count One plausibly alleges an agreement among the defendants to restrain trade.  Their claims under RICO are barred in their entirety by the statute's presumption against extraterritorial application, as are significant portions of their claims under the CEA.  To the extent that the Complaint has alleged any claims for relief, the plaintiffs have not made a prima facie case showing that any of the foreign defendants are subject to personal jurisdiction.

As a result, plaintiffs' claims are dismissed, except for one Sherman Act claim and two common-law claims against the Citigroup and J.P. Morgan defendants.

BACKGROUND.

A.  The Motion to Dismiss Is Deemed Withdrawn as to Certain Defendants.

After the filing of the operative Complaint, plaintiffs voluntarily dismissed all claims against defendant BNP Paribas S.A. without prejudice.  (Docket # 185.)  During the time that this motion to dismiss has been sub judice, the Court preliminarily approved a class action

settlement and preliminarily certified a settlement class as to the following defendants: Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., HSBC Holdings PLC and HSBC Bank PLC. (Docket # 234, 279.)  The motion to dismiss filed by the Barclays and HSBC defendants is deemed withdrawn without prejudice to refiling in the event that the proposed settlements are not finally approved.

In addition, on the consent of plaintiffs and defendants Deutsche Bank AG and DB Group Services (UK) Ltd. (collectively, "Deutsche Bank"), the motion to dismiss filed by Deutsche Bank is deemed withdrawn without prejudice to renewal.

Certain allegations against them are nevertheless relevant to fully understanding plaintiffs' claims against the remaining defendants.  To the extent that Barclays, HSBC, Deutsche Bank and BNP Paribas are discussed in this Memorandum and Order, it is as context for plaintiffs' allegations against the remaining defendants.

B.   Overview of the Euribor.

The Euribor is a daily rate intended to reflect interest rates that large banks offer one another for short-term Euro deposits.  (Compl't ¶ 107.)  It is intended to serve as a wider "daily proxy" for the banks' interest rates.  (Compl't ¶ 9.)  The Euribor was created by the European Banking Federation ("EBF"), an unregulated trade association made up of large banks. (Compl't ¶¶ 9, 108.)

The EBF code of conduct required contributor banks to make Euribor submissions on each trading day based on their observations of the terms that "prime" banks offer one another for deposits within the European Monetary Union.  (Compl't ¶ 108.)  The quotes reflect a range of fifteen different maturity dates, or "tenors," ranging from one week to twelve months, with longer-term deposits paying higher interest than short-term deposits.

(Compl't ¶ 110.)  Thomson Reuters, a publishing company, managed the Euribor submissions process and received the submitters' daily quotes electronically.  (Compl't ¶ 109.)  Thomson Reuters calculated the daily Euribor rate based on the average of the middle 70% of contributor quotes, discarding the highest and lowest 15% of the quoted rates.  (Compl't ¶ 111.)

The EBF's code of conduct required each participating bank to make an independent, daily submission.  (Compl't ¶ 10.)  It forbade the banks from coordinating or discussing their submissions, contributing false quotes, or determining quotes in light of the value of their own Euribor-based derivatives positions.  (Compl't ¶ 14, 112.)

### C.  The Euribor's Role in Valuing Derivatives.

A derivative is a contract in which the price or payment terms are drawn from another source.  (Compl't ¶ 12.)  The daily Euribor rate governed the prices and payments of Euribor-based derivatives, and its daily calculation was intended to eliminate the need for parties to derivatives contracts to independently negotiate a daily competitive rate.  (Compl't ¶¶ 14-15.)  According to the Complaint, the Euribor was an express benchmark for determining the interest rate, price or payment for the following five categories of derivatives: Euribor interest rate swaps, Euribor forward rate agreements, Euro foreign exchange forwards, Euro currency futures traded on the Chicago Mercantile Exchange ("CME") and NYSE LIFFE Euribor futures contracts.[2]  (Compl't ¶ 13.)  This Memorandum and Order describes each type of derivative in greater detail when addressing defendants' arguments directed to plaintiffs' Article III standing.  According to plaintiffs, the Euribor-based derivatives market is "one of the largest derivatives markets in the world . . . ."  (Compl't ¶ 113.)

---

[2] "LIFFE" is an abbreviation of the London International Financial Futures and Options Exchange, the market where these futures contracts are traded.  (Compl't ¶¶ 53, 118.)

Three types of derivatives at issue in this case were standardized, bilateral contracts between a buyer and a seller: NYSE Euribor futures, CME currency futures and foreign exchange forwards.  (See, e.g., Compl't ¶¶ 115, 121, 125.)  For example, in a CME Euro currency futures contract, a buyer agrees to purchase €125,000 on a designated future date, with the future cost of buying or selling those Euros determined by a formula that incorporates the Euribor.  (Compl't ¶¶ 122-23.)  As the value of the Euribor increases, the future price of Euros declines, thus lowering the value of the contract.  (Compl't ¶ 123.)  As the Euribor declines, the future price of Euros rises, and the value of the contract increases.  (Compl't ¶ 123.)  According to the Complaint, any shift in the value of the Euribor directly affects the value of the contract. (Compl't ¶ 124.)

For interest-rate swaps, forward-rate agreements and foreign exchange forwards, the derivative contracts are more individualized, but their values are still determined by the Euribor rate.  For example, in an interest rate swap, one party exchanges a "floating-rate obligation" set by the Euribor in exchange for a negotiated-upon, fixed stream of interest payments, with payment made at regular intervals.  (Compl't ¶¶ 127-29.)  To use the Complaint's example, a "fixed-stream" interest may be set at 2% per year, with the "floating rate" set to match the Euribor.  (Compl't ¶ 127.)  The party with the larger obligation – whether it is the fixed interest rate or the floating rate – makes a scheduled payment that reflects the difference between the two rates.  (Compl't ¶ 129.)  Under such an arrangement, the Euribor directly affects the value of the floating rate, and therefore the payment obligations of the parties to the agreement.  (Compl't ¶ 130.)

According to the Complaint, each of the five categories of derivatives identified by the plaintiffs is directly affected by Euribor rates.

D.  Defendants' Alleged Manipulation of the Euribor.

Plaintiffs allege that from June 1, 2005 through March 31, 2011, defendants agreed to rig the daily Euribor rate and to fix the prices of Euribor-based derivatives.  (Compl't ¶ 1.)  Instead of competitors independently submitting quotes, as required by the EBF code of conduct, defendants allegedly engaged in "the manipulation of benchmarks" to alter the price of Euribor-based derivatives.  (Compl't ¶ 15.)  Plaintiffs allege that "Deutsche Bank and the other Defendants" knew that they were acting unlawfully, and actively concealed their actions from the public by communicating through "secret electronic chat rooms," in-person meetings and "unrecorded mobile phones."  (Compl't ¶ 25.)

Defendants allegedly used several techniques to manipulate the Euribor. Plaintiffs allege that the banks' own Euribor derivatives traders requested that rates be set at artificial levels in order to enhance the value of their own positions, doing so both on target dates where derivative values were to be priced, benchmarked or settled, as well as through longer-term, standing orders to fix rates in certain directions in order to skew prices for their own benefit.  (Compl't ¶ 138-39.)  The Complaint alleges that four to eight banks coordinated prices for any given manipulation, doing so in person at social gatherings or professional conferences, or through electronic communications.  (Compl't ¶¶ 141.)

According to plaintiffs, the defendants also intentionally manipulated the Euribor rate by borrowing and lending Euros to one another at rates that were either above-market or below-market, thus distorting the rate of interest being paid in Euro deposits.  (Compl't ¶ 185.) Plaintiffs call this practice "pushing cash."  (Compl't ¶ 185.)  Plaintiffs allege that this practice was effective when several defendants with large money-market desks were involved because they could easily move cash prices and affect the Euribor.  (Compl't ¶ 187.)

Another approach used inter-dealer brokers as intermediaries to transmit false bids and offers to participants in the derivatives market in an effort to manipulate prices – a practice known as "spoofing."  (Compl't ¶ 194.)  Defendant ICAP, and inter-dealer broker, was one such intermediary.  (Compl't ¶ 194.)  Because prices were manipulated to appear artificially high, some unwitting contributors to the Euribor panel were tricked into making inflated quotes for the daily Euribor rate.  (Compl't ¶ 195.)

According to plaintiffs, management at the defendant banks – specifically, Deutsche Bank, UBS and Rabobank – facilitated their employees' activities by making structural changes to their money markets and derivatives desks that allowed for collusion, implemented lax compliance standards that failed to detect misconduct, and concealed evidence from regulators.  (Compl't ¶¶ 250-86.)  As an example, Deutsche Bank allegedly did not maintain records of which employees made Euribor submissions or train employees on the methodologies used for making submissions.  (Compl't ¶ 251.)  Deutsche Bank allegedly assigned employees responsible for daily Euribor submissions to sit in desks located near derivatives traders.  (Compl't ¶ 253.)  It also allegedly concealed from U.S. regulators a non-public report issued by a German regulator that criticized Deutsche Bank's purportedly shoddy practices for submitting rate quotes for the Euribor.  (Compl't ¶¶ 275-84.)

E.  Defendants' Other Alleged Manipulations.

Plaintiffs allege that defendants engaged in additional conduct that amounted to horizontal price-fixing between competitors in the Euribor-based derivatives market.  (Compl't ¶ 287.)  These activities were related to the Euribor-based derivatives market, but did not necessarily require the participants to artificially fix the daily Euribor quotes.  The Sherman Act violations set forth in Counts Two, Three and Four are directed to these activities.

Plaintiffs allege that Deutsche Bank and Barclays consulted each other and agreed to prices before offering price quotes for over-the-counter derivatives to their counter-parties. (Compl't ¶¶ 288-91.)  In contrast to instruments traded on public exchanges, over-the-counter derivatives are priced without transparency, and are based on a price quote and transaction that involves only the market-maker and a client.  (Compl't ¶ 289.)  Plaintiffs allege that Deutsche Bank and Barclays conferred with one another before making price quotes to counterparties. (Compl't ¶¶ 289-91.)

Deutsche Bank and Barclays also allegedly engaged in "bid rigging" whereby they agreed to offer worse prices to the same market participant in order to guarantee that an offering price stayed in a desired range.  (Compl't ¶ 292.)  Through Christian Bittar of Deutsche Bank and Philippe Moryoussef of Barclays and later RBS, Deutsche Bank, Barclays and/or RBS allegedly agreed in advance to quote the same prices for multiple derivatives in quote lists sent to the same clients, refused to deal with certain counterparties at prices below an agreed-upon rate, and offered one another favorable derivatives prices.  (Compl't ¶¶ 293-94.)  Plaintiffs allege that some defendants also shared proprietary information and coordinated concerning the "pricing curves" that they used for customer quotes concerning Euribor-based derivatives.  (Compl't ¶¶ 296-99.)

F.   Regulator Actions against the Banks.

In December 2013, the European Commission found that defendants Barclays, Deutsche Bank, Société Générale and RBS had participated in a "Euro Interest Rate Derivatives cartel," and fined them more than $1.26 billion in total.  (Compl't ¶¶ 351-52.)  In May 2014, the European Commission sent defendants Crédit Agricole, HSBC and JPMorgan a "statement of objections," stating in part that the Commission had "reached the preliminary conclusion" that

the banks "may have participated in this cartel too." (Compl't ¶ 354.) Regulators in the United States, Canada, Asia and Switzerland began investigations into submissions made to the Euribor panel. (Compl't ¶¶ 369-72.) In addition to the European Commission's investigations and penalties, the Department of Justice and the Commodity Futures Trading Commission ("CFTC") have conducted investigations and proceedings resulting in penalties against participants in the Euribor scheme, the details of which are discussed in greater details below.

After the European Commission issued its findings, defendants Citibank, UBS and Rabobank withdrew from the Euribor panel. (Compl't ¶ 360.) Senior executives resigned from some of the defendant banks, and some traders implicated in the Euribor scheme were disciplined, terminated and/or fined by their employers. (Compl't ¶¶ 361-368.)

The EBF has since reformed aspects of the Euribor rate-setting process, and revised the Euribor Code of Conduct on the methodologies, quality-control and independent review of Euribor submissions, and created a conflicts-of-interest policy. (Compl't ¶ 390.)

G. The Parties.

Plaintiffs each allegedly traded in Euribor-based derivatives in the United States. (Compl't ¶¶ 57-62.) Plaintiffs include a natural person, Stephen Sullivan; one retirement fund, the California State Teachers' Retirement System ("CalSTRS"); and four investment funds, White Oak Fund LP ("White Oak"), Sonterra Capital Master Fund, Ltd. ("Sonterra"), FrontPoint Australian Opportunities Trust ("FrontPoint Australian") and FrontPoint Partners Trading Fund, L.P. ("FrontPoint Trading"). (Compl't ¶¶ 57-62.)

Of the six plaintiffs, only FrontPoint Australian and CalSTRS allege that they participated in Euribor transactions that included a defendant as a counterparty. FrontPoint Australian alleges that it engaged in two derivative transactions with defendant UBS, and

CalSTRS alleges that it had "hundreds" of transactions with defendants Barclays UBS, Citibank, Deutsche Bank, HSBC, J.P. Morgan and RBS, as well as "dozens" of transactions with Société Générale.  (Compl't ¶¶ 347, 319.)  The other plaintiffs alleged that they participated in Euribor-based derivative transactions and were injured as a result of defendants' alleged manipulation, but do not identify any defendant as a counterparty to a Euribor-based.

       With the exception of ICAP, defendants are large financial institutions that were members of the EBF and participated in the panel that helped to set daily Euribor rates.  The defendants are alleged to have conspired between and among one another to fix daily Euribor rates.  Two of the defendants, Citigroup, Inc. and J.P. Morgan Chase & Co., are alleged to be Delaware corporations with their principal places of business in New York.  (Compl't ¶¶ 70, 85.)  Defendant JPMorgan Chase Bank, N.A., is a federally chartered national banking association headquartered in New York.  (Compl't ¶ 86.)  Citibank, N.A. is a wholly owned subsidiary of Citigroup, Inc., and was a member of the Euribor panel.  (Compl't ¶ 71.)  The J.P. Morgan and Citigroup defendants do not challenge this Court's personal jurisdiction over them.

       The remaining defendants are incorporated and headquartered in European countries, but are alleged to maintain branches, offices and/or subsidiaries within the United States.  (Compl't ¶¶ 63-103.)  All defendants are banks with the exception of the two ICAP defendants: ICAP plc and ICAP Europe Limited.  (Compl't ¶ 101-03.)  The ICAP defendants act as brokers between principals, including banks, and are alleged to have participated in the rigging of the Euribor by quoting false cash prices to other market participants, thereby "spoofing" the market.  (Compl't ¶¶ 102-03.)

H.  Plaintiffs' Claims.

Plaintiffs assert eleven causes of action.  Four of the claims assert that all defendants conspired to restrain trade in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  According to plaintiffs, defendants conspired to rig the Euribor, conspired to fix the prices of Euribor-based derivatives, unlawfully rigged bids for Euribor-based derivatives and engaged in concerted refusals to deal with certain derivatives counterparties.  (Compl't ¶¶ 422-56.)

Plaintiffs assert three causes of action under the Commodity Exchange Act, 7 U.S.C. § 1, et seq. (the "CEA").  (Compl't ¶¶ 457-71.)  They allege that the Euribor is a commodity that trades in interstate commerce, and that any manipulation of the Euribor affects Euribor futures contracts in an artificial manner that violates the CEA.  (Compl't ¶ 459.)  Plaintiffs allege that all defendants violated the CEA by manipulating prices for Euribor futures contracts, are liable for the conduct of their employees and agents, and aided and abetted the manipulation of Euribor futures contracts.  (Compl't ¶ 457-71.)

Plaintiffs assert two RICO claims against all defendants, and allege that defendants engaged in a pattern of racketeering activity based on predicate acts of wire fraud for the common purpose of profiting on their own derivatives holdings.  (Compl't ¶¶ 472-506.)

Counts Ten asserts a common law claim of unjust enrichment, and alleges that all defendants benefited from ill-gotten gains at the expense of plaintiffs and the putative class.  (Compl't ¶¶ 507-14.)  Count Eleven alleges that defendants UBS, Barclays, Citibank, Deutsche Bank, HSBC, J.P. Morgan, RBS and Société Générale violated the implied covenant of good faith and fair dealing as to plaintiffs FrontPoint Australian and CalSTRS when they entered into

derivatives contracts for the purpose of obtaining ill-gotten profits from the manipulated Euribor rates.  (Compl't ¶¶ 515-21.)

I.   THE COMPLAINT SUFFICIENTLY ALLEGES ARTICLE III STANDING.

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(1), Fed. R. Civ. P., on the grounds that the plaintiffs have not alleged any injury-in-fact, thus depriving them of Article III standing and the Court of subject-matter jurisdiction.  According to defendants, the Complaint does not plausibly allege that any alleged manipulation of the Euribor caused plaintiffs to suffer losses in the five categories of derivatives described in the Complaint.  Further, plaintiffs do not claim to have personally transacted in Forward Rate Agreements, for which they nevertheless seek relief on behalf of the class.

"Subject matter jurisdiction is generally a 'threshold question that must be resolved . . . before proceeding to the merits.'"  Stockbridge-Munsee Cmty. v. N.Y., 756 F.3d 163, 166 (2d Cir. 2014) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998)).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  The plaintiff has the burden of demonstrating subject matter jurisdiction.  See Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011).  In resolving a motion to dismiss under Rule 12(b)(1), "the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).

A plaintiff's standing is necessary to exercise subject matter jurisdiction.  See, e.g., Strubel v. Comenity Bank, 842 F.3d 181, 187 (2d Cir. 2016).  "To satisfy the 'irreducible

- 13 -

constitutional minimum' of Article III standing, a plaintiff must demonstrate (1) 'injury in fact,' (2) a 'causal connection' between that injury and the complained-of conduct, and (3) a likelihood 'that the injury will be redressed by a favorable decision.'" Id. at 187-88 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

   "As a general rule, the 'injury-in-fact' requirement means that a plaintiff must have personally suffered an injury." W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 107 (2d Cir. 2008). "Injury in fact is a low threshold, which we have held need not be capable of sustaining a valid cause of action . . . ." Ross v. Bank of Am., N.A. (USA), 524 F.3d 217, 222 (2d Cir. 2008) (quotation marks omitted). At the pleading stage, a plaintiff has only a "relatively modest" burden to show a traceable injury, which is defined as an injury that is fairly traceable to the defendant's allege conduct, and "'not th[e] result [of] the independent action of some third party not before the court . . . .'" Rothstein v. UBS AG, 708 F.3d 82, 91-92 (2d Cir. 2013) (alterations in original; quoting Lujan, 504 U.S. at 560-61). There must be a "causal nexus" between the defendant's conduct and a resulting injury, but causation need not be as direct as tort causation, and "indirectness is not necessarily fatal to standing, because the 'fairly traceable' standard is lower than that of proximate cause." Id. (internal citation and quotation marks omitted). "[H]arms that flow indirectly from the action in question" will confer standing on a plaintiff. Id. at 92.

   In addition, at the pleading stage, a plaintiff has standing to assert claims on behalf of class members if it plausibly alleges that it "has suffered some actual injury as a result of the putatively illegal conduct of the defendant," and that this conduct "implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693

F.3d 145, 162 (2d Cir. 2012) (quotation marks omitted).  To pursue a claim on behalf of the class, the plaintiff need not necessarily have suffered the same injury, provided that it suffered actual injury caused by the same underlying misconduct.  See id.

A.  Forward Rate Agreements.

Plaintiffs allege that defendants unlawfully fixed the prices of Forward Rate Agreements ("FRAs") as a direct consequence of manipulating the Euribor.  In an FRA, the parties contract for payment at a settlement date, with the amount due based on the difference between an agreed-upon, fixed "forward rate" and a fluctuating "market rate" set by the Euribor.  (Compl't ¶¶ 132-33.)  Under an FRA, one party benefits if the Euribor increases before the settlement date, and the other party benefits if the Euribor decreases.  (Compl't ¶ 132.)  The Complaint alleges that "the notional amount" of Euribor-based FRAs in the United States during the class period exceeded $5 trillion.  (Compl't ¶ 132.)

Plaintiffs do not allege that they transacted in FRAs, and acknowledge as much in their opposition memo.  (Opp. Mem. at 11.)  However, they argue that under Second Circuit authority, at the pleading stage, a plaintiff has standing to pursue claims on behalf of class members who suffer an injury based on the same underlying misconduct that harmed the named plaintiffs.  Although courts refer to this concept as "class standing," it is properly raised at the pleading stage, and weighs interests distinct from those considered on a motion for class certification.  See NECA, 693 F.3d at 158 n.9 (a plaintiff's "standing to assert claims on others' behalf is an inquiry separate from its ability to represent the interests of absent class members under Fed. R. Civ. P. Rule 23(a).").[3]

---

[3] NECA observed that the Supreme Court has "some 'tension' in its case law" as to whether class standing is a component of Article III standing or instead has its origins in Rule 23.  693 F.3d at 160-61; see also Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of N.Y., 775 F.3d 154, 160 (2d Cir. 2014)

As mentioned, in NECA, 693 F.3d at 162, the Second Circuit concluded that "a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  (quotation marks, alterations and internal citations omitted; citing Blum v. Yaretsky, 457 U.S. 991, 999 (1982); Gratz v. Bollinger, 539 U.S. 244, 267 (2003).)  "When this standard is satisfied, the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf."  Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon, 775 F.3d 154, 161 (2d Cir. 2014).

In NECA, plaintiff alleged violations of the Securities Act of 1933 based on misrepresentations made by originators whose mortgage loans were pooled into mortgage-backed securities.  693 F.3d at 148-49.  The Second Circuit concluded that the plaintiff had standing to pursue class claims on behalf of those whose certificates were backed by the same originators as those held in plaintiff's own portfolio, even if the certificates were purchased in different offerings, since claims on behalf of the class were directed to the identical misrepresentations made by the identical parties.  Id. at 163-64.  Plaintiff did not, however, have standing to pursue claims directed to other originators.  Id. at 163.  As NECA explained, misstatements made by additional originators "ha[ve] the potential to be very different – and could turn on very different proof."  Id.  The plaintiff could therefore pursue class claims only to the extent that they were directed to originators and misstatements that allegedly injured the

(noting "the murky line between traditional Article III standing and so-called 'class standing.'").  However, the Supreme Court has stated that "'[t]he standing determination is quite separate from certification of the class.'"  NECA, 693 F.3d at 161 (quoting Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996))

plaintiff itself.  Id.; see also Fernandez v. UBS AG, 2016 WL 7163823, at *10 (S.D.N.Y. Dec. 7, 2016) (plaintiffs alleged class standing because "if defendants' systematic conduct is tortious with respect to one fund, it is also tortious with respect to another fund, and does not depend on the individualized circumstances of each Fund.") (Stein, J.).  NECA emphasized that its conclusions as to standing should not be conflated with relevant considerations in a Rule 23 class certification analysis.  643 F.3d at 165.

FRAs are a different category of derivative than those transacted in by plaintiffs, but any harm suffered by a party to an FRA as a result of the Euribor's manipulation would have been caused by the identical misconduct of the identical parties.  Liability would turn on the same proof as to the allegedly false Euribor submissions.  There would be no need to separately assess separate acts of manipulation by additional parties.  See Bank of N.Y. Mellon, 775 F.3d at 162-63 (denying class standing when "alleged misconduct must be proved loan-by-loan and trust-by-trust.").  Aside from the separate issue of damages, the evidence in support of plaintiffs' own claims would be in unity with any claim brought on behalf of parties to FRA transactions.

The Court therefore concludes that plaintiffs satisfy both prongs of NECA.  At the pleading stage, they allege that they actually suffered harm as a result of the Euribor's manipulation, and that defendants' conduct implicates the same set of concerns between themselves and those who transacted in FRAs.  Because any injury suffered by those who transacted in FRAs "flowed from" the same conduct and the same parties who allegedly caused injury to plaintiffs, the Court concludes that plaintiffs have alleged class standing on behalf of those who transacted in FRAs.

Defendants' motion to dismiss plaintiffs' class claims related to FRAs pursuant to Rule 12(b)(1) is therefore denied.

- 17 -

B. FX Forwards and CME Futures.

Defendants argue that plaintiffs do not have standing to pursue claims related to two other categories of derivatives: FX forwards and CME currency futures. They argue that plaintiffs cannot allege injury-in-fact because the value of these derivatives is not tied to the Euribor. (Def. Mem. at 6-8.) Thus, any unlawful manipulation of the Euribor would not have affected the value of these transactions

A CME Euro Currency Futures Contract is alleged to be a category of standardized bilateral agreements. (Compl't ¶ 121.) The futures contracts trade on the Chicago Mercantile Exchange. (Compl't ¶ 121.) Each contract is an agreement to buy or sell €125,000, "in terms of U.S. Dollars," on a future date, and each employs "an industry standard formula that," according to plaintiffs, "incorporates Euribor." (Compl't ¶ 122.)

Defendants argue that plaintiffs do not have standing to pursue claims directed to CME Euro Currency Futures Contracts because the contracts' value is not tied to the Euribor. With no relationship to the Euribor, defendants argue, plaintiffs cannot claim that they suffered loss in these derivatives because of the Euribor manipulation. But the Complaint makes non-conclusory factual allegations about the Euribor's role in CME Euro Currency Futures Contracts. Plaintiffs allege that the price of the contracts "is determined using an industry standard formula that incorporates Euribor." (Compl't ¶ 122.) The Complaint states that the price of the contract is determined by the following formula: Future Price = Spot Price x $\left(\frac{1+\left[Rterm \text{ x} \left(\frac{d}{360}\right)\right]}{1+\left[Rbase \text{ x} \left(\frac{d}{360}\right)\right]}\right)$. (Compl't ¶ 122.) The Complaint alleges that the "Euribor . . . is incorporated into the formula as either 'Rbase' or 'Rterm' depending on whether Euros are being purchased or sold in the transaction. Thus Euribor is used to calculate the cost of carrying Euros over the 'duration' of a CME Euro currency futures contract, indicated by the variable 'd.'" (Compl't ¶ 123.) The Complaint

- 18 -

alleges that the price of a CME Euro Currency Futures Contract "will exhibit an inverse relationship to the changes in Euribor." (Compl't ¶ 123.)

Defendants assert that the "generic formula" quoted in the Complaint makes no express reference to the Euribor, nor does a supporting publication cited in the Complaint. (Def. Mem. 7.) Defendants also contend that the Euribor's maturity dates could not be applicable to CME Euro Currency Futures Contracts, making it impossible for the Euribor to affect their value. (Def. Mem. 7.) Defendants cite "other CME publications" for the proposition that prices are determined according to "an auction-like process," rather than the standard formula cited in the Complaint. (Def. Mem. 7.)

The Court cannot resolve these conflicting factual assertions at the pleading stage. The Complaint's allegations are non-conclusory, and the defendants' argument is an invitation to weigh industry publications' descriptions of how CME Euro Currency Futures Contracts are structured and valued. If defendants are correct and the Complaint inaccurately describes the Euribor's role in these transactions, the issue could likely be resolved through a summary judgment motion at the proper juncture. At the pleading stage, the Court must accept the truth of the Complaint's non-conclusory facts and not weigh competing facts offered by defendants. Cf. Wacker v. JP Morgan Chase & Co., 2017 WL 442366, at *3 (2d Cir. Feb. 1, 2017) ("our precedents caution against assessing the choice of a benchmark at the pleading stage because it involves an inherently fact-intensive inquiry into the relationship between the benchmark and the market it allegedly tracks.") (summary order). Because the Complaint plausibly alleges that the Euribor was incorporated into CME Euro Currency Futures Contracts, and that plaintiffs were consequently injured by the Euribor's manipulation, defendants' motion to dismiss for lack of standing is denied.

The same analysis applies to plaintiffs' claims concerning FX Forwards.  A foreign-exchange forward, or "FX Forward," is alleged to be an over-the-counter, Euribor-based derivative that is identical to a CME Euro Currency Futures Contract, except that instead of being governed by the regulations of the CME, the parties have the ability customize the terms of the agreement.  (Compl't ¶ 125.)  As an example, the Complaint states that instead of the standard €125,000 amount in a CME contract, the parties can bargain for a €1,000,000 contract.  (Compl't ¶ 125.)  The Complaint alleges that FX Forwards are priced according to the same formula cited above, although other short-term interest rates and interbank offering rates may be used in addition to the Euribor.  (Compl't ¶ 126.)

Defendants raise identical arguments concerning the Euribor's use in FX Forwards.  Because the Court cannot resolve this factual dispute at the pleading stage, their motion is denied as to plaintiffs' claims directed to FX Forwards.

### C.  LIFFE Futures and Interest Rate Swaps.

A NYSE LIFFE Three-Month Euribor Futures Contract has a notional value of €1,000,000, and is "directly priced, benchmarked, and settled based on the three-month Euribor . . . ."  (Compl't ¶ 114.)  "LIFFE" is an abbreviation of the London International Financial Futures and Options Exchange, the market where these futures contracts are traded.  (Compl't ¶¶ 53, 118.)  The contracts are standardized under LIFFE rules, and are an agreement between a buyer and a seller.  (Compl't ¶ 115.)  The Complaint describes them as follows:

> NYSE LIFFE three-month Euribor futures contracts are available for delivery in 28 months, those following the "March quarterly cycle," *i.e.*, March, June, September and December, and four serial months such that the nearest six contracts are for delivery are available in consecutive calendar months.  Each of the 28 available futures contract trades until the Monday before the third Wednesday of the delivery month when it "expires."

(Compl't ¶ 116.)  At the time of expiration, the two parties to the agreement "settle" their

positions, with the transaction's profit or loss determined by the difference between the initial

contract price and the price of a final, offsetting futures contract.  (Compl't ¶ 117.)  According to

the Complaint, the Euribor "has a direct impact on the price" of these transactions, and the

contracts' prices are derived from the Euribor.  (Compl't ¶ 119.)  It alleges that expiring Euribor

futures contracts are settled at a price equal to 100, minus the three-month Euribor rounded to

three decimal places.  (Compl't ¶ 119.)  The Complaint alleges that the Euribor "is the sole

variable in the formula used to price and settle" the contracts.  (Compl't ¶ 119.)

An interest rate swap is an over-the-counter derivative in which two parties agree

to exchange interest rate payment obligations on an agreed-upon principal.  (Compl't ¶ 127.)  To

use the example cited in the Complaint, the parties may agree to exchange a fixed stream of

interest rate payments at 2% a year with one based on a "floating" Euribor rate.  (Compl't ¶ 127.)

Payment is due at regular intervals, and the party with the larger obligation makes a payment

reflecting the difference between the two interest rates.  (Compl't ¶ 129.)  The Complaint alleges

that the "Euribor directly impacts the value of the Euribor-based interest rate swaps by

determining the value of the floating rate payments due under that swap contract."  (Compl't ¶

130.)

Defendants argue that plaintiffs do not have standing to bring claims directed to

LIFFE futures and interest rate swaps because the Complaint does not specifically link the dates

of defendants' individual Euribor manipulations with the dates that plaintiffs' settled their

positions.  (Def. Mem. at 8-9.)

But the Complaint alleges a years-long conspiracy to secretly manipulate the

Euribor, and asserts that defendants' misconduct occurred "on a daily basis . . . ."  (Compl't ¶

50.)  True, the Complaint identifies certain specific dates where defendants allegedly communicated with one another about manipulating the Euribor, but those dates do not purport to be the universe of defendants' communications and misconduct.  It ultimately is plaintiffs' burden to prove that any unlawful manipulation of the Euribor resulted in injury.  For the purpose of alleging a standing at the pleading stage, however, the plaintiffs have adequately alleged a traceable injury resulting from the defendants' alleged manipulation of the Euribor.

Defendants' motion to dismiss plaintiffs' claims directed to LIFFE Futures and Interest Rate Swaps for lack of standing is therefore denied.

II.    DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM.

The Court next addresses the defendants' argument that the Complaint fails to state a claim for relief under Rule 12(b)(6).  At defendants' urging, the Court reviews their Rule 12(b)(6) arguments prior to addressing their challenge to personal jurisdiction.  (See Def. Juris. Mem. at 17.)  Although a court should "traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues."  ONY, Inc. v. Cornerstone Therapeutics, Inc., 720 F.3d 490, 498 n.6 (2d Cir. 2013).  "[I]n cases such as this one with multiple defendants – over some of whom the court indisputably has personal jurisdiction – in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants."  Chevron Corp. v. Naranjo, 667 F.3d 232, 247 n.17 (2d Cir. 2012).

Defendants' arguments as to personal jurisdiction turn in part on the substance of their motion to dismiss for failure to state a claim.  Moreover, because the J.P. Morgan and

Citigroup defendants do not dispute this Court's personal jurisdiction, it ultimately is necessary to rule on the defendants' Rule 12(b)(6) arguments regardless of the Court's personal jurisdiction over the remaining defendants.  The Court therefore decides defendants' motion to dismiss under Rule 12(b)(6) before reaching the separate issue of personal jurisdiction.

To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Id.  Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  The Complaint must include non-conclusory factual allegations that "'nudge[ ]'" its claims "'across the line from conceivable to plausible.'"  Id. at 680 (quoting Twombly, 550 U.S. at 570)).  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

"[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'"  Halebian v. Berv, 644 F.3d 122, 130 (2d Cir. 2011) (quoting Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006)).  A court reviewing a Rule 12(b)(6) motion "does not ordinarily look beyond the complaint and attached documents in deciding a motion to dismiss brought under the

rule." Id.  A court may, however, "consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.'"  Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015) (quoting Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)).

A.  Plaintiffs' Sherman Act Claims.

Defendants argue that the Complaint does not plausibly allege a restraint of trade or antitrust injury, that plaintiffs do not have antitrust standing as "efficient enforcers" of the antitrust laws and that the Complaint fails to allege the existence of a conspiracy as to any of the four Sherman Act claims.  After the defendants' motion was fully briefed, the Second Circuit decided Gelboim v. Bank of America Corp., 823 F.3d 759 (2d Cir. 2016), cert. denied, 2017 WL 160462 (U.S. Jan. 17, 2017), which addresses several issues arising in the pending motions.  The parties have addressed Gelboim in supplemental letter-briefs, and Gelboim guides the Court's analysis of the Sherman Act claims.

Gelboim reviewed a horizontal price-fixing claims brought by plaintiffs who purchased financial instruments tied to the London Interbank Offered Rate ("LIBOR"), a daily benchmark that was organized similar to the Euribor.  823 F.3d at 765-67.  Similar to the instant case, the plaintiffs alleged that defendant banks colluded to fix daily LIBOR submissions for their own benefit.  Id. at 766.  The interests of the plaintiffs were more varied than those here; the plaintiffs included bondholders as well as parties to derivatives transactions.  Id. at 767-68.  As will be discussed, Gelboim comfortably concluded that the plaintiffs alleged a horizontal price fixing per se violation and resulting antitrust injury.  Id. at 770-77.  However, without ultimately

deciding whether plaintiffs were "efficient enforcers" of the antitrust laws – a component of antitrust standing – Gelboim gave guidance to the district court on remand. Id. at 777-80.

As will be explained, this Court concludes that the plaintiffs have plausibly alleged a restraint of trade and antitrust injury. The Court concludes, however, that only plaintiffs CalSTRS and FrontPoint Australian can act as efficient enforcers of the antitrust laws, and that the remaining plaintiffs lack antitrust standing. The Court also concludes that plaintiffs have plausibly alleged the existence of a horizontal price-fixing conspiracy only as to Count One, and that Counts Two through Four are therefore dismissed.

1.   The Complaint Plausibly Alleges a Restraint of Trade.

Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1.

Count One alleges that defendants restrained trade by coordinating the submission of false Euribor quotes to the EBF and Thomson Reuters, "pushing cash" to manipulate the Euribor and transmitting "spoof" bids through their brokers. (Compl't ¶ 424.) Plaintiffs allege that, as a consequence, the Euribor was the product of collusion and did not accurately reflect competitive market prices; this, in turn, caused plaintiffs and putative class members to either pay more or receive less than they should have when they participated derivatives transactions. (Compl't ¶¶ 425-26.)

Defendants argue that their duties in setting the Euribor were inherently cooperative, rather than competitive, and that Count One therefore fails to allege a restraint of trade. Gelboim rejected the same argument as a "syllogism," and concluded that the banks' actions made through a private trade association heightened, rather than diminished, the risk of

collusion.  823 F.3d at 775; <u>accord</u> <u>Alaska Elec. Pension Fund v. Bank of Am. Corp.</u>, 175 F.

Supp. 3d 44, 58 (S.D.N.Y. 2016) ("If anything, therefore, the fact that 'otherwise-competing'

entities acted together as part of a 'cooperative endeavor' is reason for more scrutiny, not less –

and certainly not a basis for immunity from antitrust liability altogether.") (Furman, J.).

        The <u>Gelboim</u> plaintiffs alleged that participating banks conspired to drive down

the LIBOR rate in order to profit from their own transactions.  823 F.3d at 766.  Among the

plaintiffs were parties to derivatives transactions who claimed that they were injured by

defendants' horizontal conspiracy to fix the LIBOR.  <u>Id.</u> at 767-68.  The Second Circuit

concluded that because the complaint alleged that LIBOR was a core component for calculating

plaintiffs' returns on certain financial instruments, any fixing of LIBOR <u>per se</u> violated the

antitrust laws.  <u>Id.</u> at 770-71.  It viewed plaintiffs' claims as "uncomplicated," stating that they

plausibly alleged that "the Banks, as sellers, colluded to depress LIBOR, and thereby increased

the cost to [plaintiffs], as buyers, of various LIBOR-based financial instruments, a cost increase

reflected in reduced rates of return."  <u>Id.</u> at 771.  "[T]he fixing of a component of price violates

the antitrust laws."  <u>Id.</u> (citing <u>United States v. Sacony-Vacuum Oil Co.</u>, 310 U.S. 150, 222

(1940).  "The unfamiliar context of appellants' horizontal price-fixing claims provides no basis

to disturb application of the <u>per se</u> rule."  <u>Id.</u>

        Applying this reasoning, Count One plausibly alleges a <u>per se</u> violation of the

Sherman Act.  The Complaint alleges that defendants colluded to artificially manipulate the

Euribor.  (Compl't ¶¶ 137-84.)  Defendants allegedly did so both as to target dates when traders

priced, benchmarked and/or settled Euribor-based derivatives, as well incrementally over longer

periods of time.  (Compl't ¶ 139.)  To support this claim, plaintiffs quote communications

between defendants' employees, including statements like, "where do you want to put the 1m

and 1m fixing," "we need to make the 1 mth libor come down," "1m very low if you can please," "they're going to set it low," "where DB 3s fixing today will u guys finally deliver?" "we also need high 1m and high 6m," and other similar statements.  (See, e.g., Compl't ¶¶ 143, 145, 146, 147, 149, 158.)

Because the Complaint plausibly alleges that the defendants coordinated to manipulate the Euribor rate-setting process, defendants' motion to dismiss Count One for failure to a conspiracy to restrain trade is denied.

2.   The Complaint Plausibly Alleges Antitrust Injury.

A plaintiff "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Gelboim, 823 F.3d at 772 (quoting Brunswick, 429 U.S. 489); see also State of N.Y. v. Hendrickson Bros., Inc., 840 F.2d 1065, 1079 (2d Cir. 1988) ("In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust law is deemed to have suffered the antitrust injury within the meaning of § 4 of the Clayton Act . . . .").

Gelboim concluded that plaintiffs successfully alleged an antitrust injury because they "claim[ed] violation (and injury in the form of higher prices) flowing from the corruption of the rate-setting process, which (allegedly) turned a process in which the Banks jointly participated into conspiracy." 823 F.3d at 775.  Gelboim explained:

> Appellants have alleged an anticompetitive tendency: the warping
> of market factors affecting the prices for LIBOR-based financial

> instruments.  No further showing of actual adverse effect in the marketplace is necessary.  This attribute separates evaluation of <u>per se</u> violations – which are presumed illegal – from rule of reason violations, which demand appraisal of the marketplace consequences that flow from a particular violation.

<u>Id.</u>  Because the plaintiffs' claims were premised on a price-fixing conspiracy that, if proven, would be a <u>per se</u> violation of the antitrust laws, plaintiffs were not required to allege additional harm to competition.  <u>Id.</u>  Such a pleading requirement "'comes dangerously close to transforming a <u>per se</u> violation into a case to be judged under the rule of reason . . . .'"  <u>Id.</u> at 776 (quoting <u>Pace Electronics, Inc. v. Canon Computer Sys., Inc.</u>, 213 F.3d 118, 123-24 (3d Cir. 2000)).  For purposes of antitrust injury, it sufficed for plaintiffs to allege "that they paid artificially fixed higher prices."  <u>Id.</u> at 777.  Although plaintiffs "remained free to negotiate the interest rates attached to particular financial instruments," the "antitrust law is concerned with influences that corrupt market conditions, not bargaining power."  <u>Id.</u> at 773.

  <u>Gelboim</u> also observed that antitrust injury is not conditioned on a plaintiff's status as a competitor, provided that the plaintiff was injured through "'a purposefully anticompetitive scheme,'" with the injury "'inextricably intertwined with the injury the conspirators sought to inflict . . . .'"  <u>Id.</u> at 774 (quoting <u>Blue Shield of Va. v. McCready</u>, 457 U.S. 465, 483-84 (1982)).  Defendants' scheme to fix the LIBOR placed plaintiffs in a "worse position," thereby demonstrating "that their injury is one the antitrust laws were designed to prevent."  <u>Id.</u> at 775.

  The Complaint in this action plausibly alleges antitrust injury.  Identifying by date, party and value of transaction, the Complaint alleges transactions in which plaintiffs paid an artificially inflated price in their Euribor-based transactions and/or liquidated their positions at a loss.  (Compl't ¶¶ 303-50.)  Defendants are alleged to have purposefully undertaken an anti-

competitive scheme to manipulate the Euribor for their own benefit, and the plaintiffs have alleged that they were injured as a direct result.  Plaintiffs have successfully alleged antitrust injury, and defendants' motion to dismiss Counts One through Four for failure to allege antitrust injury is denied.

> 3.   Based on the Complaint's Allegations, Only FrontPoint Australian and CalSTRS are Efficient Enforcers of the Antitrust Laws.
>
> a.   Overview.

If a plaintiff has established antirust injury, the second issue that must be addressed is whether it is "an efficient enforcer" of the antitrust laws.  Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 443 (2d Cir. 2005); Gelboim, 823 F.3d at 777.  The efficient enforcer analysis looks to whether the plaintiff's injuries and the nature of its dealings with the defendants render the plaintiffs suitable "as [an] instrument[] for vindicating the Sherman Act." Id. at 778.  It considers whether the antitrust laws ought to provide the party a remedy in the specific circumstances alleged.  Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 539-45 (1983) (footnotes omitted).

The factors bearing upon this analysis were first laid out in the Supreme Court's opinion in Associated General Contractors.  Each of the factors will be addressed in turn. Because several of the factors overlap, it is useful for the Court to explain its conclusion before delving into the analysis.

The Court comfortably concludes that four plaintiffs – Sullivan, White Oak, Sonterra and FrontPoint Trading – are not positioned to vindicate the public's interest in enforcing the antitrust laws.  These four plaintiffs had no direct dealings with the defendants on any Euribor-based transactions.  Their "umbrella"-type damages claims would include virtually any loss on a Euribor-based derivative transaction, regardless of the nature of the transaction or

identity of counterparty.  In part because the damages would be determined based on transactions with non-parties, the calculation and apportionment of damages would be exceptionally complex and have aspects that can fairly be described as speculative.  The total <u>quantum</u> of damages would be orders of magnitude greater than any ill-gotten gains of defendants.

It also is relevant that the defendants' conduct has been investigated by government regulators in the United States and Europe.  Billions of dollars in fines have been levied.  The European Commission has announced new regulations for the setting of benchmark rates such as the Euribor.  Given the size of the derivatives market and the risk of what courts have described as "overkill,"[4] plaintiffs Sullivan, White Oak, Sonterra and FrontPoint Trading are not positioned to serve as efficient enforcers, and their Sherman Act claims will be dismissed.

In contrast, CalSTRS and FrontPoint Australian were counterparties to Euribor-based transactions with one or more defendants, which means the proof and scope of damages would be cabined and discernable.  For transactions in which CalSTRS or FrontPoint Australian were counterparties with a remaining defendant who is alleged to have engaged in price fixing, the Court concludes that these two plaintiffs satisfy the efficient enforcer requirements of antitrust standing.

b.  <u>The "Efficient Enforcer" Factors.</u>

Four of the factors relevant to the efficient enforcer requirement for antitrust standing arise from the majority's opinion in <u>Associated General Contractors</u>, and were restated in the Circuit's opinion in <u>Gelboim</u>:

> (1) the "directness or indirectness of the asserted injury," which requires evaluation of the "chain of causation" linking [plaintiffs']

---

[4] <u>Gelboim</u>, 823 F.3d at 779 (quoting <u>Mid–West Paper Prods. Co. v. Cont'l Grp. Inc.</u>, 596 F.2d 573, 580-87 (3d Cir. 1979)); <u>Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.</u>, 454 F.2d 1292, 1295 (2d Cir. 1971)).

> asserted injury and the Banks' alleged price-fixing; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which appellants' damages claim is "highly speculative"; and (4) the importance of avoiding "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

823 F.3d at 778 (quoting <u>Associated Gen. Contractors</u>, 459 U.S. at 540-45).

Courts sometimes weigh a fifth consideration: "whether the putative plaintiff is a proper party to 'perform the office of a private attorney general' and thereby 'vindicate the public interest in antitrust enforcement.'" <u>Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.</u>, 711 F.3d 68, 80 (2d Cir. 2013) (quoting <u>Daniel</u>, 428 F.3d at 443).

"The importance assigned to these factors 'will necessarily vary with the circumstances of particular cases.'" <u>Id.</u> at 78 (quoting <u>Assoc. Gen. Contractors</u>, 459 U.S. at 542).

c.  <u>Directness of Injury and Evaluation of Chain of Causation.</u>

The first factor is the "'directness or indirectness of the asserted injury,' which requires evaluation of the 'chain of causation' linking [plaintiffs'] asserted injury and the [defendants'] alleged price-fixing. . . ." <u>Gelboim</u>, 823 F.3d at 778.  Plaintiffs bring their claims on behalf of "[a]ll persons or entities that engaged in a U.S. based transaction of Euribor-based derivatives" between June 1, 2005 and "at least March 2011." (Compl't ¶ 392.)  Thus, all derivative contracts of any manner or type that have a price term dependent upon the Euribor, whether a standard form contract or a customized agreement, could be swept into the case.

The overall market is relevant to the relationship between the defendants' actions and the "concern of damages disproportionate to wrongdoing," affecting "myriad markets where derivative instruments have proliferated." <u>Gelboim</u>, 823 F.3d at 779.  Accepting the Complaint's allegations, the Euribor-based derivatives market is extraordinarily large.  The Complaint alleges

that "the notional amount of Euribor-based interest rate swaps outstanding in the United States exceeded 41 trillion dollars during the Class Period." (Compl't ¶ 131.) It alleges that for Forward Rate Agreements, the amount exceeded $5 trillion. (Compl't ¶ 132.) To put these figures into context, the World Bank estimates that in 2015, the United States had a gross domestic product of slightly more than $18 trillion – less than half the value of "the notional amount" in the U.S. for two categories of the disputed derivatives.[5] The Complaint makes no allegation as to the United States market size for the other three categories of disputed derivatives.

For determining antitrust standing, it is relevant to weigh the remoteness of the unlawful price-fixing activity from the transactions for which a private plaintiff seeks to impose liability. The effective enforcement of the antitrust laws does not require private plaintiffs to impose liability that is wildly disproportionate to the defendants' gain. In remanding the LIBOR case for consideration of the efficient enforcer factors, Gelboim cautioned:

> Requiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap would, if appellants' allegations were proved at trial, not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated.

823 F.3d at 779.[6]

That concern applies here. Hypothetically, if a plaintiff class were to prove its entitlement to damages amounting to merely .1% of the notional market value of Euribor-based interest swaps and Forward Rate Agreements, it would receive the treble of $41 billion – or $123

---

[5] See http://data.worldbank.org/indicator/NY.GDP.MKTP.CD?locations=US.
[6] Judge Lynch did not join in that portion of Gelboim that provided guidance on the efficient enforcer issue to the district court on remand. 823 F.3d at 777 n. 17.

billion in damages.  Damages theoretically could accrue into the trillions of dollars.  Such

extraordinary sums weigh heavily on the causation analysis and the importance that plaintiffs

function as efficient enforcers.

But the potential damages relative to the overall market is only one consideration.

The directness of the would-be plaintiff's dealings with the wrongdoer is also important.

Plaintiffs' horizontal price-fixing claim seeks to recover loss for derivatives

products that have no direct relationship to any defendant.  A defendant may have had no

knowledge of the existence of a particular transaction, and the plaintiff may have had no dealings

with the defendant, but, provided the derivative product incorporated Euribor as a price term, it

would fall within the scope of plaintiffs' claims.

Plaintiffs who had no direct dealings with the defendant but purchased a product

necessarily affected by price fixing are sometimes said to be "umbrella purchasers."  <u>See</u>

<u>generally</u> <u>LIBOR VI</u>, 2016 WL 7378980, at *15 (describing umbrella purchasers).[7]  When an

umbrella purchaser pursues antitrust claims, it seek to recover against defendants who "'secured

no illegal benefit at [the plaintiffs'] expense' . . . ."  <u>Id.</u> (quoting <u>Mid-West Paper Prods. Co. v.</u>

<u>Cont'l Grp., Inc.</u>, 596 F.2d 573, 583 (3d Cir. 1979)).  "Umbrella standing concerns are most

often evident when a cartel controls only part of a market, but a consumer who dealt with a non-

cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the

market as a whole."  <u>Id.</u>  Customers of "fringe firms" that did not join the cartel may have paid

higher prices and suffered an antitrust injury arising from defendants' conduct, but their claims

---

[7] In <u>In re: LIBOR-Based Financial Instruments Antitrust Litigation</u>, Judge Buchwald has issued six decisions to date that concern claims directed to the alleged manipulation of the LIBOR.  This Court refers to them by the abbreviated captions <u>LIBOR I</u>, 935 F. Supp. 2d 666 (S.D.N.Y. 2013); <u>LIBOR II</u>, 962 F. Supp. 2d 606 (S.D.N.Y. 2013); <u>LIBOR III</u>, 27 F. Supp. 3d 447 (S.D.N.Y. 2014); <u>LIBOR IV</u>, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015); <u>LIBOR V</u>, 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015); and <u>LIBOR VI</u>, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016).

against cartel members also may "result in an overkill" that enlarges the scope of private antitrust enforcement beyond the Sherman Act's intent.  Gelboim, 823 F.3d at 778-79 (quotation marks omitted).

      Four of the six plaintiffs – Sullivan, White Oak, Sonterra and FrontPoint Trading – allege that they transacted in Euribor-based derivatives, and were harmed by defendants' manipulation of the Euribor, but, as noted, they do not identify any defendant as a counterparty to their transactions.  As described in LIBOR VI, counterparties to such transactions "made their own decisions to incorporate LIBOR into their transactions, over which defendants had no control, in which defendants had no input, and from which defendants did not profit."  2016 WL 7378980, at *16.

      In assessing causation, Judge Buchwald "dr[e]w a line between plaintiffs who transacted directly with defendants and those who did not," reasoning that the "independent decision" of contracting parties to incorporate LIBOR "breaks the chain of causation between defendants' actions and a plaintiff's injury."  Id.  Judge Schofield similarly has held that a plaintiff class consisting only of persons who directly entered into derivative transactions with a defendant did "not pose the same threat of indirect and therefore disproportionate liability" identified by Gelboim.  In re Foreign Exch. Benchmark Rates Antitrust Litig., 2016 WL 5108131, at *7 (S.D.N.Y. Sept. 20, 2016); see also Merced Irrigation District v. Barclays Bank PLC, 2016 WL 6820738, at *4 (S.D.N.Y. Nov. 10, 2016) (Gelboim's proportionality concerns are not implicated when claims are "limited to contracts which settled against the indexes at four Western United States based trading hubs.") (Marrero, J.) (quotation marks omitted).

      By contrast, two of the plaintiffs, CalSTRS and FrontPoint Australian, allege that they transacted directly with one of the defendants as counterparties.  CalSTRS alleges that it

transacted in "hundreds" of foreign exchange forwards with each UBS, Citibank, HSBC, JPMorgan and RBS, as well as "dozens" of such transactions with Société Générale. (Compl't ¶ 319.) FrontPoint Australian alleges that it had two foreign exchange forward transactions with UBS. (Compl't ¶ 347.) These claims by direct counter-parties to transactions with the price-fixer do not pose the same antitrust standing concerns. Their injury should have been foreseeable to the wrongdoers, and granting them a remedy is likely to promote antitrust compliance without imposing disproportionate damages.

### d.   The Existence of More Direct Victims.

"[N]ot every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." Gelboim, 823 F.3d at 779. "'Inferiority' to other potential plaintiffs can be relevant, but it is not dispositive." In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 689 (2d Cir. 2009). The presence of "remote victims (who acquired LIBOR-based instruments from any thousands of non-defendant banks)" was a "peculiar feature" of Gelboim, because such victims "would be injured to the same extent and in the same way" as the defendant banks' direct customers. 823 F.3d at 779. "So in this case directness may have diminished weight." Id.; see also LIBOR VI, 2016 WL 7378980, at *17 ("We agree [with Gelboim] that this factor must carry diminished weight.").

Those who engaged in a Euribor-based derivative transaction as counterparty to a defendant employing the price-fixers were in the immediate impact zone of the defendant's unlawful conduct. Plaintiffs CalSTRS and FrontPoint Australian fall into this category. The other plaintiffs who had no such dealings with a defendant would not.

e.   Speculative Damages.

"[H]ighly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." Gelboim, 823 F.3d at 779.  The reliability of a damages estimate turns on "the nature and complexity of the alleged antitrust violation." Id.  In an antitrust action, "vagaries in the marketplace" inject "a degree of uncertainty" that is absent in most other areas of the law. Id. at 779-80.  Gelboim's LIBOR claims, in particular, "present[] some unusual challenges" because some derivatives transactions included negotiated terms that did not involve the LIBOR. Id. at 780.  The plaintiffs had a burden "to support a just and reasonable estimate of damages, and it is difficult to see how [plaintiffs] would arrive at such an estimate, even with the aid of expert testimony." Id. at 779.

To prove damages in this case, plaintiffs will have to offer a reliable "but-for" Euribor calculation.  "The speculative nature of the derivatives market, based on what the interest rate is and where it will be in the future, compounded with consumers' own beliefs of where they expect the interest will be in the future make the but-for test difficult." Laydon v. Mizuho Bank, Ltd., 2014 WL 1280464, at *10 (S.D.N.Y. Mar. 28, 2014) (concluding that plaintiffs bringing inter-bank offering rate claims were not efficient enforcers) (Daniels, J.).  To prove what an alternative Euribor would have been absent collusion, plaintiffs' obstacles might include offering reliable evidence of what rate the participating banks would have quoted in their submissions, and a resulting recalculation of the overall Euribor.  Plaintiffs' burdens may be even more complicated when it comes to proving loss from the practices of "spoofing" or "pushing cash."  To use the example of "spoofing" described in the Complaint, this may require a showing of what submissions non-party banks made in a but-for world where they were not

misled by defendants' conduct.  Plaintiffs would then have the less-onerous but still complex burden of plaintiffs' corresponding injury in each category of derivative transaction.

A particular complexity arises from the existence of customized derivative contracts that included the Euribor as a price component.  The Complaint makes no meaningful allegations as to how these derivative transactions were negotiated and what considerations influenced their terms.  For example, the Complaint alleges only that foreign exchange forwards "can be customized by the parties."  (Compl't ¶ 125.)  Factors independent of the Euribor may have affected the terms of these transactions and the parties' reasonable expectations.  Indeed, for transactions between counterparties who were not involved in the Euribor manipulation, it is possible that they reached agreements that innocently factored an already-fixed Euribor rate, and it is not self-evident that they were harmed by the manipulation.  Judge Buchwald concluded in LIBOR VI that for such transactions, changes to the LIBOR were already accounted for in the transactions.  2016 WL 7378980, at *20 ("[W]hen swaps were entered into during the suppression period, the negotiated components absorbed the effects of LIBOR suppression.").  Determining damages therefore may not turn only on a formula that uses a revised Euribor, but considerations unique to a negotiated transaction.

Gelboim observed that "it is difficult to see how" plaintiffs could offer a non-speculative method for calculating damages.  823 F.3d at 779.[8]  The same concern applies here.  While this case is only at the pleading stage, and plaintiffs should not be held to an unduly high

---

[8] In LIBOR VI, Judge Buchwald was faced with claims from two different putative derivatives classes, one consisting of those who participated in negotiated transactions and one who purchased futures contracts on an exchange.  2016 WL 7378980, at *19-23.  As summarized in her decision, the allegations appeared to include details about the terms and markets for each type of transaction that are not present in this case, including how the LIBOR factored into trading prices on the open market, the purpose of certain instruments, the liquidity of certain transactions and how LIBOR manipulations affected different transactions at different points in time.  See id.

burden, neither the Complaint nor plaintiffs' memoranda of law suggests a coherent explanation as to how their damages evidence would not be steeped in speculation.

There is also the attenuated causation between defendants' acts of manipulation and the ultimate injury to plaintiffs and others.  In an antitrust case involving a Yen-based interbank offering rate, Judge Daniels summarized the discrete links of causation.  Laydon, 2014 WL 1280464, at *9.  They were: 1.) the banks' agreement to make and submit artificial submissions, 2.) the calculation of the daily benchmark rate, including the exclusion of the highest and lowest bands of submissions, 3.) the effect that the final, published rate had on market perceptions about the benchmark and 4.) any final pricing effect on plaintiffs' derivatives.  See id.  The many intervening links between the defendants' manipulations and plaintiffs' ultimate injuries also weigh the attenuated causation between defendants' scheme and any harm to plaintiffs.

The Court does not underestimate the difficulties of calculating the damages of CalSTRS and FrontPoint Australian.  Their claims would still require the calculation of the hypothetical unaffected Euribor rate at multiple points in time.  But the two plaintiffs ought to be able to identify specific transactions in which a remaining named defendant was a counterparty and that defendant, based upon its own records, ought to be able to intelligently respond.

     f.   Duplicative Recovery and Complex Damage Apportionment.

The apportionment of damages on umbrella-type claims would likely be extraordinarily complex.  Gelboim observed that "[t]he transactions that are the subject of investigation and suit are countless and the ramified consequences are beyond conception."  823 F.3d at 780.  That description applies here.

For umbrella claims, the damages calculations would implicate agreements with the "fringe firms" noted in Gelboim – non-defendants who were counterparties to derivatives transactions.  Damages would be apportioned in transactions negotiated and entered into between two parties who had no direct involvement in fixing the Euribor.  In certain of these transactions, it may not even be apparent which party profited and which party was injured by the Euribor manipulation; given the nature of these transactions, there would surely be instances in which both sides would claim to have suffered injury.

A somewhat easier, though still difficult task, would be presented in the case of CalSTRS and FrontPoint Australian.  They would be in a position to know what they gained and what they lost on transactions in which the remaining defendants were counterparties.

g.   Regulators Have Already Taken Measures to Enforce the Antitrust Laws.

As the final factor, the Court reviews whether other entities are better positioned to enforce the antitrust laws.  As noted, Gatt observed that courts may consider "whether the putative plaintiff is a proper party to 'perform the office of a private attorney general' and thereby 'vindicate the public interest in antitrust enforcement.'"  Gatt, 711 F.3d at 80; see also Daniel, 428 F.3d at 443-44 ("[O]ne factor raises particular standing concerns: the presence of other efficient antitrust enforcers 'whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement.'").

LIBOR VI concluded that the presence of ongoing, parallel government enforcement actions did not heighten a risk of duplicative recovery.  See 2016 WL 7378980, at *23.  This Court also concludes that government enforcement actions have not been shown to risk duplicative recovery in this case.

Government enforcement of the antitrust laws should still be considered as "background context [that] bears upon the need for appellants as instruments for vindicating the Sherman Act." 823 F.3d at 778. <u>Gelboim</u> emphasized that the efficient enforcer analysis goes to the ultimate question of whether a putative plaintiff is situated to act as a private attorney general and thereby "'vindicate the public interest in antitrust enforcement.'" <u>Id.</u> at 780 (citing <u>Gatt</u>, 711 F.3d at 80; <u>Associated Gen. Contractors</u>, 459 U.S. at 542). It characterized the underlying transactions as "countless" and the "ramified consequences" as "beyond conception." <u>Id.</u> This Complaint, with its umbrella-type claims, is directed to a market with a nominal value of at least $46 trillion, and consisting of an unidentified but undoubtedly vast number of transactions and counterparties; the concerns emphasized in <u>Gelboim</u> apply here. The actions of government regulators lessen the need for plaintiffs to function as private attorneys general and vindicators of the public interest. <u>See</u> <u>id.</u>

As alleged in the Complaint, in December 2013, the European Commission fined Barclays, Deutsche Bank, Société Générale and RBS more than $1.26 billion for their participation in a "Euro Interest Rate Derivatives cartel." (Compl't ¶ 351.) It provided Barclays with full immunity in exchange for its cooperation. (Compl't ¶ 353.)

In May 2014, the European Commission sent Crédit Agricole, HSBC and J.P. Morgan a statement of objections and made preliminary findings that the three banks may have participated in the cartel. (Compl't ¶ 354.) The Court takes judicial notice that in December 2016, the European Commission publicly announced total fines of €485 million against these three banks; in June 2016, it announced new regulations as to the setting of capital markets

benchmarks such as the Euribor, and directed injured parties to procedures for seeking redress in the courts of the European Commission's member states.[9]

The Department of Justice ("DOJ") entered into a deferred-prosecution agreement with Rabobank and levied a $325 million penalty against it for its activities related to manipulation of LIBOR and the Euribor.[10] In April 2015, the DOJ entered into a deferred-prosecution agreement with Deutsche Bank relating to manipulation of LIBOR and the Euribor.[11] Separately, under the auspices of the CEA, the CFTC has levied an $800 million penalty against Deutsche Bank for its manipulation of the LIBOR and Euribor; a $200 million penalty against Barclays; a $475 million penalty against Rabobank; and a $700 million penalty against UBS.[12] The Court takes judicial notice of the foregoing.

At the time that the Fourth Amended Complaint was filed on August 13, 2015, plaintiffs summarized the investigations of government regulators as follows:

> Numerous government investigations in the U.S. and abroad, including by the DOJ, the CFTC, the European Union (the "EU"), the FSA, the Swiss Financial Market Supervisory Authority, German bank regulator BaFin, the Dutch Central Bank and Italian prosecutors, into alleged Euribor rigging are on-going. The full scope of these investigations have not yet been publicly revealed.

(Compl't ¶ 372.)

The Court concludes that the government investigations and penalties directed to the Euribor mitigate the need for all six plaintiffs in this action to act as private attorneys general

---

[9] See http://europa.eu/rapid/press-release_IP-16-4304_en.htm
[10] See https://www.justice.gov/opa/pr/rabobank-admits-wrongdoing-libor-investigation-agrees-pay-325-million-criminal-penalty (public announcement of Rabobank penalty).
[11] See https://www.justice.gov/criminal/fraud/sff/cases-libor-fx/deutsche-bank/2014-04-23-deutsche-bank-deferred-prosecution-agreement.pdf
[12] See http://www.cftc.gov/PressRoom/PressReleases/pr7159-15 (announcement of Deutsche Bank penalty);
http://www.cftc.gov/PressRoom/PressReleases/pr6289-12 (Barclays);
http://www.cftc.gov/PressRoom/PressReleases/pr6752-13 (Rabobank);
http://www.cftc.gov/PressRoom/PressReleases/pr6472-12 (UBS).

vindicating the public interest in antitrust enforcement over the entire Euribor-based derivatives market.  More than $4 billion in penalties have already been levied over defendants' alleged manipulation of the Euribor.  Given the lack of direct dealings by four of the six plaintiffs, the nature of the market, the vast size of the umbrella claims and the significant risk of "overkill" type damages, the existence of governmental enforcement actions are afforded some weight.

But antitrust standing is not decided on an across-the-board as to all conceivable plaintiffs and claims.  The two direct counterparties to transactions with the remaining defendants may pursue their remedies for their Euribor-based transactions.  Their claims present a lower risk of distorting antitrust remedies beyond their intended scope.

4.   The FTAIA Does Not Bar Plaintiffs' Claims.

Defendants argue that plaintiffs' antitrust claims are barred by the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a (the "FTAIA").   The FTAIA permits a plaintiff to bring Sherman Act claims "involving trade or commerce . . . with foreign nations," provided that defendants' conduct has a "a reasonably proximate causal nexus" to an antitrust injury in the United States.  Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 405 (2d Cir. 2014).  "[T]he requirements of the FTAIA go to the merits of an antitrust claim rather than to subject matter jurisdiction."  Id.

The FTAIA provides that the Sherman Act:

shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –

(1)     such conduct has a direct, substantial, and reasonably foreseeable effect –

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

- 42 -

> > (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> > (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a. "This technical language initially lays down a general rule placing <u>all</u> (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach <u>provided that</u> the conduct <u>both</u> (1) sufficiently affects American commerce, <u>i.e.,</u> it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, <u>and</u> (2) has an effect of a kind that antitrust law considers harmful, <u>i.e.,</u> the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" <u>F. Hoffman-La Roche Ltd. v. Empagran S.A.</u>, 542 U.S. 155, 162 (2004).

In adopting the FTAIA, Congress expressly endorsed an extraterritorial application of the Sherman Act. As will be discussed later, this puts plaintiffs' antitrust claims on a very different footing than their claims brought under the CEA and RICO, which are constrained by a presumption against territoriality. <u>See</u>, <u>e.g.</u>, <u>City of Almaty, Kazakhstan v. Ablyazov</u>, 2016 WL 7756629, at *8 n.9 (S.D.N.Y. Dec. 23, 2016) (for purposes of extraterritorial application, "[t]he RICO statute contains no express analogue" to the FTAIA) (Nathan, J.).[13]

To the extent that defendants point to the FTAIA as a bar to plaintiffs' claims, their motion to dismiss is denied. Defendants' discussion of the FTAIA occupies less than a

---

[13] Further, by focusing on the domestic effects of a defendant's conduct, the FTAIA arguably may apply a less-exacting standard than the due process threshold to exercise personal jurisdiction over a foreign defendant. <u>See generally</u> <u>Waldman v. Palestine Liberation Org.</u>, 835 F.3d 317, 339 (2d Cir. 2016) ("[T]he mere fact that harm in the forum is foreseeable [is] insufficient for the purpose of establishing specific personal jurisdiction over a defendant.") (quotation marks omitted). The Court is unaware of any authority that discusses the FTAIA relationship to the Supreme Court's more recent decisions concerning the due process limits on personal jurisdiction, and it does not reach the issue here. <u>See generally</u> <u>Daimler AG v. Bauman</u>, 134 S. Ct. 746 (2014); <u>Walden v. Fiore</u>, 134 S. Ct. 1115 (2014).

page of argument and relies on positions that the Court has already rejected, such as their fact-based contention that the Euribor plays no role in the value of FX Forwards and CME Currency Futures.  Defendants also point to the Europe-based <u>conduct</u> of defendants, even though the FTAIA's express language and the decisions applying it focus on the anti-competitive <u>effects</u> within the United States.  Defendants' motion to dismiss plaintiffs' claims based on the FTAIA is therefore denied.

     5.   <u>The Complaint Plausibly Alleges a Conspiracy as to Count One Only.</u>

       a.   <u>The Complaint Plausibly Alleges a Conspiracy to Rig the Euribor.</u>

Count One alleges that defendants entered into a series of agreements to fix the value of the Euribor, using tactics that included the coordinated submissions of false Euribor quotes, "pushing cash" and "spoofing" the market with artificial bids and offers.  (Compl't ¶¶ 422-30.)  In moving to dismiss, defendants argue that the allegations describe only the communications of a small number of traders between 2006 and 2008, and do not describe facts sufficient to show a conspiracy that involves all defendants over a greater length of time.

Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  Price-fixing "conspiracies concentrate the power to set prices among the conspirators, including the 'power to control the market and to fix arbitrary and unreasonable prices.'"  <u>United States v. Apple, Inc.</u>, 791 F.3d 290, 326 (2d Cir. 2015) (quoting <u>United States v. Trenton Potteries Co.</u>, 273 U.S. 392, 397 (1927)).  "[A]ny conspiracy 'formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal per se,' and the precise 'machinery employed . . . is immaterial.'"  <u>Id.</u> at 327 (quoting <u>United States v. Socony-Vacuum Oil</u>, 310 U.S. 150, 223 (1940)).

"A plaintiff's job at the pleading stage . . . is to allege enough facts to support the inference that a conspiracy actually existed." Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013).  An agreement between two competitors to fix a price is direct evidence of conspiracy.  See id.  Alternatively, a plaintiff can rely on "inferences that may fairly be drawn from the behavior of the alleged conspirators.'" Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 183 (2d Cir. 2012) (quoting Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir. 1976)).  This includes "'circumstantial evidence that reasonably tends to prove'" a defendant's "'conscious commitment to a common scheme . . . .'" Id. at 184 (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)).

"In antitrust cases, '[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" Apple, Inc., 791 F.3d at 319 (quoting Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962)).  "At the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made,' i.e., it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." Anderson News, 630 F.3d at 184 (quoting Twombly, 550 U.S. at 556).

Accepting the truth of plaintiffs' non-conclusory allegations, the Complaint plausibly alleges a conspiracy to fix the Euribor.  The conspiracy was principally orchestrated by Christian Bittar of Deutsche Bank and Philippe Moryoussef of Barclays and later RBS.  (See, e.g., Compl't ¶¶ 67, 80.)  Virtually all substantive allegations touch on communications involving Bittar and Moryoussef – either requests from Bittar or Moryoussef to employees of

other defendants soliciting the submission of a fixed Euribor quote, or discussions between the

two men that describe the rate-fixing activities of other defendant banks.  The Complaint

describes a conspiracy that, under the guidance of Bittar and Moryoussef, artificially fixed the

Euribor, and did so principally for the benefit of Bittar and Moryoussef.

     The Complaint identifies a series of agreements to fix the Euribor, including the

dates, contents and participants in the communications.  In July 2006, Moryoussef successfully

requested that an employee of Société Générale submit false bids in an effort to lower the one-

month Euribor rate.  (Compl't ¶ 146.)  In September 2005, Bittar and a Citibank derivatives

trader, Alfredo Saitta, agreed to coordinate on making false submissions for the three-month

Euribor rate.  (Compl't ¶ 149.)  Saitta allegedly continued to coordinate on Euribor submissions

after he left Citibank and began employment at J.P. Morgan.  (Compl't ¶¶ 152-53.)  After

Saitta's departure, Bittar described Citibank as continuing to employ "people we can count on."

(Compl't ¶¶ 150.)  Crédit Agricole allegedly became involved in 2006 and 2007, after

Moryoussef separately contacted two traders and requested that they do him "a favor" to

manipulate the Euribor downward.  (Compl't ¶¶ 154-57.)  After he began employment at RBS in

August 2007, Moryoussef allegedly coordinated Euribor quotes with his former colleagues at

Barclays.  (Compl't ¶¶ 158.)  As to Rabobank, the Complaint alleges that the names of traders

who participated in the Euribor scheme are "currently unknown," but that a Rabobank Euribor

submitter made false submissions for the benefit of former Rabobank traders employed at other

banks.  (Compl't ¶ 160.)  The Complaint also quotes from online chats where a Rabobank

submitter agreed to submit quotes at ranges requested by an external trader.  (Compl't ¶ 160.)

The Complaint does not identify any direct communications with UBS, but Moryoussef

referenced UBS's false quotes in his conversations with others, once noting that "rbs and ubs are going to do everything to put it to the sk[y]."  (Compl't ¶¶ 161-66.)

The Complaint also identifies defendants that participated in longer-running efforts to manipulate the Euribor.  In one instance, Bittar and Moryoussef allegedly devised a plan to increase Euribor for the benefit of Bittar, during which time they coordinated submissions with Crédit Agricole, Société Générale, J.P. Morgan, Rabobank and certain banks whose identities are as-yet unknown.  (Compl't ¶ 205-17.)  In a related arrangement, Moryoussef and Bittar then sought to lower the Euribor, and successfully requested participation from Société Générale and Crédit Agricole.  (Compl't ¶¶ 218-27.)  For a third plan, Moryoussef and Bittar sought to artificially lower the three-month Euribor tenor, and did so by "pushing cash" with the participation of employees of Crédit Agricole, HSBC, J.P. Morgan and Société Générale.  (Compl't ¶¶ 228-42.)  The Complaint describes a fourth plan in which Bittar sought to decrease the one-month Euribor tenor, with the assistance of Moryoussef and a trader at Société Générale.  (Compl't ¶¶ 243-49.)

It is also the case that, as defendants point out, the Complaint frequently makes summary and conclusory assertions that fail to distinguish between the conduct of the individual defendants.  At one point, the Complaint alleges that "traders and submitters at each bank frequently reached out to multiple co-conspirators to solicit their help in manipulating Euribor." (Compl't ¶ 140.)  This sweeping assertion is far broader than the supporting allegations, which describe specific, successful efforts by Bittar and Moryoussef to solicit others to manipulate the Euribor.  The Complaint also makes overbroad references to "defendants" in the aggregate, when the relevant allegations identify only a subset of defendants as having participated in a particular set of communications.

Despite those imprecisions, the Complaint contains factual allegations sufficient to allege that the defendants made "conscious commitment to a common scheme" to manipulate the Euribor. Anderson News, 680 F.3d at 183. It has identified communications in which "an agreement was made" between defendants to submit false Euribor quotes, for the benefit of at least one defendant. See id. at 184. These allegations are not "merely consistent" with the existence of an agreement, but plausibly allege direct evidence of "a meeting of minds in an unlawful arrangement" to fix the Euribor. See id. at 184, 183.

The motion to dismiss Count One for failure to allege conspiracy is therefore denied.

### b. The Complaint Does Not Plausibly Allege Conspiracy as to Counts Two, Three and Four.

Counts Two, Three and Four of the Complaint are directed to narrower practices related to the market for Euribor-based derivatives. Count Two alleges that defendants conspired to fix the prices of OTC Euribor-based derivatives by colluding on the pricing of specific derivative transactions. (Compl't ¶¶ 431-39.) Count Three alleges that defendants coordinated to rig bids in their transactions with counterparties, and secretly agreed on which transactions they would enter. (Compl't ¶¶ 440-47.) Count Four alleges that defendants "engaged in numerous group boycotts or concerted refusals to deal" by quoting "exorbitant prices" to derivatives counterparties. (Compl't ¶¶ 448-56.) Counts Two through Four are brought against "all defendants."

The defendants accurately characterize the allegations in support of Counts Two through Four as "almost non-existent." (Def. Mem. at 18.) They relate only to the conduct of Deutsche Bank and Barclays, both of which have provisionally settled all claims against them. The Complaint quotes communications between Moryoussef at Barclays and a subordinate of

Bittar at Deutsche Bank wherein they coordinated on the price offered to a counterparty to a

Euribor-based derivative transaction.  (Compl't ¶ 290.)  Bittar and Moryoussef separately

coordinated on prices offered to a counterparty who they called "the ornery guy."  (Compl't ¶

291.)  In another instance, Bittar agreed to offer a client a worse price in a transaction than what

Moryoussef had offered to that same client, for Moryoussef's benefit.  (Compl't ¶ 292.)  In one

instance, Bittar and Moryoussef agreed that they would refuse to deal with a certain

counterparty.  (Compl't ¶ 295.)

       Aside from these allegations, which relate only to Deutsche Bank and Barclays,

the Complaint does not allege facts that go toward their claims in Count Two through Count

Four.  The underlying conduct does not overlap with the fixing of the Euribor, and instead

involves other horizontal activity to fix the price of Euribor-based derivatives on a transaction-

by-transaction basis.  The Complaint does not implicate any defendant other than Deutsche Bank

and Barclays, which have withdrawn their motions without prejudice.  In opposing the motion to

dismiss, plaintiffs do not even address defendants' argument Count Two through Count Four fail

to allege the existence of a conspiracy.

       Counts Two through Four do not plausibly allege that the defendants engaged in a

conspiracy to restrain trade or commerce in violation of the Sherman Act.  Counts Two through

Four therefore are dismissed.

      B.  Plaintiffs' CEA Claims Are Dismissed In Part.

       Counts Five, Six and Seven assert that defendants' alleged manipulation of the

Euribor violated the Commodity Exchange Act, 7 U.S.C. § 1, et seq. ("CEA").  The CEA

prohibits any person from "manipulat[ing] or attempt[ing] to manipulate the price of any

commodity in interstate commerce . . . ."  7 U.S.C. § 13(a)(2); see also In re Amaranth Nat. Gas

Commodities Litig., 730 F.3d 170, 173 (2d Cir. 2013).  "While the CEA itself does not define the term, a court will find manipulation where '(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.'"  Id. at 173 (quoting Hershey v. Energy Transfer Partners, L.P., 610 F.3d 239, 247 (5th Cir. 2010)).  "There is thus no manipulation without intent to cause artificial prices."  Id. at 183.  "The CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor – who may know little about the intricacies and complexities of the commodities market – from being misled or deceived."  Loginovskaya v. Batratchenko, 764 F.3d 266, 270 (2d Cir. 2014) (quotation marks omitted).

The Complaint describes the Euribor as the commodity underlying Euribor futures contracts, and alleges that the defendants knowingly altered the Euribor for their own benefit by making false reports of the daily Euribor rate.  (Compl't ¶¶ 457-63.)  Count Five alleges that defendants manipulated the prices of Euribor futures contracts in violation of 7 U.S.C. §§ 6b(a), 6c(a), 13(a)(2) and 25(a).  (Compl't ¶ 463.)  Count Six alleges that defendants are liable under the CEA for the manipulative acts of their agents, and Count Seven alleges that defendants aided and abetted the other defendants to manipulate the Euribor and Euribor futures contracts.  (Compl't ¶ 464-71.)

For reasons that will be explained, the Court concludes that plaintiffs have alleged that defendants fraudulently concealed the Euribor-manipulation scheme, and that the limitations period therefore was tolled as to their claims.  Plaintiffs' claims directed to LIFFE Euribor Futures Contracts are dismissed because the Complaint does not adequately allege that the transactions were domestic in nature.  Finally, because many of the Complaint's allegations

attribute conduct and motivation to "defendants" in the aggregate, without supporting allegations for many individual defendants, plaintiffs' remaining CME Currency Futures Contracts claims are dismissed as to all defendants except UBS and Rabobank.

   1. Plaintiffs' CEA Claims Are Limited to CME Currency Futures Contracts and LIFFE Futures Contracts.

   Defendants observe in a footnote that plaintiffs' CEA claims "appear to relate exclusively to CME currency and LIFFE futures contracts."  (Def. Mem. at 18 n.21.)  Plaintiffs' opposition memo does not contend otherwise, and the Complaint's CEA allegations specifically mention only the manipulation of "commodity futures contracts and/or the price of a commodity underlying such contracts . . . ."  (Compl't ¶ 458.)

   Plaintiffs' CEA claims are thus limited only to CME Currency Futures Contracts and LIFFE Futures Contracts.  To the extent, if any, that plaintiffs purport to raise CEA claims directed toward other categories of financial instruments or transactions, those claims are dismissed.

   2. Plaintiffs Adequately Allege that the Limitations Period Is Tolled by the Fraudulent Concealment Doctrine.

   An action brought under the CEA "shall be brought not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  The limitations period begins to run when a plaintiff is placed on inquiry notice of the alleged wrongdoing through facts that "suggest to a person of ordinary intelligence" that the CEA has been violated.  Benfield v. Mocatta Metals Corp., 26 F.3d 19, 22 (2d Cir. 1994); see also In re Commodity Exch., Inc., 2016 WL 5794776, at *27 (S.D.N.Y. Oct. 3, 2016) (Caproni, J.) ("Because the CEA does not define when a cause of action accrues, courts apply a 'discovery accrual rule' wherein discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.") (quotation marks omitted).

The original complaint in this action was filed in the Northern District of Illinois on February 12, 2013.  (Docket # 1.)  It alleged violations of the Sherman Act by the Barclays defendants, UBS and RBS.  (Docket # 1.)  The antitrust claims were directed only to Euribor futures contracts transacted on the NYSE Euronext LIFFE trading platform.  (See, e.g., Docket # 1 ¶¶ 43-56.)  The original complaint did not identify additional claims or defendants, or seek relief as to any other category of derivative.

Plaintiffs first alleged that the CEA was violated in an Amended Class Action Complaint filed on November 2, 2013, more than two years after the end of the alleged Euribor manipulation.  (Docket # 75; Compl't ¶ 392.)  That complaint added as defendants Deutsche Bank AG, the HSBC defendants, Crédit Agricole, Société Générale and Rabobank.  (Docket # 75.)  It also alleged that defendants violated the CEA by artificially manipulating the value of Euribor futures contracts that traded on the Chicago Mercantile Exchange.  (Docket # 75 ¶¶ 361-67.)

The Citigroup and J.P. Morgan defendants were added in the Second Amended Class Action Complaint filed on May 5, 2014.  (Docket # 109.)  The ICAP defendants were added in the Fourth Amended Class Action Complaint, which was filed on August 13, 2015. (Docket # 174.)

Defendants argue that plaintiffs were placed on inquiry notice of their CEA claims on or about October 19, 2011.  On that date, the European Commission publicly announced that it had inspected the offices of banks on the Euribor panel for violations of EU antitrust laws.  (Def. Mem. at 19.)  The original complaint of February 12, 2013 cited to that announcement in explaining the timing of its antitrust claims, alleging that plaintiffs "could not have discovered" defendants' alleged violations of the antitrust laws at an earlier point.  (2/12/13

Compl't ¶ 89.)  Plaintiffs argue that their CEA claims are nevertheless timely.  They argue that

because defendants pursued the Euribor scheme in secret, with no possibility of detection on the

part of the plaintiffs, the limitations period tolled under the "fraudulent concealment" doctrine.

"[T]he purpose of the fraudulent-concealment doctrine is to prevent a defendant

from 'concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until such

time as the party committing the fraud could plead the statute of limitations to protect it.'"  State

of N.Y. v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988) (quoting Bailey v.

Glover, 88 U.S. (21 Wall.) 342, 349 (1874)).  A limitations period may be tolled on grounds of

fraudulent concealment if the plaintiff ultimately proves that 1.) the defendant concealed the

existence of the cause of action, 2.) plaintiff remained ignorant of the cause of action, and 3.)

plaintiff's ignorance was not attributable to a lack of diligence.  Id.; see also LIBOR I, 935 F.

Supp. 2d at 710-11 (reviewing fraudulent concealment factors in CEA claims), vacated and

remanded on other grounds sub nom. Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir.

2016).  In some instances, "the nature of the wrong itself" is self-concealing.  Nat'l Grp. for

Commc'ns & Computers Ltd. v. Lucent Techs. Inc., 420 F. Supp. 2d 253, 267 n.20 (S.D.N.Y.

2006) (Buchwald, J.); accord In re Credit Default Swaps Antitrust Litig., 2014 WL 4379112, at

*15 (S.D.N.Y. Sept. 4, 2014) (a group boycott conspiracy "must remain concealed to be

successful.") (Cote, J.).

The Complaint adequately alleges that the limitations period was tolled based on

defendants' fraudulent concealment of the Euribor manipulation.  (Compl't ¶¶ 399-421.)  It

plausibly alleges that plaintiffs' knowledge of each defendant's conduct arose out of public

announcements of regulatory actions against the defendants.  Based on public announcements,

plaintiffs allege that they first learned of the actions of UBS on December 19, 2012; RBS, on

February 6, 2013; Rabobank on October 29, 2013; Deutsche Bank, Société Générale, J.P. Morgan, HSBC and Crédit Agricole on December 4, 2013; and Citibank on April 23, 2015. (Compl't ¶¶ 400, 404-10.)

Plaintiffs allege that, prior to revelations by regulators and governmental enforcers, they lacked information sufficient to bring claims directed to defendants' conduct. They allege that they actively monitored market trends, economic data and other public information during the class period, and discovered no evidence of fraud or irregularities. (Compl't ¶ 411.)  They allege that the structure of the Euribor submission process shielded defendants' inherently secretive actions from suspicion, and that they relied on the EBF's enforcement of a code of conduct during the submission process.  (Compl't ¶¶ 412-13, 415, 418, 420.)  After the European Commission raided certain Euribor panel banks on October 19, 2011, an EBF official publicly stated that it would be "almost impossible" to manipulate the Euribor, and defended the EBF's "high monitoring and very clear transparency."  (Compl't ¶ 417.)  It was when regulators announced a settlement with Barclays on June 27, 2012 that plaintiffs learned of the overall Euribor conspiracy; they still lacked information sufficient to identify all participants. (Compl't ¶ 419.)

The Complaint adequately alleges fraudulent concealment, and the limitations period for plaintiffs' CEA claims has tolled accordingly.  The Complaint satisfies the three elements of fraudulent concealment established by Hendrickson Brothers, 840 F.2d at 1083: First, the Complaint alleges that the defendants' employees acted in secret to coordinate Euribor submissions.  Second, the Complaint alleges that plaintiffs and other participants in the Euribor-based derivatives market were unaware of defendants' actions.  Third, the Complaint alleges that plaintiffs' unawareness was not due to a lack of diligence on their part.

Defendants argue that because the Euribor was published daily, along with the quotes of its contributors, plaintiffs could have recognized its manipulation through diligence. But it is unclear how the plaintiffs could have recognized that the daily quotes were manipulated based on the bare fact of their publication, any more than any other consumer – or a compliance department or senior executive of the defendants – would recognize artificially fixed prices. As alleged in the Complaint, the scheme's success relied on subtlety and the difficulty of its detection. Such a scheme is necessarily secretive, and not discoverable through diligence.

Defendants also argue that initial October 2011 press reports about possible Euribor manipulation should have alerted plaintiffs to their claims, but those early reports did not provide plaintiffs with information sufficient to identify each defendant or a good-faith basis to allege a cognizable theory of liability.

The Complaint has plausibly alleged that the defendants intentionally concealed the Euribor scheme, plaintiffs were unaware of the scheme and they could not have uncovered it through diligence. See Hendrickson Bros., 840 at 1083. Under the fraudulent concealment doctrine, plaintiffs' CEA claims are tolled.

3.   Defendants' Motion to Dismiss for Lack of CEA Standing Is Denied.

Defendants contend that plaintiffs lack standing under the CEA to bring claims directed to CME Currency Futures. The CEA creates a private right of action on behalf of a person injured by "a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. § 25(a)(1)(D)(ii). Defendants argue that the Euribor played no role in the value of CME Currency Futures, and therefore plaintiffs cannot seek relief under the CEA.

For the reasons previously discussed, the parties are at odds as to whether the value of CME Currency Futures is tied to the Euribor. At the pleading stage, the Court is not in a position to resolve the issue, and is bound to accept plaintiffs' non-conclusory factual allegations. Defendants' motion to dismiss plaintiffs' CEA claim directed to CME Currency Futures on this basis is therefore denied.

        4.   Plaintiffs Fail to Allege that LIFFE Euribor Futures Contracts Are "Domestic Transactions" under the CEA.

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 255 (2010) (quotation marks omitted). "[T]he mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions." Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 70 (2d Cir. 2012).

       The CEA is subject to Morrison's analysis. "Given the absence of any 'affirmative intention' by Congress to give the CEA extraterritorial effect, we must 'presume it is primarily concerned with domestic conditions.'" Loginovskaya, 764 F.3d at 272 (quoting Morrison, 130 S. Ct. at 2877). For a private party to bring suit under the CEA, "the transaction at issue – the conduct underlying the suit – must have occurred within the United States." Id. at 273. The plaintiff must "demonstrate that the transfer of title or the point of irrevocable liability for such an interest occurred in the United States." Id. at 274. Certain "actions needed to carry out the transactions," such as the wire transfer of funds into or out of the United States, are insufficient to make a transaction domestic, and must be distinguished from "the transactions themselves." Id. at 275.

As previously noted, "LIFFE" is an abbreviation of the London International Financial Futures and Options Exchange. (Compl't ¶ 53.) Plaintiffs' Third Amended Complaint described LIFFE as a "global derivatives exchange" through which investors "trade a number of globally-traded futures and derivatives contracts . . . ." (Docket # 139 ¶¶ 81-82.) LIFFE is "the platform upon which three-month Euribor futures contracts trade." (Compl't ¶ 53.) LIFFE Connect is its electronic trading and order-matching system. (Compl't ¶ 54.) In the United States, LIFFE transactions are made through LIFFE Connect terminals. (Compl't ¶ 55.)

According to the Complaint, plaintiffs Sullivan, White Oak and FrontPoint Australian initiated and liquidated LIFFE Euribor futures trades from within the United States. (Compl't ¶¶ 57-58, 61.) Plaintiffs argue that because they entered their positions through LIFFE Connect terminals in the United States, they engaged in a "domestic transaction" under the CEA. (Opp. Mem. at 24-25.) But Absolute Activist concluded that the parties' locations are inadequate to allege a domestic transaction. 677 F.3d at 69-70. There, plaintiffs were foreign investment funds that purchased U.S. penny stocks sold directly by U.S. issuers and not through a U.S. exchange, with the transactions brokered by a third-party dealer. Id. at 62. Absolute Activist noted that the underlying complaint made "only a few allegations that mention or even hint at the location of the securities transactions at issue . . . ." Id. at 70. Further:

> Absent factual allegations suggesting that the [plaintiffs] became irrevocably bound within the United States or that title was transferred within the United States, including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money, the mere assertion that transactions "took place in the United States" is insufficient to adequately plead the existence of domestic transactions.

Id. The parties' residence and citizenship were deemed "irrelevant" to classification as a domestic transaction, as was the fact that the underlying penny stocks were issued by United

States companies and registered with the SEC.  Id. at 70.  Plaintiffs' use of U.S. brokers "could be relevant," but was not determinative.  Id. at 68.

The Second Circuit has stated that "there is no reason why Absolute Activist's formulation should not apply" to CEA claims, and that CEA plaintiffs are required to "demonstrate that the transfer of title or the point of irrevocable liability for such an interest occurred in the United States."  Loginovskaya, 764 F.3d at 274.

Plaintiffs' allegations do not plausibly allege that their LIFFE Euribor futures transactions were a "domestic transaction" under Absolute Activist and Loginovskaya.  The Complaint merely alleges that plaintiffs are U.S. residents who engaged in LIFFE Euribor futures transactions through LIFFE Connect terminals located in the United States.  (Compl't ¶¶ 57-58, 61.)  The Complaint makes no allegations concerning the location of the transactions themselves or the structure of LIFFE transactions, including Absolute Activist's factors concerning the formation of the contracts, the placement of orders, the passing of title and the exchange of money.  677 F.3d at 70.  The Complaint does not include detail sufficient to discern whether these, or perhaps other additional factors, are relevant to the formation of a LIFFE Euribor futures contract.  Without more, allegations about plaintiffs' physical location and use of LIFFE Connect fail to allege a "domestic transaction" under the CEA.

Plaintiffs' opposition memo also places great weight on the fact that the CFTC exempted LIFFE and LIFFE Connect transactions from CFTC registration, based in part on a conclusion that defendants "submit and/or accept orders from within the United States."  (Opp. Mem. at 24-25 & n.25; emphasis omitted.)  This adds little and merely confirms that U.S. residents engaged in LIFFE transactions.  Plaintiffs have not demonstrated why the CFTC's regulatory role would necessarily render plaintiffs' transactions domestic.  Absolute Activist

placed no weight on the fact that the underlying penny stocks were registered with the SEC.  677 F.3d at 70.  Moreover, the CEA draws a distinction between the extraterritoriality limits on a private action and enforcement actions brought by the CFTC itself.  See Loginovskaya, 764 F.3d at 275.

The Complaint fails to allege that plaintiffs' LIFFE Euribor Futures Contracts are "domestic transactions" under the CEA.  Plaintiffs' CEA claims directed to such transactions are therefore dismissed.

5.  The Complaint Alleges Intent Only as to Rabobank and UBS.

To prove manipulation under the CEA, plaintiffs ultimately must prove that defendants "specifically intended to cause the artificial prices" of the currency futures transactions.  In re Amaranth, 730 F.3d at 173 (reciting elements of manipulation claim).  Defendants argue that plaintiffs have failed to plead with particularity that any defendant had an actual intent to manipulate the price of CME currency futures or LIFFE Euribor futures.  Rule 9(b).

Courts apply Rule 9(b)'s pleading requirements to the CEA on a case-by-case basis, see CFTC v. Parnon Energy Inc., 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012) (Pauley, J.), and plaintiffs do not dispute that Rule 9(b) governs their claims.  Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake."  "This standard is generally relaxed in the context of manipulation-based claims, where the complaint must simply specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  In re London Silver Fixing, Ltd., Antitrust Litig., 2016 WL 5794777, at *19 (S.D.N.Y. Oct. 3, 2016) (Caproni, J.) (citing ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d

87, 102 (2d Cir. 2007)).  "With regard to scienter, specific intent to manipulate prices can be

pleaded by alleging facts (1) showing that the defendants had both motive and opportunity to

commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or

recklessness."  Id. at *21 (quotation marks omitted).

The Complaint's level of detail varies among the defendants.  It makes extensive

allegations concerning the practices of Deutsche Bank (whose motion has been withdrawn

without prejudice) and UBS, as well as allegations concerning Rabobank's lack of internal

controls of Euribor submissions.  It alleges that: UBS assigned the duty to make Euribor

submission to traders who stood to benefit from changes in the Euribor; Deutsche Bank and UBS

each seated Euribor submitters next to Euribor-based derivatives traders; managers at UBS,

Deutsche Bank and Rabobank knew and encouraged employees to manipulate the Euribor; and

Deutsche Bank, UBS and Rabobank failed to implement adequate internal controls and

compliance procedures as to Euribor submissions and separately made false statements to

regulators.  (Compl't ¶¶ 176-84, 251-86.)

As to all other defendants, plaintiffs' allegations are minimal and inadequate.  In

their opposition brief, plaintiffs cite to manipulation allegations that relate only to UBS,

Deutsche Bank and Rabobank, and no allegations related to the other defendants.  (Opp. Mem. at

27-28.)  As to motive, plaintiffs' opposition brief cites only to Bittar's financial incentives, and

describe him as Deutsche Bank's "guaranteed money maker," who received a $136 million

bonus in 2008.  (Opp. Mem. at 26-27; Compl't ¶¶ 23, 248, 251-52.)  Aside from allegations

against UBS, Deutsche Bank and Rabobank, the Complaint does not allege the extent of

monitoring, knowledge, involvement, motive or reckless conduct possessed by any defendant.

Plaintiffs' summary references of a collective intent among all "defendants," while making allegations as to only three, is unavailing.  See, e.g., City of Perry, Iowa v. Procter & Gamble Co., 188 F. Supp. 3d 276, 290 (S.D.N.Y. 2016) (claim that "lumps all Defendants together" is "plainly insufficient to satisfy Rule 9(b)'s heightened pleading requirements . . . .") (Furman, J.).

The Complaint has adequately alleged intent on the part of UBS and Rabobank. As to all other defendants, plaintiffs' CEA claims are dismissed.

6.    The Complaint Adequately Alleges Actual Damages.

The CEA requires that a private plaintiff suffer "actual damages" in order to obtain relief.  7 U.S.C. § 25(a)(1).  Defendants argue that plaintiffs have not sufficiently alleged actual damages because they do not trace the dates of defendants' alleged manipulations to each of plaintiffs' individual transactions.  But many "courts have observed that loss causation is not a statutory element of proof under the CEA," the way that it is for fraud-on-the-market claims in the securities context.  In re Crude Oil Commodity Futures Litig., 913 F. Supp. 2d 41, 60 (S.D.N.Y. 2012) (collecting cases).  As Judge Pauley explained:

> [I]n the context of a CEA manipulation claim, there is no similar bright line indicating when losses begin or cease to accrue.  And the period during which the manipulative activity occurs is not necessarily a proxy for the period when losses attributable to artificial prices occur.  The issue of "actual damages" thus becomes a complex factual inquiry.

Id. at 60-61 (internal citations omitted).  The allegations in this case fit with Judge Pauley's reasoning.  According to plaintiffs, defendants engaged in a years-long scheme to fix the Euribor, with resulting distortions in the value of the Euribor-based derivatives transacted by plaintiffs.  The Complaint includes allegations of specific dates and targets selected by defendants' employees, but those allegations do not purport to be the exclusive universe of

defendants' alleged manipulation.  It ultimately remains plaintiffs' burden to prove through reliable evidence that they suffered actual loss based on defendants' manipulation of the Euribor, but at the pleading stage, they have adequately alleged that they were damaged by the Euribor's manipulation.

      C.  Plaintiffs' RICO Claims Are Dismissed.

Counts Eight alleges that defendants engaged in a pattern of racketeering activity that included predicate acts of wire fraud, in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).  Count Nine alleges conspiracy to violate RICO, 18 U.S.C. § 1962(d).  According to the Complaint, defendants committed widespread acts of wire fraud under 18 U.S.C. § 1343, including the frequent transmission of false Euribor quotes to Thomson Reuters and the sending of trade confirmations with United States counterparties.  (Compl't ¶ 484.)

For RICO claims, the Complaint fails to allege facts that overcome the presumption against extraterritoriality.  The Complaint also fails to identify conduct on the part of individual defendants sufficient to state a claim under RICO.  Plaintiffs' RICO claims are therefore dismissed.

      1.  Plaintiffs' RICO Claims Do Not Overcome the Presumption against Extraterritoriality.

        a.  Under the Law of this Circuit, Wire Fraud Does Not Have Extraterritorial Application for a Private RICO Plaintiff.

RICO recognizes a private right of action when a defendant commits a predicate act that is "indictable" under specified federal criminal statutes.  RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090, 2096 (2016); 18 U.S.C. §§ 1961(1), 1964(c).  As with the CEA, private claims under RICO must overcome Morrison's presumption against extraterritoriality.

RJR Nabisco, 136 S. Ct. at 2100.  A private plaintiff seeking extraterritorial application of RICO is subject to considerations that do not apply to criminal prosecutions under the statute, and must specifically allege a domestic injury.  Id. at 2106.

RJR Nabisco concluded that in order for a private plaintiff to plausibly allege a claim for an extraterritorial application section 1962(c), it must allege both that Congress intended the underlying predicate acts to have extraterritorial reach and that plaintiff suffered a domestic injury.  For section 1962(c) to apply, Congress must give "a clear, affirmative indication" that the RICO crime constituting a predicate act has extraterritorial application.  Id. at 2101; see also id. at 2102 ("We emphasize the important limitation that foreign conduct must violate a predicate statute that manifests an unmistakable congressional intent to apply extraterritoriality.") (quotation marks omitted); id. at 2104 (RICO may extend to a "foreign" racketeering enterprise only if Congress has indicated that the predicate acts are subject to U.S. jurisdiction).

Federal wire fraud is the only predicate act alleged by plaintiffs.  "The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires."  United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000).

 In its decision later reversed by the Supreme Court on other grounds, the Second Circuit concluded that Congress did not "manifest[ ] an intent" to give extraterritorial application of the federal wire fraud statute, 18 U.S.C. § 1343.  European Community v. RJR Nabisco, Inc., 764 F.3d 129, 140-41 (2d Cir. 2014), rev'd and remanded on other grounds, 136 S. Ct. 2090 (2016).[14]  Although the wire fraud statute applies to transmissions made by wire "in interstate or foreign commerce," 18 U.S.C. § 1343, such a broad reference to foreign commerce "'does not

---

[14] The Supreme Court vacated the Second Circuit's analysis of RICO extraterritoriality, but, in doing so, did not address the extraterritorial application of the federal wire fraud statute.  136 S. Ct. at 2105.

defeat the presumption against extraterritoriality.'" 764 F.3d at 141 (quoting <u>Morrison</u>, 130 S.

Ct. at 2882). The Second Circuit rejected as dictum the Supreme Court's earlier statements that

suggested section 1343 applied extraterritorially. <u>Id.</u> at 141 n.11; <u>accord</u> <u>Petroleos Mexicanos v.</u>

<u>SK Eng'g & Constr. Co.</u>, 572 F. App'x 60, 61 (2d Cir. 2014) ("[W]ire fraud cannot serve as such

an extraterritorial predicate.") (citing <u>RJR Nabisco</u>) (summary order); <u>Laydon v. Mizuho Bank,</u>

<u>Ltd.</u>, 2015 WL 1515487, at *8 (S.D.N.Y. Mar. 31, 2015) ("Wire fraud does not apply

extraterritorially.") (citing <u>Petroleos Mexicanos</u>).

       In <u>RJR Nabisco</u>, the Second Circuit concluded that plaintiffs had alleged that the

predicate acts were domestic in nature, and that their claims did not rely on an extraterritorial

application of the wire fraud statute. 764 F.3d at 141. The Complaint described a "global money

laundering scheme" directed from the United States, intertwined with organized crime activities

in New York City and the purchase of millions of dollars in New York real estate. 764 F.3d at

141-42. The alleged predicate acts were both organized from within the United States and

intended to affect victims in the United States. <u>See</u> <u>id.</u>

       This Court reads the law of this Circuit to be that the wire fraud statute does not

have extraterritorial application and may not serve as a predicate act for a RICO claim premised

on foreign-based activities. Thus, plaintiffs have stated a RICO claim only if their Complaint

successfully alleges that the acts of wire fraud were domestic in nature. In this respect, the

Complaint falls short.

       b.  <u>Plaintiffs Have Not Alleged Domestic Acts of Wire Fraud.</u>

       The Complaint makes few allegations that purport to identify acts of wire fraud.

(<u>See</u> Opp. Mem. at 29.) Plaintiffs cite to allegations that a Deutsche Bank manager named David

Nicolls, whose location is not identified, organized weekly "Monday Risk Calls" with traders in

London, New York, Tokyo and Frankfurt using interstate wires, in which Deutsche derivatives traders discussed their strategies and positions, including their Euribor-based derivatives positions. (Compl't ¶¶ 52, 256.) The call participants purportedly discussed ways to best exploit the manipulation of the Euribor. (Compl't ¶¶ 256.) Elsewhere, the Complaint makes generalized allegations about the defendants' use of interstate wires to coordinate the Euribor scheme. (See, e.g., Compl't ¶¶ 2, 11, 33, 50-51, 111.) It also notes that UBS has pleaded guilty to the federal crime of wire fraud. (Compl't ¶¶ 274.)

These allegations do not plausibly allege that any acts of wire fraud were primarily domestic in nature. The nexus to the United States is minimal. The only allegation tied to any specific defendant involves weekly Deutsche Bank conference calls that included employees located in New York. (Compl't ¶¶ 52, 256.) For all other defendants, the Complaint's allegations assert only that they communicated in the aggregate through interstate wires. As the Second Circuit observed in a summary order, "[s]imply alleging that some domestic conduct occurred cannot support a claim of domestic application" of RICO. Petroleos Mexicanos, 572 Fed. App'x at 61. Plaintiffs' complaint is directed toward an alleged cartel organized through the auspices of a European trade association based in Brussels – the EBF – whose membership consisted almost entirely of banks based in Europe. The Euribor was intended to reflect inter-bank term deposits "being offered within the European Monetary Union ('EMU') by one prime bank to another . . . ." (Compl't ¶ 108.) Thus, the communications were between and among European defendants, organized under a European trade association, who communicated with one another in Europe to make false representations concerning rates offered within the European Monetary Union.

In <u>Laydon</u>, 2015 WL 1515487, at *8-9, Judge Daniels described similar allegations in a proposed amended complaint, and concluded that plaintiffs could not pursue RICO claims "based on the alleged actions of foreign and international institutions that submitted false information to the [British Bankers Association] and [Japanese Bankers Association], located in London and Tokyo, respectively."  <u>See also</u> <u>Petroleos Mexicanos</u>, 572 Fed. Appx. at 61 ("The activities involved in the alleged scheme –falsifying the invoices, the bribes, the approval of the false invoices – took place outside of the United States.  The allegations of domestic conduct are simply insufficient to sustain RICO jurisdiction."); <u>United States v. Prevezon Holdings LTD.</u>, 122 F. Supp. 3d 57, 72 (S.D.N.Y. 2015) (concluding in a criminal case that "the wire fraud scheme is extraterritorial, involving 'a foreign conspiracy against a foreign victim conducted by foreign defendants participating in foreign enterprises.'") (Griesa, J.); <u>Elsevier, Inc. v. Grossman</u>, 2016 WL 7077109, at *11 (S.D.N.Y. Aug. 4, 2016) (wire fraud is domestic in nature only if "the defendant commits a substantial amount of conduct in the United States . . . .") (Failla, J.).

Accepting the truth of plaintiffs' allegations, defendants' activities were organized outside of the United States through a European trade association.  The use of United States wires was, at most, incidental.  The Complaint therefore fails to allege that defendants' acts of wire fraud were domestic in nature.

c.   <u>The Court Need Not Reach the Issue of Domestic Injury.</u>

In addition, even where Congress expressed an intent to apply a predicate act extraterritorially, the private plaintiff still "must allege and prove a <u>domestic</u> injury to its business or property."  <u>RJR</u>, 136 S. Ct. at 2106.  In so holding, the Supreme Court concluded that a private plaintiff is not entitled to the full territorial reach of RICO.  <u>Id.</u> at 2106-11.  Under 18

U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962" may sue for treble damages, costs and attorneys' fees.  Section 1964(c) "is narrower in its application than § 1962, and in any event does not support extraterritoriality." 136 S. Ct. at 2108.  A plaintiff bringing a private action under RICO "must allege and prove a domestic injury to its business or property."  Id. at 2106 (emphasis in original).  Otherwise, a private plaintiff may disruptively impose U.S. remedies abroad, displacing the laws of foreign countries that have adopted "less generous remedial schemes . . . ."  Id.  For private plaintiffs, there is a "danger of international friction" if a civil RICO plaintiff attains relief for foreign injuries."  Id. at 2107.  Thus, a civil RICO plaintiff must "allege and prove a domestic injury to business or property," and may not seek "recovery for foreign injuries.  The application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.'"  Id. at 2111.  The Supreme Court expressly declined to give additional guidance as to determining whether a RICO injury was primarily foreign or domestic in nature.  Id.

Because the Court concludes that the wire fraud statute does not have extraterritorial application and that plaintiffs have failed to allege acts of domestic wire fraud, it does not reach the issue of whether plaintiffs have adequately alleged a domestic injury sufficient to pursue a private action under section 1964(c).

    2.   The Complaint's RICO Allegations Otherwise Fail to State a Claim for Relief.

        a.   The Complaint Does Not Adequately Allege Acts of Wire Fraud with the Particularity Required by Rule 9(b).

To state a claim under 18 U.S.C. § 1962(c), a plaintiff must allege the "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  DeFalco v.

Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).  "The requirements of section 1962(c) must be established as to each individual defendant."  Id.

   RICO is not subject to the heightened pleading requirements of Rule 9(b), with the exception of allegations directed to predicate acts that sound in fraud.  First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 178 (2d Cir. 2004).  Predicate acts of wire fraud sound in fraud, and a RICO claim premised on wire fraud "'should state the contents of the communications, who was involved, [and] where and when they took place, and [should] explain why they were fraudulent.'"  Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 185 (2d Cir. 2008) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993)).

   As previously discussed, the Complaint's specific allegations of fraudulent use of wires are limited to weekly calls organized by a Deutsche Bank manager to coordinate trading strategy.  The Complaint does not make additional allegations specific to the individual defendants, and relies on overarching allegations about defendants' collective use of the interstate wires.  The Complaint also lists 48 dates where, upon information and belief, "defendants" collectively committed acts of wire fraud, but it does not identify the participants or the contents of the communications.  (Compl't ¶ 489.)  This fails to satisfy plaintiffs' obligation to state the contents of communications, who was involved, when and where they took place and why they were fraudulent.  Spool, 520 F.3d at 185.

   b.  The Complaint Does Not Plausibly Allege that Individual
       Defendants Committed at Least Two Acts of Racketeering
       Activity.

   A "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . ."  18 U.S.C. § 1961(5).  A plaintiff must allege "at least two predicate acts, [and]

show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity."  <u>Schlaifer Nance & Co. v. Estate of Warhol</u>, 119 F.3d 91, 97 (2d Cir. 1997).  As noted, the elements of a RICO claim, including conduct that amounts to a pattern of racketeering activity, "must be established as to each individual defendant."  <u>DeFalco</u>, 244 F.3d at 306.

Again, the Complaint suffers from plaintiffs' failure to distinguish which acts were attributable to individual defendants, and instead lumps the defendants' actions in the aggregate as involving the use of interstate wires.  It is insufficient to allege, as plaintiffs do, that "[e]very member of the enterprise participated in the process of transmitting or causing to be transmitted false and artificial Euribor submissions throughout the Class Period."  (Compl't ¶ 481.)

Because the Complaint does not identify any specific defendant's participation in at least two acts of wire fraud, and instead avers generally to defendants' misconduct as a whole, it fails to allege a pattern of racketeering activity.

> D.  Plaintiffs' Unjust Enrichment Claim Is Dismissed as to Crédit Agricole, <u>Rabobank and ICAP.</u>

Count Ten of the Complaint alleges that defendants unjustly enriched themselves at the expense of plaintiffs CalSTRS and FrontPoint Australian.  (Compl't ¶¶ 507-14.)  Plaintiffs allege that the defendants benefited from their unlawful manipulation of the Euribor through their positions in Euribor-based derivatives.  (Compl't ¶ 510.)  CalSTRS and FrontPoint Australian both engaged in derivatives transactions with certain defendants, and the Complaint alleges that defendants' unjust enrichment came at the expense of these two plaintiffs.  (Compl't ¶ 511-13.)  While the Complaint does not allege which law governs the unjust enrichment claim,

plaintiffs do not dispute defendants' argument that California law applies to CalSTRS's claim and New York law applies to FrontPoint Australian's claim.  (Def. Mem. at 35.)

"The elements of a cause of action to recover for unjust enrichment are (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  <u>GFRE, Inc. v. U.S. Bank, N.A.</u>, 130 A.D.3d 569, 570 (2d Dep't 2015) (quotation marks omitted).  "Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."  <u>Ashwood Capital, Inc. v. OTG Mgmt., Inc.</u>, 99 A.D.3d 1, 10 (1st Dep't 2012).

The unjust enrichment claim is dismissed to the extent that it purports to bring claims against defendants who did not deal directly with CalSTRS and FrontPoint Australian.  Under New York law, an unjust enrichment claim "will not be supported unless there is a connection or relationship between the parties that could have caused reliance or inducement on the plaintiff's part."  <u>Georgia Malone & Co. v. Ralph Rieder</u>, 86 A.D.3d 406, 408 (1st Dep't 2011).  "In order to adequately plead an unjust enrichment claim there must be allegations of a connection between the plaintiff and the defendant that is not too attenuated; that is, the parties must have something akin to specific knowledge of one another's existence."  <u>Id.</u>

FrontPoint Australian is alleged to have transacted directly only with UBS.  To the extent that FrontPoint Australian purports to allege unjust enrichment against any defendant other than UBS, its claims against those defendants are dismissed.  Similarly, CalSTRS does not purport to have transacted directly with Crédit Agricole, Rabobank and ICAP.  Under California law, a plaintiff must allege that the defendant enjoyed the "receipt of a benefit and unjust

retention of the benefit at the expense of another."  Prakashpalan v. Engstrom, Lipscomb & Lack, 167 Cal. Rptr. 3d 832, 855 (Cal. Ct. App. 2014).  The Complaint does not plausibly allege how Crédit Agricole, Rabobank and ICAP benefited at the expense of CalSTRS, and its claims against them are dismissed.

Defendants argue that the unjust enrichment claim should be dismissed because a plaintiff may not recover for "unjust enrichment where the parties have entered into a contract that governs the subject matter" of the dispute.  Pappas v. Trzolis, 20 N.Y.3d 228, 234 (2012).  Judge Buchwald rejected this argument in LIBOR II, observing that the contracts at issue did not expressly govern "whether defendants were permitted to manipulate LIBOR itself and thereby depress the amount they were required to pay plaintiffs."  962 F. Supp. 2d at 630.  At the pleading stage, plaintiffs sufficiently allege that defendants' conduct in manipulating the Euribor went beyond the terms of any underlying agreements, and that defendants who transacted directly with plaintiffs may have been unjustly enriched.

To the extent that defendants argue plaintiffs' claims are untimely, the Court's previous analysis of defendants' fraudulent concealment of their activities governs.

Plaintiffs' unjust enrichment claim is dismissed as to Crédit Agricole, Rabobank and ICAP.  Defendants' motion to dismiss the claim is otherwise denied.

E.  The Complaint Plausibly Alleges a Breach of the Implied Covenant of Good Faith and Fair Dealing.

Count Eleven alleges that UBS, Citibank, Deutsche Bank, J.P. Morgan, RBS and Société Générale breached the implied covenant of good faith and fair dealing with plaintiffs FrontPoint Australian and CalSTRS.  (Compl't ¶¶ 515-21.)  "To the extent required, this claim is pled in the alternative to" the unjust enrichment claim.  (Compl't ¶ 516.)  It alleges that FrontPoint Australian entered into contracts with UBS, and that CalSTRS entered into contracts

with UBS, Barclays, Deutsche Bank, Citibank, J.P. Morgan, RBS and Société Générale, all of which contained an implied covenant of good faith and fair dealing.  (Compl't ¶¶ 517-19.) Plaintiffs contend that these defendants breached the implied covenant of good faith and fair dealing by submitting false Euribor quotes and manipulating the price of Euribor-based derivatives.  (Compl't ¶¶ 520-21.)

In New York, the implied covenant of good faith and fair dealing "requires that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  In this way, the implied covenant is in aid and furtherance of other terms of the agreement of the parties."  Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 396 (1995) (quotation marks and internal citations omitted).  California law is similar.  See, e.g., City of Hope Nat. Med. Ctr. v. Genentech, Inc., 43 Cal. 4th 375, 389 (Cal. 2008) ("[E]very contract calls for the highest degree of good faith and honest dealing between the parties.") (quotation marks omitted).

Defendants' motion to dismiss the claim is denied.  Defendants contend that CalSTRS and FrontPoint Australian entered into derivatives transactions with defendants that did not directly incorporate the value of the Euribor, but for the reasons previously discussed, this argument turns on factual disputes that cannot be resolved at the motion to dismiss stage. Defendants also argue that the Complaint does not link the dates of manipulation to the dates in which plaintiffs entered into their derivatives transactions, but as previously discussed, plaintiffs allege a long-running scheme to manipulate the Euribor for the defendants' benefit, and not, as defendants argue, manipulation that was targeted to "only one tenor on a particular day . . . ." (Def. Mem. at 32.)  Defendants argue that the Complaint lumps all defendants and engages in "group pleading," but unlike the unjust enrichment claim, the covenant of good faith and fair

dealing claim identifies which defendants were counterparties to transactions with CalSTRS and FrontPoint Australian.  Lastly, to the extent that defendants argue that the claims are time-barred, this Court's previous discussion of defendants' purported fraudulent concealment controls.

Defendants' motion to dismiss Count Eleven is therefore denied.

III.    PLAINTIFFS HAVE NOT ALLEGED PERSONAL JURISDICTION AS TO FOREIGN DEFENDANTS.

Labeling themselves "Foreign Defendants," eight of the defendants move to dismiss the Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2), Fed. R. Civ. P. These defendants are Crédit Agricole S.A., Crédit Agricole CIB, ICAP plc, ICAP Europe Ltd., Rabobank, RBS, Société Générale and UBS.

Among the claims against the Foreign Defendants, this Court has concluded that the Complaint has plausibly alleged that they conspired to fix the Euribor in violation of section 1 of the Sherman Act, and that CalSTRS and FrontPoint Australian can be efficient enforcers of those claims.  The Court also has concluded that plaintiffs have stated claims against UBS and Rabobank as to transactions in CME Currency Futures Contracts.  Plaintiffs also have alleged claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing against UBS, Deutsche Bank, RBS and Société Générale, as well as against United States defendants Citibank and J.P. Morgan.

Each Foreign Defendant is incorporated and headquartered in a European country. Crédit Agricole S.A. is incorporated and headquartered in France, and owns a 97.8% interest in defendant Crédit Agricole CIB.  (Compl't ¶ 76.)  ICAP plc is incorporated and headquartered in the United Kingdom, and ICAP Europe Ltd. is a wholly owned subsidiary headquartered in the United Kingdom.  (Compl't ¶ 101.)  Rabobank is incorporated and headquartered in the Netherlands.  (Compl't ¶ 73.)  RBS is incorporated and headquartered in the United Kingdom.

(Compl't ¶ 88.)  Société Générale is incorporated and headquartered in France.  (Compl't ¶ 91.)
UBS is incorporated and headquartered in Switzerland.  (Compl't ¶ 95.)  Each also is alleged to
maintain a branch in New York City, and to transact significant business in the United States.
(Compl't ¶¶ 77 (Crédit Agricole); 102 (ICAP); 74 (Rabobank); 88-89 (RBS); 93 (Société
Générale); 96-97 (UBS).)

Plaintiffs have disclaimed any argument that the Foreign Defendants are
continuously present in New York and therefore subject to general jurisdiction.  (Opp. Jur. Mem.
at 1 ("Plaintiffs are not relying on general jurisdiction . . . .").)  See generally Gucci Am., Inc. v.
Weixing Li, 768 F.3d 122, 134 (2d Cir. 2014) (general jurisdiction "permits a court to hear any
and all claims against an entity.").  Instead, they argue that certain defendants have consented to
personal jurisdiction in New York based on forum-selection clauses contained in so-called
Master Agreements drafted by the International Swaps and Derivatives Association, Inc.
("ISDA"), or, alternatively, because plaintiffs registered their New York branches under New
York Banking Law § 200.  Separately, plaintiffs argue that UBS and RBS are judicially estopped
from contesting New York jurisdiction because of statements that they made in support of their
successful motion to transfer this action from the Northern District of Illinois.  Lastly, they argue
that defendants are subject to personal jurisdiction because they meet a "national contacts"
standard sometimes applied to claims brought under a federal statute.  Defendants' motion to
dismiss challenges personal jurisdiction solely on due process grounds.  (See Def. Jur. Mem. at 4
n.5 ("Because personal jurisdiction here is incompatible with due process, we do not separately
address New York's (or Illinois's) long-arm statute.").)

For reasons that will explained, this Court concludes that no defendant has
consented to personal jurisdiction in New York, and that RBS and UBS are not judicially

estopped from contesting their personal jurisdiction.  The Court further concludes that plaintiffs have not made a prima facie showing that any Foreign Defendant had national contacts with the United States sufficient to exercise specific jurisdiction over the CEA and Sherman Act claims against them.  No other grounds for exercising personal jurisdiction are alleged, and the Complaint is therefore dismissed as to all Foreign Defendants.

A.  Rule 12(b)(2) Standard.

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of making a prima facie showing that the court has personal jurisdiction over the defendant.  Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34-35 (2d Cir. 2010).  Plaintiffs showing includes "'legally sufficient allegations of jurisdiction,' including 'an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'"  Id. (quoting In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003 (per curiam)).  A court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor."  Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 85 (2d Cir. 2013) (quotation marks omitted).  Factual conflicts are not to be resolved on a Rule 12(b)(2) motion without an evidentiary hearing.  Id. at 86.  However, courts may rely on materials outside of the pleadings, including affidavits.  See DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001).

B.  No Defendant Has Consented to Jurisdiction.

a.  The ISDA Master Agreements Does Not Establish Consent to Personal Jurisdiction in this Action.

"Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements."  D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 103 (2d Cir. 2006).  Plaintiffs assert that RBS and other defendants executed Master Agreements drafted by the

ISDA, which provide for personal jurisdiction in New York.  Master Agreements govern the rights of parties to FRAs and interest-rate swaps.  (Krisiloff Dec. ¶ 7.)  Their standard terms include choice-of-law and forum-selection clauses that consent to jurisdiction in the courts of either England or New York.  (Krisiloff Dec. ¶ 16.)

   Plaintiffs argue that this Court has personal jurisdiction over the Foreign Defendants based on their use of Master Agreements.  Barclays, RBS and Deutsche Bank all are alleged to have used Master Agreements, but plaintiffs argue that they "have uncovered similar agreements executed by other Defendants" consenting to jurisdiction in New York.  (Opp. Jur. Mem. at 1.)  Plaintiffs argue that the Master Agreements are irrevocable consents to submit to New York's jurisdiction.  (Opp. Jur. Mem. at 2-3.)  Plaintiffs further argue that the practices of RBS, Deutsche Bank and Barclays "gives rise to the plausible inference that other Defendants did the same," and thereby consented to personal jurisdiction in New York.  (Opp. Jur. Mem. at 3.)

   The two Master Agreements that plaintiffs have submitted include provisions that consent to New York jurisdiction, but the consent to jurisdiction is made only "[w]ith respect to any suit, action or proceedings <u>relating to this Agreement</u> . . . ."  (Krisiloff Dec. Ex. 5 ¶ 13(b); Krisiloff Dec. Ex. 7 ¶ 13(b); emphasis added.)  The language in which each party agrees to "waive[ ] any objection which it may have . . . with respect to such Proceedings, that such court does not have any jurisdiction over such party" is expressly and unambiguously limited "to any suit, action or proceedings relating to this Agreement . . . ."  (Krisiloff Dec. Ex. 5 ¶ 13(b)(ii).)  Applying the agreements' express terms, the parties consent to the jurisdiction of New York courts for claims "relating to this Agreement," but the agreements do not provide for a broader consent to jurisdiction over any dispute.

Plaintiffs have not alleged or shown that any of their claims against any Foreign Defendant relate to a Master Agreement that consents to personal jurisdiction in New York. Plaintiffs have submitted a Master Agreement dated December 6, 2004 that was entered into between RBS and "each respective entity listed" in an appendix to the agreement's schedule. (Krisiloff Dec. Ex. 5.)  Though plaintiffs have not attached the appendix, they allege that CalSTRS was a party to this agreement.  (Compl't ¶ 46.)  The agreement was purportedly for the transaction of Euribor-based interest swaps between CalSTRS and RBS.  (Compl't ¶ 340.)  It contains a New York forum-selection clause.  (Krisiloff Dec. Ex. 5 ¶ 13(b).)  But this December 2004 agreement pre-dates the alleged efforts to manipulate the Euribor, which the Complaint says began on June 1, 2005, and plaintiffs have not urged that their claims "relat[e] to this Agreement."  The agreement consents to New York's jurisdiction over RBS only as to claims that relate to that agreement, and not as to RBS more broadly.  Because CalSTRS has not alleged that its claims against RBS relate to the agreement, the agreement does not confer personal jurisdiction over RBS.[15]

Defendants have separately submitted a Master Agreement between CalSTRS and HSBC Bank plc in 2006, which provides for venue in "the English courts."  (Brown Dec., Attachment at 13.)  Plaintiffs have not alleged or otherwise suggested that they entered into any additional Master Agreement with any defendant, and thus discovery has not been shown to be necessary.  The existence of other agreements between defendants and non-plaintiffs would not establish personal jurisdiction over a defendant for the purpose of these plaintiffs' claims

---

[15] Because plaintiffs have not pointed to any Master Agreement that applies to their claims, the Court does not reach the issue of whether a defendant's consent to jurisdiction in a Master Agreement would also encompass plaintiffs' RICO, CEA and Sherman Act claims.  See, e.g., LIBOR IV, 2015 WL 6243526, at *34 (giving a "broad reading" to the forum-selection clause of ISDA agreements while "caution[ing]" that the claims "must relate to the particular contractual relationship," and observing that the clause does not provide jurisdiction for "all fraud claims").

asserted in this action.  See, e.g., Beach v. Citigroup Alternative Investments LLC, 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014) ("Contacts with unnamed class members may not be used as a jurisdictional basis, especially before a class has been certified.").

> In sum, the Court concludes that the consents to personal jurisdiction set forth in the Master Agreements are transaction specific.  The Master Agreements do not establish a broader consent to jurisdiction for claims unrelated to the agreements.  Plaintiffs have shown the existence of only one Master Agreement between a plaintiff and defendant, but it pre-dates the alleged manipulation of the Euribor, and plaintiff CalSTRS has not alleged that its claims relate to that agreement.  Because plaintiffs have not alleged that their claims relate to the terms of a specific Master Agreement, the Master Agreements do not establish personal jurisdiction over any defendant.

> > b.  Defendants' Registrations under New York Banking Law Are Not a
> > Consent to Jurisdiction.

> Plaintiffs argue that Rabobank, Crédit Agricole CIB, RBS and Société Générale consented to New York jurisdiction by registering their New York branches with the State of New York pursuant to New York Banking Law § 200.  (Opp. Jur. Mem. at 15-18.)  New York law requires foreign banks operating in New York to "appoint[ ] the superintendent and his or her successors as its true and lawful attorney, upon whom all process in any action or proceeding against it on a cause of action arising out of a transaction with its New York agency or agencies or branch or branches, may be served . . . ."  N.Y. Banking L. § 200(3).

> According to plaintiffs, the five defendants who registered under section 200(3) have consented to jurisdiction in New York for all purposes.  But the language of section 220(3) expressly provides that registration applies to "a cause of action arising out of a transaction" with the registrant bank's "New York agency . . . or branch . . . ."  N.Y. Banking L. § 200(3).  The

statute does not establish a consent to jurisdiction by the branch's foreign parent, and courts in this District have uniformly rejected plaintiffs' argument.  See LIBOR V, 2016 WL 1558504, at *7 (registration under the New York Banking Law consents to specific jurisdiction over transactions involving only the bank's New York branches or agencies); In re Foreign Exch. Benchmark Rates Antitrust Litig., 2016 WL 1268267, at *2 (S.D.N.Y. Mar. 31, 2016)  ("any consent to jurisdiction by virtue of the [defendants'] registration with the NYDFS is not general jurisdiction over all claims, but instead is limited to claims arising out of transactions with the [defendants'] New York agencies or branches.") (Schofield, J.);  7 W. 57th St. Realty Co., LLC v. Citigroup, Inc., 2015 WL 1514539, at *11 (S.D.N.Y. Mar. 31, 2015) ("The plain language of this provision limits any consent to personal jurisdiction by registered banks to specific personal jurisdiction.") (Gardephe, J.); Motorola Credit Corp. v. Uzan, 132 F. Supp. 3d 518, 521-22 (S.D.N.Y. 2015) (defendant "banks did not consent to this Court's jurisdiction by registering or being licensed under New York Banking Law § 200 or federal law.") (Rakoff, J.); cf. Brown v. Lockheed Martin Corp., 814 F.3d 619, 641 (2d Cir. 2016) (company's compliance with Connecticut business registration statute was not a consent to general jurisdiction).

Plaintiffs' reliance on B&M Kingston, LLC v. Mega International Commercial Bank Co., 131 A.D.3d 259 (1st Dep't 2015), is unavailing.  B&M concluded that a Taiwan bank's New York branch was required to comply with a subpoena of company-wide information that was accessible from its registered New York branch.  Id. at 266-67.  The subpoena sought information about judgment debtors who maintained accounts with the Chinese bank at branches other than New York.  Id.  Although B&M raised questions in dicta concerning what it described as an "arcane rule" limiting jurisdiction to New York branches, it also acknowledge that "New York does not have general jurisdiction over [a registered bank's] worldwide operations."  Id. at

264.  As Judge Buchwald concluded, <u>B&M</u> stands for the principle that foreign banks operating

New York branches have obligations "'to participate as third-parties in lawsuits which involve

assets under their management,'" and does not support the proposition that registration under

section 200 is a broader consent to jurisdiction.  <u>LIBOR V</u>, 2016 WL 1558504, at *7 (quoting

<u>Vera v. Republic of Cuba</u>, 91 F. Supp. 3d 561, 570 (S.D.N.Y. 2015)).  Moreover, extending

<u>B&M</u> to the exercise of general personal jurisdiction would likely raise serious due process

concerns.  <u>See</u> <u>Daimler</u>, 134 S. Ct. at 758-59.

      Based on the foregoing, New York does not have personal jurisdiction over any

Foreign Defendant by reason of its registration of a branch office pursuant to New York Banking

Law § 200.

### C.  RBS and UBS Are Not Judicially Estopped from Challenging Personal Jurisdiction on Due Process Grounds.

      Plaintiffs argue that defendants RBS and UBS are judicially estopped from

contesting this Court's personal jurisdiction.  Judicial estoppel is an equitable doctrine to be

exercised in the sound discretion of the Court.  <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750

(2001).  "'[W]here a party assumes a certain position in a legal proceeding, and succeeds in

maintaining that position, he may not thereafter, simply because his interests have changed,

assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in

the position formerly taken by him.'"  <u>Id.</u> at 749 (quoting <u>Davis v. Wakelee</u>, 156 U.S. 680, 689

(1895)).  The purpose of judicial estoppel "is to protect the integrity of the judicial process by

prohibiting parties from deliberately changing positions according to the exigencies of the

moment."  <u>Id.</u> (quotation marks and internal citation omitted); <u>see also</u> <u>Wight v. BankAmerica

Corp.</u>, 219 F.3d 79, 89 (2d Cir. 2000) ("Judicial estoppel is designed to prevent a party who

plays fast and loose with the courts from gaining unfair advantage . . . .").  Factors in assessing

the appropriateness of judicial estoppel include whether a party has taken a position that is

"clearly inconsistent" with past statements, whether a court accepted the previous statement and

whether the party's new statement would give it an unfair advantage over an adversary.  See

New Hampshire, 531 U.S. at 750-51.  "Additional considerations may inform the doctrine's

application in specific factual contexts."  Id. at 751.

   The Second Circuit has cautioned that judicial estoppel should be employed only

"'when the risk of inconsistent results with its impact on judicial integrity is certain.'"  Adelphia

Recovery Trust v. Goldman, Sachs & Co., 748 F.3d 110, 116-17 (2d Cir. 2014) (quoting

Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011)).  "[A] court must

carefully consider the contexts in which apparently contradictory statements are made to

determine if there is, in fact, direct and irreconcilable contradiction."  Rodal v. Anesthesia Grp.

of Onondaga, P.C., 369 F.3d 113, 119 (2d Cir. 2004).

   This action was originally filed in the Northern District of Illinois by plaintiff

Stephen Sullivan.  (Docket # 1.)  Only Barclays, RBS and UBS were named as defendants at the

time.  (Docket # 1.)  In April 2013, approximately two months after the action commenced, all

defendants moved to transfer the action to this District pursuant to 28 U.S.C. § 1404(a).  (Docket

# 32.)  The Hon. Milton I. Shadur granted the motion, and the action was transferred to this

District.  (Docket # 44.)

   In support of their transfer motion, Barclays, RBS and UBS stated:  "All

Defendants are subject to personal jurisdiction in both the SDNY and this District and are thus

resident in both under 28 U.S.C. § 1391(c)(2), making venue proper in both districts."  (Docket #

33 at 6 n.8.)

In challenging jurisdiction, UBS and RBS have now taken a position that is "clearly inconsistent" with their prior statement in support of transfer.  They explain that their position on personal jurisdiction changed in response to the Supreme Court's 2014 decision in Daimler, which set due process limitations on the exercise of general personal jurisdiction. Daimler concluded that for a foreign corporation to be subject to general personal jurisdiction, its contacts with a state must be so continuous and systematic that it is "at home" in the state, as much as in the defendant's place of incorporation and headquarters.  Id. at 754, 760.  The mere existence of an in-state branch or subsidiary is insufficient to confer general personal jurisdiction over a foreign parent.  See id. at 758-59.  Daimler directly altered the law of this Circuit on general jurisdiction.  As noted by the Second Circuit, "[p]rior to Daimler, controlling precedent in this Circuit made it clear that a foreign bank with a branch in New York was properly subject to general personal jurisdiction here."  Gucci, 768 F.3d at 136; see also Daimler, 134 S. Ct. at 757 ("As International Shoe itself teaches, a corporation's 'continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'") (quoting International Shoe, 326 U.S. at 318).

To the extent that RBS and UBS now challenge personal jurisdiction on due process grounds, Daimler's intervening and significant clarification of the law weighs against enforcing judicial estoppel against RBS and UBS, solely to the extent that their change in position relates to the exercise of personal jurisdiction consistent with due process.  Daimler addressed the due process limitations specifically as they relate to foreign defendants that maintain branches or agencies in the United States.  The defendants' earlier statements on personal jurisdiction were made without the benefit of Daimler.  Because their challenge to jurisdiction turns entirely on due process grounds, they are not judicially estopped from

advancing that argument, even though it is "clearly inconsistent" with statements made in support of their transfer motion.

RBS and UBS are, however, judicially estopped from challenging this Court's personal jurisdiction on any basis other than due process grounds. They may challenge personal jurisdiction in New York on due process grounds based upon intervening case law, including Daimler and related, subsequent authority.

### D.   Plaintiffs Have Not Alleged Specific Jurisdiction Based on National Contacts.

#### 1.   Overview of the National Contacts Test.

Plaintiffs next contend that this Court has jurisdiction over the Foreign Defendants based on their contacts with the United States as a whole. As alleged in the Complaint: "Each Defendant is subject to personal jurisdiction because it purposefully availed itself of the privilege of trading Euribor-based derivatives in the United States and could foresee being haled into Court in this District." (Compl't ¶ 36.)

When a plaintiff asserts a federal cause of action against a foreign defendant, a defendant's national contacts may be relevant to deciding personal jurisdiction. Some Circuits, not including the Second Circuit, have concluded that "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." Gucci, 768 F.3d at 142 n.21 (collecting cases). The Second Circuit has acknowledged this reasoning but has "not yet decided" whether to adopt it. See id. "The rationale underlying this 'national contacts' approach is that '[w]hen the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation.'" LIBOR IV, 2015 WL 4634541, at *18 (adopting national contacts test) (quoting Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir.

1998)); see also S.E.C. v. Straub, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) ("When the

jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-

question jurisdiction and nationwide service of process, however, the Fifth Amendment applies,

and the Second Circuit has consistently held that the minimum-contacts test in such

circumstances looks to contacts with the entire United States rather than with the forum state.")

(Sullivan, J.) (quotation marks omitted).  The Second Circuit has stated that a district court may

"appropriately consider whether nationwide contacts are relevant in evaluating its specific

jurisdiction" to enforce an injunction.  Gucci, 768 F.3d at 142.

       The CEA provides for national service of process.  7 U.S.C. § 25(c) ("Process in

such action may be served in any judicial district of which the defendant is an inhabitant or

wherever the defendant may be found.").  Courts in this District have applied a national contacts

test to determine personal jurisdiction for a CEA claim.  See LIBOR IV, 2015 WL 4634541, at

*18; In re Amaranth Nat. Gas Commodities Litig., 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008)

(Scheindlin, J.), aff'd, 730 F.3d 170 (2d Cir. 2013); see also De David v. Alaron Trading Corp.,

796 F. Supp. 2d 915, 925 (N.D. Ill. 2010).

       As to plaintiffs' claim under the Sherman Act, Section 12 of the Clayton Act

provides for national service of process as to defendant corporations:

> Any suit, action, or proceeding under the antitrust laws against a
> corporation may be brought not only in the judicial district whereof
> it is an inhabitant, but also in any district wherein it may be found
> or transacts business; and all process in such cases may be served in
> the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.  Because the service of process provision applies only to "such cases" described

in the preceding clause, the Second Circuit has concluded that nationwide service of process is

permissible "only in cases in which its venue provision is satisfied . . . ."  Daniel, 428 F.3d at

423.  No party has addressed the relationship between the venue provision and the service of process provision, and defendants have not challenged this District's venue.  Accordingly, this Court considers whether plaintiffs have made a prima facie showing that defendants' national contacts are sufficient for this Court to exercise personal jurisdiction.  See Grosser v. Commodity Exch., Inc., 639 F. Supp. 1293, 1312 (S.D.N.Y. 1986) ("Section 12 is construed as conferring nationwide personal jurisdiction over corporate antitrust defendants.") (Lasker, J.), aff'd, 859 F.2d 148 (2d Cir. 1988).

Because the CEA and the Clayton Act include a provision for nationwide service of process, and the interests in the application of the CEA and the Sherman Act implicate the United States as opposed to the interests of a particular state, this Court adopts the reasoning of LIBOR IV and other courts, and decides the issue of personal jurisdiction based on the national contacts of the Foreign Defendants.

### 2.  Standard for Exercising Specific Jurisdiction.

Plaintiffs urge that defendants are subject to specific jurisdiction based on suit-related conduct directed toward the United States.  In determining whether a party's national contacts establish federal jurisdiction, it must be shown that jurisdiction "satisfies the Fifth Amendment due process standard."  Chew, 143 F.3d at 28.[16]  "[B]ecause the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due process clause, the same general principles guide the minimum contacts analysis."  Straub, 921 F. Supp. 2d at 253.

---

[16] The Second Circuit has analyzed national contacts pursuant to Rule 4(k)(2), Fed. R. Civ. P., which states: "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  Rule 4(k)(2) "'extends the reach of federal courts to impose jurisdiction over the person of all defendants against whom federal law claims are made and who can be constitutionally subjected to the jurisdiction of the courts of the United States.'"  Chew, 143 F.3d at 27 (quoting Purposes of Revision, Advisory Committee Notes, 1993 Amendments).

"For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014). Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum . . . ." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (quotation marks and alteration omitted). "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." Id.; accord Walden, 134 S. Ct. at 1121 ("specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation.") (quotation marks omitted). A plaintiff asserting specific personal jurisdiction "must establish the court's jurisdiction with respect to each claim asserted." Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004).

The exercise of specific jurisdiction requires a two-step analysis. See, e.g., Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013). First, courts "evaluate the quality and nature of the defendant's contacts with the forum . . . under a totality of the circumstances test." Id. (quotation marks omitted). Second, if the defendant purposefully established minimum contacts with the forum, the court must be satisfied that exercising jurisdiction comports with due process pursuant to "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

Minimum contacts exist "where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." Licci, 732 F.3d 170. "[T]he relationship must arise out of contacts that the 'defendant himself' creates with the forum . . . ." Walden, 134 S. Ct. at 1122 (quoting Burger King Corp. v. Rudzewicz, 471

U.S. 462, 475 (1985)).  The activities of plaintiffs or third parties alone will not confer

jurisdiction, and the court's analysis is directed to the defendant's contacts with the forum itself

and "not the defendant's contacts with persons who reside there."  Id.  Harmful effects alone will

not establish jurisdiction:  "[T]he mere 'fact that harm in the forum is foreseeable' [is]

'insufficient for the purpose of establishing specific personal jurisdiction over a defendant.'"

Waldman v. Palestine Liberation Org., 835 F.3d 317, 339 (2d Cir. 2016) (quoting In re Terrorist

Attacks of September 11, 2001, 714 F.3d 659, 674 (2d Cir. 2013)).  "[T]he defendant must

expressly aim his conduct at the United States."  Id. at 337; see also LIBOR IV, 2015 WL

4634541, at *27 (effects in forum do not support jurisdiction when "there is no suggestion, and it

does not stand to reason, that foreign defendants aimed their manipulative conduct at the United

States or any particular forum state.").

        The underlying "suit-related conduct must create a substantial connection with the

forum State."  Walden, 134 S. Ct. at 1121.  "[I]t is the defendant's conduct that must form the

necessary connection with the forum State that is the basis for its jurisdiction over him."  Id. at

1122.  This includes consideration of the claim's elements and where the underlying conduct

occurred.  See generally Waldman, 835 F.3d at 335-39.  The forum must be the "focal point" or

"nucleus" of plaintiff's underlying claim.  Id. at 340.  Continuous presence in the forum does not

confer specific jurisdiction unless that presence involves "suit-related conduct."  Id.; see also 7

W. 57th Realty Co., 2015 WL 1514539, at *10 ("Plaintiff must demonstrate that the Foreign

Banks' suit-related conduct creates minimum contacts with New York, however, not simply that

the Foreign Banks have a presence here or conduct business activities here in general.").  As

previously discussed, the elements of a commodity-manipulation claim under the CEA include

1.) an ability to influence market prices, 2.) the existence of an artificial price, 3.) causation of

the artificial price on the part of defendants and 4.) specific intent to cause the artificial price.

See In re Amaranth, 730 F.3d at 173.  Plaintiffs' horizontal price-fixing claim is a per se

violation of the Sherman Act that requires evidence of an agreement between competitors to

artificially fix the Euribor.  See Gelboim, 823 F.3d at 770-71.

Further, if the defendant has minimum contacts with the forum, the exercise of

jurisdiction must be consistent with due process, meaning that the exercise of jurisdiction does

"not offend 'traditional notions of fair play and substantial justice."  International Shoe Co., 326

U.S. at 316.  Relevant factors include "(1) the burden that the exercise of jurisdiction will impose

on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's

interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in

obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states

in furthering substantive social policies."  Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d

560, 568 (2d Cir. 1996).

3.   The Complaint Fails to Allege Minimum Contacts as to UBS.

Because the plaintiffs have alleged claims under both the Sherman Act and the

CEA as to defendants UBS and Rabobank, the Court first addresses its personal jurisdiction

against those two defendants.

UBS is a Swiss company headquartered in Zurich and Basel, and was a member

of the EBF Euribor panel throughout the alleged manipulation.  (Compl't ¶ 95.)  The Complaint

alleges various facts related to UBS's presence in the United States.  It maintains branches in

Connecticut, New York, Illinois and Florida.  (Compl't ¶ 96.)  It employs traders in Stamford,

Connecticut, who trade in derivatives tied to the Euribor, specifically including interest rate

swaps.  (Compl't ¶¶ 37-38.)  UBS registered a Connecticut branch office with the Connecticut

Department of Banking, and its branch office was established under the authority of the Board of

Governors of the Federal Reserve System.  (Compl't ¶¶ 45, 47.)  UBS is provisionally registered

with the CFTC as a swap dealer and is licensed and supervised by the Board of Governors of the

Federal Reserve.  (Compl't ¶ 96.)

This United States presence is relevant only insofar as it has a nexus to the

misconduct underlying plaintiffs' claims.  The fact that UBS has a United States presence is

insufficient to confer jurisdiction, unless plaintiffs can make out a prima facie case that the

existence, causation or intent to manipulate the Euribor on the part of UBS had its "nucleus" or

"focal point" in the United States.  See In re Amaranth, 730 F.3d at 173 (CEA elements);

Waldman, 835 F.3d at 340 (jurisdictional requirement).  Plaintiffs have failed to do so.

Some of UBS's counterparties were located in the United States, including

FrontPoint Australian and CalSTRS.  (Compl't ¶¶ 40-41, 59.)  But the presence of U.S. victims

alone does not make out jurisdiction, and plaintiffs' allegations concerning defendants'

misconduct does not allege a United States nexus to UBS's Euribor manipulation.  The

Complaint alleges that UBS joined the Euribor scheme through communications with traders at

RBS, with no United States connection alleged.  (Compl't ¶ 98.)  The instant-message exchanges

concerning UBS are not alleged to have originated or been transmitted by United States traders,

or to involve actions by any UBS employee in the United States.  (Compl't ¶¶ 161-66, 183-84,

307.)  The Complaint alleges that UBS's traders and submitters were assigned to desks near one

another, but the location is not identified.  (Compl't ¶¶ 257-58.)  UBS management also is

alleged not to have implemented a monitoring or compliance program for its Euribor

submissions until 2008, when it enacted certain reforms that plaintiffs describe as superficial and

ineffective.  (Compl't ¶¶ 269-72.)  UBS ultimately pleaded guilty to one count of federal wire fraud in regard to its manipulation of a foreign exchange.  (Compl't ¶¶ 274, 492.)

The Complaint does not allege conduct that was aimed at the United States.  See generally Walden, 835 F.3d at 337, 339.  Moreover, the underlying "suit-related conduct must create a substantial connection with the forum," Walden, 134 S. Ct. at 1121, a threshold requirement that is not alleged here.  Plaintiffs have not alleged that any United States branch or employee of UBS participated in the scheme to rig the Euribor.  It does not allege that UBS directly communicated with any United States co-conspirator about fixing the Euribor.  If, hypothetically, the Complaint alleged that a United State branch employed traders who requested artificial Euribor rates or submitted false quotes to the EBF panel, or pointed to directives from United States management that facilitated or encouraged the scheme, such allegations would likely reflect suit-related conduct with a substantial connection to the forum.  See LIBOR IV, 2015 WL 4634541, at *27 ("[I]n principle, we would uphold jurisdiction in the forum containing the office from which a defendant determined, or transmitted, a false LIBOR submission.").  Instead of alleging suit-related conduct that creates a substantial connection with the United States, plaintiffs have raised an assortment of U.S. ties related to UBS's presence in the broader financial services industry, with no allegations that link the elements of a CEA or Sherman Act claim to UBS conduct within the United States.[17]  See Waldman, 835 F.3d at 337 ("There is no basis to conclude that the defendants participated in these acts in the United States or that their liability for these acts resulted from their actions that did occur in the United States.").

---

[17]  A Barclays manager in New York appears to be the only United States-based individual employed by any Foreign Defendant who is alleged to have been involved in the Euribor manipulation.  (Compl't ¶ 42-43.)  Its New York manager supervised Moryoussef.  (Compl't ¶¶ 42-43.)  Barclays has provisionally settled plaintiffs' claims against it and its motion to dismiss is withdrawn without prejudice.

In addition, there is a feature of the Euribor itself that weighs against the exercise of personal jurisdiction.  According to the Complaint, under EBF guidelines, individual Euribor submissions were to be based on inter-bank term deposits "being offered <u>within the European Monetary Union</u> ('EMU') by one prime bank to another as of 11.00 a.m. Brussels time." (Compl't ¶ 108.)  Thus, any false submissions would be misrepresentations of the rates offered by entities within the Eurozone, and not misrepresentations about any United States rates. Plaintiffs' claims against UBS, and all other defendant banks, are therefore directed toward misrepresentations about the rates offered within the European Monetary Union, between European banks, which were allegedly inconsistent with a code of conduct promulgated by the Brussels-based EBF.  The substance of, and participants in, any false Euribor quotes are anchored squarely in Europe.  Though the Court makes this observation in relation to UBS, it equally is true for all other Foreign Defendants discussed below.

The Complaint does not allege minimum contacts between UBS and the United States sufficient to confer specific jurisdiction on plaintiffs' CEA or Sherman Act claims against UBS.

4.   <u>The Complaint Fails to Allege Minimum Contacts as to Rabobank.</u>

The same infirmities apply to plaintiffs' jurisdictional allegations against Rabobank.  Rabobank is headquartered and incorporated in the Netherlands.  (Compl't ¶ 73.)  It maintains a branch in New York, which is its only "material entity" in the United States. (Compl't ¶ 74.)  The branch is licensed, supervised and regulated by the New York State Department of Financial Services ("NYSDFS").  (Compl't ¶ 74.)  Rabobank employs derivatives traders in New York and around the world.  (Compl't ¶ 74.)  It transacted with counterparties located in the United States.  (Compl't ¶ 40.)

According to the Complaint, Rabobank allegedly participated in the Euribor scheme through Moryoussef at Barclays.  (Compl't ¶¶ 75, 159-60.)  Plaintiffs allege that Rabobank failed to implement sufficient internal controls to monitor its offering-rate practices.  (Compl't ¶¶ 266-68.)  Rabobank left the Euribor panel in 2013, and according to the Complaint, Rabobank admitted that thirty of its employees participated in the Euribor scheme.  (Compl't ¶ 366.)  None of the employees are alleged to have been employed by Rabobank's U.S. branch in New York or elsewhere in the United States.

As with UBS, the Complaint fails to allege that Rabobank's underlying "suit-related conduct . . . create[d] a substantial connection with the forum . . . ."  Walden, 134 S. Ct. at 1121.  The allegations of United States presence are limited to the existence of a New York branch, and the assertion that Rabobank employs derivatives traders in New York.  It does not link communications, planning or enactment of the Euribor scheme to any Rabobank office, executive or employee in the United States.  It does not allege that Rabobank made communications with any United States person in furtherance of a conspiracy to fix the Euribor.  Plaintiffs have not alleged the existence, causation or intent to manipulate the Euribor on the part of Rabobank had its "nucleus" or "focal point" in the United States.  See In re Amaranth, 730 F.3d at 173; Waldman, 835 F.3d at 340.

The Court therefore concludes that the Complaint does not allege minimum contacts between Rabobank and the United States sufficient to confer specific jurisdiction on plaintiffs' CEA and Sherman Act claims against Rabobank.

5.   The Complaint Fails to Allege Minimum Contacts as to Crédit Agricole.

Crédit Agricole, S.A. is headquartered and incorporated in France.  (Compl't ¶ 76.)  It owns a 97.8% interest in defendant Crédit Agricole CIB, which it "considers its only

business line that has a significant presence in the United States." (Compl't ¶ 76.) Crédit

Agricole CIB maintains a New York branch, which is a "material entity" in the United States.

(Compl't ¶ 76.) The New York branch is licensed, supervised and regulated by the NYSDFS,

and Crédit Agricole CIB is provisionally registered as a swap dealer with the CFTC and

regulated by the Board of Governors of the Federal Reserve. (Compl't ¶ 76.) The New York

branch buys and sells derivatives. (Compl't ¶ 76.)

       According to the Complaint, Crédit Agricole joined defendants' scheme through

two traders previously acquainted with Moryoussef. (Compl't ¶ 77.) Michael Zrihen worked at

Crédit Agricole from 2005 through 2010, and Pierre Thomir worked at Crédit Agricole from

1995 through 2008. (Compl't ¶ 77.) In 2006, Moryoussef allegedly contacted Zrihen and

Thomir, and asked them to arrange for Crédit Agricole to submit favorable Euribor quotes, to

which they agreed. (Compl't ¶¶ 154-57.) Moryoussef allegedly continued to coordinate with the

two men thereafter. (Compl't ¶ 223, 225, 237.)

       The Complaint does not allege whether Zrihen and Thomir were employed by

Crédit Agricole SA or Crédit Agricole CIB, and instead refers to the two defendants collectively

as "Crédit Agricole." It also does not identify the office or branch where Zrihen and Thomir

worked.

       The Complaint fails to allege that Crédit Agricole's "suit-related conduct . . .

create[d] a substantial connection with the forum." Walden, 134 S. Ct. at 1121. The allegations

of United States presence are limited to the existence of a New York branch and the assertion

that the branch employed derivatives traders. It does not allege that Zrihen or Thomir were

employed at the New York branch, or that any agreement by the Crédit Agricole defendants to

artificially fix the Euribor involved persons in the United States. There is no allegation that any

agreement by Crédit Agricole to manipulate the Euribor had its "nucleus" or "focal point" in the United States.  Waldman, 835 F.3d at 340.

The Court therefore concludes that the Complaint does not allege minimum contacts between the Crédit Agricole defendants and the United States sufficient to confer specific jurisdiction on plaintiffs' Sherman Act claim against Crédit Agricole.

6.   The Complaint Fails to Allege Minimum Contacts as to RBS.

RBS is headquartered and incorporated in the United Kingdom.  (Compl't ¶ 88.)  It maintains branch offices in Connecticut and New York, which are registered and regulated by the two state's authorities.  (Compl't ¶ 88.)  RBS is licensed and supervised by the Board of Governors of the Federal Reserve.  (Compl't ¶ 88.)  RBS is a registered swap dealer with the CFTC and is a major broker-dealer of interest-rate derivatives.  (Compl't ¶ 88.)  According to the Complaint, RBS has U.S.-based employees who trade derivatives, and RBS transacted in Euribor-based derivatives with counterparties in the United States.  (Compl't ¶ 89.)

The Complaint alleges that RBS joined the conspiracy to rig the Euribor when Moryoussef began his employment there in August 2007.  (Compl't ¶¶ 67, 90.)  That same month, he contacted two former subordinates at Barclays to coordinate the manipulation of one-month and three-month Euribor tenors.  (Compl't ¶ 158.)  The Complaint does not allege additional conduct or communications on the part of RBS that relate to defendants' allege conspiracy to rig the Euribor.

The Complaint fails to allege that RBS's "suit-related conduct . . . create[d] a substantial connection with the forum."  Walden, 134 S. Ct. at 1121.  The allegations of United States presence are limited to the existence of branches in Connecticut and New York and the assertion that the branch employed derivatives traders.  It does not identify any misconduct by

- 94 -

those RBS branches or other persons in the United States.  There is no allegation that any

agreement by RBS to manipulate the Euribor had its "nucleus" or "focal point" in the United

States.  Waldman, 835 F.3d at 340.

The Court therefore concludes that the Complaint does not allege the minimum

contacts between RBS and the United States sufficient to confer specific jurisdiction over

plaintiffs' Sherman Act claim against RBS.

### 7.   The Complaint Fails to Allege Minimum Contacts as to Société Générale.

Société Générale is incorporated and headquartered in France.  (Compl't ¶ 91.)  It

maintains an office in New York, and is licensed, supervised and regulated by the NYSDFS.

(Compl't ¶ 93.)  It also is regulated by the Board of Governors of the Federal Reserve.  (Compl't

¶ 93.)  It is registered as a swap dealer with the CFTC, and publicly describes its United States

business as focused on "Global Banking and Investor Solutions."  (Compl't ¶ 93.)  It has

approximately 1,800 employees in the United States, and offices in six cities in addition to New

York.  (Compl't ¶ 93.)

According to the Complaint, Société Générale became involved in the Euribor-

rigging conspiracy through an employee named Stephane Esper, who had the title of Head of

Euro and U.S. Dollar Short Term Swaps.  (Compl't ¶ 94.)  In July 2006, November 2006,

February 2007 and November 2007, Esper agreed to Moryoussef's requests to submit lower

quotes for the one-month Euribor tenor.  (Compl't ¶ 146, 161, 218, 226-27, 230.)  In June 2006,

Esper told Moryoussef that he was altering Société Générale's Euribor submissions at the request

of Citibank and UBS.  (Compl't ¶ 162.)  Moryoussef told Bittar that he had coordinated with

Société Générale on a "bid fixing" for October 2006.  (Compl't ¶ 209.)  The Complaint alleges

that from January 2007 through May 2007, Société Générale participated with Deutsche Bank and Barclays on 21 "known requests" for lower Euribor submissions.  (Compl't ¶ 245.)

The Complaint fails to allege that Société Générale's "suit-related conduct . . . create[d] a substantial connection with the forum."  <u>Walden</u>, 134 S. Ct. at 1121.  No aspect of Société Générale's alleged involvement in the Euribor conspiracy involved conduct in the United States.  As far as the Court can discern, all allegations relate to the actions of Esper, who is not alleged to have worked out of any of Société Générale's offices in the United States and is not alleged to have involved any of the bank's U.S. employees.  The Complaint does not allege that Esper communicated with any United States person in furtherance of the conspiracy to fix the Euribor, and the United States is not alleged to have been a "nucleus" or "focal point" of Société Générale's participation in the Euribor conspiracy.  <u>Waldman</u>, 835 F.3d at 340.

The Court therefore concludes that the Complaint does not allege the minimum contacts between Société Générale and the United States sufficient to confer specific jurisdiction over plaintiffs' Sherman Act claim against Société Générale.

### 8.   <u>The Complaint Fails to Allege Minimum Contacts as to ICAP.</u>

Defendant ICAP plc is headquartered and incorporated in the United Kingdom.  (Compl't ¶ 101.)  Defendant ICAP Europe Limited is alleged to be a wholly owned subsidiary of non-party ICAP Group Holdings plc, which is, in turn, a wholly owned subsidiary of ICAP plc.  (Compl't ¶ 101.)  ICAP Europe Limited is headquartered in London.  (Compl't ¶ 101.)  The Complaint collectively refers to the two ICAP defendants collectively as "ICAP," and does not distinguish between them in its allegations.

ICAP provides "independent brokering services" to commercial and investment banks, and is "active" in the derivatives market.  (Compl't ¶ 102.)  ICAP has "dedicated

derivatives teams" in New York and Chicago.  (Compl't ¶ 102.)  It brokers Euro currency trades

in the United States through an electronic system based in New York.  (Compl't ¶ 102.)

ICAP was not a submitter to the Euribor panel.  The Complaint alleges that ICAP

participated in an effort to "spoof" the market, which, as previously noted, was the alleged

practice of transmitting false bids and offers for Euro deposits in order to create the illusion that

the market was moving in certain directions, and thereby deceive other Euribor submitters.

(Compl't ¶¶ 194-95.)  The allegations concerning ICAP's conduct are limited: Moryoussef

instructed Bittar "tell [ICAP] to raise the 6m" – apparently a reference to the six-month Euribor

rate.  (Compl't ¶ 195.)  According to plaintiffs, this was an attempt to influence other contributor

banks to make higher six-month Euribor submissions.  (Compl't ¶ 195.)  Later, Moryoussef

informed Bittar that he "had dinner with icap yesterday," and that someone from ICAP informed

him "that citi was asking him for feb eonia."  (Compl't ¶ 198.)  "EONIA" is an abbreviation of

the Euro OverNight Index Average, which is an interest rate for overnight Euro deposits.

(Compl't p. 16 n.21.)

To the extent that the Complaint includes allegations as to ICAP's conduct, they

are limited to a discussion where Moryoussef directs Bittar to exercise influence on ICAP, and

Moryoussef's summary of comments that an ICAP employee made at a dinner, the relevance of

which is not clear to any conduct by ICAP.[18]  Not only does the Complaint fail to allege that

ICAP actually undertook action to "spoof" Euribor submitters, it fails to allege any United States

connection to the alleged communications or how any ensuing conduct "create[d] a substantial

---

[18] In a footnote, defendants urge the Court to dismiss all claims against ICAP pursuant to Rule 12(b)(6), Fed. R. Civ.
P.  (Def. Mem. at 17 n.19.)  Because the argument is raised in summary fashion and this Court concludes that it does
not have personal jurisdiction over ICAP, it does not reach the issue of whether the Complaint states a claim for
relief as to ICAP.

connection with" the United States.  <u>Waldman</u>, 835 F.3d at 341.  It does not allege that ICAP

engaged in "spoofing"-related conduct directed to or from the United States.

>        The Court therefore concludes that the Complaint does not allege minimum

contacts between the two ICAP defendants and the United States sufficient to confer specific

jurisdiction of plaintiffs' Sherman Act claim against ICAP.

>        E.  Plaintiffs Have Not Alleged Any Additional Basis for Exercising Jurisdiction
>            <u>over Their State Law Claims Against Any Foreign Defendant.</u>

>        Lastly, plaintiffs have not offered any additional basis for exercising personal

jurisdiction over UBS, RBS and Société Générale for the unjust enrichment and breach of

implied covenant claims alleged by FrontPoint Australian and CalSTRS.  For the reasons

discussed, this Court has concluded that no defendant consented to New York jurisdiction based

on the forum-selection clause of a Master Agreement, and that no defendant's filing pursuant to

New York Banking Law § 200 operated as a consent to jurisdiction.  The Court has further

concluded that UBS and RBS are not judicially estopped from challenging personal jurisdiction

in New York on due process grounds.

>        Plaintiffs argue that the Court "should also assert supplemental jurisdiction over

Plaintiffs' state law claims because there is no dispute that they have a 'nucleus of pertinent facts

in common with a substantial federal claim.'"  (Opp. Jur. Mem. at 11 n.14 (quoting <u>Hargrave v.</u>

<u>Oki Nursery, Inc.</u>, 646 F.2d 716, 719 (2d Cir. 1980).)  <u>See generally</u> <u>IUE AFL-CIO Pension</u>

<u>Fund v. Herrmann</u>, 9 F.3d 1049, 1056 (2d Cir. 1993) ("[U]nder the doctrine of pendent personal

jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and

state claims derive from a common nucleus of operative fact, the district court may assert

personal jurisdiction over the parties to the related state law claims even if personal jurisdiction

is not otherwise available.").  However, because the Court concludes the plaintiffs have not made

out a prima facie case personal jurisdiction over any Foreign Defendant under a national contacts analysis, there is no basis to exercise supplemental personal jurisdiction over plaintiffs' state-law claims.

The Court therefore concludes that plaintiffs have not made a prima facie showing that this Court has personal jurisdiction over any Foreign Defendant as to plaintiffs' state law claims.

F.   Plaintiffs' Request for Jurisdictional Discovery Is Denied.

Plaintiffs request that, in the alternative to dismissing their claims, this Court permit jurisdictional discovery.  (Opp. Jur. Mem. at 20.)  They seek, among other things, discovery of defendants' Master Agreements, evidence of "conspiratorial conduct," and cooperation between defendants' Euribor submitters and United States traders.  (Id.)  "A district court has wide latitude to determine the scope of discovery, and is typically within its discretion to deny jurisdictional discovery when the plaintiff has not made out a prima facie case for jurisdiction."  Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393, 401 (2d Cir. 2009) (quotation marks and alteration omitted).

Plaintiffs have not made out a prima facie case of jurisdiction.  Their request for jurisdictional discovery is therefore denied.

CONCLUSION.

Defendants' motion to dismiss for lack of subject matter jurisdiction is DENIED.

Because only FrontPoint Australian and CalSTRS can act as efficient enforcers of the antitrust laws, the Complaint's Sherman Act claims are dismissed as to all other plaintiffs on grounds of antitrust standing.  The Complaint plausibly alleges the existence of a price-fixing conspiracy as to Count One only, and Count Two, Count Three and Count Four are therefore

dismissed in their entirely.  The Complaint fails to state a claim as to Counts Five through Seven

except as to defendants UBS and Rabobank.  Counts Eight and Nine are dismissed because

plaintiffs' RICO claims are based on extraterritorial predicate acts.  The Complaint plausibly

alleges claims of unjust enrichment and breach of the implied covenant of good faith and fair

dealing as to Counts Ten and Eleven.

Because plaintiffs have not made out a prima facie case of personal jurisdiction

over any Foreign Defendant, the claims against all Foreign Defendants are dismissed.

Therefore, all claims are dismissed in this action, except to the extent that Count

One, Count Ten and Count Eleven are asserted against the Citi defendants and the J.P. Morgan

defendants.

The Clerk is directed to terminate the motion.  (Docket # 197.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       February 21, 2017

- 100 -