# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN SULLIVAN, WHITE OAK FUND LP, CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, SONTERRA CAPITAL MASTER FUND, LTD., FRONTPOINT PARTNERS TRADING FUND, L.P., AND FRONTPOINT AUSTRALIAN OPPORTUNITIES TRUST on behalf of themselves and all others similarly situated, | Docket No. 13-cv-02811 (PKC) |

Plaintiffs,

- against -

BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., CITIGROUP, INC., CITIBANK, N.A., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., CRÉDIT AGRICOLE S.A., CRÉDIT AGRICOLE CIB, DEUTSCHE BANK AG, DB GROUP SERVICES UK LIMITED, HSBC HOLDINGS PLC, HSBC BANK PLC, ICAP PLC, ICAP EUROPE LIMITED, J.P. MORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, SOCIÉTÉ GÉNÉRALE SA, UBS AG AND JOHN DOE NOS. 1-50,

Defendants.

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND FILE THE PROPOSED FIFTH AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ii

ARGUMENT ..................................................................................................................................5

I.      Leave to amend "shall be freely given." ...........................................................................5

II.     The proposed amendments are not futile. ..........................................................................5

    A. RBS and UBS consented to jurisdiction in New York pursuant to ISDA Master
    Agreements with Plaintiff CalSTRS. ....................................................................................6

    B. The Court has specific personal jurisdiction because the Foreign Defendants violated the
    antitrust laws from within the United States. .........................................................................9

        1. The PFAC's new allegations explain how Defendants' Sherman Act violation took place
        in the United States. ........................................................................................................10

        2. The PFAC alleges that components of the Foreign Defendants' manipulation, and
        necessary elements of Plaintiffs' cause of action, occurred here in the United States,
        and therefore give rise to personal jurisdiction over the Foreign Defendants. ..............12

    C. The Foreign Defendants' deliberate use of the instrumentalities of the U.S. financial
    markets to exploit customers transacting in Euribor-based derivatives here far exceeds what is
    required for "purposeful availment." ....................................................................................14

    D. Defendants' trading of futures contracts on a U.S. exchange is itself sufficient to
    demonstrate purposeful availment. .......................................................................................19

    E. All Defendants are subject to this Court's personal jurisdiction by virtue of their
    participation in a conspiracy that purposefully availed itself of the forum. ................................20

    F. There is no legal distinction between the Foreign Defendants and their New York
    branches—therefore a consent to jurisdiction by the branch constitutes consent to jurisdiction
    by the bank. .........................................................................................................................21

III.    Plaintiffs did not delay in bringing their motion to amend and are acting in good faith. .........22

IV.     Defendants will not suffer undue prejudice if this Court grants leave to amend. ......................22

CONCLUSION ..............................................................................................................................23

<u>T</u>ABLE OF <u>A</u>UTHORITIES

## Cases

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13-cv-981, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ....................................................................................................................................24

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699 (2d Cir. 2010) ..........................5

*Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 45 N.Y.S. 3d 276 (2016) .......................................................17

*Azkour v. Haouzi*, No. 11-cv-5780, 2012 WL 3667439 (S.D.N.Y. Aug. 27, 2012) ..................................25

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002)................... 4, 18, 19

*Bayerische Landesbank, New York Branch v. Barclays Capital, Inc.*, 902 F. Supp. 2d 471 (S.D.N.Y. 2012).24

*Blagman v. Apple, Inc.*, No. 12 Civ. 5453, 2014 WL 2106489 (S.D.N.Y. May 19, 2014) ........................25

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ........................................................................ 16, 19

*Calder v. Jones*, 465 U.S. 783 (1984).........................................................................................................11

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) ..................................................14

*Cutco Indus., Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) .....................................................................6

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95 (2d Cir. 2006) .......................................................................7

*DiStefano v. Carozzi N. Am. Inc.*, 286 F.3d 81 (2d Cir. 2001) ....................................................................6

*ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35 (S.D.N.Y.1999).................................................................20

*Foman v. Davis*, 371 U.S. 178 (1962).........................................................................................................5

*Ford v. United States*, 273 U.S. 593 (1927) ......................................................................................... 22, 23

*Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016) ..............................................................10

*Gucci America, Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015)..................................................16

*In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008)...........................21

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ....................................................................................................................................24

*In re LIBOR-Based Financial Instr. Antitrust Litig.* ("*LIBOR IV*"), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015)...................................................................................................................................23

*In re LIBOR-Based Financial Instr. Antitrust Litigation*, No. 11 MDL 2262, 2016 WL 1558504 (S.D.N.Y. Apr. 14, 2016)) ................................................................................................................24

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) ...........................................5

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 399 F. Supp. 2d 325 (S.D.N.Y. 2005) .....14

*In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) ................................................22

*In re Pfizer Inc. Sec. Litig.*, No. 04 Civ. 9866, 2012 WL 983548 (S.D.N.Y. Mar. 22, 2012).....................25

*In re Vitamin C Antitrust Litig.*, 06 MD 1738, 2012 WL 12355046 (E.D.N.Y. Aug. 8, 2012)................4

*Indosuez International Fin. B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 746 N.Y.S. 2d 631 (2002) ...... 8, 19

*Joblove v. Barr Labs., Inc.*, 466 F.3d 187 (2d Cir. 2006) .................................................................5

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08-cv-9116, 2009 WL 1357946 (S.D.N.Y. May 12, 2009) ...............................................................................................................................26

*Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229 (2d Cir. 2007).............................................6

*Levitin v. Sony Music Entertainment*, 101 F. Supp. 3d 376 (S.D.N.Y. 2015) ................................14

*Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ............................................16

*Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013)...........................................16

*Melissa & Doug, LLC v. LTD Commodities, LLC*, No. 15-CV-8085 (JPO), 2016 WL 4367975 (S.D.N.Y. Aug. 15, 2016) .......................................................................................................15

*Merrill Lynch Capital Servs., Inc. v. Prairie Pride, Inc.*, No. 10-cv-5223 (DAB), 2011 WL 1044887 (S.D.N.Y. Mar. 10, 2011) .....................................................................................................20

*Motorola Credit Corp. v. Uzan*, 132 F. Supp. 3d 518 (S.D.N.Y. 2015) .........................................24

*Nat'l Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311 (1964) .........................................................7

*Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013) ...............................................................23

*Official Committee of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank,* 549 Bankr. 56 (S.D.N.Y. 2016)....................................................................................................................17

*Ouedraogo v. A-1 Int'l Courier Serv.*, No. 12 Civ. 5651, 2013 WL 3466810 (S.D.N.Y. July 8, 2013) ........6

*P.T. Adimitra Rayapratama v. Bankers Tr. Co.*, No. 95 Civ. 0786 (JSM), 1995 WL 495634 (S.D.N.Y. Aug. 21, 1995) .....................................................................................................................9

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617 (2d Cir. 2009)...........................6

*Parex Bank v. Russian Sav. Bank*, 116 F. Supp. 2d 415 (S.D.N.Y. 2000) ....................................................17

*Robinson v. Overseas Military Sales Corp.*, 21 F.3d 501 (2d Cir. 1994) ...........................................................6

*Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993) ................................................................................8

*San Diego County Employees Retirement Ass'n v. Maounis*, 749 F. Supp. 2d 104 (S.D.N.Y. 2010) ..............21

*Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) .......*passim*

*Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004)...............................................................15

*Trabucco v. Intesa Sanpaolo S.P.A.*, 695 F. Supp. 2d 98 (S.D.N.Y. 2010) ......................................................21

*TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370 (S.D.N.Y. 2010) ..................................................8

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008)................................................................................................................................................21

*United States v. Manuel*, 371 F. Supp. 2d 404 (S.D.N.Y. 2005)....................................................................22

*Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236 (S.D.N.Y. 2014).........................26

*Walden v. Fiore*, 134 S. Ct. 1115 (2014) ................................................................................................ 10, 17

*Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016).....................................10, 17, 18

*Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ....................................................................14

**Rules**

Fed. R. Civ. P. 15(a)(2) .......................................................................................................................................5

**Treatises**

4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1064 (3d ed. 2002) ...............................................................................................................................................7

Plaintiffs[1] respectfully submit this memorandum of law in support of their motion under FED. R. CIV. P. 15(a) to amend the complaint in accordance with the Court's March 8, 2017 Order (ECF No. 294) (the "March 8 Order"). The Proposed Fifth Amended Class Action Complaint (the "PFAC") is attached as Exhibit 1 and a redline comparing the Fourth Amended Class Action Complaint to the PFAC is attached as Exhibit 2.[2]

## PRELIMINARY STATEMENT

While holding that the Complaint adequately alleged claims[3] against the "Foreign Defendants,"[4] the Court dismissed the claims against them for lack of personal jurisdiction, identifying what it found to be deficiencies in Plaintiffs' jurisdictional allegations. *See Sullivan*, 2017 WL 685570, at *38. The PFAC cures these deficiencies: It alleges that the so called Foreign Defendants engaged in substantial conduct in the United States to enact, further, and consummate the objectives of the conspiracy against U.S. resident "end users." ¶¶ 7-8, 240, 301-05 (Defendants specifically acknowledged over tape recorded lines that "end users" are victims of their conspiracy: "who gets f*cked on that [specific manipulation]? I assume its all you short end guys ripping off an end user.").

For example, while failing to disclose that they were in a conspiracy to manipulate, and while in fact extensively manipulating Euribor, the Foreign Defendants acted in the United States: (a) to solicit U.S. residents to purchase or sell Euribor-based derivatives; (b) to accept offers from U.S.

---

[1] "Plaintiffs" means the California State Teachers' Retirement System ("CalSTRS") and FrontPoint Australian Opportunities Trust ("FrontPoint"). Plaintiffs Stephen Sullivan, White Oak Fund LP, Sonterra Capital Master Fund, Ltd., and Frontpoint Partners Trading Fund, L.P., whose claims were dismissed on the merits in the Court's February 21, 2017 Order, reserve all rights, including their rights to appeal the dismissal of their claims.

[2] Citations to "¶ _" refer to the PFAC.

[3] On February 21, 2017, the Court held that Plaintiffs' Fourth Amended Class Action Complaint stated plausible claims for violations of: (1) the Sherman Act against all Defendants for their conspiracy to manipulate Euribor; (2) the Commodity Exchange Act ("CEA") against UBS and Rabobank; and (3) common law for unjust enrichment and breach of the implied covenant of good faith and fair dealing against Plaintiffs' direct counterparties in Euribor-based derivative transactions—against RBS, UBS, Société Générale, Deutsche Bank, Citibank and JPMorgan. *See Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *37 (S.D.N.Y. Feb. 21, 2017) (the "February 21 Order") (ECF No. 286).

[4] The "Foreign Defendants" are Crédit Agricole, S.A., Crédit Agricole CIB, ICAP plc, ICAP Europe Ltd., Rabobank, RBS, Société Générale, and UBS.

residents for such purchases or sales; (c) to enter master contracts with U.S. residents covering such purchases and sales of Euribor-based derivatives; and (d) to direct payments by U.S. residents into U.S. bank accounts to secure the performance of Euribor-based derivatives. ¶¶ 310-490. In addition to enacting the objectives of the conspiracy, the Foreign Defendants' foregoing United States conduct caused antitrust injury and damages in the United States to U.S. residents. These will be critical parts of the claims in this suit (*Sullivan* 2017 WL 685570, *26-28) and of the analyses of Foreign Defendants' "suit-related conduct" for jurisdictional purposes.

Moreover, the PFAC reveals that there was nothing "foreign" about the Foreign Defendants. The "Foreign Defendants" are actually multinational banking and financial services companies that operate—both functionally and legally—no different from a U.S. incorporated banking and financial services company (like Citibank) for purposes of the U.S. Euribor-based derivatives market, and U.S. law.[5] For example, Defendants UBS, RBS, Société Générale, Crédit Agricole, and Rabobank transacted Euribor-based derivatives in the U.S. through U.S. branches. They did so to compete for U.S. business in Euribor-based derivatives on equal footing with U.S. incorporated banks. The U.S. branches of the Foreign Defendants have no independent existence from the "parent," may not be sued separately from the "parent," are not separately capitalized, and do not report their earnings on a stand-alone basis. Thus, there is nothing "foreign" about the banks before the Court, and they are subject to this Court's jurisdiction for the following reasons:

*First*, the PFAC alleges that RBS and UBS consented to jurisdiction in New York for transactions in Euribor-based derivatives with Plaintiff CalSTRS. Plaintiffs specifically address the

---

[5] A "foreign" bank operates out of its home country or from a major financial center, and conducts cross-border business—that is, it does not rely on establishing a physical presence in foreign banking markets. Alternatively, a multinational bank establishes a physical presence in foreign markets in the form of branch offices and/or subsidiary banks. *See* William Goulding and Dianiel E. Nolle, Foreign Banks in the U.S.: A Primer, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM INTERNATIONAL FINANCE DISCUSSION PAPERS (Dec. 2012), *available at* https://www.federalreserve.gov/pubs/ifdp/2012/1064/revision/ifdp1064r.htm.

deficiencies the Court identified in the February 21 Order (*Sullivan*, 2017 WL 685570, at *39) by: (1) showing that CalSTRS is a party to the ISDA Master Agreements related to its claims; and (2) identifying Euribor interest rate swap and Euro foreign exchange forwards transactions that were entered under the terms of each ISDA Master Agreement during the Class Period. The Complaint now connects the consent provision in the ISDA Master Agreements to trades with RBS and UBS made under those agreements that give rise to Plaintiffs' claims.

*Second*, the PFAC includes new allegations explaining how the Foreign Defendants utilized U.S.-based traders, managers, and salespeople to market and sell price-fixed Euribor-based derivatives directly to U.S. investors—like CalSTRS and FrontPoint—whom the Court identified as efficient enforcers of the antitrust laws. *See Sullivan*, 2017 WL 685570, at *14. All of the Foreign Defendants entered the United States and engaged in Euribor-based derivatives trading with U.S.-domiciled investors on U.S. soil. They did so to exploit the U.S. market for Euribor-based derivatives products. Plaintiffs' new allegations demonstrate how Defendants' conspiracy to collusively manipulate Euribor-based derivatives prices was completed in the United States, and how CalSTRS and FrontPoint, along with scores of other U.S. investor counterparties of the Foreign Defendants, suffered domestic antitrust injury in the form of overcharges or underpayments which were paid to and received from the Foreign Defendants using U.S. bank accounts and other domestic facilities.

*Third*, the PFAC alleges that there is no legal distinction between the Foreign Defendants and their U.S. branches, including those which registered under the New York Banking Law § 200. The PFAC also alleges suit-related transactions (*i.e.*, transactions giving rise to causes of action) between Plaintiff CalSTRS and the New York registered branches of Defendants UBS and Société Générale.

*Fourth*, given Defendants' deliberate presence in the U.S. marketplace, domestic acts in furtherance of their conspiracy, and intentional efforts to profit off of U.S. counterparties via the conspiracy, this Court may exercise specific personal jurisdiction over all of the Foreign Defendants.

*Finally*, the PFAC includes new facts which, when coupled with existing allegations, depict how the Foreign Defendants purposefully availed themselves of jurisdiction by reaching into the U.S. Euribor-based derivatives market. The Foreign Defendants' and their co-conspirators' suit-related in-forum acts included: (a) developing Euribor-based derivatives trading platforms and operations in the United States; (b) registering for business licenses in New York and other states that enabled them to trade Euribor-based derivatives in the U.S.; (c) marketing and sales of Euribor-based derivatives directly to U.S. investors through salespeople and other personnel located in the United States; (d) utilizing U.S. facilities, including custodian bank accounts, to execute transactions for price-fixed products from their U.S. offices; (e) negotiating ISDA Master Agreements with U.S. investors to facilitate those transactions; and (f) trading on U.S. exchanges in Euribor-based futures contracts on U.S. exchanges. These suit-related domestic acts of the Foreign Defendants far surpass the type of in-forum contacts the Second Circuit and Supreme Court have held sufficient to confer personal jurisdiction (*see* Part II.B., below).

Plaintiffs' proposed new allegations plausibly show that the Foreign Defendants systematically "enact[ed]" (*Sullivan*, 2017 WL 685570 at *45) and carried out the conspiracy in the United States, causing antitrust injury and damages through conduct undertaken in the United States. The allegations further show that the proof of the antitrust and CEA claims brought by the class heavily depended on the Foreign Defendants' conduct in the United States. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 128 (2d Cir. 2002). Under prevailing personal jurisdiction law, when the Foreign Defendants undertook their newly-alleged U.S. conduct, they were on notice that they would have to defend their conduct in U.S. courts. *In re Vitamin C Antitrust Litig.*, 06 MD 1738, 2012 WL 12355046, at *12 (E.D.N.Y. Aug. 8, 2012) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003)). Plaintiffs' PFAC cures the personal jurisdiction pleading defects over the Foreign Defendants and the motion for leave to amend should be granted.

<u>ARGUMENT</u>

## I.     Leave to amend "shall be freely given."

Rule 15(a)(2) requires that leave to amend "be freely given when justice so requires." Fed. R.

Civ. P. 15(a)(2). In *Foman v. Davis*, 371 U.S. 178 (1962), the Supreme Court instructed that "[i]n the

absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on

the part of the movant, repeated failure to cure deficiencies by amendments previously allowed,

undue prejudice to the opposing party by virtue of allowance of the amendment, futility of

amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" 371 U.S. at 182; *see*

*also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725-26 (2d Cir. 2010).

## II.     The proposed amendments are not futile.

Granting leave to amend is considered futile only if it appears that plaintiff cannot address the

deficiencies identified by the court and allege facts sufficient to cure them. *Joblove v. Barr Labs., Inc.*,

466 F.3d 187, 220 (2d Cir. 2006). "Although courts commonly look to proposed amendments to

determine futility, courts need not determine futility based solely on an assessment of the proposed

amendments—that is, the complaint presented to the court for its consideration." *Panther Partners*

*Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (directing the district court to

consider whether the proposed amendment or different amendments to the complaint should be

allowed (citing *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 235 (2d Cir. 2007))). Instead, courts

may consider all possible amendments when determining futility and the Court should permit

amendment and allow the pleading to be tested again. *Id.*

Where, as here, the Court has not conducted an evidentiary hearing, the plaintiff must only make

a *prima facie* showing that the court possesses jurisdiction. *See DiStefano v. Carozzi N. Am. Inc.*, 286

F.3d 81, 84 (2d Cir. 2001). The court must "construe jurisdictional allegations liberally and take as

true uncontroverted factual allegations." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 501, 507 (2d

Cir. 1994) (internal citations omitted). In addition, the court construes any evidence in the light most favorable to the plaintiff, resolving all doubts in the plaintiff's favor. *Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). "[T]he party opposing an amendment has the burden of establishing that leave to amend would be futile." *Ouedraogo v. A-1 Int'l Courier Serv.*, No. 12 Civ. 5651, 2013 WL 3466810, at *6 (S.D.N.Y. July 8, 2013) (citation omitted).

The proposed amendment is not futile because the PFAC establishes a *prima facie* case that the Foreign Defendants are subject to personal jurisdiction for multiple, legally independent reasons.

### A. RBS and UBS consented to jurisdiction in New York pursuant to ISDA Master Agreements with Plaintiff CalSTRS.

Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) (citing *Nat'l Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315–16 (1964) ("And it is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court . . . ."); 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1064, at 344 (3d ed. 2002); *see also Sullivan*, 2017 WL 685570, at *38.

CalSTRS's claims against RBS and UBS arise from transactions "related to" ISDA Master Agreements that provide for consent to personal jurisdiction in New York. *Sullivan*, 2017 WL 685570, at *39. For both RBS and UBS, Plaintiffs allege: (1) the ISDA Master Agreement in force during the Class Period (*see* PFAC, at Ex. G (the "2004 RBS ISDA Master Agreement");[6] Ex. I (the "2007 UBS ISDA Master Agreement")); (2) the appendices showing that CalSTRS was a party to each agreement (*see* PFAC Ex. H ("Appendix I" to the 2004 RBS ISDA Master Agreement); Ex. J ("Exhibit A" to the 2007 UBS ISDA Master Agreement); (3) the schedules to both the 2004 RBS

---

[6] It makes no difference that the ISDA Master Agreement was executed before the Class Period because the ISDA Master Agreement "sets out overarching terms for all swap transactions" that are subsequently entered into between the parties. *See* ¶¶ 399, 430. The trades between CalSTRS and RBS pursuant to the 2004 ISDA Master Agreement occurred during the Class Period.

ISDA Master Agreement and 2007 UBS ISDA Master Agreement, demonstrating that RBS, UBS and CalSTRS agreed that:

> With respect to any suit, action, or proceedings related to this Agreement . . . each party irrevocably . . . submits to . . . the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City

(Ex G, at 14 (RBS); Ex I, at 12-13 (UBS)); and (4) a list of each Euribor-based interest rate swap and Euro foreign exchange forward that CalSTRS executed with RBS and UBS during the Class Period under the terms of these ISDA Master Agreements. *See* ¶¶ 434, 436, 444. CalSTRS's claims against RBS and UBS arise from the overcharges and underpayments CalSTRS suffered in these transactions. ¶¶ 424-49. They, therefore, unequivocally "relate to" the ISDA Master Agreements governing the terms of the business arrangements surrounding these financial instruments with these Defendants.[7] RBS and UBS are thus subject to personal jurisdiction for "any suit, action, or proceeding" that is "related to" these transactions. *See Sullivan*, 2017 WL 685570, at *38.

CalSTRS's Sherman Act claims and state law claims of unjust enrichment—not just its breach of the implied covenant of good faith and fair dealing claims—"relate to" the ISDA Master Agreements. *See Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993) (a forum-selection clause covering claims "relating to" plaintiffs' contracts applied to securities and RICO claims against non-signatories). Courts in this District routinely hold that a party's consent to jurisdiction in a contract covers antitrust violations that impact the business done under that agreement. *See, e.g.*, *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 379 (S.D.N.Y. 2010) (Stein, J.) ("antitrust

---

[7] These transactions are not just "related to" CalSTRS's ISDA Master Agreements with RBS and UBS; the parties' agreement expressly integrates them into these same agreements. Section 1(c) of the 2004 RBS ISDA Master Agreement and 2007 UBS ISDA Master Agreement provides that the terms of each transaction are incorporated into the ISDA Master Agreement to form a "single agreement" between the parties. ¶¶ 430, 440. Therefore, when RBS or UBS violated the trade terms, for example, by overcharging CalSTRS in a Euro foreign exchange forward, that act breached the ISDA Master Agreement.

claims [that] 'arise out of' or 'relate to' [the contract] are subject to the forum selection clause"); *see also Indosuez International Fin. B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 746 N.Y.S. 2d 631 (2002) (defendant was subject to jurisdiction under the "one global agreement" comprised of the ISDA Master Agreement and trade confirmations with a New York forum-selection clause); *P.T. Adimitra Rayapratama v. Bankers Tr. Co.,* No. 95 Civ. 0786 (JSM), 1995 WL 495634, at *4 (S.D.N.Y. Aug. 21, 1995) (interpreting language "with respect to any suit, action or proceedings relating to [the ISDA] Agreement" to extend to plaintiff's RICO and commodities claims because "the contract is the basic source of the claims").

In this case, Plaintiffs' antitrust claims "arise out of" and "relate to" CalSTRS's ISDA Master Agreements with RBS and UBS because the object of Defendants' conspiracy was to fix the prices of the derivatives CalSTRS traded with RBS and UBS under the terms of those agreements. *See* ¶¶ 404-08, 424-49. Additionally, Section 4 of the ISDA Master Agreement obliges each party to "comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party." ¶ 395. RBS and UBS also breached this term of their agreement with CalSTRS by forming a cartel that sold price-fixed Euribor-based derivatives to CalSTRS and other Class members in the United States in volition of the Sherman Act. The Court also implicitly recognized the "relatedness" between Plaintiffs' antitrust claims and these ISDA Master Agreements when it held that CalSTRS and FrontPoint Australian, by transacting Euribor-based derivatives directly with Defendants, were the only "efficient enforcers" of the antitrust laws. *See Sullivan*, 2017 WL 685570, at *14-18. Without an ISDA Master Agreement in place, CalSTRS could not have traded derivatives with these defendants. These parties irrevocably agreed to jurisdiction in this forum for their disputes, including claims of antitrust violations causing

harm to their contractual relationship. Thus, UBS and RBS consented to this Court's personal jurisdiction.

### B. The Court has specific personal jurisdiction because the Foreign Defendants violated the antitrust laws from within the United States.

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation. For a State to exercise jurisdiction consistent with due process, the defendant's suit related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). Suit-related conduct includes "the conduct that could have subjected them to liability under [the relevant statute]." *Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 335 (2d Cir. 2016).

This Court has already held that Plaintiffs state a *per se* claim for violation of the Sherman Act, which required a determination that Plaintiffs pleaded an agreement by Defendants to fix prices. *Sullivan*, 2017 WL 685570, at *13; *see also Gelboim v. Bank of America Corp.*, 823 F.3d 759, 776 (2d Cir. 2016). To plead a Sherman Act violation, Plaintiffs had to include allegations demonstrating how the effectuation of the conspiracy impacted the Plaintiffs and caused them antitrust injury and damages. *Id.* By limiting the scope of Plaintiffs' antitrust claims to investors that transacted Euribor-based derivatives directly with one or more of the Defendants (*see Sullivan*, 2017 WL 685570, at *15), the Court acknowledged the importance of the Foreign Defendants' Euribor-based derivatives trading, marketing, and sales activities in the United States, all of which occurred through their U.S. presences (*i.e.*, their U.S. branches), which were no different from those of domestic banks. Those contacts now bear heavily on the jurisdictional analysis; only through these in-forum acts could the Foreign Defendants cause the domestic antitrust injury, *i.e.*, taking of money from U.S. investors, and Plaintiffs' antitrust injury. *See Gelboim*, 823 F.3d at 776 (holding that fixing LIBOR is a *per se* Sherman Act violation and noting that "*Socony-Vacuum* allows an antitrust claim based on the influence that a conspiracy exerts on the starting point for prices."). When essential elements of a

cause of action occur in a forum, the Supreme Court has held personal jurisdiction in the forum to be appropriate. *Calder v. Jones*, 465 U.S. 783, 788-89 (1984) (finding jurisdiction over defendants where an essential element of the tort occurred in the forum).

>    1.  *The PFAC's new allegations explain how Defendants' Sherman Act violation took place in the United States.*

There is no factual, legal, or functional distinction between how banks incorporated abroad operate in the Euribor-based U.S. derivatives market (*i.e.*, UBS, RBS, Société Générale, Rabobank, and Crédit Agricole) as compared to "domestic" incorporated banks (*i.e.*, Citibank and JPMorgan).[8] During U.S. trading hours, the "foreign" banks operate as any domestic bank would: through their New York and other U.S. branches, U.S.-based traders, managers, and salespeople. ¶¶ 312-93. As acknowledged by the "foreign" banks, their domestic branches have no separate legal existence from the bank as a whole. ¶¶ 64, 72, 74, 77, 86, 91, 94, 319, 353, 377-79. The "foreign" banks also contractually agree in their agreements with U.S. investors that they are "multi-branch" entities, such that the acts of the U.S. branch during U.S. business hours (i.e., trading manipulated Euribor-based derivatives with U.S. counterparties) are the acts of the bank as a whole. ¶ 398. Thus, from beginning to end, essential parts of Defendants' antitrust violation took place in the forum.

The PFAC describes in detail the machinery through which the Foreign Defendants engaged in the Euribor conspiracy in the United States and traces this *per se* violation from their initial agreement to fix prices by, among other means, making false Euribor submissions abroad, to the marketing and sale of Euribor-based derivatives in the United States and the transfer of money to

---

[8] Every transaction by a New York branch constitutes a transaction by the entire bank, as confirmed by Defendants' ISDA Master Agreements with U.S. investors, which name the banks' U.S. branches as the counterparty. ¶ 398. In fact, Foreign Defendants' ISDA Master Agreements confirm that they are "multibranch entit[ies]," such that any acts undertaken by their U.S. branch in connection with any trade made pursuant to the agreement is deemed to have been made by the bank as a whole—not any branch and certainly not any subsidiary. *Id.* All domestic suit-related acts in furtherance of the antitrust violations which caused domestic antitrust injury to Plaintiffs and scores of other U.S. investors—*i.e.*, signing Master Agreements, executing trades, accepting or making payments and deliveries, sending and receiving notices—were made by each of the Foreign Defendants, not by any legally distinct branch or entity.

and from U.S. accounts that establish the damages element of Plaintiffs' claims. *See* ¶¶ 132-490. For example, during the Class Period, when communications between traders establish an explicit agreement to fix prices, each Foreign Defendant laid the groundwork necessary to exploit the U.S. market:

1. Deutsche Bank, Société Générale, Barclays Bank, Rabobank, Crédit Agricole, and RBS acquired banking licenses from the New York State Department of Financial Services ("NYSDFS") and other federal or state agencies. *See* ¶¶ 45, 63-95, 310. This allowed them to conduct business in the United States, including transactions for the sale of Euribor-based derivatives;

2. Capitalizing on these licenses, they developed massive operations in the United States, hiring sales, marketing, and trading personnel to specifically grow their interest rate derivatives business. *See, e.g.,* ¶¶ 390-93 (Rabobank employed senior management officers to support its interest rate derivatives trading operations in New York); ¶ 351 (Crédit Agricole directed traders in its New York offices to "create strategies and marketing materials, draft term sheets, and design trade ideas" to market Euribor-based derivatives to U.S. counterparties). They further collaborated on market infrastructure projects, either building or joining trading platforms in the United States that allowed them to reach a larger segment of the interest rate derivatives market. *Id.* ¶¶ 339-43 (RBS, UBS, and Société Générale partnered with TradeWeb, a trading network based in New York to reinforce their foothold in gaining institutional clients in the U.S. interest rate swaps market); ¶ 324 (RBS, Société Générale, and UBS formed LiquidityHub); ¶ 361-69 (Société Générale and Crédit Agricole worked with Newedge to market its interest rate derivatives business in the United States)

3. This coincided with an aggressive effort to market and promote interest rate derivatives products and over-the-counter trading, including for Euribor-based derivatives, to institutional investors in the United States. ¶ 312 (RBS, Rabobank, Crédit Agricole, ICAP, and UBS sold and marketed its Euribor-based derivatives to U.S. customers through their status as a dealer on Bloomberg). For example, Rabobank operated its Interest Rate Derivatives Trading Desk directly from its New York office during the Class Period, which was directly aimed at "cross currency swaps and options." ¶ 379. In fact, U.S. investors who wanted to trade with Rabobank in cross currency and interest rate swaps and options were *required* to contact Rabobank's New York derivatives desk. ¶ 378. As another example, Crédit Agricole's foothold in the U.S. market for Euribor-based derivatives was so substantial that it relied on its New York office to manage and direct its entire Interest Rates Strategy team. ¶ 351. Crédit Agricole tasked its New York office with soliciting and selling its services to U.S. investors (¶¶ 345-52), which included marketing its New York personnel as having "strong expertise in foreign exchange, interest rates . . ." and other derivatives. ¶ 355.

4. Each time Defendants acquired new customers, they formalized their relationships with those U.S. counterparties by negotiating and executing ISDA Master Agreements that governed the terms and conditions of all subsequent trades from within the United

States. ¶¶ 427, 437 (RBS and UBS entered into ISDA Master Agreements with named Plaintiffs CalSTRS); ¶ 450 (Société Générale executed a similar master agreement directly with Plaintiff CalSTRS for spot FX transactions); ¶ 394 (the use of ISDA Master Agreements is a common industry practice). These agreements frequently selected New York governing law and provided for consent to jurisdiction in New York. ¶ 460 (Selecting New York jurisdiction is a common industry practice for disputes related to trades made pursuant to ISDA Master Agreements with U.S. counterparties).

5.   These ISDA Master Agreements codified a direct connection to the U.S. market designating U.S.-based offices and personnel to handle trade confirmations and communications between the parties, in addition to specifying custodian bank accounts in the United States that were used to execute Euribor-based derivatives trades. ¶ 433 (RBS named its Connecticut office to be the recipient of certain notices in its Agreement with CalSTRS); ¶ 446 (UBS used its U.S.-based office to execute the agreements).

Using these instrumentalities, the Foreign Defendants extracted domestic profits from their Euribor manipulation, a benefit that directly corresponded to Class members' losses and payments made in the United States. The PFAC explicitly makes this connection, explaining how CalSTRS entered all of its Euribor-based derivative transactions with Defendants using a custodian bank account at State Street Boston. ¶¶ 402-07. From this account, CalSTRS and its U.S. investment advisors, including BlackRock and Western Asset Management Company ("WAMCO"), sent money to the Foreign Defendants *in the United States* to Defendants' bank accounts *in the United States* to pay for price-fixed Euribor-based derivatives. *Id.* at ¶ 405. The Foreign Defendants also made payments for these defective financial products to CalSTRS in the United States. *Id.* at ¶ 406.

2.   *The PFAC alleges that components of the Foreign Defendants' manipulation, and necessary elements of Plaintiffs' cause of action, occurred here in the United States, and therefore give rise to personal jurisdiction over the Foreign Defendants.*

The above facts surpass the type of suit-related contacts that typically gives rise to personal jurisdiction. Indeed, they are more than just "suit-related;" they are necessary components of the Defendants' Sherman Act violations. The Foreign Defendants reached into the forum to contract directly with U.S. counterparties in the derivatives they were manipulating—conduct sufficient for the exercise of personal jurisdiction. *Levitin v. Sony Music Entertainment*, 101 F. Supp. 3d 376

(S.D.N.Y. 2015) (the execution of a suit-related contract in the forum was sufficient to give rise to personal jurisdiction for the defendants' transaction of business in the forum).

The jurisdictional analysis applicable here is no different than any other case in which a non-U.S. defendant enters the U.S. market to sell counterfeit, defective, or otherwise illegitimate products to domestic consumers. *See Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980) (one of the ways by which a defendant could subject itself to personal jurisdiction is by delivering "its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."). Because the antitrust injury and harm to Plaintiffs and Class members arise from the sale of Euribor-based derivatives itself, the Foreign Defendants' location when they agreed to make false Euribor submissions is irrelevant.[9] *See, e.g.*, *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) ("by offering bags for sale to New York consumers . . . and by selling bags . . . to New York consumers, [defendant] has purposefully avail[ed] [him]self of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.") (internal citation omitted); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 399 F. Supp. 2d 325, 331 (S.D.N.Y. 2005) ("a corporation can establish minimum contacts with every state by deliberately 'priming' and 'pumping' the nationwide market with its products"); *Melissa & Doug, LLC v. LTD Commodities, LLC*, No. 15-CV-8085 (JPO), 2016 WL 4367975, at *3 (S.D.N.Y. Aug. 15, 2016) (foreign defendant that supplied copyright-infringing goods to distributors in New York as "part of a larger business plan purposefully directed at New York consumers" was subject to personal jurisdiction).

---

[9] To cast their wrongful conduct as "foreign," the Defendants must convince the Court that the setting of Euribor overseas may be properly dismembered from the pricing of Euribor-based derivatives sold in the United States. But, because the purpose of setting Euribor is to price derivatives uniformly and fairly (e.g., at non-manipulated levels), such acts may not dismembered. There is no difference between the false reporting (and setting) of Euribor overseas and the artificial pricing of derivatives in the United States. They go hand in hand, as the founding members of Euribor (and BBA LIBOR) intended.

Therefore, the Foreign Defendants' marketing and sales of price-fixed financial products in United States, to U.S. investors, and the resulting domestic injury that occurred in those transctions, creates a relationship between "transactions occurring within the [forum] and the cause of action sued upon" sufficient for this Court to exercise personal jurisdiction over the Foreign Defendants. *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) (internal citations and quotations omitted).

### C. The Foreign Defendants' deliberate use of the instrumentalities of the U.S. financial markets to exploit customers transacting in Euribor-based derivatives here far exceeds what is required for "purposeful availment."

With the jurisdictional analysis properly focused on the fact that the Foreign Defendants are not "foreign" banks, but multinational banking and financing institutions that operate—functionally and legally—through their U.S. branches no differently from a U.S. banking institution like Citi or JPMorgan, the jurisdictional question here is not a close call. The law for more than 30 years has been that when a "defendant 'deliberately' has engaged in significant activities within a [forum] . . . or has created 'continuing obligations' between himself and residents of the forum . . . it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985). None of the Foreign Defendants, the largest Euribor-based derivatives dealers in this country, can credibly avoid *Burger King* by claiming that its "activities" here are too insignificant or its "obligations" too sporadic that it would be unreasonable to hold them accountable in the United States for the money they stole from U.S. investors. *See* ¶¶ 301-93.

Given the level of the Foreign Defendants' involvement in the U.S. Euribor-based derivatives market (*see* Part II.B., above), and the direct role those contacts with the forum played in exploiting this same market, the facts here far exceed what courts in this District and in the Second Circuit consider sufficient to establish personal jurisdiction by "purposeful availment." For example:

In *Gucci America, Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015), a trademark dispute concerning imitation handbags sold on a Chinese website, Judge Sullivan held that a foreign bank—which had no role in the alleged counterfeiting scheme—had "purposefully availed" itself of jurisdiction in the United States because one of the bank's accounts in New York was allegedly used to funnel illicit proceeds from certain of the counterfeit purse sales. *Gucci*, 135 F. Supp. 3d. at 95.

In *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012), the Second Circuit held that a Lebanese bank that provided wire transfers for Hezbollah through a correspondent bank in New York which allegedly helped Hezbollah facilitate rocket attacks in Israel had purposefully availed itself of jurisdiction in the United States by reason of the wire transfers. *See Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013).

In *Official Committee of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank,* 549 Bankr. 56 (S.D.N.Y. 2016), the Court upheld personal jurisdiction over foreign defendant banks with correspondent accounts in New York, finding the use of those accounts satisfied both New York's CPLR 302(a)(1) long arm statute and "minimum contacts" under constitutional due process.

Similarly, in *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 45 N.Y.S. 3d 276 (2016), a case concerning an international scheme orchestrated overseas by a Saudi Arabian oil company and a Swiss banker, the court found that it had jurisdiction over the defendants because they, at times, utilized New York bank accounts to launder illicit proceeds from the scheme. 28 N.Y.3d at 322, 45 N.Y.S. 3d at 281 (The defendant's "repeated use of New York correspondent accounts to receive and transfer millions of dollars in illicit funds" subjected it to the court's personal jurisdiction by purposeful availment.).

As the Second Circuit stated in *Waldman*, "a bank that selects and makes use of a particular forum's banking system [is subject to jurisdiction there] for wrongs *related to*, and *arising from, that use*." *Waldman*, 835 F.3d at 342. The Second Circuit said that *Waldman* was different from *Licci*

because the *Waldman* plaintiffs could not allege that U.S. bank accounts funded defendants' terrorism, instead only alleging the defendants were connected to the forum by U.S. lobbying efforts unrelated to the terrorism. *Id.*[10]

Here, the Foreign Defendants utilized New York and U.S. bank accounts (and other U.S. facilities) to send and receive illicit profits from their sale of Euribor-based derivatives to U.S. investors—conduct in and of itself sufficient to give rise to purposeful availment. *See* cases *supra.* Moreover, the Foreign Defendants omitted to disclose the material facts that they were manipulating and conspiring to manipulate Euribor while soliciting and doing U.S. Euribor derivatives transactions with U.S. residents. ¶¶ 301-490, 558-61. Also, after European trading hours close, increased amounts of Defendants' suit-related activity in Euribor derivatives occurred here in this forum. ¶¶ 317, 401. Defendants thus engaged in substantial conduct in the U.S. to enact, further, and consummate the objectives of the conspiracy against and at the expense of U.S. resident end-users. ¶¶ 7-8, 301-09. Only by marketing in the U.S., opening U.S. offices, and exploiting the U.S. market through their U.S. branches (including as their primary operational presence after the close of business in Europe), were Defendants able to continue to enact, effectuate, and consummate their conspiracy.

Far less facts sufficed in *Bank Brussels*, where in a malpractice case against a Puerto Rican law firm, the defendant law firm rented a New York apartment and solicited clients in New York. *Bank Brussels*, 305 F.3d at 120.

> [A]lthough the [defendant] did not solicit [the plaintiff] as a client in
> New York, [the defendant] maintained an apartment in New York
> partially for the purpose of better servicing its New York clients, the

---

[10] This follows established Supreme Court precedent, which has repeatedly "upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond their State and into another' . . . to 'deliberately exploi[t]' a market in the forum State." *See Walden v. Fiore*, 134 S. Ct. at 1122 (internal citation omitted); *see also Parex Bank v. Russian Sav. Bank*, 116 F. Supp. 2d 415, 422 (S.D.N.Y. 2000) (a defendant bank's use of New York accounts for the payment and receipt of funds in the context of an exchange rate transaction, "and its practice of conducting other similar transactions using New York banks establishes [its] 'minimum contacts' with this jurisdiction").

> firm faxed newsletters regarding Puerto Rican legal developments to persons in New York, the firm had numerous New York clients, and its marketing materials touted the firm's close relationship with the Federal Reserve Bank of New York.

*Waldman*, 835 F.3d at 343; *see also Bank Brussels*, 305 F.3d at 128. The firm was subject to personal jurisdiction in New York **even though the plaintiff client did not come to the firm as a result of any of the defendant's New York activities**. Nor did any of the acts of malpractice occur in the forum. The defendant's above-described routine business acts of reaching into the forum to acquire other clients were deemed to "relate to" the claim, and constituted purposeful availment, since "the activities of a firm which maintains its presence and reputation in a particular legal market certainly can be said to be a proximate cause of the engagements it obtains in that market," and "where individuals purposefully derive benefit from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities." *Bank Brussels*, 305 F.3d at 128 (citing *Burger King*, 471 U.S. at 473-74) (internal quotation marks and citations omitted); *see also id.* ("The engagement which gave rise to the dispute here is not simply one of a string of fortunate coincidences [but rather, the defendant sought] to be known in the New York legal market, makes efforts to promote and maintain a client base there, and profits substantially therefrom.").

The New York Court of Appeals has also characterized contacts like these as sufficient for personal jurisdiction. *Indosuez* involved disputes related to ISDA Master Agreements, the same type of agreements at issue in this case. The Court of Appeals held that where "a course of dealing has been established between the parties . . . [in] transactions through a New York bank[, s]uch conduct constitutes purposeful exercise." *Indosuez*, 98 N.Y.2d at 247, 746 N.Y.S. 2d at 636. *Indosuez*'s proclamation on purposeful availment has spurred a clear standard on what circumstances constitute "transacting business in the forum":

> [w]hen determining whether a party transacts business within New

> York, courts look at the "totality of the circumstances," and consider:
> "(1) whether the defendant has an ongoing contractual relationship
> with a New York corporation; (2) whether the contract was negotiated
> or executed in New York; (3) whether the contract contains a New
> York choice-of-law, forum-selection or consent to jurisdiction clause;
> and (4) whether the contract requires notices or payments to be sent
> to New York or requires supervision by the corporation in New York."

*Merrill Lynch Capital Servs., Inc. v. Prairie Pride, Inc.*, No. 10-cv-5223 (DAB), 2011 WL 1044887, at *3

(S.D.N.Y. Mar. 10, 2011) (citations omitted) (interest rate swap counterparty transacted business in

New York through routine business acts including entering into confirmations with plaintiff,

performing thereunder for a year, wiring funds to plaintiff in New York, and keeping in contact with

plaintiff's New York employees; defendant sought to obtain "the manifold benefits that would

derive from affiliation with a nationwide organization" and therefore "purposefully availed" itself of

the privilege of doing business in New York).

Defendants engaged in all four of these categories of activities in the United States:[11] they

contracted with U.S. counterparties to steal from them, contracts which would have been impossible

to form if: (1) Defendants had no offices here; or (2) they only ever signed contracts from foreign

offices; or (3) they required notices be sent to and issued from the same; or (4) they dictated that

payments and collateral be sent to and from foreign accounts; or (5) they required that foreign

sovereigns provide the governing law and jurisdiction.

In *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 57-59 (S.D.N.Y.1999), power company affiliates

"transacted business" in the forum despite having no office, mailing address, representatives,

corporate records, or contract for performance there. The court, using the four-factor test, held that

the totality of forum contacts, while again routine business conduct, was "qualitatively" significant.

---

[11] Your Honor acknowledged in the February 21 Order that "[b]ecause the CEA and the Clayton Act include a provision for nationwide service of process, and the interests in the application of the CEA and the Sherman Act implicate the United States as opposed to the interests of a particular state, this Court . . . decides the issue of personal jurisdiction based on the national contacts of the Foreign Defendants." *Sullivan*, 2017 WL 685570, at *42.

This consisted of solicitation of business in New York, maintenance of a bank account in New York, negotiation of agreements in New York by telephone and facsimile, and the terms in the contract requiring specific performance in New York and/or the Forum Selection Clause.

The PFAC's jurisdictionally-significant allegations go far beyond those that sufficed in the foregoing cases.

### D. Defendants' trading of futures contracts on a U.S. exchange is itself sufficient to demonstrate purposeful availment.

The PFAC's new allegations regarding Defendants' trading of futures contracts on a U.S. exchange likewise demonstrate purposeful availment and subjects them to this Court's jurisdiction. ¶ 29, 198. Consistent with both the Second Circuit's and Supreme Court's reasoning, several courts in this District have found that when a claim arises from a defendant's transactions on a domestic exchange, that defendant is subject to personal jurisdiction. *See San Diego County Employees Retirement Ass'n v. Maounis*, 749 F. Supp. 2d 104, 117-18 (S.D.N.Y. 2010) (holding that foreign defendant "purposely availed [himself]" of New York and was subject to personal jurisdiction as a result of transacting in futures contracts on the New York Mercantile Exchange (internal quotation omitted); *Trabucco v. Intesa Sanpaolo S.P.A.*, 695 F. Supp. 2d 98, 104-05 (S.D.N.Y. 2010) (holding that foreign bank was subject to personal jurisdiction in New York because the plaintiff's claim arose from transactions on the New York Stock Exchange); *see also U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 530 (S.D.N.Y. 2008) (holding that a foreign domiciled defendant had purposefully availed himself of the privilege of conducting business in the United States by placing orders through a NYMEX broker and directed traders under his supervision to trade natural gas futures on the NYMEX); *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 536 (S.D.N.Y. 2008) (Canadian trader subject to jurisdiction where his manipulative futures transactions had "unmistakably foreseeable effects within the United States"). For example, as alleged in the PFAC, Defendants UBS and Rabobank transacted CME currency

futures contracts on the CME and intended to manipulate the prices of those contracts through their manipulation of Euribor. ¶ 198, 411-20, 489-90.

Even if the Complaint did not allege that UBS and Rabobank traded CME currency futures contracts, they would still be subject to this Court's jurisdiction because, as this Court held, the Complaint alleges that they intended to manipulate the prices of CME currency futures contracts. *See Sullivan*, 2017 WL 685570, at \*30–31; *see also In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) (an out-of-forum defendant who did not trade NYMEX natural gas futures contracts, but allegedly intended to "manipulat[e] the market for natural gas futures [that were being traded] on the *New York* Mercantile Exchange," was subject to personal jurisdiction in New York).

### E. All Defendants are subject to this Court's personal jurisdiction by virtue of their participation in a conspiracy that purposefully availed itself of the forum.

Jurisdiction "exists to try one who is a conspirator whenever the conspiracy is in whole or in part carried on in the country whose laws are conspired against." *Ford v. United States*, 273 U.S. 593, 622 (1927). The PFAC's new allegations of suit-related contacts, described above, demonstrate that Defendants did not confine themselves to acts abroad. Defendants' conspiracy had feet planted in the United States, and no one member of that conspiracy can escape this Court's jurisdiction just because its co-conspirators had more substantial contacts. "The Supreme Court has specifically upheld the exercise of jurisdiction over conspirators who have never entered the United States, where the conspiracy was 'directed to violation of the United States law within the United States.'" *United States v. Manuel*, 371 F. Supp. 2d 404, 409 (S.D.N.Y. 2005) (quoting *Ford*, 273 U.S. at 620). A co-conspirator cannot avoid this Court's jurisdiction by remaining overseas and tasking another of its co-conspirator with handling the in-forum aspects of the conspiracy. *Newsome v. Gallacher*, 722 F.3d 1257, 1266 (10th Cir. 2013) ("If three Kansans conspired to fire a cannonball into Oklahoma, we do not believe the Constitution would foreclose Oklahoma courts from exercising jurisdiction over the conspirators simply because they confined themselves to Kansas.").

When one conspirator purposefully makes contacts with the forum to benefit the conspiracy, which at least RBS, UBS, Barclays, Deutsche Bank, Société Générale, ICAP, and Crédit Agricole did, those contacts impute to all other members. *In re LIBOR-Based Financial Instr. Antitrust Litig.* ("*LIBOR IV*"), 2015 WL 6243526, at *29 (S.D.N.Y. Oct. 20, 2015) ("[T]he contacts that one co-conspirator made with a forum while acting in furtherance of the conspiracy may be attributed for jurisdictional purposes to the other co-conspirators."). Your Honor alluded to many of these contacts as in-forum, suit-related, purposeful acts (*Sullivan*, 2017 WL 685570, at *39 (Deutsche Bank's "Monday Risk Calls" in New York, and Barclays' New York manager's involvement in the manipulation), and the PFAC alleges many more. *See* Part II.C., *supra*. These acts give rise to jurisdiction by purposeful availment, and should be imputed to all the other Defendants.

**F.  There is no legal distinction between the Foreign Defendants and their New York branches—therefore a consent to jurisdiction by the branch constitutes consent to jurisdiction by the bank.**

The Court held that there is no personal jurisdiction over any "foreign" defendant by reason of its registration of a New York branch pursuant to New York Banking Law § 200. *Sullivan*, 2017 WL 685570, at *39. To the extent the Court reached its conclusion on the basis that the "foreign" defendant and its New York branch are legally distinct entities, such that the acts of the New York branch may not be considered the acts of the "foreign" defendant, we submit that the PFAC cures this deficiency. For example, the PFAC alleges that the New York branch of a "foreign" defendant is not a distinct legal or corporate entity from the "foreign" bank, is not separately capitalized, does not report their earnings on a stand-alone basis, and that the branch may not be sued separately from the "foreign" bank itself. *Bayerische Landesbank, New York Branch v. Barclays Capital, Inc.*, 902 F. Supp. 2d 471, 472-73 (S.D.N.Y. 2012) ("Under New York law, the domestic branch of a foreign bank is not a separate legal identity from its parent bank."). When the Foreign Defendant registered its New York branch, it registered itself, not a wholly-owned subsidiary or affiliate with a separate

21

corporate existence or formality. Likewise, to the extent the Court reached its decision on the basis that plaintiffs' failed to plausibly allege that their claims arose out of a transaction with a foreign bank's New York branch[12], the PFAC now alleges that certain of CalSTRS' transactions were executed with Société Générale's New York branch.[13]

### III.   Plaintiffs did not delay in bringing their motion to amend and are acting in good faith.

Plaintiffs made this motion without delay, as Plaintiffs sought leave to file this motion within ten days of the Court's February 21 Order, and then moved in accordance with the schedule set forth in the March 8 Order. *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, No. 04 Civ. 9866, 2012 WL 983548, at *2 (S.D.N.Y. Mar. 22, 2012) (motion to amend was "timely, having been made within the time limit previously established by the Court"). And after reviewing the Court's February 21 Order and noting the Court's requirements for personal jurisdiction, Plaintiffs now seek to amend to ensure a full adjudication of the pertinent issues and parties in this action, all at once, after addressing the Court's rulings. Therefore, Plaintiffs are acting in good faith. *See Azkour v. Haouzi*, No. 11-cv-5780, 2012 WL 3667439, at *2 (S.D.N.Y. Aug. 27, 2012) ("[b]ad faith exists when a party attempts to amend its pleading for an improper purpose").

### IV.   Defendants will not suffer undue prejudice if this Court grants leave to amend.

To establish undue prejudice, Defendants bear the burden of demonstrating that amendment would "'(i) require the opponent to expend significant additional resources to conduct

---

[12] *Id.* at *39 (According to plaintiffs, the five defendants who registered under section 200(3) have consented to jurisdiction in New York for all purposes. But the language of section 220(3) expressly provides that registration applies to "a cause of action arising out of a transaction" with the registrant bank's "New York agency ... or branch...." N.Y. Banking L. § 200(3).").

[13] Similar outcome determinative facts were not before the Court in the following decisions: *In re LIBOR-Based Financial Instr. Antitrust Litigation*, No. 11 MDL 2262, 2016 WL 1558504, at *7 (S.D.N.Y. Apr. 14, 2016)); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, 2016 WL 1268267, at *2 (S.D.N.Y. Mar. 31, 2016); *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13-cv-981, 2015 WL 1514539, at *11 (S.D.N.Y. Mar. 31, 2015); *Motorola Credit Corp. v. Uzan*, 132 F. Supp. 3d 518, 521-22 (S.D.N.Y. 2015).

discovery and prepare for trial [or] (ii) significantly delay the resolution of the dispute.'" *Pfizer Inc.*, 2012 WL 983548, at *3 (alteration in original) (citation omitted); *see also Blagman v. Apple, Inc.*, No. 12 Civ. 5453, 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014) ("prior notice of a claim" and "whether the new claim arises from the same transaction as the claims in the original pleading" are central to the analysis of prejudice). Defendants cannot satisfy their burden here.

Defendants will have a full and fair opportunity to develop defenses to the claims asserted against them and, in any event, will have ample opportunity in ongoing discovery to further investigate the factual bases underlying Plaintiffs' allegations and prepare a defense. *See Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 253 (S.D.N.Y. 2014) (granting leave to amend where two months of discovery remained). Granting the motion to amend will not significantly delay the resolution of this dispute. *See JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08-cv-9116, 2009 WL 1357946, at *4-5 (S.D.N.Y. May 12, 2009) (granting motion to amend in the absence of pending dispositive motions or trial date).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs leave to amend and file their Proposed Fifth Amended Class Action Complaint.

Dated:  March 17, 2017
       White Plains, New York

**LOWEY DANNENBERG COHEN
& HART, P.C.**

By: /s/ Vincent Briganti
     Vincent Briganti
     Geoffrey Horn
     Peter D. St. Phillip
     One North Broadway
     White Plains, New York 10601
     Tel.: (914) 997-0500
     Fax: (914) 997-0035
     vbriganti@lowey.com
     ghorn@lowey.com
     pstphillip@lowey.com

**LOVELL STEWART HALEBIAN JACOBSON
LLP**

By: /s/ Christopher Lovell
     Christopher Lovell
     Gary S. Jacobson
     Ian T. Stoll
     61 Broadway, Suite 501
     New York, NY 10006
     Tel.: 212-608-1900
     Fax: 212-719-4677
     clovell@lshllp.com
     gsjacobson@lshllp.com
     istoll@lshllp.com

*Proposed Interim Co-Lead Class Counsel*

     Todd A. Seaver
     **BERMAN DEVALERIO**
     One California Street, Suite 900
     San Francisco, CA 94111
     Telephone: (415) 433-3200
     Facsimile: (415) 433-6282
     tseaver@bermandevalerio.com

     Patrick T. Egan (PE-6812)
     **BERMAN DEVALERIO**
     One Liberty Square
     Boston, MA 02109
     Telephone: (617) 542-8300
     Facsimile: (617) 542-1194
     pegan@bermandevalerio.com

Brian P. Murray
Lee Albert (pro hac vice to be filed)
**GLANCY PRONGAY & MURRAY LLP**
122 East 42nd Street, Suite 2920
New York, NY 10168
Tel.: 212-682-5340
Fax: 212-884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

David E. Kovel
**KIRBY McINERNEY LLP**
825 Third Avenue
New York, NY 10022
Tel.: 212-371-6600
Fax: 212-751-2540
dkovel@kmllp.com

*Additional Counsel for Plaintiffs*