UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN SULLIVAN, WHITE OAK FUND LP, CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, SONTERRA CAPITAL MASTER FUND, LTD., FRONTPOINT PARTNERS TRADING FUND, L.P., AND FRONTPOINT AUSTRALIAN OPPORTUNITIES TRUST on behalf of themselves and all others similarly situated,<br>　　　　　　　　　　Plaintiffs,<br><br>　　　　　　- *against* -<br><br>BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BNP PARIBAS S.A., CITIGROUP, INC., CITIBANK, N.A., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., CRÉDIT AGRICOLE S.A., CRÉDIT AGRICOLE CIB, DEUTSCHE BANK AG, DB GROUP SERVICES UK LIMITED, HSBC HOLDINGS PLC, HSBC BANK PLC, ICAP PLC, ICAP EUROPE LIMITED, J.P. MORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, SOCIÉTÉ GÉNÉRALE SA, UBS AG AND JOHN DOE NOS. 1-50,<br>　　　　　　　　　　Defendants. | Docket No. 13-cv-02811 (PKC) |

**DECLARATION OF VINCENT BRIGANTI AND CHRISTOPHER LOVELL**

Vincent Briganti and Christopher Lovell, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1. We, Vincent Briganti and Christopher Lovell, are members of the Bar of this Court and, respectively, are a shareholder with the law firm Lowey Dannenberg, P.C. ("Lowey Dannenberg") and a partner with the law firm Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart" and with Lowey Dannenberg, "Interim Lead Counsel"). We submit this Joint Declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement with Defendants Citigroup Inc. and Citibank, N.A. (collectively, "Citi") and JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. (collectively, "JPMorgan" and, collectively with Citi, the "Settling Defendants"), Scheduling Hearing for Final Approval Thereof and Approval of the Proposed Form and Program of Notice to the Settlement Class. We have personal knowledge of the matters set forth herein involving our respective firms, based on our active supervision of and participation in the prosecution and settlement of the claims asserted in this Action.

2. A true and correct copy of the Stipulation and Agreement of Settlement between Plaintiffs, JPMorgan and Citi dated November 21, 2018 (the "Settlement Agreement" or "Agreement"), is attached as Exhibit 1.[1]

3. Attached hereto as Exhibit 2 is a true and correct copy of the Affidavit of Linda V. Young, dated November 21, 2018.

4. Attached hereto as Exhibit 3 is a true and correct copy of the Proposed Mailed Notice.

5. Attached hereto as Exhibit 4 is a true and correct copy of the Proposed Publication Notice.

---

[1] Capitalized terms have the same meaning as in the Settlement Agreement.

6. Attached hereto as Exhibit 5 is a true and correct copy of the Proof of Claim and Release form.

7. Attached hereto as Exhibit 6 is Lowey Dannenberg's Firm Resume.

8. Attached hereto as Exhibit 7 is Lovell Stewart's Firm Resume.

9. **Experience**. Interim Lead Counsel are experienced in prosecuting claims under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*, and Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq. See* Exhibits 6-7. Interim Lead Counsel's experience includes obtaining, as court-appointed lead or co-lead counsel or individual plaintiff's counsel, what at the time were the first, second, third, and fourth largest class action recoveries ever under the Commodity Exchange Act.[2]

10. Mr. Briganti has nearly twenty years of experience in successfully developing and leading the prosecution of federal commodity manipulation, antitrust, and securities litigation matters. Currently, Lowey Dannenberg serves as court-appointed class counsel in multiple cases alleging anticompetitive conduct and manipulation of the world's most important financial benchmarks, including among others the London Interbank Offered Rate ("LIBOR") for the Japanese Yen ("Yen-LIBOR") and the Tokyo Interbank Offered Rate ("Euroyen TIBOR") (*Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (S.D.N.Y.) & *Sonterra Capital Master Fund Ltd. et al v. UBS AG et al*, No. 15-cv-5844 (S.D.N.Y.), Swiss Franc LIBOR (*Sonterra Capital Master Find Ltd. et al. v. Credit Suisse Group AG et al.*, Case No. 15-cv-871 (SHS) (S.D.N.Y.)), and the London Silver Fixing (*In re: London Silver Fixing Ltd., Antitrust Litigation*, Case No. 14-md-2573 (VEC) (S.D.N.Y.).

---

[2] *See In re Sumitomo Copper Litigation*, Master File No. 96 CV 4854 (S.D.N.Y.) (Pollack, J.) ($149 million settlement); *Hershey v. Pacific Investment Management Corp.*, Case No. 05-C-4681 (RAG) (N.D. Ill.) ($118.75 million settlement); *In re Natural Gas Commodity Litigation*, Master File No. 03 CV 6186 (S.D.N.Y.) (Marrero, J.) ($101 million settlement); and *In re Amaranth Natural Gas Commodities Litigation*, Master File No. 07 Civ. 6377 (S.D.N.Y) (Scheindlin, J.) ($77.1 million settlement).

11. Mr. Lovell has more than 40 years of experience with antitrust and commodity futures claims. Mr. Lovell founded and has been the Senior Partner at Lovell Stewart. Lovell Stewart and its predecessors ("the Firm") have obtained as Court appointed Lead Counsel or Co-Lead Counsel, what were at the times the largest class action recoveries under three federal statutes, two of which (the antitrust laws and commodity laws) are the primary statutes at issue here. *See* Ex. 7. The Firm has successfully tried antitrust and derivatives claims, and recovered billions of dollars for the benefit of its clients or class members during the Firm's history. *Id.*

12. **Well-Informed**. Before reaching the Agreement, Interim Lead Counsel was well-informed regarding the strengths and weaknesses of Plaintiffs' claims. Lowey Dannenberg and Lovell Stewart extensively reviewed and analyzed the following documents and information: (i) government settlements, including plea, non-prosecution and deferred prosecution agreements; (ii) publicly available information relating to the conduct alleged in Plaintiffs' complaints; (iii) ACPERA and settlement cooperation from Barclays plc, Barclays Bank plc, and Barclays Capital, Inc. (collectively, "Barclays") in this Action, and settlement cooperation from HSBC Holdings plc and HSBC Bank plc (collectively, "HSBC") and Deutsche Bank AG and DB Group Services (UK) Ltd. (collectively, "Deutsche Bank") in this Action; (iv) expert and industry research regarding Euribor and Euribor-Based Derivatives futures and over-the-counter markets; and (v) prior decisions of this Court and others deciding similar issues. In addition, Interim Lead Counsel: (a) conducted an extensive investigation into the facts and legal issues in this Action; (b) engaged in extensive negotiations with Citi and JPMorgan, including three separate mediation sessions; and (c) took many other steps to research and analyze the strengths and weaknesses of the claims, including ongoing consultations with a leading commodity manipulation consulting expert.

13. **Procedural History**. On February 12, 2013, Plaintiff Stephen Sullivan filed the first class action complaint in this Action in the United States District Court for the Northern District of

Illinois captioned *Sullivan v. Barclays PLC et al.*, 13-cv-1159 (N.D. Ill.), individually and on behalf of a proposed class of U.S. investors who purchased or sold a NYSE Euronext LIFFE Euro Interbank Offered Rate futures contract ("Euribor futures contracts") during the period of at least June 1, 2005 through at least June 30, 2010. The complaint alleged violations of the Sherman Antitrust Act, 15 U.S.C. § 1, and common law arising from the alleged manipulation by Defendants of Euribor and the prices of Euribor futures contracts.

14. On April 25, 2013, the Honorable Milton I. Shadur ordered that the Action be transferred to the U.S. District Court for the Southern District of New York ("S.D.N.Y."). On April 29, 2013, the Action was transferred to the S.D.N.Y. and assigned to the Honorable P. Kevin Castel.

15. On November 2, 2013, Plaintiffs filed their Amended Class Action Complaint. ECF No. 75. On May 2, 2014, Plaintiffs filed their Second Amended Class Action Complaint ("SAC"). ECF Nos. 109, 113.

16. On September 11, 2014, the Court granted the motion of the United States Department of Justice, Fraud Section of the Criminal Division and the Antitrust Division, to intervene in this Action and its request for a stay of discovery until May 12, 2015. ECF No. 136.

17. On October 3, 2014, Plaintiffs filed their Third Amended Class Action Complaint ("TAC"). ECF No. 139. The TAC added additional named Plaintiffs, including the California State Teachers' Retirement System.

18. On August 13, 2015, Plaintiffs filed their Fourth Amended Class Action Complaint ("FAC").[3] ECF No. 174. In the FAC, Plaintiffs made additional detailed allegations of

---

[3] The FAC asserts eleven claims against Citi, JPMorgan, and nine other banks and an interdealer broker: (i) a conspiracy to restrain competition in and to fix the prices of Euribor-based derivatives in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (iii) bid rigging in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (iv) concerted refusal to deal in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (v) the manipulation of Euribor and the prices of Euribor-based derivatives, in violation of the Commodity

conspiratorial manipulation of Euribor and Euribor Products. *See, e.g.*, FAC, Appendix A and Appendix B. In particular, the FAC alleges that Defendants employed multiple means to manipulate Euribor and the prices of Euribor-based derivatives during the Class Period, including:

- **Coordinating false Euribor submissions**: Defendants organized and influenced brokers and banks to cause Euribor panel members and affiliates to submit interest rate quotes to Thomson Reuters that did not reflect the cost of borrowing Euros in the inter-bank money market. FAC, Part II.A;

- "**Pushing Cash**": Defendants intentionally borrowed or loaned Euros at above or below prevailing market rates to manipulate the cost of borrowing funds in the inter-bank money market, above or below competitive levels in order to manipulate the Euribor submissions. FAC, Part II.B;

- "**Spoofing**": Defendants transmitted false bids and offers for money market instruments through, *e.g.*, inter-dealer brokers, in order to change the perception of the cost of borrowing Euros in the inter-bank money, and directly manipulate Euribor. FAC, Part II.C;

- **Using Derivatives Traders As Submitters**: Certain Defendants caused their derivative traders, who had a profit interest in obtaining lower or higher Euribor submissions, to act as the bank's Euribor submitter and thereby, to maximize the correspondence between the actual Euribor submission and the financial profit interest of the bank. FAC, Part II.A.2-3, Part E.

- **Agreeing on Where to Price Euribor-based Derivatives**: Defendants consulted with one another to determine a mutually beneficial price level before issuing quotes to other market participants and directly manipulate Euribor-based derivatives prices. FAC, Part III.A;

- **Rigging Bids for Euribor-based Derivatives**: Defendants intentionally submitted price quotes worse than their supposed competitors to guarantee a trade with another Defendant at a higher price and cause non-competitive prices of Euribor-based derivatives. FAC, Part III.B;

- **Coordinating Pricing "Runs" Sent to Clients**: Defendants made sure to match prices for multiple Euribor-based derivatives with those other Defendants sent and thereby cause non-competitive prices for Euribor based derivatives. FAC, Part III.C;

---

Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*; (vi) vicarious liability for manipulation of Euribor and prices of Euribor-based derivatives, in violation of Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1); (vii) aiding and abetting the manipulation of Euribor and the prices of Euribor-based derivatives, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1); (viii) racketeering by engaging in wire fraud to transmit false Euribor submissions, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*; (ix) conspiracy to violate RICO, in violation of 18 U.S.C. § 1962(d); (x) unjust enrichment; and (xi) breach of the implied covenant of good faith and fair dealing.

- **Refusing to Deal with Certain Market Participants**: Various Defendants agreed to show "no interest" or not issue price quotes below a certain level and thereby manipulate the price of Euribor-based derivatives. FAC, Part III.D;

- **Sharing Non-Public, Proprietary Information**: Various Defendants included the names of their clients, the pricing curves used by their bank to value their Euribor-based derivatives, their trading positions, and overall contents of their portfolio. FAC, Part III.E; and

- **Trading with Co-Conspirators at Below Market Rates**: Defendants reserved special "members only" pricing for the other Defendants and their affiliates that was unavailable to other market participants. FAC, Part III.F.

19. On December 15, 2015, the Court issued an order preliminarily approving Plaintiffs' settlement with Barclays plc, Barclays Bank plc and Barclays Capital Inc. ("Barclays"). ECF No. 234 (preliminarily approving $94 million Barclays settlement).

20. On January 18, 2017, the Court preliminarily approved Plaintiffs' settlement with HSBC Holdings plc, and HSBC Bank plc. ("HSBC"). ECF No. 279 (preliminarily approving $45 million HSBC settlement).

21. On February 21, 2017, the Court granted in part and denied in part Defendants' motion to dismiss the Fourth Amended Complaint ("FAC"), dismissing Plaintiffs' claims against Coöperatieve Rabobank U.A. (f/k/a Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.), Crédit Agricole S.A., Crédit Agricole CIB, ICAP plc, ICAP Europe Limited, The Royal Bank of Scotland plc, Société Générale SA, and UBS AG (the "Dismissed Defendants") for lack of personal jurisdiction, and sustaining CalSTRS's and FrontPoint Australian's Sherman Act claim for restraint of trade and certain of CalSTRS's state law claims. ECF No. 286 (the "February 21 Order"). The Court also dismissed Plaintiffs Sullivan, White Oak Fund LP, Sonterra Capital Master Fund, Ltd., and FrontPoint Partners Trading Fund, L.P.'s Sherman Act claims, holding that these four Plaintiffs are not efficient enforcers of the antitrust laws. *Id.*

22. On March 3, 2017, Plaintiffs requested permission to file a motion for leave to amend the FAC to cure the jurisdictional deficiencies identified in the February 21 Order. ECF No. 290.

23. On March 7, 2017, Citi and JPMorgan filed a motion for clarification, or, in the alternative, reconsideration of the February 21 Order. ECF Nos. 291-92.

24. On March 7, 2017, the Court granted Plaintiffs permission to file a motion to amend the FAC. ECF No. 294.

25. On March 17, 2017, Plaintiffs filed their motion to amend the FAC, along with their Proposed Fifth Amended Class Action Complaint. ECF Nos. 299, 301.

26. On March 21, 2017, Plaintiffs filed their opposition to Citi and JPMorgan's motion for clarification, or, in the alternative, reconsideration of the February 21 Order. ECF No. 302.

27. Citi and JPMorgan filed their reply memorandum of law in support of their motion on March 28, 2017. ECF No. 303.

28. On March 31, 2017, the Dismissed Defendants filed their memorandum of law and three declarations in opposition to Plaintiffs' motion to amend the FAC. ECF Nos. 308-311.

29. On April 3, 2017, Plaintiffs and HSBC filed a Joint Motion for Issuance of a Request for Judicial Assistance, Appointment of Commissioner and Direction of Submission of Hague Convention Application. ECF No. 315. On April 7, 2017, the Court entered an order granting Plaintiffs and HSBC's joint motion. ECF No. 331.

30. On April 7, 2017, Citi and JPMorgan each filed an answer to the FAC. ECF Nos. 324-325.

31. On April 7, 2017, Plaintiffs filed their reply memorandum of law and the Declaration of Glenn Hosokawa in support of their motion to amend the FAC. ECF Nos. 333-34.

32. On April 10, 2017, the Court held a case management conference and entered a scheduling order. ECF No. 337.

33. On April 18, 2017, the Court granted Citi and JPMorgan's motion for clarification pursuant to Fed. R. Civ. P. 60(a), confirming that the February 21 Order dismissed Plaintiffs' claims based on exchange-traded Euribor Products in their entirety. ECF No. 339. Also, on April 18, 2017, the Court denied Plaintiffs' motion for leave to amend their complaint to add new jurisdictional allegations against the Dismissed Defendants. ECF No. 340.

34. On July 6, 2017, the Court preliminarily approved Plaintiffs' $170 million settlement with Defendants Deutsche Bank AG and DB Group Services (UK) LTD ("Deutsche Bank"), and scheduled hearing for final approval of Plaintiffs' settlement with Deutsche Bank, HSBC and Barclays. ECF No. 364.

35. On January 8, 2018, Plaintiffs moved for preliminary approval of their plan of allocation for their settlements with Deutsche Bank, HSBC, and Barclays [ECF No. 381], which the Court granted on February 16, 2018. ECF No. 392.

36. On March 23, 2018, Plaintiffs moved for final approval of their settlements with Deutsche Bank, HSBC, and Barclays. ECF No. 399.

37. On April 12, 2018, the Court extended request for exclusion deadline in connection with Plaintiffs' Barclays, HSBC, and Deutsche Bank settlements. ECF No. 416.

38. On May 18, 2018, the Court granted final approval of Plaintiffs' Barclays, HSBC, and Deutsche Bank settlements, totaling $309 million (ECF No. 424), and Class Counsel's motions for attorneys' fees and expenses. ECF Nos. 425-26.  The Court also entered judgment dismissing Barclays, HSBC, and Deutsche Bank from the case. ECF Nos. 427, 431.

39. **Arm's-Length**. Negotiations leading to the Agreement were entirely non-collusive and strictly arm's-length. During the course of negotiations, Plaintiffs had the benefit of developing

information from various sources, including government settlements and orders related to Euribor and other benchmarks, other public accounts of alleged manipulation involving Euribor, counsel's investigation into Plaintiffs' claims, industry and expert analysis, ACPERA and settlement cooperation from Barclays, settlement cooperation from HSBC and Deutsche Bank, and information shared by Settling Defendants during the negotiations. We were involved in all aspects of the settlement negotiations on behalf of Plaintiffs.

40. **<u>Settlement Negotiations</u>**. The negotiations with Citi began in 2015. Citi first approached Plaintiffs regarding a potential settlement in May 2015. On June 4, 2015, Interim Lead Counsel met with Citi's counsel in Manhattan for preliminary settlement discussions. During this meeting, Plaintiffs and Citi presented views on the factual and legal issues in the case and the opportunities for settlement. This initial meeting did not result in a settlement.

41. Plaintiffs and Citi continued their dialogue over the next several months. During these discussions, Citi answered questions Plaintiffs developed during their continuing investigation into Citi's alleged involvement in the Euribor manipulation. Plaintiffs described their analysis of the developing case law in benchmark litigation actions, and how such law supported their arguments concerning Citi's potential liability and exposure. Citi repeatedly asserted that it was not liable for the alleged misconduct. However, by October 1, 2016, the parties' negotiations had stalled.

42. On April 28, 2017, Plaintiffs, Citi, and JPMorgan informed the Court of their agreement to pursue private mediation pursuant to the Court's April 10, 2017 Scheduling Order. The parties selected nationally recognized mediator David Geronemus, Esq. to facilitate settlement negotiations.

43. In August of 2017, Plaintiffs, Citi, and JPMorgan scheduled a mediation with Mr. Geronemus for November 21, 2017.

44. On November 21, 2017, Mr. Geronemus held an in-person mediation session between Plaintiffs, Citi, and JPMorgan. Brian J. Bartow, CalSTRS' General Counsel and Chief Compliance Officer, attended the mediation.

45. Over the course of this first mediation session, Interim Lead Counsel were well-informed regarding the strengths and weaknesses of Plaintiffs' claims. Among other sources of information, Plaintiffs had the benefit of: (a) Lowey Dannenberg's and Lovell Stewart's extensive factual and legal research regarding the best possible claims here, (b) ACPERA and settlement cooperation from Barclays and settlement cooperation from HSBC and Deutsche Bank; (c) government orders revealing various facts and findings, and (d) economic analyses concerning the alleged Euribor manipulation.

46. After a full day of negotiations, this first mediation session ended in impasse. In the weeks and months following the impasse, Mr. Geronemus continued engaging with the parties to assess their interest in resuming mediation at a later date.

47. Plaintiffs, Citi and JPMorgan engaged in discovery prior to and following the November 21, 2017 mediation session. Interim Lead Counsel analyzed the documents and transactional data provided by Citi and JPMorgan in response to their documents requests. Plaintiffs continued to work with their economics experts to understand the purported degree of deviation, and the impact of such deviation, on Euribor and the prices of Euribor Products attributable to Citi's and JPMorgan's (and other Defendants') alleged conduct. Plaintiffs sought and received responses to questions posed to Citi's and JPMorgan's corporate representatives. The various information compiled through discovery supplemented their experts' work and formed the basis of Plaintiffs' expert reports. Citi and JPM later deposed Plaintiffs' experts on the contents and bases of their reports.

48. Following the exchange of Citi and JPMorgan's expert report, but before Citi and JPMorgan's expert was deposed, the parties met on July 11, 2018 for a second mediation session. The parties held a third mediation session on July 12, 2018. Mr. Bartow traveled to attend both of these mediation sessions.

49. In addition to the information they had at the first mediation session, Interim Lead Counsel now had expert reports developed both by Plaintiffs and Settling Defendants, the benefit of discovery from Citi and JPMorgan, and analysis of recent cases evaluating similar claims.

50. As the third mediation session concluded on July 12, 2018, the parties were still at a substantial impasse. The parties agreed to continue negotiations on their own. Mr. Geronemus agreed to make himself available if any additional assistance was needed.

51. Plaintiffs, Citi, and JPMorgan then resumed negotiating on Friday, July 13, 2018, and these negotiations continued until 9:30 a.m. on Tuesday, July 17, 2018, when Plaintiffs, Citi, and JPMorgan reached an agreement in principle to settle the case. The Settlement occurred minutes before the start of Citi and JPMorgan's economic expert's deposition.

52. On October 4, 2018, counsel for Plaintiffs, Citi, and JPMorgan signed a Term Sheet after several weeks of hard-fought negotiations on non-monetary settlement terms. The Term Sheet set forth the terms on which the parties agreed, subject to the preparation of a full Settlement Agreement, to settle Plaintiffs' claims against Citi and JPMorgan. At the time the Term Sheet was executed, Interim Lead Counsel were well-informed about the legal risks, factual uncertainties, potential damages and other aspects of the strengths and weaknesses asserted herein. On October 5, 2018, the Parties reported to the Court that a settlement had been reached.

53. Following weeks of arm's-length negotiations, consisting of teleconferences and the exchanges of draft settlement terms, Interim Lead Counsel, on behalf of Plaintiffs, counsel for Citi, and counsel for JPMorgan entered into the Agreement on November 21, 2018. The Settlement

Agreement was the culmination of arms-length, settlement negotiations that had extended over a year.

54. The Agreement was not the product of collusion. Before any financial numbers were discussed in the settlement negotiations and before any demand or counter-offer was ever made, we were well informed about the legal risks, factual uncertainties, potential damages, and other aspects of the strengths and weaknesses of the claims against Citi and JPMorgan.

55. The Agreement involves a structure and terms that are common in class action settlements in this District.

56. The consideration that Citi and JPMorgan have agreed to pay is within the range of that which may be found to be fair, reasonable, and adequate at final approval.

57. Interim Lead Counsel have strong reason to believe that there are at least hundreds of geographically dispersed persons and entities that fall within the Settlement Class definition. This belief is based on data from the Bank of International Settlements which shows that trillions of dollars of Euribor-based interest rate swaps and forward rate agreements were traded within the United States from 2005 through 2011. This belief is also based on data Lowey Dannenberg received through a Freedom of Information Act ("FOIA") request to the Commodity Futures Trading Commission ("CFTC") reflecting the total volume in NYSE LIFFE Euribor futures contracts originating from LIFFE CONNECT Application Program Interfaces assigned to each of LIFFE's members in the United States from 2000 through 2012.

58. Lowey Dannenberg and Lovell Stewart have diligently represented the interests of the Class in this litigation. They investigated and brought the case. They preserved the statute of limitations. They performed all of the years' work developing the 205-page Fourth Amended Complaint, obtaining and reviewing discovery, preparing and analyzing the expert reports and reaching the Settlement with Citi and JPMorgan.

59. Interim Lead Counsel plan to seek up to 19% of the Settlement Fund (or $34,675,000) in attorneys' fees. This amount is based on the agreement between Interim Lead Counsel and Plaintiff CalSTRS that set a graduated fee schedule and limits attorneys' fees in this instance to 19% of the Settlement. Based on unaudited records, through October 2018, Plaintiffs' Counsel had worked approximately 140,000 hours on this Action, with a resulting lodestar of approximately $65,000,000. Interim Lead Counsel also anticipate seeking up to $1,300,000 as reimbursement of costs and expenses incurred since March 1, 2018. Based on our unaudited data, a significant portion of the requested reimbursement will involve discovery and expert costs estimated at approximately $970,000 (with Lowey Dannenberg's costs at approximately $440,000 and Lovell Stewart's costs at approximately $530,000). As done previously, if Plaintiffs' Counsel's expenses exceed $1,300,000, we will nonetheless cap our reimbursement request. Interim Lead Counsel may apply, at the time of any application for distribution to qualifying Settlement Class Members, for an award from the Settlement Fund for reimbursement of costs and expenses incurred in connection with the administration of the Settlement Agreement after the date of the Settlement Hearing. Plaintiffs have not yet decided whether to seek an Incentive Award but have agreed to seek no more than $400,000.

We declare under penalty of perjury that the foregoing is true and correct.

Dated: December 14, 2018

| _____/s/Vincent Briganti_____ | _____ |
| Vincent Briganti | Christopher Lovell |

59.     Interim Lead Counsel plan to seek up to 19% of the Settlement Fund (or $34,675,000) in attorneys' fees. This amount is based on the agreement between Interim Lead Counsel and Plaintiff CalSTRS that set a graduated fee schedule and limits attorneys' fees in this instance to 19% of the Settlement. Based on unaudited records, through October 2018, Plaintiffs' Counsel had worked approximately 140,000 hours on this Action, with a resulting lodestar of approximately $65,000,000. Interim Lead Counsel also anticipate seeking up to $1,300,000 as reimbursement of costs and expenses incurred since March 1, 2018. Based on our unaudited data, a significant portion of the requested reimbursement will involve discovery and expert costs estimated at approximately $970,000 (with Lowey Dannenberg's costs at approximately $440,000 and Lovell Stewart's costs at approximately $530,000). As done previously, if Plaintiffs' Counsel's expenses exceed $1,300,000, we will nonetheless cap our reimbursement request. Interim Lead Counsel may apply, at the time of any application for distribution to qualifying Settlement Class Members, for an award from the Settlement Fund for reimbursement of costs and expenses incurred in connection with the administration of the Settlement Agreement after the date of the Settlement Hearing. Plaintiffs have not yet decided whether to seek an Incentive Award but have agreed to seek no more than $400,000.

We declare under penalty of perjury that the foregoing is true and correct.

Dated: December 14, 2018

_/s/Vincent Briganti_
Vincent Briganti

_[signature]_
Christopher Lovell

14