**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STEPHEN SULLIVAN, WHITE OAK FUND LP, CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, SONTERRA CAPITAL MASTER FUND, LTD., FRONTPOINT PARTNERS TRADING FUND, L.P., AND FRONTPOINT AUSTRALIAN OPPORTUNITIES TRUST on behalf of themselves and all others similarly situated,

Plaintiffs,

– against –

BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BNP PARIBAS S.A., CITIGROUP, INC., CITIBANK, N.A., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., CRÉDIT AGRICOLE S.A., CRÉDIT AGRICOLE CIB, DEUTSCHE BANK AG, DB GROUP SERVICES UK LIMITED, HSBC HOLDINGS PLC, HSBC BANK PLC, ICAP PLC, ICAP EUROPE LIMITED, J.P. MORGAN CHASE & CO., CRÉDIT AGRICOLE CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, SOCIÉTÉ GÉNÉRALE SA, UBS AG AND JOHN DOE NOS. 1-50,

Defendants

Docket No.: 13-cv-02811 (PKC)

**JOINT DECLARATION OF VINCENT BRIGANTI AND CHRISTOPHER LOVELL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT WITH DEFENDANTS CRÉDIT AGRICOLE S.A. AND CRÉDIT AGRICOLE CIB, SCHEDULING HEARING FOR FINAL APPROVAL THEREOF AND APPROVAL OF THE PROPOSED FORM AND PROGRAM OF NOTICE TO THE SETTLEMENT CLASS**

Vincent Briganti and Christopher Lovell, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1. We, Vincent Briganti and Christopher Lovell, are members of the Bar of this Court and, respectively, are Chairman and a shareholder with the law firm Lowey Dannenberg, P.C. ("Lowey Dannenberg") and a partner with the law firm Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart" and with Lowey Dannenberg, "Interim Lead Counsel"). We submit this Joint Declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement with Defendants Crédit Agricole S.A. and Crédit Agricole CIB (collectively, "Crédit Agricole"), Scheduling Hearing for Final Approval Thereof and Approval of the Proposed Form and Program of Notice to the Settlement Class. We have personal knowledge of the matters set forth herein involving our respective firms, based on our active supervision of and participation in the prosecution and settlement of the claims asserted in this Action.

2. A true and correct copy of the Stipulation and Agreement of Settlement between Plaintiffs and Crédit Agricole dated March 10, 2022 (the "Settlement Agreement" or "Agreement"), is attached as Exhibit 1.[1]

3. Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Linda V. Young, dated April 29, 2022, together with Exhibits A through C.

4. Attached hereto as Exhibit 3 is a true and correct copy of the Proposed Mailed Notice.

5. Attached hereto as Exhibit 4 is a true and correct copy of the Proposed Publication Notice.

[1] Capitalized terms have the same meaning as in the Settlement Agreement.

6. Attached hereto as Exhibit 5 is a true and correct copy of the Proof of Claim and Release form.

7. Attached hereto as Exhibit 6 is Lowey Dannenberg's Firm Resume.

8. Attached hereto as Exhibit 7 is Lovell Stewart's Firm Resume.

9. **Experience**. Interim Lead Counsel are experienced in prosecuting claims under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.*, and Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq. See* Exhibits 6-7. Interim Lead Counsel's experience includes obtaining, as court-appointed lead or co-lead counsel or individual plaintiff's counsel, what at the time were the first, second, third, and fourth largest class action recoveries ever under the Commodity Exchange Act.[2]

10. Mr. Briganti has over 25 years of experience in successfully developing and leading the prosecution of federal commodity manipulation, antitrust, and securities litigation matters. Currently, Lowey Dannenberg serves as court-appointed class counsel in multiple cases alleging anticompetitive conduct and manipulation of the world's most important financial benchmarks, including among others: the London Interbank Offered Rate ("LIBOR") for the Japanese Yen ("Yen-LIBOR") and the Tokyo Interbank Offered Rate ("Euroyen TIBOR") (*Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD) (S.D.N.Y.) & *Sonterra Capital Master Fund Ltd. et al. v. UBS AG et al*, No. 15-cv-5844 (GBD) (S.D.N.Y.)); Swiss Franc LIBOR (*Sonterra Capital Master Find Ltd. et al. v. Credit Suisse Group AG et al.*, Case No. 15-cv-871

[2] *See In re Sumitomo Copper Litigation*, Master File No. 96 CV 4854 (S.D.N.Y.) (Pollack, J.) ($149 million settlement); *Hershey v. Pacific Investment Management Corp.*, Case No. 05-C-4681 (RAG) (N.D. Ill.) ($118.75 million settlement); *In re Natural Gas Commodity Litigation*, Master File No. 03 CV 6186 (S.D.N.Y.) (Marrero, J.) ($101 million settlement); and *In re Amaranth Natural Gas Commodities Litigation*, Master File No. 07 Civ. 6377 (S.D.N.Y) (Scheindlin, J.) ($77.1 million settlement).

(SHS) (S.D.N.Y.)); Sterling LIBOR (*Sonterra Capital Master Fund Ltd. et al. v. Barclays Bank plc, et al.*, Case No. 15-cv-3538 (VSB) (S.D.N.Y.)); Australian Bank Bill Swap Rate (BBSW) Derivatives (*Dennis, et al. v. JPMorgan Chase & Co., et al.*, Case No. 16-cv-6496 (LAK) (S.D.N.Y.)); SIBOR / SOR (*Fund Liquidation Holdings LLC v. Citibank, N.A., et al*., Case No. 16-cv-5263 (AKH) (S.D.N.Y.)); and the London Silver Fixing (*In re London Silver Fixing Ltd., Antitrust Litigation*, Case No. 14-md-2573 (VEC) (S.D.N.Y.)).

11. Mr. Lovell has more than 40 years of experience litigating antitrust and Commodity Exchange Act ("CEA") claims. Mr. Lovell founded and has been the Senior Partner at Lovell Stewart. Lovell Stewart and its predecessors have obtained as Court appointed Lead Counsel or Co-Lead Counsel, what were at the times the largest class action recoveries under three federal statutes, two of which (the antitrust laws and commodity laws) are the primary statutes at issue here. *See* Ex. 7. Lovell Stewart has successfully tried antitrust and derivatives claims, and recovered billions of dollars for the benefit of its clients or class members during Lovell Stewart's history. *Id.*

12. **Well-Informed Counsel**. Before reaching the Agreement, Interim Lead Counsel was well-informed regarding the strengths and weaknesses of Plaintiffs' claims. Lowey Dannenberg and Lovell Stewart extensively reviewed and analyzed the following documents and information: (i) government settlements, including plea, non-prosecution and deferred prosecution agreements; (ii) publicly available information relating to the conduct alleged in Plaintiffs' complaints; (iii) ACPERA and settlement cooperation provided by Defendants Barclays, HSBC, Deutsche Bank, and document discovery provided by Defendants JPMorgan and Citi in this Action; (iv) expert and industry research regarding Euribor and Euribor Products in futures and over-the-counter markets; and (v) prior decisions of this Court and others deciding

similar issues. In addition, Interim Lead Counsel: (a) conducted an extensive investigation into the facts and legal issues in this Action; (b) engaged in extensive negotiations with Crédit Agricole; and (c) took many other steps to research and analyze the strengths and weaknesses of Plaintiffs' claims, including ongoing consultations with a leading commodity manipulation consulting expert.

13. **Procedural History**. On February 12, 2013, Plaintiff Stephen Sullivan filed the first class action complaint in this Action in the United States District Court for the Northern District of Illinois captioned *Sullivan v. Barclays PLC et al*., 13-cv-1159 (N.D. Ill.), individually and on behalf of a proposed class of U.S. investors who purchased or sold a NYSE Euronext LIFFE Euro Interbank Offered Rate futures contract ("Euribor futures contracts") during the period of at least June 1, 2005 through at least June 30, 2010. The complaint alleged violations of the Sherman Antitrust Act, 15 U.S.C. § 1, and common law arising from the alleged manipulation by Defendants of Euribor and the prices of Euribor futures contracts.

14. On April 25, 2013, the Honorable Milton I. Shadur ordered that the Action be transferred to the U.S. District Court for the Southern District of New York ("S.D.N.Y."). On April 29, 2013, the Action was transferred to the S.D.N.Y. and assigned to this Court.

15. On November 2, 2013, Plaintiffs filed their Amended Class Action Complaint. ECF No. 75. On May 2, 2014, Plaintiffs filed their Second Amended Class Action Complaint ("SAC"). ECF Nos. 109, 113.

16. On September 11, 2014, the Court granted the motion of the United States Department of Justice, Fraud Section of the Criminal Division and the Antitrust Division, to intervene in this Action and to stay discovery until May 12, 2015. ECF No. 136.

17. On October 3, 2014, Plaintiffs filed their Third Amended Class Action Complaint ("TAC"). ECF No. 139. The TAC added additional named Plaintiffs, including the California State Teachers' Retirement System ("CalSTRS").

18. On August 13, 2015, Plaintiffs filed their Fourth Amended Class Action Complaint ("FAC").[3] ECF No. 174. In the FAC, Plaintiffs made additional detailed allegations of conspiratorial manipulation of Euribor and Euribor Products. *See, e.g.*, FAC, Appendix A and Appendix B. In particular, the FAC alleges that Defendants employed multiple means to manipulate Euribor and the prices of Euribor Products during the Class Period, including:

- **Coordinating false Euribor submissions**: Defendants organized and influenced brokers and banks to cause Euribor panel members and affiliates to submit interest rate quotes to Thomson Reuters that did not reflect the cost of borrowing Euros in the inter-bank money market. FAC, Part II.A;

- "**Pushing Cash**": Defendants intentionally borrowed or loaned Euros at above or below prevailing market rates to manipulate the cost of borrowing funds in the interbank money market to manipulate the Euribor submissions. FAC, Part II.B;

- "**Spoofing**": Defendants transmitted false bids and offers for money market instruments through, *e.g.*, interdealer brokers, in order to change the perception of the cost of borrowing Euros in the inter-bank money, and directly manipulate Euribor. FAC, Part II.C;

- **Using Derivatives Traders As Submitters**: Certain Defendants caused their derivative traders, who had a profit interest in obtaining lower or higher Euribor submissions, to act as the bank's Euribor submitter and thereby maximizing the

[3] The FAC asserts eleven claims against Defendants, including Crédit Agricole:: (i) a conspiracy to restrain competition in and to fix the prices of Euribor Products in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (iii) bid rigging in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (iv) concerted refusal to deal in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (v) the manipulation of Euribor and the prices of Euribor Products, in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*; (vi) vicarious liability for manipulation of Euribor and prices of Euribor Products, in violation of Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1); (vii) aiding and abetting the manipulation of Euribor and the prices of Euribor Products, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1); (viii) racketeering by engaging in wire fraud to transmit false Euribor submissions, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*; (ix) conspiracy to violate RICO, in violation of 18 U.S.C. § 1962(d); (x) unjust enrichment; and (xi) breach of the implied covenant of good faith and fair dealing.

correspondence between the actual Euribor submission and the financial profit interest of the bank. FAC, Part II.A.2-3, Part E.

- **Agreeing on Where to Price Euribor Products**: Defendants consulted with one another to determine a mutually beneficial price level before issuing quotes to other market participants and directly manipulate Euribor Products prices. FAC, Part III.A;

- **Rigging Bids for Euribor Products**: Defendants intentionally submitted price quotes worse than their supposed competitors to guarantee a trade with another Defendant at a higher price and cause non-competitive prices of Euribor Products. FAC, Part III.B;

- **Coordinating Pricing "Runs" Sent to Clients**: Defendants made sure to match prices for multiple Euribor Products with those other Defendants sent and thereby cause non-competitive prices for Euribor based derivatives. FAC, Part III.C;

- **Refusing to Deal with Certain Market Participants**: Various Defendants agreed to show "no interest" or not issue price quotes below a certain level and thereby manipulate the prices of Euribor Products. FAC, Part III.D;

- **Sharing Non-Public, Proprietary Information**: Various Defendants shared the names of their clients, the pricing curves used by their bank to value their Euribor Products, their trading positions, and overall contents of their portfolio. FAC, Part III.E; and

- **Trading with Co-Conspirators at Below Market Rates**: Defendants reserved special "members only" pricing for the other Defendants and their affiliates that was unavailable to other market participants. FAC, Part III.F.

19. On December 15, 2015, the Court issued an order preliminarily approving Plaintiffs' settlement with Barclays plc, Barclays Bank plc and Barclays Capital Inc. ("Barclays"). ECF No. 234 (preliminarily approving $94 million Barclays settlement).

20. On January 18, 2017, the Court preliminarily approved Plaintiffs' settlement with HSBC Holdings plc, and HSBC Bank plc. ("HSBC"). ECF No. 279 (preliminarily approving $45 million HSBC settlement).

21. On February 21, 2017, the Court granted in part and denied in part Defendants' motion to dismiss the Fourth Amended Complaint ("FAC"), dismissing Plaintiffs' claims against

Coöperatieve Rabobank U.A. (f/k/a Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.), Crédit Agricole, ICAP plc, ICAP Europe Limited, The Royal Bank of Scotland plc, Société Générale SA, and UBS AG (the "Dismissed Defendants") for lack of personal jurisdiction, and sustaining CalSTRS's and FrontPoint Australian Opportunities Trust's Sherman Act claim for restraint of trade and certain of CalSTRS's state law claims. ECF No. 286 (the "February 21 Order"). The Court also dismissed Plaintiffs Stephen Sullivan, White Oak Fund LP, Sonterra Capital Master Fund, Ltd., and FrontPoint Partners Trading Fund, L.P.'s Sherman Act claims, holding that these four Plaintiffs are not efficient enforcers of the antitrust laws. *Id.*

22. On March 3, 2017, Plaintiffs requested permission to file a motion for leave to amend the FAC to cure the jurisdictional deficiencies identified in the February 21 Order. ECF No. 290.

23. On March 7, 2017, Citi and JPMorgan filed a motion for clarification, or, in the alternative, reconsideration of the February 21 Order. ECF Nos. 291-92.

24. On March 7, 2017, the Court granted Plaintiffs' request to file a motion to amend the FAC. ECF No. 294.

25. On March 17, 2017, Plaintiffs filed their motion to amend the FAC, along with their Proposed Fifth Amended Class Action Complaint. ECF Nos. 299, 301.

26. On March 21, 2017, Plaintiffs filed their opposition to Citi and JPMorgan's motion for clarification, or, in the alternative, reconsideration of the February 21 Order. ECF No. 302.

27. Citi and JPMorgan filed their reply memorandum of law in support of their motion on March 28, 2017. ECF No. 303.

28. On March 31, 2017, the Dismissed Defendants filed their memorandum of law and three declarations in opposition to Plaintiffs' motion to amend the FAC. ECF Nos. 308-311.

29. On April 3, 2017, Plaintiffs and HSBC filed a Joint Motion for Issuance of a Request for Judicial Assistance, Appointment of Commissioner and Direction of Submission of Hague Convention Application. ECF No. 314. On April 7, 2017, the Court entered an order granting Plaintiffs and HSBC's joint motion. ECF No. 331.

30. On April 7, 2017, Citi and JPMorgan each filed an answer to the FAC. ECF Nos. 324-325.

31. On April 7, 2017, Plaintiffs filed their reply memorandum of law and a declaration in support of their motion to amend the FAC. ECF Nos. 333-34.

32. On April 10, 2017, the Court held a case management conference and entered a scheduling order. ECF No. 337.

33. On April 18, 2017, the Court granted Citi and JPMorgan's motion for clarification pursuant to FED. R. CIV. P. 60(a), confirming that the February 21 Order dismissed Plaintiffs' claims based on exchange-traded Euribor Products in their entirety. ECF No. 339. Also, on April 18, 2017, the Court denied Plaintiffs' motion for leave to amend their complaint to add new jurisdictional allegations against the Dismissed Defendants. ECF No. 340.

34. On July 6, 2017, the Court preliminarily approved Plaintiffs' $170 million settlement with Defendants Deutsche Bank AG and DB Group Services (UK) LTD ("Deutsche Bank"), and scheduled hearing for final approval of Plaintiffs' settlement with Deutsche Bank, HSBC and Barclays. ECF No. 364.

35. On January 8, 2018, Plaintiffs moved for preliminary approval of their plan of allocation for their settlements with Deutsche Bank, HSBC, and Barclays (ECF No. 381), which the Court granted on February 16, 2018. ECF No. 392.

36. On March 23, 2018, Plaintiffs moved for final approval of their settlements with Deutsche Bank, HSBC, and Barclays. ECF No. 399.

37. On April 12, 2018, the Court extended request for exclusion deadline in connection with Plaintiffs' Barclays, HSBC, and Deutsche Bank settlements. ECF No. 416.

38. On May 18, 2018, the Court granted final approval of Plaintiffs' Barclays, HSBC, and Deutsche Bank settlements, totaling $309 million (ECF No. 424), and Class Counsel's motions for attorneys' fees and expenses. ECF Nos. 425-26. The Court also entered judgment dismissing Barclays, HSBC, and Deutsche Bank from the case. ECF Nos. 427, 431.

39. On December 19, 2018, the Court preliminarily approved Plaintiffs' $182.5 million settlement with JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., (collectively, "JPMorgan"), Citigroup Inc., and Citibank, N.A. (collectively, "Citi"). ECF No. 454.

40. On March 22, 2019, Plaintiffs moved for final approval of their settlement with JPMorgan and Citi. ECF Nos. 468-483.

41. On May 17, 2019, the Court granted final approval of Plaintiffs' settlement with JPMorgan and Citi (ECF No. 498), and Class Counsel's motions for attorneys' fees and expenses. ECF Nos. 500-501. The Court also entered judgment dismissing JPMorgan and Citi from the case. ECF Nos. 499.

42. **Appeal to Second Circuit:** On June 14, 2019, Plaintiffs timely filed a Notice of Appeal, and Crédit Agricole and other non-settling defendants filed a Notice of Cross-Appeal on June 28, 2019 to the United States Court of Appeals for the Second Circuit (the "Second

Circuit"). The appeals are currently pending in the Second Circuit and docketed as Case Nos. 19-1769 & 19-2012, respectively (the "Appeals").

43. On August 28, 2019, the Second Circuit granted a motion to hold the Appeals in abeyance pending the Second Circuit's mandate in *In re LIBOR Financial Instruments*, Case No. 17-1569. Following issuance of the mandate on January 20, 2022 in the *In re LIBOR* appeal, the Second Circuit lifted the stay of the Appeals on February 15, 2022 and directed the parties to submit a briefing schedule. *See Sullivan v. Barclays plc et al*, Appeal No. 19-1769 (2d Cir.), ECF No. 132.

44. **Severance and Remand**: In light of the Settlement, on March 17, 2022, Plaintiffs and Crédit Agricole jointly filed a motion in the Second Circuit to sever and remand the Appeals as to Crédit Agricole only so that this Court could review the proposed Settlement pursuant to Rule 23. *See Sullivan v. Barclays plc et al*, Appeal No. 19-1769 (2d Cir.), ECF No. 144. On March 24, 2022, the Second Circuit granted that motion. *See Sullivan v. Barclays plc et al*, Appeal No. 19-1769 (2d Cir.), ECF No. 148; *see also* ECF No. 513 (certified order filed on above-referenced docket).

45. **Arm's-Length**. Negotiations leading to the Settlement Agreement with Crédit Agricole were entirely non-collusive and strictly arm's-length. During the course of negotiations, Plaintiffs had the benefit of developing information from various sources, including government settlements and orders related to Euribor and other benchmarks, other public accounts of alleged manipulation involving Euribor and other benchmarks, counsel's investigation into Plaintiffs' claims, industry and expert analysis including in connection with preparing for class certification, ACPERA and settlement cooperation from Barclays, HSBC, Deutsche Bank, and document discovery from JPMorgan and Citi and information shared by Crédit Agricole during

the negotiations. We were involved in all aspects of the settlement negotiations on behalf of Plaintiffs. In addition, Crédit Agricole is represented by White & Case LLP, a well-respected international law firm with extensive experience litigating antitrust class actions.

46. **Settlement Negotiations**. The negotiations with Crédit Agricole began in November 2019. On November 14, 2019, Interim Lead Counsel and Crédit Agricole's counsel began preliminary settlement discussions, which continued over the next several months. During these meetings, Plaintiffs and Crédit Agricole presented their views on the factual and legal issues in the case and the opportunities for settlement.

47. During these discussions, Crédit Agricole also answered questions Plaintiffs developed during their continuing investigation into Crédit Agricole's alleged involvement in the Euribor manipulation. Plaintiffs described their analysis of the developing case law in benchmark litigation actions, and how such law supported their arguments concerning Crédit Agricole's potential liability and exposure. Crédit Agricole repeatedly asserted that it was not liable for the alleged misconduct. However, by March 2020, the Parties' negotiations had stalled and settlement discussions ceased.

48. Plaintiffs and Crédit Agricole later resumed negotiating in November 2020. After several months of hard-fought negotiations on monetary and certain non-monetary settlement terms, Plaintiffs and Crédit Agricole reached an agreement in principle to settle the case.

49. On June 22, 2021, Counsel for Plaintiffs and Crédit Agricole signed a Term Sheet that set forth the terms on which the parties agreed, subject to the preparation of a full Settlement Agreement, to settle Plaintiffs' claims against Crédit Agricole. At the time the Term Sheet was executed, Interim Lead Counsel were well-informed about the legal risks, factual uncertainties, potential damages and other aspects of the strengths and weaknesses asserted herein.

50. Nine months after execution the Term Sheet, and after more than a year of arm's-length negotiations, consisting of teleconferences and the exchanges of draft settlement terms, Interim Lead Counsel, on behalf of Plaintiffs, and counsel for Crédit Agricole entered into the Agreement on March 10, 2022.

51. The Agreement was not the product of collusion. Before any financial numbers were discussed in the settlement negotiations and before any demand or counter-offer was ever made, we were well informed about the legal risks, factual uncertainties, potential damages, and other aspects of the strengths and weaknesses of the claims against Crédit Agricole.

52. The Agreement involves a structure and terms that are common in class action settlements in this District.

53. The consideration that Crédit Agricole has agreed to pay is within the range of that which may be found to be fair, reasonable, and adequate at final approval.

54. Interim Lead Counsel have strong reason to believe that there are thousands of geographically dispersed persons and entities that fall within the Settlement Class definition. This belief is based on, among other information, data from the Bank of International Settlements which shows that trillions of dollars of Euribor-based interest rate swaps and forward rate agreements were traded within the United States from 2005 through 2011. This belief is also based on data Lowey Dannenberg received through a Freedom of Information Act ("FOIA") request to the Commodity Futures Trading Commission ("CFTC") reflecting the total volume in NYSE LIFFE Euribor futures contracts originating from LIFFE CONNECT Application Program Interfaces assigned to each of LIFFE's members in the United States from 2000 through 2012.

55. Lowey Dannenberg and Lovell Stewart have diligently represented the interests of the Class in this litigation. They investigated and brought the case. They preserved the statute of limitations. They performed all of the years' work developing the 205-page Fourth Amended Complaint, obtaining and reviewing discovery, preparing and analyzing the expert reports and reaching the Settlement with Crédit Agricole.

56. Interim Lead Counsel plan to seek up to 16.50% of the Settlement Fund (or $9,075,000 in attorneys' fees. This amount is based on the agreement between Interim Lead Counsel and Plaintiff CalSTRS that set a graduated fee schedule and limits attorneys' fees in this instance to 16.5% of the Settlement. Interim Lead Counsel also anticipate seeking no more than $1,000,000 as reimbursement of costs and expenses incurred since March 1, 2019. Plaintiffs have not yet decided whether to seek an Incentive Award but have agreed to seek no more than $400,000.

57. All of the Plaintiffs support this Settlement, including CalSTRS, the largest education-only retirement fund in the United States.

We declare under penalty of perjury that the foregoing is true and correct.

Dated: April 29, 2022.

| *[/s/Vincent Briganti](#)* | *[/s/ Christopher Lovell](#)* |
|---|---|
| Vincent Briganti | Christopher Lovell |